No. 2017-1645

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
and AUROMEDICS PHARMA LLC,
Defendants-Appellants,

v.

MYLAN INSTITUTIONAL LLC and APICORE US LLC
Plaintiffs-Appellees

———————————

Appeal From The United States District Court For The Eastern District Of Texas
In Case No. 16-cv-00491, Judge Robert W. Schroeder III

———————————

## APPELLANTS' CORRECTED NONCONFIDENTIAL EMERGENCY
## MOTION FOR STAY OF PRELIMINARY INJUNCTION PENDING
## APPEAL

———————————

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(415) 901-8749

Sailesh K. Patel
Cindy S. Ahn
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5698

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................1

BACKGROUND .............................................................................2

    I.    PROCEDURAL BACKGROUND .......................................2

    II.    FACTUAL BACKGROUND ..............................................3

ARGUMENT ..................................................................................5

    I.    LEGAL STANDARD ........................................................5

    II.    AUROBINDO HAS A STRONG LIKELIHOOD OF
           SUCCEEDING ON THE MERITS OF ITS APPEAL........................5

           A.    Aurobindo Raised A Substantial Question As To
                Infringement Of The Process Patents ...................................... 6

           B.    Aurobindo Raised Substantial Questions As To The
                Validity Of The Purity Patent .................................................. 9

           C.    Aurobindo Is Likely To Show That Apicore Did Not
                Establish The Requisite Causal Nexus To Prove
                Irreparable Harm .................................................................... 12

           D.    Aurobindo Will Likely Show That Apicore Will Not
                Suffer Irreparable Harm Absent An Injunction ..................... 16

    III.    EQUITABLE CONSIDERATIONS WEIGH IN FAVOR OF A
           STAY ..............................................................................17

           A.    Aurobindo Will Suffer Irreparable Harm Absent a Stay ........ 17

           B.    A Stay Pending Appeal Serves The Public Interest................ 19

           C.    A Brief Stay Will Not Irreparably Harm Apicore .................. 20

    IV.    THE BRIEFING SCHEDULE FOR THIS MOTION SHOULD
           BE EXPEDITED .............................................................20

CONCLUSION ..............................................................................21

STATEMENT OF OPPOSITION ..................................................23

CERTIFICATE OF INTEREST ....................................................24

CERTIFICATE OF SERVICE ......................................................26

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott Labs. v. Andrx Pharm., Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006) ....................................................9, 16

*Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*,
    No. CIV.A. 03-1095-KAJ, 2005 WL 3454283 (D. Del. Dec. 16, 2005).............20

*Amazon.com Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) ....................................................6, 10

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012) ........................................................12

*Apple Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) ........................................................16

*Apple Inc. v. Samsung Elecs. Co.*,
    839 F.3d 1034 (Fed. Cir. 2016) ........................................................10

*Apple Inc. v. Samsung Electronics Co.*,
    678 F.3d 1314 (Fed.Cir.2012)..........................................................14

*AstraZeneca LP v. Breath Ltd.*,
    88 F. Supp. 3d 326 (D.N.J. 2015), aff'd, 603 F. App'x 999 (Fed. Cir. 2015)......13

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
    499 F.3d 1293 (Fed. Cir. 2007) ........................................................10

*Biovail Corp. Int'l v. Andrx Pharm., Inc.*,
    239 F.3d 1297 (Fed.Cir.2001)............................................................6

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012)..........................................................16

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    469 F.3d 1005 (Fed. Cir. 2006) ..........................................................8

*Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*,
    339 U.S. 605 (1950)......................................................................7

*Hilton v. Braunskill,*
   481 U.S. 770 (1987)). ...........................................................5

*Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.,*
   No. CV 15-819-LPS-CJB, 2016 WL 4770244 (D. Del. Aug. 12, 2016) ............15

*Interactive Health, LLC v. King Kong USA, Inc.,*
   No. 2009-1141, 2009 WL 1228489 (Fed. Cir. May 1, 2009)..............................5

*Janssen Products, L.P. v. Lupin Ltd.,*
   109 F. Supp. 3d 650 (D.N.J. 2014) ......................................................15

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.,*
   205 F.3d 1377 (Fed. Cir. 2000) ...........................................................7

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,*
   357 F.3d 1319 (Fed. Cir. 2004) ...........................................................6

*Nautilus, Inc. v. Biosig Instr., Inc.,*
   134 S. Ct. 2120 (2014) ...................................................................12

*Otsuka Pharm. Co. v. Torrent Pharma. Ltd.,*
   99 F. Supp. 3d 461 (D.N.J. 2015) .......................................................16

*Qingdao Taifa Grp. Co., Ltd. v. United States,*
   581 F.3d 1375 (Fed. Cir. 2009) ...........................................................6

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
   789 F.3d 1335 (Fed. Cir. 2015) .........................................................12

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
   520 U.S. 17 (1997)........................................................................6

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................. 17, 20

**Statutes**

35 U.S.C. § 103(a) ..............................................................10

# **INTRODUCTION**

Defendants-Appellants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC ("Aurobindo") respectfully submit this emergency motion, pursuant to Fed. R. App. P. 8, to stay and suspend immediately, pending appeal, the February 24, 2017 order of the U.S. District Court for the Eastern District of Texas (Schroeder, J.) preliminarily enjoining Aurobindo from "manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States" as of February 24, 2017. (Addendum C at 3.)

A temporary stay is warranted in this case because Aurobindo has a strong likelihood of success on appeal, and the equities favor a stay. The District Court clearly erred, both legally and factually, in finding that Plaintiffs-Appellees Mylan Institutional LLC ("Mylan") and Apicore US LLC ("Apicore") (collectively, "Apicore") would most likely succeed on the merits of their case. The district court applied the wrong legal standard and disregarded Aurobindo's significant evidence of noninfringement and invalidity of the patents-at-issue. Furthermore, the district court made erroneous irreparable harm findings and failed to apply the correct causal nexus analysis.

Equitable factors also favor a temporary stay in this case. The preliminary injunction irreparably harms Aurobindo and disrupts the market for isosulfan blue,

1

a product surgeons use to detect cancer metastases.[1] Conversely, Apicore will suffer little—if any—harm, and expedited proceedings would minimize any such harm.

## BACKGROUND

## I.    PROCEDURAL BACKGROUND

On May 11, 2016, Apicore filed a complaint against Aurobindo in the Eastern District of Texas alleging infringement of U.S. Patent Nos. 7,662,992 (the "'992 patent") and 8,969,616 (the "'616 patent"; collectively, the "Process Patents"). Apicore amended its complaint on May 31, 2016 alleging infringement of the newly-issued U.S. Patent No. 9,353,050 (the "'050 patent" or "Purity Patent") directed to 99% pure isosulfan blue. Apicore then moved for a preliminary injunction on June 9, 2016. Aurobindo raised substantial questions both as to the infringement of the Process Patents under the doctrine of equivalents—Apicore did not allege literal infringement—and the validity of the Purity Patent. On November 2, 2016, Magistrate Judge Roy Payne presided over an evidentiary hearing relating to Apicore's motion for preliminary injunction.

On November 21, 2016, Magistrate Judge Payne issued a Report and Recommendation ("R&R") that Apicore's motion for preliminary injunction be granted. (Addendum D at 52.)  On February 7, 2017, the District Court Judge

---

[1] Apicore is already exacerbating the harm to the public by pursuing a ▉ of accused products already in the possession of Aurobindo's customers. (Ex. 1 at 1.)

Robert Schroeder adopted the R&R. (Addendum D at 3.)  On February 9, 2017, Aurobindo filed a motion with the district court requesting a stay of the preliminary injunction pending Aurobindo's appeal to this Court, or alternatively, until this Court ruled on the present motion to stay. The district court denied Aurobindo's motion on February 22, 2017 finding that "Defendants have not met their burden of showing the requisite likelihood of success to obtain a stay of the preliminary injunction pending appeal. Nor have Defendants submitted satisfactory evidence suggesting that the harms factors warrant a stay." The district court issued the preliminary injunction on February 24, 2017.  (Addendum C at 3.)

## II.    FACTUAL BACKGROUND

ISB belongs to a class of dyes known as triarylmethane dyes, and ISB, as well as triarylmethane dyes, were well-known in the prior art. (Ex. 5 at ¶ 40; Ex. 16 at MYL_AUR00028413.) The prior art is replete with methods for producing triarylmethane dyes, including ISB, using an oxidation step to oxidize an intermediate compound to make the triarylmethane dye compound. (Ex. 5 at ¶ 41.) Many different oxidizing agents were known for producing triarylmethane dyes, including the claimed silver oxide of the Process Patents.  (*Id.* at ¶ 43.)

Apicore did not develop the first ISB product approved by the FDA.  In 1981, the FDA approved Lymphazurin® to assess lymph node involvement by primary or secondary neoplasm. (Ex. 6 at AURO_ISO 0018902; Ex. 7 at 1064.)

3

At that time, Lymphazurin® was found to have a purity of 94.5% by HPLC.[2] (Ex. 7 at 1061.) The prior art explicitly taught that ISB from commercial sources "may be further purified by classical purification techniques such as dissolution, filtration and reprecipitation as well as by chromatography." (Ex. 8 at ¶ 53.)

The patents-at-issue generally relate to alleged improvements to the prior art isosulfan blue ("ISB") compound. The Process Patents require the use of silver oxide to make ISB. (*E.g.*, Ex. 2 at Claim 1.) The Purity Patent claims compositions of ISB having at least 99% purity. (Ex. 4 at Claim 1.)

Mylan entered the market with a generic equivalent of Lymphazurin® in 2010, almost thirty years after Lymphazurin's® launch. (Ex. 9 at ¶ 12.) Mylan offered significantly lower prices and by 2012 captured ███ market share. (Ex. 11 at ¶ 98.) In September 2012, Covidien withdrew Lymphazurin® for reasons other than safety and efficacy. (Ex. 12 at 1.)

Aurobindo launched its ISB product in February 2016. (Ex. 13 at 6.) Aurobindo uses a strong oxidizing agent, manganese dioxide ($MnO_2$), with acid to manufacture ISB, unlike the methods claimed in the Process Patents which use silver oxide ($Ag_2O$). (Ex. 14 at AURO_ISO 0006793-94.) Aurobindo reported to the FDA that its process results in crude ISB with approximately ███ purity.

---

[2] "HPLC is a process for separating, identifying, and measuring compounds contained in a liquid." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1357–58 (Fed. Cir. 2008) (providing background on how HPLC functions).

4

(Ex. 14 at AURO_ISO 0006795.)    Aurobindo then uses prior art HPLC purification methods to purify the crude ISB to 99% purity.  (*Id.*)

## ARGUMENT

### I.    LEGAL STANDARD

"To prevail on a motion to stay, the movant must establish a strong likelihood of success on the merits or, failing that, must demonstrate that it has a substantial case on the merits and that the harms factors militate in its favor." *Interactive Health, LLC v. King Kong USA, Inc.*, No. 2009-1141, 2009 WL 1228489, at *1 (Fed. Cir. May 1, 2009) (citing *Hilton v. Braunskill*, 481 U.S. 770,778 (1987)).

### II.    AUROBINDO HAS A STRONG LIKELIHOOD OF SUCCEEDING ON THE MERITS OF ITS APPEAL

Aurobindo has a strong likelihood of success on appeal because the district court abused its discretion in granting Apicore's preliminary injunction motion. A court abuses its discretion in granting a preliminary injunction if it makes "a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." *Qingdao Taifa Grp. Co., Ltd. v. United States*, 581 F.3d 1375, 1379 (Fed. Cir. 2009) (citations omitted). This Court reviews factual findings for clear error, and conclusions of law de novo. *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004).    If Aurobindo "raise[d] a substantial question concerning either

5

infringement or validity," the preliminary injunction should not have issued. *Amazon.com Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001). This Court has also held that "case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* …likelihood of success on the merits and irreparable harm." *Id.* (emphasis in original).

### A. Aurobindo Raised A Substantial Question As To Infringement Of The Process Patents

Aurobindo raised substantial questions regarding the infringement of the Process Patents under the doctrine of equivalents. Infringement under the doctrine of equivalents as well as the district court's application of the function-way-result test are questions of fact that this Court reviews for clear error. *Biovail Corp. Int'l v. Andrx Pharm., Inc*., 239 F.3d 1297, 1300 (Fed.Cir.2001). To find infringement under the doctrine of equivalents, the factfinder must undertake "an objective inquiry on an element-by-element basis." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17, 40 (1997). A step in an accused process is equivalent "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prod. Co*., 339 U.S. 605, 608 (1950). A finding of infringement under the doctrine of equivalents is disfavored in the preliminary injunction stage because it is a "highly factual inquiry" that "rarely comes clear on a premature record." *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1384 (Fed. Cir. 2000).

6

In finding infringement under the doctrine of equivalents, the district court erroneously concluded that manganese dioxide and silver oxide are equivalent because both "function" as oxidizing agents. (Addendum D at 22-24.) As shown below, the district court improperly discounted the different "way" manganese dioxide oxidizes, and the different "result" obtained by Aurobindo.

Aurobindo's process oxidizes ISB in a substantially different way than the Process Patents. The Process Patents require silver oxide, a mild oxidizing agent that *cannot* be used in combination with an acid, to produce ISB. (Ex. 15 at 144:13-17, 224:6-10.) In fact, Apicore emphasized during prosecution that its process, unlike the prior art, did not require acid. (Ex. 16 at MYL-AUR_00028413.) Aurobindo, however, uses (1) a strong oxidizing agent (manganese dioxide) in combination with (2) phosphoric acid to make ISB. (Ex. 14 at AURO_ISO 0006729.) Aurobindo also presented documentary evidence that characterized manganese dioxide ($MnO_2$) as a strong oxidizing agent. (Ex. 25 at 128.) Nevertheless, the court found manganese dioxide to be a mild oxidizing agent based on nothing more than the conclusory opinion of Apicore's expert. Regardless of whether or not manganese oxide is a strong or mild oxidant, the need to use acid with manganese dioxide contrasted with the inability to use acid with silver oxide proves that two oxidants are not interchangeable.

7

Furthermore, oxidant strength should factor into the equivalents analysis whether or not it is a claim limitation. The doctrine of equivalents "necessarily deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim." *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 469 F.3d 1005, 1018 (Fed. Cir. 2006). Although oxidant strength is not a claim limitation of the Process Patents, it is still relevant to whether manganese dioxide and silver oxide are equivalent. The district court erred when it found the contrary. (Addendum D at 22-23).

Further, the district court confused the concepts of "yield" and "purity" in its equivalents analysis, which led to the erroneous conclusion that manganese oxide and silver oxide give equivalent results because use of manganese dioxide and silver oxide results in an ISB product with approximately similar yields. (Addendum D at 24; Ex. 16 at MYL-AUR_00028412; Ex. 14 at AURO_ISO 0006795.)    The district court relied on an Indian patent application where Aurobindo stated that manganese dioxide provides 66.93% yield. (Addendum D at 24). Because the Process Patents described similar yields, the district court erroneously concluded that manganese oxide and silver oxide give equivalent results. *Id.*

But as Apicore acknowledged during prosecution, purity (relating to the amount of unwanted substances) is distinct and separate from yield (the amount of

8

product recovered from the starting material). (Ex. 16 at MYL-AUR_00028412.) Even methods that used known prior art oxidants to produce ISB achieved a yield similar to ISB made using manganese oxide or silver oxide. (Ex. 16 at MYL-AUR_00028412; compare Ex. 2 at 9:22-24.) The district court's reliance on yield as a proxy for purity led to the erroneous conclusion that manganese dioxide gives a similar result to silver oxide.  In fact, Aurobindo's process leads to ISB with ████ purity (with a yield of ████) whereas the Process Patents purport to result in ISB having purity greater than 99.0%.  (Ex. 14 at AURO_ISO 0006795; *compare* Ex. 2 at 7:31-35.)

### B.    Aurobindo Raised Substantial Questions As To The Validity Of The Purity Patent

Aurobindo substantially challenged the validity of the Purity Patent. "When moving for the extraordinary relief of a preliminary injunction, a patentee need not establish the validity of a patent beyond question.  The patentee must, however, present a clear case supporting the validity of the patent in suit." *Abbott Labs. v. Andrx Pharm., Inc*., 452 F.3d 1331, 1335 (Fed. Cir. 2006).  "A substantial question as to invalidity requires less proof than the clear and convincing showing necessary to establish invalidity itself at trial." *Amazon.com.,* 239 F.3d at 1350. A patent is obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to

9

which said subject matter pertains." 35 U.S.C. § 103(a).  Whether a patent claim is obvious is ultimately a question of law based on underlying facts.  *Apple Inc. v. Samsung Elecs. Co*., 839 F.3d 1034, 1047 (Fed. Cir. 2016).

Here, Apicore's compound is not patentable because its only inventive feature is higher purity. *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301-02 (Fed. Cir. 2007) (holding that a product with a greater degree of purity is not patentable unless "the purification results in "properties and characteristics which were different in kind from those of the known product rather than in degree"). Lymphazurin® was reported to have at least 94.5% purity (as opposed to 99%), and Apicore represented that its generic ISB product is bioequivalent to Lymphazurin® when it sought FDA approval. (Ex. 7 at 1061; Ex. 18 at MYL-AUR_00005850.) Mylan markets its ISB product as equivalent to Lymphazurin®. (Ex. 19 at ¶ 19-20.) There is no evidence of any difference in kind between Lymphazurin® and the claimed isosulfan blue, and a mere difference in degree is not patentable. *Aventis*, 499 F.3d at 1302.

Aurobindo also presented prior art combinations that render the claims of the Purity Patent obvious.  The prior art makes it clear that one could employ any of several well-known, prior art purification techniques, such as preparative HPLC, to purify ISB to a purity of at least 99%. (Ex. 15 at 230:25-231:6).  Moreover, the prior art not only demonstrates that these purification techniques were obvious to

10

try, it shows that a person having ordinary skill in the art would have a reasonable expectation of success. (Ex. 8 at ¶¶ 52, 53) ("Vital dyes are commercially available compounds or may be easily obtained by well-known chemical syntheses. Commercial products may be further purified by classical means such as dissolution, filtration and reprecipitation *as well as by chromatography*.") (emphasis added).) In addition, the Snyder reference discloses that "[c]onvenient recovery of highly purified (99%+) product" is possible using suitable HPLC conditions. (Ex. 17 at 621.) Nevertheless, the district court found that a person having ordinary skill in the art would not have been able to purify ISB to a purity of at least 99.0% by HPLC. (Addendum D at 38). The district court's findings fail to appreciate the state of the prior art.

Aurobindo also raised substantial questions regarding the definiteness of the Purity Patent. "A patent is indefinite 'if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1340–41 (Fed. Cir. 2015) (citing *Nautilus, Inc. v. Biosig Instr., Inc.*, 134 S. Ct. 2120, 2124 (2014). The claims of the Purity Patent are indefinite as a matter of law because they fail to define with reasonable certainty the scope of the term "having a purity of at least 99.0% by HPLC." *See Teva*, 789 F.3d at 1344-45 (holding claims indefinite because of

11

different reasonable ways of determining claimed "average molecular weight"). Apicore's expert did not dispute that different HPLC conditions could lead to different results such that one ISB sample could show both purity greater than 99% *and* purity less than 99%. (Ex. 20 at 209:10-18.) Yet the Purity Patent fails to provide *any* conditions for analysis of purity using HPLC (Ex. 20 at 197:18-199:15.) For this reason, the Purity Patent is indefinite as a matter of law.

### C. Aurobindo Is Likely To Show That Apicore Did Not Establish The Requisite Causal Nexus To Prove Irreparable Harm

To establish irreparable harm a patentee must show "(1) that absent an injunction, it will suffer irreparable harm, and (2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple* II").

The district court found that "Aurobindo's causal nexus arguments are largely irrelevant to a product such as the accused isosulfan blue product, which would not be on the market if Aurobindo had not obtained Food and Drug Administration approval for a product that will likely be found to be covered by the patents-in-suit." (Addendum E at 2 (citing Addendum D at 49-50).) Essentially, the district court appears to have concluded that the nexus requirement does not apply because FDA approval required infringement of the asserted patents. And because the FDA approval required infringement of the patents-in-suit, the court assumed a causal nexus. *Id.*

12

But FDA approval cannot satisfy the causal nexus requirement because the causal nexus analysis does not consider *how* a product arrived in the market, but whether the patented features drive demand once the product is *on* the market. *See, e.g., AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 393 (D.N.J. 2015), aff'd, 603 F. App'x 999 (Fed. Cir. 2015) ("Whether or not there is a nexus between the novel features of the patented product and the commercial success must be evaluated in terms of what is driving sales, not what is allowing the product to reach the shelf in the first place.").[3] Furthermore, Apicore never presented evidence that FDA approval could only be achieved by infringing the asserted patents. In any case, establishing the requisite irreparable harm nexus requires more than infringement alone. *See, e.g., Apple Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1324 (Fed.Cir.2012) ("*Apple* I") ("a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct").

---

[3] Although *AstraZeneca* discusses the causal nexus requirement in the context of commercial success as a secondary consideration of non-obviousness, the nexus analyses for commercial success and irreparable harm are equivalent because they both focus on determining the impact of a patent's patented or inventive features on consumer demand. That is, both require evidence that establishes that the commercial success or consumer demand are a result of patented features rather than other non-patented features. *Compare In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008) (explaining that a nexus in the commercial success context is satisfied if evidence shows "a direct result of the unique characteristics of the claimed invention.") *with Apple II* at 1375 (explaining that the nexus requirement in the irreparable harm context requires a patentee to "show that the infringing feature drives consumer demand for the accused product.").

13

Furthermore, Apicore failed to disprove that the isosulfan blue compound itself—and not the patented features—drove demand for ISB. "Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple I* at 1324. Here, the patented features of the Apicore patents are (1) the use of silver oxide in the Process Patents and (2) ISB that is at least 99.0% pure. (*E.g.*, Ex. 2 at Claim 1; Ex. 4 at Claim 1.) Apicore failed to establish a connection between these patented features and its alleged harm. Mylan promotes its ISB product as "bioequivalent" to Lymphazurin®, and does not advertise the allegedly inventive features of the Purity and Process Patents. (Ex. 19, at ¶¶ 19-20; Ex. 11 at ¶¶ 52, 54, 55; Ex. 21 at ¶¶ 12, 15.) In fact, there is no evidence end customers are even aware of either the purity level or method of manufacturing ISB. (Ex. 19 at ¶ 21; Ex. 22 at 185:6-22; 187:2-23; 188:9-13; 191:23-192:10.)   Thus, the patented features have no impact on why consumers buy ISB products.

The district court also erred in finding that causal nexus need not be shown for the Process Patents because "it is not possible to separate Apicore's patented process from the commercial ISB product for purposes of evaluating consumer demand and nexus." (Addendum D, at 50.) By finding that no nexus must be established for process claims, the district court reads out the key claim limitations of the Process Patents, effectively converting the process claims into composition

14

claims, and essentially exempts process claims from the causal nexus requirement. However, there is no precedent exempting process claims from the nexus requirement. *See e.g.*, *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, No. CV 15-819-LPS-CJB, 2016 WL 4770244, at *20 (D. Del. Aug. 12, 2016) (applying nexus requirement to method of manufacture claims).

The district court's reliance on *Janssen Products, L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650 (D.N.J. 2014) is misplaced. In *Janssen*, the patented process was the *only known method* for manufacturing the key element of Janssen's product at a large scale. Furthermore, that key element significantly impacted the *efficacy* of the final product, so medical professionals would appreciate the difference between Janssen's product and prior art products. *Id.* at 658-59 (D.N.J. 2014). Neither is true in this case. First, there is at least one other known prior art process (*e.g.,* the method to manufacture Lymphazurin®) that does not follow the claims of the Process Patents. Second, it is undisputed that Apicore's products are bioequivalent to Lymphazurin®, and there is no evidence that any difference in the manufacturing process would be appreciable to consumers. (Ex. 19, at ¶¶ 19-20; Ex. 11 at ¶¶ 52, 54, 55; Ex. 21 at ¶¶ 12, 15).

Finally, the alleged simplicity of ISB does not exempt Apicore from showing a causal nexus. (Addendum D at 50.) This Court's precedent is clear: "the

15

causal nexus requirement applies regardless of the complexity of the products."

*Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013)

### D.    Aurobindo Will Likely Show That Apicore Will Not Suffer Irreparable Harm Absent An Injunction

To demonstrate irreparable harm, a movant must establish that it will suffer harm that cannot be adequately compensated through monetary damages. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 930 (Fed. Cir. 2012). Apicore has failed to do so.

First, Apicore will not suffer irreparable harm due to lost sales. Lost sales standing alone are insufficient to prove irreparable harm. *Abbott Labs.*, 452 F.3d at 1348. The district court made no findings to the contrary. Further, Apicore presented no evidence to support the district court's findings relating to layoffs resulting from those lost sales. In any case, these harms constitute economic damages and are compensable by money damages. *See Otsuka Pharm. Co. v. Torrent Pharma. Ltd.*, 99 F. Supp. 3d 461, 501 (D.N.J. 2015).

Furthermore, Apicore's lost sales would not lead to lost R&D ability. The district court ignores that Apicore's forecasts, prepared prior to Aurobindo's launch, anticipated that Apicore's ISB API revenue would decrease from approximately ███ in 2016 to ███ by 2020. (Ex. 11 at ¶¶ 81-84.) Such low revenue projections belie any argument that lost sales would adversely impact Apicore's R&D ability. Moreover, the evidence shows that any lost R&D ability is

16

speculative in nature. (Ex. 11 at ¶¶ 90-91.)  Merely demonstrating "a possibility of irreparable harm" is insufficient. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Finally, the district court's finding that Apicore US LLC directly competes with Aurobindo Pharma Ltd. in the ISB API market flies in the face of the undisputed evidence.  Apicore US manufactures ISB API exclusively for Mylan (Ex. 23 at ¶ 7.) Aurobindo does not compete with Apicore to sell ISB API to Mylan, nor does Apicore compete with Aurobindo Pharma Ltd. to sell ISB finished product to AuroMedics Pharma. Therefore it is impossible for Apicore to suffer price erosion as a result of Aurobindo's presence in the market.

## III.    EQUITABLE CONSIDERATIONS WEIGH IN FAVOR OF A STAY.

Aurobindo is entitled to a stay because it has shown a strong likelihood of success on appeal. Nevertheless, even if Aurobindo made only a substantial showing of success, the severe consequences of allowing an injunction to move forward before appellate review warrant a stay.

### A.    Aurobindo Will Suffer Irreparable Harm Absent a Stay

Even if the injunction is ultimately lifted, Aurobindo will suffer irreparable harm unless the injunction is stayed in the interim. Aurobindo will suffer irreparable injury in the form of lost goodwill and credibility among its customers, the inability to regain its customers should the injunction be reversed, and inability

17

to sell its other products to customers. These harms cannot be quantified and therefore cannot be recovered from Apicore's bond.

An injunction forcing Aurobindo to withdraw its ISB from the market will result in a loss of Aurobindo's goodwill and credibility with its customers. (Ex. 13 at ¶¶ 11-13.) A manufacturer's credibility is especially important in the pharmaceutical market, where there are a limited number of suppliers and customer confidence and trust are critical. (*Id.* at ¶ 14.) Aurobindo has spent years building "a really good rapport and reputation [with customers] based on quality … sustainability of supply … [and] pricing." (Ex. 15 at 208:11-13.) Even if the injunction is subsequently reversed on appeal, Aurobindo's reputation will be irreversibly tarnished. (Ex. 13 at ¶¶ 11-13.)

Furthermore, Mylan has indicated that it would seek a ██████ of Aurobindo's ISB products already in the possession of its customers. (Ex. 1 at 1.) The results of such a ██████ would be devastating to Aurobindo's business. If products already in customers' possession are ██████, customers will lose all confidence that Aurobindo can reliably supply its products. (Ex. 13 at ¶ 11.) These reputational harms would also extent to Aurobindo's sales of other products, particularly products it expects to launch in the future, because customers would no longer trust the reliability of Aurobindo's supply. (*Id.*)

18

Additionally, if Aurobindo can no longer offer ISB, customers will essentially be "forced" to return to Mylan, the sole remaining provider of ISB, "hat in hand" to ask for a new contract for ISB. Customers will feel that Aurobindo put them in a weakened bargaining position, increasing reluctance to contract with Aurobindo for the purchase of any other products. (Ex. 13 at ¶¶ 12, 16.) In addition, because typical contract negotiations between pharmaceutical companies and consumers are not limited to a single product, Mylan will have the opportunity to negotiate for, and undercut Aurobindo's other product lines. (Ex. 13 at ¶¶ 12, 16.) Worse, once Aurobindo is replaced with another provider, it is unlikely these customers will return to Aurobindo even if the injunction is reversed. (Ex. 13 at ¶¶ 11, 13-15.)

### B.    A Stay Pending Appeal Serves The Public Interest

The public interest strongly favors staying the injunction in this case. First, the public benefits from a competitive marketplace, particularly in the market for life saving medical products. (Ex. 13 at ¶ 9.) *See, e.g.*, *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*, No. CIV.A. 03-1095-KAJ, 2005 WL 3454283, at *11 (D. Del. Dec. 16, 2005) (granting a motion to stay where removing "important medical equipment" from the market indicates that "the public interest strongly favors granting a stay"). Absent a stay, both the public and Aurobindo's customers will be in a weakened bargaining position when they turn to Mylan for ISB products.

19

Finally, Mylan has threaded to ███ products already in customers'
possession based on the mistaken assumption that the preliminary injunction went
into effect on February 7, 2017. (Ex. 1 at 1.) Enforcing the injunction while
Aurobindo's appeal is pending will not only disrupt future product supply to
hospitals, but will also disrupt the current plans and expectations of customers that
have already lawfully purchased Aurobindo's ISB product. A stay would minimize
the impact of unnecessarily halting and retracting supply to existing customers if
this Court finds that Aurobindo was wrongly enjoined.

### C.    A Brief Stay Will Not Irreparably Harm Apicore

In contrast, maintaining the status quo for the order of a few months will not
prejudice Apicore. Mylan is Apicore's *only* customer for ISB API. Neither party
has represented that Mylan will purchase API from Apicore in the coming months.
Any harm to Apicore arising from a stay is merely speculative and does not suffice
to prove irreparable harm. *See Winter*, 555 U.S. at 22. In addition, an expedited
briefing schedule would alleviate any harm that may arise from granting a stay.

## IV.    THE BRIEFING SCHEDULE FOR THIS MOTION SHOULD BE EXPEDITED

If necessary, Aurobindo respectfully requests that the Court adopt an
expedited briefing schedule for resolution of this motion. The preliminary
injunction is already in place, and the foregoing indicates that even a short delay
will irreparably and irreversibly harm Aurobindo, and will also prejudice its

20

customers. Given the urgency of the situation, Aurobindo proposes that Apicore file its response within 5 days of service of this motion, and that Aurobindo will reply within 3 days of Apicore's response.

On February 27, 2017, Aurobindo met and conferred with Apicore's attorneys regarding the proposed expedited schedule. Apicore objected to Aurobindo's proposal.

## CONCLUSION

For these reasons, Aurobindo respectfully requests that this Court stay the district court's preliminary injunction pending appeal.

21

Respectfully submitted,

Date: February 28, 2017                          */s/ Sailesh K. Patel*

George C. Yu                                     Sailesh K. Patel
SCHIFF HARDIN LLP                                Cindy S. Ahn
One Market, Spear Street Tower                   SCHIFF HARDIN LLP
Thirty-Second Floor                              233 S. Wacker Drive, Suite 6600
San Francisco, CA 94105                          Chicago, IL 60606
(415) 901-8749                                   (312) 258-5698

                                                 Michael E. Jones
                                                 Patrick Clutter IV
                                                 POTTER MINTON, P.C.
                                                 110 North College
                                                 Tyler, Texas 75702
                                                 (903) 597-8311

22

## **STATEMENT OF OPPOSITION**

Pursuant to Federal Circuit Rule 27(a)(5), counsel for Appellants conferred with counsel for Appellees on February 28, 2017. Appellees object to this motion and intend to file a response.

Dated: February 28, 2017          */s/ Sailesh K. Patel*
                                   Sailesh K. Patel

23

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendants-Appellants certifies the following:

1.    **The full name of every party or amicus represented by me is:**

Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC.

2.    **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

3.    **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Aurobindo Pharma Ltd. is a publicly-held corporation organized under the laws of India.  Aurobindo Pharma Ltd. has no parent corporation and no other publicly held corporation owns 10% or more of the stock of Aurobindo Pharma Ltd.

Aurobindo Pharma USA, Inc. is a wholly-owned subsidiary of Aurobindo Pharma Ltd. No other publicly held corporation owns 10% or more of the stock of Aurobindo Pharma USA, Inc.  AuroMedics Pharma LLC is a wholly-owned subsidiary of Aurobindo Pharma Ltd. No other publicly held corporation owns 10% or more of the stock of AuroMedics Pharma LLC.

24

4.     **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:**

| LAW FIRM | COUNSEL |
|---|---|
| Schiff Hardin LLP | Sailesh K. Patel<br>Cindy S. Ahn<br>Jason G. Harp<br>Neil Lloyd<br>Arun J. Mohan<br>Emily M. Peña<br>Jaimin Shah<br>George C. Yu |
| Potter Minton, P.C. | Michael E. Jones<br>Patrick Clutter IV |

Date:  February 28, 2017

_____*/s/ Sailesh K. Patel*_____
Sailesh K. Patel
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Tel:  (312) 258-5500
Fax:  (312) 258-5600
Email:  SPatel@schiffhardin.com

*Counsel for Defendants-Appellants*
*Aurobindo Pharma Ltd., Aurobindo*
*Pharma USA Inc., and AuroMedics*
*Pharma LLC*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of February, 2017, pursuant to Federal Circuit Rule 25(e)(1),  I electronically filed a copy of this APPELLANTS' EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION AND EXPEDITE APPEAL with the Clerk of the Court using the Court's Case Management/Electronic Case Filing ("CM/EMF") System, which will send a notification of electronic filing (NEF) to all counsel of record who are registered CM/EMF users, including counsel of record for the Petitioners.

Dated: February 28, 2017          */s/ Sailesh K. Patel*
                                             Sailesh K. Patel

26

## **CERTIFICATE OF COMPLIANCE**

Counsel for appellants certifies that the motion contained herein has a proportionally spaced 14-point typeface, and contains 5,059 words, based on the "Word Count" feature of Microsoft Word, including footnotes and endnotes.

Dated: February 28, 2017                    */s/ Sailesh K. Patel*
                                                      Sailesh K. Patel

27

# ADDENDUM A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

MYLAN INSTITUTIONAL LLC and
APICORE US LLC

        Plaintiffs,

    v.

AUROBINDO PHARMA LTD.,
AUROBINDO PHARMA USA INC., and
AUROMEDICS PHARMA LLC

        Defendants.

Civil Action No.: 2:16-cv-491-RWS-RSP

## <u>NOTICE OF APPEAL</u>

Pursuant to Federal Rule of Appellate Procedure 3(a), notice is hereby given that Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC hereby appeal to the United States Court of Appeals for the Federal Circuit pursuant to 28 U.S.C. § 1292(a)(1) from the following:  (1) the February 7, 2017 Order adopting the November 21, 2016 Report and Recommendation of the United States Magistrate Judge (Dkt. No. 122); and (2) the November 21, 2016 Report and Recommendation of the United States Magistrate Judge to grant Plaintiffs' motion for preliminary injunction (Dkt. No. 101).

Dated:  February 10, 2017

Respectfully submitted,

*/s/ Sailesh K. Patel with permission by*
*Michael E. Jones*
Michael E. Jones (State Bar No. 10929400)
Patrick C. Clutter, IV( State Bar No.
24036374)
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500
Tyler, TX 75702
Tel: 903.597.8311
Fax: 903.593.0846
mikejones@potterminton.com
patrickclutter@potterminton.com

Sailesh K. Patel
Cindy S. Ahn
Neil Lloyd
Emily M. Pena
Jaimin H. Shah
SCHIFF HARDIN LLP
233 S. Wacker Drive
Chicago, IL 60606
Tel.: 312-258-5500
Fax: 312-258-5600
spatel@schiffhardin.com
cahn@schiffhardin.com
nlloyd@schiffhardin.com
epena@schiffhardin.com
jshah@schiffhardin.com

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-First Floor
San Francisco, CA 94105
Tel.: 415-901-8700
Fax: 415-901-8701
gyu@schiffhardin.com

*Attorneys for Defendants*
*Aurobindo Pharma Ltd.,*
*Aurobindo Pharma USA Inc., and*
*AuroMedics Pharma LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 10, 2017.

*/s/ Michael E. Jones*

3

# ADDENDUM B

No. 2017-1645

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

MYLAN INSTITUTIONAL LLC and APICORE US LLC
Plaintiffs-Appellees

v.

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
and AUROMEDICS PHARMA LLC,
Defendants-Appellants

_____

Appeal From The United States District Court For The Eastern District Of Texas
In Case No. 16-cv-00491, Judge Robert W. Schroeder III

_____

## AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
## AND AUROMEDICS PHARMA LLC'S
## AMENDED NOTICE OF APPEAL

_____

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-First Floor
San Francisco, CA 94105
(415) 901-8749

Sailesh K. Patel
Cindy S. Ahn
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5698

*Attorneys for Defendant-Appellants*

i

# CERTIFICATE OF INTEREST

Counsel for Appellants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC certifies the follows:

1.      The full name of every party or amicus represented by me is:

**AUROBINDO PHARMA LTD.**

**AUROBINDO PHARMA USA INC.**

**AUROMEDICS PHARMA LLC**

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**N/A**

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**Aurobindo Pharma Ltd. is a publicly-held corporation, has no parent company, and there is no publicly held company that owns 10% or more of the stock of Aurobindo Pharma Ltd.**

**Aurobindo Pharma USA, Inc. is a wholly-owned subsidiary of Aurobindo Pharma Ltd.**

**AuroMedics Pharma LLC is a wholly-owned subsidiary of Aurobindo Pharma Ltd.**

i

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

| LAW FIRM | COUNSEL |
|---|---|
| Schiff Hardin LLP | Sailesh K. Patel<br>Cindy S. Ahn<br>Jason G. Harp<br>Neil Lloyd<br>Arun J. Mohan<br>Emily M. Pena<br>Jaimin Shah<br>George C. Yu |
| Potter Minton, P.C. | Michael E. Jones<br>Patrick Clutter IV |

Date:  February 27, 2017

　　　　　　　/s/ Sailesh K. Patel　　
Sailesh K. Patel
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Tel:  (312) 258-5500
Fax:  (312) 258-5600
Email:  SPatel@schiffhardin.com

*Counsel for Defendants-Appellants*
*Aurobindo Pharma Ltd., Aurobindo*
*Pharma USA Inc., and AuroMedics*
*Pharma LLC*

ii

Notice is hereby given that Defendants-Appellants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC (collectively, "Aurobindo") have amended their notice of appeal dated February 9, 2017, and filed the amended notice of appeal to the United States Court of Appeals for the Federal Circuit from the following: (1) the district court's February 24, 2017 Order enjoining Aurobindo from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court (Dkt. No. 139); (2) the district court's February 7, 2017 Order adopting the November 21, 2016 Report and Recommendation of the United States Magistrate Judge (Dkt. No. 122); and (3) the November 21, 2016 Report and Recommendation of the United States Magistrate Judge to grant Plaintiffs' motion for preliminary injunction (Dkt. No. 101). The amended notice of appeal has been filed in the district court. (Dkt. No. 140.)

Aurobindo had earlier filed a Notice of Appeal in this matter related to the district court's February 7, 2017 Order adopting the November 21, 2016 Report and Recommendation of the United States Magistrate Judge and the November 21, 2016 Report and Recommendation of the United States Magistrate Judge to grant Plaintiffs' motion for preliminary injunction. (Dkt. No. 123.) That appeal has been docketed as Appeal No. 2017-1645. Aurobindo has already paid the appeal

1

docketing fee for this matter, by ECF online payment on February 10, 2017 in the

amount of $505.00.  (Dkt. No. 126.)


                              Respectfully submitted,


                              _____/s/ Sailesh K. Patel_____


George C. Yu                  Sailesh K. Patel
SCHIFF HARDIN LLP             Cindy S. Ahn
One Market, Spear Street Tower   SCHIFF HARDIN LLP
Thirty-First Floor            233 S. Wacker Drive, Suite 6600
San Francisco, CA 94105       Chicago, IL 60606
(415) 901-8749                (312) 258-5698


2

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2017, I caused the foregoing Amended Notice of Appeal to be filed with the Clerk of the Court via CM/ECF.  I also caused a true and correct copy of the foregoing to be served on the following counsel of record via the CM/ECF:

Nicole W. Stafford
WILSON SONSINI GOODRICH & ROSATI
900 S. Capital of Texas Hwy
Las Cimas IV, Fifth Floor
Austin, TX 78746
Telephone: (512) 338-5400
nstafford@wsgr.com

David Galluzzo
SHARMA & DEYOUNG
555 Fifth Avenue, 17th Floor
New York, NY 10017
Telephone: (212) 856-7236
david@sharmadeyoung.com

Respectfully submitted,

   /s/  Sailesh K. Patel

Sailesh K. Patel

CH2\19306447.1\03:11

3

# ADDENDUM C

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, et al., | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

On February 6, 2017, the Court issued an Order (Docket No. 122) adopting the Magistrate Judge's Report and Recommendations (Docket No. 101) on Plaintiffs' Motion for a Preliminary Injunction (Docket No. 20). In the Order, the Court states, "Plaintiffs' Motion for Preliminary Injunction . . . will be [granted] following Plaintiffs' submission of an adequate injunction bond. Defendants will be enjoined from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court." Docket No. 122 at 3. On February 10, 2017, Defendants filed a notice of appeal of the Court's Order to the Federal Circuit. Docket No. 126.

On February 13, 2017, the Magistrate Judge issued an Order instructing the parties to submit a joint proposed preliminary injunction by February 28, 2017 that identifies any disagreements as to the scope of the preliminary injunction. Docket No. 129. On February 21, 2017, Defendants submitted a brief on the preliminary injunction bond and requested a bond in the amount of $24,750,000. Docket No. 134 at 2. On February 22, 2017, Plaintiffs posted a bond in the amount of $24,750,000. Docket No. 136.

On February 23, 2017, Plaintiffs filed an emergency motion requesting that the Court expedite the entry of the preliminary injunction and attached a proposed preliminary injunction. Docket No. 138.  Plaintiffs contend that Defendants are "flooding distributors and wholesalers with their infringing product before formal imposition of the injunction." *Id*. at 1.  Plaintiffs state that "one of the [Group Purchasing Organizations] that currently contracts with Aurobindo for their isosulfan blue product[] issued a 'Pharmacy Alert' notifying its members of the pending preliminary injunction and recommending their members to 'make appropriate orders and/or back-orders' of isosulfan blue due to the pending injunction." *Id*.  Plaintiffs attached a copy of the Pharmacy Alert to their motion.  Docket No. 138-7.  Plaintiffs further contend that in the first three weeks of February alone, Aurobindo has manufactured and imported more than double the amount of its average monthly sales of isosulfan blue.  Docket No. 138 at 3–4.

The Court's February 6, 2017 Order stated that "Plaintiffs' Motion for Preliminary Injunction . . . will be [granted] following Plaintiffs' submission of an adequate injunction bond." Docket No. 122 at 3.  That condition has been satisfied as Plaintiffs have submitted an injunction bond in the amount requested by Defendants.  Docket No. 136; Docket No. 134 at 2.  The Court's February 6, 2017 Order further states that Defendants would "be enjoined from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court." *Id*.  The Magistrate Judge's February 13, 2017 Order required the parties' proposed preliminary injunctions to include similar language consistent with the Court's February 6, 2017 Order.  In light of the contentions presented in Plaintiffs' emergency motion and because the parties' proposed preliminary injunctions are required to include this language, the Court finds that it is appropriate for this portion of the injunction to be entered immediately.

The Court recognizes that Defendants have not had an opportunity to respond to Plaintiffs' emergency motion and that the parties continue to dispute the scope of the injunction.  The parties have previously been ordered to submit a proposed preliminary injunction by February 28, 2017; Defendants may submit any arguments in opposition to Plaintiffs' emergency motion by February 28, 2017, either separately or together with their proposed preliminary injunction.

Accordingly, Defendants are hereby

**ENJOINED** from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court. Defendants are further

**ORDERED** to submit a proposed preliminary injunction that complies with the Magistrate Judge's February 13, 2017 Order (Docket No. 129).  Upon review of both Plaintiffs' and Defendants' submissions to the Court, the Court will issue a revised Order detailing the scope of the preliminary injunction if appropriate.

**SO ORDERED**.

**SIGNED this 24th day of February, 2017.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

# ADDENDUM D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, | § | |
| AUROBINDO PHARMA USA INC., | § | |
| AUROMEDICS PHARMA LLC, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## REPORT AND RECOMMENDATION

Plaintiffs Apicore US LLC and Mylan Institutional LLC allege that Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA. Inc., and Auromedics Pharma LLC (collectively "Aurobindo") are importing and selling isosulfan blue formulations in violation of U.S. Patent Nos. 7,662,992, 8,969,616, and 9,353,050. Dkt. No. 12 (Amended Complaint) ¶¶ 13-14. Plaintiffs seek a preliminary injunction to prevent further infringement. Dkt. No. 20. The Court finds that Plaintiffs have established a likelihood of success on the merits with respect to at least one claim of each patent-in-suit, and that Apicore would be irreparably harmed without preliminary relief. Accordingly, Plaintiffs' motion for a preliminary injunction must be **GRANTED**.

## I.   BACKGROUND

Sentinel lymph node biopsy is a procedure used to determine whether cancer cells have spread from an original tumor site to other parts of the body. *See* Dkt. No. 55-55 at 137. A sentinel lymph node is the lymph node (often nearest a tumor site) that is capable of "draining"

1

cancer cells from the tumor, allowing the cancer to spread to the rest of the lymphatic system. *Id.*; '050 patent at 1:54-56. To determine whether drainage has occurred, a surgeon biopsies the sentinel node and looks for cancer cells. Dkt. No. 55-55 at 137. The presence of cancer cells in the sentinel node is indicative of whether cancer has spread to the rest of the lymphatic system. *Id.*

It is difficult to perform a minimally-invasive sentinel lymph node biopsy without first mapping the lymphatic system surrounding the tumor site. *See, e.g.*, '050 patent at 1:53-54; Dkt. No. 80-9 at 1061. The lymphatic system is a network of interconnected vessels and nodes appearing to a surgeon's naked eye as clear fluid and is thus difficult to distinguish from surrounding tissue. *See* Dkt. No. 80-9 at 1061; Dkt. No. 55-52 ¶¶ 11-12. Since the early 1960s, surgeons mapped the lymphatic network surrounding a tumor site by making a subcutaneous or intradermal injection of a blue dye that is selectively absorbed by lymphatic cells. Dkt. No. 80-9 at 1061. The early medical literature acknowledged that surgeons used dyes that were not approved by the Food and Drug Administration (FDA), though no major problems were reported. *Id.*

### A.  Isosulfan Blue and Its FDA Approval

Isosulfan blue is the monosodium salt of a 2,5-disulfonated triarylmethane dye and is represented by the following structural formula:

See Dkt. No. 80-9 at 1061; '050 patent at 1:23-45. The chemical name for isosulfan blue is "N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt." '050 patent at 1:23-45. The FDA approved the use of isosulfan blue for lymphatic vessel delineation in 1981. *See, e.g.*, Dkt. No. 20-2 ¶ 11.

After the FDA's approval, Dr. Jerry Hirsch and his colleagues from the Medical College of Virginia conducted clinical studies and found that an injectable 1% solution of isosulfan blue is safe and effective for identifying lymphatic cells during sentinel lymph node biopsy. *See* Dkt. No. 80-9 at 1064. Dr. Hirsch, through Hirsch Industries, Inc., commercially introduced the injectable 1% solution under the trade name Lymphazurin™. *See id.*; Dkt. No. 80-18. Hirsch Industries and successors-in-interest United States Surgical Corporation (U.S. Surgical), Tyco Healthcare, and later Covidien Ltd.[1] held the original New Drug Application (NDA) for the isosulfan blue solution and were the sole suppliers of Lymphazurin™ in the United States for 30 years. Dkt. No. 20-2 ¶ 11; Dkt. No. 79-33 ¶¶ 92, 105; Dkt. No. 81-3.

## B.  Problems with Isosulfan Blue Synthesis and Purity

From Lymphazurin™'s inception, Hirsch Industries reported problems associated with the synthesis and purification of isosulfan blue. Dr. Hirsch's original clinical trials publication described the use of an isosulfan blue mixture containing "94.5% dye content . . . as determined by high-pressure liquid chromatography." Dkt. No. 80-9 at 1061. The publication explained that "[t]he remaining 5.5% consists of closely related isomers produced during synthesis." *Id.* at 1061-62. Hirsch Industries later determined that the same lot of isosulfan blue contained only 83.4% isosulfan blue and 8.2% "other organics." Dkt. No. 80-18 at 1-2. Dr. Hirsch reported this finding to the FDA through a letter dated June 8, 1990, assuring the FDA that Hirsch Industries

---

[1] Covidien is now Medtronic Minimally Invasive Therapies, a division of Medtronic, Inc.

3

remained "committed to conduct studies designed to identify and/or remove the organic compound" found in the isosulfan blue product and welcomed the FDA's "advice as to the best approach to achieve this." *Id.* at 3.

The process used to prepare isosulfan blue was unknown to Hirsch Industries and later suppliers, but analytical testing suggested that manufacturers were using heavy-metal oxidants. *See, e.g.*, Dkt. No. 80-19; Dkt. No. 79-33 ¶ 96. For about 26 years following the FDA's approval of isosulfan blue, Sigma-Aldrich Corporation supplied Hirsch Industries and successors-in-interest with isosulfan blue manufactured by Allied Chemical Corporation. Dkt. No. 80-19; Dkt. No. 80-16; Dkt. No. 79-33 ¶¶ 96-97. Allied Chemical's manufacturing process was unknown, but records indicate the presence of lead, which is consistent with the use of a lead compound during synthesis. *See* Dkt. No. 80-19. Sigma-Aldrich "developed a recrystallization process that removed the lead and purified the [isosulfan blue]," but records do not specify the isosulfan blue percentage in the purified product. *See* Dkt. No. 80-16.

In early to mid-2000, after Hirsch Industries' original isosulfan blue NDA had been transferred to Covidien predecessors, Allied Chemical stopped supplying Sigma-Aldrich with isosulfan blue. *See* Dkt. No. 80-19; Dkt. No. 79-33 ¶ 101. Sigma-Aldrich and Covidien predecessors initiated efforts to identify a new supplier, an effort that took "more than five years of determination and focus," according to a Covidien press release. *See* Dkt. No. 81-3; Dkt. No. 80-16. Before a new supplier could be found, existing supplies of isosulfan blue became depleted, eventually prompting Covidien to send a letter to its customers notifying them that Covidien was "completely out" of Lymphazurin™, but that Covidien expected a "*potential return to supply in February of 2008.*" Dkt. No. 81-2.

By June 2008, Covidien and Sigma-Aldrich had located a new supplier, Innovassynth

Technologies, a chemical company located in Mumbai, India, and necessary process and

manufacturing changes were approved by the FDA. Dkt. No. 81-3; Dkt. No. 80-19.

Innovassynth's process involved the use of ammonium dichromate, resulting in chromium levels

up to 100 parts per million (ppm). *See* Dkt. No. 80-19. Sigma-Aldrich developed a process to

purify Innovassynth's crude isosulfan blue that reportedly reduced chromium levels to below 10

ppm, but the record does not indicate the percentage of isosulfan blue present in the purified

Innovassynth product. *See id.* Sigma-Aldrich reported numerous problems with the purity of

Innovassynth's product, *see* Dkt. No. 81-4, 81-5, 81-6, eventually prompting Sigma-Aldrich to

develop its own manufacturing process sometime around 2010. *See* Dkt. No. 81-8.

### C.  The Patents-in-Suit and Apicore's Generic Isosulfan Blue Product

Apicore was founded in 2003 and, with six employees by 2004, began developing an

improved process for synthesizing isosulfan blue. *See id.* In September 2004, Apicore partnered

with Synerx Pharma, LLC, Mylan's predecessor and a manufacturer of finished drug products, to

develop and market a generic version of Lymphazurin™. Dkt. No. 55-19. On May 11, 2007,

Apicore filed Non-Provisional Patent Application No. 11/747,291 that ultimately led to the three

patents-in-suit, all of which claim priority to the '291 application. *See* '992 patent at 1:5-10; '616

patent at 1:5-15; '050 patent at 1:5-15. Consistent with reports from isosulfan blue suppliers, the

patents explain that existing methods of synthesizing isosulfan blue used hazardous oxidizing

agents and crude methods of purification. *See, e.g.*, '050 patent at 1:63-2:14. The patents thus

describe a need for preparing high-purity isosulfan blue that is suitable for use in pharmaceutical

formulations. *Id.* at 2:20-23.

5

The patents claim both methods of preparing isosulfan blue and a high-purity form of isosulfan blue. The '992 and '616 patents claim processes in which an isoleuco acid is reacted in a polar solvent with silver oxide to form isosulfan blue acid, which is then treated with a sodium solution to form isosulfan blue. *See, e.g.*, '616 patent at 9:38-64. The '992 patent claims recite a more specific process in which the isoleuco acid is combined with "2.0 to 3.0 equivalents of silver oxide." '992 patent at 9:44-65. The claimed methods provide isosulfan blue "having purity greater than 99.5% by [High Performance Liquid Chromatography] HPLC." *See id.* at 7:29-34. The '050 patent claims isosulfan blue "having a purity of at least 99.0% by HPLC." '050 patent at 9:54-57. The '050 patent also claims solutions and compositions containing the high-purity isosulfan blue. *Id.* at 12:8-12.

Based on the process described in the patents-in-suit, Synerx[2] filed an Abbreviated New Drug Application (ANDA) seeking FDA approval to market a generic version of Lymphazurin™ in September 2008, and the FDA approved the ANDA in July 2010. Dkt. No. 55-20, 55-21. By 2011, isosulfan blue sales had become a significant portion of Apicore's revenue. *See* Dkt. No. 20-29 ¶¶ 11-15. At the same time, Covidien's Lymphazurin™ sales sharply declined, *see* Dkt. No. 20-14 ¶ 23, and Covidien withdrew Lymphazurin™ from the market by September 2012, *see* Dkt. No. 55-23 at 5561. The FDA determined that Covidien discontinued Lymphazurin™ for "reasons other than safety or effectiveness." Dkt. No. 55-23 at 5561. Since Covidien's exit from the market, Mylan became the sole supplier of isosulfan blue drug product until March 2016, when Aurobindo entered the market. *See* Dkt. No. 20-14 ¶ 23. Mylan sourced its supply of isosulfan blue exclusively through Apicore. *See* Dkt. No. 20-2 ¶ 14.

---

[2] By February 2012, Mylan Institutional LLC had acquired Synerx and became the ANDA holder and exclusive licensee of the patents-in-suit. *See* Dkt. No. 55-22; Dkt. No. 12 ¶¶ 4, 29.

6

### D.  Aurobindo's Entry into the Isosulfan Blue Market

Aurobindo Pharma, LTD is an Indian corporation headquartered in Andhra Pradesh, India. Dkt. No. 40 at 2; Dkt. No. 27-1 ¶ 5. Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC are Delaware corporations and wholly-owned subsidiaries of Aurobindo India, both headquartered in Dayton, New Jersey. *Id.* at 3; Dkt. No. 27-1 ¶¶ 3-4.

Aurobindo sought FDA approval for a generic isosulfan blue product sometime after the application leading to Apicore's '992 patent was published. *See* Dkt. No. 80-14 at 3. Aurobindo informed the FDA that, after having studied a "number of patents" describing processes for manufacturing isosulfan blue, Aurobindo selected U.S. Patent No. 7,534,911, a patent filed after the priority date of the patents-in-suit, and Apicore's '992 patent. *See* Dkt. No. 80-14 at 3. Based on initial studies, Aurobindo "considered the process described in [the '992] patent for the initial sample preparation and further, the optimization of the process." *Id.*

Aurobindo acknowledged to the FDA that the '992 patent claims recite the use of silver oxide to convert the isoleuco acid to isosulfan blue acid, and thus Aurobindo was looking for a reagent "other than silver oxide." *Id.* at 6. Aurobindo reported results from a process involving manganese dioxide, but the process resulted in 5-10% impurity. *Id.* at 8. According to Aurobindo, the impurity could not be removed by recrystallization, column chromatography, or acid-base purification, and Aurobindo therefore decided to purify the material through preparatory HPLC to achieve a purity greater than 99.5%. *Id.*

The Food and Drug Administration approved Aurobindo's ANDA to market its isosulfan blue product on February 2, 2016, Dkt. No. 55-24, and Aurobindo publicly announced its intent to sell the product within the United States in March 2016, Dkt. No. 40 at 9. Aurobindo thereafter began importing and selling its isosulfan blue product, *id.* at 13-14, and as of October,

2016, Aurobindo had captured more than half of the isosulfan blue market, *see, e.g.*, Dkt. No. 97-1 at 5-6.

### E.  Procedural History

Plaintiffs filed this action on May 11, 2016, Dkt. No. 1, and later moved for a preliminary injunction on June 6, 2016, Dkt. No. 20. Aurobindo filed a declaratory judgment action against Apicore and Mylan in the District of New Jersey, seeking a judgment of noninfringement and invalidity. *See Aurobindo v. Apicore*, Case No. 1:16-cv-03358, Dkt. No. 1 (D.N.J. June 6, 2016). The New Jersey action was administratively stayed pending resolution of Aurobindo's motion to change venue in this case to New Jersey. Aurobindo's motion was denied on November 15, 2016, Dkt. No. 100, and Apicore and Mylan thereafter requested that the New Jersey action be consolidated with this case or dismissed. *See id.*, Dkt. No. 20 (D.N.J. Nov. 15, 2016). The parties dispute whether the New Jersey action will bar Aurobindo from petitioning the Patent Office for inter partes review of the patents-in-suit. *See id.*, Dkt. No. 16; *see also* 35 U.S.C. § 315(a)(1).

Plaintiffs seek a preliminary injunction because they allege that Defendants' product and method of manufacture will likely be found to infringe the patents-in-suit, and that irreparable harm will result if preliminary relief is not granted. Dkt. No. 20. Aurobindo contends that the patents are invalid and not infringed, and that Plaintiffs' harm is not irreparable. Dkt. No. 55.

### II.   DISCUSSION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These traditional four factors "apply with equal force to disputes arising under the Patent Act." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

8

## A.  Likelihood of Success on the Merits

Assessing whether Plaintiffs are likely to prove that Aurobindo is infringing the patents-in-suit depends on the scope of the asserted claims and how those claims compare to the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). Accordingly, "[t]he first step is determining the meaning and scope of the patent claims asserted to be infringed." *Id.*

### 1.  Claim Construction

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, a district court starts by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule, subject to certain specific exceptions, is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). A term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other

9

asserted or unasserted claims can also aid in determining the claim's meaning. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* "[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

### a) Prosecution History Disclaimer

"The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[I]n order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013). "Where the alleged disavowal is ambiguous, or even 'amenable to multiple reasonable interpretations,'" the Federal Circuit has declined to find prosecution disclaimer. *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (quoting *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003)).

Although the parties do not yet dispute the meaning of the '992 and '616 patent claims, Aurobindo identifies a portion of the prosecution history that raises the issue of whether Apicore disclaimed "the use of an acid along with an oxidizing agent to oxidize isosulfan blue." *See* Dkt. No. 55 at 6. The examiner rejected Apicore's pending claims as unpatentable over the "Kulkarni" reference, which discloses the synthesis of isosulfan blue using ammonium dichromate and sulfuric acid. *See* Dkt. No. 55-6. Apicore distinguished Kulkarni by explaining that "[a]rtisans have typically used lead or chrome oxides with *an acid* to make isosulfan blue,"

and that "[t]he use by applicants of silver oxide *without acid* is significantly different than the use in Kulkarni of sulfuric acid and ammonium dichromate." *Id.* at 10 (emphasis added).

Apicore's discussion of the Kulkarni reference does not raise a question regarding disclaimer of a process involving a weak acid such as the acid used in the accused process. As explained by Plaintiffs' expert, Dr. Jonathan Sessler, Kulkarni's process involves a harsh oxidizing agent and concentrated sulfuric acid. Dkt. No. 79-33 ¶ 125-26, ¶ 43. Apicore distinguished this process by emphasizing that the use of heavy-metal oxidants with strong acids is different than the process claimed in the '992 and '616 patents, which simply uses silver oxide. *See* Dkt. No. 55-6 at 10. Apicore may have disclaimed a process involving strong acid, but because Kulkarni did not involve the use of a weak acid, Apicore's prosecution statement was not referring to a weak acid when describing the "acid" of Kulkarni. *See id.* As explained by Dr. Sessler at the hearing, there is no question that phosphoric acid is a weak acid.

### b)  Ensnarement

Plaintiffs' theory of infringement with respect to the '992 and '616 patents relies on the doctrine of equivalents. Aurobindo raises a defense based on ensnarement, which, like prosecution history disclaimer, is a "legal limitation on the application of the doctrine of equivalents." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323 (Fed. Cir. 2009) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003)). "Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art." *Id.* at 1322. To determine whether there would be ensnarement, a district court first constructs a hypothetical claim that literally covers the accused product or process. *Id.* at 1324. "Next, the district court must assess the prior art introduced by the accused infringer and determine whether the patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art." *Id.* at 1325. "Ultimately, '[i]f

11

such a claim would be unpatentable under 35 U.S.C. §§ 102 or 103, then the patentee has overreached, and the accused device is noninfringing as a matter of law." *Id.* (quoting *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001)).

Aurobindo contends that the hypothetical claim is one that literally covers manganese dioxide, the oxidant used in the accused process, and that such a claim is obvious in view of prior art disclosing the use of manganese dioxide to oxidize triarylmethane dyes. Dkt. No. 55 at 7. The numerous references relied on by Aurobindo describe the oxidation of various triarylmethane compounds with a number of different oxidizing agents, including manganese dioxide. *See* Dkt. No. 55-49 ¶ 43. Aurobindo's expert, Dr. Edward Brown, acknowledged that these references do not describe the use of manganese dioxide to synthesize isosulfan blue. Dkt. No. 79-2 at 152:1-6. Aurobindo appears to simply assume that a person of ordinary skill in the art would be motivated to combine the process described in one of the references with another reference that discloses isosulfan blue, such as Dr. Hirsch's original clinical trials publication, for example.

This unstated assumption leaves Aurobindo well short of raising a substantial question regarding ensnarement. An obvious analysis under the ensnarement doctrine is no different than an ordinary obvious analysis. *See Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1363-64 (Fed. Cir. 2016). It is not sufficient to identify numerous references that disclose various triarylmethane dyes and oxidizing agents without explaining through expert testimony or otherwise how a person of ordinary skill in the art would have arrived at the claimed invention. Dr. Brown opines that a person of ordinary skill in the art would be motivated to "try different oxidizing agents to see if any performed better," but this testimony—to the extent that it even establishes motivation—refers to motivation to try silver oxide, not manganese dioxide. *See* Dkt. No. 55-49 ¶ 80.

12

Other than the Apicore inventors' own disclosure, there is no evidence in the record suggesting that isosulfan blue purity was affected by the way in which the isoleuco acid is oxidized to form isosulfan blue acid. While isosulfan blue manufacturers such as Covidien and others reported problems meeting the market demand for isosulfan blue, *see, e.g.*, Dkt. No. 81-2, the prior art of record does not recognize the problem solved by the Apicore inventors. Aurobindo's unstated assumption reveals "hindsight of the worst kind, 'wherein that which only the invention taught is used against its teacher.'" *Sci. Plastic Prod., Inc. v. Biotage AB*, 766 F.3d 1355, 1362 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2380, 192 L. Ed. 2d 166 (2015) (Moore, J., dissenting) (quoting *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983); *see also Apple Inc. v. Samsung Elecs. Co.*, No. 2015-1171, 2016 WL 5864573, at *16-*17 (Fed. Cir. Oct. 7, 2016) (en banc); *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1354 (Fed. Cir. 2013).

Aurobindo is correct that the patents-in-suit generally acknowledge that prior art methods of preparing triarylmethane dyes involved strong oxidation reagents and crude purification processes. *See, e.g.*, '992 at 2:7-17. Yet there is no acknowledgement that triarylmethane dye purity was affected by the oxidation step. It may go without saying that if a heavy-metal oxidant is used, there would likely be traces of that metal in the final product. But there is no indication that existing oxidation methods would have created other impurities, such as the closely-related isomers recognized by Dr. Hirsch. The prior art described crude methods to prepare dyes for fabric, paper, and ink, and those same methods were used to prepare pharmaceutical dyes. *See id.* at 2:12-17. Such pharmaceutical dyes included isosulfan blue, as the Kulkarni reference

considered by the examiner during prosecution demonstrates. *See, e.g.*, Dkt. No. 55-49 ¶ 74.[3] Finally, even if the problem solved by Apicore was known in the prior art, the record does not reveal motivation to combine the manganese dioxide prior art with isosulfan blue publications, nor does it establish a reasonable expectation of success for the same reasons discussed below with respect to silver oxide.

The parties have not otherwise raised a dispute regarding the meaning of the '992 and '616 patents claims, and thus the Court will assess relevant terms according to their plain and ordinary meaning, informed by the parties' and experts' use of the terms.

### c)   "Purity"

Claim 1 of the '050 patent recites "[a] compound N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl)   methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium,   sodium   salt having a purity of at least 99.0% by HPLC." According to Aurobindo, a person having ordinary skill in the art would understand claim 1's purity limitation to mean "having not more than 1% extraneous material—i.e., material that is not isosulfan blue, sodium salt—as determined using HPLC with a reproducible set of conditions." Dkt. No. 55 at 8 (quoting Dr. Brown).

The Court does not agree. The term "purity," in the context of the '050 patent, does not simply refer to the absence of material that is not isosulfan blue. The claim requires the "compound" to have at least 99.0% purity. Claim 11 recites a "solution" containing the compound, and the compound is defined as having the same purity as recited in claim 1. '050 patent at 12:7-12. Aurobindo's proposed construction would exclude solutions covered by claim 11 because solvent would qualify as "more than 1% extraneous material." "[A] claim

---

[3] When describing the prosecution of the application leading to the '992 patent and Aurobindo's ensnarement defense, Dr. Brown refers to the Kulkarni reference as "Kulkarni." Dkt. No. 55-49 ¶ 60. Dr. Brown also opines that a combination of references—including Kulkarni—renders the '992 and '616 patent claims obvious. *See id.* ¶ 74. For the latter obviousness theory, Dr. Brown refers to Kulkarni as "the '003 application." *See id.*

14

construction that excludes a preferred embodiment . . . is rarely, if ever correct." *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (quoting *Vitronics*, 90 F.3d at 1583). Similarly, claim 15 recites "[a] composition consisting essentially of" the compound. '050 patent at 12:23-29. "'Consisting essentially of' is a transition phrase commonly used to signal a partially open claim in a patent." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998). "By using the term 'consisting essentially of,' the drafter signals that the invention necessarily includes the listed ingredients *and is open to unlisted ingredients* that do not materially affect the basic and novel properties of the invention." *Id.* (emphasis added).

The remainder of the specification is instructive. The patent's background describes prior art methods that "give rise to crude triarylmethane dyes." '050 patent at 2:8-11. As a result, the patent explains a "need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale . . . production." *Id.* at 2:20-23. The synthetic examples described in the specification involve steps resulting in "crude isosulfan blue acid." *Id.* at 7:29-31. The acid is then "purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography." *Id.* at 7:31-37. These purification steps involve removing reaction by-products from a crude mixture to yield the claimed compound. "Purity" in the context of the '050 patent therefore refers to the absence of reaction by-products, rather than the absence of any extraneous material.

Testimony from Plaintiffs' expert, Dr. Jonathan Sessler, confirms that the '050 patent refers to "purity" according to the ordinary meaning as understood by those in the pharmaceutical industry. Dkt. No. 79-33 at 18-20. According to Dr. Sessler, the ordinary

meaning of the term refers to the absence of unwanted reaction products formed during synthesis. *Id.* ¶ 77. "This common understanding of purity is aptly demonstrated by numerous publications and regulatory guidelines." *Id.* ¶ 78. "[F]or pharmaceutical products, the [International Conference on Harmonisation] ICH defines impurities as 'substances in the product that are not the [active pharmaceutical ingredient] API itself or the excipients used to manufacture it, i.e., impurities are unwanted chemicals that remain within the formulation or API." *Id.* (quoting PHARMACEUTICAL IMPURITIES, AN OVERVIEW (2010) at 1). Dr. Brown's testimony to the contrary is not credible. Accordingly, the Court finds that the extrinsic evidence conclusively demonstrates that the term "purity" in the '050 patent refers to the absence of reaction by-products, not the absence of other extraneous material. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841-42 (2015) (describing the district court's fact-finding role in claim construction).

The Federal Circuit affirmed a nearly-identical construction in *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004). Apotex argued that the district court erred in construing the phrase "having a purity of at least 95%" to cover formulations with more than 5% of other ingredients. *Id.* at 1346. According to Apotex, the asserted claim covered only the pure compound and any other compounds added to the formulation rendered the compound impure for purposes of meeting the purity limitation. *Id.* The Federal Circuit held that Apotex's position was "both contrary to the ordinary meaning of such a phrase in the pharmaceutical arts and belied by the specification of the . . . patent." *Id.* at 1346-47. The same is true here.

#### d)  Definiteness

A likelihood of success on the merits cannot be shown "if an alleged infringer raises a substantial question regarding either infringement or validity of the asserted patents." *Takeda Pharm. USA, Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015). A patent's

specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2. A patent is indefinite "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). "The definiteness requirement must take into account the inherent limitations of language." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). "Some modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Nautilus*, 134 S. Ct. at 2128 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732 (2002)). On the other hand, "a patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Id.* at 2129 (internal quotation marks and citations omitted). Indefiniteness is a question of law. *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1365-66 (Fed. Cir. 2011).

Defendants argue that the claims of the '050 patent are indefinite because "having a purity of at least 99.0% by HPLC can be tested in many different ways." Dkt. No. 55 at 11. According to Defendants, the '050 patent "does not provide any conditions for HPLC analysis." *Id.* Dr. Brown explains that one set of conditions might indicate greater than 99% purity while the same sample run under different conditions might indicate less than 99% purity. *Id.*

The Court is not persuaded. Dr. Sessler testified that "[d]etermination of purity by HPLC is a common and well understood way of designating purity in publications and patents that are relied upon by the scientific and technical community." Dkt. No. 79-33 at 96-97. Numerous sources support Dr. Sessler's opinion. Patents filed before the application resulting in the '050 patent describe compounds by reference to HPLC purity without providing comprehensive

HPLC parameters. *See, e.g.*, U.S. Patent Nos. 9,403,770, 7,417,143, 7,960,545, and 8,633,241; Dkt. No. 79-33 at 98. Other scientific literature reflects the same convention. Dkt. No. 79-33 at 97-98.

Dr. Brown relies on a single patent application that does describe HPLC parameters for the contrary position that HPLC conditions must be specified to convey reasonable certainty. *See* Dkt. No. 55-49 at 53. Yet even Dr. Brown agrees that the phrase "purity by HPLC" is a term that is typically used in FDA submissions to describe purity levels allowed in an active pharmaceutical ingredient or a finished dosage form, and that "specific techniques and solvents and things" can be "*elucidated . . .* so that the practitioner knows how the material was purified." *See* Dkt. No. 80-2 at 53:23-54-7 (emphasis added).

Dr. Brown's opinion is based in part on the fact that a dye like isosulfan blue absorbs light at different wavelengths. *See* Dkt. No. 55-49 at 53 ¶ 146. A user could run HPLC at the peak absorption wavelength (approximately 640 nm), or the user could run HPLC at a lower ultraviolet wavelength, such as 220 nm. *Id.* Accordingly, Dr. Brown opines that "a person of ordinary skill could not tell whether performing HPLC analysis at these different wavelengths would lead to different determinations of purity by HPLC." *Id.* Dr. Brown admits, however, that he did not look at actual HPLC chromatograms of isosulfan blue to determine whether different purity results would be obtained if a user changed wavelengths. *See* Dkt. No. 80-2 (Brown Deposition) at 36:19-37:12. Dr. Brown also admitted that he had never performed HPLC on any triarylmethane dye, including isosulfan blue. *See id.* at 37:24-38:1.

Even if different wavelength HPLC detectors would yield different isosulfan blue purity levels, the scope of the claims would be reasonably certain. The term "purity" gives the claims reasonably certainty because one of ordinary skill in the art would understand that this term

means the absence of reaction by-products. Thus, even if some reaction by-products did not absorb radiation in the same way as isosulfan blue does, a person of ordinary skill in the art would know to use a different detector, if necessary, to determine by HPLC whether reaction by-products are present. Dr. Brown's testimony regarding HPLC supports this finding. *See* Dkt. No. 80-2 at 42:2-43:24.

Dr. Brown also suggests that because the patents do not indicate whether the HPLC "peak" for isosulfan blue is pure, the phrase "purity by HPLC" is not reasonably certain. Dkt. No. 44-49 at 53-54. According to Dr. Brown, a person of ordinary skill in the art needs to ensure that an unwanted compound is not co-eluting or co-migrating along with isosulfan blue and hiding within the isosulfan blue HPLC peak. *See id.* There is no evidence, however, of any reaction by-product or other compound co-eluting with isosulfan blue. Even if co-elution was a problem, Dr. Brown admits that techniques were available to distinguish between co-eluting compounds. *See id.* Such techniques could be used to determine the presence of reaction by-products and therefore determine whether the isosulfan blue contained more than 1% impurities.

Contrary to Aurobindo's assertion, the Federal Circuit's decision in *Teva* following remand from the Supreme Court does not compel a contrary conclusion. In *Teva*, the claims recited the term "molecular weight," and the parties agreed that this term could refer to weight-average molecular weight ($M_\text{w}$), number-average molecular weight ($M_\text{n}$), or peak-average molecular weight ($M_\text{p}$). *See* 789 F.3d at 1341. These measures of molecular weight are "calculated in a different way and would typically yield a different result for a given polymer sample." *Id.* Because the record did not establish which measure to use, the Federal Circuit held that the term "molecular weight" rendered the claims indefinite. *Id.* at 1345. Claims of the '050 patent would perhaps be analogous if the claims recited "purity by chromatography," without

any indication in the patent of which type of chromatography was intended. But the claims recite "purity by HPLC," which has a well-understood meaning in the pharmaceutical arts.

Accordingly, the Court finds that a person of ordinary skill in the art would readily understand the phrase "purity by HPLC" and would be able to elucidate HPLC conditions to determine whether an isosulfan blue sample satisfied the purity requirement. Although definiteness is an ultimate question of law, "in some instances, a factual finding may be close to dispositive of the ultimate legal question of the proper meaning of the term in the context of the patent." *Teva*, 135 S. Ct. at 841-42. Such is the case here. Plaintiffs will likely establish that the phrase "purity by HPLC" does not render claims of the '050 patent indefinite.

### 2. Infringement

At the preliminary injunction stage, a patentee must prove that infringement is "more likely than not." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525–26 (Fed. Cir. 2012).

### a) '992 and '616 Patents

The parties do not dispute that Aurobindo's isosulfan blue product is manufactured in India and formulated into the finished drug product before it is imported into the United States. *See* Dkt. No. 55 at 11-12. Section 271(g) of the Patent Act provides, however, that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer . . . ." 35 U.S.C. § 271(g). Plaintiffs contend that Aurobindo infringes claim 1 of the '992 and '616 patents by importing and selling isosulfan blue made by the claimed processes.

20

Dkt. No. 20 at 7.[4] It is undisputed that Aurobindo's process performs every step and includes every element recited in claim 1 of the '992 and '616 patents except silver oxide. *See* Dkt. No. 20, 20-3 ¶¶ 39-60; Dkt. No. 55 at 5-7. Because Aurobindo's process uses manganese dioxide, there is no dispute that Aurobindo does not literally infringe the claims. The only dispute is whether manganese dioxide is equivalent to silver oxide. *See* Dkt. No. 20 at 7-8; Dkt. No. 55 at 5-7.

Equivalence may be shown in one of two ways. *Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 700 (Fed. Cir. 2014). "[A] claim limitation not literally met may be satisfied by an element of the accused product if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)). Equivalence can also be established "by showing on an element-by-element basis that 'the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product,' often referred to as the function-way-result test." *Intendis*, 822 F.3d at 1360 (quoting *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)). "To succeed on a doctrine of equivalents theory, the patentee must demonstrate equivalence under one of these two tests." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

Although Plaintiffs initially discuss the insubstantial difference test, *see* Dkt. No. 20 at 7-8, Aurobindo only addresses the function-way-result test and appears to concede that the

---

[4] Plaintiffs also contend that Aurobindo infringes the '992 and '616 patents under § 271(b), Dkt. No. 20 at 7, but the Court is unaware of authority suggesting that a party can infringe a *process* claim by inducing the domestic use of a product made overseas by a claimed process.

function-way-result test is the appropriate test to use in this case.[5] Although it is difficult to distinguish the two tests, they are not entirely coextensive. In *Intendis*, for example, the Federal Circuit considered a composition claim that included triglyceride and lecithin excipients that were not literally found in the accused composition. 822 F.3d at 1361-62. The district court found that an isopropyl myristate excipient in the accused composition was equivalent to the claimed excipients because the excipient in the accused product performed the same function as the claimed excipients. *Id.* at 1361. The Federal Circuit distinguished this issue on appeal from the insubstantial difference question, i.e., whether "the differences between the chemical structures of isopropyl myristate, triglyceride, and lecithin" are substantial. *Id.*

The distinction is relevant in this case. Aurobindo contends only that manganese dioxide does not perform the same function as silver oxide because manganese dioxide is a strong oxidant, whereas silver oxide is a weak oxidant. Dkt. No. 55 at 6. Yet claim 1 of the '992 and '616 patents does not specify how weak or strong the oxidation step must be. The silver oxide in the claims converts the isoleuco acid to the isosulfan blue acid. *See, e.g.*, '992 patent at 9:41-67, 6:42-7:43. Converting the isoleuco acid to isosulfan blue acid is the function of the silver oxide, and Aurobindo has not argued that the claims should be construed more narrowly.

Aurobindo highlights alleged chemical differences between silver oxide and manganese dioxide, but these differences are irrelevant under the function-way-results test as applied to the face of the claims. *See Intendis*, 822 F.3d at 1361-62. Aurobindo's factual equivalency theory does not match the legal test that it agrees is appropriate, illustrating why the Supreme Court in

---

[5] Dkt. No. 55 at 6 (Aurobindo stating that "manganese dioxide does not serve substantially the same function in substantially the same way to obtain substantially the same result."); Dkt. No. 55-49 ¶ 68 (Dr. Brown opining that "it is my opinion that manganese dioxide in the presence of phosphoric acid does not serve the same function (mild oxidation) as silver oxide without addition of an acid.").

*Warner-Jenkinson* acknowledged that the function-way-result test "may be suitable for analyzing mechanical devices, [but] it often provides a poor framework for analyzing other products or processes." 520 U.S. 17, 39-40 (emphasis added). There is no dispute that manganese dioxide converts the isoleuco acid to isosulfan blue acid in Aurobindo's accused process. Accordingly, the Court finds that Plaintiffs are likely to succeed in proving that Aurobindo's manganese dioxide is equivalent to silver oxide under the function-way-results test, given the scope of the claims on their face.[6]

Despite the Federal Circuit's acknowledgement of the differences between the two equivalency tests, the Court is mindful that "the particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson*, 520 U.S. at 40. The function-way-result test may inform whether insubstantial differences exist between a claim element and an accused element. *See, e.g.*, *Boehringer Ingelheim*, 320 F.3d at 1351-52. Because the '992 and '616 claims on their face simply require silver oxide and do not require that oxidation be carried out at any particular strength, the Court finds that the oxidation strength of manganese dioxide is irrelevant under the insubstantial difference test. *See id.*

The Court appreciates that infringement under the doctrine of equivalents is a "highly factual inquiry [that] rarely comes clear on a premature record." *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1384 (Fed. Cir. 2000). Aurobindo's non-equivalency theory appears to be based on the unstated premise that the '992 and '616 patent claims are limited to "mildly

---

[6] Aurobindo does not argue that the term "silver oxide" implies that the claims are limited to "mildly oxidizing" the isoleuco acid. *Cf. Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337 (Fed. Cir. 2000).

oxidizing" the isoleuco acid to isosulfan blue acid, perhaps because particular embodiments in the specification describe mild oxidation. *See, e.g.*, '992 patent at 6:61-67. Although Aurobindo has not given the Court a reason to limit the claims, a more fully-developed factual record and claim construction proceeding could change things.

Assuming for purposes of the Court's preliminary inquiry that the claims will be limited to a mild oxidation step, the Court finds manganese dioxide to be a mild oxidant equivalent to silver oxide in the context of the '992 and '661 patents. Dr. Sessler testified that manganese dioxide and silver dioxide are mild oxidizing agents that are both markedly different than stronger oxidizing agents such as lead oxide, chromium dioxide, ammonium dichromate, and others. Dkt. No. 20-3 ¶ 46. Dr. Brown testified, by contrast, that manganese dioxide is not equivalent to silver oxide because manganese dioxide is a strong oxidizing agent when used with phosphoric acid, as is done in the accused process. Dkt. No. 55-49 ¶ 67.

While there may be a generalized dispute as to whether manganese dioxide with an acid such as phosphoric acid is a strong or weak oxidizing agent, the Court agrees with Dr. Sessler's testimony in light of the evidence of record. According to an Indian patent application filed by Aurobindo, manganese dioxide provides a 66.93% yield of isosulfan blue acid. *See* Dkt. No. 20-3 ¶ 49. Embodiments described in the '992 and '616 patents describe similar yields ranging from 65 to 70%. *See, e.g.*, '992 patent at 9:22-24. Other than the oxidizing agent, other reaction conditions are the same, e.g., the molar equivalent of manganese dioxide (relative to the isoleuco acid) is within the range recited by claim 1 of the '992 patent. *See* Dkt. No. 20-3 ¶ 48. If it were true that manganese dioxide was acting as a substantially stronger oxidizing agent than silver oxide, then a person of ordinary skill in the art would expect different results. *See id.* ¶ 49.

24

**b)  '050 Patent**

Plaintiffs contend that Aurobindo infringes claim 1, 11, and 15 of the '050 patent under

§ 271(a), Dkt. No. 20 at 6, which provides that "whoever without authority makes, uses, offers to

sell, or sells any patented invention, within the United States or imports into the United States

any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C.

§ 271(a). "To prove an accused product literally infringes the patent in suit, the product must

contain each and every limitation of the asserted claim(s)." *Trebro Mfg., Inc. v. Firefly Equip.,*

*LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014).

Aurobindo's product has "HPLC Purity: [not less than] NLT 99.8%, Isoleuco acid not

more than 0.15% and any other not more than 0.10%." Dkt. No. 20-10 at 6, 7, 9; Dkt. No. 20-11

at 6, 7, 9. FDA submissions indicate that the product does not contain more than 0.15% of any

reaction product used to synthesize the product, as determined by HPLC. Dkt. No. 80-12 at 18.

On the basis of these materials, both Dr. Sessler and Dr. Brown agree that Defendants' isosulfan

blue product has a purity of greater than 99% as determined by HPLC. *See* Dkt. No. 80-2 at

222:14-18; Dkt. No. 79-33 at 21-22. Aurobindo admits that it has imported and sold the product

within the United States. Dkt. No. 40 at 13-14.

Aurobindo contends that they do not infringe because their isosulfan blue product is

"manufactured in India and is formulated into the finished product *before* it is imported to the

U.S." Dkt. No. 55 at 11-12. Thus, according to Defendants, the imported isosulfan blue product

that is sold within the U.S. is a 1% solution of isosulfan blue, which does not meet the 99%

purity limitation because 99% of the solution is not isosulfan blue. *Id.* at 11. This argument

presumes that the term "purity" means the absence of any extraneous material, and the Court

rejected such a construction above. Accordingly, it is more likely than not that Aurobindo is

Case 17-1645   Document 42   Page: 73   Filed: 03/10/2017

infringing at least claim 1 of the '050 patent by importing and selling their isosulfan blue product within the United States.

### 3. Validity

As the parties seeking preliminary relief, Plaintiffs carry the burden of establishing a likelihood of success on validity and must therefore show that Defendants will "not likely prove that the patent is invalid." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). Under § 282 of the Patent Act, however, "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. Section 282 requires an invalidity defense to be proved by "clear and convincing evidence." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). A patent's presumption of validity "exists at every stage of the litigation," including the preliminary injunction stage. *Canon Computer*, 134 F.3d at 1088.

Accordingly, validity at the preliminary injunction stage "is determined in the context of the presumptions and burdens that would inhere at trial on the merits." *Id.* (quoting *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed. Cir. 1987)). At trial, a patent holder "need only submit sufficient evidence to rebut any proof of invalidity" offered by the challenger. *Id.* "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Id.* Thus, whether a challenger has raised a "substantial question" regarding validity depends on "whether the challenger's evidence of invalidity is sufficiently persuasive that it is likely to overcome the presumption of patent validity" at trial. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996).

### a)  Anticipation

The Patent Act defines several ways that an invention can be anticipated. As relevant here, a patent is invalid if the claimed invention (1) was known or used by others before invention by the patentee, § 102(a); (2) was patented or described in a printed publication in this or a foreign country, or in public use or on sale in this country more than a year before the filing date, § 102(b); or (3) was first made in this country by another inventor who did not abandon, suppress, or conceal the invention, § 102(g)(2). "[A]nticipation is a question of fact, including whether an element is inherent in the prior art." *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009).

### i.  *Sigma-Aldrich Documents*

Aurobindo contends that Sigma-Aldrich made and sold isosulfan blue having a purity by HPLC of greater than 99% in March 2001, six years before the earliest priority date of the '050 patent, thus invalidating the patent under §§ 102(b) and 102(g)(2). Dkt. No. 71 at 2-3. To support this argument, Aurobindo cites to eleven documents produced by Sigma-Aldrich. *See* Dkt. No. 71-2 through Dkt. No. 71-12; Dkt. No. 72-1.

Aurobindo does not contend that any of the Sigma-Aldrich documents are printed publications or otherwise publicly-available, and Aurobindo filed the documents with the Court under seal. Aurobindo has attempted to authenticate the documents as business records under Fed. R. Evid. 902(11) through a declaration provided by a Sigma-Aldrich manager, who testified that the documents were "stored in Sigma's electronic record retention system." Dkt. No. 85-1 at 3. Regardless of any authenticity dispute, the Court will consider the documents at this stage even if the documents are not admissible. *See Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence.").

27

Of the eleven Sigma-Aldrich documents, a Sigma-Aldrich Certificate of Analysis is most important. *See* Dkt. No. 72-1. The Certificate refers to a product named "Patent Blue Violet," having a product number "P4808," a Chemical Abstracts Service (CAS) number "68238-36-8," and Lot number "112F5011." *Id.* The Certificate includes an entry titled "Purity by HPLC," and the result is listed as "100%." *Id.* The HPLC purity amount is qualified by an asterisk: the value appears to have been "Corrected for Water Content," which is listed on the Certificate as "5%." *Id.* The Certificate includes an entry titled "QC Release Date" corresponding to "March 2001." *Id.* Aurobindo contends that the Certificate raises a substantial question that the claims are anticipated under § 102(g)(2) because the document indicates that the claimed isosulfan blue was made before the priority date, and the assigned product number and other catalog entries suggest that the product may have been sold before that date.

The Court does not agree. Even assuming, as Aurobindo asserts, that the Certificate sufficiently establishes or corroborates some sort of prior knowledge, use, or invention "within this country" under § 102, the Certificate suffers from two critical shortcomings. First, the record shows that the term "Patent Blue Violet," at least as that term was used by Sigma-Aldrich at the time, did not necessarily refer to isosulfan blue. A Sigma-Aldrich catalog entry states that "Patent Blue Violet" dyes differ structurally with "regard to the substituents on one of the aromatic rings." *See* Dkt. No. 71-3 at 15. This catalog entry is consistent with prior art distinguishing "Patent Blue Violet" dyes from "isosulfan blue." *See, e.g.*, Hirsch et al., *Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation*, 139 American Journal of Roentgenology 1061, 1061 (1982) (Dkt. 80-9). Yet Sigma-Aldrich referred to these different dyes collectively as "Patent Blue Violet." *See* Dkt. No. 71-3 at 15. Other undated Sigma-Aldrich documents state that "Patent Violet Blue" and "isosulfan blue" are

28

synonyms, but these documents do not establish that the term "Patent Blue Violet," as it was used on the Certificate, refers to the claimed isosulfan blue. Dr. Sessler's extensive testimony on the issue supports the finding that there is simply no way to know which compound the Certificate is referring to. Dkt. No. 79-33 at 70-71.

Second, and more important, the record establishes that the Certificate's declaration of "100% purity by HPLC" is inaccurate. The Certificate contradicts numerous other Sigma-Aldrich documents. The Lot number identified in the Certificate, "Lot 112F5011," corresponds to a Sigma-Aldrich reference standard. *See* Dkt. No. 80-20. Sigma-Aldrich analyzed this standard annually to determine whether the Lot remained suitable for use as a reference. *Id.* The pages immediately following the Certificate in the produced document include other reports regarding the same "Lot 112F5011." In January 1998, the reference standard had a purity of "83.0%." Dkt. No. 72-1 at 4. Numerous other certificates for the same Lot reported purity levels no higher than 95%. Dkt. No. 79-33 at 77-82.

The balance of the Sigma-Aldrich documents are either catalog entries that contain no information regarding the purity of the Patent Blue Violet or are undated development documents detailing the synthesis of Patent Blue Violet or isosulfan blue. As Dr. Sessler's testimony explains, these documents do not disclose the claimed compound much less indicate that it had been made or sold. Dkt. No. 79-33 at 71-75. Accordingly, the Court finds that the Sigma-Aldrich documents do not raise a substantial question that the '050 patent claims are invalid under § 102.

### ii.    *Publications Reporting Less Pure Forms of Patent Blue Violet or Isosulfan Blue*

A claim is anticipated by a printed publication "if a single prior art reference discloses each and every limitation claimed." *See Trebro*, 748 F.3d at 1169. Defendants argue that "[e]ssentially pure forms of isosulfan blue for use in surgical applications were well known and

even commercially available well before the priority date of the Apicore patents." Dkt. No. 55 at 9. To support this proposition, Aurobindo cites to Newton et al., *Physicochemical Characterization of Patent Blue Violet Dye*, 70(2) JOURNAL OF PHARMACEUTICAL SCIENCES 122 (1981) ("Newton"). *Id.* at 55 n.5. Newton describes experiments to determine the physiochemical characteristics of "patent blue violet," a compound used to delineate the patency of lymph vessels. Dkt. No. 81-8 at 122. Newton explains that "[b]ased on the pKa for the equilibrium" between the patent blue violet compound and one of its isomers and "TLC [thin-layer chromatography] determinations," the patent blue violet compound "appears to be essentially pure with respect to its organic compound content." *Id.* at 126. Aurobindo argues that this disclosure anticipates the claims.

The Court does not agree. First, Newton indicates that the "patent blue violet" was purchased from Sigma-Adrich, *id.* at 122, and a Sigma-Aldrich catalog entry dated around the same time as Newton's publication date demonstrates that Sigma-Aldrich's "patent blue violet" products could have been dyes other than isosulfan blue. *See* Dkt. No. 71-3 at 15. Newton includes a reaction scheme that appears to include the structure of isosulfan blue, *see* Dkt. No. 81-18 at 124, but this does not mean the "patent blue violet" described Newton was in fact isosulfan blue. A person of ordinary skill in the art would have recognized the potential discrepancy based on a public catalog announcement in which Sigma-Aldrich disclosed that its "patent violet blue" refers to different dyes. *See* Dkt. No. 71-3 at 15. Indeed, Newton uses the generic "patent blue violet" phrase, and Dr. Sessler explains that a person of ordinary skill in the art would not understand this phrase to necessarily mean isosulfan blue. In light of the fact that Newton uses the term "patent blue violet," and Newton indicates that the patent blue violet was purchased from Sigma-Aldrich, there is ambiguity in what Newton teaches, and such ambiguity

30

would more likely than not preclude a finding that Newton anticipates the claims by clear and convincing evidence.

Second, even if Newton sufficiently discloses isosulfan blue, Newton does not describe isosulfan blue having a purity of 99% purity by HPLC. "Purity" and "99% purity" are very different phrases, as both experts appear to agree. Newton, for example, refers to "[p]urified patent blue violet" as a compound that is 85% pure. *See id.* at 122; *see also* Dkt. No. 79-33 at 55. Although Newton later discloses that this compound was purified by thin-layer chromatography, purity by thin-layer chromatography does not suggest 99% purity by HPLC. Dkt. No. 179-33 at 56. As Dr. Sessler explains, the "precision of [thin-layer chromatography] TLC is typically less than HPLC and, in fact, is not a quantitative measurement method." *Id.* This testimony is undisputed.

As contemporaneous prior art explains, isosulfan blue (or at least patent blue violet) could be prepared in "high purity of 94.5%," but [t]he remaining 5.5% consists of closely related isomers producing during synthesis." *See, e.g.*, Hirsch, Dkt. No. 80-9 (emphasis added). Less precise purification methods such as thin-layer chromatography would not have been expected to resolve closely-related isomers. *See* Dkt. No. 79-33 at 56. Accordingly, Newton and other analogous prior art disclosing patent blue violet or isosulfan blue having a purity of around 95% does not raise a substantial question that the '050 patent claims are invalid under § 102.

### b)  Obviousness

A claim is invalid as obvious if an alleged infringer proves that the differences between the claims and the prior art are such that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law based on underlying facts. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356-57 (Fed. Cir. 2012). The Supreme Court set out the

31

framework for the obviousness inquiry in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966),

and *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

"A determination of whether a patent claim is invalid as obvious under § 103 requires

consideration of all four *Graham* factors." *Apple Inc. v. Samsung Elecs. Co.*, No. 2015-1171,

2016 WL 5864573, at *8 (Fed. Cir. Oct. 7, 2016) (en banc). "Objective indicia of

nonobviousness must be considered in every case where present." *Id.*; *see also In re

Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075

(Fed. Cir. 2012) ("The district court erred, however, by making its finding that the patents in suit

were obvious before it considered the objective considerations and by shifting the burden of

persuasion to Cephalon.").

"What a prior art reference teaches and whether a skilled artisan would have been

motivated to combine references are questions of fact." *Apple*, 2016 WL 5864573, at *11. In

addition to common knowledge or teachings in the prior art itself, a "design need or market

pressure or other motivation" may provide a suggestion or motivation to combine prior art

elements in the manner claimed. *Rolls Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339

(Fed. Cir. 2010); *accord KSR*, 550 U.S. at 420. A party asserting that a patent is invalid as

obvious must "show by clear and convincing evidence that a skilled artisan would have been

motivated to combine the teachings of the prior art references to achieve the claimed invention,

and that the skilled artisan would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

### i.    *Level of Ordinary Skill in the Art*

Dr. Brown contends that a person of ordinary skill in the art would have an advanced degree such as a Ph.D. or foreign equivalent "in the field of chemistry or a closely related field, with additionally at least about 2 years of experience in synthetic, medicinal, and/or process chemistry, including analytical methodology relating to testing active pharmaceutical ingredients." Dkt No.. 55-49 at 8. Dr. Sessler contends that this characterization is too limiting in that it requires a Ph.D. Dr. Sessler explains that a person of ordinary skill could "hold a lower advanced degree in chemistry, biochemistry, chemical engineering, or complementary discipline along with laboratory experience." Dkt. No. 79-33 at 4. Dr. Brown appears to have agreed during a subsequent deposition that "[d]epending on the experience," a person of ordinary skill in the art could have a lesser advanced degree and still qualify as a person of ordinary skill in the art. Dkt. No. 80-2 at 99:1-8. Although the Court is inclined to agree that a Ph.D. may not necessarily be required, the Court's obviousness analysis at this stage will presume the higher level of skill articulated by Dr. Brown.

### ii.    *Scope and Content of the Prior Art and Differences between the Claims and the Art*

#### *'992 and '616 Patents*

Aurobindo argues that claim 1 of the '992 and '616 patents is obvious over the following combination of references (*see* Dkt. No. 55 at 7-8; Dkt. No. 55-49 ¶¶ 69-82, 97-110):

1. Hirsch et al., Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation 139 AMERICAN JOURNAL OF ROENTGENOLOGY 1061 (1982) ("Hirsch")
2. Kondo, U.S. Patent No. 4,054,458 ("Kondo")
3. Gessner, U.S. Patent No. 5,659,053 ("Gessner")

33

4. Thoraval et al., Development Of Paper, Chemical Agent Detector, 3-Way Liquid Containing Non-Mutagenic Dyes. II-Replacement Of The Blue Indicator Dye Ethyl-bis-(2.4-DINITROPHENYL) Acetate (EDA), *available at* http://www.dtic.mil/dtic/tr/fulltext/u2/a193781.pdf ("Thoraval")

5. U.S. Patent Application Publication No. 2006/0224003 ("Kulkarni")

Specifically, Aurobindo contends that Hirsch describes isosulfan blue and its use as a pharmaceutical dye; Kulkarni discloses that isosulfan blue can be prepared by oxidizing the isoleuco acid to isosulfan blue acid; Thoravel teaches the use of silver oxide in a nonpolar solvent with triarylmethane dyes; Kulkarni discloses the use of polar solvents (such as an aqueous solution) during triarylmethane synthesis; Kondo teaches that isosulfan blue can be recovered by filtration and mixed with sodium; and Gessner teaches that triarylmethane dyes can be recovered from a reaction mixture in a conventional manner. *See, e.g.*, Dkt. No. 55-49 ¶¶ 75-78.

When all elements of a claim are found in the prior art, as they are here, there are additional factual questions: "whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that combination, a person of ordinary skill would have had a reasonable expectation of success." *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1380 (Fed. Cir. 2015). The critical gap in Aurobindo's prior art combination is between references such as Hirsch that disclose isosulfan blue for pharmaceutical use and Thoraval—the reference Aurobindo relies on for a disclosure of silver oxide as an oxidizing agent for triarylmethane dyes.

To bridge the gap, Dr. Brown seems to contend that the invention would have been obvious to try based on a disclosure in Thoraval. Dr. Brown highlights that Thoraval "found that the oxidation of a particular triphenylmethane intermediate performed best with silver oxide." Dkt. No. 55-49 ¶ 73. Dr. Brown then concludes that a personal of ordinary skill in the art would

34

be motivated to "*try* different oxidizing agents to see if any performed better." Dkt. No. 55-49

¶ 80 (emphasis added). Aurobindo's Response Brief simply states the bare conclusion: "[a]

skilled artisan would have had the motivation to combine these prior art references." Dkt. No. 55

at 8.

The Court cannot find the requisite motivation in the prior art or testimony of record.

First, the prior art of record either does not recognize the problem with isosulfan blue synthesis

at all or does not attribute the problem to the oxidation step or the oxidizing agent, and thus the

nature of the problem to be solved would not have provided motivation. *See* § II.A.1.b, *supra*.

"One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the

prior art to deprecate the claimed invention." *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988).

Second, even if the problem was known, the problem would not have motivated a person

of ordinary skill in the art to combine references such as Hirsch and Thoraval. Thoraval does not

address the same problem. While Thoraval is not necessarily non-analogous art as Plaintiffs

suggest, it is undisputed by both parties' experts that Thoraval discloses a particular class of

triarylmethane dyes that are used as chemical weapons detectors. *See* Dkt. No. 79-33 ¶ 132; Dkt.

No. 80-2 at 200:9-13. As Dr. Sessler explains, Thoraval's dyes are different in that none of them

include diethylamine and sulfonate substituents on the aryl groups. *See* Dkt. No. 79-33 ¶ 132.

Thoraval is not concerned with pharmaceutical purity.

Third, a person of ordinary skill in the art would not have expected silver oxide to work

with a compound such as isosulfan blue on the basis of Thoraval. Although Thoraval discloses

that silver oxide worked best for a particular triarylmethane compound, *see* Dkt. No. 55-49 ¶ 73,

Thoraval also teaches that silver oxide was entirely incapable of oxidizing other triarylmethane

dyes that were very similar in structure to the compound for which silver oxide was effective.

See Dkt. No. 79-33 ¶ 132; Thoraval at 31-34. Thoraval does not necessarily teach away from trying silver oxide as Plaintiffs assert, but Thoraval demonstrates that where silver oxide was unsuccessful, stronger oxidizing agents such as lead compounds were successful. See Dkt. No. 79-33 ¶ 133; Thoraval at 34. Thoraval establishes that modest structural changes to a triarylmethane dye can render silver oxide ineffective at oxidation. Accordingly, a person of ordinary skill in the art would not have had a reasonable expectation of success when using silver oxide with isosulfan blue because isosulfan blue is structurally different than the triarylmethane dyes disclosed in Thoraval. See Dkt. No. 79-33 ¶ 132.

*'050 Patent*

In addition to the Sigma-Aldrich documents discussed above, Aurobindo contends that various combinations of the following references raise a substantial question that the '050 claims are obvious:

1. Newton et al., *Physicochemical Characterization of Patent Blue Violet Dye*, 70(2) JOURNAL OF PHARMACEUTICAL SCIENCES 122 (1981) ("Newton")

2. Hirsch

3. Kulkarni

4. U.S. Patent Application Publication No. 2008/0008658

5. PCT Patent Application Publication No. WO 2004/092122 A2

6. Snyder et al., *Preparative HPLC Separation* in PRACTICAL HPLC METHOD DEVELOPMENT (John Wiley & Sons, Inc. 2d ed. 1997) ("Snyder")

7. Huber and Majors, *Principles in Preparative HPLC* (Agilent Pub. No. 5989-6639EN, April 2007) ("Huber")

8. Papenfuss, U.S. Patent No. 3,671,553

9. Canadian Patent Application No. CA 2 500 803 A1

10. Ranganathan, U.S. Patent No. 5,573,752

11. PCT Patent Application Publication No. WO2005/009423

Certain references such as Newton and Hirsch disclose patent blue violet or isosulfan blue having a purity of about 95%. See Dkt. No. 55 at 9. Aurobindo contends that purification of

36

such a mixture to achieve 99% purity would have been obvious because "[t]he law is well-settled that a claim to a purified form of a known compound is not patentable." *Id.* According to Aurobindo, the only exception to this rule is when a purified compound "results in 'properties and characteristics which were different in kind from those of the known product rather than in degree.'" *Id.* (quoting *In re Merz*, 97 F.2d 599 (CCPA 1938)). Thus, because Plaintiffs have not established that the 99% pure form of isosulfan blue is not "different in kind" than the 95% pure mixture known in the prior art, Aurobindo contends that the claims are obvious.

It is true that in the chemical arts, the Federal Circuit has long held that "structural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives a reason or motivation to make the claimed compositions, creates a prima facie case of obviousness." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356 (Fed. Cir. 2007) (quoting *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (en banc)).[7] "The analysis is similar where, as here, a claimed composition is a purified form of a mixture that existed in the prior art." *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007). As the Federal Circuit explained:

> [I]f it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, or if the prior art would provide a person of ordinary skill in the art with reason to believe that this is so, the purified compound is prima facie obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified.

*Id.* Ordinarily, a person of ordinary skill in the art "expects a concentrated or purified ingredient to retain the same properties it exhibited in a mixture, and for those properties to be amplified

---

[7] Whether "prima facie" obviousness of a chemical compound as described by cases like *Takeda* is a concept that survives later precedent such as *In re Cyclobenzaprine*, 676 F.3d 1063, and the Federal Circuit's recent en banc decision in *Apple*, 2016 WL 5864573, is a question that the Court need not answer because the Court addresses each *Graham* factor, including objective considerations, without engaging in burden-shifting.

when the ingredient is concentrated or purified." *Id.* at 1302. Indeed, "isolation of interesting compounds is a mainstay of the chemist's art." *Id.* "If it is known how to perform such an isolation, doing so 'is likely the product not of innovation but of ordinary skill and common sense.'" *Id.* (quoting *KSR*, 127 S.Ct. at 1742).

Critical to the analysis, however, is whether it was "known how to perform" the isolation or purification of the compound. As the Federal Circuit explained in *Aventis*,

> [A] purified compound is not always prima facie obvious over the mixture; for example, it may not be known that the purified compound is present in or an active ingredient of the mixture, **or the state of the art may be such that discovering how to perform the purification is an invention of patentable weight in itself**.

*Id.* (emphasis added). Accordingly, a pure compound may be nonobvious over a prior art mixture when the purification method is inventive or, if the purification method is not inventive, when objective considerations suggest that the pure compound would not have been obvious. *See id.*

The prior art of record universally suggests that isosulfan blue had a purity of no more than 95%. The Court assumes without deciding, based on *Aventis* and other cases, that a person of ordinary skill in the art would have been motivated to purify existing isosulfan blue even further because, generally speaking, the purer the better. The Court also assumes without deciding that Aurobindo is correct that Plaintiffs have not demonstrated that 99% pure isosulfan blue is "different in kind" than the 95% mixture, as that phrase is defined by Federal Circuit precedent.[8]

The Court nevertheless finds that Plaintiffs have established that it is more likely than not that the state of the art was such that a person of ordinary skill in the art would not have been able to purify isosulfan blue to at least 99% purity before the priority date. Apicore's discovery

---

[8] The record is not clear whether the 99% pure isosulfan blue may be "different in kind" from the less pure mixture because of its ability to better withstand regulatory scrutiny by the FDA.

of a process to make highly-pure isosulfan blue is "an invention of patentable weight in itself." *Id.* The '050 patent describes the synthetic process used to obtain 99% pure isosulfan blue in detail. Starting with a commercially-available compound, the specification describes steps for obtaining a benzaldehyde intermediate. '050 patent at Scheme 1, 5:1-7:45. This intermediate is then reacted in a subsequent step, after which the isoleuco-acid "with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture." *Id.* at 6:41-45. The isoleuco-acid is then reacted, in the critical step, under unique conditions to obtain isosulfan blue, which can then simply be filtered, precipitated, and recrystallized to obtain the isosulfan blue with greater than 99% HPLC purity. *Id.* at 7:25-45. Contrary to Aurobindo's suggestion, Apicore did not simply purify the known mixture of isosulfan blue using common methods and then claim the result. Accordingly, Apicore's process provides patentable weight to the resulting 99% pure isosulfan blue because the process is itself patentable.

Dr. Brown contends that the 95% pure isosulfan blue mixture known in the prior art could have been passed through a preparatory HPLC column to obtain highly-pure isosulfan blue. *See* Dkt. No. 55-49 at 45-50. Dr. Brown is correct that the prior art, including Snyder, Huber, the '658 application (to the extent this application is prior art), and other references teach that HPLC can generally be used to purify compounds. Dr. Brown is also correct that the prior art, including the '553 patent to Papenfuss, teaches that triarylamine dyes can be purified in a range from 96% to 98%. *Id.* at 48-49.

The '050 patent, however, indicates that prior art methods used for isosulfan blue synthesis resulted in particularly crude mixtures that made purification to highly-pure levels troublesome. *See* '050 patent at 2:8-19. This is consistent with the prior art of record, which explains that isosulfan blue contains "closely related isomers produced during synthesis." *See,*

39

*e.g.*, Hirsch, Dkt. No. 80-9; Dkt. No. 79-33 at 69. Dr. Brown's explanation of HPLC confirms that a crude mixture of closely related isomers would be difficult to separate with HPLC alone because closely related isomers would have similar affinities for the stationary phase, *see* Dkt. No. 80-2 at 42:-43 (discussing HPLC generally), and could co-elute from an HPLC column at the same time as isosulfan blue, *see* Dkt. No. 44-49 at 53-54.

Dr. Sessler's testimony suggests that the success of HPLC and separation methods in general depends not only on the particular compound but also the mixture in which the compound is present. *See* Dkt. No. 79-33 at 66-69. For a "complex mixture, repeated chromatography will increase the overall purity, but only relative to the impurities for which there is good separation." *Id.* at 67. Repeated chromatography comes at the cost of decreased yield, which explains why a person of ordinary skill in the art would not have tried preparatory HPLC on a mixture of isosulfan blue and its isomers, and certainly not with an expectation of success. *See id.* at 67-69. Accordingly, the Court finds that Aurobindo has not raised a substantial question that the claims of the '050 patent are prima facie obvious.

### iii.   *Objective Considerations*

Various factors "serve to guard against slipping into use of hindsight, and to resist the temptation to read into the prior art the teachings of the invention in issue." *Apple*, 2016 WL 5864573, at *12 (quoting *Graham*, 383 U.S. at 36). The factors are known as "objective indicia of non-obviousness." *Id.* "These include: commercial success enjoyed by [products] practicing the patented invention, industry praise for the patented invention, copying by others, and the existence of a long-felt but unsatisfied need for the invention." *Id.* As the Federal Circuit recently explained:

> Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light

of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*Id.* (quoting *Stratoflex*, 713 F.2d at 1538-39). Plaintiffs contend that the following objective considerations support patentability: failure of others, long-felt need, commercial success, praise by others, copying, teaching away, and unexpected results. Dkt. No. 79 at 7-8. Relevant to these factors is the Court's view that objective considerations regarding the patentable process described in the '992 and '616 patents are relevant to the patentability of the '050 patent claims.

*Long-Felt Need*

"Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious." *Apple*, 2016 WL 5864573, at *15. Plaintiffs contend that isosulfan blue suppliers such as Covidien and others searched for years to find a reliable isosulfan blue manufacturer that could meet quantity and purity demands. Dkt. No. 79 at 7-8. The Court agrees. The evidence establishes that for over 30 years, isosulfan blue manufacturers had trouble maintaining supply and meeting purity demands, and it appears from the preliminary record that many of the purity problems may have been associated with the oxidation method used during synthesis. *See, e.g.*, Dkt. No. 80-18; Dkt. No. 80-19; Dkt. No. 81-3; Dkt. No. 80-16; *see also* Dkt. No. 79-33 ¶¶ 259-85.

Aurobindo argues that because Lymphazurin™ was on the market for 30 years "with only a few periods of shortages," Plaintiffs cannot establish long-felt need. Dkt. No. 92 at 4. It may be true as Aurobindo suggests that the market was capable of meeting isosulfan blue demand for extended periods of time during the Lymphazurin™ years, and that certain shortages were attributable to events unrelated to isosulfan blue synthesis, but there is no dispute that suppliers such as Sigma-Aldrich had a long-felt need for a reliable supply of high-purity

41

isosulfan blue. Sigma-Aldrich was itself forced to initiate efforts to purify isosulfan blue acquired from manufacturers, and Sigma-Aldrich eventually began developing its own manufacturing process sometime around 2010. *See* Dkt. No. 80-16; Dkt. No. 81-4, 81-5, 81-6, 81-8. It is undisputed that the claimed invention reliably provides high-purity isosulfan blue. Accordingly, the Court finds that evidence of long-felt need supports the likelihood that Apicore's invention claimed in the '616, '992, and '050 patents will not be found obvious.

*Failure of Others*

"Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry." *Cyclobenzaprine*, 676 F.3d at 1081. "While absolute certainty is not necessary to establish a reasonable expectation of success, there can be little better evidence negating an expectation of success than actual reports of failure." *Boehringer Ingelheim*, 320 F.3d at 1354. "This is particularly true when the evidence indicates that others found development of the claimed invention difficult and failed to achieve any success." *Cyclobenzaprine*, 676 F.3d at 1081. "In such circumstances, 'evidence of failed attempts by others could be determinative on the issue of obviousness.'" *Id.* (quoting *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000).

The Court does not find that the record supports a finding that others had failed to develop the invention claimed by the patents-in-suit. Plaintiffs' argument regarding failure of others is too general. Plaintiffs contend that Covidien and others tried to develop a reliable method for synthesizing isosulfan blue, and they were unable to do so. Dkt. No. 79 at 7-8; Dkt. No. 79-33 ¶¶ 277-85. The claimed invention, however, is a method of preparing isosulfan blue using silver oxide and the resulting high-purity isosulfan blue compound. Plaintiffs have not suggested that others tried to use silver oxide to synthesize isosulfan blue but failed. *See, e.g.*,

42

*Cyclobenzaprine*, 676 F.3d at 1081 (referencing failure of others to develop the "claimed invention"); *Boehringer Ingelheim*, 320 F.3d at 1354. Failure of others therefore is not a factor the Court considers as weighing against a finding of obviousness at this stage.

*Commercial Success*

Plaintiffs argue that commercial success of their isosulfan blue product supports nonobviousness. Dkt. No. 79 at 7-8; Dkt. No. 79-33 ¶¶ 286-292. Though Aurobindo does not dispute this argument, *see* Dkt. Nos. 55, 92, Aurobindo raises arguments concerning nexus with respect to irreparable harm, *see, e.g.*, Dkt. No. 92-12 ¶ 6, and the Court is mindful that the primary concern with evidence of commercial success is establishing a nexus between the claimed invention and the success. *See Ransomes, Inc. v. Great Dane Power Equip., Inc.*, 232 F.3d 911 (Fed. Cir. 2000) ("When a patentee asserts that commercial success supports its contention of nonobviousness, there must be a sufficient relationship between the commercial success and the patented invention."). Nexus is an issue that Aurobindo raises with respect to irreparable harm, and the Court addresses the dispute below.

There is no question that Plaintiffs' commercial isosulfan blue product was commercially successful. Shortly after the FDA approved Synerx's ANDA for the isosulfan blue product, Apicore began generating significant revenue from isosulfan blue sales, despite Covidien's presence in the market. *See* Dkt. No. 20-29 ¶¶ 11-15. Covidien's Lymphazurin™ sales then sharply declined, *see* Dkt. No. 20-14 ¶ 23, and Covidien withdrew Lymphazurin™ from the market by September 2012, *see* Dkt. No. 55-23 at 5561. Sales figures coupled with market data provide strong evidence of commercial success. *See Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360-61 (Fed. Cir. 1999). While the FDA determined that Covidien discontinued Lymphazurin™ for "reasons other than safety or effectiveness," Dkt. No. 55-23 at 5561, the

timing of Covidien's exit from the market provides circumstantial evidence that Covidien could not compete with Apicore.

Plaintiffs' commercial success is sufficiently tied to the invention claimed in at least the '919 and '616 patents. "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). If it were not for the process claimed in the '992 and '616 patents, it is likely that neither Apicore nor Aurobindo would be in the market. *See, e.g.*, Dkt. No. 55-19; *See also Akzo N.V. v. Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed. Cir. 1986) (finding commercial success where a product made by a patented method was commercially successful). The commercial success of the invention claimed in the '919 and '616 patents increases the likelihood that the claims would withstand an obviousness challenge. In addition, even if Aurobindo is correct that the market demand for isosulfan blue is not sufficiently tied to the 99% purity limitation of the '050 patent, the nonobviousness of the '919 and '616 patent claims supports the patentability of the '050 patent claims. *See Aventis*, 499 F.3d at 1301-02.

### Copying and Praise by Others

"The copying of an invention may constitute evidence that the invention is not an obvious one. This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed." *Vandenberg v. Dairy Equip. Co., a Div. of DEC Int'l*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (citations omitted). Aurobindo admitted to the FDA that it searched the literature for a suitable process for preparing isosulfan blue and decided to use the invention disclosed in Apicore's '992 patent, though Aurobindo substituted

44

manganese dioxide for silver oxide. *See* Dkt. No. 80-14. Aurobindo's Indian patent application also reveals similarities to the invention claimed in Apicore's patents. *See* Dkt. No. 20-3 ¶¶ 49-53.

Copying may not always weigh against obviousness because copying may be explained by something other than the superiority of the patented invention, such as disrespect for patent rights, the inability of the patentee to enforce the patent, or "contempt for the specific patent in question." *See, e.g., Cable Elec. Prod., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999). In this case, however, Aurobindo told the FDA that isosulfan blue synthesis is described in a "number of patents," and after having "studied all these patents," Aurobindo selected the process described in the '992 patent. *See* Dkt. No. 80-14 at 3. Even if Aurobindo's likely insubstantial modification to the claimed process diminishes the significance of Aurobindo's copying, Aurobindo's statements to the FDA at least constitute praise of Apicore's invention.

Aurobindo contends that this alleged evidence of copying supports a finding of obviousness because Aurobindo resorted to preparatory HPLC to achieve greater than 99.5% purity. Dkt. No. 55 at 10. The Court does not agree. Aurobindo's process involving preparatory HPLC is not prior art. Neither are internal documents from Apicore discussing preparatory HPLC. *See, e.g.*, Dkt. No. 92 at 3 (Aurobindo arguing that Apicore lab notebook entries support obviousness); *See also* § 103 ("Patentability shall not be negated by the manner in which the invention was made.").

More importantly, Aurobindo's preparatory HPLC step was carried out on an isosulfan blue mixture prepared according to the process described and claimed by the '992 patent.

45

Aurobindo did not simply run a crude isosulfan blue mixture from the prior art through a preparatory HPLC column and achieve greater than 99% purity. Aurobindo started from something the '992 patent provided. Finally, the fact that Aurobindo made the effort to achieve greater than 99% purity for its FDA submission suggests that highly-pure isosulfan blue may be "different in kind" than less pure mixtures. *See Aventis*, 499 F.3d at 1301-02. Accordingly, the Court finds that evidence of copying and Aurobindo's praise of the invention to the FDA would weigh against a finding of obviousness.[9]

*Unexpected Results and Teaching Away*

Plaintiffs contend that the Apicore inventors unexpectedly found that high-purity isosulfan blue could be prepared by a process that used silver oxide, and the prior art taught away from this invention. Dkt. No. 79 at 7-8. Aurobindo appears not to dispute this point, arguing instead that objective considerations cannot "suffice to overcome a strong showing of obviousness in a case in which obviousness is clear from a comparison of the prior art references and the patent in suit." *See* Dkt. No. 92 at 4 (quoting *Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp. 3d 656, 675 (E.D. Tex. 2015)). As the Court has explained, Aurobindo has not established a substantial question concerning obviousness. Although the Court does not find that the record supports Plaintiffs' assertion of teaching away, there is significant evidence that the purity levels achieved by the claimed invention were unexpected. The Court therefore finds that unexpected results would weigh against a finding of obviousness.

### iv.    Obviousness Conclusion

Aurobindo does not raise a substantial question regarding motivation to combine prior art references to achieve the claimed invention with a reasonable expectation of success, and

---

[9] Plaintiffs present additional evidence of praise by others, *see* Dkt. No. 79-33 ¶¶ 293-300, but the Court finds this evidence insufficient.

objective considerations overwhelmingly weigh against a finding of obviousness. Accordingly, the Court finds that Plaintiffs have established that Aurobindo will not likely prove that the patents-in-suit are invalid as obvious. *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).

## B.  Irreparable Harm

As the party seeking emergency relief, Plaintiffs "must make a clear showing that [they are] at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *See Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). The patentee must also establish that the harm is related to the infringement, a requirement referred to as the "causal nexus" requirement. *Id.* at 1324.

### 1.  Substantial and Immediate Irreparable Injury

"Irreparable injury encompasses different types of losses that are often difficult to quantify." *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930-31 (Fed. Cir. 2012). A showing of lost market share and sales can support a finding of irreparable harm. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861–62 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). A patentee can also demonstrate irreparable harm from a diminished ability to invest in research and development. *See Bio–Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996). In addition, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345; *see also Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d

47

1351, 1363 (Fed. Cir. 2012) (''Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.'').

With respect to lost sales, research and development, and price erosion, Apicore's Chief Financial Officer, Mr. Rahul Devnani, testified that isosulfan blue sales constituted a significant portion of Apicore's total revenue before Aurobindo entered the market, and profit from isosulfan blue sales fueled research and development. Dkt. No. 20-29 at 3-5. Mr. Devnani testified that if half or more of Apicore's revenue from isosulfan blue is lost as Apicore projects, Apicore would need to eliminate or delay the research and development of new products currently in development. Dkt. No. 20-29 ¶ 16. Mr. Devnani testified further at the hearing that private financing would be unavailable to temporarily make up for lost isosulfan blue revenue through trial because of another significant loan obligation. In addition, Mr. Devnani testified that two of Apicore's employees had already left the company since Apicore had ceased isosulfan blue manufacturing, and that employee morale was down because manufacturing activity at the Apicore facility was at a standstill. There is no question that Apicore will lose most if not all of its isosulfan blue sales to Aurobindo if infringement is allowed to continue. *See Automated Merch. Sys., Inc. v. Crane Co.*, 357 Fed.Appx. 297, 301 (Fed. Cir. 2009) (''To the extent that failing to grant a preliminary injunction would permit Crane to drop its prices in order to drive AMS out of the market entirely, this might support a finding of irreparable harm sufficient to warrant a preliminary injunction.''). Finally, there is undisputed evidence that Aurobindo's infringement has and is continuing to result in significant price erosion. *See, e.g.*, Dkt. No. 20-2 ¶¶ 41-61.

48

Aurobindo admits that it manufactures its own isosulfan blue product, and thus Apicore is directly competing with Aurobindo. Plaintiffs will likely establish that Aurobindo's competition is being fueled by its infringement of Apicore's valid patents. This supports a finding of irreparable injury. *Douglas Dynamics*, 717 F.3d at 1345; *Presidio Components*, 702 F.3d at 1363; *see also Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) (''Trebro and FireFly are direct competitors selling competing products in this market. Thus, the record strongly shows a probability for irreparable harm.'').

Accordingly, the Court finds that Apicore has demonstrated that it has and will continue to suffer irreparable injury from Aurobindo's infringement in the form of lost sales, lost research and development ability, price erosion, and having to compete with an infringing competitor. Plaintiffs' expert testimony of record supports this finding.[10]

## 2.   Causal Nexus

"[T]he causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition—e.g., sales [that] would be lost even if the offending feature were absent from the accused product." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (internal quotation omitted). "The former type of harm may weigh in favor of an injunction, whereas the latter does not." *Id.*

Aurobindo argues at length that the causal nexus requirement has not been satisfied, and Aurobindo presents extensive expert testimony from a physician and economist on the subject. The Court is not persuaded. Plaintiffs have demonstrated that Apicore's irreparable injury is the direct result of Aurobindo's infringement. Without infringing the '992, '616, and '050 patents, Aurobindo would not be able to make the isosulfan blue product described in its ANDA. And

---

[10] The Court does not decide whether Mylan will suffer irreparable harm.

without a preliminary injunction, Aurobindo would continue using Apicore's patented process to produce a product that has already begun destroying Apicore's isosulfan blue business.

Aurobindo's arguments are for another product and another market that is not regulated by the FDA. In a nutshell, Aurobindo argues that Plaintiffs have not presented evidence that the patented features "actually drive consumer demand" for isosulfan blue. *See, e.g.*, Dkt. No. 55 at 14. The law on which Aurobindo bases this argument, however, is readily distinguishable. Unlike *Apple* and similar cases, this case does not involve a complex, multi-featured product. The finished drug product is isosulfan blue in an injectable solution, which is more like the "relatively simple products" the Federal Circuit contrasted with smart-phones and tablets in the *Apple* cases. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013). In addition, at least with respect to the '992 and '616 patents, the *Apple* cases dealt with features of a consumer good, not chemicals such as silver oxide that are used in a patented process. It is not possible to separate Apicore's patented process from the commercial isosulfan blue product for purposes of evaluating consumer demand and nexus. *See, e.g.*, *Amgen Inc. v. F. Hoffman–La Roche Ltd.*, 580 F.3d 1340, 1386 (Fed. Cir. 2009) (affirming injunction in part based on finding of infringement of process patents under § 271(g)); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1356 (Fed. Cir. 2006) (affirming injunction for infringement of patented process).

### 3.   Balance of Equities

The balance of equities weighs in favor of Apicore. If an injunction is not granted, Apicore stands to lose its entire isosulfan blue business, a business which Apicore relies on to fund ongoing research and development. Aurobindo was aware of Apicore's process, and Aurobindo copied it. *See* Dkt. No. 80-14. "One who elects to build a business on a product found [likely] to infringe cannot be heard to complain if an injunction against continuing infringement

destroys the business so elected." *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed. Cir. 1986).

### 4.   Public Interest

"[T]he public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. The Federal Circuit "has long acknowledged the importance of the patent system in encouraging innovation. Indeed, the 'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.'" *Sanofi Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (quoting *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985)). Disclosure of how to make and use an invention is the "quid pro quo" of the patent grant. *See JEM Ag Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124 (2001). Apicore satisfied its end of the bargain by disclosing to the public its method for preparing isosulfan blue. Apicore would not likely have made such a disclosure if it had known that a competitor would use it to destroy Apicore's isosulfan blue business before Apicore could make it to trial.

Aurobindo argues that the public interest "favors competition and less expensive generic drugs." Dkt. No. 55 at 19. According to Aurobindo, denying an injunction would "restore the policy of the Hatch-Waxman Act" because Plaintiffs enjoyed the benefit of the statute by allegedly "piggy-backing" on Covidien's brand product and then creating a monopoly after Covidien exited the market, keeping isosulfan blue prices high. Dkt. No. 55 at 19. The Court disagrees. The policy of the Hatch-Waxman Act does not preclude or discourage district courts from promoting innovation in the generic drug market. "[W]hile the statutory framework . . . does seek to make low cost generic drugs available to the public, it does not do so by entirely eliminating the exclusionary rights conveyed by pharmaceutical patents. Nor does the statutory framework encourage or excuse infringement of valid pharmaceutical patents." *Pfizer,*

51

*Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). Accordingly, the Court finds that the public interest will not be disserved by granting a preliminary injunction.

## III.   CONCLUSION

Plaintiffs have satisfied the burden required for preliminary relief. The Court therefore RECOMMENDS that Defendants be enjoined from manufacturing, selling or offering for sale, using, or importing the accused product within the United States until further order of the Court. Pursuant to Federal Rule of Civil Procedure 65(c), the Court RECOMMENDS that, following input from the parties, Plaintiffs be required to post bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report by **December 4, 2016** shall bar that party from de novo review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

**SIGNED this 19th day of November, 2016.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

# ADDENDUM E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, et al., | § | |
| | § | |
| *Defendants*. | § | |

## ORDER ADOPTING REPORT AND RECOMMENDATION

Before the Court is the Report and Recommendation (Docket No. 101) filed by Magistrate

Judge Payne on November 21, 2016 recommending that Plaintiffs' motion for a preliminary

injunction (Docket No. 20) be granted.   Aurobindo objects to the Report and Recommendation,

contending that it includes four incorrect conclusions of law.  The Court disagrees for the following

reasons.

First, Aurobindo argues that the Report incorrectly determines that Aurobindo failed to

raise a substantial question regarding noninfringement of the '992 and '616 patents.  Docket No.

106 at 2-6.  The Report explains, however, that "it is undisputed that Aurobindo's process performs

every step and includes every element recited in claim 1 of the '992 and '616 patents except silver

oxide." Docket No. 101 at 21.  Aurobindo's process uses manganese oxide, which is likely to be

found equivalent to silver oxide by a fact-finder.  *Id.* at 21-24.  The Court finds Aurobindo's

arguments to the contrary unpersuasive for the extensive reasons explained in the Report. *Id.* at

11-14, 20-24.

1

Second, Aurobindo contends that the Report incorrectly finds that Aurobindo failed to raise a substantial question concerning validity of the '050 patent. Docket No. 10-6 at 6-8. However, the numerous prior art references presented by Aurobindo suggest that those skilled in the art were unable to achieve isosulfan blue purity levels of greater than 95 percent. On the basis of a thorough review of the prior art and live testimony from the expert witnesses, the Court concludes that the Report correctly finds that there is not a substantial question regarding validity of the '050 patent. *See* Docket No. 101 at 26-47.

Aurobindo's third objection is that the Report incorrectly concludes that Plaintiffs established a causal nexus between Aurobindo's alleged infringement and Plaintiffs' alleged harm. Docket No. 106 at 8-10. As the Report explains, however, Aurobindo's causal nexus arguments are largely irrelevant to a product such as the accused isosulfan blue product, which would not be on the market if Aurobindo had not obtained Food and Drug Administration approval for a product that will likely be found to be covered by the patents-in-suit. *See* Docket No. 101 at 49-50. The Report's conclusion is consistent with other courts who have evaluated the causal nexus requirement in the context of pharmaceutical products. *See, e.g.*, *Janssen Prod., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 697-701 (D.N.J. 2014).

Fourth, Aurobindo argues that the Report incorrectly finds irreparable harm. However, the Report identifies hallmark examples of irreparable harm that are demonstrated by the preliminary record, including lost sales, lost research and development opportunities, price erosion, and the fact that Apicore must now directly compete with an infringer. Docket No. 101 at 47-49. These findings were more than adequately supported by the record evidence.[1]

---

[1] *See, e.g.*, Docket No. 20-29 ¶¶ 5, 7, 9-22; Docket No. 79-11 ¶¶ 5-6, 9, 12-25, 32-23; Hr'g Tr. At 156:11-158:4, 159:22-163:9, 176:19-25; Docket No. 20-2 ¶¶ 39-46, 53-55, 60; Hr'g Tr. at 40:18-

2

Finally, Aurobindo does not object to the Report's findings with respect to Aurobindo's infringement of the '050 patent or the validity of the '992 and '616 patents.  Accordingly, the Court affirms those findings.  *See United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989) (findings to which no specific objections are made do not require de novo review).

Plaintiffs' Motion for Preliminary Injunction (Docket No. 20) will be **GRANTED** following Plaintiffs' submission of an adequate injunction bond.  *See* Fed. R. Civ. P. 65. Defendants will be enjoined from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court.

Defendants are **ORDERED** to submit a brief of no more than five pages providing a supported and reasoned amount of an appropriate injunction bond **within 14 days** of this Order.  Plaintiffs are **ORDERED** to file any response **within seven days** after service of Defendants brief.  The matter remains referred to Magistrate Judge Payne for further proceedings.

**SIGNED this 7th day of February, 2017.**

Robert W Schroeder III

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

---

41:2, 44:5-45:24, 47:20-51:2; Docket No. 20-14 ¶¶ 9, 12, 14, 29-32, 34-35; Docket No. 56-4 ¶¶ 6-8; Docket No. 79-18 ¶ 4, 14-25, 32-34; Hr'g Tr. at 182:5-184:19.

# ADDENDUM F

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, | § | |
| AUROBINDO PHARMA USA INC., | § | |
| AUROMEDICS PHARMA LLC, | § | |

## <u>ORDER</u>

Defendants move for a stay, pending appeal, of the preliminary injunction that is scheduled to be entered by the Court upon Plaintiffs' submission of an adequate injunction bond. *See* Dkt. No. 124.

In deciding whether to grant a stay or injunction, pending appeal, the Court "assesses the movant's chances of success on the merits and weighs the equities as they affect the parties and the public." *E.I DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987); *see also Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511 (Fed. Cir. 1990). To prevail, a movant must establish a strong likelihood of success on the merits or, failing that, must demonstrate that it has a substantial case on the merits and that the harms factors militate in its favor. *Hilton v. Braunskill*, 481 U.S. 770, 778 (1987).

Defendants have not met their burden of showing the requisite likelihood of success to obtain a stay of the preliminary injunction pending appeal. Nor have Defendants submitted satisfactory evidence suggesting that the harms factors warrant a stay.

1

Accordingly, IT IS ORDERED THAT:

Defendants' motion for a stay, pending appeal, of the preliminary injunction (**Dkt. No. 124**) is **DENIED**.

Defendants' motion to defer entry of the preliminary injunction pending the Court's ruling on Defendants' motion to stay (**Dkt. No. 132**) is **DENIED-AS-MOOT**.

**SIGNED this 21st day of February, 2017.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

2

No. 2017-1645

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
and AUROMEDICS PHARMA LLC,
Defendants-Appellants,

v.

MYLAN INSTITUTIONAL LLC and APICORE US LLC
Plaintiffs-Appellees

———————————

Appeal From The United States District Court For The Eastern District Of Texas
In Case No. 16-cv-00491, Judge Robert W. Schroeder III

———————————

# DECLARATION OF GEORGE C. YU IN SUPPORT OF APPELLANTS'
# EMERGENCY MOTION FOR STAY OF
# PRELIMINARY INJUNCTION PENDING APPEAL

———————————

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(415) 901-8749

Sailesh K. Patel
Cindy S. Ahn
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5698

I, GEORGE C. YU, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am an attorney with the law firm of Schiff Hardin LLP, counsel for Defendants-Appellants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC ("Aurobindo"). I submit this declaration in support of Aurobindo's Emergency Motion for a Stay of Preliminary Injunction Pending Appeal.

2.      Attached as **Exhibit 1** to this Declaration is a true and correct copy of a letter from Frank Mullery, President of Mylan Institutional, to Tony Griest and Ben Thiel of Cardinal Health dated February 23, 2017 regarding *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Exhibit 1 has been redacted in its entirety because Apicore has unilaterally designated it as containing confidential information. However, Aurobindo disagrees that this document contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491.

3.      Attached as **Exhibit 2** to this Declaration is a true and correct copy of U.S. Patent No. 7,6692,992.

4.      Attached as **Exhibit 3** to this Declaration is a true and correct copy of U.S. Patent No. 8,969,616.

5.      Attached as **Exhibit 4** to this Declaration is a true and correct copy of U.S. Patent No. 9,353,050.

6.     Attached as **Exhibit 5** to this Declaration is a true and correct copy of the Declaration of Edward G. Brown, Ph.D. dated September 8, 2016.

7.     Attached as **Exhibit 6** to this Declaration is a true and correct copy of Lymphazurin®'s "Highlights of Prescribing Information."

8.     Attached as **Exhibit 7** to this Declaration is a true and correct copy of Hirsch *et al.*, "Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation," *American Journal of Roentgenology* 139:1061-1064 (1982).

9.     Attached as **Exhibit 8** to this Declaration is a true and correct copy of U.S. Patent Application Publication No. 2008/0008658.

10.     Attached as **Exhibit 9** to this Declaration is a true and correct copy of excerpts from the Declaration of Heather Paton, Vice President of Sales of Mylan, dated June 9, 2016. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Exhibit 9 has been redacted in its entirety to protect the aforementioned confidential information.

11.     Attached as **Exhibit 10** to this Declaration is a true and correct copy of excerpts from the Rebuttal Declaration of Michael J. Dansky, dated October 19, 2016. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-

cv-491. Exhibit 10 has been redacted in its entirety to protect the aforementioned confidential information.

12.    Attached as **Exhibit 11** to this Declaration is a true and correct copy of excerpts from the Rebuttal Declaration of W. Christopher Bakewell Provided in Opposition to Plaintiffs' Request for Preliminary Injunction, dated September 9, 2016. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Exhibit 11 has been redacted in its entirety to protect the aforementioned confidential information.

13.    Attached as **Exhibit 12** to this Declaration is a true and correct copy of an excerpt from the Federal Register, Vol. 80, No. 21, pp. 5560-61.

14.    Attached as **Exhibit 13** to this Declaration is a true and correct copy of excerpts from the Declaration of Mark Fedele, dated September 8, 2016. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Exhibit 13 has been redacted in its entirety to protect the aforementioned confidential information.

15.    Attached as **Exhibit 14** to this Declaration is a true and correct copy of an Excerpt from the Drug Master File for Aurobindo's Isosulfan Blue product (AURO_ISO 0006723-6772). The exhibit contains confidential business

information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Exhibit 14 has been redacted in its entirety to protect the aforementioned confidential information.

16.    Attached as **Exhibit 15** to this Declaration is a true and correct copy of excerpts from the evidentiary hearing held on November 2, 2016 in the Eastern District of Texas, Marshall Division, (Payne, M. J.) in the case *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-49. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Portions of Exhibit 15 have been redacted to protect the aforementioned confidential information.

17.    Attached as **Exhibit 16** to this Declaration is a true and correct copy of an excerpt from the Response to Office Action filed during prosecution of U.S. Patent Application Serial No. 12/180,057 on July 19, 2009.

18.    Attached as **Exhibit 17** to this Declaration is a true and correct copy of an excerpt from Snyder *et al*., "Preparative HPLC Separation" in *Practical HPLC Method Development* (John Wiley & Sons, Inc. 2nd ed. 1997).

19.    Attached as **Exhibit 18** to this Declaration is a true and correct copy of excerpts of Synerx's ANDA for Isosulfan Blue Injection, dated September 18, 2008 (MYL-AUR_00005850-5884). Exhibit 18 has been redacted in its entirety to protect the aforementioned confidential information.

20.    Attached as **Exhibit 19** to this Declaration is a true and correct copy of excerpts from the deposition of David Krag, M.D., dated August 11, 2016.

21.    Attached as **Exhibit 20** to this Declaration is a true and correct copy of excerpts from the deposition of Jonathan L. Sessler, dated August 11, 2016.

22.    Attached as **Exhibit 21** to this Declaration is a true and correct copy of excerpts from the Rebuttal Declaration of W. Christopher Bakewell Provided in Support of Defendants' Sur-Reply in Opposition to Motion for Preliminary Injunction, dated October 31, 2016. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-491. Exhibit 21 has been redacted in its entirety to protect the aforementioned confidential information.

23.    Attached as **Exhibit 22** to this Declaration is a true and correct copy of excerpts from the deposition of Michael J. Dansky, dated August 11, 2016. Exhibit 22 has been redacted in its entirety to protect the aforementioned confidential information.

24.    Attached as **Exhibit 23** to this Declaration is a true and correct copy of excerpts from the Declaration of Ravishanker Kovi, dated September 8, 2016. The exhibit contains confidential business information as designated under the protective order in *Mylan Inst. LLC, et al. v. Aurobindo Pharma Ltd.*, No. 2:16-cv-

491. Exhibit 23 has been redacted in its entirety to protect the aforementioned confidential information.

25.    Attached as **Exhibit 24** to this Declaration is a true and correct copy of an excerpt from Aurobindo's Abbreviated New Drug Application for isosulfan blue (AURO_ISO 0001382-1388). Exhibit 24 has been redacted in its entirety to protect the aforementioned confidential information.

26.    Attached as **Exhibit 25** to this Declaration is a true and correct copy of an excerpt from Muthyala and Lan, "The Chemistry of Leuco Triarylmethanes," in *Chemistry and Applications of Leuco Dyes* (Plenum Press 1997).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Date: February 28, 2017                      _____*/s/ George C. Yu*_____
                                                              George C. Yu

# EXHIBIT 1
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 2

US007662992B2

(12) **United States Patent**
Kovi et al.

(10) Patent No.: **US 7,662,992 B2**
(45) **Date of Patent:** **Feb. 16, 2010**

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(75) Inventors: **Ravishanker Kovi**, Monroe, NJ (US);
**Satyam Nampalli**, Belle Mead, NJ (US);
**Peter Xavier Tharial**, Piscataway, NJ
(US)

(73) Assignee: **Apicore, LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/180,057**

(22) Filed: **Jul. 25, 2008**

(65) **Prior Publication Data**

US 2008/0293963 A1    Nov. 27, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 11/747,291, filed on
May 11, 2007, now abandoned.

(51) **Int. Cl.**
*C07C 309/00*    (2006.01)

(52) **U.S. Cl.** ........................................ **562/46**; 562/59

(58) **Field of Classification Search** ..................... 568/30
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1 * | 10/2006 | Kulkarni et al. ............. 552/111 |

OTHER PUBLICATIONS

Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd
Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US07/84051.

* cited by examiner

*Primary Examiner* Jafar Parsa
*Assistant Examiner* Chukwuma O Nwaonicha
(74) *Attorney, Agent, or Firm*—Timothy X. Gibson; Gibson
& Dernier LLP

(57) **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**23 Claims, No Drawings**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027301

US 7,662,992 B2

1

# PROCESS FOR PREPARATION OF ISOSULFAN BLUE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 11/747,291 filed May 11, 2007, the entirety of which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

## BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula



(5)

is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triarylmethane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazard-

ous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531, 507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726, 252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks. The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

**Page 117 of 227**

MYL-AUR_00027302

US 7,662,992 B2

**3**

These and other aspects of the invention will be apparent to those skilled in the art.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention.

**4**

Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme

The following provides a process for the production of isosulfan blue of formula (5):

US 7,662,992 B2

5

6

Experimental Procedures

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).

(2)



In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N, N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

(3)



In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N,N-diethylaniline to provide isoleuco acid of the formula (4).

(4)



In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

US 7,662,992 B2

7



(5)

In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic Acid, Sodium Salt of the Formula (2)

113.82 g (based on SO₃ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford

8

150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

Benzaldehyde-2,5-disulfonic Acid, Sodium Salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of Na₂SO₃ and 5.97 g (10% of Na₂SO₃) of NaHSO₃ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to afford 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic Acid, Sodium Salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel. The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027305

US 7,662,992 B2

9 10

15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 ml of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 ml deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 ml of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

What is claimed is:

1. A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula



(4)

in a polar solvent with 2.0 to 3.0 equivalents of silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

2. The process according to claim 1 comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula



(2)

followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

3. The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) according to claim 2 comprising reacting one equivalent of 2-chlorobenzaldehyde with 2 equivalents, based on SO₃ content, of 20% fuming sulfuric acid.

4. The process according to claim 1 wherein the polar solvent is methanol.

5. The process according to claim 2 of preparing free benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula



(3)

wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

6. The process according to claim 5 wherein the reaction is carried out in a pressure vessel at 170-180° C. for 5 to 7 hours.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027306

US 7,662,992 B2

11

12

7. The process according to claim 6 wherein the reaction is carried out under a pressure of 140 to 150 psi.

8. The process according to claim 2 comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

9. The process according to claim 2 in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

10. The process according to claim 9 wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

11. The process according to claim 1 wherein the isoleuco acid of the formula (4)

is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

with N,N-diethylaniline, and urea and glacial acetic acid.

12. The process according to claim 11 performed at reflux conditions for 20-25 hours at 115 to 120° C.

13. The process according to claim 11 comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

14. The process according to claim 11 in which the crude solid is further purified using water.

15. The process according to claim 1 comprising oxidation of isoleuco acid of the formula (4) with 2.5 equivalents of silver oxide in methanol, resulting in a reaction mass, stirring the reaction mass at 20 to 25° C. for 12-14 hours, and filtering the silver oxide to provide a filtrate.

16. The process according to claim 15 comprising passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

17. The process according to claim 16 further comprising passing the filtrate through a 0.2 micron filtration unit.

18. The process according to claim 15 comprising precipitating the filtrate using a non-polar solvent miscible with the filtrate.

19. The process according to claim 18 wherein the nonpolar solvent is isopropyl ether.

20. The process according to claim 1 comprising adjusting the N-[4-[[4-(diethylamino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N -ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

21. The process according to claim 20 wherein the pH is adjusted using sodium bicarbonate solution.

22. The process according to claim 1 comprising recrystallization of N-[4-[[4-(diethylamino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N -ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%

23. The process according to claim 22 wherein the solvent is selected from an aqueous acetone medium and 80%_aqueous isopropanol/acetone.

*    *    *    *    *

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT 3

US008969616B2

(12) **United States Patent**     (10) **Patent No.:**     **US 8,969,616 B2**

Kovi et al.     (45) **Date of Patent:**     *Mar. 3, 2015

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(71) Applicants: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam S. Nampalli**, Hunt Valley, MD (US); **Peter Xavier Tharial**, Edison, NJ (US)

(72) Inventors: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam S. Nampalli**, Hunt Valley, MD (US); **Peter Xavier Tharial**, Edison, NJ (US)

(73) Assignee: **Apicore US LLC**, Somerset, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/951,034**

(22) Filed: **Jul. 25, 2013**

(65) **Prior Publication Data**

US 2013/0310600 A1     Nov. 21, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/310,019, filed on Dec. 2, 2011, which is a continuation of application No. 12/643,056, filed on Dec. 21, 2009, now abandoned, which is a continuation of application No. 12/180,057, filed on Jul. 25, 2008, now Pat. No. 7,662,992, which is a continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**

|  |  |
|---|---|
| *C07C 309/00* | (2006.01) |
| *C07C 303/02* | (2006.01) |
| *C07C 303/22* | (2006.01) |

(52) **U.S. Cl.**

CPC ............. *C07C 303/02* (2013.01); *C07C 303/22* (2013.01)

USPC .............................................. **562/43**; 562/41

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1* | 10/2006 | Kulkarni et al. ............. 552/111 |

OTHER PUBLICATIONS

Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US2007/084051.
Office Action for corresponding U.S. Appl. No. 12/180,057, dated Feb. 23, 2009.
Office Action for corresponding U.S. Appl. No. 11/747,291, dated Feb. 7, 2008.
Office Action for corresponding U.S. Appl. No. 12/643,056, dated Jul. 19, 2011.
Coleman et al., "Unexplained Decrease in Measured Oxygen Saturation by Pulse Oximetry Following Injection of Lymphazurin 1% (isosulfan Blue) During a Lymphatic Mapping Procedure", Journal of Surgical Oncology 1999, 70: 126-129.
Office Action for corresponding U.S. Appl. No. 13/310,019, dated Jul. 10, 2012.

* cited by examiner

*Primary Examiner* — Karl J Puttlitz

(74) *Attorney, Agent, or Firm* — Timothy X. Gibson, Esq.; Gibson & Dernier LLP

(57)     **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**23 Claims, No Drawings**

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    MYL-AUR_00027308

US 8,969,616 B2

**1**

# PROCESS FOR PREPARATION OF ISOSULFAN BLUE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 13/310,019, filed Dec. 2, 2011, which is a continuation of U.S. patent application Ser. No. 12/643,056, filed Dec. 21, 2009, now abandoned, which is a continuation of U.S. Ser. No. 12/180,057 filed Jul. 25, 2008, now U.S. Pat. No. 7,662,992, which is a continuation of U.S. Ser. No. 11/747,291 filed May 11, 2007, now abandoned, the entireties of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

## BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino) phenyl](2,5-disulfophenyl) methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula

(5)



is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to

**2**

leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triarylmethane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazardous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531, 507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726, 252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027309

US 8,969,616 B2

**3**

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific

**4**

details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention. Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme The following provides a process for the production of isosulfan blue of formula (5):

CONFIDENTIAL - ATTORNEYS' EYES ONLY

US 8,969,616 B2

5

**Experimental Procedures**

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).

(2)



In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N,N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

6

(3)



In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline to provide isoleuco acid of the formula (4).

(4)



In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027311

US 8,969,616 B2

7

(5)



In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic acid, Sodium Salt of the Formula (2)

113.82 g (based on SO₃ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford 150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

8

Benzaldehyde-2,5-disulfonic acid, Sodium Salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of Na₂SO₃ and 5.97 g (10% of Na₂SO₃) of NaHSO₃ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic acid, Sodium Salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq) and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel. The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension, 15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027312

US 8,969,616 B2

9      10

the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

The invention claimed is:

**1**. A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula

(4)



in a polar solvent with silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

**2**. The process according to claim **1** comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula

(2)



followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

**3**. The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) according to claim **2** comprising reacting 2-chlorobenzaldehyde with sulfuric acid.

**4**. The process according to claim **1** wherein the polar solvent is methanol.

**5**. The process according to claim **2** of preparing free benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula

(3)



wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

**6**. The process according to claim **5** wherein the reaction is carried out at 170-180° C. for 5 to 7 hours.

**7**. The process according to claim **6** wherein the reaction is carried out under a pressure of 140 to 150 psi.

**8**. The process according to claim **2** comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

CONFIDENTIAL - ATTORNEYS' EYES ONLY      MYL-AUR_00027313

US 8,969,616 B2

11

**9**. The process according to claim **2** in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

**10**. The process according to claim **9** wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

**11**. The process according to claim **1** wherein the isoleuco acid of the formula (**4**) is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



with N,N-diethylaniline, and urea and glacial acetic acid.

**12**. The process according to claim **11** performed at reflux conditions for 20-25 hours at 115 to 120° C.

**13**. The process according to claim **11** comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

**14**. The process according to claim **11** in which the crude solid is further purified using water.

12

**15**. The process according to claim **1** comprising oxidation of isoleuco acid of the formula (**4**) with silver oxide in methanol to obtain a reaction mass.

**16**. The process according to claim **15** comprising stirring the reaction mass for 12-14 hours, and filtering the silver oxide to provide a filtrate.

**17**. The process according to claim **16** comprising passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

**18**. The process according to claim **17** further comprising passing the filtrate through a 0.2 micron filtration unit.

**19**. The process according to claim **16** comprising precipitating the filtrate using a non-polar solvent miscible with the filtrate.

**20**. The process according to claim **19** wherein the nonpolar solvent is isopropyl ether.

**21**. The process according to claim **1** comprising adjusting the N-[4-[[4-(diethylamino) phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

**22**. The process according to claim **21** wherein the pH is adjusted using sodium bicarbonate solution.

**23**. The process according to claim **1** comprising recrystallization of N-[4-[[4-(diethylamino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%.

*   *   *   *   *

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# EXHIBIT 4

US009353050B2

(12) **United States Patent**
Kovi et al.

(10) **Patent No.:** **US 9,353,050 B2**
(45) **Date of Patent:** **May 31, 2016**

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(75) Inventors: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam Nampalli**, Belle Mead, NJ (US); **Peter Xavier Tharial**, Piscataway, NJ (US)

(73) Assignee: **Apicore US LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 584 days.

(21) Appl. No.: **13/310,019**

(22) Filed: **Dec. 2, 2011**

(65) **Prior Publication Data**

US 2012/0078007 A1    Mar. 29, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/643,056, filed on Dec. 21, 2009, now abandoned, which is a continuation of application No. 12/180,057, filed on Jul. 25, 2008, now Pat. No. 7,662,992, which is a continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**
*C07C 303/02*    (2006.01)
*C07C 303/22*    (2006.01)

(52) **U.S. Cl.**
CPC ............. *C07C 303/02* (2013.01); *C07C 303/22* (2013.01)

(58) **Field of Classification Search**
CPC ...... C09B 11/10; C07C 309/22; C07C 309/52
USPC ....................................... 564/80; 562/58, 59
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1 | 10/2006 | Kulkarni |

OTHER PUBLICATIONS

Dan et al., "1% Lymphazurin vs. 10% Fluorescein for Sentinel Node Mapping in Colorectal Tumors," Arch. Surg., 139, 1180-1184, 2004.*
Argentine et al., "Strategies for the investigation and control of process-related impurities in drug substances," Advanced Drug Delivery Reviews, 59, 12-28, 2007.*
Hiranaka et al., "Chemical Structure and Purity of Dyes Used in Lymphangiograms," Investigative Radiology, 10(1), 79, 1975.*
Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US07/84051.
Office Action for corresponding U.S. Appl. No. 12/180,057, dated Feb. 23, 2009.
Office Action for corresponding U.S. Appl. No. 11/747,291, dated Feb. 7, 2008.
Office Action for corresponding U.S. Appl. No. 12/643,056, dated Jul. 19, 2011.
Coleman et al., "Unexplained Decrease in Measured Oxygen Saturation by Pulse Oximetry Following Injection of Lymphazurin 1% (isosulfan Blue) During a Lymphatic Mapping Procedure", Journal of Surgical Oncology 1999, 70: 126-129.

* cited by examiner

*Primary Examiner* — Paul A Zucker
*Assistant Examiner* — Mark Luderer
(74) *Attorney, Agent, or Firm* — Timothy X. Gibson; Gibson & Dernier LLP

(57) **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**18 Claims, No Drawings**

CONFIDENTIAL - ATTORNEYS' EYES ONLY    MYL-AUR_00027294

US 9,353,050 B2

**1**

## PROCESS FOR PREPARATION OF ISOSULFAN BLUE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 12/643,056, filed Dec. 21, 2009, which is a continuation of U.S. Ser. No. 12/180,057 filed Jul. 25, 2008, now U.S. Pat. No. 7,662,992, which is a continuation of U.S. Ser. No. 11/747,291 filed May 11, 2007, now abandoned, the entireties of which are incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

### BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula



(5)

is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triaryl-

**2**

methane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazardous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531, 507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726, 252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks. The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

US 9,353,050 B2

| 3 | 4 |

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention.

Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme

The following provides a process for the production of isosulfan blue of formula (5):

US 9,353,050 B2

5

**Experimental Procedures**

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).

(2)



In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N,N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

6

(3)



In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N,N-diethylaniline to provide isoleuco acid of the formula (4).

(4)



In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

**Page 135 of 227**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

US 9,353,050 B2

7

(5)



In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic acid, sodium salt of the Formula (2)

113.82 g (based on $SO_3$ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow

8

colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford 150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

Benzaldehyde-2,5-disulfonic acid, sodium salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of $Na_2SO_3$ and 5.97 g (10% of $Na_2SO_3$) of $NaHSO_3$ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic acid, sodium salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

US 9,353,050 B2

9    10

The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension, 15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

The invention claimed is:

1. A compound N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at least 99.0% by HPLC.

2. The compound according to claim 1 having a purity between 99.0% and 99.5% by HPLC.

3. The compound according to claim 1 having less than 20 ppm silver.

4. The compound according to claim 3 having a purity greater than 99.5% by HPLC.

5. The compound according to claim 1 prepared by a process comprising combining a suspension of isoleuco acid of the formula



(4)

in a polar solvent with silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

6. The compound according to claim 5 wherein the process comprises sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula



(2)

followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfate to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

7. The compound according to claim 6 wherein the process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) comprises reacting 2-chlorobenzaldehyde with sulfuric acid.

8. The compound according to claim 5 wherein the polar solvent is methanol.

CONFIDENTIAL - ATTORNEYS' EYES ONLY    MYL-AUR_00027299

US 9,353,050 B2

| 11 | 12 |

9. The compound according to claim **5** wherein the iso-leuco acid of the formula



(4)

is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

with N, N-diethylaniline, and urea and glacial acetic acid.

10. The compound according to claim **5** wherein the process comprises recrystallization of N-[4-[[4-(diethylamino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%.

11. A solution containing N-[4-[[4-(diethyl amino)phenyl] (2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt, the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at least 99.0% by HPLC.

12. The solution according to claim **11** wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity between 99.0% and 99.5% by HPLC.

13. The solution according to claim **11** having less than 20 ppm silver.

14. The solution according to claim **13** wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity greater than 99.5% by HPLC.

15. A composition consisting essentially of N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt, the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at least 99.0% by HPLC.

16. The composition according to claim **15** wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity between 99.0% and 99.5% by HPLC.

17. The composition according to claim **15** having less than 20 ppm silver.

18. The composition according to claim **17** wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity greater than 99.5% by HPLC.

\* \* \* \* \*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MYL-AUR_00027300

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC <br><br> Plaintiffs, <br><br> v. <br><br> AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC <br><br> Defendants. | Civil Action No.: 2:16-cv-491-RWS-RSP <br><br> **Jury Trial Demanded** <br><br> **CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY** |

**DECLARATION OF EDWARD G. BROWN, Ph.D.**

Isosulfan Blue                              Patent Blue VF



39.   The structures of three additional triarylmethane dyes are shown below:

Alphazurine          Methyl Violet 2B          Brilliant Green



These structures are intended to illustrate the different side chains present in triarylmethane dyes and how they can affect the color of the dye.  There are many more triarylmethane dyes and derivatives of triarylmethane dyes.

40.   According to Van Nostrand's Scientific Encyclopedia, "Triphenylmethane dyes comprise one of the oldest classes of synthetic dyes."  "Triphenylmethane and Related Dyes" in *Van Nostrand's Scientific Encyclopedia* (John Wiley & Sons, Inc. 2006; hereinafter "Van Nostrand") at 1.  Van Nostrand indicates that the first triarylmethane dyes were synthesized in the 1850s.  (*Id.* at 2.)  Many triarylmethane dyes are prepared by oxidation of a leuco (*i.e.*, an

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

uncolored or slightly colored compound that may be oxidized to generate a dye) compound. (*Id.* at 3; '992 patent at 1:64-2:3.)    The leuco intermediate of triarylmethane compounds is characterized in part by the central carbon having a single bond with each of the three aryl groups as well as being bonded to a hydrogen.  The leuco intermediate of isosulfan blue is shown here:



Isosulfan Blue (Leuco Form)

41.    The leuco intermediate of a triarylmethane dye can be oxidized such that the hydrogen bonded to the central carbon is removed and a shared double bond is created between the central carbon and the three aryl groups.  I present the general oxidation of the leuco intermediate of isosulfan blue (referred to in the asserted patents as "isoleuco acid") to the dye form as follows:

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

Isosulfan Blue (Leuco Form)                              Isosulfan Blue



This oxidation reaction to convert the leuco intermediate to the dye form is common to triarylmethane dyes.

42.    The oxidizing agent in this reaction accepts electrons from the leuco dye compound.  Strong oxidizing agents have a greater affinity for electrons than weaker oxidizing agents.  Because triarylmethane dyes are usually destroyed by strong oxidizing agents, "[c]areful choice of both the oxidant and the reaction conditions is required to prevent loss of product during this stage of the manufacture."  (Van Nostrand at 3.)

43.    I have prepared a table to summarize different oxidizing agents used to make triarylmethane dyes:

-13-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

| REFERENCE / DATE | DYE | OXIDIZING AGENT |
|---|---|---|
| U.S. Patent No. 1,805,925 (p. 1, left col., ll. 8-21)  1931 |  | Copper salt/oxygen |
| U.S. Patent No. 1,878,530 (p. 2, left col., ll. 35-40)  1932 | Malachite Green | Lead peroxide |
| U.S. Patent No. 2,103,846 (p. 1, left col., ll. 1-7; p. 2, left col., ll. 17-20)  1937 | Triaryl methane dyes containing "one or more aryl radicles [*sic*] containing one or more amino groups substituted by at least one arylated ethyl sulfonic acid radicle." | "The leuco acid can be oxidized in accordance with the customary methods, for example by means of lead dioxide, *manganese dioxide* and the like." (Emphasis added.) |
| U.S. Patent No. 3,021,344 (p. 1, left col., ll. 67-72)  1962 |  | "The 'leucos,' upon dissolving in a suitable acidic medium, may be oxidized to the cationic dye by adding the requisite amount of any of the oxidants known in the art, such as sodium nitrite, ferric chloride, *manganese dioxide*, or lead peroxide."  (Emphasis added.) |
| U.S. Patent No. 4,054,458 (9:39-66)  1977 |   and | As an oxidizing agent, *manganese compounds such as* permanganates, manganates, *managanese [sic] dioxide*, manganese (III) salts and manganese acetate; chromic acid compounds such as chromic anhydride, chromic acid, perchromates, alkyl esters of chromic acid and chromyl chloride; lead compounds such as PbO, $PbO_2$ and $Pb(CCOCH_3)_4$ ; copper compounds such as CuO, $Cu(OH)_2$, $CuSO_4$, $Cu(OCOCH_3)_2$, $CuCl_2$ and $CuBr_2$ ; cobalt |

-14-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

| REFERENCE / DATE | DYE | OXIDIZING AGENT |
|---|---|---|
| |  | compounds such as $Co_2(SO_4)_3$ and $Co_3O_4$ ; cerium compounds such as $CeO_2$, $Ce(SO_4)_2$ and $Ce(SO_4)_3$ ; bismuth compounds such as $NaBiO_3$, $BiO$ and $Bi(OCOCH_3)_2$ ; *silver compounds such as $Ag_2O$*, $AgOCOCH_3$ and $AgNO_3$ ; iron compounds such as $FeCl_3$, $Fe_2(SO_4)_3$ and potassium ferricyanate; $SeO_2$ ; $RuO_4$ ; $OsO_4$ ; inorganic peroxides such as hydrogen peroxide, Fenton's reagent, persulfuric acid and salts thereof; organic peroxides such as performic acid, peracetic acid, perpropionic acid, perbutyric acid, perbenzoic acid, monoperphthalic acid, monoperterephthalic acid, monopersuccinic acid and trifluoroperacetic acid; halides such as hypochlorites, chlorates, hypobromites and bromates; oxygen; ozone; ultraviolet ray; sulfoxides; amine oxides; and chloranil are preferably used. The amount of oxidizing agent may be controlled according to the kinds of oxidizing agent to be used, but it may be usually used in an excess of a stoichiometric amount based on the amount of said triarylmethane derivatives having the general formula (I) or (II). (Emphasis added.) |
| EP 0 057 661 (p. 1, ll. 14-41; p. 6, ll. 20-22)  1984 |  | "The resulting leuco compound of formula (1) may be converted into a dyestuff by oxidation in conventional manner. Suitable oxidising agents include sodium or potassium dichromate and sulphuric acid, *manganese dioxide*, lead (II) dioxide, chloranil, oxygen or air." |

-15-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

| REFERENCE / DATE | DYE | OXIDIZING AGENT |
|---|---|---|
| | | (Emphasis added.) |
| U.S. Patent No. 5,198,558 (1:12-31, 2:50-65)<br><br>1993 | Many different triarylmethane dyes of the general formula:<br><br> | "The oxidation step I is conducted in water with manganese dioxide in the presence of phosphoric acid. The leuco compound may be formed in situ in aqueous solution, or added to the water. **Phosphoric acid and manganese dioxide** is added to the slurry of the leuco compound in water. The molar ratio of manganese dioxide to leuco compound is from about 1.0 to 1.5, preferably 1.0 to 1.3 mol manganese dioxide per mol leuco compound." (Emphasis added.) |
| Thoraval (pp. 30-33, 55-59)<br><br>2003 | Many different triarylmethane dyes, such as<br><br> | Silver oxide<br><br>"Table 7 shows that the oxidation of triphenylmethane intermediate 66 was best performed using silver oxide as the oxidizing agent. Oxidations of other intermediates were tried using this method. . . . In general, the oxidation reactions listed in Table 8 proceeded well. . . . The crude indicator dyes were generally obtained sufficiently pure to be used directly for further testing." |
| U.S. Patent Application Publication No. 2006/0224003 (¶¶ 0048-51)<br><br>2005 | Isosulfan blue | Ammonium dichromate |

44.     As further discussed in "The Chemistry of Leuco Triarylmethanes" in *Chemistry and Applications of Leuco Dyes* (Plenum Press 1997; hereinafter "Chemistry of Leuco

-16-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

4. **There Are No Secondary Considerations of Non-Obviousness Relating to the '050 Patent**

144.    I am not aware of any evidence of secondary considerations that would reflect any non-obviousness of the subject matter claimed by the '050 patent. For example, I am not aware of evidence indicating that the composition of at least 99% pure isosulfan blue satisfied a long felt need. Indeed, I understand that the FDA-approved Lymphazurin® dye was on the market in May 2007, when the priority application to the '050 patent was filed.  I am also not aware that others attempted to make the claimed isosulfan blue composition and failed, or any skepticism of a POSA with respect to the subject matter of the '050 patent. Moreover, I understand that Dr. Krag, as an expert on the use of isosulfan blue, does not find that there are any unexpected benefits that flow from the claimed composition of isosulfan blue.  It is my opinion that the claimed composition could be achieved by a POSA according to the prior art discussed above with a reasonable expectation of success. Should another expert assert any secondary considerations, I specifically reserve the right to respond to those opinions.

G. **Claims 1, 11, and 15 of the '050 Patent Are Indefinite**

145.    Each of claims 1, 11, and 15 of the '050 patent requires isosulfan blue, sodium salt "having a purity of at least 99.0% by HPLC."  The '050 patent provides no information on how the HPLC analysis is performed.  For example, the '050 patent does not disclose whether a standard is used, what type of column is used, what mobile phase was used, what flow rate was used, and what absorbance wavelength was used.  In comparison, the WO '122 application provides all this information:

-52-

3. HPLC Conditions for Analysis

A synergi Hydro RP, 80A, 250 x 4.6mm, and 4micron column was used to perform the purity checks with the following:

| Mobile phase: | Gradient |
| | A: Water + 0.1% TEA + 0.1% TFA |
| | B: Acetonitrile |

| Time | %A | %B |
|------|-----|-----|
| 0 | 100 | 0 |
| 10 | 52 | 48 |
| 30 | 52 | 48 |
| 40 | 0 | 100 |
| 50 | 0 | 100 |

| Flow Rate: | 1 ml/min |
| Run Time: | 50 minutes |

| Injection volume: | 10μl |
| Wavelength: | 281 nm |

(WO '122 application, ¶ 159, pp. 34-35.)

146.    In particular, for a dye like isosulfan blue, one of skill in the art may use an absorbance wavelength of approximately 640 nm—*i.e.*, at the peak absorption wavelength. But one could also use an absorbance in the UV range, for example 220 nm. I agree with Dr. Sessler in that a person of ordinary skill could not tell whether performing HPLC analysis at these different wavelengths would lead to different determinations of purity by HPLC.

147.    In addition, the '050 patent provides no information as to whether the "peak" that is implied by reference to HPLC analysis is "pure." As discussed in the white paper by Mark Stahl entitled, "Peak purity analysis in HPLC and CE using diode-array technology," one needs to ensure that another compound (*i.e.*, an impurity) does not co-elute or co-migrate with isosulfan blue. (Stahl, p. 2.) Techniques to distinguish between co-migrating compounds were known to those of skill in the art by May 2007. But those different techniques could lead to

-53-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

different results in terms of purity.  Based on my review of the '050 patent specification and its

file history, a POSA would not understand with reasonable certainty what the scope of the term

"having a purity of at least 99.0% by HPLC" is.

I hereby declare under penalty of perjury that the foregoing statements made by me are

true and correct.

Dated: SEPTEMBER 8, 2016

_____
Edward G. Brown

-54-

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

# EXHIBIT 6

# LYMPHAZURIN- isosulfan blue injection, solution
# UNITED STATES SURGICAL CORPORATION

----------

## HIGHLIGHTS OF PRESCRIBING INFORMATION
**These highlights do not include all the information needed to use LYMPHAZURIN safely and effectively. See full prescribing information for LYMPHAZURIN.**

**LYMPHAZURIN injection, solution for subcutaneous use**
**Initial U.S. Approval: 1981**

--------------------------------------- **RECENT MAJOR CHANGES** --------------------------------------
Warnings and Precautions, Interference with Oxygen Saturation and Methemoglobin Measurements (5.3). 10/2007

--------------------------------------- **INDICATIONS AND USAGE** --------------------------------------
Lymphazurin™ 1% (isosulfan blue) upon subcutaneous administration, delineates the lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; lymph node response to therapeutic modalities (1.1).

--------------------------------------- **DOSAGE AND ADMINISTRATION** --------------------------------------
Lymphazurin™ 1% is to be administered subcutaneously, one-half (1/2) ml into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 ml (30 mg) isosulfan blue is, therefore, injected (2.1).

--------------------------------------- **DOSAGE FORMS AND STRENGTHS** --------------------------------------
1% aqueous solution (isosulfan blue) (3)

--------------------------------------- **CONTRAINDICATIONS** --------------------------------------
Hypersensitivity to triphenylmethane or related compounds (4).

--------------------------------------- **WARNINGS AND PRECAUTIONS** --------------------------------------
- Life-threatening anaphylactic reactions have occurred after Lymphazurin 1% administration. Monitor patients closely for at least 60 minutes after administration of Lymphazurin 1% (5.1).
- The admixture of Lymphazurin 1% with local anesthetics results in an immediate precipitation of 4-9% drug complex. Use a separate syringe for anesthetics (5.2).
- Lymphazurin 1% interferes with measurements in peripheral blood pulse oximetry. Arterial blood gas analysis may be needed (5.3).

--------------------------------------- **ADVERSE REACTIONS** --------------------------------------
*Hypersensitivity reactions*: Hypersensitivity reactions occurring approximately 2% of patients and include life-threatening anaphylactic reactions with respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following IV administration of a similar compound (6).

**To report SUSPECTED ADVERSE REACTIONS, contact U.S. Surgical at 1-800-522-0263 option 5 and website or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch**

--------------------------------------- **DRUG INTERACTIONS** --------------------------------------
No drug interactions have been identified for Lymphazurin 1% (7).

--------------------------------------- **USE IN SPECIFIC POPULATIONS** --------------------------------------
- Caution should be exercised when Lymphazurin 1% is administered to nursing mothers (8.3).
- Safety and effectiveness of Lymphazurin 1% in children has not been established (8.4).

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 1/2012**

---

# FULL PRESCRIBING INFORMATION: CONTENTS*
# RECENT MAJOR CHANGES
# 1 INDICATIONS AND USAGE
  1.1 Lymphatic Vessel Delineation
# 2 DOSAGE AND ADMINISTRATION

2.1 Subcutaneous administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
5.1 Hypersensitivity Reactions
5.2 Precipitation of Lymphazurin 1% by Lidocaine
5.3 Interference with Oxygen Saturation and Methemoglobin Measurements
**6 ADVERSE REACTIONS**
6.1 Postmarketing Experience
**7 DRUG INTERACTIONS**
**8 USE IN SPECIFIC POPULATIONS**
8.3 Nursing Mothers
8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
12.2 Pharmacodynamics
12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
13.2 Teratogenic Effects
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**
* Sections or subsections omitted from the full prescribing information are not listed.

---

## FULL PRESCRIBING INFORMATION

## 1 INDICATIONS AND USAGE

### 1.1 Lymphatic Vessel Delineation

Lymphazuirn™ 1% (isosulfan blue) upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

## 2 DOSAGE AND ADMINISTRATION

### 2.1 Subcutaneous administration

Lymphazurin™ 1% is to be administered subcutaneously, one-half (1/2) ml into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 ml (30 mg) isosulfan blue is, therefore, injected.

## 3 DOSAGE FORMS AND STRENGTHS

1% aqueous solution (isosulfan blue)

# 4 CONTRAINDICATIONS

Lymphazurin™ 1% (isosulfan blue) is contraindicated in those individuals with known hypersensitivity to triphenylmethane or related compounds.

# 5 WARNINGS AND PRECAUTIONS

## 5.1 Hypersensitivity Reactions

Life-threatening anaphylactic reactions (respiratory distress, shock, angioedema) have occurred after Lymphazurin 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of Lymphazurin 1%. Trained personnel should be available to administer emergency care including resuscitation.

## 5.2 Precipitation of Lymphazurin 1% by Lidocaine

The admixture of Lymphazurin 1% (with local anesthetics (i.e. lidocaine)) in the same syringe results in an immediate precipitation of 4 – 9% drug complex. Use a separate syringe to administer a local anesthetic.

## 5.3 Interference with Oxygen Saturation and Methemoglobin Measurements

Lymphazurin 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by four hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Lymphazurin 1% may also cause falsely elevated readings of methemoglobin by arterial blood gas analyzer. Therefore, co-oximetry may be needed to verify methemoglobin level.

# 6 ADVERSE REACTIONS

## 6.1 Postmarketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life-threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following administration of a similar compound employed to estimate the depth of a severe burn. Reactions are more likely to occur in patients with a personal or family history of bronchial asthma, significant allergies, drug reactions or previous reactions to triphenylmethane dyes [see Warnings and Precautions (5)].

Laboratory tests: Lymphazurin 1% interferes with measurements of oxygen saturation by pulse oximetry and of methemoglobin by gas analyzer [see Warnings and Precautions (5)].

Skin: transient or long-term (tattooing) blue coloration.

# 7 DRUG INTERACTIONS

No Drug Interactions have been identified with Lymphazurin 1%.

# 8 USE IN SPECIFIC POPULATIONS

## 8.3 Nursing Mothers

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Lymphazurin™ 1% (isosulfan blue) is administered to a nursing mother.

## 8.4 Pediatric Use

Safety and effectiveness of Lymphazurin™ 1% (isosulfan blue) in children have not been established.

## 10 OVERDOSAGE

Do not exceed indicated recommended dosage as overdosage levels have not been identified for Lymphazurin 1%.

## 11 DESCRIPTION

The chemical name of Lymphazurin 1% (isosulfan blue) is N-[4-[[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylehananamunium hydroxide, inner salt, sodium salt. Its structural formula is:



Lymphazurin 1% is a sterile aqueous solution for subcutaneous administration. Phosphate buffer in sterile, pyrogen free water is added in sufficient quantity to yield a final pH of 6.8-7.4. Each ml of solution contains 10 mg Isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate. The solution contains no preservative. Lymphazurin 1% is a contrast agent for the delineation of lymphatic vessels.

## 12 CLINICAL PHARMACOLOGY

## 12.2 Pharmacodynamics

Following subcutaneous administration, Lymphazurin 1% binds to serum proteins and is picked up by the lymphatic vessels. Thus, the lymphatic vessels are delineated by the blue dye.

## 12.3 Pharmacokinetics

Up to 10% of the subcutaneously administered dose of Lymphazurin 1% is excreted unchanged in the urine in 24 hours in human.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of Lymphazurin 1%. Reproduction studies in animals have not been conducted and, therefore, it is unknown if a problem concerning mutagenesis or impairment of fertility in either males or females exists.

### 13.2 Teratogenic Effects

Pregnancy Category C. Animal reproduction studies have not been conducted with Lymphazurin 1%. It is not known whether Lymphazurin 1% can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Lymphazurin 1% should be given to a pregnant woman only if clearly needed.

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Lymphazurin 1% is supplied as a 5 ml single dose vial, 1% aqueous solution in a phosphate buffer prepared by appropriate manufacturing to be sterile and pyrogen-free.

## 17 PATIENT COUNSELING INFORMATION

Inform patients that urine color may be blue for 24 hours following administration of Lymphazurin 1%.

## PRINCIPAL DISPLAY PANEL

**D.I.N. 00592358**
**NDC 63261-250-21 LYM-100**
**LYMPHAZURIN* 1%**
(isosulfan blue) Single Dose Vial 5 ml.

Mfd. for United States Surgical, a division of
Tyco Healthcare Group LP,
Norwalk, CT 06856 USA.

by Ben Venue Labs, Inc., Bedford, OH 44146 USA

Distributed in Canada by: Tyco Healthcare
Montreal, Quebec
Canada, H9R 5H8



# LYMPHAZURIN
isosulfan blue injection, solution

## Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:63261-250 |
| --- | --- | --- | --- |
| Route of Administration | SUBCUTANEOUS | | |

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
| --- | --- | --- |
| ISOSULFAN BLUE (UNII: 39N9K8S2A4) (ISOSULFAN BLUE - UNII:39N9K8S2A4) | ISOSULFAN BLUE | 10 mg  in 1 mL |

## Inactive Ingredients

| Ingredient Name | Strength |
| --- | --- |
| SODIUM PHOSPHATE, DIBASIC, ANHYDROUS (UNII: 22ADO53M6F) | |
| POTASSIUM PHOSPHATE, MONOBASIC (UNII: 4J9FJ0HL51) | |
| WATER (UNII: 059QF0KO0R) | |

## Product Characteristics

| Color | blue | Score | |
| --- | --- | --- | --- |
| Shape | | Size | |
| Flavor | | Imprint Code | |
| Contains | | | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
| --- | --- | --- | --- | --- |
| 1 | NDC:63261-250-21 | 5 mL in 1 VIAL, SINGLE-USE | | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
| --- | --- | --- | --- |
| NDA | NDA018310 | 01/12/2012 | |

## Labeler - UNITED STATES SURGICAL CORPORATION (044680650)

## Establishment

| Name | Address | ID/FEI | Business Operations |
| --- | --- | --- | --- |
| BEN VENUE LABORATORIES, INC. | | 004327953 | manufacture |

## Establishment

| Name | Address | ID/FEI | Business Operations |
| --- | --- | --- | --- |

| SIGMA-ALDRICH CO LTD | | 397924143 | api manufacture |

Revised: 1/2012                                        UNITED STATES SURGICAL CORPORATION

# EXHIBIT 7

1061

# Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

Jerry I. Hirsch[1]
Jaime Tisnado
Shao-Ru Cho
Michael C. Beachley

Use of vital dyes for identification of lymphatic vessels before cannulation has heretofore not been approved by the Food and Drug Administration (FDA). The suitability of isosulfan blue, the 2,5 disulfonic acid isomer of Patent Blue, for this purpose was evaluated experimentally in the rat and clinically in 11 volunteers and 543 patients under an investigational new drug application. FDA approval for this drug has been obtained. Volunteers and patients received up to 15 mg of a 1% sterile, pyrogen-free solution per extremity (total dose of 0.4 mg/kg in the average patient). Excellent identification of lymphatic vessels was achieved in 100% of volunteers and in 97.4% of patients. In the other 2.6%, lymphatic vessels were not identified mainly due to congenital lymphatic vascular (Milroy) disease. Baseline blood chemistry in volunteers was not altered after administration of the dye. No adverse reactions were found in volunteers and minimal allergic reactions occurred in less than 1% of patients. Acute toxicity studies demonstrated an $LD_{50}$ greater than 150 mg/kg in the rat. Isosulfan blue was excreted unchanged in the urine (7%) and feces. Comparable excretion was found in volunteers. Isosulfan blue is a safe and efficacious vital dye for lymphangiography.

Lymphangiography remains a very useful diagnostic procedure [1–3]. We estimate that the number of lymphangiograms performed in the United States exceeds 30,000 per year.

Although some authors have performed lymphangiography without the aid of blue dyes [4], lymphatic cannulation, as usually performed in the United States since the early 1960s, requires the subcutaneous or intradermal administration of a vital blue dye into the interdigital web spaces of the extremity to be studied. Selective absorption of the dye by the lymphatics facilitates their identification.

It is widely known that dye materials unapproved by the Food and Drug Administration (FDA) are used for lymphangiography in clinical centers throughout the United States. Although no major problems have been reported, their clinical use may result in risk to the patient or liability to the radiologist.

We present our experimental and clinical experience with isosulfan blue* (adopted by the United States Adopted Name Council, June 13, 1979), a drug recently approved by the FDA for identifying the lymphatics during lymphangiography.

## Materials and Methods

### Preparation

Isosulfan blue is the monosodium salt of a 2,5 disulfonated triphenylmethane dye (fig. 1). The compound was prepared in high purity of 94.5% dye content of the 2,5 isomer as determined by high-pressure liquid chromatography. The remaining 5.5% consists of

Received May 24, 1982; accepted after revision August 23, 1982.

Presented at the annual meeting of the American Roentgen Ray Society, New Orleans, May 1982.

[1] All authors: Department of Radiology, Virginia Commonwealth University, Medical College of Virginia, Box 1, MCV Station, Richmond, VA 23298. Address reprint requests to J. I. Hirsch.

*AJR* 139:1061–1064, December 1982

0361–803X/82/1396–1061 $00.00
© American Roentgen Ray Society

* Commercial availability of isosulfan blue dosage form is tentatively scheduled for the autumn of 1982. For further information please contact author J. I. Hirsch.

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved



Fig. 1.—Structural formula of isosulfan blue.

C.I. No. 42051
C.I. FOOD BLUE 5
C.I. ACID BLUE 3
PATENT BLUE V

C.I. No. 42045
C.I. FOOD BLUE 3
C.I. ACID BLUE 1
PATENT BLUE VF
SULFAN BLUE

ALPHAZURINE-2G®

Fig. 2.—Structural formulae of Alphazurine 2G, Patent VF, and Patent Blue V with synonyms.

closely related isomers produced during synthesis.

Isosulfan blue injection was prepared as a 1% solution. Phosphate buffer in sterile pyrogen-free water was used as diluent in sufficient quantity to yield a final pH of 6.8–7.5. The solution was subdivided into 5 ml single-dose vials, sterilized, and quality control performed.

*Phase I Preclinical Trials*

*Acute Toxicity.* A 14 day acute toxicity study was performed in both genders of Sprague-Dawley rats. Rats were 5–6 weeks old on arrival, quarantined for 1 week, and allowed to grow to at least 200 g for females and 250 g for males. Ten animals of each gender were injected intravenously with the contents of one vial (5 ml) of isosulfan blue injection (1%) via the lateral tail vein. Three rats of each gender received an equivalent amount of diluent but no dye.

Mortality and gross signs of toxicity were evaluated twice daily. Body weights were determined before drug administration and again before necropsy on the final day of study. Animal behavior responses were monitored over the first 8 hr after administration of the drug and then daily.

All animals were sacrificed on day 14 of the study and gross necropsy was performed. Tissues were removed and fixed in 10% neutral buffered formalin. The tissues were sectioned at 6 $\mu$m and stained with hematoxylin and eosin.

*Pharmacology.* Three rats of each gender were studied for urinary excretion of the drug. Animals were injected subcutaneously with 0.5 ml isosulfan blue injection (1%) and housed separately in metabolic cages. Urine samples were collected daily for 3 days and evaluated spectrophotometrically for dye content. Determination of metabolites in urine was done by thin-layer chromatography. A 2 $\mu$l sample of urine was spotted on 250 $\mu$m silica gel plate, allowed to dry, and eluted with acetone:ammonium hydroxide:1-butanol:water (37:19:37:7).

*Phase II Clinical Trials*

Clinical trials were conducted in 11 volunteer subjects. Six men and five women aged 22–32 years were studied. No pregnant or lactating women or individuals with known hypersensitivity to triphenylmethane compounds were administered the drug. Permission from the Committee for the Conduct of Human Research at the Medical College of Virginia was obtained.

Volunteers received 30 mg (3 ml) of isosulfan blue injection (1%) administered subcutaneously. Local anesthetic was not admixed with the dye preparation. Five-tenths (0.5) ml was injected in three interdigital web spaces of each foot. Subjects were observed after the administration of the drug every 15 min for 3 hr and then daily for 2 weeks for adverse reactions and changes in vital signs or any other evidence of intolerance to the drug.

Venous blood samples were obtained before the administration of the drug and at 1, 24, and 48 hr after administration. Samples were analyzed by the Sequential Multiple Analyzer Computer (SMAC) system (Technicon Instrument Corp., Tarrytown, NY), Coulter-S, absolute eosinophils, white blood cell differential, and platelets. Total urine was collected daily for 2 days and dye excretion was measured.

Efficacy or the ability to identify the lymphatics through the intact skin was assessed by two independent radiologists. Lymphatics were scored as either adequately (+) or inadequately (−) identified about 10 min after the administration of the drug.

*Phase III Clinical Trials*

Clinical trials were conducted in 543 patients (296 men, 247 women) referred for lymphangiography at 17 cooperative hospitals in the United States. Permission from respective Committees for the Conduct of Human Research was obtained. Patients received 1–3 ml of isosulfan blue injection (1%) per dose, administered subcutaneously, in the interdigital web spaces of the extremity to be studied. No local anesthetic was admixed with the dye preparation except in a few selected cases. Lymphatics were scored in the manner previously described.

**Results**

*Phase I Toxicology and Pharmacology*

All animals studied for acute toxicity demonstrated no adverse effects and all survived the 14 day period. At

AJR:139, December 1982    ISOSULFAN BLUE FOR LYMPHANGIOGRAPHY    1063

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

necropsy, no organ accumulation of the drug was seen. Gross pathology was normal except for slightly gray discoloration of the kidneys. However, kidneys did not exhibit any gross histopathologic changes and were essentially normal histologically. This study suggested that the acute $LD_{50}$ of isosulfan blue in the rat is greater than 150 mg/kg. This suggests that the average patient dose of 0.4 mg/kg has a safety factor of at least 375 times the animal toxic dose.

It was determined spectrophotometrically that up to 10% of the subcutaneously administered dose of isosulfan blue is excreted in the urine during the first 24 hr collection period. No drug could be detected in urine samples collected during subsequent time intervals. Urine samples subjected to thin-layer chromatography demonstrated a single spot equivalent to that of isosulfan blue. This suggests that the drug is excreted unchanged in the urine.

Feces from rats studied were found to be stained dark blue. Techniques for the determination of dye in fecal material are inaccurate and, therefore, none were performed. It was presumed that 90% of the isosulfan blue administered was excreted through the feces through biliary excretion.

*Phase II Clinical Trials*

No adverse effects, changes in vital signs, or significant ($p < 0.05$) changes in blood chemistry were observed in any of the volunteers studied. All laboratory values were within normal limits at each time period.

A mean value of 7% of the administered dose was recovered in the urine from the initial 24 hr collection period. No measurable drug could be found within the 24–48 hr period. Subjects reported blue discoloration of feces as well.

Excellent identification of the lymphatics was achieved in all 11 subjects.

*Phase III Clinical Trials*

Five (0.9%) of 543 patients studied had an adverse reaction within 15 min after administration of isosulfan blue. These reactions were all of a relatively mild allergic type. Patients received no or minimal symptomatic therapy and all recovered within 1 hr or less. Four of these reactions occurred in patients who received blue dye admixed with local anesthetic.

The 543 patients who received isosulfan blue injection were evaluated for identification of the lymphatics. Patients were divided into three groups according to the clinical indication for the lymphangiogram (table 1). Group 1 included patients with possible lymph node involvement by primary or secondary malignancy; group 2 included patients with possible primary lymphatic disease; and group 3 included patients with chyluria, chylous ascites, or chylothorax.

In group 1, 503 (99%) of 508 patients demonstrated excellent identification of the lymphatics. In five (1%) of 508 patients, inadequate identification was achieved. In retrospect, these five patients received less than the recommended 30 mg dosage of isosulfan blue which may have accounted for these results. In group 2, 19 (67.9%) of 28

**TABLE 1: Identification of Lymphatics**

| Group: Clinical Indication | No. Patients Studied | No. Patients in Whom Lymphatics were Identified (%) |
|---|---|---|
| 1: Possible lymph node involvement by primary or secondary malignancy | 508 | 503 (99.0) |
| 2: Possible primary lymphatic disease | 28 | 19 (67.9) |
| 3: Chyluria, chylous ascites, chylothorax | 7 | 7 (100.0) |
| Total | 543 | 529 (97.4) |

showed excellent identification of the lymphatics. The other nine patients without identification had evidence of primary vascular disease manifested by dermal backflow of the drug. All of these patients were found to have Milroy disease. In group 3, all seven patients had excellent lymphatic identification.

Overall, isosulfan blue injection (1%) improved identification of the lymphatics in 97.4% of patients. The failure of identification of the lymphatics in the other 2.6% can be mainly attributed to primary lymphatic vascular disease.

**Discussion**

Blue dyes have been used since the early 1960s for the identification of lymphatics before lymphangiography. These dyes may be grouped into two categories: (1) miscellaneous blue dyes with questionable lymphatic selectivity, marketed before 1938, which have not been reviewed for safety and efficacy by the FDA (e.g., methylene blue, Evan's blue); and (2) the family of Patent Blue dyes providing selective lymphatic localization but not approved for human use by the FDA. The second category includes the triphenylmethane dyes Alphazurine 2G (Allied Chemical Corp., Morristown, NJ), Patent Blue VF, and Patent Blue V (fig. 2). The exact purity of these dyes and the impurities they contain may not be known and therefore, the nature and toxicity of the material is uncertain. Solutions prepared of these dyes may, therefore, be of variable concentration, sterility, pyrogenicity, and stability.

A 1% solution of isosulfan blue was chosen because of the work of Gangolli et al. [5] who described the relation between concentration of triphenylmethane dyes and subsequent tissue reaction after their subcutaneous administration. Dye concentration closely correlated with the severity of necrosis and type of connective tissue reaction that evolved. These reactions varied from no necrosis for a 1% solution to widespread necrosis for a 3% solution.

Complications of the use of blue dye during lymphangiography are uncommon but do occur. Several reports [6–13] of allergic reactions to blue dye have been published. The first report on adverse effects from Patent Blue during lymphangiography was published by Kopp in 1966 [14]. In his series, two patients suffered from anaphylactic reactions after an injection of 0.25 ml of an 11% solution of the dye. Both patients recovered. At the International Symposium on Lymphology (Zurich, 1966) general reports of adverse reactions to blue dyes used during lymphangiography were given [15]. A probable incidence of 1/1000 hypersensitivity

1064

HIRSCH ET AL.

AJR:139, December 1982

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

reactions was concluded.

Koehler [16] compiled the incidence of complications associated with lymphangiography from a survey of individuals performing this study. From 32,000 examinations there were 57 (1:600) instances of hypersensitivity reactions to vital dyes. In 50 of these cases, either Patent Blue Violet or Alphazurine 2G was used. The hypersensitivity reactions ranged from hives to angioneurotic edema, with or without laryngospasm, to vasomotor collapse. In many instances, a local anesthetic was mixed with the vital blue; however, since this complication also occurred in patients who had negative skin reactions to the local anesthetic, it was suggested that the vital blue was the allergic component. The role of anesthetics mixed with dyes in these hypersensitivity reactions is not always elucidated; some authors believe that these agents may increase the frequency of adverse reactions [7, 8, 17].

Castellino et al. [17] identified Patent Blue as the causative agent for minor allergic complications in one patient and the possible cause in another two from their series of 659 lymphangiograms performed in children. An allergic manifestation incidence of 0.15%–0.5% attributable to Patent Blue may be derived.

In four of our cases, hypersensitivity reactions were associated with the administration of blue dye with a local anesthetic. Which of the two agents was responsible is not known. In the fifth patient who received blue dye alone, the reaction was due to the dye, so that the incidence of mild reactions is at least 0.2%, but could be as high as 1%. All reactions, however, were mild and of short duration.

The use of local anesthetics admixed with solutions of blue dye was first recommended by Wallace et al.[18] to minimize transitory pain which occurred when Evan's Blue dye was injected alone. This method was subsequently applied to the use of the triphenylmethane dye Alphazurine 2G [19]. Newton et al. [20] described a physicochemical instability of this admixture resulting in the formation of a sticky precipitate undesirable for administration to patients. Dye in amounts of 4% and 9% was found in a dye/anesthetic complex when solutions of lidocaine, unpreserved and preserved with 0.1% methylparaben, respectively, were used in the formulation of dosage forms.

Since the potential for drug hypersensitivity reactions and physicochemical incompatibility exists, the admixture of local anesthetics and blue dyes in the same syringe is not recommended. Furthermore, our patients reported good tolerance of the injection of isosulfan blue dye alone.

Isosulfan blue injection (1%) is a safe and efficacious drug for the identification of lymphatics during lymphangiography. FDA approval for human use has been obtained. Commercial introduction of this drug is forthcoming under the trade name Lymphazurin (1%).

## ACKNOWLEDGMENTS

Coinvestigators in the isosulfan blue study were Thomas A. Sos, New York Hospital–Cornell Medical Center, New York, NY; Michael A. Mertens, Georgetown University Medical Center, Washington, DC: Ronald L. McCartney, Hamot Medical Center, Erie, PA; Claire A. Beetlestone, Strong Memorial Hospital, Rochester, NY; Thomas P. James, Providence Hospital, Southfield, MI; Thomas E. Quinn, Orlando Regional Medical Center, Orlando, FL; Walter L. Grubb, Charlotte Memorial Hospital, Charlotte, NC; C. W. Reade, USPHS Hospital, Seattle, WA; Paul A. Richardson, St. Agnes Medical Center, Philadelphia, PA; Donald C. Jackson, Duke University Medical Center, Durham, NC. Coinvestigators in the Richmond, VA area were William E. Wheeler, St. Mary's Hospital; James J. Zelenak, Retreat for the Sick; William M. Fogel, Doctor's Hospital; William F. Proctor, St. Luke's Hospital; Maurice F. Mullins, Stuart Circle Hospital; Allen A. Frey, Johnston-Willis Hospital; and William R. Fields, VA Medical Center.

## REFERENCES

1. Zelch MG, Haaga JR. Clinical comparison of computed tomography and lymphangiography for detection of retroperitoneal lymphadenopathy. Radiol Clin North Am 1979;17:157–168
2. Harell GS, Breiman RS, Glatstein EJ, Marshall WH, Castellino RA. Computed tomography of the abdomen in the malignant lymphomas. Radiol Clin North Am 1977;15:391–400
3. Dunnick NR, Javadpour N. Value of CT and lymphography: distinguishing retroperitoneal metastases from nonseminomatous testicular tumors. AJR 1981;136:1093–1099
4. Kapdi CC. Lymphography without the use of vital dyes. Radiology 1979;133:795–796
5. Gangolli SD, Grasso P, Golberg L. Physical factors determining the early local tissue reactions produced by food colourings and other compounds injected subcutaneously. Food Cosmet Toxicol 1967;5:601–621
6. Collard M, Collette JM. Les modalities cliniques de l'allergie au bleu patente violet. J Belge Radiol 1967;50:407–410
7. von Sieber F. Zwischenfälle nach der subkutanen Installation von Patentblau zur Lymphographie. Med Bild 1968;11:102–103
8. Sinclair DJ, Perera FA. Allergic reactions: following patent blue dye administration. Can Med Assoc J 1969;101:100–101
9. Mortazavi SH, Burrows BD. Allergic reactions to patent blue dye in lymphangiography. Clin Radiol 1971;22:389–390
10. von Meseg W, Melzer KJ. Einfall von Patentblau-allergie bei Fußlymphographie. Z Urol 1972;65:945–947
11. Pevny I, Bohdorf W. Gruppenallergische Untersuchenung bei Patentblau-sensibilisierung. Med Klin 1972;20:698–702
12. Biran S, Hochman A. Allergic reaction to patent blue during lymphangiography. Radiol Clin Radiol 1973;42:166–168
13. Molnar Z, Böhm K, Varga Gy. Patentblau-allergie bei der Lymphographie. Rontgenblatter 1976;29:100–103
14. Kopp WL. Anaphylaxis from alphazurine 2G during lymphography. JAMA 1966;198:200–201
15. Koehler PR. Complications and accidents. In: Ruttiman A, ed. Progress in lymphology: proceedings of the International Symposium on Lymphology, Zurich, 1966. Stuttgart: Georg Thieme, 1967:306–308
16. Koehler PR. Complications of lymphography. Lymphology 1968;1:116–120
17. Castellino RA, Bergiron C, Markovits P. Experience with 659 consecutive lymphograms in children. Cancer 1977;40:1097–1101
18. Wallace S, Jackson L, Schaffer B, et al. Lymphangiograms: their diagnostic and therapeutic potential. Radiology 1961;1:157–173
19. Greening RR, Wallace S. Further observations in lymphangiography. Radiol Clin North Am 1963;1:157–173
20. Newton DW, Rogers AG, Becker CH, Torosian G. Evaluation of preparations of patent blue (Alphazurine 2G) dye for parenteral use. Am J Hosp Pharm 1975;32:912–917

# EXHIBIT 8



US 20080008658A1

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2008/0008658 A1**

De Haen    (43) **Pub. Date:**    **Jan. 10, 2008**

(54) **CONTRAST AGENT FORMULATIONS FOR THE VISUALIZATION OF THE LYMPHATIC SYSTEM**

(75) Inventor:    **Christoph De Haen**, Thalwil (CH)

Correspondence Address:
**BRACCO RESEARCH USA INC.**
**305- COLLEGE ROAD EAST**
**PRINCETON, NJ 08540 (US)**

(73) Assignee:    **Bracco Imaging SpA**, Milano (IT)

(21) Appl. No.:    **11/664,662**

(22) PCT Filed:    **Oct. 6, 2005**

(86) PCT No.:    **PCT/EP05/55071**

§ 371(c)(1),
(2), (4) Date:    **Apr. 4, 2007**

(30)    **Foreign Application Priority Data**

Oct. 8, 2004    (EP) ........................................ 04024102.8

**Publication Classification**

(51)    **Int. Cl.**
*A61K   49/22*    (2006.01)
(52)    **U.S. Cl.** ............................................ **424/9.52**; 424/9.5

(57)    **ABSTRACT**

The present invention relates to the field of diagnostic imaging and provides compositions of ultrasound contrast agents, particularly gas-filled microvesicles suspensions, in combination with vital dyes. The compositions of the invention are advantageously used in the visualization of the lymphatic system, particularly for the detection of the sentinel lymph node or nodes of a tumor.



Fig. 1



US 2008/0008658 A1

1

Jan. 10, 2008

# CONTRAST AGENT FORMULATIONS FOR THE VISUALIZATION OF THE LYMPHATIC SYSTEM

[0001]   The present invention relates to the field of diagnostic imaging and, more particularly, it relates to formulations of ultrasound contrast agents in combination with visible marking agents, in particular vital dyes.

[0002]   The formulations of the invention may be used in a variety of diagnostic imaging situations including ultrasound echographic and intraoperative optical visualization of the lymphatic system and, more particularly, of the sentinel lymph node or nodes of a tumor.

## BACKGROUND OF THE INVENTION

[0003]   Development of ultrasound techniques and diagnostic applications thereof has taken advantage, in recent years, from a variety of formulations of contrast agents useful in the imaging of blood and lymph vessels, organs and tissues, of human or animal bodies. Most of the above formulations are primarily designed for intravenous or intra-arterial administration in conjunction with the use of medical echographic equipment.

[0004]   A first class of injectable formulations of ultrasound contrast agents include, for instance, suspensions of gas bubbles having a proper diameter of a few microns dispersed in aqueous media.

[0005]   Of particular interest, within this class, are gas bubbles which are stabilized by means of suitable additives or ingredients such as, for instance, fatty acids and phospholipids, or by entrapping or encapsulating the gas or a precursor thereof in a variety of systems. These stabilized gas bubbles are widely known in the art and are generally referred to as "microvesicles".

[0006]   Microvesicles, in their turn, may be conveniently divided into two main categories. A first category of stabilized bubbles or microvesicles is generally referred to as "microbubbles". Microbubbles comprise aqueous suspensions in which the bubbles of gas are bound at the gas/liquid interface by a very thin envelope (film) involving a stabilizing amphiphilic material disposed at the gas to liquid interface.

[0007]   A few methods are known in the art for preparing the microbubble suspension. Typically, the microbubble suspension is prepared by suspending, in a suitable aqueous solution for injection, a suitably prepared solid formulation containing the amphiphilic material, e.g. freeze-dried preformed liposomes or freeze-dried or spray-dried phospholipid solutions, kept under an atmosphere of a suitable gas, for instance air or nitrogen or perfluorinated gases or mixtures thereof The microbubble suspension thus generated can be administered, preferably shortly after its preparation.

[0008]   In a second way, the microbubble suspension is prepared from a suspension of gas-free particles containing the amphiphilic material kept under the aforementioned gas atmosphere which, under vigorous agitation, forms a suspension of microbubbles.

[0009]   In a third way, the microbubble suspension is prepared by suspending, in a suitable aqueous solution for injection, a suitably prepared solid formulation containing the amphiphilic material together with materials that pro-duce a gas upon contact with water, or that liberate a gas from the suspension medium or the blood plasma or both, once injected.

[0010]   Non limiting examples of aqueous suspensions of the above gas microbubbles and preparations thereof are disclosed, for instance, in U.S. Pat. No. 5,271,928, U.S. Pat. No. 5,445,813, U.S. Pat. No. 5,413,774, U.S. Pat. No. 5,556,610, U.S. Pat. No. 5,597,549, U.S. Pat. No. 5,827,504, WO 97/29783, WO 04/069284, EP 0855186, U.S. Pat. No. 5,141,738, U.S. Pat. No. 6,306,366, EP 0365467, all of which are herewith incorporated by reference in their entirety.

[0011]   A second category of injectable formulations of ultrasound contrast agents comprises formulations containing microvesicles of the kind generally referred to as "microballoons" or "microcapsules" and includes suspensions in which the gas bubbles are surrounded by a solid material envelope of a lipid or of natural or synthetic polymers.

[0012]   Non limiting examples of microballoons and preparations thereof are disclosed, for instance, in U.S. Pat. No. 5,711,933, U.S. Pat. No. 6,333,021, U.S. Pat. No. 5,611,344, U.S. Pat. No. 6,045,777, U.S. Pat. No. 6,132,699 and WO 01/12071, all of which herein incorporated by reference in their entirety.

[0013]   Ultrasound contrast agents, hence including the above microbubbles and microballons, are currently used in a variety of diagnostic applications for the visual imaging of organs and tissues through known echographic instrumentations and techniques. Among the said diagnostic application is, for instance, the imaging of the lymphatic system.

[0014]   The lymphatic system comprises vessels or ducts that begin in tissues and are designed to collect interstitial fluid and to carry it as lymph to local lymph nodes. The lymph is therein filtered and processed and sent to the next of a series of consecutive lymph nodes down the line, until it enters the blood.

[0015]   During filtration the macrophages inside the nodes remove, via phagocytosis, particulate and cell material from the lymph. Large particles such as cells may become trapped in the small lymphatic passages in the nodes. When cancer occurs in tissues or organs, dislodging of cancerous cells into the lymphatic system may occur as well. These cancerous cells may thus become entrapped in the lymph node where they adhere to tissue and grow, forming metastatic foci.

[0016]   However, whilst in early stages of cancer development in the node the cancer remains limited to the node itself, the nodal deposit can also subsequently grow to totally replace the node and/or can spread downstream to the next node. The lymph nodes that drain the tissue or organ of interest, like the cancerous tissue, are the so-called regional lymph nodes and the first node that traps the cancer-derived metastatic cells is referred to as the sentinel lymph node (see, for a general reference, WO 04/030651). In rare cases the tumor lymph drains into more than one drainage basin, leading to multiple sentinel lymph nodes.

[0017]   In cancer surgery, known techniques like lymphadenectomies are often performed with the aim of eliminating cancer disease which has spread to lymph nodes. The

2

intervention may be made by open surgery or by endoscopically guided surgery. Typically, the surgeon removes the fat tissue strings which, from experience, are known to include the lymph nodes and which are located close to the large blood vessels, and above all the veins.

[0018] The outcome of this type of surgery may vary to a great extent as it may depend, essentially, upon the identification of the single lymph nodes in the fat masses, all having similar colour and consistency (see, for a reference, WO 00/35490). In the light of the above limitations, the need of easily detecting and inspecting the lymphatic system and, more particularly, the sentinel lymph node, is of utmost importance in the early stage of cancer diagnosis and therapy.

[0019] Certain lymphatic pathways may be visualized by various imaging techniques after injection of appropriate contrast agents directly into lymphatic vessels (direct lymphography). This approach is applicable to X-ray imaging, magnetic resonance imaging, echographic imaging and nuclear imaging. Direct lymphography is a skill-requiring open surgery procedure under anesthesia. It is only practical when large lymphatic vessels are accessible. For example, after administration of X-ray contrast agents into lymphatic vessels of the foot, a few leg lymph nodes and pelvic and abdominal lymph nodes may be thus visualized. However, direct lymphography is not usually suitable for the identification of the sentinel lymph node(s) of a tumor.

[0020] Several means specifically intended for the identification of the sentinel lymph node(s) and based on the use of contrast agents are known in the art. They may involve indirect lymphography, i.e. the imaging of the lymphatic system after injection of contrast agents outside the lymphatic system, e.g. interstitially, subcutaneously, subdermally, intradermally, subareolarly, periareolarly, intraperitoneally or intravenously. Contrast agents injected into tissue interstitium in general, e.g. into peritumoral regions in particular, do reach the lymphatic system but to degrees depending on their nature. In this respect, as truly soluble agents with molecular diameters substantially below 3 nm tend to enter the blood vasculature just as easily as the lymphatic system, they do not offer a good lymphatic contrast.

[0021] Commonly available soluble contrast agents are much smaller than the above limit and, hence, do not get trapped in lymph nodes, yet do get into the vasculature. As a result, their concentration in the nodes does not reach sufficient levels to permit good visualization.

[0022] Particulate contrast agents, instead, enter the lymphatic system preferentially over blood vessels, provided they contain particulates of a suitable size range, typically with diameters between 3 and 900 nm.

[0023] Particles having a diameter up to about 900 nm have been found to enter lymphatic systems from the interstitium, whereas particles substantially larger are reported not to do so (see Wolf G. et al.; Percutaneous lymphography using particulate fluorocarbon emulsions; U.S. Pat. No. 5,114,703).

[0024] As an example, WO 01/12071 describes an ultrasound contrast agent composition with diameters in the range of about 100 to 800 nm for sentinel lymph node detection after subcutaneous administration.

[0025] Suitably sized particulate contrast agents injected interstitially allow imaging of the lymph nodes, in part because after opsonization they get trapped by macrophages in the nodes; passage from interstitium to the lymphatic system is reported to be accelerated by massaging the interested area.

[0026] Subcutaneous and subdermal injection of contrast agents has requirements and limitations for successful imaging of the lymphatic system very similar to the interstitial injection. The process of diffusion of the contrast agent, in fact, is rather slow and requires as well the massaging at the injection site.

[0027] Among the currently used methods for the identification of the sentinel lymph nodes is lymphoscintigraphy that, despite the above limitations, is today mostly performed by subcutaneous or interstitial injection. More recently in the case of breast subareolar and periareolar injection is being proposed.

[0028] The scintigraphic contrast agents used are colloidal contrast agents prepared from commercial products by further filtration in the hospitals. No scintigraphic contrast agent, at present, is registered with the indication for sentinel lymph node detection. In the case of breast tumor scintigraphic sentinel lymph node detection involves the injection, under local or general anesthesia, of a scintigraphic contrast agent, usually administered several hours before the start of the diagnostic imaging. Typically, the biopsy of the identified sentinel lymph node(s) can be performed the subsequent day only.

[0029] As an additional drawback, scintigraphy requires to be performed within a Nuclear Medicine Department with heavy and immobile imaging equipment, a nuclear pharmacy and authorized personnel which, in many hospitals, are not available. For biopsy of the sentinel lymph node(s) the patient usually has to be transferred to the surgical department. The whole procedure is thus lengthy and involves, at least, two distinct hospital departments.

[0030] Another known method for detecting sentinel lymph nodes involves the injection of a blue vital dye.

[0031] The visual identification of the sentinel lymph node(s) is then performed intraoperatively, that is by observing the dye at the region suspected to contain the sentinel lymph node. In particular, when intraoperative lymphatic mapping is performed with a blue dye, the sentinel lymph node may be identified by following a blue-stained lymphatic channel draining from the primary tumor site to a blue stained node, the sentinel lymph node (see, for a reference, Donald L. Morton et al.; Ann. Surg. Oncol., Vol. 6, No. 1, 1999).

[0032] Moreover, the blue dye allows the labeling of all of the lymph nodes and the sentinel one needs to be identified through the earliest time of arrival of the dye. So far, given the size of the area to be kept under observation together with the fact that the dye tends to spread around all of the lymphatic structures, this visualization is rather troublesome. Clearly, this method may suffer from excessive surgical exploration.

[0033] Combined techniques have been also developed which may comprise, for instance, preoperative lymphoscintigraphy by using Tc-99m labeled sulfur colloid followed by blue dye administration.

US 2008/0008658 A1

3

Jan. 10, 2008

[0034] Nevertheless, whilst the blue dye is injected 5-15 min before intraoperative lymphatic mapping and sentinel lymph node detection, additional injections of labeled sulfur colloid may be required if more than 24 h has passed since preoperative lymphoscintigraphy (see Donald L. Morton et al.).

[0035] U.S. Pat. No. 6,205,352 describes the detection of the sentinel lymph node(s) of a tumor by injection of a non-radioactive contrast agent followed by imaging with a modality capable of detecting the contrast agent. Among the contrast agents and imaging modalities, ultrasound contrast agents and echographic detection methods are also claimed therein.

[0036] In addition, it is therein reported that such agents "are preferably about 10 to about 200 nanometers in diameter". According to this latter aspect, however, it is known to the skilled man that with those sizes ultrasound contrast agents have essentially no echographic efficacy.

[0037] It is also known in the art that flexible microbubbles injected interstitially, subcutaneously or intradermally can reach the lymphatic system even if they are larger than 900 nm in diameter. Probably these products can deform on their own or under the action of massage, thereby assuming adaptive shapes for entering the lymphatic system. U.S. Pat. No. 6,444,192 describes the echographic imaging of the lymphatic ducts and nodes after the administration, into an appropriate site other than blood or lymph structures, of a particulate ultrasound contrast agent.

[0038] From all of the above there is the need, in the field of diagnostics, of a technique for the imaging of the lymphatic system that allows an easy, rapid, reproducible and robust detection of the sentinel lymph node(s).

DESCRIPTION OF THE INVENTION

[0039] We have now found that visualization of the lymphatic system, in particular identification of the sentinel lymph node or nodes of a tumor, can be advantageously achieved by combining ultrasound imaging techniques with vital dyes techniques.

[0040] We have thus found, unexpectedly, that ultrasound contrast agents may be conveniently formulated in combination with vital dyes and thus administered, preferably shortly before diagnostic imaging.

[0041] It is therefore a first object of the present invention a composition comprising an ultrasound contrast agent in combination with a vital dye.

[0042] Once administered to a subject undergoing diagnostic imaging, for instance of the lymphatic system, the composition of the invention allows optimal visualization and inspection of the sentinel lymph node and minimizes surgical exploration during sentinel lymph node excision.

[0043] Very advantageously, in fact, the use of the composition of the invention enables the surgeon to locate the sentinel lymph node by ultrasound imaging and, hence, the optimal site of operative incision just prior to surgery, whilst allowing visual recognition of the lymphatic structures and the lymph nodes before their optional excision.

[0044] From the above, it is clear to the skilled man that in the composition of the invention, a diagnostically effective amount of both the components is required.

[0045] With the terms "diagnostically effective amount" we intend, unless otherwise provided, any amount of both the ultrasound contrast agent and the dye which is sufficient to enable echographic imaging and visual imaging, respectively.

[0046] Typically, the amounts of the ultrasound contrast agent and the vital dye substantially correspond to the same amount that would have been administered by using each of them separately, according to known techniques.

[0047] Preferably, the composition of the invention is administered so as to provide amounts of the ultrasound contrast agent ranging from about 0.01 μl to about 6.0 μl of gas, inside microvesicles, per patient.

[0048] Likewise, through the administration of the composition of the invention, amounts of vital dye ranging from about 1 μmol to about 100 μmol may be thus administered, in one or multiple sites.

[0049] In the present description, unless otherwise indicated, with the term vital dye we intend any known dye being developed as suitable for the parenteral administration to human and animal bodies.

[0050] Preferably, with the aim of providing optimal ocular visibility, the dye is characterized by having at least one light absorption maximum at wavelengths comprised between 500 nm and 900 nm and, even more preferably, between 520 and 750 nm. Suitable vital dyes according to the invention may include, for instance, water soluble dyes selected among the classes of triphenylmethane dyes, cyanine dyes, mero-cyanine dyes, styryl dyes, thiazine dyes, diazo dyes, porphyrins and their ring-enlarged higher homologues and phthalocyanins and their ring-enlarged higher homologues dyes.

[0051] Additional vital dyes according to the invention may also comprise suitable complexes with metals, e.g. gadolinium, copper, cobalt and magnesium, so as to give rise, for instance, to metalloporphyrins, metallochlorins, metallophthalocyanins and higher homologues thereof.

[0052] Non limiting examples of vital dyes according to the invention may thus include, for instance, Evans blue [CAS 61-73-4], patent blue V [CAS 3536-49-0], patent blue VF [CAS 129-17-9], isosulfan blue [also known as Patent blue violet, CAS 68238-36-8], indocyanine green monosodium salt [CAS 3599-32-4], methylene blue [CAS 314-13-6], sulfobromophthaleine [123359-42-2], copper phthalocyanine tetrasulfonate [27360-85-6], gadolinium texaphyrin [156436-89-4]. According to a preferred embodiment of the invention, the vital dye is selected between Evans blue and patent blue VF.

[0053] Vital dyes are commercially available compounds or may be easily obtained by well known chemical syntheses. Commercial products may be further purified by classical means such as dissolution, filtration and reprecipitation as well as by chromatography.

[0054] In particular, available solutions of these products may be purified from contaminant salts by electrodialysis and from particulates and endotoxins by ultrafiltration. Thus, they may be purified until they reach the required degree of purity for parenteral administration to mammals, including humans.

[0055] In the present description, unless otherwise specified, with the term ultrasound contrast agent we intend any contrast agent known to be used for echographic diagnostic imaging techniques.

[0056] Preferably, said ultrasound contrast agents are those previously reported and shortly referred to as gas-containing or gas-filled microbubble or microballoon suspensions. For details about the gas-filled microvesicles, their main components and optional excipients, the gases themselves, their appearance as well as the method for their preparation, see the following extensive section.

[0057] Ultrasound Contrast Agents: Gas-Filled Microvesicles

[0058] The gas-filled microbubbles are those known in the art and comprise bubbles of gas dispersed in an aqueous medium which are stabilized by a thin envelope comprising an amphiphilic compound disposed at the gas to liquid interface. Said stabilizing envelope, sometimes referred to as an "evanescent envelope", has in general a thickness of less than 5 nm, typically of about 2-3 nm, thus often amounting to a substantially monomolecular layer.

[0059] The amphiphilic compound included in the microbubbles' envelope can be a synthetic or naturally-occurring biocompatible compound and may include, for example a film forming lipid, in particular a phospholipid. Examples of amphiphilic compounds include, for instance, phospholipids; lysophospholipids; fatty acids, such as palmitic acid, stearic acid, arachidonic acid or oleic acid; lipids bearing polymers, such as chitin, hyaluronic acid, polyvinylpyrrolidone or polyethylene glycol (PEG), also referred as "pegylated lipids"; lipids bearing sulfonated mono- di-, oligo- or polysaccharides; cholesterol, cholesterol sulfate or cholesterol hemisuccinate; tocopherol hemisuccinate; lipids with ether or ester-linked fatty acids; polymerized lipids; diacetyl phosphate; dicetyl phosphate; ceramides; polyoxyethylene fatty acid esters (such as polyoxyethylene fatty acid stearates), polyoxyethylene fatty alcohols, polyoxyethylene fatty alcohol ethers, polyoxyethylated sorbitan fatty acid esters, glycerol polyethylene glycol ricinoleate, ethoxylated soybean sterols, ethoxylated castor oil or ethylene oxide (EO) and propylene oxide (PO) block copolymers; sterol aliphatic acid esters including, cholesterol butyrate, cholesterol iso-butyrate, cholesterol palmitate, cholesterol stearate, lanosterol acetate, ergosterol palmitate, or phytosterol n-butyrate; sterol esters of sugar acids including cholesterol glucuronides, lanosterol glucuronides, 7-dehydrocholesterol glucuronide, ergosterol glucuronide, cholesterol gluconate, lanosterol gluconate, or ergosterol gluconate; esters of sugar acids and alcohols including lauryl glucuronide, stearoyl glucuronide, myristoyl glucuronide, lauryl gluconate, myristoyl gluconate, or stearoyl gluconate; esters of sugars with aliphatic acids including sucrose laurate, fructose laurate, sucrose palmitate, sucrose stearate, glucuronic acid, gluconic acid or polyuronic acid; saponins including sarsasapogenin, smilagenin, hederagenin, oleanolic acid, or digitoxigenin; glycerol or glycerol esters including glycerol tripalmitate, glycerol distearate, glycerol tristearate, glycerol dimyristate, glycerol trimyristate, glycerol dilaurate, glycerol trilaurate, glycerol dipalmitate,; long chain alcohols including n-decyl alcohol, lauryl alcohol, myristyl alcohol, cetyl alcohol, or n-octadecyl alcohol; 6-(5-cholesten-3β-yloxy)-1-thio-β-D-galactopyranoside; digalactosyl-diglyc-

eride; 6-(5-cholesten-3β-yloxy)hexyl-6-amino-6-deoxy-1-thio-β-D-galactopyranoside; 6-(5-cholesten-3β-yloxy)hexyl-6-amino-6-deoxyl-1-thio-β-D-mannopyranoside; 12-(((7'-diethylaminocoumarin-3-yl)carbonyl)methylamino)octadecanoic acid; N-[1 2-(((7'-diethylaminocoumarin-3-yl)carbonyl)methylamino)octadecanoyl]-2-aminopalmitic acid; N-succinyldioleylphosphatidylethanolamine; 1 ,2-dioleyl-sn-glyceryl; 1,2-dipalmitoyl-sn-3-succinylglycerol; 1,3-dipalmitoyl-2-succinylglycerol; 1-hexadecyl-2-palmitoylglycerophosphoethanolamine or palmitoylhomocysteine; alkylamines or alkylammonium salts, comprising at least one ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), alkyl chain, such as, for instance, N-stearylamine, N,N'-distearylamine, N-hexadecylamine, N,N'-dihexadecylamine, N-stearylammonium chloride, N,N'-distearylammonium chloride, N-hexadecylammonium chloride, N,N'-dihexadecylammonium chloride, dimethyldioctadecylammonium bromide (DDAB), hexadecyltrimethylammonium bromide (CTAB); tertiary or quaternary ammonium salts comprising one or preferably two ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), acyl chain linked to the N-atom through a ($C_3$-$C_6$) alkylene bridge, such as, for instance, 1,2-distearoyl-3-trimethylammonium-propane (DSTAP), 1,2-dipalmitoyl-3-trimethylammonium-propane (DPTAP), 1,2-oleoyl-3-trimethylammonium-propane (DOTAP), 1,2-distearoyl-3-dimethylammonium-propane (DSDAP); and mixtures or combinations thereof.

[0060] Depending on the combination of components and on the manufacturing process of the microbubbles, the above listed exemplary compounds may be employed as main compound for forming the microbubble's envelope or as simple additives, thus being present only in minor amounts.

[0061] According to a preferred embodiment, at least one of the compounds forming the microbubbles' envelope is a phospholipid, optionally in admixture with any of the other above cited film-forming materials. According to the present description, the term phospholipid is intended to encompass any amphiphilic phospholipid compound, the molecules of which are capable of forming a stabilizing film of material (typically in the form of a mono-molecular layer) at the gas-water boundary interface in the final microbubbles suspension. Accordingly, these materials are also referred to in the art as "film-forming phospholipids".

[0062] Amphiphilic phospholipid compounds typically contain at least one phosphate group and at least one, preferably two, lipophilic long-chain hydrocarbon group.

[0063] Examples of suitable phospholipids include esters of glycerol with one or preferably two (equal or different) residues of fatty acids and with phosphoric acid, wherein the phosphoric acid residue is in turn bound to a hydrophilic group, such a, for instance, choline (phosphatidylcholines—PC), serine (phosphatidylserines—PS), glycerol (phosphatidylglycerols—PG), ethanolamine (phosphatidylethanolamines—PE), inositol (phosphatidylinositol). Esters of phospholipids with only one residue of fatty acid are generally referred to in the art as the "lyso" forms of the phospholipid or "lysophospholipids". Fatty acids residues present in the phospholipids are in general long chain aliphatic acids, typically containing from 12 to 24 carbon atoms, preferably from 14 to 22; the aliphatic chain may contain one or more unsaturations or is preferably completely saturated. Examples of suitable fatty acids included

5

in the phospholipids are, for instance, lauric acid, myristic acid, palmitic acid, stearic acid, arachidic acid, behenic acid, oleic acid, linoleic acid, and linolenic acid. Preferably, saturated fatty acids such as myristic acid, palmitic acid, stearic acid and arachidic acid are employed.

[0064]   Further examples of phospholipid are phosphatidic acids, i.e. the diesters of glycerol-phosphoric acid with fatty acids; sphingolipids such as sphingomyelins, i.e. those phosphatidylcholine analogs where the residue of glycerol diester with fatty acids is replaced by a ceramide chain; cardiolipins, i.e. the esters of 1,3-diphosphatidylglycerol with a fatty acid; glycolipids such as gangliosides GM1 (or GM2) or cerebrosides; glucolipids; sulfatides and glycosphingolipids.

[0065]   As used herein, the term phospholipids include either naturally occurring, semisynthetic or synthetically prepared products that can be employed either singularly or as mixtures. Examples of naturally occurring phospholipids are natural lecithins (phosphatidylcholine (PC) derivatives) such as, typically, soya bean or egg yolk lecithins.

[0066]   Examples of semisynthetic phospholipids are the partially or fully hydrogenated derivatives of the naturally occurring lecithins. Preferred phospholipids are fatty acids di-esters of phosphatidylcholine, ethylphosphatidylcholine, phosphatidylglycerol, phosphatidic acid, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol or of sphingomyelin.

[0067]   Examples of preferred phospholipids are, for instance, dilauroyl-phosphatidylcholine (DLPC), dimyristoyl-phosphatidylcholine (DMPC), dipalmitoyl-phosphatidylcholine (DPPC), diarachidoyl-phosphatidylcholine (DAPC), distearoyl-phosphatidylcholine (DSPC), dioleoylphosphatidylcholine (DOPC), 1,2 Distearoyl-sn-glycero-3-Ethylphosphocholine (Ethyl-DSPC), dipentadecanoyl-phosphatidylcholine (DPDPC), 1-myristoyl-2-palmitoylphosphatidylcholine (MPPC), 1-palmitoyl-2-myristoylphosphatidylcholine (PMPC), 1-palmitoyl-2-stearoylphosphatidylcholine (PSPC), 1-stearoyl-2-palmitoylphosphatidylcholine (SPPC), 1-palmitoyl-2-oleylphosphatidylcholine (POPC), 1-oleyl-2-palmitoylphosphatidylcholine (OPPC), dilauroylphosphatidylglycerol (DLPG) and its alkali metal salts, diarachidoylphosphatidyl-glycerol (DAPG) and its alkali metal salts, dimyristoylphosphatidylglycerol (DMPG) and its alkali metal salts, dipalmitoylphosphatidylglycerol (DPPG) and its alkali metal salts, distearoylphosphatidylglycerol (DSPG) and its alkali metal salts, dioleoylphosphatidylglycerol (DOPG) and its alkali metal salts, dimyristoyl phosphatidic acid (DMPA) and its alkali metal salts, dipalmitoyl phosphatidic acid (DPPA) and its alkali metal salts, distearoyl phosphatidic acid (DSPA), diarachidoylphosphatidic acid (DAPA) and its alkali metal salts, dimyristoyl-phosphatidylethanolamine (DMPE), dipalmitoylphosphatidylethanolamine (DPPE), distearoyl phosphatidyl-ethanolamine (DSPE), dioleylphosphatidyl-ethanolamine (DOPE), diarachidoylphosphatidylethanolamine (DAPE), dilinoleylphosphatidylethanolamine (DLPE), dimyristoyl phosphatidylserine (DMPS), diarachidoyl phosphatidylserine (DAPS), dipalmitoyl phosphatidylserine (DPPS), distearoylphosphatidylserine (DSPS), dioleoylphosphatidylserine (DOPS), dipalmitoyl sphingomyelin (DPSP), and distearoylsphingomyelin (DSSP), dilau-

royl-phosphatidylinositol (DLPI), diarachidoylphosphatidylinositol (DAPI), dimyristoylphosphatidylinositol (DMPI), dipalmitoylphosphatidylinositol (DPPI), distearoylphosphatidylinositol (DSPI), dioleoylphosphatidylinositol (DOPI).

[0068]   The term phospholipid further includes modified phospholipid, e.g. phospholipids where the hydrophilic group is in turn bound to another hydrophilic group. Examples of modified phospholipids are phosphatidylethanolamines modified with polyethylenglycol (PEG), i.e. phosphatidylethanolamines where the hydrophilic ethanolamine moiety is linked to a PEG molecule of variable molecular weight (e.g. from 300 to 5000 daltons), such as DPPE-PEG (or DSPE-, DMPE- or DAPE-PEG), i.e. DPPE (or DSPE, DMPE, or DAPE) having a PEG polymer attached thereto. For example, DPPE-PEG2000 refers to DPPE having attached thereto a PEG polymer having a mean average molecular weight of about 2000.

[0069]   Particularly preferred phospholipids are DAPC, DSPC, DPPA, DSPA, DMPS, DPPS, DSPS and Ethyl-DSPC. Most preferred are DPPS or DSPC.

[0070]   Mixtures of phospholipids can also be used, such as, for instance, mixtures of DPPE, DPPC, DSPC and/or DAPC with DSPS, DPPS, DSPA, DPPA, DSPG, DPPG, Ethyl-DSPC and/or Ethyl-DPPC.

[0071]   In preferred embodiments, the phospholipid is the main component of the stabilizing envelope of microbubbles, amounting to at least 50% (w/w) of the total amount of components forming the envelope of the gas filled microbubbles. In some of the preferred embodiments, substantially the totality of the envelope (i.e. at least 90% and up to 100% by weight) can be formed of phospholipids.

[0072]   The phospholipids can conveniently be used in admixture with any of the above listed amphiphilic compounds. Thus, for instance, lipids such as cholesterol, ergosterol, phytosterol, sitosterol, lanosterol, tocopherol, propyl gallate or ascorbyl palmitate, fatty acids such as myristic acid, palmitic acid, stearic acid, arachidic acid and derivatives thereof or butylated hydroxytoluene and/or other non-phospholipid compounds can optionally be added to one or more of the foregoing phospholipids in proportions ranging from zero to 50% by weight, preferably up to 25%. Particularly preferred is palmitic acid.

[0073]   According to a preferred embodiment, the envelope of microbubbles includes a compound bearing an overall (positive or negative) net charge. Said compound can be a charged amphiphilic material, preferably a lipid or a phospholipid.

[0074]   Examples of phospholipids bearing an overall negative charge are derivatives, in particular fatty acid di-ester derivatives, of phosphatidylserine, such as DMPS, DPPS, DSPS; of phosphatidic acid, such as DMPA, DPPA, DSPA; of phosphatidylglycerol such as DMPG, DPPG and DSPG or of phosphatidylinositol, such as DMPI, DPPI or DPPI. Also modified phospholipids, in particular PEG-modified phosphatidylethanolamines, such as DMPE-PEG1000, DMPE-PEG2000, DMPE-PEG3000, DMPE-PEG4000, DMPE-PEG5000, DPPE-PEG1000, DPPE-PEG2000, DPPE-PEG3000, DPPE-PEG4000, DPPE-PEG5000, DSPE-PEG1000, DSPE-PEG2000, DSPE-PEG3000, DSPE-PEG4000, DSPE-PEG5000, DAPE-

6

PEG1000, DAPE-PEG2000, DAPE-PEG3000, DAPE-PEG4000 or DAPE-PEG5000 can be used as negatively charged molecules. Also the lyso- form of the above cited phospholipids, such as lysophosphatidylserine derivatives (e.g. lyso-DMPS, -DPPS or -DSPS), lysophosphatidic acid derivatives (e.g. lyso-DMPA, -DPPA or -DSPA) and lyso-phosphatidylglycerol derivatives (e.g. lyso-DMPG, -DPPG or -DSPG), can advantageously be used as negatively charged compound. Examples of negatively charged lipids are bile acid salts such as cholic acid salts, deoxycholic acid salts or glycocholic acid salts; and ($C_{12}$-$C_{24}$), preferably ($C_{14}$-$C_{22}$) fatty acid salts such as, for instance, palmitic acid salt, stearic acid salt, 1,2-dipalmitoyl-sn-3-succinylglycerol salt or 1,3-dipalmitoyl-2-succinylglycerol salt.

[0075]   Preferably, the negatively charged compound is selected among DPPA, DPPS, DSPG, DSPE-PEG2000, DSPE-PEG5000 or mixtures thereof.

[0076]   The negatively charged component is typically associated with a corresponding positive counter-ion, which can be mono- (e.g. an alkali metal or ammonium), di- (e.g. an earth-alkali metal) or tri-valent (e.g. aluminium). Preferably the counter-ion is selected among alkali metal cations, such as $Li^+$, $Na^+$, or $K^+$, more preferably $Na^+$.

[0077]   Examples of phospholipids bearing an overall positive charge are derivatives of ethylphosphatidylcholine, in particular di-esters of ethylphosphatidylcholine with fatty acids, such as 1,2-Distearoyl-sn-glycero-3-Ethylphosphocholine (Ethyl-DSPC or DSEPC), 1,2-Dipalmitoyl-sn-glycero-3-Ethylphosphocholine (Ethyl-DPPC or DPEPC). The negative counterion is preferably an halogen ion, in particular chlorine or bromine. Examples of positively charged lipids are alkylammonium salts with a halogen counter ion (e.g. chlorine or bromine) comprising at least one ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), alkyl chain, such as, for instance mono or di-stearylammonium chloride, mono or di-hexadecylammonium chloride, dimethyldioctadecylammonium bromide (DDAB), hexadecyltrimethylammonium bromide (CTAB). Further examples of positively charged lipids are tertiary or quaternary ammonium salts with a halogen counter ion (e.g. chlorine or bromine) comprising one or preferably two ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), acyl chain linked to the N-atom through a ($C_3$-$C_6$) alkylene bridge, such as, for instance,   1,2-distearoyl-3-trimethylammonium-propane (DSTAP),   1,2-dipalmitoyl-3-trimethylammonium-propane (DPTAP),   1,2-oleoyl-3-trimethylammonium-propane (DOTAP),   1,2-distearoyl-3-dimethylammonium-propane (DSDAP). DSEPC, DPEPC and/or DSTAP are preferably employed as positively charged compounds in the microbubbles envelope.

[0078]   The positively charged component is typically associated with a corresponding negative counter-ion, which can be mono- (e.g. halogen), di- (e.g. sulphate) or tri-valent (e.g. phosphate). Preferably the counter-ion is selected among halogen ions, such as F⁻ (fluorine), Cl⁻ (chlorine) or Br⁻ (bromine).

[0079]   Mixtures of neutral and charged compounds, in particular of phospholipids and/or lipids, can be satisfactorily employed to form the microbubbles envelope. The amount of charged lipid or phospholipid may vary from about 95% to about 1% by mole, with respect to the total amount of lipid and phospholipid, preferably from 80% to 20% by mole.

[0080]   Preferred mixtures of neutral phospholipids and charged lipids or phospholipids are, for instance, DPPG/DSPC , DSTAP/DAPC, DPPS/DSPC, DPPS/DAPC, DPPE/DPPG, DSPA\DAPC, DSPA\DSPC and DSPG/DSPC.

[0081]   Other excipients or additives may be present either in the dry formulation of the microbubbles or may be added together with the aqueous carrier used for the reconstitution thereof, without necessarily being involved (or only partially involved) in the formation of the stabilizing envelope of the microbubble. These include pH regulators, osmolality adjusters, viscosity enhancers, emulsifiers, bulking agents, etc. and may be used in conventional amounts. For instance compounds like polyoxypropylene glycol and polyoxyethylene glycol as well as copolymers thereof can be used. Examples of viscosity enhancers or stabilizers are compounds selected from linear and cross-linked poly- and oligo-saccharides, sugars, hydrophilic polymers like polyethylene glycol.

[0082]   As the preparation of gas-filled microbubbles may involve a freeze drying or spray drying step, it may be advantageous to include in the formulation a lyophilization additive, such as an agent with cryoprotective and/or lyoprotective effect and/or a bulking agent, for example an amino-acid such as glycine; a carbohydrate, e.g. a sugar such as sucrose, mannitol, maltose, trehalose, glucose, lactose or a cyclodextrin, or a polysaccharide such as dextran; or a polyglycol such as polyethylene glycol.

[0083]   The microbubbles can be produced according to any known method in the art. Typically, the manufacturing method involves the preparation of a dried powdered material comprising an amphiphilic material as above indicated, preferably by lyophilization (freeze drying) of an aqueous or organic suspension comprising said material.

[0084]   For instance, as described in WO 91/15244 film-forming amphiphilic compounds can be first converted into a lamellar form by any liposome forming method. To this end, an aqueous solution comprising the film forming lipids and optionally other additives (e.g. viscosity enhancers, non-film forming surfactants, electrolytes etc.) can be submitted to high-speed mechanical homogenisation or to sonication under acoustical or ultrasonic frequencies, and then freeze dried to form a free flowable powder which is then stored in the presence of a gas. Optional washing steps, as disclosed for instance in U.S. Pat. No. 5,597,549, can be performed before freeze drying.

[0085]   According to an alternative embodiment (described for instance in U.S. Pat. No. 5,597,549) a film forming compound and a hydrophilic stabiliser (e.g. polyethylene glycol, polyvinyl pyrrolidone, polyvinyl alcohol, glycolic acid, malic acid or maltol) can be dissolved in an organic solvent (e.g. tertiary butanol, 2-methyl-2-butanol or $C_2Cl_4F_2$) and the solution can be freeze-dried to form a dry powder.

[0086]   Preferably, as disclosed in WO 04/069284, a phospholipid (selected among those cited above and including at least one of the above-identified charged phospholipids) and a lyoprotecting agent (such as those previously listed, in particular carbohydrates, sugar alcohols, polyglycols and mixtures thereof) can be dispersed in an emulsion of water with a water immiscible organic solvent (e.g. branched or linear alkanes, alkenes, cycloalkanes, aromatic hydrocar-

bons, alkyl ethers, ketones, halogenated hydrocarbons, perfluorinated hydrocarbons or mixtures thereof) under agitation. The emulsion can be obtained by submitting the aqueous medium and the solvent in the presence of at least one phospholipid to any appropriate emulsion-generating technique known in the art, such as, for instance, sonication, shaking, high pressure homogenization, micromixing, membrane emulsification, high speed stirring or high shear mixing. For instance, a rotor-stator homogenizer can be employed, such as Polytron PT3000. The agitation speed of the rotor-stator homogenizer can be selected depending from the components of the emulsion, the volume of the emulsion, the relative volume of organic solvent, the diameter of the vessel containing the emulsion and the desired final diameter of the microdroplets of solvent in the emulsion. Alternatively, a micromixing technique can be employed for emulsifying the mixture, e.g. by introducing the organic solvent into the mixer through a first inlet (at a flow rate of e.g. 0.05-5 ml/min), and the aqueous phase a second inlet (e.g. at a flow rate of 2-100 ml/min). The outlet of the micromixer is then connected to the vessel containing the aqueous phase, so that the aqueous phase drawn from said vessel at subsequent instants and introduced into the micromixer contains increasing amounts of emulsified solvent. When the whole volume of solvent has been added, the emulsion from the container can be kept under recirculation through the micromixer for a further predetermined period of time, e.g. 5-120 minutes, to allow completion of the emulsion. Depending on the emulsion technique, the organic solvent can be introduced gradually during the emulsification step or at once before starting the emulsification step. Alternatively the aqueous medium can be gradually added to the water immiscible solvent during the emulsification step or at once before starting the emulsification step. Preferably, the phospholipid is dispersed in the aqueous medium before this latter is admixed with the organic solvent. Alternatively, the phospholipid can be dispersed in the organic solvent or it may be separately added the aqueous-organic mixture before or during the emulsification step. The so obtained microemulsion, which contains microdroplets of solvent surrounded and stabilized by the phospholipid material (and optionally by other amphiphilic film-forming compounds and/or additives), is then lyophilized according to conventional techniques to obtain a lyophilized material, which is stored (e.g. in a vial in the presence of a suitable gas) and which can be reconstituted with an aqueous carrier to finally give a gas-filled microbubbles suspension where the dimensions and size distribution of the microbubbles are substantially comparable with the dimensions and size distribution of the suspension of microdroplets.

[0087] A further process for preparing gas-filled microbubbles comprises generating a gas microbubble dispersion by submitting an aqueous medium comprising a phospholipid (and optionally other amphiphilic film-forming compounds and/or additives) to a controlled high agitation energy (e.g. by means of a rotor stator mixer) in the presence of a desired gas and subjecting the obtained dispersion to lyophilisation to yield a dried reconstitutable product. An example of this process is given, for instance, in WO 97/29782, here enclosed by reference.

[0088] Spray drying techniques (as disclosed for instance in U.S. Pat. No. 5,605,673) can also be used to obtain a dried powder, reconstitutable upon contact with physiological aqueous carrier to obtain gas-filled microbubbles.

[0089] The dried or lyophilised product obtained with any of the above techniques will generally be in the form of a powder or a cake, and can be stored (e.g. in a vial) in contact with the desired gas. The product is readily reconstitutable in a suitable physiologically acceptable aqueous liquid carrier, which is typically injectable, to form the gas-filled microbubbles, upon gentle agitation of the suspension. Suitable physiologically acceptable liquid carriers are sterile water, aqueous solutions such as saline (which may advantageously be balanced so that the final product for injection is not hypotonic), or solutions of one or more tonicity adjusting substances such as salts or sugars, sugar alcohols, glycols or other non-ionic polyol materials (eg. glucose, sucrose, sorbitol, mannitol, glycerol, polyethylene glycols, propylene glycols and the like).

[0090] Mean dimensions and size distribution of the final reconstituted microbubbles can be in general be determined by suitably acting on the parameters of the preparation process. In general, different values of mean size and size distribution of a final preparation can be obtained by selecting different envelope-stabilizing phospholipids and/or (when required by the process) by the selection of different organic solvents and/or different volumes thereof (relative to the volume of aqueous phase). In addition, for the specific preparation processes disclosed in WO 04/069284 or W097/29782, a variation of the mixing speed generally results in a variation of the mean dimensions of the final microbubble preparation (typically, the higher the mixing speeds, the smaller the obtained microbubbles).

[0091] According to a preferred alternative embodiment, the composition of the invention may comprise any suitable ultrasound contrast agent in the form of microballons.

[0092] As formerly reported, gas-filled microballoons as defined herein comprise microvesicles having a material envelope, the thickness of which is in general much greater than the thickness of microbubbles stabilizing film-envelope. Depending from the material forming said envelope (which can be e.g. polymeric, proteinaceous, of a water insoluble lipid or of any combination thereof), said thickness is in general of at least 50 nm, typically of at least 100 nm, up to few hundred nanometers (e.g. 300 nm). Microballons also generally differ from microbubbles in terms of acoustic response to ultrasonication. While the ultrasonic behavior of microbubbles is in fact closer to the behavior of "free" gas bubbles, microballons (probably because of a higher stiffness of the envelope) are in general less responsive (in terms of intensity of the reflected echo signal) when irradiated at low levels of acoustic pressure energy (e.g. at a mechanical index of about 0.1).

[0093] Preferred examples of microballons are those comprising a stabilizing polymeric envelope, preferably comprising a biodegradable polymer, or a stabilizing envelope based on biodegradable water-insoluble lipids, such as, for instance those described in U.S. Pat. No. 5,711,933 and U.S. Pat. No. 6,333,021, herein incorporated by reference in their entirety. Microballons having a proteinaceous envelope, i.e. made of natural proteins (albumin, haemoglobin) such as those described in U.S. Pat. No. 4,276,885 or EP-A-0 324 938, can also be employed. Polymers forming the envelope of the injectable microballons are preferably hydrophilic, biodegradable physiologically compatible polymers. Examples of such polymers, which may be natu-

US 2008/0008658 A1

8

Jan. 10, 2008

ral or synthetic, are substantially insoluble polysaccharides (e.g. chitosan or chitin), polycyanoacrylates, polylactides and polyglycolides and their copolymers, copolymers of lactides and lactones such as γ-caprolactone or **67** -valerolactone, copolymers of ethyleneoxide and lactides, polyethyleneimines, polypeptides, and proteins such as gelatin, collagen, globulins or albumins. Other suitable polymers mentioned in the above cited U.S. Pat. No. 5,711,933 include poly-(ortho)esters, polylactic and polyglycolic acid and their copolymers (e.g. DEXONO, Davis & Geck, Montreal, Canada); poly(DL-lactide-co-γ-caprolactone), poly(DL-lactide-co-δ-valerolactone), poly(DL-lactide-co-γ-butyrolactone), polyalkylcyanoacrylates; polyamides, polyhydroxybutyrate; polydioxanone; poly-β-aminoketones; polyphosphazenes; and polyanhydrides. Polyamino-acids such as polyglutamic and polyaspartic acids can also be used, as well as their derivatives, such as partial esters with lower alcohols or glycols. Copolymers with other amino acids such as methionine, leucine, valine, proline, glycine, alanine, etc. can also be used.

[0094]    Derivatives of polyglutamic and polyaspartic acid with controlled biodegradability (such as those described in WO87/03891, U.S. Pat. No. 4,888,398 or EP 130935, all herein incorporated by reference) can also be used. These polymers (and copolymers with other amino-acids) have formulae of the following type: —(NH—CHA-CO)$_w$— (NH—CHX—CO)$_y$— where X designates the side chain of an amino acid residue (e.g. methyl, isopropyl, isobutyl, or benzyl); A is a group of formula —(CH$_2$)$_n$COOR$^1$R$^2$— OCOR, —(CH$_2$)$_n$ COO—CHR$^1$COOR, —(CH$_2$)$_n$CO(NH—CHX—CO)$_m$NH—CH(COOH)—(CH$_2$)$_p$COOH, or the respective anhydrides thereof, wherein R$^1$ and R$^2$ represent H or lower alkyls, and R represents alkyl or aryl; or R and R$^1$ are connected together by a substituted or unsubstituted linking member to provide 5- or 6- membered rings; n, m and p are lower integers, not exceeding 5; and w and y are integers selected for having molecular weights not below 5000.

[0095]    Non-biodegradable polymers (e.g. for making microballoons to be used in the digestive tract) can be selected from most water-insoluble, physiologically acceptable, bioresistant polymers including polyolefins (polystyrene), acrylic resins (polyacrylates, polyacrylonitrile), polyesters (polycarbonate), polyurethanes, polyurea and their copolymers. ABS (acryl-butadiene-styrene) is a preferred copolymer.

[0096]    Biodegradable water-insoluble lipids useful for forming a microballoon comprise, for instance, solid water insoluble mono-, di- or tri-glycerides, fatty acids, fatty acid esters, sterols such as cholesterol, waxes and mixtures thereof Mono-, di- and tri- glycerides include mainly the mono-, di- and tri-laurin compounds as well as the corresponding -myristin, -palmitin, -stearin, -arachidin and -behenin derivatives. Mono-, di- and tri-arachidin, -palmitin -stearin and mixed triglycerides such as dipalmitoylmonooleyl glyceride are particularly useful; tripalmitin and tristearin are preferred. Fatty acids include solid (at room temperature, about 18-25° C.) fatty acids (preferably saturated) having 12 carbon atoms or more, including, for instance, lauric, arachidic, behenic, palmitic, stearic, sebacic, myristic, cerotinic, melissic and erucic acids and the fatty acid esters thereof. Preferably, the fatty acids and their esters are used in admixture with other glycerides.

[0097]    The sterols are preferably used in admixture with the other glycerides and or fatty acids and are selected from cholesterol, phytosterol, lanosterol, ergosterol, etc. and esters of the sterols with the above mentioned fatty acids; however, cholesterol is preferred.

[0098]    Preferred biodegradable lipids are triglycerides such as tripalmitin, triarachidin, tristearin or mixtures of the above mentioned triglycerides.

[0099]    Optionally, up to 75% by weight of a biodegradable polymer, such as those listed previously, can be admixed together with the biodegradable water insoluble lipid forming the envelope of the microballoon.

[0100]    Advantageously, ionic polymers (i.e. polymers bearing ionic moieties in their structure), preferably biodegradable ionic polymers, can also be used to form the stabilizing envelope of the microballoons, thus conferring the desired overall net charge thereto. Ionic polymers can be used as main components of the stabilizing envelope or they can be admixed in various amounts (e.g. from 2 to 80% by weight) with non ionic polymers. Suitable ionic polymers are, for instance, polymers comprising a quaternized nitrogen atom, such as quatemized amines or polymers comprising an carboxylic, sulfate, sulfonate or phosphonate moieities. Examples of suitable ionic polymers include, without limitation, polyethylenimine, poly(diallyldimethylammonium chloride), poly{bis(2-chloroethyl)ether-alt- 1,3-bis[3-(dimethylamino)propyl]urea}quaternized (Polyquaternium®-2), poly(4-vinylpyridinium tribromide), hydroxyethylcellulose ethoxylate quaternized (Polyquaternium®-4, poly(p-xylene tetrahydrothiophenium chloride), poly(L-lysine), chitin, diethyleneaminoethyl dextran, poly-(acrylic acid), poly(methacrylic acid), poly(styrene-alt-maleic acid), poly(amino acids), alginic acid, poly(uridylic acid), hyaluronic acid, i.e. poly(B-glucuronic acid-alt-β-N-acetylglucosamide), poly(galacturonic acid), poly(vinyl acetate-co-crotonic acid), DNA, poly(3,3',4,4'-benzophenonetetracarboxylic dianhydride-co-4,4'-oxydianiline), poly(isoprene-graft-maleic acid monomethyl ether), copolymer of glutamic acid with alkyl glutamate, heparin, poly-(styrene sulfonate), sulfonated poly(isophthalic acid), poly-(vinyl sulfonate, potassium salt), poly(vinyl sulfate, potassium salt), chondroitin sulfate A, dextran sulfate, fucoidan, polyphosphoric acid, sodium polyphosphate, sodium polyvinylphosphonate, poly-L-lysine hydrobromide, chitosan, chitosan sulfate, sodium alginate, alginic acid and ligninsulfonate.

[0101]    Conventional additives can also be incorporated into the envelope of the microballoons, to modify physical properties thereof, such as dispersibility, elasticity and water permeability. In particular, effective amounts of amphiphilic materials can be added to the emulsion prepared for the manufacturing of said microballoons, in order to increase the stability thereof. Said materials can advantageously be selected among those amphiphilic compounds, such as lipids, phospholipids and modified phospholipids, listed in the foregoing of this specification.

[0102]    The added amphiphilic material can advantageously be a compound bearing an overall net charge. Preferred charged lipids, phospholipids and modified phospholipids are those previously listed. Preferably the amount of charged compound, when present, is from about 2% to 40% of the total weight of the material forming the stabilizing envelope.

US 2008/0008658 A1

Jan. 10, 2008

9

[0103]   Other excipients or additives, in particular used for the preparation of microballoons, can be incorporated into the envelope such as redispersing agents or viscosity enhancers.

[0104]   Biodegradable polymer-containing microballoons can be prepared, for instance, according to the process disclosed in U.S. Pat. No. 5,711,933, herein incorporated by reference, which comprises (a) emulsifying a hydrophobic organic phase into a water phase so as to obtain droplets of said hydrophobic phase as an oil-in-water emulsion in said water phase; (b) adding to said emulsion a solution of at least one polymer in a volatile solvent insoluble in the water phase, so that said polymer forms a layer around said droplets; (c) evaporating said volatile solvent so that the polymer deposits by interfacial precipitation around the droplets which then form beads with a core of said hydrophobic phase encapsulated by a membrane of said polymer, said beads being in suspension in said water phase; (d) removing said encapsulated hydrophobic phase by evaporation by subjecting said suspension to reduced pressure; and (e) replacing said evaporated hydrophobic phase with a suitable gas.

[0105]   Biodegradable lipid-containing microballoons can be prepared, for instance, according to the process disclosed in U.S. Pat. No. 6,333,021 (herein incorporated by reference), by dispersing a mixture of one or more of the solid constituents of the microcapsule envelope dissolved in an organic solvent in a water carrier phase, so as to produce an oil-in-water emulsion. The emulsion water phase may contain an effective amount of amphiphilic materials which are used to stabilise the emulsion.

[0106]   A certain amount of redispersing agent and/or of a cryoprotecting or lyoprotecting agent, such as those previously indicated, is then added to the emulsion of tiny droplets of the organic solution in the water phase, prior to freezing at a temperature below −30° C. Any convenient redispersing agent may be used; redispersing agents selected from sugars, albumin, gelatine, polyvinyl pyrolidone (PVP), polyvinyl alcohol (PVA), polyethylene glycol (PEG) and ethyleneoxide-propyleneoxide block copolymer (e.g. Pluronico, or Synperonico) or mixtures thereof are preferred. The redispersing agents which are added to prevent particle agglomeration are particularly useful when the microcapsules are in the form of non-coalescent, dry and instantly dispersible powders. The frozen emulsion is then subjected to reduced pressure to enable lyophilisation, i.e. the removal by sublimation of the organic solvent from the droplets and of the water of the carrier phase, and the freeze-dried product is then contacted with the desired gas.

[0107]   The microballoons can then be reconstituted by contacting the dried powder with a suitable aqueous carrier under gentle agitation.

[0108]   As far as the gas filling in the above microbubbles or microballoons is concerned, any biocompatible gas, gas precursor or mixture thereof may be employed for the preparation of the above microvesicles.

[0109]   The gas may comprise, for example, air; nitrogen; oxygen; carbon dioxide; hydrogen; nitrous oxide; a noble or inert gas such as helium, argon, xenon or krypton; a radioactive gas such as $Xe^{133}$ or $Kr^{81}$; a hyperpolarized noble gas such as hyperpolarized helium, hyperpolarized xenon or hyperpolarized neon; a low molecular weight hydrocarbon (e.g. containing up to 7 carbon atoms), for example an alkane such as methane, ethane, propane, butane, isobutane, pentane or isopentane, a cycloalkane such as cyclobutane or cyclopentane, an alkene such as propene, butene or isobutene, or an alkyne such as acetylene; an ether; a ketone; an ester; halogenated gases, preferably fluorinated gases, such as or halogenated, fluorinated or prefluorinated low molecular weight hydrocarbons (e.g. containing up to 7 carbon atoms); or a mixture of any of the foregoing. Where a halogenated hydrocarbon is used, preferably at least some, more preferably all, of the halogen atoms in said compound are fluorine atoms.

[0110]   Fluorinated gases are preferred, in particular perfluorinated gases, especially in the field of ultrasound imaging. Fluorinated gases include materials which contain at least one fluorine atom such as, for instance fluorinated hydrocarbons (organic compounds containing one or more carbon atoms and fluorine); sulfur hexafluoride; fluorinated, preferably perfluorinated, ketones such as perfluoroacetone; and fluorinated, preferably perfluorinated, ethers such as perfluorodiethyl ether. Preferred compounds are perfluorinated gases, such as $SF_6$ or perfluorocarbons (perfluorinated hydrocarbons), i.e. hydrocarbons where all the hydrogen atoms are replaced by fluorine atoms, which are known to form particularly stable microbubble suspensions, as disclosed, for instance, in EP 0554 213, which is herein incorporated by reference.

[0111]   The term perfluorocarbon includes saturated, unsaturated, and cyclic perfluorocarbons. Examples of biocompatible, physiologically acceptable perfluorocarbons are: perfluoroalkanes, such as perfluoromethane, perfluoroethane, perfluoropropanes, perfluorobutanes (e.g. perfluoro-n-butane, optionally in admixture with other isomers such as perfluoro-isobutane), perfluoropentanes, perfluorohexanes or perfluoroheptanes; perfluoroalkenes, such as perfluoropropene, perfluorobutenes (e.g. perfluorobut-2ene) or perfluorobutadiene; perfluoroalkynes (e.g. perfluorobut-2-yne); and perfluorocycloalkanes (e.g. perfluorocyclobutane, perfluoromethylcyclobutane, perfluorodimethylcyclobutanes, perfluorotrimethylcyclobutanes, perfluorocyclopentane, perfluoromethylcyclopentane, perfluorodimethylcyclopentanes, perfluorocyclohexane, perfluoromethylcyclohexane and perfluorocycloheptane). Preferred saturated perfluorocarbons have the formula $C_nF_{n+2}$, where n is from 1 to 12, preferably from 2 to 10, most preferably from 3 to 8 and even more preferably from 3 to 6. Suitable perfluorocarbons include, for example, $CF_4$, $C_2F_6$, $C_3F_8$, $C_4F_8$, $C_4F_{10}$, $C_5F_{12}$, $C_6F_{12}$, $C_6F_{14}$, $C_7F_{14}$, $C_7F_{16}$, $C_8F_{18}$, and $C_9F_{20}$.

[0112]   Particularly preferred gases are $SF_6$ or perfluorocarbons selected from $CF_4$, $C_2F_6$, $C_3F_8$, $C_4F_8$, $C_4F_{10}$ or mixtures thereof; $SF_6$, $C_3F_8$ or $C_4F_{10}$ are particularly preferred.

[0113]   It may also be advantageous to use a mixture of any of the above gases in any ratio. For instance, the mixture may comprise a conventional gas, such as nitrogen, air or carbon dioxide and a gas forming a stable microbubble suspension, such as sulfur hexafluoride or a perfluorocarbon as indicated above. Examples of suitable gas mixtures can be found, for instance, in WO 94/09829, which is herein incorporated by reference. The following combinations are particularly preferred: a mixture of gases (A) and (B) in

**Page 174 of 227**

which the gas (B) is a fluorinated gas, preferably selected from $SF_6$, $CF_4$, $C_2F_6$, $C_3F_6$, $C_3F_8$, $C_4F_6$, $C_4F_8$, $C_4F_{10}$, $C_5F_{10}$, $C_5F_{12}$ or mixtures thereof, and (A) is selected from air, oxygen, nitrogen, carbon dioxide or mixtures thereof The amount of gas (B) can represent from about 0.5% to about 95% v/v of the total mixture, preferably from about 5% to 80%.

[0114]   In certain circumstances it may be desirable to include a precursor to a gaseous substance (i.e. a material that is capable of being converted to a gas in vivo). Preferably the gaseous precursor and the gas derived therefrom are physiologically acceptable. The gaseous precursor may be pH-activated, photo-activated, temperature activated, etc. For example, certain perfluorocarbons may be used as temperature activated gaseous precursors. These perfluorocarbons, such as perfluoropentane or perfluorohexane, have a liquid/gas phase transition temperature above room temperature (or the temperature at which the agents are produced and/or stored) but below body temperature; thus, they undergo a liquid/gas phase transition and are converted to a gas within the human body. For ultrasonic echography, the biocompatible gas or gas mixture is preferably selected from air, nitrogen, carbon dioxide, helium, krypton, xenon, argon, methane, halogenated hydrocarbons (including fluorinated gases such as perfluorocarbons and sulfur hexafluoride) or mixtures thereof. Advantageously, perfluorocarbons (in particular $C_4F_{10}$ or $C_3F_8$) or $SF_6$ can be used, optionally in admixture with air or nitrogen.

[0115]   For the use in MRI the microvesicles will preferably contain a hyperpolarized noble gas such as hyperpolarized neon, hyperpolarized helium, hyperpolarized xenon, or mixtures thereof, optionally in admixture with air, $CO_2$, oxygen, nitrogen, helium, xenon, or any of the halogenated hydrocarbons as defined above.

[0116]   For use in scintigraphy, the microvesicle will preferably contain radioactive gases such as $Xe^{133}$ or $Kr^{81}$ or mixtures thereof, optionally in admixture with air, $CO_2$, oxygen, nitrogen, helium, kripton or any of the halogenated hydrocarbons as defmed above.

[0117]   Going back to the compositions of the present invention and according to an additional preferred embodiment, the suspension of gas-containing microvesicles are selected from aqueous suspensions of amphiphile-stabilized microbubbles or microballoons.

[0118]   More preferably, the said suspended microvesicles are characterized by a gaseous core and a stabilizing coat wherein said coat comprises a layer or multiple layers of self-assembling amphiphilic compounds or a solid layer of elastic polymeric material or a solid or liquid layer of a fat.

[0119]   Preferably, the stabilizing coat comprises: phospholipids; phosphatidic acids; biocompatible and biodegradable polymers; triglycerides; detergents, preferably fatty acids; or any mixture thereof.

[0120]   According to another embodiment of the invention, the gas of the gas-containing microvesicles is selected from nitrogen, oxygen, fluorine containing gases and noble gases and mixtures thereof.

[0121]   Among the fluorine containing gases, perfluoroalkanes and sulphur hexafluoride are preferred, particularly when employed in amounts not lower than 1% (v/v) with respect to the total amount of gas.

[0122]   From all of the above, non limiting examples of preferred compositions of the invention comprise ultrasound contrast agents selected from SonoVue® (Bracco), Definity® (Dupont Pharmaceutical), Imagent® (Imcor Pharmaceutical), Optison® (Amersham Health), A1700 (Acusphere) and Cardiosphere® (Point Biomedical).

[0123]   According to an additional embodiment of the invention, as the targeting of cells and tissues by means of suitable ligands having a high affinity to the said cells and tissues is a rather well-known technique, for instance in the occurrence of targeted delivery of bioactive(s), the ultrasound contrast agent of the invention may also be bound to a suitable ligand which provides affinity to the cells of the lymphatic system or of the tumor.

[0124]   Suitable ligands may be thus comprise, for instance, polypeptides and antibodies or their fragments and drugs, all of which having selectivity for macrophages or tumor cells. Examples of a ligands selective for certain tumor cells are: gastrin-related polypeptide, octreotide, rituximab, infliximab, trastuzumab, adalimumab, omalizumab, tositumomab, efalizumab, cetuximab.

[0125]   The contrast agent of the invention contains the echographic component at microvesicle concentrations between $10^6$/mL and $10^{10}$/mL, preferably between $10^7$/mL and $10^9$/mL.

[0126]   The wide concentration range is justified by the facts that: a) the echographic signal is approximately proportional to the logarithm of the concentration; and b) reconstitution of echographic agents leads to concentrations with a substantial, but echographically irrelevant, variation.

[0127]   The contrast agent of the invention contains the echographic dye at concentrations in the range from $5\times10^{-6}$ M to $2\times10^{-4}$ M, preferably in the range from $10^{-5}$ M to $5\times10^{-5}$ M. The indicated wide range of concentrations reflects the fact that molar extinction coefficients of different dyes may vary greatly.

[0128]   With respect to the manufacturing process, any of the aforementioned methods for preparing microbubbles and microballoons as known ultrasound contrast agents, comprehensive of any variant thereof, may apply as well to the preparation of the compositions of the invention.

[0129]   Typically, the vital dye can be either present in the dried powdered material or solid or fluffy cake to be reconstituted in the form of microbubbles or microballoons before administration or, alternatively, it can be present in the solution to be used for their reconstitution.

[0130]   In the former case, a suitable solution of the vital dye is properly admixed with the components of the microbubbles or microballoons themselves, for instance phospholipid components, and properly processed as above indicated, e.g. freeze-dried, so as to obtain the desired dried powdered material.

[0131]   According to a preferred embodiment, however, the compositions of the invention may be prepared by reconstituting the powdered material or solid or fluffy cake with a physiological solution also comprising a proper amount of the vital dye.

11

[0132] Therefore, it represents a further object of the invention a process for manufacturing the compositions of the invention which process comprises reconstituting a dried powdered material or solid or fluffy cake, properly stored in the presence of a suitable microvesicle-forming gas, with a suitable aqueous carrier for injection, wherein the vital dye is present in the dried powdered material or solid or fluffy cake or in the aqueous carrier.

[0133] Preferably, as formerly indicated, the selected vital dye is present in the aqueous carrier. In the present description, unless otherwise provided, with the term solid or fluffy cake we intend the material in the state in which it is found after a lyophilization step.

[0134] Alternatively, as formerly reported, the compositions of the invention may be also prepared by converting amphiphile containing particles, being suspended in a vital dye-containing aqueous carrier for injection under a microbubble-forming gas, into a suspension of gas-containing microbubbles by vigorous agitation.

[0135] For additional details concerning the preparation processes of the compositions of the invention see, also, the subsequent experimental section.

[0136] According to the above alternative embodiments for preparing the compositions of the invention, each comprising any one of the aforementioned variants, stable formulations of ultrasound contrast agents in combination with vital dyes are thus obtained.

[0137] For an optimal visualization of the lymphatic system, the compositions of the invention may comprise microbubbles or microballons having a mean particle diameter size not exceeding about 6 μm, and preferably ranging from about 0.5 μm to about 5 μm.

[0138] Clearly, as the particles size and their frequency of distribution is known to depend on several factors, among which are the formerly reported preparation steps, possible deviations from the above mean size have to be also considered.

[0139] Even so, despite the fact that minor alteration in the chemical composition may strongly influence the yield, the distribution size and, importantly, the stability of the compositions themselves, the finding that known ultrasound contrast agents could be successfully formulated in combination with vital dyes, as per the invention, has to be certainly regarded as unexpected.

[0140] In this respect, experimental evidence is given to demonstrate the stability of some representative compositions of the invention.

[0141] More in particular, upon reconstitution of suitable freeze-dried cakes with aqueous carriers also comprising the selected vital dye, tests were performed to analyze the bubble size distribution of the microbubbles thus formed.

[0142] A combined composition according to the invention is preferably stored in dried powdered form and as such can advantageously be packaged in a two component diagnostic kit. The kit preferably comprises a first container, containing the lyophilized composition in contact with a selected microvesicle-forming gas and a second container, containing a physiologically acceptable aqueous carrier, wherein any one between the lyophilized composition or the

physiologically acceptable carrier comprises the vital dye. Examples of suitable carriers are water, typically sterile, pyrogen free water (to prevent as much as possible contamination in the intermediate lyophilized product), aqueous solutions such as saline (which may advantageously be balanced so that the final product for injection is not hypotonic), or aqueous solutions of one or more tonicity adjusting substances such as salts or sugars, sugar alcohols, glycols or other non-ionic polyol materials (eg. glucose, sucrose, sorbitol, mannitol, glycerol, polyethylene glycols, propylene glycols and the like).

[0143] Preferably, the said physiologically acceptable water carrier also comprises the vital dye.

[0144] Said two component kit can include two separate containers or a dual-chamber container. In the former case the container is preferably a conventional septum-sealed vial, wherein the vial containing the lyophilized residue is sealed with a septum through which the carrier liquid may be injected using an optionally prefilled syringe. In such a case the syringe used as the container of the second component may be also then used for injecting the composition of the invention. In the latter case, the dual-chamber container is preferably a dual-chamber syringe and once the lyophilisate has been reconstituted and then suitably mixed or gently shaken, the container can be used directly for injecting the composition.

[0145] The compositions of the present invention may be used in a variety of diagnostic ultrasound imaging techniques comprising, for instance, fundamental and harmonic B- mode imaging, pulse or phase inversion imaging and fundamental and harmonic Doppler imaging, imaging of ultrasound-provoked contrast agent rupture; if desired three-dimensional imaging techniques may be used.

[0146] As the compositions of the invention and, in particular, the gas-filled microvesicles, upon injection remain intact in sufficient proportion, both the microvesicles themselves as well as the vital dye are taken up by the lymphatic system and retained in the sentinel lymph node.

[0147] Taking advantage of it, the surgeon may perform a very sensitive and effective ultrasound detection of the sentinel lymph node and thus identify the optimal site of operative incision just prior to surgery, whilst allowing optical visualization of the color marked sentinel lymph node or nodes of the tumor and optionally providing for its excision, for instance for any subsequent tissue evaluation and biopsy.

[0148] From the above, it should be clear to the skilled man that the above method allows the identification of the sentinel lymph node with a particularly non invasive technique. In addition, the possibility of properly preparing and administering a single stable composition of the invention, also minimizes the need for subsequent administrations of the single components, for instance comprising two separated injections of the ultrasound contrast agent and of the vital dye.

[0149] It is therefore an additional object of the invention a method for the identification of the sentinel lymph node or nodes of a tumor in a mammal, which method comprises:

[0150] a) administering to said mammal a composition comprising an ultrasound contrast agent in combination with a vital dye;

US 2008/0008658 A1                                                                    Jan. 10, 2008

12

[0151] b) observing by ecography the area of the lymphatic system or systems draining the tumor so as to determine the lymph node or nodes;

[0152] c) visually localizing the sentinel lymph node or nodes by surgery being guided by the coloration of the vital dye; and, optionally,

[0153] d) excising the sentinel lymph node or nodes.

[0154] Preferably, according to the method of the invention, the mammal is a human.

[0155] According to step (a), the compositions of the invention are preferably administered intradermally, subdermally, subcutaneously upstream of the lymphatic area under investigation, or specifically in the breast, also subareolarly or periareolarly.

[0156] The compositions of the invention may be typically administered at a dose corresponding to the range from about 0.001 μL to about 10 μL, preferably from about 0.01 μL to about 1 μL, of gas, depending on their respective composition, the tissue or organ to be imaged. This general dose range can of course vary further depending on specific imaging modality used, e.g. lower doses may be used when imaging with highly sensitive techniques, such as imaging based on contrast agent rupture or power pulse inversion.

[0157] In the imaging of the lymphatic system and, more particularly, of the sentinel lymph node or nodes, volumes of the compositions of the invention to be injected may preferably range from about 5 μL to about 1000 μL and, even more preferably, from about 50 μL to about 500 μL..

[0158] According to step (b) of the above method, echographic observation of the territory of interest may occur immediately after the beginning of the administration and up to a time varying from a 10 s to hours after termination of the administration, depending on the exact characteristics of the contrast composition, the administration regime and the lymphatic area under examination.

[0159] Typically, the lymph node or nodes in step (b) are those being first filled by the composition of the invention and so identified because of the echograhic contrast. According to step (c), the ocular visualization of the lymph node or nodes occurs through a minimally invasive surgical access to the interested area, the said access being guided by the coloration of the lymphatic system brought about by the vital dye of the composition of the invention.

[0160] Once finally detected and visualized, the said lymph node or nodes may be thus subsequently analysed or anyway properly treated.

[0161] As an example, according to optional step (d), the sentinel lymph node or nodes can be surgically excised so as get histological information or, alternatively, it may be imaged in situ, for instance through magnetic resonance microscopy or single plane optical microscopy.

[0162] Alternatively, according to an additional embodiment, the compositions of the invention may be also administered as an intradermal bolus at rates preferably not exceeding 100 μL/(min and needle), followed by quantitative monitoring of the signal intensity in the lymph nodes as a function of time. The time-course may be thus used to characterize perfusion rates and sinusoidal residence times

of the lymph nodes, both parameters known to be altered by the presence of obstructing tumor masses.

[0163] From all of the above, it is an additional object of the invention the use of the aforementioned compositions for the imaging of the lymphatic system and, even more particularly, for the identification of the sentinel lymph node or nodes.

[0164] With the aim of better illustrating the present invention, without posing any limitation to it, the following examples are now given.

EXAMPLE 1

[0165] A 5% (w/v) solution of Evans blue (CAS [61-73-4]), obtained from E. Merck AG, Dietikon, Switzerland, in 0.9% sodium chloride was prepared and the pH was adjusted to 7.0 with hydrochloric acid. The solution was filtered on a 0.45 μm filter. Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVueo, Bracco Imaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

[0166] With the sole aim of verifying that the presence of the dye did not interfere with the known echographic contrast enhancement, once administered, the above suspension was injected intravenously at a dose of 0.03 mL/kg to a rabbit, where it provided outstanding echocardiographic views of the right and left ventricle. Even a ten fold dilution of this suspension showed strong contrast enhancement.

EXAMPLE 2

[0167] A 5% (w/v) solution of patent blue VF (CAS [129-17-9]; CI [42045]; sulphane blue), obtained from ACROS Organics Inc./Fisher Scientific, Wohlen, Switzerland, was prepared in 0.9% (w/v) sodium chloride. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide. The solution was filtered on a 0.22 μm single use filter.

[0168] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Imaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

EXAMPLE 3

[0169] A 8% (w/v) solution of patent blue VF (CAS [129-17-9]; CI [42045]; sulphane blue), obtained from ACROS Organics Inc./Fisher Scientific, Wohlen, Switzerland, was prepared in pharmaceutical grade water for injection, yielding an essentially isotonic solution. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide. The solution was filtered on a 0.22 μm single use filter. Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Imaging SA, Geneva, Switzerland) containing the specially for-

13

mulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

### EXAMPLE 4

[0170] A 4% (w/v) solution of isosulfan blue (USAN) (CAS [68238-36-8]), obtained from Sigma-Aldrich / Fluka Chemie GmbH, Buchs, Switzerland, as patent blue violet (Code # P 1888), was prepared in 0.9% (w/v) sodium chloride. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide. The solution was filtered on a 0.22 μm single use filter.

[0171] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Inaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

### EXAMPLE 5

[0172] A 8% (w/v) solution of leuco patent blue violet (CAS [133978-89-9]), obtained from Sigma-Aldrich/Fluka Chemie GmbH, Buchs, Switzerland, Code # L 1275, was prepared in pharmaceutical grade water for injection. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid. The solution was filtered on a 0.22 μm single use filter.

[0173] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Inaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

### EXAMPLE 6

[0174] A 2.5% (w/v) solution of indocyanine green (USP) monosodium salt (CAS [3599-32-4]); sulphobromophthalein (BAN) monosodium salt; cardiogreen; foxgreen), obtained from Fluka Chemie GmbH, Buchs, Switzerland, Code # 21981, was prepared in 0.9% (w/v) sodium chloride. After complete solubilization, the pH was adjusted to 7.0. The solution was filtered on a 0.22 μm single use filter.

[0175] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Inaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark green suspension of microbubbles was obtained.

### EXAMPLE 7

[0176] From a 2 mL vial of perflutren lipid microbubbles (Definity®, Bristol-Myers Squibb Medical Imaging, Inc., North Billerica, Mass., USA) and before its activation, 1 mL of liquid was withdrawn and replaced by a 8% (w/v) solution of isosulfan blue (USAN) (CAS [68238-36-8]). Isosulfan blue was obtained from Sigma-Aldrich/Fluka Chemie

GmbH, Buchs, Switzerland, as patent blue violet (Code # P 1888) and dissolved in pharmaceutical grade water for injection. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide and the solution was filtered on a 0.22 μm single use filter. Upon activation of the product by agitation in the Vialmixo equipment (Bristol-Myers Squibb) the microbubble suspension formed regularly.

### EXAMPLE 8

[0177] From a 3 mL vial of perflutren protein-type A microspheres for injection (USP) (Optison®, Amersham Buchler GmbH & Co. KG, Braunschweig, Germany) 1 mL of liquid was withdrawn and replaced by a 8% (w/v) solution of isosulfan blue (USAN) (CAS [68238-36-8]). Upon gentle agitation a suspension with $4.8 \times 10^8$/mL microbubbles was obtained. The dye solution was prepared in the following manner: the dye was obtained from Sigma-Aldrich/Fluka Chemie GmbH, Buchs, Switzerland, as patent blue violet (Code # P 1888) and dissolved in pharmaceutical grade water for injection. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide and the solution was filtered on a 0.22 μm single use filter.

### EXAMPLE 9

[0178] Echogenic microballoons are prepared as described in Example 3 of WO 96/15815. Then, floating microcapsules are recovered, suspended in a 5% (w/v) mannitol solution containing Evans Blue (5% w/v) at a concentration of $5 \times 10^8$ microballoons/mL. 1 mL of the suspension is then lyophilized. After reconstitution with 5 mL of water for injection, the resulting bubble suspension can be used for sentinel lymph node detection (see following Examples 13 and 14).

### EXAMPLE 10

[0179] Dye-containing suspensions of gas-containing ultrasound contrast agents of the invention were analyzed for the particle size distributions in the Coulter® Multisizer (Beckman Coulter Inc. Fullerton, Calif., USA). Depending of the preparation the suspension could contain, besides the gas-containing particles that do produce ultrasound contrast, also gas-free particles that do not. Two methods may be used to determine the distribution of just the gas-containing particles in the compositions of the invention.

[0180] Method a) The frequency distribution of the diameter of gas-containing particles is obtained as the difference between the particle size distribution before and after destruction of the gas-containing particles, in a Branson bath sonicator (Branson Ultrasonics). This method is preferable in those cases wherein, in the initial suspension, the insoluble material in the gas-containing particles is small with respect to the material in gas-free particles.

[0181] Method b) The frequency distribution of the diameter of gas-containing particles is obtained after purification of the initial suspension from gas-free particles. Purification is achieved by flotation of the gas-containing particles in a centrifuge and substitution of the infranatant containing the gas-free particles with fresh saline. The procedure is executed once or twice depending on the initial contamination by gas-free particles. This method is preferable in those cases wherein the amount of insoluble material in the gas-containing particles exceeds 10% of the total insoluble material, in the initial suspension.

US 2008/0008658 A1

14

Jan. 10, 2008

[0182]  The results may be represented either in the form of plots of the frequency distributions (e.g. example 11 and FIG. **1**) or as parameters elaborated therefrom, i. e. total microbubble concentration, total microbubble surface, microbubble volume concentration and mean diameter in number (e.g. example 12).

### EXAMPLE 11

[0183]  Dye-containing suspensions of sulphur hexafluoride, phospholipids stabilized microbubbles for injection of the invention were analyzed for the bubble size distribution according to the method (a) of Example 10.

[0184]  The analysis, in particular, was carried out with the composition of the invention of example 2 (see FIG. **1**).

[0185]  FIG. **1**: Bubbles reconstituted with Patent blue VF (5% w/v in saline) wherein the number concentration of particles of each diameter (left scale) and the integral of the corresponding number concentration over increasing diameters (right scale) were plotted against the logarithm of the particle diameter.

[0186]  The ragged curves represent particle diameter frequency distributions and the smooth curves report the corresponding integrals. The thin solid curves (★) represent the situation before destruction of the microbubbles. The dashed curves (▲) represent the situation after destruction of the microbubbles, and the thick solid curves (●) represent those that characterize the size distribution which is due to gasfilled microbubbles of the invention only.

[0187]  These distributions are essentially identical to those of regularly prepared ultrasound contrast agent Sono-Vue®, that is, in the absence of the dye.

### EXAMPLE 12

[0188]  Analysis of the preparations particle size distributions in the Coulter® Multisizer (Beckman Coulter Inc. Fullerton, CA, USA) was carried out according to example 10 (method b).

[0189]  By working as therein described, the following four parameters were derived for the compositions of the invention (microbubble suspensions of example 1) in comparison with the same known microbublles (that is in the absence of the dye): total microbubble concentration, total microbubble surface, microbubble volume concentration and mean diameter in number (see Table I).

[0190]  In consideration of the fact that the echographic efficacy of a contrast agent is approximately proportional to the logarithm of the total microbubble concentration, comparison of SonoVue® being reconstituted with saline (hereinafter regular SonoVue®) over SonoVue® being reconstituted with saline also containing Evans blue, has unexpectedly shown that Evans blue interfered with the regular formation of microbubbles to a degree that from an echographic perspective may be considered negligible.

[0191]  In addition, by comparing the above results at time 0 (that is upon microbubbles formation) and after 3 h, the presence of the Evans blue did not jeopardize the stability of the microbubbles.

### EXAMPLE 13

[0192]  A patient in which a breast carcinoma has been diagnosed by any combination of imaging modality and biopsy may be readied on an operating table for breast lymph node resection. Based on the imaging information the clock position (quadrant, ICD-O code) of the tumor, i.e. the direction between tumor and nipple, may be determined. Under general anesthesia an appropriate dose depending on the patient, of the blue ultrasound contrast agent of example 3 is injected intradermally, using a needle of 26 G introduced in a bevel-upward orientation at a 15° angle to the skin, stopping when the bevel dips under the skin, but the outline of the needle remains visible. The site of injection is chosen in the periareolar region in the direction of the tumor. During the whole time of injection the lymph node basin draining the tumor is monitored with an ultrasound probe (15L8, Sequoia 512 from Acuson/Siemens). The first lymph node with enhanced echographic signal is identified as the sentinel lymph node. Its position is marked on the skin. About 10 min later the surgeon makes an incision and begins the search for the sentinel lymph node in the site indicated by echography, letting himself be helped further by the blue staining of the lymphatic system visible on the video screen connected to his fiberoptic telescope.

### EXAMPLE 14

[0193]  A patient in which a breast carcinoma has been diagnosed by any combination of imaging modality and biopsy may be readied on an operating table for breast lymph node resection. Under imaging guidance, e.g. by

TABLE I

| Parameters | Formulation | | | |
| --- | --- | --- | --- | --- |
| | Formulation A | Formulation B | Formulation C | Formulation D |
| Total microbubble concentration [×10$^8$/mL] | 3.9 | 3.3 | 2.3 | 2.0 |
| Total microbubble surface [×10$^9$ μm$^2$/mL] | 6.8 | 6.2 | 5.5 | 5.6 |
| Total microbubble volume Concentration [μL/mL] | 6.1 | 5.6 | 5.3 | 5.4 |
| Total microbubble diameter in number [μm] | 1.8 | 1.9 | 2.2 | 2.5 |

Formulation A: SonoVue reconstituted in saline, at time 0;
Formulation B: SonoVue reconstituted in saline, after 3 h;
Formulation C: SonoVue reconstituted in Evans blue, at time 0 (see example 1);
Formulation B: SonoVue reconstituted in Evans blue, after 3 h (see example 1);

US 2008/0008658 A1

Jan. 10, 2008

ultrasound imaging, the blue ultrasound contrast agent of example 3 is injected at appropriate doses into various sites immediately around the tumor. The tissue is then massaged and the sentinel lymph node is identified as the first lymph node to show increase echo. Its position is marked on the skin. About 10 min later the surgeon makes an incision and begins the search for the sentinel lymph node in the site indicated by echography, letting himself be helped further by the blue staining of the lymphatic system visible on the video screen connected to his fiberoptic telescope.

**1**. A composition comprising an ultrasound contrast agent in combination with a vital dye.

**2**. A composition according to claim 1 wherein the ultrasound contrast agent comprises a suspension of gas-containing microvesicles.

**3**. A composition according to claim 2 wherein the ultrasound contrast agent is selected from the group consisting of SonoVue®, Definity®, Imagent®, Optison®, A1700 and Cardiosphere® (Point Biomedical).

**4**. A composition according to claim 3 wherein the ultrasound contrast agent is SonoVue®.

**5**. A composition according to claim 1 wherein the vital dye is a water soluble vital dye.

**6**. A composition according to claim 5 wherein the vital dye is selected from patent blue V, patent blue VF, isosulfan blue, indocyanine green monosodium salt, methylene blue, sulfobromophthaleine, copper phthalocyanine tetrasulfonate and gadolinium texaphyrin.

**7**. A composition according to claim 5 wherein the vital dye is selected from Evans blue and patent blue VF.

**8**. A process for manufacturing the composition of claim 1 which process comprises reconstituting a dried powdered material or solid or fluffy cake, properly stored in the presence of a suitable microvesicle-forming gas, with a suitable aqueous carrier for injection, wherein the vital dye is present in the dried powdered material or solid or fluffy cake or in the aqueous carrier.

**9**. A process according to claim 8 wherein the vital dye is present in the aqueous carrier.

**10**. A kit for preparation of a composition comprising an ultrasound contrast agent in combination with a vital dye comprising a first container containing the lyophilized composition in contact with a selected microvesicle-forming gasp and a second container containing a physiologically acceptable aqueous carrier, wherein any one of the lyophilized composition or the physiologically acceptable carrier comprises the vital dye.

**11**. A kit according to claim 10 wherein the physiologically acceptable carrier comprises the vital dye.

**12**. A composition according to claim 1 for use in the preparation of a formulation for the imaging of the lymphatic system.

**13**. A method for the imaging of the lymphatic system comprising administering to a mammal the composition of claim 1.

**14**. A method for the identification of the sentinel lymph nodes or nodes of a tumor in a mammal which method comprises:

a) administering to said mammal a composition comprising an ultrasound contrast agent in combination with a vital dye;

b) observing by ecography the area of the lymphatic system or systems draining the tumor so as to determine the lymph node or nodes; and

c) visually localizing the sentinel node or nodes by surgery being guided by the coloration of the vital dye.

**15**. The method of claim 13, further comprising the step of:

d) excising the sentinel lymph node or nodes, so identified.

*    *    *    *    *

# EXHIBIT 9
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 10
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 11
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 12

[Federal Register Volume 80, Number 21 (Monday, February 2, 2015)]
[Notices]
[Pages 5560-5561]
From the Federal Register Online via the Government Publishing Office [www.gpo.gov]
[FR Doc No: 2015-01859]

-----------------------------------------------------------------------

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration

[Docket No. FDA-2015-N-0175]


Determination That LYMPHAZURIN (Isosulfan Blue) Injectable and
Other Drug Products Were Not Withdrawn From Sale for Reasons of Safety
or Effectiveness

AGENCY: Food and Drug Administration, HHS.

ACTION: Notice.

-----------------------------------------------------------------------

SUMMARY: The Food and Drug Administration (FDA or Agency) has
determined that the drug products listed in this document were not
withdrawn from sale for reasons of safety or effectiveness. This
determination means that FDA will not begin procedures to withdraw
approval of abbreviated new drug applications (ANDAs) that refer to
these drug products, and it will allow FDA to continue to approve ANDAs
that refer to the products as long as they meet relevant legal and
regulatory requirements.

FOR FURTHER INFORMATION CONTACT: Amy Hopkins, Center for Drug
Evaluation and Research, Food and Drug Administration, 10903 New
Hampshire Ave., Bldg. 51, Rm. 6223, Silver Spring, MD 20993-0002, 301-
796-5418, Amy.Hopkins@fda.hhs.gov.

SUPPLEMENTARY INFORMATION: In 1984, Congress enacted the Drug Price
Competition and Patent Term Restoration Act of 1984 (Pub. L. 98-417)
(the 1984 amendments), which authorized the approval of duplicate
versions of drug products approved under an ANDA procedure. ANDA
applicants must, with certain exceptions, show that the drug for which
they are seeking approval contains the same active ingredient in the
same strength and dosage form as

[[Page 5561]]

the ``listed drug,'' which is a version of the drug that was previously
approved. ANDA applicants do not have to repeat the extensive clinical
testing otherwise necessary to gain approval of a new drug application
(NDA).
    The 1984 amendments include what is now section 505(j)(7) of the
Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)), which
requires FDA to publish a list of all approved drugs. FDA publishes
this list as part of the ``Approved Drug Products With Therapeutic
Equivalence Evaluations,'' which is generally known as the ``Orange
Book.'' Under FDA regulations, a drug is removed from the list if the
Agency withdraws or suspends approval of the drug's NDA or ANDA for
reasons of safety or effectiveness or if FDA determines that the listed
drug was withdrawn from sale for reasons of safety or effectiveness (21
CFR 314.162).

Federal Register/Vol. 80, No. 21/Monday, February 2, 2015

Under Sec. 314.161(a) (21 CFR 314.161(a)), the Agency must determine whether a listed drug was withdrawn from sale for reasons of safety or effectiveness: (1) Before an ANDA that refers to that listed drug may be approved, (2) whenever a listed drug is voluntarily withdrawn from sale and ANDAs that refer to the listed drug have been approved, and (3) when a person petitions for such a determination under 21 CFR 10.25(a) and 10.30. Section 314.161(d) provides that if FDA determines that a listed drug was withdrawn from sale for safety or effectiveness reasons, the Agency will initiate proceedings that could result in the withdrawal of approval of the ANDAs that refer to the listed drug.

FDA has become aware that the drug products listed in the table in this document are no longer being marketed. (As requested by the applicants, FDA withdrew approval of NDA 018310 for LYMPHAZURIN (isosulfan blue) Injectable in the Federal Register of December 5, 2014 (79 FR 72186) and NDA 020151 for EFFEXOR (venlafaxine HCl) Tablets in the Federal Register of July 19, 2013 (78 FR 43210).)

| Application No. | Drug | Applicant |
| --- | --- | --- |
| NDA 018310.................. | LYMPHAZURIN (isosulfan blue) Injectable; Injection, 1%. | Covidien, 60 Middletown Ave., North Haven, CT 06473. |
| NDA 019966.................. | TEMOVATE (clobetasol propionate) Solution; Topical, 0.05%. | Fougera Pharmaceuticals Inc., 1 Health Plaza, Bldg. 434, East Hanover, NJ 07936. |
| NDA 020151.................. | EFFEXOR (venlafaxine hydrochloride (HCl)) Tablet; Oral, Equivalent to (EQ) 12.5 milligram (mg) Base; EQ 25 mg Base; EQ 37.5 mg Base; EQ 50 mg Base; EQ 75 mg Base; EQ 100 mg Base. | Wyeth Pharmaceuticals Inc., 235 East 42nd St., New York, NY 10017. |
| NDA 020214.................. | ZEMURON (rocuronium bromide) Injectable; Injection 100 mg/10 milliliter (mL); 50 mg/5 mL; 10 mg/mL. | Organon USA Inc., 351 North Sunmeytown Pike, North Wales, PA 19454. |
| NDA 021040.................. | PREFEST (estradiol; norgestimate) Tablet; Oral, 1 mg, 1 mg/0.09 mg. | Teva Branded Pharmaceutical Products R&D, Inc., 41 Moores Rd., P.O. Box 4011, Frazer, PA 19355. |
| NDA 021621.................. | CHILDREN'S ZYRTEC ALLERGY (cetirizine HCl) and CHILDREN'S ZYRTEC HIVES RELIEF (cetirizine HCl) Chewable Tablet; Oral, 5 mg; 10 mg. | McNeil Consumer Healthcare, 7050 Camp Hill Rd., Fort Washington, PA 19034. |
| NDA 050783.................. | PERIOSTAT (doxycycline hyclate) Tablet; Oral, EQ 20 mg Base. | Galderma Laboratories, L.P., 14501 North Freeway, Fort |

     FDA has reviewed its records and, under Sec.  314.161, has
determined that the drug products listed in this document were not
withdrawn from sale for reasons of safety or effectiveness.
Accordingly, the Agency will continue to list the drug products listed
in this document in the ``Discontinued Drug Product List'' section of
the Orange Book. The ``Discontinued Drug Product List'' identifies,
among other items, drug products that have been discontinued from
marketing for reasons other than safety or effectiveness.

     Approved ANDAs that refer to the NDAs listed in this document are
unaffected by the discontinued marketing of the products subject to
those NDAs. Additional ANDAs that refer to these products may also be
approved by the Agency if they comply with relevant legal and
regulatory requirements. If FDA determines that labeling for these drug
products should be revised to meet current standards, the Agency will
advise ANDA applicants to submit such labeling.

     Dated: January 26, 2015.
Leslie Kux,
Associate Commissioner for Policy.
[FR Doc. 2015-01859 Filed 1-30-15; 8:45 am]
BILLING CODE 4164-01-P

# EXHIBIT 13
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 14
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 15
# Withheld

**Confidential – Business or Technical
Information Subject to Protective Order**

# EXHIBIT 16

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of:
 Ravishanker Kovi, et al.

Application No.: 12/180,057

Filed: July 25, 2008

For:    PROCESS FOR PREPARATION OF
       ISOSULFAN BLUE

Confirmation No.: 9285

Group Art Unit: 1621

Examiner: Chukwuma O. Nwaonicha

Attorney Docket No.: 536/7x2

**MS: Amendment**
Commissioner of Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO OFFICE ACTION

Sir:

     In response to the Office Action mailed on February 23, 2009, please enter the following amendments and reconsider the application in view of these amendments and the following remarks.

**Petition for Extension of Time** appears on page 2 of this paper.

**Amendments to the claims** begin on page 3 of this paper.

**Remarks/Arguments** begin on page 8 of this paper.

## REMARKS/ARGUMENTS

Claims 1-23 are pending and stand rejected. Claims 1, 3, 4, 11, 15, 16 and 23 are amended. No new matter has been added by way of the amendments herein. Support for the amendments is found in the specification as filed, for example, at paragraphs [0026] and [0037].

In the Office Action on page 2 claim 1 stands rejected under 35 U.S.C. §112, second paragraph as being indefinite and 35 U.S.C. §101 for not reciting a proper process claim. Amended claim 1 clearly reflects process steps and is an appropriate process claim. Applicants submit these rejections are overcome.

In the Office Action on page 3 claims 1, 3, 8, 11 and 22 stand rejected under 35 U.S.C. §112, second paragraph as being indefinite The rejection as to claim 1 is overcome by virtue of the foregoing amendment to claim 1 which includes sodium. The rejection as to claim 3 is overcome by virtue of the amendment of claim 3 to depend from claim 2. The rejection of claim 11 is overcome by the amendment to include formula 3. Applicants traverse the rejection with respect to claim 8 in which the Examiner alleges "the phrases 'inorganic salts and inorganic or organic derivatives of sodium'" are not clear. These phrases are not in claim 8. Claim 8 is clear on its face, and one skilled in the art would understand what is meant by the claim language. This rejection should be withdrawn.

Applicants believe the rejection of claim 22 was a typographical error, and a rejection of claim 23 was intended. The amendment to claim 23 providing a space between the terms "80%" and "aqueous" overcomes the rejection as to claim 23, therefore the rejection should be withdrawn.

In the Office Action on page 4 claims 1-23 stand rejected under 35 U.S.C. §103(a) as being unpatentable over Kulkarni et al. (US 20060224003, "Kulkarni"). Applicants traverse this rejection. Amended claim 1 recites a novel process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid in a polar solvent with silver oxide. As noted by the examiner Kulkarni teaches an oxidizing step using ammonium dichromate. Applicants submit the use in claim 1 of silver oxide provides unexpectedly superior results over any prior art process, including Kulkarni, for making isosulfan blue sodium salt, and that the process of claim 1 is patentable.

8

Claim 1 recites in part a process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula (4) in a polar solvent with 2.0 to 3.0 equivalents of silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution. By way of background, the applicants have invented a process which provides a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form, *i.e.*, 99.0% or greater, for pharmaceutical applications. The process produces isosulfan blue that is easily purified to a purity greater than 99.5% by HPLC with silver content less than 20ppm (specification, paragraph [0026]). Impurity and metal removal in the present process is vastly more efficient than that which must be performed in any prior art process.

By contrast, the process disclosed in Kulkarni produces a product that is not suitable for applications requiring commercial-scale production and high purity, such as pharmaceutical applications. The Kulkarni reference describes a bench-scale process that achieves an isosulfan blue compound suitable only for industrial uses such as for dyes, where purity is not of paramount importance. The product made by the process disclosed in Kulkarni would not meet the standards necessary for pharmaceutical grade isosulfan blue.

In making the argument for patentability over prior art processes for making isosulfan blue, the applicants in Kulkarni submitted data comparing the product made using ammonium dichromate in the Kulkarni claimed process Step IV (oxidation step) to that made using potassium dichromate per the prior art teaching. The data presented by the Kulkarni applicants alleged the process using ammonium dichromate achieved crude isosulfan blue HPLC purity of 86.36% compared to 79.68% achieved by the prior art process, and a higher yield from crude (about 60% compared to about 42%). The overall purity difference was less than 7%. On the basis of this data the Kulkarni process was found to be nonobvious over the prior art reference which taught potassium dichromate as an oxidizer.

Here, the applicants provide a process which does not use a dichromate and surprisingly and unexpectedly achieves isosulfan blue sodium salt having a purity in excess of 99%, a significant improvement (over 12 percentage points) over what was allegedly achieved in Kulkarni over the

prior art.

The totality of the prior art must be considered, and proceeding contrary to accepted wisdom in the art is evidence of nonobviousness. *In re Hedges,* 783 F.2d 1038, 228 USPQ 685 (Fed. Cir. 1986). Processes for making isosulfan blue have been in existence for over 100 years, and yet no artisan has ever used silver oxide in accordance with the process of claim 1. Artisans have typically used lead or chrome oxides with an acid to make isosulfan blue. All the teachings in the art have been to employ oxides of these types, with or without a solvent, with acid. One skilled in the art viewing Kulkarni and in view of the totality of the prior art teachings would have been led to use a dichromate compound as an oxidizer. The use by applicants of silver oxide without acid is significantly different than the use in Kulkarni of sulfuric acid and ammonium dichromate, and would not be obvious to a skilled artisan.

In view of the foregoing applicants submit claim 1 is patentable and request this rejection be withdrawn. Claims 2-23 depend from claim 1 and recite additional patentable features and are likewise allowable. Applicants submit all claims are in condition for allowance. Early and favorable allowance of this application is earnestly solicited.

The fee for a two-month extension of time is included herewith. In the event there are any fees due and owing in connection with this matter, please charge same to our Deposit Account No. 11-0223.

Dated: July 17, 2009

Respectfully submitted,

By: s/Timothy X. Gibson/
Timothy X. Gibson
Registration No.: 40,618
GIBSON & DERNIER LLP
900 Route 9 North, Suite 504
Woodbridge, New Jersey 07095
Telephone (732) 634-7634
Attorneys for Applicant

536-7x2_response-to-2-23-09OA.doc

10

# EXHIBIT 17

# PRACTICAL HPLC METHOD DEVELOPMENT

# PRACTICAL HPLC METHOD DEVELOPMENT

Second Edition

**LLOYD R. SNYDER**
LC Resources, Inc.
Walnut Creek, California

**JOSEPH J. KIRKLAND**
Rockland Technologies, Inc.
Newport, Delaware

**JOSEPH L. GLAJCH**
DuPont Merck Pharmaceutical Company
North Billerica, Massachusetts



A Wiley-Interscience Publication
**JOHN WILEY & SONS, INC.**

This text is printed on acid-free paper.

Copyright © 1997 by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.
No part of this publication may be reproduced, stored in a retrieval system or transmitted
in any form or by any means, electronic, mechanical, photocopying, recording, scanning
or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States
Copyright Act, without either the prior written permission of the Publisher, or
authorization through payment of the appropriate per-copy fee to the Copyright
Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax
(978) 750-4470. Requests to the Publisher for permission should be addressed to the
Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030,
(201) 748-6011, fax (201) 748-6008, E-Mail: PERMREQ@WILEY.COM.
To order books or for customer service please, call 1(800)-CALL-WILEY (225-5945).

*Library of Congress Cataloging in Publication Data:*

Snyder, Lloyd R.
     Practical HPLC method development / Lloyd R. Snyder, Joseph J. Kirkland, Joseph L.
Glajch.—2nd ed.
         p.   cm.
     Includes index.
     ISBN 0-471-00703-X (cloth : alk. paper)
     1. High performance liquid chromatography—Methodology.
I. Kirkland, J. J. (Joseph Jack), 1925–          II. Glajch, Joseph L.
III. Title.
QP519.9.H53S69   1997
543′.0894—dc20                                                                    96-34296

Printed in the United States of America

18  17  16  15  14

*Practical HPLC Method Development, Second Edition*
by Lloyd R. Snyder, Joseph J. Kirkland and Joseph L. Glajch
Copyright © 1997 John Wiley & Sons, Inc.

# 13

# PREPARATIVE HPLC SEPARATION

13.1   Introduction
13.2   Developing a Preparative HPLC Separation
    13.2.1   General Considerations
    13.2.2   Effect of Sample Size: Touching-Band Separation
    13.2.3   Optimizing Conditions for Preparative HPLC
    13.2.4   Gradient Separations
    13.2.5   Trace Recovery
13.3   Practical Aspects of Preparative HPLC
    13.3.1   Sample Solubility
    13.3.2   Equipment Requirements
13.4   Quantitative Prediction of Preparative HPLC Separation
    13.4.1   General Relationships
    13.4.2   Column Saturation Capacity
    13.4.3   Gradient Elution Separations
    13.4.4   Heavily Overloaded Separation
    13.4.5   Unusual Isotherm Behavior
13.5   Summary and Example of Method Development for Preparative HPLC
    13.5.1   Process-Scale HPLC Separations

## 13.1   INTRODUCTION

Other chapters in this book assume that the purpose of HPLC separation is the analysis of different samples. This chapter deals with preparative HPLC (prep LC), where the goal is the isolation of purified material (product) for further use. The goals and characteristics of preparative vs. analytical HPLC are compared in Table 13.1. When only small amounts of pure product are required, an analytical HPLC method (e.g., 0.46-cm column ID) can be used to recover nanogram-to-sub-milligram quantities of product. The sample band is observed as it passes through the detector, and the band is collected at the detector outlet. Removal of the mobile phase by evaporation or lyophilization

**616**

**TABLE 13.1  Analytical vs. Preparative HPLC: Differences in Goals and Characteristics**

| Analytical HPLC | Preparative HPLC |
|---|---|
| *Goals* | |
| Information about sample composition | Recovery of purified product |
| Most or all sample components often of interest | Usually only one or a few sample components (products) of interest |
| *Characteristics* | |
| Sample weight just large enough for adequate detection | Largest possible sample weight for maximum yield of pure product |
| Reversed-phase HPLC most convenient | Normal-phase HPLC most convenient |
| Column ID 1–5 mm | Column ID 1–10 cm (or larger) |
| Column particles 5 $\mu$m or smaller | Column particles 7 $\mu$m or larger |
| HPLC pumps provide up to 10 mL/min | HPLC pumps provide $\gg$ 10 mL/min |
| Sample injection usually not a problem | Sample injection more difficult, requires more attention |
| Detection conditions selected for maximum sensitivity | Detection conditions often selected for reduced sensitivity |
| Solubility of sample in mobile phase usually not important | Sample solubility usually very important |
| Mobile-phase volatility unimportant | Mobile phase should be volatile; no involatile additives |

then furnishes purified product. Larger amounts of purified material can be obtained by injecting larger samples and/or by repetitive injections with pooling of product fractions.

When milligram or greater amounts of purified product are needed, it is usually best to operate the column under *overload* conditions [where the sample weight is large enough to distort the band and reduce resolution (Section 2.4.2)]. This is illustrated in Fig. 13.1. For sample injections that contain no more than 25 $\mu$g of product (Fig. 13.1*a*, 0.46-cm column), bandwidth and retention times are usually not a function of sample size, and the appearance of the chromatogram remains the same regardless of sample weight. The injection of a much larger sample weight under the same conditions leads to separation as in Fig. 13.1*b*. The product band Y (*) has widened to the point where it touches the adjacent impurity band X (called *touching-band separation;* see Refs. 1 and 2). However, product recovery and purity are still $\approx$100% in the separation of Fig. 13.1*b*, while a much larger yield or production rate of purified product is possible than in Fig. 13.1*a*.

A maximum production of purified product per injection is usually a major goal in prep LC. Often, the yield of purified product per run can be increased beyond that of Fig. 13.1*b* by injecting a still greater weight of sample (Fig.



**FIGURE 13.1**   Hypothetical separations as a function of sample weight. (*a*) Analytical conditions; (*b*) lightly overloaded (touching band) separation; (*c*) heavily overloaded (overlapping band) separation. A column internal diameter of 0.46 cm is assumed in the discussion of these separations.

13.1*c*). Now the product band overlaps one or more impurity bands. However, small fractions can be collected across the product band and analyzed by the HPLC procedure of Fig. 13.1*a*. Fractions containing purified product can be pooled, followed by removal of the mobile phase and recovery of the final product. Although this procedure is more complicated and requires additional experimental effort, it can be cost-effective when large amounts of purified product are required.

For the recovery of purified product from an impure starting material, it is convenient to use the same optimized HPLC conditions that were developed initially for analysis of the sample. Sample size can then be increased, as in Fig. 13.1, to the point where the required amount of purified product can be recovered from one or more runs. When larger amounts of product are required, column diameter can be increased and larger samples injected (other conditions, except flow rate, the same). If relatively large amounts of purified product are required, however, it is usually best to redesign the analytical method so that it is optimum for prep LC.

## 13.2   DEVELOPING A PREPARATIVE HPLC SEPARATION

### 13.2.1   General Considerations

Usually, an analytical HPLC procedure will be developed first and can be used as a starting point for a preparative method. Several considerations

significant) *N for the product band* (as in Fig. 13.2*b*). As indicated above, normal-phase (rather than reversed-phase) HPLC will often be a good starting point. If normal-phase conditions are used, unmodified silica is the preferred column packing. Larger (more expensive) columns are often required for preparative separation, and silica is less expensive than polar-bonded-phase packings such as cyano or diol. Using silica, there is also no loss of bonded phase to contaminate collected product fractions (however, silica is somewhat soluble in aqueous mobile phases when the mobile phase pH > 6).

### 13.2.2 Effect of Sample Size: Touching-Band Separation

After suitable HPLC conditions have been selected for a prep LC separation (as in Fig. 13.2*b*), it is desirable to inject a sample that is large enough to maximize the amount of purified product recovered from each run. For laboratory-scale prep LC, it is preferable to work under lightly overloaded or touching-band conditions, as in Fig. 13.1*b*. Such separations have several advantages:

· Convenient recovery of highly purified (99%+) product
· Nearly complete recovery (95%+) of purified product
· Simple separation procedures; no need to analyze fractions for pooling of purified product (as in the overlapping-band separation of Fig. 13.1*c*)
· Easy development of a touching-band separation

The maximum weight of sample ($w_{max}$) that can be injected for touching-band separation is usually determined by trial and error. For the first experiment, a sample weight equal to $w_{max}$ can be estimated from the chromatogram obtained for injection of a small weight of sample (< 10 $\mu$g). The maximum sample weight is a function of the separation factor $\alpha$ for the product band and the closest impurity band (Table 13.2). If this separation factor $\alpha$ is increased by a suitable choice of conditions, the value of $w_{max}$ increases rapidly. For example, with an analytical column (25 × 0.46 cm) and $\alpha = 1.05$, ≈ 30 $\mu$g of product can be injected for touching-band separation. If $\alpha = 3$, ≈ 6 mg of product can be injected (2000-fold larger sample). The importance of large values of $\alpha$ in prep LC is another reason for preferring normal-phase separation, because large changes in selectivity are more readily obtainable compared to reversed-phase HPLC (Section 6.6).

Table 13.2 also illustrates some other features of prep LC separation. First, the required plate number $N$ for these separations depends on values of $\alpha$ and $k$ for the product band (as is the case for analytical separation, Eq. 2.3).

---

**FIGURE 13.2**    Hypothetical separations suitable for (*a*) analysis and (*b*) preparative separation of a crude product. See the text for details.

**TABLE 13.2  Optimum Values of $N$ and Sample Weight $w$ as a Function of Selectivity $\alpha$ and Retention $k^a$ for Touching-Band Separation[b]**

| | $N$ | | | Sample Weight (mg)[c] | | |
| | | | | 25-cm Column | | |
| $\alpha$ | $k = 0.5$ | $k = 1.0$ | $k = 3.0$ | 0.46 cm ID | 1 in. OD | 4 in. OD |
|---|---|---|---|---|---|---|
| 1.05 | 180,000 | 81,000 | 37,000 | 0.03 | 0.6 | 10 |
| 1.10 | 46,000 | 21,000 | 10,000 | 0.09 | 2 | 30 |
| 1.20 | 12,000 | 6,000 | 2,800 | 0.3 | 6 | 100 |
| 1.50 | 2,400 | 1,200 | 650 | 1.3 | 27 | 400 |
| 2.0 | 800 | 430 | 260 | 3 | 60 | 1000 |
| 3.0 | 300 | 190 | 130 | 6 | 130 | 2000 |

*Source:* Ref. 1.

[a] Value of $k$ refers to product band or largest of two bands to be separated.

[b] See the text and Fig. 13.1 for details.

[c] Values shown are for touching-band separation, assuming that the product and adjacent impurity band(s) are present in the sample at the same concentration; if the product concentration is $x$-fold greater than that of the impurity, the maximum sample size can be increased approximately $x$-fold [or decreased $(1/x)$-fold].

An increase in $\alpha$ (by selection of appropriate HPLC conditions) not only increases the weight of sample that can be separated in each run, it also lowers the column plate number that is required [e.g., $N = 130$ for $\alpha = 3$ and $k = 3$ (Table 13.2)]. Smaller values of $N$ (larger particles, higher flow rates) reduce the run time and increase production rate (weight per hour of purified product). Shorter run times also favor an increased recovery of the product, since less time in the column is allowed for possible degradation of the product during separation.

A second consideration related to Table 13.2 is the choice of $k$ for the product band. Larger $k$ values require more solvent to produce each gram of purified product. The cost of the solvent can be a major consideration in prep LC, so that smaller values of $k$ (other factors equal) are preferred. Table 13.2 provides a means of evaluating the advantage of smaller values of $k$ vs. the larger plate numbers that are required.

The data of Table 13.2 are intended as approximate guidelines. The use of larger values of $N$ allows somewhat larger sample weights to be injected; lower values of $N$ may require much smaller sample weights. Prep LC separations are often carried out at lower pressures (e.g., < 1000 psi) than are analytical separations, especially if larger particles and wider-diameter columns are used. However, higher pressures (with higher flow rates and/or longer columns) can achieve increased amounts of purified product per hour.

### 13.2.3  Optimizing Conditions for Preparative HPLC

The following steps provide a systematic approach to acceptable conditions for touching-band prep LC separation [1,2], which is usually the preferred

# EXHIBIT 18
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 19

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC | Civil Action No.: 2:16-cv-491-RWS-RSP |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | |
| AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC | |
| Defendants. | |

**DECLARATION OF DAVID KRAG, M.D.**

## II.   THERE ARE NO SIGNIFICANT DIFFERENCES BETWEEN LYMPHAZURIN® AND MYLAN'S ISOSULFAN BLUE PRODUCT

19.     I have extensively reviewed the literature pertaining to the use of blue dyes for sentinel node mapping.  The literature contained no references indicating that Mylan's generic isosulfan blue product altered the efficacy rate of sentinel node mapping as compared to Lymphazurin®.  This lack of distinguishing factors between the two isosulfan blue products is consistent with my observation that most surgeons just use the blue dye that hospital pharmacies have on hand and do not chose the blue dye based on a particular manufacturer.  In fact, the efficacy rate of isosulfan blue reported on Mylan's website (http://isosulfanblue.mylan.com/en/efficacy) refers to an article, Hirsch et al., discussing Lymphazurin®, indicating that the efficacy of both products is comparable.

20.     My review of the pertinent literature also indicated that Mylan's generic isosulfan blue product did not alter the incidence of adverse events resulting from the use of isofulfan blue as compared to Lymphazurin®.  For example, the incidence of allergic reactions resulting from the use of isosulfan blue remained consistent following the launch of Mylan's generic isosulfan blue product.  I further note that the safety information provided on Mylan's website (http://isosulfanblue.mylan.com/en/safety) refers to the Hirsch et al. article, which provides data on adverse effects in patients treated with Lymphazurin®, indicating that the two products are comparably safe.

21.     Thus, it is my opinion that there is no significant difference between Lymphazurin® and Mylan's generic isosulfan blue product and that the two products are therefore interchangeable.  It is also my opinion that other practitioners would share my opinion.

25.     While the use of isosulfan blue is more widespread, it is my opinion that methylene blue is also acceptable for use in sentinel node mapping.

26.     Finally, it is my understanding that methylene blue used in sentinel node mapping does not contain any isosulfan blue.  It is also my understanding that a radioactive tracer used alone for sentinel node mapping does not contain any isosulfan blue.

I hereby declare under penalty of perjury that the foregoing statements made by me are true and correct.

Dated: 9/8/16

David Krag, M.D.

-9-

# EXHIBIT 20

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2                 MARSHALL DIVISION
3   MYLAN INSTITUTIONAL LLC      )
    and APICORE US LLC,          )
4                                )
        Plaintiffs,              )
5                                ) Civil Action
    vs.                          ) No. 2:16-cv-491-RWS-RSP
6                                )
    AUROBINDO PHARMA LTD.,       )
7   AUROBINDO PHARMA USA INC.,  )
    and AUROMEDICS PHARMA LLC,  )
8                                )
        Defendants.              )
9
10  ****************************************************
11            ORAL AND VIDEO DEPOSITION OF
12             JONATHAN LAWRENCE SESSLER
13                 August 11, 2016
14    (Designated Confidential - Attorneys' Eyes Only)
15  ****************************************************
16      ORAL AND VIDEO DEPOSITION OF JONATHAN LAWRENCE
17  SESSLER, produced as a witness at the instance of the
18  Defendants, and duly sworn, was taken in the
19  above-styled and numbered cause on August 11, 2016,
20  from 9:32 a.m. to 7:14 p.m., before WILLIAM M.
21  FREDERICKS, CSR in and for the State of Texas,
22  reported by machine shorthand at the offices of
23  Wilson Sonsini Goodrich & Rosati, 900 South Capital of
24  Texas Highway, 5th Floor, Austin, Texas, pursuant to
25  the Federal Rules of Civil Procedure.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

```
 1              A P P E A R A N C E S
 2

    FOR THE PLAINTIFF MYLAN INSTITUTIONAL LLC:
 3
         MS. NICOLE W. STAFFORD, Ph.D., and
 4       MR. TREY HEBERT
         Wilson Sonsini Goodrich & Rosati, P.C.
 5       900 South Capital of Texas Highway, Fifth Floor
         Austin, Texas 78746-5546
 6       512.338.5400
         nstafford@wsgr.com
 7       thebert@wsgr.com
 8
    FOR THE PLAINTIFF APICORE US LLC:
 9
         MR. DAVID JAMES GALLUZZO
10       Sharma & DeYoung LLP
         555 Fifth Avenue, 17th Floor
11       New York, New York  10017
         212.856.7236
12       david@sharmadeyoung.com
13
    FOR THE DEFENDANTS:
14
         MR. GEORGE C. YU and
15       MS. CINDY S. AHN
         Schiff Hardin LLP
16       One Market
         Spear Street Tower, Suite 3200
17       San Francisco, California  94105
         415.935.4498
18       gyu@schiffhardin.com
         cahn@schiffhardin.com
19
20  ALSO PRESENT:  Mr. Jason Lemley, Videographer.
21
22
23
24
25
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 197

1    as I mentioned earlier, I was looking through a large

2    stack of documents.  At one point, Apicore did note

3    batches that they considered not meeting their

4    specification, but that to my knowledge did not go on

5    further.

6                    So I would like to look at those, look

7    at the underlying data, as opposed to just letters to

8    the FDA, what were the errors; what was the analysis;

9    how did this compare to standard.  So delve down into

10   the granular details in a way that simply wasn't

11   possible in my preparation for this deposition.

12       Q.   (BY MR. YU)  And when you speak of granular

13   details, are you referring to the conditions under

14   which the HPLC analysis is performed?

15       A.   Among others, yes.

16                    MR. GALLUZZO:  Objection to the form of

17   the question.

18       Q.   (BY MR. YU)  And going back to Claim 1 of the

19   '050 patent in which the language is having a purity

20   of at least 99 percent by HPLC, what is your

21   understanding of the appropriate HPLC conditions to

22   make this determination of 99 percent purity --

23                    MS. STAFFORD:  Objection to form.

24       Q.   (BY MR. YU)  -- as a person of ordinary skill

25   in the art?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 198

1              MS. STAFFORD:   Sorry.   Objection to

2      form.

3         A.   Well, that's a good question.   So I would

4      want to have a reference standard, I would want to

5      make sure that I'm integrating appropriately, but this

6      claim does not have inherent in it any of those

7      details, and it is left to a person of ordinary skill

8      in the art to determine what -- what are acceptable

9      conditions.

10             I can tell you how I would like to do

11     this, but other scientists, including those with more

12     analytical experience than myself, might have a

13     different take on this.   I would integrate under the

14     curve using a detector that could be correlated

15     with -- whose output could be correlated with

16     concentration.   I would normally like to use two

17     different detectors.   One typically we use is based on

18     absorptivity at a given wavelength where we know the

19     extinction coefficient, and the other we use is

20     conductance.   So the presence of a material will

21     change the -- the conductance.   I tend to be a little

22     bit worried, so I like to then do follow-up mass

23     spectrometric analysis to make sure I'm looking at the

24     material I think I'm looking at.

25        Q.   (BY MR. YU)   And again --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 199

1    A.    But none of this is enunciated in this claim,

2    nor required for the practice of it.    This is just my

3    personal view.

4    Q.    I understand.    And I am referring to, you

5    know, the context of the '050 patent and the term

6    having a purity of 99 percent by HPLC because I'm

7    interested in knowing how one of ordinary skill in the

8    art would interpret that in the context of this claim.

9    A.    Uh-huh.

10    Q.    Now, you would agree with me, right, that in

11    the specification of the '050 patent there are no

12    HPLC conditions that are provided?

13              MS. STAFFORD:    Objection to form.

14              MR. GALLUZZO:    Objection.

15    A.    I have not seen any.

16    Q.    (BY MR. YU)  You would agree, right, that in

17    terms of analyzing a chemical preparation for purity

18    using HPLC that there could be a number of different

19    conditions that you would have to select?

20              MS. STAFFORD:    Objection to form.

21    A.    "Could be a number of different conditions

22    that you would have to select."  That's true in a

23    global sense.  I think by the time we move into the

24    specific context of isosulfan blue where standards can

25    be made life becomes considerably simpler.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 243

1        IN WITNESS WHEREOF I have hereunto set my

2   hand and affixed my seal on this 16th day of August

3   2016.

4

5

6                 William M. Fredericks, CSR No. 2392

                  Expiration Date: 12/31/2017

7                 Veritext Legal Solutions

                  Firm Registration No. 571

8                 300 Throckmorton, Suite 1600

                  Fort Worth, Texas  76102

9                 800-497-0277

10

    JOB NO. 2357297

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 21
# Withheld

**Confidential – Business or Technical Information Subject to Protective Order**

# EXHIBIT 22
# Withheld

**Confidential – Business or Technical
Information Subject to Protective Order**

# EXHIBIT 23

# Withheld

**Confidential – Business or Technical
Information Subject to Protective Order**

# EXHIBIT 24
# Withheld

**Confidential – Business or Technical
Information Subject to Protective Order**

# EXHIBIT 25

TOPICS IN APPLIED CHEMISTRY

# CHEMISTRY AND APPLICATIONS OF LEUCO DYES



## EDITED BY
## RAMAIAH MUTHYALA

TP918
.V37C47
1997

Library of Congress Cataloging-in-Publication Data

```
Chemistry and applications of leuco dyes / edited by Ramaiah Muthyala.
      p.   cm. -- (Topics in applied chemistry)
   Includes bibliographical references and index.
   ISBN 0-306-45459-9
   1. Vat dyes.   I. Muthyala, Ramaiah.  II. Series.
TP918.V37C47  1997
667'.2--dc21                                                97-11194
                                                               CIP
```

ISBN 0-306-45459-9

© 1997 Plenum Press, New York
A Division of Plenum Publishing Corporation
233 Spring Street, New York, N. Y. 10013

http://www.plenum.com

10 9 8 7 6 5 4 3 2 1

All rights reserved

No part of this book may be reproduced, stored in a retrieval system, or transmitted in any form
or by any means, electronic, mechanical, photocopying, microfilming, recording, or otherwise,
without written permission from the Publisher

Printed in the United States of America

# 5

# The Chemistry of Leuco Triarylmethanes

## RAMAIAH MUTHYALA and XIANGFU LAN

## 5.1.  INTRODUCTION

Di- or triarylmethane leuco dyes are those with electron-donating groups such as amino, or hydroxyl substituted at the *para* or less frequently at the *ortho* position of phenyl rings. To be of value as dye precursors, at least two amino groups or a combination of hydroxyl and amino groups are required. The amino groups can be primary, secondary, or tertiary. Additional substituents such as carboxylic acids, sulfonic acids, or halogens can also be present. The number, nature, and position of these substituents determine the hue or color of the dye and the type of application. For example, introduction of sulfonic acid group converts the basic dyes into acid dyes; a carboxylic group *ortho* to the phenolic hydroxyl group converts basic dyes into mordant dyes.

Arylmethane leuco dyes are converted into di- or triarylmethane dyes on oxidation. This class of dye precursors sometimes is referred to as leuco di- or triphenylmethane dyes, or di- or triphenylmethane leuco dyes. The use of the term di- or triarylmethane dyes can be misleading as the central carbon atom is a carbonium ion. Instead, the term di- and triarylmethine dye is recommended for this class as it correlates with the well-known polymethine dyes. Nevertheless, it has not been commonly used.

RAMAIAH MUTHYALA • 3M Company, St. Paul, Minnesota 55144.    XIANGFU LAN • Clariant Corporation, Charlotte, North Carolina 28269.

*Chemistry and Applications of Leuco Dyes*, edited by Muthyala. Plenum Press, New York, 1997.

125

Triphenylmethane dyes show inferior lightfastness properties. They are, however, still one of the most important groups of synthetic dyes due to their brilliance, high tinctorial strength, and low cost. Several reviews have appeared on di- and triphenylmethane dyes.[1-5] However, the color-forming precursors—leuco dyes—have received less attention in the literature.

In general, the triarylmethane leuco skeleton can be represented by structures **1-4**. Traditional leuco di- and triphenylmethane dyes frequently include compounds of type **1** and **3**. The closely related compounds **2** and **4** are derived from **1** and **3**. Another closely related type is the lactone or phthalide **5** (see Chapter 4). In all of these leuco dyes, one or more of the phenyl rings can be replaced by a hetaryl ring or by a fused aromatic ring such as a naphthalene.



(1)    X = H              (3)    X = H                        (5)

(2)    X = -NR$_2$, -SO$_2$R      (4)    X = -OH, -OR, -NR$_2$, -CN, N-Heterocycle, -P(O)OR$_2$

R$^1$, R$^2$, R$^3$ = -NH$_2$, NR$_2$, -OH

While the classical leuco dyes **1** or **3** form colors by hydride abstraction or oxidation, the leuco dyes **4** or **5** give colored substances on contact with an acid.

Triphenylmethane leuco dyes are far more important than the diphenylmethanes in terms of practical value. Use of triphenylmethane dyes for traditional applications of dyes is limited to dyeing wool, silk, leather, and polyacrylonitrile fibers. The largest portion of the annual production of this class of leuco dyes is consumed in the manufacturing of various copying papers.

The leuco triphenylmethanes are generally stable substances. However, IR studies have shown that in the solid state, some leuco dyes such as **6a–c**

(6)                                          (7)

(a)  $R^1$ = OH,  $R^2$ - $R^4$ = H          (d)  $R^1$ = $R^4$ = H,  $R^2$ = $R^3$ = OH

(b)  $R^1$ = $R^4$ = OH,  $R^2$ = $R^4$ = H  (e)  $R^1$ = $R^2$ = H,  $R^3$ = $R^4$ = OH

(c)  $R^1$ = $R^2$ = OH,  $R^3$ = $R^4$ = H  (f)  $R^1$ = $R^3$ = OH,  $R^2$ = $R^4$ = H

                                             (g)  $R^1$ = $R^2$ = $R^4$ = H,  $R^3$ = OH

exist as a mixture of phenol and the quinone carboxylic acids **7a–c**, whereas **6d–g** exist exclusively as lactone.[6]


## 5.2.  PROPERTIES OF DI- AND TRIARYLMETHANES

### 5.2.1.  Color-Formation Reactions

Colorless triarylmethane leuco materials **8** can be converted to carbonium ion (**9**)-colored materials, either by hydride abstraction or by chemical or photooxidation. In addition, some leuco compounds such as **11** can be converted to colored materials by treatment with an acid. The latter case is similar to the chemistry observed for fluoran (see Chapter 6) or phthalide (see Chapter 4) leuco compounds (Scheme 1).

#### 5.2.1.1.  Via Oxidation

Direct oxidation of diphenylmethanes is of little practical value as color formers. In liquid sulfur dioxide, leuco diphenylmethane **12** (Scheme 2) undergoes hydride abstraction by triphenylcarbenium perchlorate at the benzylic amine position to form immonium ion[7] **13**, whereas in acetonitrile

**Scheme 1**

diphenylmethane dye **14** is formed. This example demonstrates the influence that the solvent can have directing effect on the hydride abstraction.

The practical route for oxidizing leuco diphenylmethanes **15** demands inital conversion to an imine salt **16**. The imine salt is obtained by heating a mixture of diphenylmethane, sulfur, ammonium chloride, and sodium chloride at 175°C in a current of ammonia; or by heating a mixture of diphenylmethane, urea, sulfamic acid, sulfur, and ammonia at 175°C (Scheme 3). Dyes **16** can be represented as the quinonoid resonance structure **17**. Dyes of this class, known as auramines, are all yellow, with the only commercial representative being auramine O **16a**. Due to its poor lightfastness and instability to hot acids and bases, its use has been restricted to dyeing and printing cotton, paper, silk, leather, and jute.

The chemical oxidants for triphenylmethanes are categorized into two groups: the strong oxidant group consists of $PbO_2$, $Na_2Cr_2O_7/H^+$, and $MnO_2$, while the mild oxidant group consists of oxygen or air, hydrogen peroxide, nitrobenzene, peroxomonosulfuric acid or its salts. Care must be taken in selecting the proper oxidant and the reaction conditions in order to prevent overoxidation. For example, oxidation of leuco Malachite Green with excess $PbO_2$ leads to decomposition products to quinoneimine and benzoic acid.