**2017-1645**

# United States Court of Appeals
# for the Federal Circuit

MYLAN INSTITUTIONAL LLC and APICORE US LLC

*Plaintiffs-Appellees,*

*v.*

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
and AUROMEDICS PHARMA LLC,

*Defendants-Appellants.*

*Appeal from the United States District Court
for the Eastern District of Texas in No. 2:16-cv-00491-RWS-RSP,
Judge Robert W. Schroeder III.*

### NON-CONFIDENTIAL BRIEF OF APPELLEES

DAVID S. STEUER
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

NICOLE W. STAFFORD
WILSON SONSINI GOODRICH & ROSATI
900 South Capital of Texas Hwy
Las Cimas IV, Fifth Floor
Austin, TX 78746
(512) 338-5400

*Counsel for Plaintiff-Respondent
Mylan Institutional LLC*

ALLEN F. GARDNER
GILLAM & SMITH, LLP
102 N. College Avenue
Suite 800
Tyler, Texas 75702
(903) 503-7413

*Counsel for Plaintiff-Respondent
Apicore US LLC*

March 20, 2017

# CERTIFICATE OF INTEREST FOR MYLAN INSTITUTIONAL LLC

Counsel for Appellee Mylan Institutional LLC certifies the following:

1.    The full name of every part or amicus represented by me is:

**Mylan Institutional LLC**

2.    The name of the real party in interest (If the party named in the caption is not the real party in interest) represented by me is:

**N/A**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Mylan Institutional LLC is a wholly owned subsidiary of Mylan Inc.

Mylan Inc. is indirectly wholly owned by Mylan N.V., a publicly held company.

Abbott Laboratories, a publicly held company, owns more than 10% of Mylan N.V.'s stock through wholly-owned subsidiaries.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| LAW FIRM | COUNSEL |
|---|---|
| Wilson Sonsini Goodrich & Rosati | David S. Steuer<br>Nicole W. Stafford<br>Sami Sedghani<br>Aden M. Allen<br>Anna Phillips<br>Adam Burrowbridge<br>Gina H. Cremona |
| Gillam & Smith | Allen F. Gardner<br>Melissa Smith |

March 20, 2017

*/s/ David S. Steuer*
David S. Steuer
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 320-4855
Fax: (650) 493-6811
Email dsteuer@wsgr.com

*Counsel for Plaintiff-Appellee*
*Mylan Institutional LLC*

## CERTIFICATE OF INTEREST FOR APICORE US LLC

Counsel for Appellee Apicore US LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

**Apicore US LLC**

2.    The name of the real party in interest (If the party named in the caption is not the real party in interest) represented by me is:

**N/A**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Apicore US LLC is a wholly owned subsidiary of Apicore Inc.

As of December 2016, Medicure Inc. of Canada, a publicly held company, owns more than 10% of the shares of Apicore Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| LAW FIRM | COUNSEL |
|---|---|
| Sharma DeYoung LLP | David J. Galluzzo<br>Joanna Garelick Goldstein<br>Himanshu Rajan Sharma |
| Gillam & Smith | Melissa Smith<br>Allen F. Gardner |

Dated: March 20, 2017

*/s/: Allen F. Gardner*
Allen F. Gardner
Gillam & Smith
102 N. College, Suite 800
Tyler, Texas 75702
Tel: 903.503.7413
Fax: 903.934.9257
Email: allen@gillamsmithlaw.com

*Counsel for Plaintiff-Appellee*
*Apicore US LLC*

# TABLE OF CONTENTS

*Page*

STATEMENT OF RELATED CASES ....................................................................1

INTRODUCTION ...............................................................................................2

COUNTERSTATEMENT OF ISSUES PRESENTED.............................................4

COUNTERSTATEMENT OF THE CASE..............................................................5

COUNTERSTATEMENT OF FACTS ...................................................................6

      A.   FDA's Approval of Isosulfan Blue 1% ...........................................6

      B.   Lymphazurin® Shortages ..............................................................7

      C.   Apicore Developed a Better ISB ....................................................9

      D.   The Asserted Patents ...................................................................10

      E.   Aurobindo's ISB Product .............................................................11

SUMMARY OF THE ARGUMENT ....................................................................12

STANDARD OF REVIEW ................................................................................15

ARGUMENT ...................................................................................................16

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION AND
     CORRECTLY DETERMINED THAT APPELLEES ARE LIKELY
     TO SUCCEED ON THE MERITS. ...........................................................17

      A.   The District Court Correctly Found That the '992 and '616
           Patents Are Likely Infringed. ........................................................17

           1.   The District Court's Factual Finding that Aurobindo's
               Manganese Dioxide Oxidizes the Isoleuco Acid in
               Substantially the Same Way as the Claimed Silver Oxide
               Is Not Clearly Erroneous. .....................................................19

2.    The District Court's Factual Finding That Manganese Dioxide in Aurobindo's Process Leads to the Same Result as the Claimed Silver Oxide Is Not Clearly Erroneous. ................................................................21

3.    The District Court Correctly Found That Application of the Doctrine of Equivalents Does Not Ensnare the Prior Art.  ......................................................................................23

B.    The District Court's Finding That There Was No Substantial Question as to the Validity of the '050 Patent's Claims Is Not Clearly Erroneous.............................................................25

1.    The District Court Correctly Found That Lymphazurin® and Hirsch 1982 Do Not Render the '050 Patent Obvious.....26

2.    The District Court Correctly Found That no Prior Art Combination Renders the Claims of the '050 Patent Obvious. ..................................................................................29

3.    The District Court's Finding That the Patentee's Inventor Notebook Did Not Demonstrate Obviousness Is Not Clearly Erroneous. ................................................................32

4.    The District Court's Findings That the Claims of the '050 Patent Were Not Anticipated or Obvious in View of Sigma's ISB Are Not Clearly Erroneous................................33

5.    The District Court Correctly Found That Secondary Considerations "Overwhelmingly Weigh" Against Obviousness. ........................................................................36

6.    The District Court Did Not Commit Plain Error in Finding That the Claims of the '050 Patent Are Not Indefinite. ..............................................................................38

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT APPELLEES PRESENTED HALLMARK EVIDENCE OF IRREPARABLE HARM AS A DIRECT RESULT OF AUROBINDO'S CONTINUED INFRINGEMENT. ...................................40

A.    The District Court's Finding that Apicore Suffered Irreparable Harm Is Not Clearly Erroneous. ....................................................41

    1.    The District Court Correctly Found That Apicore and Aurobindo Are Direct Competitors. ......................................41

    2.    The District Court Properly Found that Apicore and Mylan Would Suffer Price Erosion. ......................................43

    3.    The District Court Properly Found That Apicore's Lost Sales and Lost R&D Would Lead to Irreparable Harm..........44

B.    The District Court Did Not Commit Legal Error in Finding a Causal Nexus Between Aurobindo's Infringement and Apicore's Harm. ...............................................................................48

    1.    Apicore's Irreparable Harm Is Directly Caused by Aurobindo's Infringement. ....................................................49

    2.    The District Court Did Not Apply the Wrong Causal Nexus Standard. ....................................................................51

    3.    The District Court Did Not Assume That Regulatory Approval Conferred Causal Nexus. .......................................55

CONCLUSION ......................................................................................56

## STATEMENT OF CONFIDENTIAL INFORMATION

Pursuant to Federal Circuit Rule 28(d)(2)(B), the confidential information omitted on pages 7, 8, 14, 33, 34, 35, 36, 45, and 50 concerns financial information identified as highly confidential business information by Appellants. The total number of words redacted is 13.

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Andrx Pharms., Inc.*,
  473 F.3d 1196 (Fed. Cir. 2007) ...................................................15

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008) .....................................................6

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015) .............................................17, 33

*Apple, Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) ..........................................*passim*

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013) .....................................51, 52, 55

*Apple Inc. v. Samsung Elecs. Co.*,
  809 F.3d 633 (Fed. Cir. 2015) ...............................................52, 53

*AstraZeneca LP v. Breath Ltd.*,
  88 F. Supp. 3d 326, 393 (D.N.J. 2015).........................................55

*Automated Merch. Sys. v. Crane Co.*,
  357 F. App'x 297 (Fed. Cir. 2009) ...............................................47

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
  499 F.3d 1293 (Fed. Cir. 2007) .............................................28, 29

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
  80 F.3d 1553 (Fed. Cir. 1996) .....................................................45

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .....................................................15

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  469 F.3d 1005 (Fed. Cir. 2006) ...................................................20

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) .............................................23, 24

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .............................................42, 53

*Douglass v. United Servs. Auto Ass'n*,
  79 F.3d 1415 (5th Cir. 1996) (en banc) ...........................16, 24, 38

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
   501 F.3d 1263 (Fed. Cir. 2007) ...................................................29

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)............................45

*Janssen Products, L.P. v. Lupin Ltd.*,
   109 F. Supp. 3d 650 (D.N.J. 2014) ...............................................54

*Lakedreams v. Taylor*,
   932 F.2d 1103 (5th Cir. 1991) ...............................................15, 16

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ...................................................26

*Oakley, Inc. v. Sunglass Hut Int'l*,
   316 F.3d 1331 (Fed. Cir. 2003) ...................................................15

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012) ...................................................33

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012) ...................................................42

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ...........................................44, 45, 53

*Sci. Plastic Prod., Inc. v. Biotage AB*,
   766 F.3d 1355 (Fed. Cir. 2014) ...................................................33

*Titan Tire Corp. v. Case New Holland, Inc.*,
   566 F.3d 1372 (Fed. Cir. 2009) ...................................................26

*Trebro Mfg., Inc. v. FireFly Equip., LLC*,
   748 F.3d 1159 (Fed. Cir. 2014) ...................................................15

## STATUTES

28 U.S.C. § 1404 ...................................................1

35 U.S.C. § 102 ...................................................24

35 U.S.C. § 103 ...............................................24, 32

## RULES

Federal Circuit Rule 47.5 ...................................................1

# TABLE OF ABBREVIATIONS

| TERM | ABBREVIATION |
|------|--------------|
| '291 application | Patent Application No. 11/747,291 |
| '050 patent | U.S. Patent No. 9,353,050 |
| '616 patent | U.S. Patent No. 8,969,616 |
| '992 patent | U.S. Patent No. 7,662,992 |
| ANDA | Abbreviated New Drug Application |
| API | Active Pharmaceutical Ingredient |
| Apicore | Apicore US LLC |
| Appellants' Brief | AB Br. |
| Appellees | Mylan Institutional LLC and Apicore US LLC |
| Asserted Patents | U.S. Patent Nos. 7,662,992, 8,969,616, and 9,353,050. |
| Aurobindo or Appellants | Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., Auromedics Pharma LLC |
| FDA | Food and Drug Administration |
| HPLC | High Pressure Liquid Chromatography |
| ISB | Isosulfan Blue |
| Mylan | Mylan Institutional LLC |

| **TERM** | **ABBREVIATION** |
| --- | --- |
| NDA | New Drug Application |
| POSA | Person of Ordinary Skill in the Art |
| R&D | Research and Development |
| R&R | Report and Recommendation |
| Sigma | Sigma Aldrich |
| Synerx | Synerx Pharma, LLC |

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, Appellee states that on March 3, 2017, Aurobindo filed with this Court a petition for writ of mandamus requesting this Court to direct the United States District Court for the Eastern District of Texas to (1) vacate its February 1, 2017 order denying Aurobindo's Motion to Transfer Under 28 U.S.C. § 1404(a); and (2) transfer *Mylan Institutional LLC and Apicore US LLC v. Aurobindo Pharma Ltd., et al.*, C.A. No. 2:16-cv-491 to the United States District Court for the District of New Jersey (Appeal No. 17-115).   No other appeal from this civil action was previously before this Court or any other appellate court.

