No. 2017-1645

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
————————————

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
and AUROMEDICS PHARMA LLC,
Defendants-Appellants,

v.

MYLAN INSTITUTIONAL LLC and APICORE US LLC,
Plaintiffs-Appellees

————————————

Appeal From The United States District Court For The Eastern District Of Texas
In Case No. 16-cv-00491, Judge Robert W. Schroeder III

————————————

## REPLY IN SUPPORT OF DEFENDANTS-APPELLANTS'
## PRELIMINARY INJUNCTION APPEAL

### NONCONFIDENTIAL VERSION
————————————

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(415) 901-8749

Sailesh K. Patel
Cindy S. Ahn
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5698

# CERTIFICATE OF INTEREST

Counsel for Appellants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC certifies the following:

1. The full name of every party or amicus represented by me is:

   **AUROBINDO PHARMA LTD.**

   **AUROBINDO PHARMA USA INC.**

   **AUROMEDICS PHARMA LLC**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   **N/A**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   **Aurobindo Pharma Ltd. is a publicly-held corporation, has no parent company, and there is no publicly held company that owns 10% or more of the stock of Aurobindo Pharma Ltd.**

   **Aurobindo Pharma USA, Inc. is a wholly-owned subsidiary of Aurobindo Pharma Ltd.**

   **AuroMedics Pharma LLC is a wholly-owned subsidiary of Aurobindo Pharma Ltd.**

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

| LAW FIRM | COUNSEL |
|---|---|
| Schiff Hardin LLP | Sailesh K. Patel<br>Cindy S. Ahn<br>Jason G. Harp<br>Neil Lloyd<br>Arun J. Mohan<br>Emily M. Peña<br>Jaimin Shah<br>George C. Yu |
| Potter Minton, P.C. | Michael E. Jones<br>Patrick Clutter IV |

Date:  March 27, 2017

_/s/ Sailesh K. Patel_
Sailesh K. Patel
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Tel:  (312) 258-5500
Fax:  (312) 258-5600
Email:  SPatel@schiffhardin.com

*Counsel for Defendants-Appellants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................1

I.   AUROBINDO RAISED A SUBSTANTIAL QUESTION AS TO
     INFRINGEMENT OF THE PROCESS PATENTS UNDER THE
     DOCTRINE OF EQUIVALENTS ..................................................1

     A.   Apicore Did Not Meet Its Burden Under The Function-Way-
          Result Test .........................................................................1

          1.   Aurobindo Achieves A Substantially Different Result
               Than Apicore's Claimed Process..................................2

          2.   Aurobindo Achieves A Substantially Different Result
               Because Manganese Dioxide Oxidizes In A Significantly
               Different Way Than Silver Oxide..................................3

               a.   The District Court Improperly Relied On
                    Apicore's Unsupported Expert Opinion That
                    Manganese Dioxide Is A Mild Oxidizing Agent.............6

               b.   The District Court Improperly Relied On Yield,
                    Rather Than Purity, To Perform Its Doctrine of
                    Equivalents Analysis ........................................7

               c.   Manganese Dioxide Cannot Be Substituted For
                    Silver Oxide In The Claimed Process .............................7

     B.   A Finding Of Infringement Under The Doctrine Of Equivalents
          Violates The Doctrine Of Ensnarement ...............................9

II.  AUROBINDO RAISED A SUBSTANTIAL QUESTION AS TO
     THE VALIDITY OF THE '050 PATENT..................................................12

     A.   Apicore Has Not Shown That The '050 Patent Claims Are
          Different In Kind From The Prior Art..................................12

# TABLE OF CONTENTS

(continued)

Page

B.    Aurobindo's Prior Art Combinations Render The '050 Claims
      Obvious .................................................................................................14

C.    Apicore Provides No Relevant Evidence To Support Its
      Secondary Considerations Of Nonobviousness ................................16

      1.    There Was No Long-Felt But Unmet Need For 99% Pure
            ISB.............................................................................................16

      2.    Apicore Provides No Evidence That Others Tried And
            Failed To Make 99% Pure ISB .................................................17

D.    The District Court Ignored Clear Evidence Indicating
      Anticipation Of The '050 Claims......................................................19

III.  THE DISTRICT COURT ERRONEOUSLY FOUND
      IRREPARABLE HARM TO APICORE ....................................................20

A.    There Is No Nexus Between The Alleged Harms To Apicore
      And The Patented Features Of The Asserted Patents ........................20

      1.    There is No Evidence of Any Market Demand for the
            ISB API by Any Entity for Any of the Patented Features.......20

      2.    The Lower Court Erred By Misapplying The Law
            Regarding Causal Nexus...........................................................23

      3.    The District Court Assumed Causal Nexus Based on
            FDA Approval............................................................................25

B.    Mylan Has Not Demonstrated Irreparable Harm ..............................26

CONCLUSION ....................................................................................................29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
   695 F.3d 1370 (Fed. Cir. 2012) ................................................................. 24, 26

*Apple Inc. v. Samsung Elecs. Co.*,
   809 F.3d 633 (Fed. Cir. 2015) ..................................................................... 29

*Apple Inc. v. Samsung Elecs. Co.*,
   735 F.3d 1352 (Fed. Cir. 2013) ................................................................... 24

*Apple, Inc. v. Samsung Elecs. Co.*,
   678 F.3d 1314 (Fed. Cir. 2012) ......................................................... 21, 24, 26

*Application of Petering*,
   301 F.2d 676 (C.C.P.A. 1962) ...................................................................... 11

*AstraZeneca v. Breath Ltd.*,
   88 F. Supp.3d 326 (D.N.J. 2015) .................................................................. 23

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.*,
   824 F.3d 989 (Fed. Cir. 2016) ....................................................................... 3

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) ................................................................... 28

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006) ................................................................... 11

*In re DBC*,
   545 F.3d 1373 (Fed. Cir. 2008) ................................................................... 26