In a now partially dismissed case, *Aurobindo Pharma USA Inc. v. Apicore US LLC*, 3:16-cv-03358-RMB-KMW (D.N.J.), Aurobindo filed a declaratory judgement suit challenging the validity of the same patents based on the same facts at issue in the present appeal.   Although Aurobindo voluntarily dismissed its declaratory judgment claims on December 14, 2016 without prejudice, Apicore's counterclaims remain pending.   Aurobindo subsequently petitioned the USPTO for inter partes review of the '050 patent, where the patentee's response is due May 7, 2017 and the decision to institute is expected approximately August 7, 2017. *Auromedics Pharma LLC v. Apicore US LLC*, IPR No. 2017-00762.

There are no other cases pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in this appeal.

## INTRODUCTION

Apicore's patents solved the difficult problem of reliably producing ISB of high purity. Aurobindo copied Apicore's technology and eroded Appellees' well-deserved market share. After extensive briefing, and a full day of testimony by 12 witnesses, Magistrate Judge Payne issued a 52-page report recommending that Aurobindo be enjoined from further marketing and selling their infringing ISB products. Appx7-58 (finding "that Plaintiffs have established a likelihood of success on the merits with respect to at least one claim of each patent-in-suit, and that Apicore would be irreparably harmed without preliminary relief").

District Judge Schroeder overruled Aurobindo's objections and fully adopted the R&R and granted the preliminary injunction. Appx4-6.

Aurobindo fails to show any legal error, clearly erroneous findings of fact, or other abuse of discretion by the district court. As an initial matter, the injunction can be affirmed based on Appellees' likelihood of success on either the '992 and '616 patents (the process patents) or the '050 patent (the purity patent). Aurobindo does not challenge the district court's findings with respect to the validity of the process patents or infringement of the purity patent. Instead, its challenge to the likelihood of success is limited to infringement of the process

patents and the validity of the purity patent. Aurobindo fails to show either factual finding was clearly erroneous, let alone both.

Aurobindo also fails to show that the district court's finding of nexus between Apicore's irreparable harm and Aurobindo's infringement was clearly erroneous. Other than criticize the district court for its conclusions, Aurobindo does not identify a single factual finding of irreparable harm that is not thoroughly supported by the record. It should be undisputed that Aurobindo's unlawful infringement and copying of Apicore's patents directly caused Apicore's harm. However, Aurobindo improperly attempts to extend this Court's analysis from the *Apple* cases related to mobile phone technology to the pharmaceutical patents at issue (process and compound patents) which the district court found to be fundamentally different. As the record showed, by copying Apicore's patents, Aurobindo gained a competitive advantage in both manufacturing high purity ISB and ultimately obtaining FDA approval of their DMF and ANDA products. Furthermore, due to the exclusive supply arrangement between Apicore and Mylan, Aurobindo's infringing sales had a direct impact on Apicore leading to lost sales, price erosion, and loss of R&D investments.

Under these circumstances, Aurobindo has failed to meet its burden for demonstrating that the district court committed legal or that its factual findings were clearly erroneous constituting an abuse of discretion.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.    Whether the district court abused its discretion in finding that the Appellees showed a likelihood of success in demonstrating that Aurobindo infringes at least claim 1 of the '992 and '616 patents when Aurobindo literally practices every element of the claim, other than, using an equivalent metal oxide to the claimed silver oxide.

2.    Whether the district court abused its discretion in determining that Aurobindo failed to raise a substantial question as to the validity of claims 1, 11, and 15 of the '050 patent when extensive evidence supported the court's findings that a POSA would not have been motivated to combine the cited prior art references nor would a POSA have had any expectation of success in doing so.

3.    Whether the district court abused its discretion in finding that Apicore would suffer irreparable harm when the court found hallmark signs of irreparable harm, including lost sales, lost R&D ability, price erosion, and direct competition with an infringer, absent a preliminary injunction.

4.    Whether the district court abused its discretion in finding a causal nexus between Aurobindo's infringement and Apicore's harm when Aurobindo copied Apicore's process, thereby gaining a competitive advantage and ultimately receiving FDA approval.

## COUNTERSTATEMENT OF THE CASE

Appellees filed suit against Aurobindo for infringement of the '992, '616 and '050 patents.  Appx79.  The '992 and the '616 patents both cover a novel process for manufacturing ISB and the '050 patent covers novel compositions of high purity ISB.  On June 9, 2016, Appellees moved the district court to enjoin Aurobindo from manufacturing, selling or offering for sale, using, or importing its ISB product and API within the United States.  Appx185-573.  The magistrate judge and district court granted the motion because Appellees showed that Aurobindo was infringing valid claims of the Asserted Patents and inflicting substantial harm to both Apicore and Mylan.

## COUNTERSTATEMENT OF FACTS

### A.    FDA's Approval of Isosulfan Blue 1%

ISB is a blue dye consisting of the monosodium salt of a 2,5-disulfonated triarylmethane dye identified by the chemical name "N- [4-[[4-(diethyl amino) phenyl]    (2,5-disulfophenyl)    methylene]-    2,5-cyclohexadien-1-ylidene]-Nethylethanaminium, sodium salt." Appx8-9; Appx166; Appx189-190.  ISB is a contrast agent primarily used for sentinel lymph node mapping that allows surgeons to take a targeted approach to excising cancerous lymph nodes, which makes the invasive treatment more successful and less injurious to cancer patients. Appx7-8; Appx190; Appx4524.  The FDA originally approved ISB in 1981 as a 1% injectable pharmaceutical product, which NDA holder Hirsch Industries marketed as Lymphazurin®.  *See, e.g.*, Appx402-403; Appx209, ¶ 11; Appx4727-4755.

From the beginning, Hirsch Industries encountered and reported problems associated with the synthesis and purification of ISB.  *See* Appx9-10; Appx4524-4525.  Dr. Hirsch's original clinical trial publication described use of an ISB mixture containing "94.5% dye content . . . as determined by high-pressure liquid chromatography."  Appx9; Appx4524.  The publication explained that "[t]he remaining 5.5% consists of closely related isomers produced during synthesis." Appx4524-4525.  Hirsch Industries later determined that the same lot of ISB

*Confidential Material Redacted*

actually contained only ███ ISB and ███ "other organics."  Appx4727-4728.

Dr. Hirsch reported this finding to the FDA through a letter dated June 8, 1990,

assuring the FDA that Hirsch Industries remained "committed to conduct studies

designed to identify and/or remove the organic compound" found in the ISB

product and welcomed the FDA's "advice as to the best approach to achieve this."

Appx9-10; Appx4729.  However, because of the process used, Hirsch was unable

to further remove the organic impurities in the ISB.

### B.    Lymphazurin® Shortages

Hirsch Industries, and its successors-in-interest U.S. Surgical, Tyco

Healthcare, and later Covidien, held the original NDA for the ISB 1% injectable

solution and were the sole suppliers of Lymphazurin® in the United States until

2011.  Appx209, ¶ 11; Appx4309, ¶¶ 92,105; Appx4779.

For about 26 years following the FDA's approval of Lymphazurin®, Sigma

supplied Hirsch Industries and its successors-in interest with ISB.  Appx4757;

Appx4688-4689; Appx4309, ¶¶ 96-97.  Sigma did not manufacture the ISB itself,

but sourced the material from other API suppliers that proved to be unreliable.

Appx4757; Appx4688.   Before 2006, Sigma obtained crude ISB from Allied

Chemical.  Appx4310, ¶¶ 100-102.

In 2006, Covidien who was now supplying Lymphazurin®, sent a letter to

its customers explaining that due to ***manufacturing issues*** from key vendors their

supply of Lymphazurin® was "***completely out***." Appx12; Appx4311, ¶¶ 103-104; Appx4777. Sigma, who supplied Covidien with their ISB API, had completely run out of their crude ISB inventory synthesized by Allied Chemical (a company no longer in business). Though Sigma was unaware of how Allied Chemical manufactured the crude ISB, analysis revealed numerous impurities including "high levels of lead," which Sigma presumed was a result of the manufacturing process. *See* Appx10; Appx4757.

In 2008, after more than five years of seeking to locate and qualify new suppliers, Covidien informed its customers that the FDA had approved a new source for raw material and a new process to refine the crude material, but that the price of ISB would be considerably higher to reflect the modifications. Appx10-11; Appx4311, ¶ 105; Appx4779; Appx4757. However, Covidien's supply issues continued as ███████ failed to provide ISB that met DMF specifications. Appx4311-4312, ¶¶ 108-111; Appx4781 ███████ has been extremely unreliable and they have managed to do only one thing consistently - be inconsistent!!!"). For example, as recently as 2009, production batches of ISB manufactured and declared passed at ███████ failed to meet specifications for heavy metal content and had "recurring issues with high [copper, tin and lead] which [had] not been resolved despite numerous attempts to do so." Appx10-11; Appx4786. Because "███████ . . . [had] consistently failed to deliver in

specification material for 12 months," Sigma was unable to meet the large and growing demand for ISB. Appx4786. At one point, "the commercial product [Lymphazurin®] was a month away from going off the market," which "would have affected 1000's of patients worldwide!" Appx4781. Covidien eventually discontinued selling Lymphazurin® in September 2012. *See* Appx5849.