*In re OxyContin Antitrust Litig.*,
   994 F. Supp.2d 367 (S.D.N.Y. 2014) ........................................................... 23

*Janssen Products, L.P. v. Lupin Ltd.*,
   109 F. Supp. 3d 650 (D.N.J. 2014) ............................................................... 25

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ............................................................................... 11, 12

*Merck & Co., Inc. v. Biocraft Labs., Inc.*,
   874 F.2d 804, 807 (Fed.Cir.1989) ........................................................... 11, 12

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460, 120 S. Ct. 1579, 146 L. Ed. 2d 530 (2000) ..................................23

*Otsuka Pharm. Co. v. Torrent Pharma. Ltd.*,
    99 F. Supp. 3d 461 (D.N.J. 2015).....................................................................28

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ...........................................................................28

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) .............................................................................6

## Statutory Authorities

35 U.S.C. § 102 ..................................................................................................10

35 U.S.C. § 103 ..................................................................................................10

| TERM | ABBREVIATION |
|---|---|
| Active pharmaceutical ingredient | API |
| Apicore US LLC or<br>Apicore US LLC and Mylan<br>Institutional LLC | Apicore |
| Aurobindo Pharma Ltd., Aurobindo<br>Pharma USA Inc., and AuroMedics<br>Pharma LLC | Aurobindo |
| AuroMedics Pharma LLC | AuroMedics |
| Bioniche Pharma USA, LLC | Bioniche |
| Food and Drug Administration | FDA |
| High-performance (or high-pressure)<br>liquid chromatography | HPLC |
| Hirsch *et al.*, "Use of Isosulfan Blue<br>for Identification of Lymphatic<br>Vessels: Experimental and Clinical,"<br>Am. J. Roentgenology 139:1061-1064<br>(1982) | Hirsch |
| Isosulfan Blue | ISB |
| Mylan Institutional LLC | Mylan |
| New drug application | NDA |
| Person having ordinary skill in the art | POSA |
| Report and Recommendation re<br>Preliminary Injunction, dated<br>November 21, 2016 (D.I. 101) | R&R |
| Sigma Chemical Co. | Sigma |
| Snyder et al., "Preparative HPLC<br>Separation" in Practical HPLC Method | Snyder |

| TERM | ABBREVIATION |
|---|---|
| Development (John Wiley & Sons, Inc. 2nd ed. 1997) | |
| Synerx Pharma LLC | Synerx |
| U.S. Patent Application Publication No. 2006/0224003 Al | Kulkarni |
| U.S. Patent Application Publication No. 2008/0008658 Al | De Haen |
| U.S. Patent No. 7,662,992 | '992 patent |
| U.S. Patent No. 8,969,616 | '616 patent |
| U.S. Patent Nos. 7,662,992 and 8,969,616 | Process Patents |
| U.S. Patent No. 9,353,050 | '050 patent |
| The '992, '616, and '050 patents | Apicore patents |

## TABLE OF REDACTIONS

| REDACTION | PAGE(S) |
|---|---|
| Information identified by Apicore/Mylan as highly confidential technical and business information | 28 |
| Information identified by Aurobindo/AuroMedics as highly confidential technical and business information | 2, 3, 4, 8 |
| Information identified by Sigma as highly confidential technical and business information | 19 |
| **TOTAL NUMBER OF WORDS REDACTED** | 10 |

**INTRODUCTION**

Apicore's Responsive Brief fails to rebut the substantial questions Aurobindo raised as to the merits of Apicore's motion for preliminary injunction. Additionally, Apicore fails to demonstrate the requisite nexus between the patented features of the patents-in-suit and Apicore's alleged irreparable harm. The district court abused its discretion and clearly erred in granting the preliminary injunction. Accordingly, this Court should vacate the preliminary injunction.

**ARGUMENT**

I. **AUROBINDO RAISED A SUBSTANTIAL QUESTION AS TO INFRINGEMENT OF THE PROCESS PATENTS UNDER THE DOCTRINE OF EQUIVALENTS.**

A. **Apicore Did Not Meet Its Burden Under The Function-Way-Result Test.**

Aurobindo provided corroborating documentary evidence that manganese dioxide does not oxidize in the same way or provide the same results as the claimed silver oxide process. (*See, e.g.*, Appx649; Appx7336; Appx4628.) Other than broadly functioning to oxidize the isosleuco precursor to ISB, manganese dioxide works in a substantially different way and provides a different result—substantially lower purity—than silver oxide. Apicore and the district court erroneously collapse the analysis into a broad inquiry of whether manganese dioxide serves the same overall function as silver oxide—to oxidize the isoleuco precursor to ISB—without separately assessing the "way" and "result" tests. Even if just the way is different,

CONFIDENTIAL INFORMATION REDACTED

the doctrine of equivalents does not apply. There is no infringement under the doctrine of equivalents even if an accused product performs the same function and achieves the same result, if it does so in a different way. *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1320 (Fed. Cir. 2015). Here, both the way and the result are different.

### 1. Aurobindo Achieves A Substantially Different Result Than Apicore's Claimed Process.

Aurobindo's ISB has "~ ████ ████ impurity" after oxidation with manganese dioxide that is well outside the 99% or greater purity required by the claims. (Appx4628.) In an exemplary reaction, Aurobindo's ISB had ████ impurities—*i.e.*, the ISB was ████ pure. (*Id.*) The ████ impurity results from over-oxidation by manganese dioxide. (Appx4627.) Aurobindo reported that "we have not succeeded to remove this impurity with [crystallization]." (Appx4628.) Instead, Aurobindo decided to purify ISB using conventional HPLC. (*Id.*)

In contrast, Apicore states in the '992 patent that an "object of the invention is to use very mild oxidation agent to avoid any over-oxidized products." (Appx95.) The Process Patents further disclose that using only "recrystallization" (*i.e.*, a second crystallization), Apicore achieved ISB "having purity greater than 99.5% by HPLC." (Appx98.) This is not the result Aurobindo found using its different process.