### C.    Apicore Developed a Better ISB

Apicore was founded in 2003, and with six employees by 2004, almost immediately began developing an improved process for synthesizing ISB to address the critical shortage in the United States. Appx11; Appx4810-4820. At the time, Covidien was the sole provider of Lymphazurin® 1%, but as discussed above, it repeatedly failed to meet market demand for the product due (in part) to difficulties in synthesizing and obtaining high purity ISB.

Given that the ISB API was known to be difficult to make—let alone at a purity sufficient for pharmaceutical use—Apicore spent close to three years researching and developing an improved process for synthesis to obtain highly pure ISB API. Appx188; Appx3617-3618, ¶¶ 8-9. Apicore eventually succeeded in inventing a process that reliably and consistently yielded high purity ISB API.

In September 2004, Apicore partnered with Synerx via an exclusive supply agreement to develop and market a high-purity generic version of Lymphazurin®. Appx11; Appx188-189; Appx849-852. The FDA approved Synerx's ANDA

application in July 2010.   Appx12; Appx854-888; Appx890.   Mylan acquired Synerx in 2011, and incorporated Apicore's API into a high purity ISB injection 1% product ("ISB Product") that it packages and sells.   Appx188-189.   A significant portion of Apicore's revenue since 2011 has come from its ISB API sales to Mylan.   Appx12; Appx188-189; Appx7630-7632, ¶¶ 11-15.   Mylan is also the exclusive licensee of the Asserted Patents.   Appx188-189.

During the same period, Covidien's Lymphazurin® experienced several product shortages precipitated by its inability to reliably obtain ISB API, prompting Covidien to withdraw Lymphazurin® from the market by September 2012.   Appx895; Appx4777; Appx4779; Appx7630-7632, ¶¶ 11-15.   Upon Covidien's exit from the market, Mylan became the sole supplier of ISB 1% injectable product.   That was the status quo until March 2016, when Aurobindo entered the market using Apicore's patented technology without authorization.   Appx433, ¶ 23.

## D.   The Asserted Patents

The Asserted Patents explain that existing methods of synthesizing ISB used hazardous oxidizing agents resulting in lower purity product, giving rise to a need for a method of synthesizing high-purity ISB suitable for use in pharmaceutical formulations.   *See* Appx166, 1:63-2:14.   Apicore spent close to three years carefully selecting, evaluating, and modifying the possible reagents and precise

reaction conditions necessary for synthesizing high-purity ISB API.  Appx190-191; Appx3617-3618, ¶¶ 8-9.  Apicore finally solved the ISB shortage problem by developing a novel process that consistently produces a highly pure form of ISB API.  Appx190-191.  Apicore's novel process was superior to anything in the prior art, in part due to the lack of impurities in the final product.  Apicore disclosed its inventions in its '291 patent application that matured into the '992, the '616, and the '050 patents.  Appx191.  All three patents claim priority to the '291 application filed in 2007.  *See* Appx150, 1:5-10; Appx158, 1:5-15; Appx166, 1:5-15.

The Asserted Patents claim both methods of synthesizing ISB and a high-purity form of ISB.  The '992 and '616 patents claim processes in which an isoleuco acid is reacted in a polar solvent with silver oxide to form ISB acid, which is then treated with a sodium solution to form ISB.  Appx163, 9:38-64.  The '992 patent claims recite a more specific process in which the isoleuco acid is combined with 2.0 to 3.0 equivalents of silver oxide.  Appx154, 9:44-65.  The '050 patent claims ISB "having a purity of at least 99.0% by HPLC" (Appx170, 9:54-57), and solutions and compositions containing the high-purity ISB (Appx171, 12:8-12.)

### E.    Aurobindo's ISB Product

Aurobindo Pharma, Ltd. is an Indian corporation headquartered in Andhra Pradesh, India (Aurobindo India).  Appx9004; Appx9001, ¶ 5.  Aurobindo Pharma USA Inc. and AuroMedics Pharma LLC are Delaware corporations and wholly-

owned subsidiaries of Aurobindo India. Appx9005; Appx9001, ¶¶ 3-4. Sometime after the USPTO published Apicore's '291 application, Aurobindo sought FDA approval for a generic ISB product. *See* Appx4623. Aurobindo informed the FDA that, after having studied a "number of patents" describing processes for manufacturing ISB, Aurobindo had selected the methods described in Apicore's '992 patent and another patent. *See* Appx4623. Aurobindo further informed the FDA that it "considered the process described in [the '992] patent for the initial sample preparation and further, the optimization of the process." *Id*.

On February 2, 2016, the FDA approved Aurobindo's ANDA to market its ISB product (Appx897), and Aurobindo publicly announced its intent to sell the product within the United States beginning in March 2016. Appx9011. Thereafter, Aurobindo began manufacturing its API and importing and selling its ANDA product incorporating the ISB API in the United States. Because Aurobindo copied Apicore's invention, Aurobindo's ISB API and ANDA product both had purity greater than 99% as measured by HPLC. *See* Appx182; *see also* Appx243-245.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion by entering a preliminary injunction. The district court did not make any clearly erroneous factual findings because none of the material facts is in dispute. Similarly, the district court's legal

analysis correctly followed the precedent established by this Court. Importantly, Aurobindo does not contest the validity of the '992 and '616 patents or infringement of the '050 patent. Aurobindo must therefore prevail on both their non-infringement and invalidity arguments to prevail.

Aurobindo argues that the district court erred in finding no substantial question regarding noninfringement of the '992 and '616 patents. But "it is undisputed that Aurobindo's process performs every step and includes every element recited in claim 1 of the '992 and '616 patents except silver oxide." Appx4; Appx27. The district court correctly found that Aurobindo's use of manganese dioxide is equivalent to silver oxide and correctly rejected Aurobindo's arguments to the contrary. Appx17-20; Appx26-30. The district court found that Aurobindo's manganese dioxide functioned to oxidize the leuco intermediate to ISB in substantially the same way as the claimed silver oxide, to achieve substantially the same result of obtaining ISB that could be purified to 99% as measured by HPLC.

Aurobindo next contends that the district court erred in finding no substantial question concerning validity of the '050 patent. However, based on a thorough review of the prior art and live testimony from both parties' technical experts, the district court properly held that the numerous prior art references presented by Aurobindo overwhelmingly suggests that those skilled in the art were

unable to achieve the ISB purity claimed in the '050 patent. Accordingly, the district court concluded that there is not a substantial question regarding validity of the '050 patent. *See* Appx32-53. Aurobindo's additional arguments predicated on the unsubstantiated premise that Sigma possessed ███ pure ISB in March 2001 are refuted by documents that the district court found clearly showed that the purity by HPLC *for the same lot* was lower than ███ in 1995 ███ and 2003 ███. Appx4356-4360, ¶¶ 238-239.

Aurobindo further contends that the district court incorrectly found a causal nexus between Aurobindo's infringement and Appellees' demonstrated harm. As the district court explained, however, Aurobindo's causal nexus arguments are largely irrelevant for the accused ISB product. Appx5. This is at least because, absent infringement of the Asserted Patents, Aurobindo would not have been able to either manufacture sufficiently pure ISB or obtain FDA approval. *See* Appx5; Appx55-56. Thus, the district court's conclusion of a direct nexus between the infringement and the harm is sound.

Lastly, Aurobindo's complaint that Appellees did not establish irreparable harm is without merit as the district court identified hallmark examples of irreparable harm that were demonstrated by the record, including lost sales, lost research and development opportunities, price erosion, and the fact that Apicore must now directly compete with an infringer. Appx53-55.

In short, the district court did not abuse its discretion in weighing the relevant factors and deciding that a preliminary injunction order was proper under these circumstances. This Court should affirm the district court's order as it is fully consistent with this and other courts' recent decisions on similar facts.

## STANDARD OF REVIEW

On appeal, procedural issues are governed by Fifth Circuit law, while substantive issues of patent law are governed by this Court's precedents. *Trebro Mfg., Inc. v. FireFly Equip., LLC*, 748 F.3d 1159, 1165 (Fed. Cir. 2014). The factors to consider when deciding whether to issue a preliminary injunction are well-known: (1) likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. *Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir. 1991)*; Abbott Labs. v. Andrx Pharms., Inc.,* 473 F.3d 1196, 1200-01 (Fed. Cir. 2007) (quoting *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1338-39 (Fed. Cir. 2003)).

To prevail on appeal, Aurobindo must show that the district court abused its discretion in issuing the preliminary injunction order. *Celsis in Vitro, Inc. v. CellzDirect, Inc.,* 664 F.3d 922, 925 (Fed. Cir. 2012)*; Lakedreams,* 932 F.2d at 1107. "Abuse of discretion is established by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based

-15-

upon an error of law or clearly erroneous factual findings." *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1345 (Fed. Cir. 2008) (internal citations omitted).

In the Fifth Circuit, if an appellant asserts an argument on appeal that was not in the appellant's objections to a magistrate judge's report and recommendation, then that argument is subject to a heightened standard of review of "plain error" on appeal. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc). This "plain error" standard is applicable even if the argument on appeal involves pure issues of law. *Id.* "Plain error" has been described as the equivalent of "manifest injustice." *Id.* at 1428.

## ARGUMENT

This Court should affirm the district court's preliminary injunction because the district court's order is not an abuse of discretion, or based on any clearly erroneous factual findings. The district court did not commit plain error with respect to issues not raised in Appellants' objections, including finding that the '050 patent was not indefinite. This is shown by the district court's well-reasoned application of the four-factor test for issuing a preliminary injunction. The record evidence established that Aurobindo not only infringed all three of the Asserted Patents, but as the district court concluded Aurobindo had copied them: "Aurobindo was aware of Apicore's process, and Aurobindo copied it." Appx56.

Aurobindo's mischaracterization of the prior art does not support a contrary conclusion or demonstrate any clear error by the district court. Similarly, Aurobindo's misstatement of the law concerning causal nexus was twice shown to be inapplicable and Aurobindo has not identified any new or contrary precedent that would compel a different result here.

## I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION AND CORRECTLY DETERMINED THAT APPELLEES ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    The District Court Correctly Found That the '992 and '616 Patents Are Likely Infringed.

The district court's factual finding that Aurobindo likely infringes the '992 and '616 patents under the doctrine of equivalents is well supported by the evidence. Infringement under the doctrine of equivalents is a question of fact that this Court reviews for clear error. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1311 (Fed. Cir. 2015). The '992 and '616 patents claim processes in which an isoleuco acid is reacted in a polar solvent with silver oxide to form ISB acid. The district court explained that "it is undisputed that Aurobindo's process performs every step and includes every element recited in claim 1 of the '992 and '616 patents except silver oxide." Appx4; Appx27; Appx582-586. Based on extensive expert testimony, the district court determined that Aurobindo's use of manganese dioxide would likely be found to be equivalent to the claimed silver oxide. *Id.* Moreover, the district court found Aurobindo's arguments to the contrary

unpersuasive and correctly found that Aurobindo's use of manganese dioxide performs the same function, in the same way, to achieve the same result as the claimed silver oxide.  Appx29-30; Appx236, ¶ 46; Appx4.