The ISB resulting from oxidation by manganese dioxide has about the same level of impurity as reported by the prior art Hirsch article and much more than

CONFIDENTIAL INFORMATION REDACTED

reported in the Process Patents—███ for Aurobindo as compared to 5.5% for Hirsch and 0.5% for Apicore.  (Appx4628; Appx844; Appx98.)

Apicore illogically argues that the Court should only consider the purity of the Aurobindo product *after* HPLC.  Aurobindo resorted to HPLC, a technique known in the prior art, after determining that it could not remove the ███ impurity using the crystallization technique taught in the Process Patent.  *See David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 998-99 (Fed. Cir. 2016) (finding no infringement under the doctrine of equivalents where defendant's process required an additional purification step to achieve the same purity level as the patentee's).  In other words, just using manganese dioxide instead of silver oxide in the process set forth in the Process Patents would result in ISB having far more than 0.5% impurities.  The district court abused its discretion when it implicitly found that Aurobindo's process leads to substantially the same result as the claimed process even though there is a start difference in the purity obtained using manganese dioxide.

2.    **Aurobindo Achieves A Substantially Different Result Because Manganese Dioxide Oxidizes In A Significantly Different Way Than Silver Oxide.**

Furthermore, the district court erred as a matter of law because it made no findings as to the *way* manganese dioxide and silver oxide oxidize isoleuco intermediates.  Apicore attempts to backfill this critical omission by pointing to

CONFIDENTIAL INFORMATION REDACTED

"evidence" relating to the similar toxicity of manganese dioxide and silver oxide and their similar behavior in polar solvent. (Resp. at 16, 18.) But Apicore's attempt to argue "harmless error" fails because the district court made no findings as to either of these aspects of the oxidizing step to make ISB.

The evidence shows that manganese dioxide does not oxidize in substantially the same way as silver oxide. Aurobindo presented evidence that manganese dioxide, along with lead oxide and sodium dichromate, is a strong oxidizing agent. (Appx649; Appx7336; Appx7416.) And, as shown above, Aurobindo's oxidation using manganese dioxide led to the formation of ▮▮▮ ▮▮▮ impurity due to overoxidation. (Appx4627.) In contrast, the Process Patents make it clear that the purpose of using silver oxide is to avoid such overoxidized products: "Still another object of the invention is to use very mild oxidation agent to avoid any over-oxidized products.…" (Appx95.) Nevertheless, the district court erroneously disregarded the evidence presented by Aurobindo as to the different way in which manganese dioxide affects the formation of impurities.

The district court's disregard for oxidative strength of the oxidant also constitutes an error of law because it assumed that aspects of the invention not explicitly recited in the claims are not relevant to the doctrine of equivalents analysis. (Appx29.) That is incorrect as a matter of law. *See, e.g., DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 469 F.3d 1005, 1018 (Fed. Cir. 2006) ("[A]ny

analysis of infringement under the doctrine of equivalents necessarily deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim."). Apicore attempts to distinguish *DePuy* by arguing that *DePuy* purportedly only addresses the "all-elements" rule. But as the *DePuy* court explained, the all-elements rule is nothing more than a conclusion that there is evidence for a reasonable factfinder to find that all elements of the claim are present, whether literally or equivalently. *Id.* at 1018-1019. Notably, even Apicore's own expert testified that it was important to consider the strength of the oxidant in the claimed process. (Appx7289.) The strength of the oxidant is not in the claim, but under *DePuy*, even Apicore recognized that it is appropriate to consider the strength of the oxidant to determine whether Aurobindo oxidizes in substantially the same way as claimed.

Apicore also distinguished the prior art by arguing that "[a]ll the teachings in the art have been to employ oxides of these types, with or without a solvent, with acid…. The use by applicants of silver oxide without acid is significantly different than the use in Kulkarni of sulfuric acid and ammonium dichromate, and would not be obvious to a skilled artisan." (Appx642.) In so arguing, Apicore emphasized the "significant [] differen[ce]" between 1) silver oxide without acid and 2) ammonium dichromate with sulfuric acid." (*Id.*) Thus, the oxidizing agents such as manganese dioxide, which ***require*** the use of acids, function in a very different way than

oxidizing agents like silver oxide that ***cannot*** be used with acid. *See, e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

> **a.     The District Court Improperly Relied On Apicore's Unsupported Expert Opinion That Manganese Dioxide Is A Mild Oxidizing Agent.**

Furthermore, the district court abused its discretion when it relied on the unsupported testimony of Apicore's expert, Dr. Sessler, to arrive at the conclusion that manganese dioxide is a mild oxidant equivalent to silver oxide in the context of the '992 and '616 patents. (Appx7288-7289.)  Apicore cannot point to a single reference cited by Dr. Sessler to support his opinion that manganese dioxide functions as a mild oxidant in the context of making ISB.  To the contrary, Dr. Sessler states that published information is wrong.  But Dr. Sessler provides nothing more than general, conclusory allegations that treatises such as the Merck Index that characterize manganese dioxide as a strong oxidant are incorrect.  (Appx7336-7337.)

b.    **The District Court Improperly Relied On Yield, Rather Than Purity, To Perform Its Doctrine of Equivalents Analysis.**

Apicore incorrectly argues that the district court considered purity results. When discussing the doctrine of equivalents, the district court focused entirely on yield and never mentioned purity. (Appx30.) Mylan points to the district court's discussion on the construction of the term "purity." But contrary to Apicore's assertion, this discussion does not show that the district court understood purity to be "the proper metric to compare the results under the doctrine of equivalents analysis." (Resp. at 22.)