Aurobindo concedes the district court's finding that the function of its manganese dioxide is the same as the function of the silver oxide in the patented inventions and instead contends that the district court erred in analyzing the "way" and the "result."    AB Br. 23.    Specifically, Aurobindo argues that (1) its manganese dioxide oxidizes ISB in a substantially different "way" because manganese dioxide is purportedly a stronger oxidizing agent than silver oxide, and (2) the "results" are different because the district court allegedly confused "yield" with "purity."  *Id*. at 23, 26.  Both of these arguments lack merit.

As an initial matter, the record evidence established that both manganese dioxide and silver oxide are non-hazardous metal oxides that act as a proton donor in the presence of a polar solvent.  Appx4292, ¶ 44.  Moreover, under the reaction conditions employed by Aurobindo's manufacturing process both the manganese dioxide and the silver oxide of the claims act as a mild oxidant to oxidize the reaction intermediate into the final ISB dye which can be purified to high purity (99% by HPLC).  Appx236, ¶¶ 44-46; Appx7288-7289, 98:19-99:08.

1.    **The District Court's Factual Finding that Aurobindo's Manganese Dioxide Oxidizes the Isoleuco Acid in Substantially the Same Way as the Claimed Silver Oxide Is Not Clearly Erroneous.**

The district court fully considered Aurobindo's argument with respect to the oxidative strength of manganese dioxide, but found the "differences are irrelevant under the function-way-results test as applied to the face of the claims." Appx28.[1] The court properly rejected Aurobindo's noninfringement argument finding that it relied on the "unstated premise that the '992 and '616 patent claims are limited to mildly oxidizing the isoleuco acid to isosulfan blue acid."  Appx29-30.   The district court further recognized that "claim 1 of the '992 and '616 patents does not specify how weak or strong the oxidation step must be," (Appx28), and that "[t]here is no dispute that manganese dioxide converts the isoleuco acid to isosulfan blue acid in Aurobindo's accused process."  Appx29.   Thus, the district court correctly found that "Aurobindo's manganese dioxide is equivalent to silver

---

[1] Aurobindo also raises a prosecution history disclaimer argument, asserting that the district court erred by not finding that Apicore disclaimed "the use of an acid along with an oxidizing agent to oxidize isosulfan blue" in distinguishing the Kulkarni reference to the examiner.  AB Br. 23-24; *see also* Appx833-838.  The district court considered Aurobindo's argument, and correctly held that there was no issue regarding disclaimer because Kulkarni's process involved a harsh oxidizing agent and concentrated sulfuric acid, i.e., a strong acid.   Appx17; Appx4318-4319, ¶¶ 125-126; *see also* Appx7334-7335, 144:05-145:18.  The court decided that, because Kulkarni did not involve the use of a weak acid, Apicore's prosecution statement was not referring to a weak acid when describing the 'acid' of Kulkarni.  Appx16.

oxide under the function-way-results test, given the scope of the claims on their face." *Id.*; Appx236, ¶¶ 44-46; Appx7288-7289, 98:19-99:08.

Aurobindo cites to *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1018 (Fed. Cir. 2006) for the proposition that the district court erred in finding oxidant strength to be unrelated to the analysis. *See* AB Br. 25. Aurobindo is incorrect for two reasons. First, the decision in *DePuy Spine* concerns the all-elements rule—where the theory of equivalence would entirely vitiate or remove a particular claim element. That is not this case here because, as Aurobindo concedes, oxidant strength is not a claim limitation. AB Br. 25. Second, contrary to Aurobindo's assertion, the district court did in fact specifically consider the oxidant strength issue and concluded that even if the claims were *limited* to a mild oxidant as Aurobindo alleges, "manganese dioxide is a mild oxidant equivalent to silver oxide *in the context* of the '992 and '616 patents." Appx30 (emphasis added). In so finding, the district court correctly credited the testimony of Appellees' expert that the relative oxidative strength of a particular agent depends on the specific reaction in question. Appx30; Appx236, ¶ 46; Appx7443-7445, 253:9-255:25. In fact, Aurobindo's own expert agreed that under the conditions of Aurobindo's process, the oxidation potency of manganese dioxide approaches that of silver oxide. Appx7443-7445, 253:9-255:25. Thus, Aurobindo has not demonstrated any clear error by the district court.

### 2. The District Court's Factual Finding That Manganese Dioxide in Aurobindo's Process Leads to the Same Result as the Claimed Silver Oxide Is Not Clearly Erroneous.

Aurobindo's argument that the district court confused "yield" with "purity" is simply wrong. AB Br. 26. It is beyond dispute that Aurobindo's manufacturing process produces ISB with a purity of greater than 99% by HPLC. *See e.g.*, Appx31; Appx7217, 27:10-12 (counsel for Aurobindo admitting that the "solid isosulfan blue API that Aurobindo makes, is 99 percent" pure). In fact, Aurobindo's own expert testified at the hearing that Aurobindo's manganese dioxide "reaction produces a relatively pure form of isosulfan blue." Appx7442, 252:12-13.

With respect to Aurobindo's argument based on the oxidation strength of manganese dioxide, the district court correctly determined that because silver oxide and manganese dioxide produce similar yields, their oxidative strengths were also likely equivalent. Appx30. The district court then cited Aurobindo's Indian patent application disclosing that manganese dioxide provides a 66.93% yield of ISB while embodiments described in the '992 and '616 patents demonstrate similar yields ranging from 65 to 70%. Appx30; Appx237, ¶ 49; Appx154, 9:22-24. The court's order demonstrates no confusion between "purity' and "yield" whatsoever. After a thorough analysis, the district court concluded that Aurobindo's manganese dioxide produced similar *purities* of ISB, and further correctly concluded that

Aurobindo's use of manganese dioxide met all of the limitations of the function-way-result test. *See* Appx237, ¶¶ 48-49.

Aurobindo's reference to the prosecution history misses the point. During prosecution, the patentee indicated that an embodiment of their invention achieved an ISB crude yield of 60% having a purity of 86.36%, which was higher than that of the prior-art process, which resulted in 42% yield having a purity of 79.68%. Appx641. While increased yield may be beneficial, the "results" under the doctrine of equivalence analysis relates to the ISB purity and not the yield.

The district court demonstrated a clear understanding that "purity" is the proper metric to compare the results under the doctrine of equivalents analysis, recognizing that the patented process avoids the use of toxic heavy metals and produces a crude ISB that ***can be purified*** to exceptional levels. Appx19; Appx150, 2:7-17. Aurobindo's claim that they do not infringe because they have "5-10% impurities" present "***before*** purification" ignores the final purification step described in the '992 and '616 patents after which they achieve greater than 99% purity by HPLC. *Cf.* AB Br. at 27 (emphasis supplied). In contrast, the prior art ISB sold by Allied Chemical and initially made by Dr. Hirsch contained significant impurities that ***could not be removed*** despite best efforts and thus was incapable of being purified to greater than 99% as measured by HPLC. Appx9; Appx4524. The district court ultimately determined that Aurobindo's use of the patented

process was necessary for Aurobindo's success in synthesizing ISB with the claimed purity. Appx55. Accordingly, the district court correctly concluded that the result from Aurobindo's use of manganese dioxide was the same as silver oxide (each resulting in crude ISB that can be purified to high purity unlike the prior art). Appx29. Aurobindo has not demonstrated any clear legal or factual error in the district court's analysis or conclusions.

### 3. The District Court Correctly Found That Application of the Doctrine of Equivalents Does Not Ensnare the Prior Art.

The Court should reject Aurobindo's assertions of ensnarement because not a single reference in the past 30 years disclosed use of manganese dioxide for oxidizing the leuco intermediate of ISB. *See* AB Br. 28; Appx235, ¶42; Appx239-240, ¶¶ 55-58.

"Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009). To determine ensnarement, a court first constructs a hypothetical claim that literally covers the accused process. *Id.* at 1324. Next, the court assesses the prior art introduced by the accused infringer and determines whether patentee "carried its burden of persuading the court that the hypothetical claim is patentable over the prior art." *Id.* at 1325. "Ultimately, '[i]f such a claim would be unpatentable under 35 U.S.C.

§§ 102 or 103, then the patentee has overreached, and the accused device is noninfringing as a matter of law." *Id.*

Here, Aurobindo constructs a hypothetical claim that literally covers manganese dioxide—the oxidant used in the accused process—and asserts that it would have been obvious in light of Newton, Kulkarni and the '558 patent's teachings. AB Br. 28-29. This is a new argument. In previously objecting to the magistrate judge's analysis of ensnarement in the R&R, Aurobindo did not seek to combine Newton and Kulkarni, but only mentioned the '558 patent. Appx7502-7503. Accordingly, a higher standard of plain error applies to this new argument and combination. *Douglass*, 79 F.3d at 1430

The district court did not commit plain error when it held that Aurobindo's expert provided no evidence of any motivation to combine these references. Appx18-19. Instead, the district court found Aurobindo merely listed off "numerous references that disclose various triarylmethane dyes and oxidizing agents without explaining through expert testimony or otherwise how a person of ordinary skill in the art would have arrived at the claimed invention." Appx18-19. The district court further held that because these references described a large number of different oxidizing agents and unrelated triarylmethane compounds, Aurobindo's arguments incorrectly assumed that a POSA would be motivated to combine a process disclosed in one of the references with a completely unrelated

reference that disclosed ISB.  Appx19; *see also* Appx4307-4308, ¶ 90; Appx4419, 102:6-18 (Dr. Brown admitting that the family of triarylmethane dyes includes a large number of different compounds and that such dyes are not interchangeable because the different structures of the triarylmethane dyes means that they constitute different chemical substances with different properties).

Aurobindo's technical expert also admitted that none of the cited references described the use of manganese dioxide to synthesize ISB.  Appx4431, 152:1-6. Without citing to any support, Aurobindo's expert opined that a POSA would be motivated to "try different oxidizing agents to see if any performed better," but the district court correctly recognized that this testimony—to the extent it suggested a motivation at all—referred to the motivation to try silver oxide, not manganese dioxide.  Appx18; Appx1412, ¶ 80.