The district court did not consider the evidence that Aurobindo's manganese dioxide process results in 5-10% impurities as compared to the 1% or less impurities allegedly achieved by Apicore. (Appx4628.) The court merely cites passages from the patent specification to support its conclusion that "'[p]urity' in the context of the '050 patent … refers to the absence of reaction by-products, rather than the absence of any extraneous material." The court abused its discretion when it failed to consider purity in its doctrine of equivalents analysis.

c.    **Manganese Dioxide Cannot Be Substituted For Silver Oxide In The Claimed Process.**

Apicore emphasizes the importance of the reaction conditions of the Process Patents and Aurobindo's manufacturing process to rebut Aurobindo's assertion that manganese dioxide is a strong oxidizing agent. But Apicore cherry-picks particular

CONFIDENTIAL INFORMATION REDACTED

conditions to focus on and ignores the effect of the difference of the key reaction condition in Aurobindo's process: the use of acid ("pH █████") during the oxidation step. (Appx4628.) This omission speaks volumes because it is undisputed that without acid, manganese dioxide *cannot* oxidize the isoleuco intermediate. (Appx7412.) Conversely, silver oxide cannot be used with acid, because, as Dr. Sessler expressly stated, it would be dangerous to use silver oxide with an acid. (Appx7334.) Instead, silver oxide oxidizes the isoleuco intermediate in a basic or neutral environment, *i.e.*, pH $\geq 7$. (Appx642.) *See Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1568–69 (Fed. Cir. 1994) (holding that two products did not function in the same way where accused product would be therapeutically ineffective if used under the same conditions as patentee's product).

If manganese dioxide and silver oxide truly perform in the same *way*, a POSA would be able to follow each step of the Process Patents, in the conditions described, and simply substitute silver oxide with manganese dioxide. But such substitution is not possible because they operate in starkly different environments. Silver oxide oxidizes in a basic environment, while manganese dioxide requires an acidic environment to oxidize the isoleuco intermediate. (Appx7412; Appx7414.) Conversely, if Aurobindo truly "performs every step and includes every element recited in claim 1 of the [Process Patents] except silver oxide," as the court concluded, then Aurobindo could simply substitute silver oxide in its manufacturing

process.  (Appx27.)  But it would be impossible to do so because Aurobindo uses acid in its process and silver oxide does not oxidize in the presence of acid. (Appx7334.)  The use of acid along with manganese dioxide represents a significant difference in the way Aurobindo oxidizes its ISB.

The district court made a clear legal error when it found manganese dioxide equivalent to silver oxide without making a finding that they performed in substantially the same way.  And any "implicit" finding of such is an abuse of discretion given the evidence that establishes that manganese dioxide does not oxidize ISB in substantially the same way as silver oxide.

## B.    A Finding Of Infringement Under The Doctrine Of Equivalents Violates The Doctrine Of Ensnarement.

Aurobindo presented several prior art references showing that manganese dioxide was a common oxidizing agent used for oxidizing triarylmethane dyes, of which ISB is one.  (Appx95; Appx755; Appx649; Appx1395.)  While Aurobindo has the initial burden of showing that the range of equivalents encompasses the prior art, the ultimate burden of persuasion is on the *patentee* to show that the scope of equivalents does not ensnare prior art.  *DePuy* , 567 F.3d at 1323-24.  Aurobindo made a clear showing that application of the doctrine of equivalents to cover manganese dioxide encompasses the prior art, and Apicore failed to carry its burden and show otherwise.

Aurobindo showed that the hypothetical claim using manganese dioxide—simply substituting manganese dioxide for silver oxide in claim 1 of each of the Process Patents—would be unpatentable as obvious over Newton or Kulkarni in view of the '558 patent. *See DePuy*, 567 F.3d at 1325 ("[i]f such a claim would be unpatentable under 35 U.S.C. §§ 102 or 103, then the patentee has overreached, and the accused device is noninfringing as a matter of law."). Apicore failed to rebut Aurobindo's showing. Apicore incorrectly assumes that the ensnarement analysis requires an anticipatory reference disclosing all of the claim elements. As is clear from *DePuy*, a combination of references that renders the hypothetical claim obvious is sufficient. *See id.* at 1325-1326 (performing obviousness analysis on hypothetical claim).

The district court's criticisms of the prior art are irrelevant in light of this Court's precedent. First, the fact that a prior art reference discloses multiple and "various triarylmethane dyes and oxidizing agents" does not diminish the relevance of the prior art reference. *See Application of Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962). As discussed in Aurobindo's Opening Brief, the '558 patent discloses triarylmethane dyes that are structurally similar to ISB (missing only a sulfonic acid group) thereby strongly suggesting to a POSA that manganese dioxide could be used to oxidize isosulfan blue.

Further, the motivation to combine can be supported by the ordinary knowledge of a POSA and does not need to be expressly stated in the prior art. *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367–68 (Fed. Cir. 2006).

Second, the district court erroneously concludes that Aurobindo's prior art references are "unrelated" and thus provide no motivation to combine. (Appx19-20.) The district court disregards the knowledge of a POSA to make this straightforward substitution. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Additionally, whether "a specific embodiment is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered" in the obviousness analysis. *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989).

The district court appears not to have performed any of this analysis. The district court does not address the references presented by Aurobindo in support of its ensnarement defense—the district court does not discuss the '558 patent, which teaches the use of manganese dioxide to oxidize the genus of triarylmethane dyes. (Appx17-20.) Rather, the district court analyzes the prior art in a rigid fashion that is at odds with *KSR*. (*Id.*)

Aurobindo has shown that the district court abused its discretion in finding that Apicore is likely to succeed on its claim that Aurobindo infringes the asserted

claims of the Process Patents. Apicore has not met its burden to demonstrate infringement under the doctrine of equivalents and has not rebutted Aurobindo's ensnarement defense. Accordingly, the Court should vacate the district court's finding that Aurobindo infringes claim 1 of the Process Patents under the doctrine of equivalents.