In sum, Aurobindo has not shown that the district court abused its discretion in finding that Aurobindo failed to raise a substantial question as to infringement of the '992 and '616 patents.

### B.    The District Court's Finding That There Was No Substantial Question as to the Validity of the '050 Patent's Claims Is Not Clearly Erroneous.

Aurobindo improperly reverses its burden arguing that Appellees failed to show that no substantial questions exist as to the validity of asserted claims of the '050 patent.  AB Br. 30.  In any event, Aurobindo's argument is factually baseless.

-25-

A patent is entitled to a presumption of validity, which may only be overcome by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). This presumption applies through all stages of litigation including "during preliminary injunction proceedings." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). Aurobindo did not raise a substantial question as to the validity of the '050 patent. Aurobindo failed to demonstrate the *prima facie* obviousness of any claim of the '050 patent, and even if it had, Appellees presented substantial evidence of secondary considerations that establish nonobviousness. Aurobindo now asserts that the '050 patent's claims are rendered obvious by (1) public use of, and publications relating to, Lymphazurin®, (2) a combination of Hirsch 1982 and other prior art, (3) Sigma's unpublished documents and, (4) experiments from the inventors own lab notebook. AB Br. 32. None of these arguments have merit.

### 1.    The District Court Correctly Found That Lymphazurin® and Hirsch 1982 Do Not Render the '050 Patent Obvious.

The fact that Aurobindo's expert relied on eleven references at the hearing to cobble together an obviousness position only highlights the difficulties and challenges associated with synthesizing and purifying ISB. Appx1427-1434; Appx4336-4346, ¶¶ 175-208. Aurobindo's brief further obfuscates the fact that each triarylmethane dye is unique and has its own challenges with purification.

Appx4346-4347, ¶ 209.   Aurobindo incorrectly assumes that because certain techniques were successfully used on a non-analogous compound, that same technique will be successful for ISB.   *See* Appx4346-4347, ¶ 209.   That is not the case though.

For example, Aurobindo argues, absent any evidentiary support, that it would have been obvious to purify Lymphazurin® or the ISB described by Hirsch 1982 to the claimed 99.0% purity. AB Br. 33, 39-41.   This argument suffers from a critical deficiency though because Aurobindo cites no evidence that the ISB described by Hirsch 1982 could be further purified.   Indeed, Aurobindo's own expert acknowledged that despite 30 years of interest in obtaining purer ISB, no one was able to do it. Appx7441, 251:8-21; Appx4465, 286:29-287:9.   As an initial matter, Hirsch 1982 does not provide any information with respect to how the ISB sample was synthesized, the types of impurities present (only confidential documents revealed that it was organically related impurities that could not be removed), or whether the indicated purity was even reproducible.   Appx4347, ¶ 210.   Moreover, the impurity level of the dyes in Hirsch 1982 differ dramatically from those of the '050 patent.   Appx4266-4267, ¶87.   Even Aurobindo's expert agreed that the purity in Hirsch could in fact be lower than the stated 94.5% purity. Appx4408-4409, 60:23-61:5.   Because ISB is difficult to synthesize, and has a unique impurity profile, a POSA would not have any expectation of succeeding in

producing ISB of at least 99% purity as measured by HPLC.  Appx4351, ¶ 225.  In fact, as noted above, even as recently as 2009—seventeen years later—drug companies such as Sigma were still unable to purify ISB to the claimed purity levels.  Appx4347, ¶ 210; Appx4351, ¶ 225.

The district court correctly credited the testimony of Appellees' expert and held that, even assuming a POSA would have been motivated to purify existing ISB, the state of the art was such they would not have any expectation of success in doing so.  Appx44.  Contrary to Aurobindo's suggestion, Appellees did not merely purify Lymphazurin® and file a patent application.  Rather, they developed a novel process of synthesizing ISB that lent itself to obtaining the high purity claimed in the '050 patent.  Aside from the fact that the novel process produces a high purity product, it also avoids harmful chemicals used in the prior art and avoids the unreliable processes that plagued Lymphazurin® and caused supply shortages.  Appx4311-4312, ¶¶ 103-10.

Aurobindo misreads *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301-02 (Fed. Cir. 2007) in asserting that Appellees' inventions are not patentable over Lymphazurin® because they are purportedly only a purer form.  AB Br. 40.  Contrary to what Aurobindo suggests, *Aventis* does not hold that claims to purity are invalid absent evidence of a "difference in kind."  *Aventis*, 499 F.3d at 1301-02.  Instead, this Court has repeatedly held that a purified compound

is not *prima facie* obvious over the mixture where "the state of the art [is] such that discovering how to perform the purification is an invention of patentable weight in itself." *Id.* at 1301; *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1269 (Fed. Cir. 2007) (affirming finding that purified mixture was non-obvious based upon, *inter alia*, evidence showing difficulty in purification).

### 2. The District Court Correctly Found That no Prior Art Combination Renders the Claims of the '050 Patent Obvious.

Aurobindo claims one could purify prior art ISB with conventional purification techniques to at least 99% purity. AB Br. 33. This is despite the fact that no one was able to, or did it, for over 30 years. Appx7441, 251:8-21. Aurobindo's assertion further ignores the fact that each triarylmethane dye is unique and has its own challenges with purification. App4346-4347, ¶ 209. Aurobindo incorrectly assumes that if a certain purification technique successfully purifies a non-analogous compound, that the same techniques would be successful for ISB. App4346-4347, ¶ 209. Aurobindo's unstated assumption is that any compound can be purified using off-the shelf techniques and thus no method for arriving at a highly purified compound is ever patentable. But, if purification were so simple and nonspecific, there would be no reason to continue to perform research and develop new techniques. App4346-4347, ¶ 209. Contrary to

Aurobindo's assumption, purification procedures do not abide by a one size fits all model and must be individually developed for each specific synthetic molecule in a mixture. Appx4348-4349, ¶¶ 212-215.

The district court methodically evaluated each argument with respect to alleged combinations and found that the prior-art ISB contained closely related isomers "that made purification to highly-pure levels troublesome." Appx44-46; Appx166, 2:8-19. Aurobindo's heavy reliance on De Haen[2] (Appx1138-1154) and Snyder (Appx1310-1339) (AB Br. 33-34, 36-38) ignores the district court's finding that "the success of HPLC and separation methods in general depends not only on the particular compound but also the mixture in which the compound is present." Appx46. As the district court recognized, for a "complex mixture, repeated chromatography will increase the overall purity, but only relative to the impurities for which there is good separation." Appx45-46; Appx4349, ¶ 218.

Aurobindo cherry-picks language from Snyder and other art (*see* AB Br. 36-38), yet fails to disclose that the district court considered those references in depth. Snyder is a general text regarding the practical aspects of preparative HPLC; it does not provide any specific applications, it neither discloses nor discusses ISB,

---

[2] In objecting to the R&R, Aurobindo did not rely on De Haen, but instead relied on Hirsch 1982 and Snyder. Arguments relating to De Haen should therefore be held to the higher plain error standard on appeal.

nor does it teach a POSA how to purify a mixture containing ISB with closely related isomers. *See* Appx45-46; Appx1337 ("[T]his chapter is not intended as a detailed guide for the design of process-scale separations."). Likewise, De Haen does not mention ISB or how to purify a sample of ISB containing closely related isomers and unknown organic impurities.

Furthermore, in choosing a purification method one must consider other factors such as yield and throughput that can negatively affect drug purity. Appx4348-4351, ¶¶ 215-25. The district court properly found (in accord with Appellees' expert) that at least because of the cost of decreased yield, it would not have been obvious to try preparatory HPLC on a mixture of ISB and its isomers. Appx46; *see also* Appx4340, ¶ 188. Besides the fact that Aurobindo did not present any motivation to combine the random disclosures of the 11 cited references, Aurobindo also failed to proffer any evidence supporting any expectation of success. The district court found that although the prior art generally taught that HPLC could be used to purify compounds, prior- art methods used specifically for ISB synthesis resulted in particularly crude mixtures that made purification to highly-pure levels troublesome, as the crude mixture contained closely related isomers that would co-elute from the HPLC column, at the same time. Appx46. As such, a POSA would not have tried preparatory HPLC

on a mixture of ISB and its isomers and "certainly not with an expectation of success." Appx46.

The district court did not abuse its discretion in applying this Court's precedent to find that Lymphazurin® and ISB described by Hirsch 1982 do not render the '050 patents' claims obvious.

### 3. The District Court's Finding That the Patentee's Inventor Notebook Did Not Demonstrate Obviousness Is Not Clearly Erroneous.

Aurobindo presumptuously argues that the patentee's lab notebook depicting use of conventional purification techniques to purify prepared ISB samples is somehow evidence that a POSA would possess a reasonable expectation of success in purifying the prior art ISB. AB Br. 35; *see also* Appx7317, 127:3-21. As attested to by Appellees' expert, the lab notebook described the early inventive process using novel combinations of reagents at precise amounts and temperatures to achieve the synthesis and desired purity, but it neither "obviate[d] the problem of hazardous oxidizing agents" nor "negate[d] concerns associated with heavy metal impurities." Appx7304-7305, 114:21-115:5; Appx7312, 122:10-17; Appx7317, 127:3-21. Aurobindo apparently intends to rely on the inventors' path to discovery solely in the hope of showing obviousness. That is legally impermissible: "Patentability shall not be negated by the manner in which the invention was made." 35 U.S.C. § 103. Validity is judged solely from the

*Confidential Material Redacted*

perspective of a hypothetical "person of ordinary skill in the art," not the inventor's perspective. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012); *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309-10 (Fed. Cir. 2015). That the patentee was able to purify the ISB samples synthesized through their own early experiments does not suggest that a POSA would have been able to purify Lymphazurin® made by a completely different process.

Properly rejecting Aurobindo's argument, the district court found that "[o]ther than the Apicore inventors' own disclosure, there is no evidence in the record suggesting that isosulfan blue purity was affected by the way in which the isoleuco acid is oxidized to form isosulfan blue acid" and that Aurobindo's improper assumption constituted "hindsight of the worst kind, 'wherein that which only the invention taught is used against its teacher.'" Appx19 (citing *Sci. Plastic Prod., Inc. v. Biotage AB*, 766 F.3d 1355, 1362 (Fed. Cir. 2014)).

### 4. The District Court's Findings That the Claims of the '050 Patent Were Not Anticipated or Obvious in View of Sigma's ISB Are Not Clearly Erroneous.