## II. AUROBINDO RAISED A SUBSTANTIAL QUESTION AS TO THE VALIDITY OF THE '050 PATENT.

### A. Apicore Has Not Shown That The '050 Patent Claims Are Different In Kind From The Prior Art.

The '050 patent claims are obvious over the prior art ISB product, Lymphazurin®. Apicore's ISB product, which Apicore asserts is an embodiment of the '050 patent, purportedly has the same therapeutic index as Lymphazurin®. (Appx7459.) The only difference between Lymphazurin® and Apicore's ISB product is purity. (Appx844; Appx170-171.)

Rather than dispute evidence that there is no patentable difference in kind between Lymphazurin® and Apicore's ISB product, Apicore relies on the erroneous conclusion that an inventive purification method for a prior art compound is enough to make the resulting purer compound itself nonobvious: "discovering how to perform the purification is an invention of patentable weight in itself." (Resp. at 28-29.) However, the asserted '050 claims do not cover methods to purify ISB. They claim the purified compound itself. Thus, the relevant portion of the *Aventis* opinion

is "the purified compound is *prima facie* obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified." *Aventis Pharma Deutschland GmbH v. Lupin Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007). *Aventis* relies on *In re Merz*, which found that if an applicant is "entitled to a patent on a method for purifying [a known dye], [it] is not entitled to a patent on the article which after being produced *has a greater degree of purity* than the product produced by former methods," unless the resulting product "differs not only in degree but in kind." *In re Merz*, 97 F.2d 599, 601 (C.C.P.A. 1938) (emphasis added). Thus, the process of *performing* the purification may be patentable in some cases, but not the resulting purified compound.

The *Forest Labs* decision Apicore relies upon actually presents an example of what it means for a purified compound to be different in kind from a less pure prior art compound.  In *Forest Labs*, evidence indicated that "it was unexpected that all of the therapeutic benefit of citalopram would reside in the (+)enantiomer, resulting in escitalopram having twice the potency of racemic citalopram." *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263, 1269 (Fed. Cir. 2007).  In contrast, evidence establishes that Apicore's ISB has the same efficacy and safety as Lymphazurin®, and has no unexpected results relating to 99% purity. *See In re Harris,* 409 F.3d 1339, 1344 (Fed. Cir. 2005) (finding increased efficacy, measured by percentages, to be a difference of degree and not of kind). *Forest Labs* is distinguishable because,

unlike the present situation, the purified product was different in kind than the prior art less pure product.

Apicore has not rebutted the evidence presented by Aurobindo that the claims of the '050 patent are obvious over Lymphazurin® because Apicore has not shown that the claimed invention is different in kind.

## B. Aurobindo's Prior Art Combinations Render The '050 Claims Obvious.

Claims 1, 11, and 15 of the '050 patent cover a compound, a solution, and a composition consisting essentially of ISB having a purity of 99.0% by HPLC. (Appx170-171.)  Aurobindo focused its analysis of the validity of the '050 patent claims on the prior art combinations of Hirsch in view of Snyder or De Haen.  Hirsch discloses ISB that is 94.5% pure, and successfully used analytical HPLC to separate and identify the 5% closely related impurities.  (Appx844.)  Snyder teaches that if a POSA can use analytical HPLC to identify impurities, as Hirsch successfully did, a POSA can simply discard the impurities and recover a highly pure compound that merely required collection at detector outlet rather than just discarding after analysis. (Appx1313.)  De Haen directs a POSA to use "classical means [such as] chromatography" to purify vital dyes, such as ISB (which De Haen indicates was also known as "Patent blue violet").  (Appx1142.)  Therefore, the combination of Hirsch in view of Snyder or De Haen renders the '050 claims obvious.

The district court's finding that a POSA would not be motivated to use HPLC because of a resulting decrease in yield was an abuse of discretion. The '050 claims do not have a yield limitation or even mention yield at all. (Appx170-171.) A 99% pure ISB product satisfies the '050 claims regardless of the amount of ISB. The relevant question is whether a POSA can use the references to achieve ISB having 99% purity as measured by HPLC, with a reasonable expectation of success. The answer is clearly yes.

Apicore points to the district court's finding that a POSA would not be motivated to use HPLC because closely related impurities "co-elute" with ISB making separation difficult. This finding is clearly erroneous based on the documentary evidence of record. The undisputed evidence shows that Hirsch measured the purity of his ISB product and identified the impurities as "closely related isomers" by HPLC. (Appx844-845.) That means Hirsch was able to use HPLC to separate the ISB from closely related impurities. Because Hirsch successfully used HPLC to analyze the purity of ISB, following Snyder, a POSA could easily purify the ISB to greater than 99%: "The sample band is observed as it passes through the detector, and the band is collected at the detector outlet." (Appx1313.) The district court clearly erred in its understanding of the explicit teachings of the prior art regarding the use of HPLC to purify compounds such as ISB when HPLC was used to analyze the purity of the compound.

The district court also committed clear error in its assessment of De Haen's teaching to use classical purification techniques on dyes such as ISB. (Appx1142.) Inventor Nampalli used flash chromatography and crystallization/precipitation to purify ISB made using prior art lead oxide. (Appx4672-4674; Appx7321-7322; Appx7323-7324.) The expert witnesses agree that flash chromatography and crystallization/precipitation were well-known techniques as of the priority date of the '050 patent. (Appx7318, Appx7321, Appx7324, Appx7421.) These are the same "classical techniques" referenced by De Haen: "[c]ommercial products may be further purified by classical means such as dissolution, filtration and reprecipitation as well as by chromatography." (Appx1142.) The district court abused its discretion by ignoring the clear teachings of De Haen as well as the evidence that a POSA could use those "classical means" to make 99% pure ISB.

Aurobindo has raised a substantial question as to whether the claims of the '050 patent are obvious over Hirsch in view of Snyder or De Haen.