Aurobindo's allegation that Sigma had an ISB product that anticipated the "asserted claims of the '050 patent" is unsupported, and in fact is contradicted, by the Sigma documents. *Contra* AB Br. at 43. The Sigma documents in fact demonstrated that Sigma was unable to purify ISB beyond ██ before Apicore conceived the patented invention. Appx4351, ¶ 226.

**Confidential Material Redacted**

Aurobindo's premise that Sigma "possessed" ISB allegedly having "▮▮▮

purity" prior to the invention date by Apicore (*contra* AB Br. at 42) is conclusory

attorney argument based on an incomplete, uninformed, and misleading reading of

the Sigma documents.   Appx4331-4334, ¶¶ 164-168.   Aurobindo provided zero

evidence by way of testimony or references to a printed publication or public sale

by Sigma to support its allegations.   Notably, Aurobindo did not offer any expert

or fact testimony on any of the Sigma documents and made only conclusory

assertions contradicted by the evidence of record.   As a result of Aurobindo's

failure of proof, the district court's factual findings with respect to the Sigma

documents were based on unrebutted testimony from Appellees' expert.   Appx34;

Appx3195-3211; Appx7275-7280, 85:22-90:23; Appx7283-7286, 93:23-96:07.

Even though Aurobindo failed to make the prerequisite showing that the

Sigma document was a printed publication, (Appx33), the district court

nonetheless considered it and found that it "suffered two critical shortcomings."

Appx34-35; Appx4351-4353, ¶¶ 227-229.   First, the document did not explicitly

refer to ISB, but rather to Patent Blue Violet, an ambiguous name used by Sigma

that could have referred to a dye that was structurally different.   Appx34-35;

Appx4351-4353, ¶¶ 227-229 (stating that the Sigma catalog provides "isosulfan

blue" as the proposed USAN names for "P1888" and "P4125" (Appx3172) and

lists as "Patent Blue Violet" two other chemical dyes "P6671" (CAS number 3536-

*Confidential Material Redacted*

49-0) and "P6396" (CAS number 129-17-9) (Appx3180-3187)); *see also* Appx7275-7280, 85:22-90:23 (explaining that Sigma sold at least three different compounds under the name of patent blue violet).

Second, Aurobindo's allegation that Sigma possessed ISB that was ███ pure in March 2001 was contradicted by documents that clearly showed that the purity by HPLC *for the same lot* was much lower.  Appx4356-4359, ¶ 238; *Contra* AB Br. 43.  In rejecting Aurobindo's argument, the court observed that Lot number "112F5011" identified in the Certificate actually corresponded to a reference standard that Sigma analyzed annually.   The district court found that other certificates for the same Lot "reported purity levels no higher than ███ ." Appx35; *see also* Appx7283-7286, 93:23-96:07 (explaining that the particular ███ value on which Aurobindo relies on was completely inconsistent with other information). As a general matter, references to the same lot number indicate the same samples. Appx4365-4366, ¶¶ 253-255.  Further, as a sample is subject to degrade over time, a POSA would expect the measured purity to decrease or at best stay the same on subsequent measurements.  Appx4360, ¶ 240.

In addition, there were numerous questions of reliability and authenticity associated with the document itself—for example, the certificate of analysis for the 2001 test stated on its face that it was signed on "Tuesday, August 23, 2016." Appx4365-4366, ¶¶ 253-55.  Therefore, a POSA reviewing the 2001 certificate of

*Confidential Material Redacted*

analysis (*see* Appx4360-4362, ¶¶ 240-42; Appx3195) would not believe that the sample actually had a purity of ███ by HPLC or that the reported result was reproducible.  Based on these critical facts, the district court correctly held that the Sigma documents did not raise a substantial question as to validity of the '050 patent.

> **5.    The District Court Correctly Found That Secondary Considerations "Overwhelmingly Weigh" Against Obviousness.**

The district court also concluded that Aurobindo's obviousness arguments were overcome by objective considerations that "*overwhelmingly* weigh against a finding of obviousness."  Appx53 (emphasis added).  The district court considered evidence of long-felt but unresolved need, commercial success, copying and praise of others, as well as unexpected results.  Appx47-52.  Aurobindo does not acknowledge or reference many of these secondary considerations at all and devotes just one paragraph of its brief to asserting an alleged lack of long-felt need. AB Br. 39.

First, Aurobindo ignores the fact that for many years there was a long-felt need resulting from repeated shortages by Covidien and failure of its main supplier to reliably provide ISB API.  Appx4367-4370, ¶¶ 259-276; Appx47-52.  For 30 years, manufacturers had trouble maintaining supply and meeting purity demands for ISB, and the district court found that the purity problems may have been

associated with the oxidation method used during synthesis. Appx48; Appx4367-4372, ¶¶ 259-285 (stating that a review of Sigma documents (Appx4786; Appx5810; Appx5836-5842), Hirsch 1982 (Appx844-847), and Covidien's failure to supply (Appx4777; Appx5849) all lend credence to this consideration); Appx4429, 141:21-142:25.

The FDA's approval of Mylan's ISB product resulted in the availability of ISB to a greater number of patients whose needs would otherwise not have been met. Appx4267, ¶ 89. Starting with an API of higher purity provided Appellees a major advantage during drug formulation and FDA approval process. This advantage was demonstrated when Aurobindo copied the patented invention and touted the benefits of its reliable supply to its customers. *See, e.g.,* Appx4375-4377, ¶¶ 299-305; Appx4266, ¶ 86; Appx51-52.

The district court further determined there was "significant evidence that the purity levels achieved by the claimed invention were unexpected" and thus unexpected results weighed against a finding of obviousness. Appx52; *see* Appx4377-4378, ¶¶ 306-313. Aurobindo does not challenge that finding on appeal.

Lastly, the commercial success and large volume of sales of ISB product by both Mylan and Aurobindo are directly tied to the high purity and reliable process taught by the Asserted Patents. Appx4373, ¶ 289; Appx3470-3472, ¶ 4-10. As the

district court noted, "there is no question that [Appellees'] commercial [ISB] product was commercially successful." Appx50; *see also* Appx4372-4373, ¶¶ 286-292. Aurobindo's and Appellees' sales are in large part due to the purity of the ISB API and the patented processes necessary to achieve it. Unavailability of a drug product due to the unreliability of its manufacturing process obviously affects successful diagnosis and treatment of life-threatening diseases, a simple fact acknowledged by both Covidien and Sigma, indicating that a supply shortage could affect thousands of patients and doctors. Appx4371, ¶¶ 280-281; Appx4781.

### 6.    The District Court Did Not Commit Plain Error in Finding That the Claims of the '050 Patent Are Not Indefinite.

Aurobindo argues that if the claims of the '050 patent are not obvious, then they are somehow indefinite because a POSA would not understand the bounds of the term "having a purity of at least 99% by HPLC." AB Br. at 44-45. Because Aurobindo did not raise this in its objection to the R&R, this Court must affirm the district court's decision unless it was based on "plain error" or "manifest injustice." *Douglass*, 79 F.3d at 1430. Faced with this hurdle, Aurobindo's only argument is the district court overlooked the fact that the '050 patent did not provide any specific conditions for the analysis of purity using HPLC. AB Br. 44. But, as the record shows, determination of purity by HPLC is within the knowledge of a POSA and is a common and well understood way of designating purity in the

pharmaceutical arts.  Appx4298-4300, ¶¶ 67-73; Appx4301, ¶ 76; Appx4380-4381, ¶¶ 324-325.  Aurobindo's own expert Dr. Brown admitted that 99% purity by HPLC means "having not more than one percent extraneous material . . . as determined using HPLC with a reproducible set of conditions."  Appx7425-7426, 235:16-236:8; Appx7446, 256:1-4; Appx7449, 259:2-6.

Moreover, the record showed that numerous patents denoted the purity of a particular pharmaceutical product based on HPLC, without providing any details surrounding testing conditions.[3]  Although an author or inventor may choose to provide exemplary HPLC conditions, a POSA would understand that such details are not required to perform the analysis.  Appx4379, ¶ 318.  Aurobindo offered no evidence that any changes in the testing parameters would affect the HPLC results.  Indeed, even assuming a particular HPLC parameter would affect the measurements, the parties' experts both acknowledged that a POSA would readily identify the correct one based on the reproducibility of the results.  Appx4380-4381, ¶¶ 323-325; Appx7426, 236:16-25.  The district court acted well within its discretion in finding that POSA would clearly understand what falls within the scope of the claims and what would fall outside the scope.  Aurobindo has not

---

[3]  For example, Dr. Brown is an inventor on U.S. Patent No. 5,861,532 (Appx ppx4379, ¶ 317; Appx23-24) where purity of a compound is denoted simply by reference to HPLC with no details about how to replicate the conditions.

offered any evidence to show manifest injustice or plain error in the district court's factual findings with respect to Aurobindo's indefiniteness claims.

## II.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT APPELLEES PRESENTED HALLMARK EVIDENCE OF IRREPARABLE HARM AS A DIRECT RESULT OF AUROBINDO'S CONTINUED INFRINGEMENT.

Appellees have suffered several types of harm for which monetary damages will not adequately compensate.  Specifically, the district court determined that Apicore demonstrated irreparable harm as evidenced by "lost sales, lost research and development ability, price erosion, and having to compete with an infringing competitor."  Appx55.  Aurobindo does not dispute that these types of injuries are all appropriate reasons for finding irreparable harm.   AB Br. 57-62.   Rather, Aurobindo attempts to argue error by objecting to the district court's factual findings but ignoring its finding of causal nexus.   Aurobindo's arguments are futile, however, because the district court's factual findings were supported by extensive evidence in the record and far from clearly erroneous.   Moreover, the district court's causal nexus determination follows this Court's precedent.   Thus, the district court's conclusions as to irreparable harm demonstrate no abuse of discretion.

### A.    The District Court's Finding that Apicore Suffered Irreparable Harm Is Not Clearly Erroneous.

The district court correctly recognized that Appellees identified several "hallmark examples of irreparable harm . . . including lost sales, lost research and development opportunities, price erosion, and the fact that Apicore must now directly compete with an infringer." Appx5 (citing Appx53-55). The district court found that evidence of irreparable harm was "more than adequately supported by the record." *Id.* (citing Appx7629-7633, ¶¶ 5, 7, 9-22; Appx3616-3627, ¶¶ 5-6, 9, 12-25, 32-33; Appx7346-7348, 156:11-158:4; Appx7349-7353, 159:22-163:9; Appx7366, 176:19-25; Appx215-222, ¶¶ 39-46, 53-55, 60; Appx7230-7231, 40:18-41:2; Appx7234-7235, 44:5-45:24; Appx7237-7241, 47:20-51:2; Appx424-438, ¶¶ 9, 12, 14, 29-32, 34-35; Appx3471-3476, ¶¶ 6-8, 15; Appx4101-4120, ¶¶ 4, 14-25, 32-34; Appx7372-7374, 182:5-184:19). Aurobindo ignores the substantial evidence and alleges three purported errors by the court. None of these three arguments has merit.