### C.    Apicore Provides No Relevant Evidence To Support Its Secondary Considerations Of Nonobviousness.

#### 1.    There Was No Long-Felt But Unmet Need For 99% Pure ISB.

Apicore relies heavily on the assumption that the '050 claims met a long-felt but unmet need, but there is no evidence identifying any efforts and failures to make ISB having a purity of 99% by HPLC. Apicore's long-felt but unmet need argument

is pure speculation. *See In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[O]ur precedent requires that the applicant submit actual evidence of long-felt need, as opposed to argument.").

First, Apicore does not identify any need that was not already met by the prior art Lymphazurin® product. Even assuming that there were periods of time when there were shortages of Lymphazurin®, Apicore has not presented any evidence that any shortage was due to problems with the prior art technology as opposed to other business reasons. Nor is there any evidence that making Lymphazurin purer would have resolved any supply issues.

Moreover, when Lymphazurin® was not available, there was a need for Lymphazurin® (*i.e.*, 94.5% pure ISB), not the claimed 99% pure ISB. *See AstraZeneca LP v. Breath Ltd.*, 603 F. App'x 999, 1002 (Fed. Cir. 2015) (rejecting patentee's arguments that "sterility was the key factor underlying the need for, and success of, its product" because "had the FDA determined [the product] could be sold in the United States without being sterile, the unmet need would have been met."). The availability of Lymphazurin® is irrelevant to Apicore's assertion of a long-felt but unmet need.

### 2.    Apicore Provides No Evidence That Others Tried And Failed To Make 99% Pure ISB.

Apicore's argument that others tried and failed to make 99% pure ISB has no support. First, Apicore presents no evidence that Hirsch, or anybody else, tried to

make 99% ISB and failed.  Hirsch reports clinical study results of Lymphazurin, the purity of which was reported as 94.5% with 5.5% closely related impurities. (Appx844-845.)  Hirsch's 1990 letter to the FDA reports the specific levels of unidentified impurities in its specification.   (Appx4729.)   Neither document describes or suggests failures at attempts to make 99% pure ISB. Apicore selectively quotes from Hirsch's concluding paragraph noting that he would continue to strive to identify and remove impurities and welcomed the FDA's guidance.  (Appx4729.) The concluding paragraph simply acknowledges FDA guidance regarding impurity identification. There is no indication that Dr. Hirsch was trying to make 99% pure ISB, let alone failed to do so.

Next, Apicore speculates that Innovasynth failed to produce 99% pure ISB by referencing isolated documents about its struggle to manufacture and purify ISB. But it is undisputed that Innovasynth developed a new ISB process shortly after it was engaged to synthesize ISB.  *See Dow Chem. Co. v. Halliburton Oil Well Cementing Co.*, 324 U.S. 320, 330-31 (1945) (finding that there was no proof of trying and failing because a process was immediately found when the need arose). Apicore presents no evidence that Innovasynth's issues with making ISB stemmed from failing to make 99% pure ISB.

Finally, Apicore's assumptions about Covidien's market exit is also speculative.  It is undisputed that Covidien supplied the market with pharmaceutical

CONFIDENTIAL INFORMATION REDACTED

grade ISB for decades and the FDA published a notice indicating that Covidien withdrew its NDA for Lymphazurin® for reasons unrelated to safety or efficacy. (Appx1564-1566.)  Covidien itself stated that it it would supply ISB as long as customers needed it because it was the only supplier of ISB at that time. (*Id.*)  When Mylan entered the market, that was no longer the case.

Apicore has failed to present actual evidence that there was a long-felt but unmet need for 99% pure ISB or that others tried to make 99% pure ISB and failed. Apicore also does not establish any nexus between the evidence it proffers and the claims of the '050 patent.  Accordingly, Apicore has failed to present any relevant secondary considerations of nonobviousness.

### D.   The District Court Ignored Clear Evidence Indicating Anticipation Of The '050 Claims.

Finally, the district court abused its discretion when it disregarded Sigma's certificate of analysis indicating that a batch of its ISB had a purity of ▮ in 2001. (Appx3364; Appx3138-3139; Appx7215.)  On its face, this document presents a substantial question as to the novelty and obviousness of the '050 claims.  The district court improperly found that Apicore's suppositions rebutted Aurobindo's documentary evidence without a complete evidentiary record.  Apicore's arguments regarding Sigma's purity measurement, particularly in light of Sigma's declaration stating that the documents "were kept in the ordinary course of business," does not negate the evidence that Sigma made ▮ pure ISB in 2001.

Based on the evidence presented by Aurobindo and the failure of Apicore to rebut this evidence, Aurobindo has raised a substantial question as to the validity of the '050 patent. Accordingly, this Court should also vacate the finding that Apicore has demonstrated a likelihood of success as to the '050 patent.

## III.  THE DISTRICT COURT ERRONEOUSLY FOUND IRREPARABLE HARM TO APICORE.

### A.  There Is No Nexus Between The Alleged Harms To Apicore And The Patented Features Of The Asserted Patents.

Apicore asserts that "nexus between Aurobindo's infringement and Appellees' harm was quite clear" "because '[w]ithout infringing the '992, '616 and '050 patents, Aurobindo would not be able to make the isosulfan blue product described in its ANDA.'" (Resp. at 48-49.) In so asserting, Apicore continues to misconstrue the law—infringement alone does not confer the requisite causal nexus: "To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*").

### 1.  There is No Evidence of Any Market Demand for the ISB API by Any Entity for Any of the Patented Features

Admitting that there is no evidence of any consumer demand for the final ISB product, Apicore argues that Aurobindo ignored evidence of market demand for ISB

API from "pharmaceutical companies, API suppliers, hospitals,[1] and the FDA" but fails to cite to any evidence that actually supports its argument. (Resp. at 49.)

First, Apicore refers to Sigma's difficulty in finding a new ISB API supplier as evidence that API buyers demand 99% pure ISB API. Apicore, however, fails to cite to any supporting evidence because there is none. (Resp. at 49.) Apicore also points to "evidence" that manufacturers (such as Mylan) generally desire "substantially pure API" in order to reliably supply a final dose form to the market. (Resp. at 52.) But all this "evidence" is wholly unsupported conjecture as to whether any manufacturer actually desired the patented features, that is, 99% purity or use of silver oxide.