### 1.    The District Court Correctly Found That Apicore and Aurobindo Are Direct Competitors.

Aurobindo's argument that Aurobindo and Apicore are not competitors because Apicore only sells ISB API to Mylan and Aurobindo Pharma Ltd. only sells to Auromedics defies common sense. *See* AB Br. 58-59. For the purposes of irreparable harm, the district court correctly found that direct competition is with

respect to the product and market. *See* Appx53-54 (citing *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to **compete against products** that incorporate and infringe its own patented inventions.") and *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the **same market** is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.")) (emphasis added).

It is undisputed that before Aurobindo copied Apicore's patented process, Apicore was the sole supplier of ISB API for the commercial market in the U.S. AB Br. 17; Appx7630, ¶ 9; Appx216, ¶ 46; Appx7230-7231, 40:18-41:2; Appx7238, 48:10-16.    Had Aurobindo not copied the patented process in connection with its manufacture of ISB API, it would not be able to sell any product to AuroMedics for distribution in the U.S.    Moreover, Aurobindo's unlawful entry into the market resulted in Apicore losing sales that it would otherwise have made to Mylan.    Appx 3618, ¶ 12; Appx424-426, ¶ 9; Appx4111-4112, ¶ 21.    Contrary to Aurobindo's assertion, the link between Aurobindo's infringement and pricing strategy is not speculative because Apicore and Aurobindo are direct competitors in the market.    *Cf.* AB Br. 60.    Accordingly, the

district court correctly found that "Apicore is directly competing with Aurobindo," supporting "a finding of irreparable injury." Appx55. In other words, the district court's factual findings with respect to direct competition were not clearly erroneous.

### 2.   The District Court Properly Found that Apicore and Mylan Would Suffer Price Erosion.

Aurobindo wrongly asserts that the district court made a clear factual error when it found that Apicore would suffer price erosion as a direct result of Aurobindo's presence in the market. AB Br. 59-60. But, Aurobindo disregards the evidence of Aurobindo's own expert, who admitted that the average sales price for Appellees' ISB has declined since Aurobindo entered the market. Appx7492-93, 302:16-303:3. With respect to price erosion, the district court relied on more than ample documentary and testimonial evidence related to Appellees' losses.[4] Appx54. The district court noted that "there is undisputed evidence that Aurobindo's infringement has and is continuing to result in significant price erosion." Appx54; Appx216-222, ¶¶ 41-61. For example as the sales price for

---

[4] *See* Appx5, n.1; Appx424-438, ¶¶ 9, 34-35; Appx4101-4120, ¶¶ 4, 15, 19, 32-34; Appx7234-7235, 44:5-45:24; Appx7240-7241, 50:4-51:2; Appx7373-7374, 183:22-184:19.

Mylan's product declines, it directly affects the price Mylan can afford to pay for Apicore's API. *See* Appx4118, ¶¶ 32-33.

Aurobindo offers no evidence rebutting the district court's findings with respect to price erosion. Furthermore, although the district court did not reach a conclusion as to the irreparable harm suffered by Mylan, it correctly relied on undisputed evidence of Mylan's price erosion to support harm to Apicore. As the exclusive licensee, harm to Mylan from Aurobindo's infringing activity directly affects Apicore. The district court properly relied upon the declaration of Heather Paton, Vice President of Sales for Mylan, to support its finding that Aurobindo's infringement is causing price erosion. Appx54. Specifically, Ms. Paton testified that if Mylan chooses to match Aurobindo's price, Mylan risks never being able to return the price to pre-infringement levels. Appx220-221, ¶¶ 55-58. Aurobindo fails to explain how the district court erred by relying on this evidence. As such the district court's determination that Apicore suffered irreparable harm due to price erosion was not clearly erroneous.

### 3.    The District Court Properly Found That Apicore's Lost Sales and Lost R&D Would Lead to Irreparable Harm.

Invoking this Court's precedent, the district court identified Appellees' lost sales and diminished ability to conduct research and development as evidence relevant to finding irreparable harm. Appx53 (citing *Robert Bosch LLC v. Pylon*

*Confidential Material Redacted*

*Mfg. Corp.*, 659 F.3d 1142, 1154 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861–62 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011); and *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996)). Aurobindo's half-hearted argument that "[l]ost sales standing alone are insufficient to prove irreparable harm" does not compel a different result. AB Br. 60. Although lost sales *alone* do not constitute irreparable harm, Aurobindo ignores the fact that Apicore suffered numerous other harms as identified by the district court. Appx53 (citing *Bosch*, 659 F.3d at 1154) (emphasis added).

The significance of Apicore's lost sales is magnified by their relationship to Apicore's R&D activity. Apicore specializes in researching and developing APIs, and that work is substantially funded through its sales of ISB API. Appx3621-3622, ¶¶ 20-21; Appx7630-7632, ¶¶ 11-14. Specifically, ISB sales were responsible for ███ of Apicore's total revenue in 2015 and ███ of Apicore's total revenue over the last five years. Appx3619, ¶ 13. Because Apicore reinvests much of its revenue in R&D, ISB API sales are critical to R&D of new products. Appx3621, ¶ 20. The high profit margin for ISB API compared to all other Apicore products ███ versus ███ respectively, in 2015) only magnifies the importance of ISB API sales to Apicore. Appx3619-3620, ¶¶ 13-14, 16. Moreover, Judge Payne confirmed that these R&D losses were not speculative, but had already begun to manifest. Appx54; *see* Appx3622-3624, ¶ 22. As such,

Judge Payne was correct to find that this lost R&D ability has already caused irreparable harm to Apicore and would continue to do so in the absence of an injunction. Because of this and other evidence in the record, the district court correctly determined that Apicore's lost ISB API sales result in a significant loss of R&D opportunities. Appx54; Appx5; *see also* Appx5, n.1; Appx7629-7633, ¶¶ 5, 7, 11-22; Appx3616-3627, ¶¶ 5-6, 9, 13-16, 20-25, 32-33; Appx424-436, ¶¶ 9, 12, 14, 29-32; Appx4108-4114, ¶¶ 17, 24; Appx7346-7348, 156:11-158:4; Appx7351-7353, 161:6-163:9; Appx7372-7373, 182:23-183:13.

The district court found that "[t]here is no question that Apicore will lose most if not all of its isosulfan blue sales to Aurobindo if infringement is allowed to continue." Appx54. This finding also had abundant support in the record, as evidenced by Mylan's dwindling market share, Appx216-217, ¶¶ 43-44; Appx7237-7240, 47:20-50:3; Appx7372, 182:5-11, which resulted in Apicore making no ISB sales in 2016, Appx3620-3621, ¶¶ 17-18; Appx7351, 161:1-5; Appx7372, 182:12-16, and which will likely have similar long-term effects, Appx3620-3621, ¶¶ 17, 19; Appx217-219, ¶¶ 46, 53; Appx7350, 160:3-25; Appx7372, 182:17-22.

Again, the significance of these lost sales is amplified by substantial evidence of the importance of ISB API to Apicore's business. Appx7630-7631, ¶¶ 11-13; Appx3619-3620, ¶¶ 13-16; Appx427-435, ¶¶ 12, 29; Appx4101-4115,

¶¶ 4, 17, 25; Appx7346-7347, 156:11-157:15; Appx7347-7348, 157:24-158:4. Given this evidence, the district properly recognized that the longer Aurobindo is permitted to make its infringing sales, the closer Apicore is to being "[driven] out of the market entirely, [which] might support a finding of irreparable harm." Appx54 (quoting *Automated Merch. Sys. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009)). Accordingly, the court's findings with respect to lost sales and irreparable harm were fully supported by the record and were not clearly erroneous.

Aurobindo's reliance on forecasts made *before* Aurobindo's infringement do not support a contrary result. *See* AB Br. 61. These forecasts were made prior to Apicore's knowledge of Aurobindo's impending entry into the marketplace and assumed that Apicore's ISB API sales to Mylan would continue to fund its R&D projects and that some of those R&D projects would be profitable. *See* Appx7366, 176:19-25; Appx4112-4114, ¶¶ 23-24; Appx3621, ¶¶ 19-20. The forecasts did not contemplate Aurobindo's infringement, which caused Mylan not to purchase any ISB API from Apicore for over a year. *See* Appx3644-3647. Because of this drop in ISB API sales, Apicore halted numerous R&D projects—projects which were necessary to realizing its earlier forecasts. Therefore, these forecasts are rendered meaningless and an inaccurate reflection of the harm caused by Aurobindo. *See* Appx3621, ¶ 18. Accordingly, the district court's determination that without an

injunction Apicore would miss significant R&D opportunities is well supported. *See* Appx54.[5]  As Aurobindo does not dispute that loss of R&D opportunity is irreparable harm, this finding alone should be sufficient to affirm the district court's findings.

Lastly, Appellees demonstrated that Apicore's workforce was adversely affected by the loss of ISB revenue.  *Cf.* AB Br. 61.  Specifically, with respect Apicore's quality assurance employee, Aurobindo argues that he left because another company offered him a higher salary.  *Id.*  That is true, but what Aurobindo fails to recognize is that Apicore was unable to match the employee's salary offer because it was losing money from diminished ISB sales.  Appx3626, ¶ 29.  Therefore, the district court did not clearly err by linking the loss of an employee to Apicore's decrease in revenue.

## B.    The District Court Did Not Commit Legal Error in Finding a Causal Nexus Between Aurobindo's Infringement and Apicore's Harm.

In determining nexus, the district court noted that "Apicore's injury is the direct result of Aurobindo's infringement."  Appx55.  This is so because "[w]ithout infringing the '992, '616, and '050 patents, Aurobindo would not be able to make

---

[5] The district court issued a correction to the R&R on November 22, 2016 stating that the live hearing testimony referred to on page 48 (Appx54) was given by Mr. Kovi and not Mr. Devnani.  *See* Appx74.

the isosulfan blue product described in its ANDA." *Id.*; Appx4533. The causal

nexus between Aurobindo's infringement and Appellees' harm was quite clear. In

arguing otherwise, Aurobindo asserts a meritless objection based on readily

distinguishable law. Aurobindo's attempt to limit the causal nexus analysis by

relying only on a subset of the consumer demand is flawed and this Court has

previously rejected it.