Similarly, Apicore's argument that pharmaceutical companies demand the patented features does not provide the requisite nexus. Instead of pointing to any evidence that any pharmaceutical company demanded 99% pure ISB API made by silver oxide, Apicore only states that (unidentified and hypothetical) pharmaceutical companies demand "high purity API" without any evidence of what "high purity API" would be demanded by pharmaceutical companies. Even if speculation were enough, pharmaceutical companies may desire 97% pure ISB API and consider it to

---

[1] The record is completely barren of any evidence that hospitals demanded 99% pure ISB API or ISB that was manufactured using silver oxide. In fact, the uncontroverted evidence shows that hospitals (like physicians) were never aware of the purity level of any ISB product, let alone the API. (Appx7482.)

be "high purity API." There can be no causal nexus between the patented features and the alleged harm in this case.

Finally, Apicore suggests that causal nexus is established by the FDA's demand for 99% purity in the ISB API. (Resp. at 50.) But, as noted in Aurobindo's Opening Brief, there is no evidence that the FDA would not have approved Aurobindo's ANDA but for 99% purity. Aurobindo independently selected that threshold without it being required to do so by the FDA. Apicore argues that because Aurobindo itself required 99% purity in its specification, any ISB API that is not 99% pure "would not be approved by the FDA purity specification."[2] (Resp. at 50.) This distinction is significant because the district court relied upon Apicore's incorrect and unsupported statements[3] that the FDA would not have approved Aurobindo's ANDA without infringing the patents-in-suit. (Appx5.) There is no evidence that the patented features were demanded by the FDA. There is, however,

---

[2]Apicore is precluded from relying upon this new argument because it was not raised at the district court level. That is, Apicore never argued that Aurobindo's Drug Master File specification established causal nexus and should not be allowed here to raise it for the first time. *See, e.g., Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000).

[3]For example, Apicore argued that "99[%] is now the grade that meets the current FDA and ICH standards for pharmaceutical ISB impurity limits." (Resp. at 50.) The lower court even explicitly asked whether the 99% purity requirement "originated with the FDA as a requirement" to which Apicore's expert responded (wrongly and without any supporting evidence) that 99% purity is "now the standard set by the FDA." (Appx7293.)

clear evidence to the contrary—the FDA did approve Lymphazurin® which does not have 99% purity. (Appx844.)  FDA approval does not establish demand for the patented features where there is no evidence that 99% purity was actually required by the FDA.   Moreover, FDA approval does not satisfy the causal nexus requirement.  *See, e.g., AstraZeneca v. Breath Ltd.*, 88 F. Supp.3d 326, 393 (D.N.J. 2015) ("Whether or not there is a nexus between the novel features of the patented product and the commercial success must be evaluated in terms of *what is driving sales, not what is allowing the product to reach the shelf in the first place*.") (emphasis added); *In re OxyContin Antitrust Litig*., 994 F. Supp.2d 367, 400 (S.D.N.Y. 2014); *aff'd* 811 F.3d 1345 (Fed. Cir. 2016).

The law is clear that a preliminary injunction is an extraordinary remedy that should only be granted if the harms are connected directly to the inventive contribution and value of the patent.  *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012) ("*Apple II*").   Where, as here, Apicore failed to provide any evidence of any connection between the harms it alleges and the inventive contribution of the asserted patents, the district court abused its discretion finding otherwise.

## 2.    The Lower Court Erred By Misapplying The Law Regarding Causal Nexus.

Apicore justifies a new legal test to explain the lower court's finding that "simple products" do not require a finding of causal nexus, but ultimately cannot

validate such an error.  The district court erred when it distinguished the *Apple* line of cases on the basis that the ISB product was a "relatively simple product" and as such required no evidence of causal nexus. (Appx56.) The district court simply assumed causal nexus. It did not identify any evidence that would support the conclusion that patented features of 99% purity or use of silver oxide drive demand. (*Id.*) The district court committed legal error by not requiring any proof of causal nexus, even assuming the ISB product and API were relatively simple. *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013) (*"Apple III"*) ("the causal nexus requirement applies regardless of the complexity of the products.")

The district court also committed legal error by finding that Apicore did not have to show evidence of market demand for the patented features of the Process Patents.  Apicore attempts to bolster the district court's erroneous application of the law by arguing that the court's reliance on *Janssen* was correct because the accused infringer in *Janssen* "would not be able to make the products proposed in its ANDA without infringing the asserted [] patent." (Resp. at 54.) But, in this case, as admitted by Apicore, there are myriad ways to make ISB, including the prior art Lymphazurin® product, and there is no 99% purity requirement in the Process Patents. In *Janssen*, there was only the one known method for manufacturing the key element of *Janssen*'s product. *Janssen Products, L.P. v. Lupin Ltd.,* 109 F. Supp. 3d 650, 700 (D.N.J. 2014).  That key element in *Janssen* so significantly impacted the

efficacy of the final product that consumers could appreciate the difference and it created demand for *Janssen*'s product. (*Id.* at 658-59.) That is not the case here.

### 3.    The District Court Assumed Causal Nexus Based on FDA Approval

Apicore denies that the district court assumed nexus based upon FDA approval, but the district court stated: "Aurobindo's causal nexus arguments are largely irrelevant to a product such as the accused isosulfan blue product, *which would not be on the market if Aurobindo had not obtained Food and Drug Administration approval* for a product that will likely be found to be covered by the patents-in-suit." (Appx5 (emphasis added).)