### 1. Apicore's Irreparable Harm Is Directly Caused by Aurobindo's Infringement.

Aurobindo argues that the district court failed to cite any evidence

establishing a connection between the patented features and ***customer*** demand for

the final ISB product. AB Br. 48-53. However, Aurobindo improperly focuses on

a subset of the customers (physicians) and fails to recognize evidence of market

demand for the patented features from other sources such as pharmaceutical

companies, API suppliers, hospitals, and the FDA. Aurobindo cannot deny the fact

that the patented features provide a competitive advantage to API suppliers

desiring to make ISB. For example, there was ample evidence in the record of

Sigma's difficulty finding an acceptable ISB API supplier. By copying the

patented process, Aurobindo gained a competitive advantage.

Similarly, pharmaceutical companies have a clear demand for high purity

API that can be reliably produced. This very fact was again demonstrated by

**Confidential Material Redacted**

Covidien taking its ISB product off the market because it could not source a reliable high purity ISB API.  The high purity feature of Apicore's patent was also of interest to the FDA, which approved both Aurobindo's and Appellees' ANDA and DMF applications with a specification requirement that each achieve a purity level of at least 99%.  As explained above, Aurobindo's ANDA and DMF specification explicitly requires a threshold value of ███ purity for the ISB API.  Appx4533.  Thus, unless Aurobindo is able to hit this exceptionally high target, it would not meet the DMF specifications and would not be approved by the FDA purity specification.  *Id.*  This fact alone establishes the demand for the patented feature and should be dispositive as to nexus.  The only reason that Aurobindo is even able to get approval for its API is because it literally infringes at least claim 1 of the '050 patent.

Contrary to Aurobindo's assertion, there were not any other "prior art processes to manufacture pharmaceutical grade ISB (e.g., the method to manufacture Lymphazurin®).  *Cf* AB Br. 57.  Aurobindo had no way other than the patented process to make the ISB because the process used to develop the Lymphazurin® product was known only to Allied Chemical and not publicly available.  Appx10; Appx4757.  Moreover, even if Aurobindo were aware of an alleged non-infringing process, Aurobindo's copying of Apicore's process is a tacit admission as to its desirable properties and the competitive advantage it provides.

If Aurobindo had not copied the process patents, it would not be able to synthesize ISB, it would not have a product on the market, and Apicore would not have lost any sales. Therefore, Aurobindo's infringement and Apicore's harm are inextricably linked.

**2.    The District Court Did Not Apply the Wrong Causal Nexus Standard.**

Despite the district court's identification of this relationship, Aurobindo suggests that the district court was required to find causal nexus between demand from the end consumers (doctors) and the "novel patented features." AB Br. 47. To support this proposition, Aurobindo relies extensively on the *Apple/Samsung* cases, and repeatedly urges "a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*").

Contrary to Aurobindo's assertion, the district court did not err when it recognized that causal nexus "may be more easily satisfied (indeed, perhaps even conceded) for relatively simple products." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013) ("*Apple III*"); Appx56. Specifically, Aurobindo argues there is no evidence that doctors are aware of the purity or method of manufacturing ISB, and thus those patented features do not drive demand for ISB. *See* AB Br. 55-56. Aurobindo's selective reading of *Apple* is unpersuasive. *See*

Appx56. Not only did the claims at issue in the *Apple* cases cover only a handful of features of "a complex, multi-featured product," *id.*, but the products involved (smartphones and tablets) were consumer goods in a market characterized by "discrete sales to numerous consumers," *Broadcom*, 732 F.3d at 1337 (distinguishing *Apple I*). Aurobindo's infringing products have fewer features, embody the asserted claims, and are situated in a marketplace that is incomparable to one for consumer goods. As the district court recognized, "[t]he finished drug product is isosulfan blue in an injectable solution, which is more like the 'relatively simple products' the Federal Circuit contrasted with smart-phones and tablets in the *Apple* cases." Appx56 (quoting *Apple III*, 735 F.3d at 1362).

Aurobindo also mistakenly argues that the patented features must drive *physicians'* demand for ISB, *see Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 642 (Fed. Cir. 2015) ("*Apple IV*") ("The district court thus erred when it required Apple to prove that the infringing features were the exclusive or predominant reason why consumers bought Samsung's products to find irreparable harm. . . . [c]ausal nexus can be shown with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions."), and ignores Appellees' evidence that substantially pure API is indicative of the manufacturer's ability to reliably supply the final dose form to the market, Appx4266-4267, ¶¶ 86-90, which is a consideration of hospital pharmacy buyers, Appx209 ¶ 10.

This case is also distinct from *Apple* because Aurobindo and Appellees are in a two-player market, which "creates an inference that an infringing sale amounts to a lost sale for the patentee." *Bosch*, 659 F.3d at 1151. "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345 ("Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, Douglas's exclusive right to make, use, and sell the patented inventions is under attack by Buyers's infringement.").

Aurobindo cites no evidence that Appellees would suffer harm irrespective of Aurobindo's infringement. Moreover, the fact that Aurobindo copied Apicore's process, (Appx56; Appx4623), runs contrary to Aurobindo's assertions of lack of demand, and further supports the district court's finding of causal nexus, *see Apple IV*, 809 F.3d at 643 ("Apple's evidence of copying established a further link between Apple's and Samsung's subjective beliefs and consumers' perceptions, thereby strengthening a causal nexus and irreparable harm to Apple."). Aurobindo also ignores Appellees' evidence that substantially pure API is indicative of the manufacturer's ability to reliably supply the final dose form to the market,

Appx4266-4267, ¶¶ 86-90, which is an important consideration of hospital pharmacy buyers, Appx209, ¶ 10.

Aurobindo also argues that the district court committed legal error when it found that the '992 and '616 patents are not subject to the causal nexus requirement because it is not possible to separate the patented process from the commercial ISB product.  AB Br. 56.  As discussed above, however, the district court found that causal nexus was established for each of the patents, including the process patents.

The district court's reliance on *Janssen Products, L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650 (D.N.J. 2014), was also proper because that case involved similar facts.  The court in *Janssen* held that causal nexus was established and *Apple I* was inapplicable because Lupin, the generic manufacturer, would not be able to make the products proposed in its ANDA without infringing the asserted '015 patent.  *Id.* at 698-701.  Because Lupin's process for making its products infringed the '015 patent, "the sale of those products would lead directly to the irreparable harm shown—lost sales, price erosion [ ], adverse impact on research and development, and the need to compete directly with an infringing competitor."  *Id.* at 699-700 (internal citations omitted) ("And without an injunction, Lupin would use Janssen's patented process to produce a product that would substantially destroy Janssen's Prezista business.").  The same is true here.

### 3.    The District Court Did Not Assume That Regulatory Approval Conferred Causal Nexus.

Contrary to Aurobindo's assertion, the district court did not find that the FDA requirements constitute causal nexus.  AB Br. 53-54.  Rather, the district court found that Aurobindo's ANDA, which Aurobindo itself drafted, requires 99% purity.  Appx55; Appx4533.  Aurobindo relies on *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 393 (D.N.J. 2015), for the proposition that FDA approval cannot satisfy the causal nexus requirement.  AB Br. 54.  That case is inapposite, however, because it addressed nexus in the context of commercial success rather than irreparable harm, which requires a wholly different analysis.  In the context of irreparable harm, "the causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition."  *Apple III*, 735 F.3d at 1361.  Commercial success, on the other hand, is "utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented" and is a proxy for obviousness.  *AstraZeneca*, 88 F. Supp. 3d at 382.  Furthermore, because Aurobindo never objected to the magistrate judge's R&R on these grounds, this Court should apply the heightened standard of plain error.  Accordingly, Aurobindo has failed to show that the district court's finding that Aurobindo's ISB meets its own stated purity standard is relevant to causal nexus, amounts to any manifest injustice.

## CONCLUSION

For the foregoing reasons, the district court's decision to issue a preliminary injunction against Aurobindo should be affirmed.

Dated: March 20, 2017                    Respectfully Submitted,

/s/: *David S. Steuer*

David S. Steuer
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300

Nicole W. Stafford
Wilson Sonsini Goodrich & Rosati
900 South Capital of Texas Hwy
Las Cimas IV, Fifth Floor
Austin, TX 78746
(512) 338-5400

*Counsel for Plaintiff-Appellee*
*Mylan Institutional LLC*

/s/: *Allen F. Gardner*

Allen F. Gardner
Gillam & Smith, LLP
102 N. College Avenue
Suite 800
Tyler, Texas 75702
(903) 503-7413

*Counsel for Plaintiff-Appellee*
*Apicore US LLC*

## CERTIFICATE OF COMPLIANCE MOTIONS OR BRIEFS CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER

Briefs Containing Material Subject to a Protective Order

[X]    This brief complies with the limitations set forth in Fed. Cir. R. 28(d) and contains [13] words (including numbers) marked as confidential, or

[ ]    This brief does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion is requesting permission to exceed the maximum word count

/s/: *David S. Steuer*
David S. Steuer
Wilson Sonsini Goodrich & Rosati
*Counsel for Plaintiff-Appellee*
*Mylan Institutional LLC*

## CERTIFICATE OF SERVICE

I, Elissa Diaz, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Wilson Sonsini Goodrich & Rosati, attorneys for Appellees to print this document.  I am an employee of Counsel Press.

On **March 20, 2017** counsel has authorized me to electronically file the foregoing **Brief for Appellees (confidential and non-confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including the following principal counsel for the other parties:

> Sailesh K. Patel
> Schiff Hardin LLP
> 233 S Wacker Drive
> Sears Tower, Suite 6600
> Chicago, IL 60606
> 312-258-5698
> spatel@schiffhardin.com

The confidential paper copies will also be served via email and U.S. Mail above principal counsel on this date.

Six paper confidential copies will be filed with the Court via hand delivery on this same day.

March 20, 2017                                    /s/ Elissa Diaz
                                                            Counsel Press

## CERTIFICATE OF COMPLIANCE

The response complies with the word-count limitation of Federal Rule of

Appellate Procedure 27(d)(2)(A).  The body of the response contains 12,039 words

according to the word processing software used to prepare it.

The document complies with the typeface and type style requirements of

Federal Rule of Appellate Procedure 27(d)(1)(E).  It has been prepared in a

proportionally spaced typeface using Microsoft Word 2010 using 14-point Times

New Roman Font.

Dated: March 20, 2017          */s/: David S. Steuer*_____
                              David S. Steuer
                              Wilson Sonsini Goodrich & Rosati
                              650 Page Mill Road
                              Palo Alto, CA 94304
                              (650) 493-9300