Apicore then erroneously argues that the cases explicitly holding that FDA approval is insufficient to satisfy the causal nexus requirement are inapposite because those cases addressed nexus in the context of commercial success rather than irreparable harm. (Resp. at 55.)  Apicore does not explain why the nexus analysis would differ as between commercial success and irreparable harm. In either context, the focus of the nexus analysis is on determining the impact of patented features on consumer demand.  That is, the nexus analysis in either context requires evidence that establishes that the commercial success or consumer demand are a result of patented features rather than other non-patented features.  *Compare In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008) (explaining that a nexus in the

commercial success context is satisfied if evidence supporting success is "a direct result of the unique characteristics of the claimed invention") *with Apple II,* 695 F.3d at 1375 (explaining that the nexus requirement in the irreparable harm context requires a patentee to provide evidence supporting demand that is connected to or driven by the patented features).  The fact that the nexus analysis can be used in different contexts does not negate the applicability of the law on nexus.

Finally, Apicore's argument that Aurobindo did not timely object on these grounds is wrong. The district court explicitly laid out the false assumption of nexus based on FDA approval. (Appx5.) The magistrate judge's R&R only stated such an assumption based on infringement (to which Aurobindo did timely object and which is included in Aurobindo's opening brief).

### B.    <u>Mylan Has Not Demonstrated Irreparable Harm.</u>

The district court erred in finding that Apicore suffered irreparable harm in the form of price erosion, direct competition lost sales, and lost R&D opportunities.

First, the factual record is entirely devoid of evidence suggesting that Apicore suffered price erosion. All of the evidence related to price erosion is specific to Mylan but the district court erroneously found that Apicore *directly* suffered price erosion. (Resp. at 43.) Contrary to Apicore's assertion, the district court never

suggested that Apicore US's alleged price erosion derived from harms to Mylan. This is an entirely new argument that cannot supplant the district court's findings.[4]

Apicore then attempts to rehabilitate the district court's finding that Apicore US and Aurobindo are direct competitors despite the fact that Apicore US cannot lose a single API sale to Aurobindo because it is contractually obligated to provide API only to Mylan. Thus, a sale by Aurobindo to AuroMedics does not result in a loss of API sale for Apicore US because Apicore and Aurobindo have different customers. *See e.g.*, *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1347-48 (Fed. Cir. 2013) (finding no direct competition where parties targeted different customers and patentee "was unable to point to a single [product] sale that had been lost to" the alleged infringer) *compared to Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (finding direct competition where parties' customer bases overlapped).

Apicore's only direct competition argument is that it lost sales because Mylan stopped buying ISB after Aurobindo's market entry. First, this is another new argument that the district court never heard or considered. Second, Apicore cannot point to a single sale lost directly to Aurobindo because Aurobindo never targeted Mylan as a customer. Apicore's argument only indicates that it suffered, at most,

---

[4]Both Apicore and Mylan waived any such arguments based on both entities' failure to object to the magistrate judge's failure to find irreparable harm as to Mylan.

**CONFIDENTIAL INFORMATION REDACTED**

lost sales, which are compensable by money damages and thus not irreparable. *See e.g., Otsuka Pharm. Co. v. Torrent Pharma. Ltd*., 99 F. Supp. 3d 461, 501 (D.N.J. 2015).

Apicore's arguments regarding lost R&D opportunities are similarly unpersuasive. Irreparable harm is necessarily a forward-looking inquiry. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 652 (Fed. Cir. 2015). "[T]he past is only relevant as an indicator of the future." *Id.* Here, Apicore looks only to past revenue information when it asserts that Apicore US's revenue is evidence of the irreparable harm of its lost ISB revenue. (Resp. at 45.) But it is not necessary to look backwards in this case because Apicore's own forecasts unequivocally show future revenue projections that indicate that ISB revenue is a trivial source of revenue going forward. In 2016, Apicore expected ISB to account for only ▮ of its revenue and only ▮ by 2020. (Appx1656-1657, at ¶¶ 81-84.)

Moreover, Apicore's forecasts were made before Aurobindo entered the market, bolstering their reliability. The forecasts are free from litigation bias and clearly show the diminishing importance of ISB to Apicore's business. Apicore's suggestion that Aurobindo's market entry rendered the forecast "meaningless" strains logic. The forecasts show the fading importance of ISB to Apicore's business. Finally, Apicore argues that this loss of revenue precluded Apicore from matching a salary offer of a former employee and cites Dr. Kovi's declaration, but

overlooks Dr. Kovi's testimony that he never even asked for the salary offer number. (Appx7368-7369.)

In summary, Apicore failed to show that there is any nexus between its alleged irreparable harm and the claimed invention or even that the alleged injury is irreparable.

## CONCLUSION

Apicore has failed to meet its burden of demonstrating a likelihood of success on the merits and irreparable harm as to the Apicore patents. The district abused its discretion in granting Apicore's motion for a preliminary injunction against Aurobindo. Based on the foregoing, Aurobindo respectfully requests that this Court reverse the order of the district court and vacate the preliminary injunction.

Respectfully submitted,

*/s/ Sailesh K. Patel*

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(415) 901-8749

Sailesh K. Patel
Cindy S. Ahn
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5698

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 27th day of March, 2017, two bound copies of the foregoing were served by First Class Mail to the following:

Nicole W. Stafford
WILSON SONSINI GOODRICH & ROSATI
900 S. Capital of Texas Hwy
Las Cimas IV, Fifth Floor
Austin, TX 78732

I also certify pursuant to Fed. R. App. P. 25(a)(2)(B)(ii) and Fed. Cir. R. 31(b) that on this 27th day of March 2017, that 12 copies of the foregoing, including the original, were filed by hand delivery to the Clerk of the Court for the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

*/s/ Sailesh K. Patel*
Sailesh K. Patel

**CERTIFICATE OF COMPLIANCE**

Counsel for appellants certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 6,743 words, based on the "Word Count" feature of Microsoft Word, including footnotes and endnotes. Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Certificate of Filing and Service, Table of Contents, Table of Authorities, Addendum, and Statement of Related Cases.

Dated:  March 27, 2017                          Respectfully submitted,


                                                         */s/ Sailesh K. Patel*
                                                         Sailesh K. Patel