No. 17-1645

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

MYLAN INSTITUTIONAL LLC and APICORE US LLC
Plaintiffs-Appellees,

v.

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC.,
and AUROMEDICS PHARMA LLC,
Defendants-Appellants,

_____

**NONCONFIDENTIAL JOINT APPENDIX,**
**[Appx1 – Appx9025]**

_____

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(415) 901-8749

Sailesh K. Patel
Cindy S. Ahn
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
(312) 258-5698

*Attorneys for Defendant-Appellants*

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 139 | ORDER Preliminarily Enjoining Defendants. | Appx1 – Appx3 |
| 122 | ORDER ADOPTING REPORT AND RECOMMENDATION re Motion for Preliminary Injunction | Appx4 – Appx6 |
| 101 | REPORT AND RECOMMENDATIONS re Motion for Preliminary Injunction | Appx7 – Appx58 |
| N/A | U.S. District Court for the Eastern District of Texas Civil Docket for Case No. 2:16-cv-491 | Appx59 - Appx78 |
| 1 | COMPLAINT for Patent Infringement against AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. | Appx79 - Appx92 |
| 1-1 | Exhibit A to COMPLAINT for Patent Infringement | Appx93 – Appx100 |
| 1-2 | Exhibit B to COMPLAINT for Patent Infringement | Appx101 – Appx108 |
| 12 | AMENDED COMPLAINT for Patent Infringement against AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc., filed by Mylan Institutional LLC, Apicore US LLC | Appx131 – Appx147 |
| 12-1 | Exhibit A to AMENDED COMPLAINT for Patent Infringement | Appx148 – Appx155 |
| 12-2 | Exhibit B to AMENDED COMPLAINT for Patent Infringement | Appx156 – Appx163 |
| 12-3 | Exhibit C to AMENDED COMPLAINT for Patent Infringement | Appx164 – Appx171 |
| 12-5 | Exhibit E to AMENDED COMPLAINT for Patent Infringement | Appx180 – Appx184 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 20 | MOTION for Preliminary Injunction by Apicore US LLC, Mylan Institutional LLC — REDACTED | Appx185 – Appx205 |
| 20-2 | Declaration of Heather Paton in support of MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx206 – Appx222 |
| 20-3 | Declaration of Jonathan L. Sessler in support of MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx224 – Appx250 |
| 20-8 | Exhibit D to Declaration of Aden M. Allen in support of MOTION for Preliminary Injunction | Appx391 – Appx394 |
| 20-10 | Exhibit F to Declaration of Aden M. Allen in support of MOTION for Preliminary Injunction (Excerpts) | Appx402 – Appx403 |
| 20-14 | Declaration of Michael J. Dansky in support of MOTION for Preliminary Injunction — REDACTED | Appx422 – Appx441 |
| 20-28 | Exhibit O to Declaration of Michael J. Dansky in support of MOTION for Preliminary Injunction — REDACTED | Appx543 – Appx573 |
| 55 | RESPONSE to MOTION for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. — REDACTED | Appx574 – Appx598 |
| 55-6 | Exhibit 4 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx632 – Appx642 |
| 55-7 | Exhibit 5 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx643 – Appx678 |
| 55-14 | Exhibit 12 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx753 – Appx758 |
| 55-16 | Exhibit 14 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx832 – Appx838 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 55-17 | Exhibit 15 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx839 – Appx842 |
| 55-18 | Exhibit 16 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx843 – Appx847 |
| 55-19 | Exhibit 17 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx848 – Appx852 |
| 55-20 | Exhibit 18 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx853 – Appx888 |
| 55-21 | Exhibit 19 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx889 – Appx890 |
| 55-23 | Exhibit 21 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx893 – Appx895 |
| 55-24 | Exhibit 22 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx896 – Appx897 |
| 55-29 | Exhibit 27 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx1057 – Appx1071 |
| 55-33 | Exhibit 31 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1137 – Appx1154 |
| 55-37 | Exhibit 35 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1236 – Appx1239 |
| 55-38 | Exhibit 36 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1240 – Appx1243 |
| 55-39 | Exhibit 37 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1244 – Appx1247 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 55-40 | Exhibit 38 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1248 – Appx1254 |
| 55-42 | Exhibit 40 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx1263 – Appx1280 |
| 55-43 | Exhibit 41 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx1282 – Appx1287 |
| 55-45 | Exhibit 43 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1302 – Appx1308 |
| 55-46 | Exhibit 44 to Declaration of George C. Yu in support of RESPONSE to MOTION for Preliminary Injunction | Appx1309 – Appx1339 |
| 55-49 | Declaration of Edward G. Brown, Ph.D. in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx1382 – Appx1447 |
| 55-50 | Declaration of Mark Fedele in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx1448 – Appx1454 |
| 55-52 | Declaration of David Krag, M.D. in support of RESPONSE to MOTION for Preliminary Injunction | Appx1457 – Appx1465 |
| 55-57 | Exhibit E to David Krag, M.D. in support of RESPONSE to MOTION for Preliminary Injunction | Appx1534 – Appx1546 |
| 55-59 | Exhibit G to David Krag, M.D. in support of RESPONSE to MOTION for Preliminary Injunction | Appx1555 – Appx1562 |
| 55-60 | Exhibit H to David Krag, M.D. in support of RESPONSE to MOTION for Preliminary Injunction | Appx1563 – Appx1567 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 55-61 | Exhibit I to David Krag, M.D. in support of RESPONSE to MOTION for Preliminary Injunction | Appx1568 – Appx1577 |
| 55-62 | Exhibit J to David Krag, M.D. in support of RESPONSE to MOTION for Preliminary Injunction | Appx1578 – Appx1584 |
| 55-69 | Declaration of W. Christopher Bakewell in support of RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx1621 – Appx1664 |
| 71 | Defendants' Supplemental Brief in support of RESPONSE to MOTION for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. — REDACTED | Appx3137 – Appx3142 |
| 71-3 | Exhibit B to Defendants' Supplemental Brief in support of RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx3158 – Appx3191 |
| 71-4 | Exhibit C to Defendants' Supplemental Brief in support of RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx3194 – Appx3211 |
| 72-1 | Defendants' Notice of Corrected Exhibit C to Defendants' Supplemental Brief in support of RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx3363 – Appx3364 |
| 79 | REPLY to RESPONSE to MOTION for Preliminary Injunction filed by Apicore US LLC, Mylan Institutional LLC — REDACTED | Appx3381 – Appx3403 |
| 79-10 | Exhibit I to Declaration of Aden M. Allen in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx3467 – Appx3479 |
| 79-11 | Declaration of Ravishanker Kovi in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx3615 – Appx3627 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 79-15 | Exhibit D to Declaration of Ravishanker Kovi in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx3643 – Appx3647 |
| 79-18 | Declaration of Michael J. Dansky in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4099 – Appx4122 |
| 79-31 | Declaration of Ralph Tarantino in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4246 – Appx4267 |
| 79-33 | Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4280 - Appx4381 |
| 80-2 | Exhibit 1 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4393 – Appx4468 |
| 80-9 | Exhibit 8 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction | Appx4523 – Appx4527 |
| 80-10 | Exhibit 9 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4528 – Appx4534 |
| 80-14 | Exhibit 13 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4620 – Appx4629 |
| 80-15 | Exhibit 14 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4632 – Appx4674 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 80-16 | Exhibit 15 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx4687 – Appx4689 |
| 80-18 | Exhibit 17 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx4726 – Appx4755 |
| 80-19 | Exhibit 18 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx4756 – Appx4757 |
| 80-20 | Exhibit 19 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx4758 – Appx4763 |
| 81-2 | Exhibit 21 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction | Appx4776 – Appx4777 |
| 81-3 | Exhibit 22 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction | Appx4778 – Appx4779 |
| 81-4 | Exhibit 23 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx4780 – Appx4781 |
| 81-6 | Exhibit 25 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction (Excerpts) — REDACTED | Appx4785 – Appx4786 |
| 81-8 | Exhibit 27 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx4809 – Appx4820 |
| 83-6 | Exhibit 63 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to | Appx5809 – Appx5810 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| | MOTION for Preliminary Injunction — REDACTED | |
| 83-9 | Exhibit 66 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx5835 – Appx5842 |
| 83-11 | Exhibit 68 to Declaration of Jonathan L. Sessler in support of REPLY to RESPONSE to MOTION for Preliminary Injunction — REDACTED | Appx5848 – Appx5849 |
| 85-1 | Ex. A to Defendants' Notice of Supplemental Declaration of Sigma-Aldrich Corporation (regarding Defendants' Supplemental Brief in support of RESPONSE to MOTION for Preliminary Injunction filed) — REDACTED | Appx5932 – Appx5936 |
| 92 | SUR-REPLY to Reply to Response to PATENT Motion re 20 SEALED MOTION for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. — REDACTED | Appx5937 – Appx5943 |
| 92-12 | Rebuttal Declaration of W. Christopher Bakewell in Support of Defendants' SUR-REPLY to Reply to Response to PATENT Motion re 20 SEALED MOTION for Preliminary Injunction — REDACTED | Appx5984 – Appx5993 |
| 95-1 | Exhibit A to Defendants' deposition designations and counter-designations - deposition designations of October 29, 2016 deposition of Richard J. Bleicher filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. (Excerpts) | Appx6262 – Appx6296 |
| 98 | Defendants' Disclosure of Exhibits and Demonstratives for the November 2, 2016 Preliminary Injunction and Motion to Transfer Venue Hearing (Excerpts) — REDACTED | Appx7016 – Appx7174 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 104 | OFFICIAL TRANSCRIPT of Proceedings held on 11/2/2016 (Motion Hearing) before Judge Roy Payne (Excerpts) — REDACTED | Appx7191 – Appx7497 |
| 106 | Defendants' Objections to REPORT AND RECOMMENDATIONS re Motion for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. — REDACTED | Appx7498 – Appx7544 |
| 110 | RESPONSE by Mylan Institutional LLC, Apicore US LLC to Defendants' Objections to REPORT AND RECOMMENDATIONS re Motion for Preliminary Injunction filed by Apicore US LLC, Mylan Institutional LLC — REDACTED | Appx7545 – Appx7606 |
| 126 | NOTICE OF APPEAL - FEDERAL CIRCUIT as to ORDER ADOPTING REPORT AND RECOMMENDATION re Motion for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. | Appx7607 – Appx7609 |
| 140 | AMENDED NOTICE OF APPEAL - PATENT CASE as to NOTICE OF APPEAL - FEDERAL CIRCUIT as to ORDER ADOPTING REPORT AND RECOMMENDATION re Motion for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. | Appx7610 – Appx7612 |
| N/A | *M-I LLC v. FPUSA, LLC*, 626 F. App'x 995 (Fed. Cir. 2015) | Appx7613 – Appx7619 |
| N/A | *AstraZeneca LP v. Breath Ltd.*, 603 F. App'x 999 (Fed. Cir. 2015) | Appx7620 – Appx7627 |

| Docket Entry No. | Description | Appendix Numbers |
|---|---|---|
| 20-29 | Declaration of Rahul Devnani in support of MOTION for Preliminary Injunction — REDACTED | Appx7628 – Appx7634[1] |
| 27-1 | Declaration of Ronald Quadrel in support of MOTION to Change Venue under 28 U.S.C. Sec. 1404(a) filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. | Appx9000 – Appx9002 |
| 40 | ANSWER to AMENDED COMPLAINT for Patent Infringement against AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc., filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. (Excerpts) | Appx9003 – Appx9025 |

The redacted documents contain information identified by either Appellants, Appellees, or third parties as highly confidential technical and business information. This information retains its status as covered by the protective order in the underlying district court case.

[1] Due to software error, the document with D.I. No. 20-29 did not get sequentially paginated along with the remaining exhibits and was therefore added here towards the end of the Appendix.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, et al., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## <u>ORDER</u>

On February 6, 2017, the Court issued an Order (Docket No. 122) adopting the Magistrate Judge's Report and Recommendations (Docket No. 101) on Plaintiffs' Motion for a Preliminary Injunction (Docket No. 20).  In the Order, the Court states, "Plaintiffs' Motion for Preliminary Injunction . . . will be [granted] following Plaintiffs' submission of an adequate injunction bond. Defendants will be enjoined from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court." Docket No. 122 at 3.  On February 10, 2017, Defendants filed a notice of appeal of the Court's Order to the Federal Circuit.  Docket No. 126.

On February 13, 2017, the Magistrate Judge issued an Order instructing the parties to submit a joint proposed preliminary injunction by February 28, 2017 that identifies any disagreements as to the scope of the preliminary injunction.  Docket No. 129.  On February 21, 2017, Defendants submitted a brief on the preliminary injunction bond and requested a bond in the amount of $24,750,000.  Docket No. 134 at 2.  On February 22, 2017, Plaintiffs posted a bond in the amount of $24,750,000.  Docket No. 136.

On February 23, 2017, Plaintiffs filed an emergency motion requesting that the Court expedite the entry of the preliminary injunction and attached a proposed preliminary injunction. Docket No. 138.  Plaintiffs contend that Defendants are "flooding distributors and wholesalers with their infringing product before formal imposition of the injunction." *Id*. at 1.  Plaintiffs state that "one of the [Group Purchasing Organizations] that currently contracts with Aurobindo for their isosulfan blue product[] issued a 'Pharmacy Alert' notifying its members of the pending preliminary injunction and recommending their members to 'make appropriate orders and/or back-orders' of isosulfan blue due to the pending injunction." *Id*.  Plaintiffs attached a copy of the Pharmacy Alert to their motion.  Docket No. 138-7.  Plaintiffs further contend that in the first three weeks of February alone, Aurobindo has manufactured and imported more than double the amount of its average monthly sales of isosulfan blue.  Docket No. 138 at 3–4.

The Court's February 6, 2017 Order stated that "Plaintiffs' Motion for Preliminary Injunction . . . will be [granted] following Plaintiffs' submission of an adequate injunction bond." Docket No. 122 at 3.  That condition has been satisfied as Plaintiffs have submitted an injunction bond in the amount requested by Defendants.  Docket No. 136; Docket No. 134 at 2.  The Court's February 6, 2017 Order further states that Defendants would "be enjoined from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court." *Id*.  The Magistrate Judge's February 13, 2017 Order required the parties' proposed preliminary injunctions to include similar language consistent with the Court's February 6, 2017 Order.  In light of the contentions presented in Plaintiffs' emergency motion and because the parties' proposed preliminary injunctions are required to include this language, the Court finds that it is appropriate for this portion of the injunction to be entered immediately.

Page **2** of **3**

Appx2

The Court recognizes that Defendants have not had an opportunity to respond to Plaintiffs' emergency motion and that the parties continue to dispute the scope of the injunction.  The parties have previously been ordered to submit a proposed preliminary injunction by February 28, 2017; Defendants may submit any arguments in opposition to Plaintiffs' emergency motion by February 28, 2017, either separately or together with their proposed preliminary injunction.

Accordingly, Defendants are hereby

**ENJOINED** from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court. Defendants are further

**ORDERED** to submit a proposed preliminary injunction that complies with the Magistrate Judge's February 13, 2017 Order (Docket No. 129).  Upon review of both Plaintiffs' and Defendants' submissions to the Court, the Court will issue a revised Order detailing the scope of the preliminary injunction if appropriate.

**SO ORDERED**.

**SIGNED this 24th day of February, 2017.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

Case: 17-1645   Document: 81   Page: 15   Filed: 03/29/2017

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, et al., | § | |
| | § | |
| *Defendants*. | § | |

## ORDER ADOPTING REPORT AND RECOMMENDATION

Before the Court is the Report and Recommendation (Docket No. 101) filed by Magistrate Judge Payne on November 21, 2016 recommending that Plaintiffs' motion for a preliminary injunction (Docket No. 20) be granted. Aurobindo objects to the Report and Recommendation, contending that it includes four incorrect conclusions of law. The Court disagrees for the following reasons.

First, Aurobindo argues that the Report incorrectly determines that Aurobindo failed to raise a substantial question regarding noninfringement of the '992 and '616 patents. Docket No. 106 at 2-6. The Report explains, however, that "it is undisputed that Aurobindo's process performs every step and includes every element recited in claim 1 of the '992 and '616 patents except silver oxide." Docket No. 101 at 21. Aurobindo's process uses manganese oxide, which is likely to be found equivalent to silver oxide by a fact-finder. *Id.* at 21-24. The Court finds Aurobindo's arguments to the contrary unpersuasive for the extensive reasons explained in the Report. *Id.* at 11-14, 20-24.

1

Second, Aurobindo contends that the Report incorrectly finds that Aurobindo failed to raise a substantial question concerning validity of the '050 patent.  Docket No. 10-6 at 6-8.  However, the numerous prior art references presented by Aurobindo suggest that those skilled in the art were unable to achieve isosulfan blue purity levels of greater than 95 percent.  On the basis of a thorough review of the prior art and live testimony from the expert witnesses, the Court concludes that the Report correctly finds that there is not a substantial question regarding validity of the '050 patent.  *See* Docket No. 101 at 26-47.

Aurobindo's third objection is that the Report incorrectly concludes that Plaintiffs established a causal nexus between Aurobindo's alleged infringement and Plaintiffs' alleged harm.  Docket No. 106 at 8-10.  As the Report explains, however, Aurobindo's causal nexus arguments are largely irrelevant to a product such as the accused isosulfan blue product, which would not be on the market if Aurobindo had not obtained Food and Drug Administration approval for a product that will likely be found to be covered by the patents-in-suit.  *See* Docket No. 101 at 49-50.  The Report's conclusion is consistent with other courts who have evaluated the causal nexus requirement in the context of pharmaceutical products.  *See, e.g.*, *Janssen Prod., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 697-701 (D.N.J. 2014).

Fourth, Aurobindo argues that the Report incorrectly finds irreparable harm.  However, the Report identifies hallmark examples of irreparable harm that are demonstrated by the preliminary record, including lost sales, lost research and development opportunities, price erosion, and the fact that Apicore must now directly compete with an infringer.  Docket No. 101 at 47-49.  These findings were more than adequately supported by the record evidence.[1]

---

[1] *See, e.g.*, Docket No. 20-29 ¶¶ 5, 7, 9-22; Docket No. 79-11 ¶¶ 5-6, 9, 12-25, 32-23; Hr'g Tr. At 156:11-158:4, 159:22-163:9, 176:19-25; Docket No. 20-2 ¶¶ 39-46, 53-55, 60; Hr'g Tr. at 40:18-

2

Finally, Aurobindo does not object to the Report's findings with respect to Aurobindo's infringement of the '050 patent or the validity of the '992 and '616 patents. Accordingly, the Court affirms those findings. *See United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989) (findings to which no specific objections are made do not require de novo review).

Plaintiffs' Motion for Preliminary Injunction (Docket No. 20) will be **GRANTED** following Plaintiffs' submission of an adequate injunction bond. *See* Fed. R. Civ. P. 65. Defendants will be enjoined from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court.

Defendants are **ORDERED** to submit a brief of no more than five pages providing a supported and reasoned amount of an appropriate injunction bond **within 14 days** of this Order. Plaintiffs are **ORDERED** to file any response **within seven days** after service of Defendants brief. The matter remains referred to Magistrate Judge Payne for further proceedings.

   **SIGNED this 7th day of February, 2017.**


ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

---

41:2, 44:5-45:24, 47:20-51:2; Docket No. 20-14 ¶¶ 9, 12, 14, 29-32, 34-35; Docket No. 56-4 ¶¶ 6-8; Docket No. 79-18 ¶ 4, 14-25, 32-34; Hr'g Tr. at 182:5-184:19.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC, | § | |
| APICORE US LLC, | § | |
| | § | Case No. 2:16-CV-00491-RWS-RSP |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| AUROBINDO PHARMA LTD, | § | |
| AUROBINDO PHARMA USA INC., | § | |
| AUROMEDICS PHARMA LLC, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## REPORT AND RECOMMENDATION

Plaintiffs Apicore US LLC and Mylan Institutional LLC allege that Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA. Inc., and Auromedics Pharma LLC (collectively "Aurobindo") are importing and selling isosulfan blue formulations in violation of U.S. Patent Nos. 7,662,992, 8,969,616, and 9,353,050. Dkt. No. 12 (Amended Complaint) ¶¶ 13-14. Plaintiffs seek a preliminary injunction to prevent further infringement. Dkt. No. 20. The Court finds that Plaintiffs have established a likelihood of success on the merits with respect to at least one claim of each patent-in-suit, and that Apicore would be irreparably harmed without preliminary relief. Accordingly, Plaintiffs' motion for a preliminary injunction must be **GRANTED**.

## I.    BACKGROUND

Sentinel lymph node biopsy is a procedure used to determine whether cancer cells have spread from an original tumor site to other parts of the body. *See* Dkt. No. 55-55 at 137. A sentinel lymph node is the lymph node (often nearest a tumor site) that is capable of "draining"

1

cancer cells from the tumor, allowing the cancer to spread to the rest of the lymphatic system. *Id.*; '050 patent at 1:54-56. To determine whether drainage has occurred, a surgeon biopsies the sentinel node and looks for cancer cells. Dkt. No. 55-55 at 137. The presence of cancer cells in the sentinel node is indicative of whether cancer has spread to the rest of the lymphatic system. *Id.*

It is difficult to perform a minimally-invasive sentinel lymph node biopsy without first mapping the lymphatic system surrounding the tumor site. *See, e.g.*, '050 patent at 1:53-54; Dkt. No. 80-9 at 1061. The lymphatic system is a network of interconnected vessels and nodes appearing to a surgeon's naked eye as clear fluid and is thus difficult to distinguish from surrounding tissue. *See* Dkt. No. 80-9 at 1061; Dkt. No. 55-52 ¶¶ 11-12. Since the early 1960s, surgeons mapped the lymphatic network surrounding a tumor site by making a subcutaneous or intradermal injection of a blue dye that is selectively absorbed by lymphatic cells. Dkt. No. 80-9 at 1061. The early medical literature acknowledged that surgeons used dyes that were not approved by the Food and Drug Administration (FDA), though no major problems were reported. *Id.*

## A. Isosulfan Blue and Its FDA Approval

Isosulfan blue is the monosodium salt of a 2,5-disulfonated triarylmethane dye and is represented by the following structural formula:



2

*See* Dkt. No. 80-9 at 1061; '050 patent at 1:23-45. The chemical name for isosulfan blue is "N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt." '050 patent at 1:23-45. The FDA approved the use of isosulfan blue for lymphatic vessel delineation in 1981. *See, e.g.*, Dkt. No. 20-2 ¶ 11.

After the FDA's approval, Dr. Jerry Hirsch and his colleagues from the Medical College of Virginia conducted clinical studies and found that an injectable 1% solution of isosulfan blue is safe and effective for identifying lymphatic cells during sentinel lymph node biopsy. *See* Dkt. No. 80-9 at 1064. Dr. Hirsch, through Hirsch Industries, Inc., commercially introduced the injectable 1% solution under the trade name Lymphazurin™. *See id.*; Dkt. No. 80-18. Hirsch Industries and successors-in-interest United States Surgical Corporation (U.S. Surgical), Tyco Healthcare, and later Covidien Ltd.[1] held the original New Drug Application (NDA) for the isosulfan blue solution and were the sole suppliers of Lymphazurin™ in the United States for 30 years. Dkt. No. 20-2 ¶ 11; Dkt. No. 79-33 ¶¶ 92, 105; Dkt. No. 81-3.

## B.  Problems with Isosulfan Blue Synthesis and Purity

From Lymphazurin™'s inception, Hirsch Industries reported problems associated with the synthesis and purification of isosulfan blue. Dr. Hirsch's original clinical trials publication described the use of an isosulfan blue mixture containing "94.5% dye content . . . as determined by high-pressure liquid chromatography." Dkt. No. 80-9 at 1061. The publication explained that "[t]he remaining 5.5% consists of closely related isomers produced during synthesis." *Id.* at 1061-62. Hirsch Industries later determined that the same lot of isosulfan blue contained only 83.4% isosulfan blue and 8.2% "other organics." Dkt. No. 80-18 at 1-2. Dr. Hirsch reported this finding to the FDA through a letter dated June 8, 1990, assuring the FDA that Hirsch Industries

---

[1] Covidien is now Medtronic Minimally Invasive Therapies, a division of Medtronic, Inc.

remained "committed to conduct studies designed to identify and/or remove the organic compound" found in the isosulfan blue product and welcomed the FDA's "advice as to the best approach to achieve this." *Id.* at 3.

The process used to prepare isosulfan blue was unknown to Hirsch Industries and later suppliers, but analytical testing suggested that manufacturers were using heavy-metal oxidants. *See, e.g.*, Dkt. No. 80-19; Dkt. No. 79-33 ¶ 96. For about 26 years following the FDA's approval of isosulfan blue, Sigma-Aldrich Corporation supplied Hirsch Industries and successors-in-interest with isosulfan blue manufactured by Allied Chemical Corporation. Dkt. No. 80-19; Dkt. No. 80-16; Dkt. No. 79-33 ¶¶ 96-97. Allied Chemical's manufacturing process was unknown, but records indicate the presence of lead, which is consistent with the use of a lead compound during synthesis. *See* Dkt. No. 80-19. Sigma-Aldrich "developed a recrystallization process that removed the lead and purified the [isosulfan blue]," but records do not specify the isosulfan blue percentage in the purified product. *See* Dkt. No. 80-16.

In early to mid-2000, after Hirsch Industries' original isosulfan blue NDA had been transferred to Covidien predecessors, Allied Chemical stopped supplying Sigma-Aldrich with isosulfan blue. *See* Dkt. No. 80-19; Dkt. No. 79-33 ¶ 101. Sigma-Aldrich and Covidien predecessors initiated efforts to identify a new supplier, an effort that took "more than five years of determination and focus," according to a Covidien press release. *See* Dkt. No. 81-3; Dkt. No. 80-16. Before a new supplier could be found, existing supplies of isosulfan blue became depleted, eventually prompting Covidien to send a letter to its customers notifying them that Covidien was "completely out" of Lymphazurin™, but that Covidien expected a "*potential* return to supply in February of 2008." Dkt. No. 81-2.

4

By June 2008, Covidien and Sigma-Aldrich had located a new supplier, Innovassynth Technologies, a chemical company located in Mumbai, India, and necessary process and manufacturing changes were approved by the FDA. Dkt. No. 81-3; Dkt. No. 80-19. Innovassynth's process involved the use of ammonium dichromate, resulting in chromium levels up to 100 parts per million (ppm). *See* Dkt. No. 80-19. Sigma-Aldrich developed a process to purify Innovassynth's crude isosulfan blue that reportedly reduced chromium levels to below 10 ppm, but the record does not indicate the percentage of isosulfan blue present in the purified Innovassynth product. *See id.* Sigma-Aldrich reported numerous problems with the purity of Innovassynth's product, *see* Dkt. No. 81-4, 81-5, 81-6, eventually prompting Sigma-Aldrich to develop its own manufacturing process sometime around 2010. *See* Dkt. No. 81-8.

### C.  The Patents-in-Suit and Apicore's Generic Isosulfan Blue Product

Apicore was founded in 2003 and, with six employees by 2004, began developing an improved process for synthesizing isosulfan blue. *See id.* In September 2004, Apicore partnered with Synerx Pharma, LLC, Mylan's predecessor and a manufacturer of finished drug products, to develop and market a generic version of Lymphazurin™. Dkt. No. 55-19. On May 11, 2007, Apicore filed Non-Provisional Patent Application No. 11/747,291 that ultimately led to the three patents-in-suit, all of which claim priority to the '291 application. *See* '992 patent at 1:5-10; '616 patent at 1:5-15; '050 patent at 1:5-15. Consistent with reports from isosulfan blue suppliers, the patents explain that existing methods of synthesizing isosulfan blue used hazardous oxidizing agents and crude methods of purification. *See, e.g.*, '050 patent at 1:63-2:14. The patents thus describe a need for preparing high-purity isosulfan blue that is suitable for use in pharmaceutical formulations. *Id.* at 2:20-23.

5

The patents claim both methods of preparing isosulfan blue and a high-purity form of isosulfan blue. The '992 and '616 patents claim processes in which an isoleuco acid is reacted in a polar solvent with silver oxide to form isosulfan blue acid, which is then treated with a sodium solution to form isosulfan blue. *See, e.g.*, '616 patent at 9:38-64. The '992 patent claims recite a more specific process in which the isoleuco acid is combined with "2.0 to 3.0 equivalents of silver oxide." '992 patent at 9:44-65. The claimed methods provide isosulfan blue "having purity greater than 99.5% by [High Performance Liquid Chromatography] HPLC." *See id.* at 7:29-34. The '050 patent claims isosulfan blue "having a purity of at least 99.0% by HPLC." '050 patent at 9:54-57. The '050 patent also claims solutions and compositions containing the high-purity isosulfan blue. *Id.* at 12:8-12.

Based on the process described in the patents-in-suit, Synerx[2] filed an Abbreviated New Drug Application (ANDA) seeking FDA approval to market a generic version of Lymphazurin™ in September 2008, and the FDA approved the ANDA in July 2010. Dkt. No. 55-20, 55-21. By 2011, isosulfan blue sales had become a significant portion of Apicore's revenue. *See* Dkt. No. 20-29 ¶¶ 11-15. At the same time, Covidien's Lymphazurin™ sales sharply declined, *see* Dkt. No. 20-14 ¶ 23, and Covidien withdrew Lymphazurin™ from the market by September 2012, *see* Dkt. No. 55-23 at 5561. The FDA determined that Covidien discontinued Lymphazurin™ for "reasons other than safety or effectiveness." Dkt. No. 55-23 at 5561. Since Covidien's exit from the market, Mylan became the sole supplier of isosulfan blue drug product until March 2016, when Aurobindo entered the market. *See* Dkt. No. 20-14 ¶ 23. Mylan sourced its supply of isosulfan blue exclusively through Apicore. *See* Dkt. No. 20-2 ¶ 14.

---

[2] By February 2012, Mylan Institutional LLC had acquired Synerx and became the ANDA holder and exclusive licensee of the patents-in-suit. *See* Dkt. No. 55-22; Dkt. No. 12 ¶¶ 4, 29.

6

## D.  Aurobindo's Entry into the Isosulfan Blue Market

Aurobindo Pharma, LTD is an Indian corporation headquartered in Andhra Pradesh, India. Dkt. No. 40 at 2; Dkt. No. 27-1 ¶ 5. Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC are Delaware corporations and wholly-owned subsidiaries of Aurobindo India, both headquartered in Dayton, New Jersey. *Id.* at 3; Dkt. No. 27-1 ¶¶ 3-4.

Aurobindo sought FDA approval for a generic isosulfan blue product sometime after the application leading to Apicore's '992 patent was published. *See* Dkt. No. 80-14 at 3. Aurobindo informed the FDA that, after having studied a "number of patents" describing processes for manufacturing isosulfan blue, Aurobindo selected U.S. Patent No. 7,534,911, a patent filed after the priority date of the patents-in-suit, and Apicore's '992 patent. *See* Dkt. No. 80-14 at 3. Based on initial studies, Aurobindo "considered the process described in [the '992] patent for the initial sample preparation and further, the optimization of the process." *Id.*

Aurobindo acknowledged to the FDA that the '992 patent claims recite the use of silver oxide to convert the isoleuco acid to isosulfan blue acid, and thus Aurobindo was looking for a reagent "other than silver oxide." *Id.* at 6. Aurobindo reported results from a process involving manganese dioxide, but the process resulted in 5-10% impurity. *Id.* at 8. According to Aurobindo, the impurity could not be removed by recrystallization, column chromatography, or acid-base purification, and Aurobindo therefore decided to purify the material through preparatory HPLC to achieve a purity greater than 99.5%. *Id.*

The Food and Drug Administration approved Aurobindo's ANDA to market its isosulfan blue product on February 2, 2016, Dkt. No. 55-24, and Aurobindo publicly announced its intent to sell the product within the United States in March 2016, Dkt. No. 40 at 9. Aurobindo thereafter began importing and selling its isosulfan blue product, *id.* at 13-14, and as of October,

2016, Aurobindo had captured more than half of the isosulfan blue market, *see, e.g.*, Dkt. No. 97-1 at 5-6.

### E.  Procedural History

Plaintiffs filed this action on May 11, 2016, Dkt. No. 1, and later moved for a preliminary injunction on June 6, 2016, Dkt. No. 20. Aurobindo filed a declaratory judgment action against Apicore and Mylan in the District of New Jersey, seeking a judgment of noninfringement and invalidity. *See Aurobindo v. Apicore*, Case No. 1:16-cv-03358, Dkt. No. 1 (D.N.J. June 6, 2016). The New Jersey action was administratively stayed pending resolution of Aurobindo's motion to change venue in this case to New Jersey. Aurobindo's motion was denied on November 15, 2016, Dkt. No. 100, and Apicore and Mylan thereafter requested that the New Jersey action be consolidated with this case or dismissed. *See id.*, Dkt. No. 20 (D.N.J. Nov. 15, 2016). The parties dispute whether the New Jersey action will bar Aurobindo from petitioning the Patent Office for inter partes review of the patents-in-suit. *See id.*, Dkt. No. 16; *see also* 35 U.S.C. § 315(a)(1).

Plaintiffs seek a preliminary injunction because they allege that Defendants' product and method of manufacture will likely be found to infringe the patents-in-suit, and that irreparable harm will result if preliminary relief is not granted. Dkt. No. 20. Aurobindo contends that the patents are invalid and not infringed, and that Plaintiffs' harm is not irreparable. Dkt. No. 55.

### II.   DISCUSSION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These traditional four factors "apply with equal force to disputes arising under the Patent Act." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

8

## A.  Likelihood of Success on the Merits

Assessing whether Plaintiffs are likely to prove that Aurobindo is infringing the patents-in-suit depends on the scope of the asserted claims and how those claims compare to the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). Accordingly, "[t]he first step is determining the meaning and scope of the patent claims asserted to be infringed." *Id.*

### 1.  Claim Construction

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, a district court starts by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule, subject to certain specific exceptions, is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). A term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other

9

Case 17-1645   Document 81   Page 27   Filed 03/29/2017

asserted or unasserted claims can also aid in determining the claim's meaning. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* "[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

### a) Prosecution History Disclaimer

"The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[I]n order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013). "Where the alleged disavowal is ambiguous, or even 'amenable to multiple reasonable interpretations,'" the Federal Circuit has declined to find prosecution disclaimer. *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (quoting *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003)).

Although the parties do not yet dispute the meaning of the '992 and '616 patent claims, Aurobindo identifies a portion of the prosecution history that raises the issue of whether Apicore disclaimed "the use of an acid along with an oxidizing agent to oxidize isosulfan blue." *See* Dkt. No. 55 at 6. The examiner rejected Apicore's pending claims as unpatentable over the "Kulkarni" reference, which discloses the synthesis of isosulfan blue using ammonium dichromate and sulfuric acid. *See* Dkt. No. 55-6. Apicore distinguished Kulkarni by explaining that "[a]rtisans have typically used lead or chrome oxides with *an acid* to make isosulfan blue,"

and that "[t]he use by applicants of silver oxide *without acid* is significantly different than the use in Kulkarni of sulfuric acid and ammonium dichromate." *Id.* at 10 (emphasis added).

Apicore's discussion of the Kulkarni reference does not raise a question regarding disclaimer of a process involving a weak acid such as the acid used in the accused process. As explained by Plaintiffs' expert, Dr. Jonathan Sessler, Kulkarni's process involves a harsh oxidizing agent and concentrated sulfuric acid. Dkt. No. 79-33 ¶ 125-26, ¶ 43. Apicore distinguished this process by emphasizing that the use of heavy-metal oxidants with strong acids is different than the process claimed in the '992 and '616 patents, which simply uses silver oxide. *See* Dkt. No. 55-6 at 10. Apicore may have disclaimed a process involving strong acid, but because Kulkarni did not involve the use of a weak acid, Apicore's prosecution statement was not referring to a weak acid when describing the "acid" of Kulkarni. *See id.* As explained by Dr. Sessler at the hearing, there is no question that phosphoric acid is a weak acid.

### b) Ensnarement

Plaintiffs' theory of infringement with respect to the '992 and '616 patents relies on the doctrine of equivalents. Aurobindo raises a defense based on ensnarement, which, like prosecution history disclaimer, is a "legal limitation on the application of the doctrine of equivalents." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323 (Fed. Cir. 2009) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003)). "Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art." *Id.* at 1322. To determine whether there would be ensnarement, a district court first constructs a hypothetical claim that literally covers the accused product or process. *Id.* at 1324. "Next, the district court must assess the prior art introduced by the accused infringer and determine whether the patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art." *Id.* at 1325. "Ultimately, '[i]f

11

such a claim would be unpatentable under 35 U.S.C. §§ 102 or 103, then the patentee has overreached, and the accused device is noninfringing as a matter of law." *Id.* (quoting *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001)).

Aurobindo contends that the hypothetical claim is one that literally covers manganese dioxide, the oxidant used in the accused process, and that such a claim is obvious in view of prior art disclosing the use of manganese dioxide to oxidize triarylmethane dyes. Dkt. No. 55 at 7. The numerous references relied on by Aurobindo describe the oxidation of various triarylmethane compounds with a number of different oxidizing agents, including manganese dioxide. *See* Dkt. No. 55-49 ¶ 43. Aurobindo's expert, Dr. Edward Brown, acknowledged that these references do not describe the use of manganese dioxide to synthesize isosulfan blue. Dkt. No. 79-2 at 152:1-6. Aurobindo appears to simply assume that a person of ordinary skill in the art would be motivated to combine the process described in one of the references with another reference that discloses isosulfan blue, such as Dr. Hirsch's original clinical trials publication, for example.

This unstated assumption leaves Aurobindo well short of raising a substantial question regarding ensnarement. An obvious analysis under the ensnarement doctrine is no different than an ordinary obvious analysis. *See Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1363-64 (Fed. Cir. 2016). It is not sufficient to identify numerous references that disclose various triarylmethane dyes and oxidizing agents without explaining through expert testimony or otherwise how a person of ordinary skill in the art would have arrived at the claimed invention. Dr. Brown opines that a person of ordinary skill in the art would be motivated to "try different oxidizing agents to see if any performed better," but this testimony—to the extent that it even establishes motivation—refers to motivation to try silver oxide, not manganese dioxide. *See* Dkt. No. 55-49 ¶ 80.

Other than the Apicore inventors' own disclosure, there is no evidence in the record suggesting that isosulfan blue purity was affected by the way in which the isoleuco acid is oxidized to form isosulfan blue acid. While isosulfan blue manufacturers such as Covidien and others reported problems meeting the market demand for isosulfan blue, *see, e.g.*, Dkt. No. 81-2, the prior art of record does not recognize the problem solved by the Apicore inventors. Aurobindo's unstated assumption reveals "hindsight of the worst kind, 'wherein that which only the invention taught is used against its teacher.'" *Sci. Plastic Prod., Inc. v. Biotage AB*, 766 F.3d 1355, 1362 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2380, 192 L. Ed. 2d 166 (2015) (Moore, J., dissenting) (quoting *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983); *see also Apple Inc. v. Samsung Elecs. Co.*, No. 2015-1171, 2016 WL 5864573, at *16-*17 (Fed. Cir. Oct. 7, 2016) (en banc); *Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1354 (Fed. Cir. 2013).

Aurobindo is correct that the patents-in-suit generally acknowledge that prior art methods of preparing triarylmethane dyes involved strong oxidation reagents and crude purification processes. *See, e.g.*, '992 at 2:7-17. Yet there is no acknowledgement that triarylmethane dye purity was affected by the oxidation step. It may go without saying that if a heavy-metal oxidant is used, there would likely be traces of that metal in the final product. But there is no indication that existing oxidation methods would have created other impurities, such as the closely-related isomers recognized by Dr. Hirsch. The prior art described crude methods to prepare dyes for fabric, paper, and ink, and those same methods were used to prepare pharmaceutical dyes.  *See id.* at 2:12-17. Such pharmaceutical dyes included isosulfan blue, as the Kulkarni reference

13

considered by the examiner during prosecution demonstrates. *See, e.g.*, Dkt. No. 55-49 ¶ 74.[3]

Finally, even if the problem solved by Apicore was known in the prior art, the record does not

reveal motivation to combine the manganese dioxide prior art with isosulfan blue publications,

nor does it establish a reasonable expectation of success for the same reasons discussed below

with respect to silver oxide.

The parties have not otherwise raised a dispute regarding the meaning of the '992 and

'616 patents claims, and thus the Court will assess relevant terms according to their plain and

ordinary meaning, informed by the parties' and experts' use of the terms.

### c)  "Purity"

Claim 1 of the '050 patent recites "[a] compound N-[4-[[4-(diethyl amino) phenyl] (2,5-

disulfophenyl)   methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium,   sodium   salt

having a purity of at least 99.0% by HPLC." According to Aurobindo, a person having ordinary

skill in the art would understand claim 1's purity limitation to mean "having not more than 1%

extraneous material—i.e., material that is not isosulfan blue, sodium salt—as determined using

HPLC with a reproducible set of conditions." Dkt. No. 55 at 8 (quoting Dr. Brown).

The Court does not agree. The term "purity," in the context of the '050 patent, does not

simply refer to the absence of material that is not isosulfan blue. The claim requires the

"compound" to have at least 99.0% purity. Claim 11 recites a "solution" containing the

compound, and the compound is defined as having the same purity as recited in claim 1. '050

patent at 12:7-12. Aurobindo's proposed construction would exclude solutions covered by

claim 11 because solvent would qualify as "more than 1% extraneous material." "[A] claim

---

[3] When describing the prosecution of the application leading to the '992 patent and Aurobindo's ensnarement defense, Dr. Brown refers to the Kulkarni reference as "Kulkarni." Dkt. No. 55-49 ¶ 60. Dr. Brown also opines that a combination of references—including Kulkarni—renders the '992 and '616 patent claims obvious. *See id.* ¶ 74. For the latter obviousness theory, Dr. Brown refers to Kulkarni as "the '003 application." *See id.*

construction that excludes a preferred embodiment . . . is rarely, if ever correct." *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (quoting *Vitronics*, 90 F.3d at 1583). Similarly, claim 15 recites "[a] composition consisting essentially of" the compound. '050 patent at 12:23-29. "'Consisting essentially of' is a transition phrase commonly used to signal a partially open claim in a patent." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998). "By using the term 'consisting essentially of,' the drafter signals that the invention necessarily includes the listed ingredients *and is open to unlisted ingredients* that do not materially affect the basic and novel properties of the invention." *Id.* (emphasis added).

The remainder of the specification is instructive. The patent's background describes prior art methods that "give rise to crude triarylmethane dyes." '050 patent at 2:8-11. As a result, the patent explains a "need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale . . . production." *Id.* at 2:20-23. The synthetic examples described in the specification involve steps resulting in "crude isosulfan blue acid." *Id.* at 7:29-31. The acid is then "purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography." *Id.* at 7:31-37. These purification steps involve removing reaction by-products from a crude mixture to yield the claimed compound. "Purity" in the context of the '050 patent therefore refers to the absence of reaction by-products, rather than the absence of any extraneous material.

Testimony from Plaintiffs' expert, Dr. Jonathan Sessler, confirms that the '050 patent refers to "purity" according to the ordinary meaning as understood by those in the pharmaceutical industry. Dkt. No. 79-33 at 18-20. According to Dr. Sessler, the ordinary

meaning of the term refers to the absence of unwanted reaction products formed during synthesis. *Id.* ¶ 77. "This common understanding of purity is aptly demonstrated by numerous publications and regulatory guidelines." *Id.* ¶ 78. "[F]or pharmaceutical products, the [International Conference on Harmonisation] ICH defines impurities as 'substances in the product that are not the [active pharmaceutical ingredient] API itself or the excipients used to manufacture it, i.e., impurities are unwanted chemicals that remain within the formulation or API." *Id.* (quoting PHARMACEUTICAL IMPURITIES, AN OVERVIEW (2010) at 1). Dr. Brown's testimony to the contrary is not credible. Accordingly, the Court finds that the extrinsic evidence conclusively demonstrates that the term "purity" in the '050 patent refers to the absence of reaction by-products, not the absence of other extraneous material. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841-42 (2015) (describing the district court's fact-finding role in claim construction).

The Federal Circuit affirmed a nearly-identical construction in *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004). Apotex argued that the district court erred in construing the phrase "having a purity of at least 95%" to cover formulations with more than 5% of other ingredients. *Id.* at 1346. According to Apotex, the asserted claim covered only the pure compound and any other compounds added to the formulation rendered the compound impure for purposes of meeting the purity limitation. *Id.* The Federal Circuit held that Apotex's position was "both contrary to the ordinary meaning of such a phrase in the pharmaceutical arts and belied by the specification of the . . . patent." *Id.* at 1346-47. The same is true here.

### d) Definiteness

A likelihood of success on the merits cannot be shown "if an alleged infringer raises a substantial question regarding either infringement or validity of the asserted patents." *Takeda Pharm. USA, Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015). A patent's

16

specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2. A patent is indefinite "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). "The definiteness requirement must take into account the inherent limitations of language." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). "Some modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Nautilus*, 134 S. Ct. at 2128 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732 (2002)). On the other hand, "a patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Id.* at 2129 (internal quotation marks and citations omitted). Indefiniteness is a question of law. *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1365-66 (Fed. Cir. 2011).

Defendants argue that the claims of the '050 patent are indefinite because "having a purity of at least 99.0% by HPLC can be tested in many different ways." Dkt. No. 55 at 11. According to Defendants, the '050 patent "does not provide any conditions for HPLC analysis." *Id.* Dr. Brown explains that one set of conditions might indicate greater than 99% purity while the same sample run under different conditions might indicate less than 99% purity. *Id.*

The Court is not persuaded. Dr. Sessler testified that "[d]etermination of purity by HPLC is a common and well understood way of designating purity in publications and patents that are relied upon by the scientific and technical community." Dkt. No. 79-33 at 96-97. Numerous sources support Dr. Sessler's opinion. Patents filed before the application resulting in the '050 patent describe compounds by reference to HPLC purity without providing comprehensive

17

HPLC parameters. *See, e.g.*, U.S. Patent Nos. 9,403,770, 7,417,143, 7,960,545, and 8,633,241; Dkt. No. 79-33 at 98. Other scientific literature reflects the same convention. Dkt. No. 79-33 at 97-98.

Dr. Brown relies on a single patent application that does describe HPLC parameters for the contrary position that HPLC conditions must be specified to convey reasonable certainty. *See* Dkt. No. 55-49 at 53. Yet even Dr. Brown agrees that the phrase "purity by HPLC" is a term that is typically used in FDA submissions to describe purity levels allowed in an active pharmaceutical ingredient or a finished dosage form, and that "specific techniques and solvents and things" can be "*elucidated . . . so that the practitioner knows how the material was purified.*" *See* Dkt. No. 80-2 at 53:23-54-7 (emphasis added).

Dr. Brown's opinion is based in part on the fact that a dye like isosulfan blue absorbs light at different wavelengths. *See* Dkt. No. 55-49 at 53 ¶ 146. A user could run HPLC at the peak absorption wavelength (approximately 640 nm), or the user could run HPLC at a lower ultraviolet wavelength, such as 220 nm. *Id.* Accordingly, Dr. Brown opines that "a person of ordinary skill could not tell whether performing HPLC analysis at these different wavelengths would lead to different determinations of purity by HPLC." *Id.* Dr. Brown admits, however, that he did not look at actual HPLC chromatograms of isosulfan blue to determine whether different purity results would be obtained if a user changed wavelengths. *See* Dkt. No. 80-2 (Brown Deposition) at 36:19-37:12. Dr. Brown also admitted that he had never performed HPLC on any triarylmethane dye, including isosulfan blue. *See id.* at 37:24-38:1.

Even if different wavelength HPLC detectors would yield different isosulfan blue purity levels, the scope of the claims would be reasonably certain. The term "purity" gives the claims reasonably certainty because one of ordinary skill in the art would understand that this term

means the absence of reaction by-products. Thus, even if some reaction by-products did not absorb radiation in the same way as isosulfan blue does, a person of ordinary skill in the art would know to use a different detector, if necessary, to determine by HPLC whether reaction by-products are present. Dr. Brown's testimony regarding HPLC supports this finding. *See* Dkt. No. 80-2 at 42:2-43:24.

Dr. Brown also suggests that because the patents do not indicate whether the HPLC "peak" for isosulfan blue is pure, the phrase "purity by HPLC" is not reasonably certain. Dkt. No. 44-49 at 53-54. According to Dr. Brown, a person of ordinary skill in the art needs to ensure that an unwanted compound is not co-eluting or co-migrating along with isosulfan blue and hiding within the isosulfan blue HPLC peak. *See id.* There is no evidence, however, of any reaction by-product or other compound co-eluting with isosulfan blue. Even if co-elution was a problem, Dr. Brown admits that techniques were available to distinguish between co-eluting compounds. *See id.* Such techniques could be used to determine the presence of reaction by-products and therefore determine whether the isosulfan blue contained more than 1% impurities.

Contrary to Aurobindo's assertion, the Federal Circuit's decision in *Teva* following remand from the Supreme Court does not compel a contrary conclusion. In *Teva*, the claims recited the term "molecular weight," and the parties agreed that this term could refer to weight-average molecular weight ($M_w$), number-average molecular weight ($M_n$), or peak-average molecular weight ($M_p$). *See* 789 F.3d at 1341. These measures of molecular weight are "calculated in a different way and would typically yield a different result for a given polymer sample." *Id.* Because the record did not establish which measure to use, the Federal Circuit held that the term "molecular weight" rendered the claims indefinite. *Id.* at 1345. Claims of the '050 patent would perhaps be analogous if the claims recited "purity by chromatography," without

19

Case 17-1645   Document 81   Page: 37   Filed: 03/29/2017

any indication in the patent of which type of chromatography was intended. But the claims recite "purity by HPLC," which has a well-understood meaning in the pharmaceutical arts.

Accordingly, the Court finds that a person of ordinary skill in the art would readily understand the phrase "purity by HPLC" and would be able to elucidate HPLC conditions to determine whether an isosulfan blue sample satisfied the purity requirement. Although definiteness is an ultimate question of law, "in some instances, a factual finding may be close to dispositive of the ultimate legal question of the proper meaning of the term in the context of the patent." *Teva*, 135 S. Ct. at 841-42. Such is the case here. Plaintiffs will likely establish that the phrase "purity by HPLC" does not render claims of the '050 patent indefinite.

### 2.  Infringement

At the preliminary injunction stage, a patentee must prove that infringement is "more likely than not." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525–26 (Fed. Cir. 2012).

### a)  '992 and '616 Patents

The parties do not dispute that Aurobindo's isosulfan blue product is manufactured in India and formulated into the finished drug product before it is imported into the United States. *See* Dkt. No. 55 at 11-12. Section 271(g) of the Patent Act provides, however, that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer . . . ." 35 U.S.C. § 271(g). Plaintiffs contend that Aurobindo infringes claim 1 of the '992 and '616 patents by importing and selling isosulfan blue made by the claimed processes.

Dkt. No. 20 at 7.[4] It is undisputed that Aurobindo's process performs every step and includes every element recited in claim 1 of the '992 and '616 patents except silver oxide. *See* Dkt. No. 20, 20-3 ¶¶ 39-60; Dkt. No. 55 at 5-7. Because Aurobindo's process uses manganese dioxide, there is no dispute that Aurobindo does not literally infringe the claims. The only dispute is whether manganese dioxide is equivalent to silver oxide. *See* Dkt. No. 20 at 7-8; Dkt. No. 55 at 5-7.

Equivalence may be shown in one of two ways. *Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 700 (Fed. Cir. 2014). "[A] claim limitation not literally met may be satisfied by an element of the accused product if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)). Equivalence can also be established "by showing on an element-by-element basis that 'the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product,' often referred to as the function-way-result test." *Intendis*, 822 F.3d at 1360 (quoting *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)). "To succeed on a doctrine of equivalents theory, the patentee must demonstrate equivalence under one of these two tests." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

Although Plaintiffs initially discuss the insubstantial difference test, *see* Dkt. No. 20 at 7-8, Aurobindo only addresses the function-way-result test and appears to concede that the

---

[4] Plaintiffs also contend that Aurobindo infringes the '992 and '616 patents under § 271(b), Dkt. No. 20 at 7, but the Court is unaware of authority suggesting that a party can infringe a *process* claim by inducing the domestic use of a product made overseas by a claimed process.

Case 17-1645   Document 81   Page 39   Filed 03/29/2017

function-way-result test is the appropriate test to use in this case.[5] Although it is difficult to distinguish the two tests, they are not entirely coextensive. In *Intendis*, for example, the Federal Circuit considered a composition claim that included triglyceride and lecithin excipients that were not literally found in the accused composition. 822 F.3d at 1361-62. The district court found that an isopropyl myristate excipient in the accused composition was equivalent to the claimed excipients because the excipient in the accused product performed the same function as the claimed excipients. *Id.* at 1361. The Federal Circuit distinguished this issue on appeal from the insubstantial difference question, i.e., whether "the differences between the chemical structures of isopropyl myristate, triglyceride, and lecithin" are substantial. *Id.*

The distinction is relevant in this case. Aurobindo contends only that manganese dioxide does not perform the same function as silver oxide because manganese dioxide is a strong oxidant, whereas silver oxide is a weak oxidant. Dkt. No. 55 at 6. Yet claim 1 of the '992 and '616 patents does not specify how weak or strong the oxidation step must be. The silver oxide in the claims converts the isoleuco acid to the isosulfan blue acid. *See, e.g.*, '992 patent at 9:41-67, 6:42-7:43. Converting the isoleuco acid to isosulfan blue acid is the function of the silver oxide, and Aurobindo has not argued that the claims should be construed more narrowly.

Aurobindo highlights alleged chemical differences between silver oxide and manganese dioxide, but these differences are irrelevant under the function-way-results test as applied to the face of the claims. *See Intendis*, 822 F.3d at 1361-62. Aurobindo's factual equivalency theory does not match the legal test that it agrees is appropriate, illustrating why the Supreme Court in

---

[5] Dkt. No. 55 at 6 (Aurobindo stating that "manganese dioxide does not serve substantially the same function in substantially the same way to obtain substantially the same result."); Dkt. No. 55-49 ¶ 68 (Dr. Brown opining that "it is my opinion that manganese dioxide in the presence of phosphoric acid does not serve the same function (mild oxidation) as silver oxide without addition of an acid.").

22

*Warner-Jenkinson* acknowledged that the function-way-result test "may be suitable for analyzing mechanical devices, [but] it often provides a poor framework for analyzing other products or processes." 520 U.S. 17, 39-40 (emphasis added). There is no dispute that manganese dioxide converts the isoleuco acid to isosulfan blue acid in Aurobindo's accused process. Accordingly, the Court finds that Plaintiffs are likely to succeed in proving that Aurobindo's manganese dioxide is equivalent to silver oxide under the function-way-results test, given the scope of the claims on their face.[6]

Despite the Federal Circuit's acknowledgement of the differences between the two equivalency tests, the Court is mindful that "the particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson*, 520 U.S. at 40. The function-way-result test may inform whether insubstantial differences exist between a claim element and an accused element. *See, e.g.*, *Boehringer Ingelheim*, 320 F.3d at 1351-52. Because the '992 and '616 claims on their face simply require silver oxide and do not require that oxidation be carried out at any particular strength, the Court finds that the oxidation strength of manganese dioxide is irrelevant under the insubstantial difference test. *See id*.

The Court appreciates that infringement under the doctrine of equivalents is a "highly factual inquiry [that] rarely comes clear on a premature record." *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1384 (Fed. Cir. 2000). Aurobindo's non-equivalency theory appears to be based on the unstated premise that the '992 and '616 patent claims are limited to "mildly

---

[6] Aurobindo does not argue that the term "silver oxide" implies that the claims are limited to "mildly oxidizing" the isoleuco acid. *Cf. Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337 (Fed. Cir. 2000).

oxidizing" the isoleuco acid to isosulfan blue acid, perhaps because particular embodiments in the specification describe mild oxidation. *See, e.g.*, '992 patent at 6:61-67. Although Aurobindo has not given the Court a reason to limit the claims, a more fully-developed factual record and claim construction proceeding could change things.

Assuming for purposes of the Court's preliminary inquiry that the claims will be limited to a mild oxidation step, the Court finds manganese dioxide to be a mild oxidant equivalent to silver oxide in the context of the '992 and '661 patents. Dr. Sessler testified that manganese dioxide and silver dioxide are mild oxidizing agents that are both markedly different than stronger oxidizing agents such as lead oxide, chromium dioxide, ammonium dichromate, and others. Dkt. No. 20-3 ¶ 46. Dr. Brown testified, by contrast, that manganese dioxide is not equivalent to silver oxide because manganese dioxide is a strong oxidizing agent when used with phosphoric acid, as is done in the accused process. Dkt. No. 55-49 ¶ 67.

While there may be a generalized dispute as to whether manganese dioxide with an acid such as phosphoric acid is a strong or weak oxidizing agent, the Court agrees with Dr. Sessler's testimony in light of the evidence of record. According to an Indian patent application filed by Aurobindo, manganese dioxide provides a 66.93% yield of isosulfan blue acid. *See* Dkt. No. 20-3 ¶ 49. Embodiments described in the '992 and '616 patents describe similar yields ranging from 65 to 70%. *See, e.g.*, '992 patent at 9:22-24. Other than the oxidizing agent, other reaction conditions are the same, e.g., the molar equivalent of manganese dioxide (relative to the isoleuco acid) is within the range recited by claim 1 of the '992 patent. *See* Dkt. No. 20-3 ¶ 48. If it were true that manganese dioxide was acting as a substantially stronger oxidizing agent than silver oxide, then a person of ordinary skill in the art would expect different results. *See id.* ¶ 49.

### b)  '050 Patent

Plaintiffs contend that Aurobindo infringes claim 1, 11, and 15 of the '050 patent under § 271(a), Dkt. No. 20 at 6, which provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). "To prove an accused product literally infringes the patent in suit, the product must contain each and every limitation of the asserted claim(s)." *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014).

Aurobindo's product has "HPLC Purity: [not less than] NLT 99.8%, Isoleuco acid not more than 0.15% and any other not more than 0.10%." Dkt. No. 20-10 at 6, 7, 9; Dkt. No. 20-11 at 6, 7, 9. FDA submissions indicate that the product does not contain more than 0.15% of any reaction product used to synthesize the product, as determined by HPLC. Dkt. No. 80-12 at 18. On the basis of these materials, both Dr. Sessler and Dr. Brown agree that Defendants' isosulfan blue product has a purity of greater than 99% as determined by HPLC. *See* Dkt. No. 80-2 at 222:14-18; Dkt. No. 79-33 at 21-22. Aurobindo admits that it has imported and sold the product within the United States. Dkt. No. 40 at 13-14.

Aurobindo contends that they do not infringe because their isosulfan blue product is "manufactured in India and is formulated into the finished product *before* it is imported to the U.S." Dkt. No. 55 at 11-12. Thus, according to Defendants, the imported isosulfan blue product that is sold within the U.S. is a 1% solution of isosulfan blue, which does not meet the 99% purity limitation because 99% of the solution is not isosulfan blue. *Id.* at 11. This argument presumes that the term "purity" means the absence of any extraneous material, and the Court rejected such a construction above. Accordingly, it is more likely than not that Aurobindo is

infringing at least claim 1 of the '050 patent by importing and selling their isosulfan blue product within the United States.

### 3.   Validity

As the parties seeking preliminary relief, Plaintiffs carry the burden of establishing a likelihood of success on validity and must therefore show that Defendants will "not likely prove that the patent is invalid." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). Under § 282 of the Patent Act, however, "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. Section 282 requires an invalidity defense to be proved by "clear and convincing evidence." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). A patent's presumption of validity "exists at every stage of the litigation," including the preliminary injunction stage. *Canon Computer*, 134 F.3d at 1088.

Accordingly, validity at the preliminary injunction stage "is determined in the context of the presumptions and burdens that would inhere at trial on the merits." *Id.* (quoting *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed. Cir. 1987)). At trial, a patent holder "need only submit sufficient evidence to rebut any proof of invalidity" offered by the challenger. *Id.* "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Id.* Thus, whether a challenger has raised a "substantial question" regarding validity depends on "whether the challenger's evidence of invalidity is sufficiently persuasive that it is likely to overcome the presumption of patent validity" at trial. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996).

26

### a) Anticipation

The Patent Act defines several ways that an invention can be anticipated. As relevant here, a patent is invalid if the claimed invention (1) was known or used by others before invention by the patentee, § 102(a); (2) was patented or described in a printed publication in this or a foreign country, or in public use or on sale in this country more than a year before the filing date, § 102(b); or (3) was first made in this country by another inventor who did not abandon, suppress, or conceal the invention, § 102(g)(2). "[A]nticipation is a question of fact, including whether an element is inherent in the prior art." *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009).

### i. *Sigma-Aldrich Documents*

Aurobindo contends that Sigma-Aldrich made and sold isosulfan blue having a purity by HPLC of greater than 99% in March 2001, six years before the earliest priority date of the '050 patent, thus invalidating the patent under §§ 102(b) and 102(g)(2). Dkt. No. 71 at 2-3. To support this argument, Aurobindo cites to eleven documents produced by Sigma-Aldrich. *See* Dkt. No. 71-2 through Dkt. No. 71-12; Dkt. No. 72-1.

Aurobindo does not contend that any of the Sigma-Aldrich documents are printed publications or otherwise publicly-available, and Aurobindo filed the documents with the Court under seal. Aurobindo has attempted to authenticate the documents as business records under Fed. R. Evid. 902(11) through a declaration provided by a Sigma-Aldrich manager, who testified that the documents were "stored in Sigma's electronic record retention system." Dkt. No. 85-1 at 3. Regardless of any authenticity dispute, the Court will consider the documents at this stage even if the documents are not admissible. *See Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence.").

27

Of the eleven Sigma-Aldrich documents, a Sigma-Aldrich Certificate of Analysis is most important. *See* Dkt. No. 72-1. The Certificate refers to a product named "Patent Blue Violet," having a product number "P4808," a Chemical Abstracts Service (CAS) number "68238-36-8," and Lot number "112F5011." *Id.* The Certificate includes an entry titled "Purity by HPLC," and the result is listed as "100%." *Id.* The HPLC purity amount is qualified by an asterisk: the value appears to have been "Corrected for Water Content," which is listed on the Certificate as "5%." *Id.* The Certificate includes an entry titled "QC Release Date" corresponding to "March 2001." *Id.* Aurobindo contends that the Certificate raises a substantial question that the claims are anticipated under § 102(g)(2) because the document indicates that the claimed isosulfan blue was made before the priority date, and the assigned product number and other catalog entries suggest that the product may have been sold before that date.

The Court does not agree. Even assuming, as Aurobindo asserts, that the Certificate sufficiently establishes or corroborates some sort of prior knowledge, use, or invention "within this country" under § 102, the Certificate suffers from two critical shortcomings. First, the record shows that the term "Patent Blue Violet," at least as that term was used by Sigma-Aldrich at the time, did not necessarily refer to isosulfan blue. A Sigma-Aldrich catalog entry states that "Patent Blue Violet" dyes differ structurally with "regard to the substituents on one of the aromatic rings." *See* Dkt. No. 71-3 at 15. This catalog entry is consistent with prior art distinguishing "Patent Blue Violet" dyes from "isosulfan blue." *See, e.g.*, Hirsch et al., *Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation*, 139 American Journal of Roentgenology 1061, 1061 (1982) (Dkt. 80-9). Yet Sigma-Aldrich referred to these different dyes collectively as "Patent Blue Violet." *See* Dkt. No. 71-3 at 15. Other undated Sigma-Aldrich documents state that "Patent Violet Blue" and "isosulfan blue" are

28

synonyms, but these documents do not establish that the term "Patent Blue Violet," as it was used on the Certificate, refers to the claimed isosulfan blue. Dr. Sessler's extensive testimony on the issue supports the finding that there is simply no way to know which compound the Certificate is referring to. Dkt. No. 79-33 at 70-71.

Second, and more important, the record establishes that the Certificate's declaration of "100% purity by HPLC" is inaccurate. The Certificate contradicts numerous other Sigma-Aldrich documents. The Lot number identified in the Certificate, "Lot 112F5011," corresponds to a Sigma-Aldrich reference standard. *See* Dkt. No. 80-20. Sigma-Aldrich analyzed this standard annually to determine whether the Lot remained suitable for use as a reference. *Id.* The pages immediately following the Certificate in the produced document include other reports regarding the same "Lot 112F5011." In January 1998, the reference standard had a purity of "83.0%." Dkt. No. 72-1 at 4. Numerous other certificates for the same Lot reported purity levels no higher than 95%. Dkt. No. 79-33 at 77-82.

The balance of the Sigma-Aldrich documents are either catalog entries that contain no information regarding the purity of the Patent Blue Violet or are undated development documents detailing the synthesis of Patent Blue Violet or isosulfan blue. As Dr. Sessler's testimony explains, these documents do not disclose the claimed compound much less indicate that it had been made or sold. Dkt. No. 79-33 at 71-75. Accordingly, the Court finds that the Sigma-Aldrich documents do not raise a substantial question that the '050 patent claims are invalid under § 102.

### ii.  *Publications Reporting Less Pure Forms of Patent Blue Violet or Isosulfan Blue*

A claim is anticipated by a printed publication "if a single prior art reference discloses each and every limitation claimed." *See Trebro*, 748 F.3d at 1169. Defendants argue that "[e]ssentially pure forms of isosulfan blue for use in surgical applications were well known and

29

even commercially available well before the priority date of the Apicore patents." Dkt. No. 55 at 9. To support this proposition, Aurobindo cites to Newton et al., *Physicochemical Characterization of Patent Blue Violet Dye*, 70(2) JOURNAL OF PHARMACEUTICAL SCIENCES 122 (1981) ("Newton"). *Id.* at 55 n.5. Newton describes experiments to determine the physiochemical characteristics of "patent blue violet," a compound used to delineate the patency of lymph vessels. Dkt. No. 81-8 at 122. Newton explains that "[b]ased on the pKa for the equilibrium" between the patent blue violet compound and one of its isomers and "TLC [thin-layer chromatography] determinations," the patent blue violet compound "appears to be essentially pure with respect to its organic compound content." *Id.* at 126. Aurobindo argues that this disclosure anticipates the claims.

The Court does not agree. First, Newton indicates that the "patent blue violet" was purchased from Sigma-Adrich, *id.* at 122, and a Sigma-Aldrich catalog entry dated around the same time as Newton's publication date demonstrates that Sigma-Aldrich's "patent blue violet" products could have been dyes other than isosulfan blue. *See* Dkt. No. 71-3 at 15. Newton includes a reaction scheme that appears to include the structure of isosulfan blue, *see* Dkt. No. 81-18 at 124, but this does not mean the "patent blue violet" described Newton was in fact isosulfan blue. A person of ordinary skill in the art would have recognized the potential discrepancy based on a public catalog announcement in which Sigma-Aldrich disclosed that its "patent violet blue" refers to different dyes. *See* Dkt. No. 71-3 at 15. Indeed, Newton uses the generic "patent blue violet" phrase, and Dr. Sessler explains that a person of ordinary skill in the art would not understand this phrase to necessarily mean isosulfan blue. In light of the fact that Newton uses the term "patent blue violet," and Newton indicates that the patent blue violet was purchased from Sigma-Aldrich, there is ambiguity in what Newton teaches, and such ambiguity

30

would more likely than not preclude a finding that Newton anticipates the claims by clear and convincing evidence.

Second, even if Newton sufficiently discloses isosulfan blue, Newton does not describe isosulfan blue having a purity of 99% purity by HPLC. "Purity" and "99% purity" are very different phrases, as both experts appear to agree. Newton, for example, refers to "[p]urified patent blue violet" as a compound that is 85% pure. *See id.* at 122; *see also* Dkt. No. 79-33 at 55. Although Newton later discloses that this compound was purified by thin-layer chromatography, purity by thin-layer chromatography does not suggest 99% purity by HPLC. Dkt. No. 179-33 at 56. As Dr. Sessler explains, the "precision of [thin-layer chromatography] TLC is typically less than HPLC and, in fact, is not a quantitative measurement method." *Id.* This testimony is undisputed.

As contemporaneous prior art explains, isosulfan blue (or at least patent blue violet) could be prepared in "high purity of 94.5%," but [t]he remaining 5.5% consists of closely related isomers producing during synthesis." *See, e.g.*, Hirsch, Dkt. No. 80-9 (emphasis added). Less precise purification methods such as thin-layer chromatography would not have been expected to resolve closely-related isomers. *See* Dkt. No. 79-33 at 56. Accordingly, Newton and other analogous prior art disclosing patent blue violet or isosulfan blue having a purity of around 95% does not raise a substantial question that the '050 patent claims are invalid under § 102.

### b) Obviousness

A claim is invalid as obvious if an alleged infringer proves that the differences between the claims and the prior art are such that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law based on underlying facts. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356-57 (Fed. Cir. 2012). The Supreme Court set out the

framework for the obviousness inquiry in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966),

and *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

"A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors." *Apple Inc. v. Samsung Elecs. Co.*, No. 2015-1171, 2016 WL 5864573, at *8 (Fed. Cir. Oct. 7, 2016) (en banc). "Objective indicia of nonobviousness must be considered in every case where present." *Id.*; *see also In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) ("The district court erred, however, by making its finding that the patents in suit were obvious before it considered the objective considerations and by shifting the burden of persuasion to Cephalon.").

"What a prior art reference teaches and whether a skilled artisan would have been motivated to combine references are questions of fact." *Apple*, 2016 WL 5864573, at *11. In addition to common knowledge or teachings in the prior art itself, a "design need or market pressure or other motivation" may provide a suggestion or motivation to combine prior art elements in the manner claimed. *Rolls Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010); *accord KSR*, 550 U.S. at 420. A party asserting that a patent is invalid as obvious must "show by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention,

and that the skilled artisan would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

### i.   *Level of Ordinary Skill in the Art*

Dr. Brown contends that a person of ordinary skill in the art would have an advanced degree such as a Ph.D. or foreign equivalent "in the field of chemistry or a closely related field, with additionally at least about 2 years of experience in synthetic, medicinal, and/or process chemistry, including analytical methodology relating to testing active pharmaceutical ingredients." Dkt No.. 55-49 at 8. Dr. Sessler contends that this characterization is too limiting in that it requires a Ph.D. Dr. Sessler explains that a person of ordinary skill could "hold a lower advanced degree in chemistry, biochemistry, chemical engineering, or complementary discipline along with laboratory experience." Dkt. No. 79-33 at 4. Dr. Brown appears to have agreed during a subsequent deposition that "[d]epending on the experience," a person of ordinary skill in the art could have a lesser advanced degree and still qualify as a person of ordinary skill in the art. Dkt. No. 80-2 at 99:1-8. Although the Court is inclined to agree that a Ph.D. may not necessarily be required, the Court's obviousness analysis at this stage will presume the higher level of skill articulated by Dr. Brown.

### ii.   *Scope and Content of the Prior Art and Differences between the Claims and the Art*

#### *'992 and '616 Patents*

Aurobindo argues that claim 1 of the '992 and '616 patents is obvious over the following combination of references (*see* Dkt. No. 55 at 7-8; Dkt. No. 55-49 ¶¶ 69-82, 97-110):

1. Hirsch et al., Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation 139 AMERICAN JOURNAL OF ROENTGENOLOGY 1061 (1982) ("Hirsch")
2. Kondo, U.S. Patent No. 4,054,458 ("Kondo")
3. Gessner, U.S. Patent No. 5,659,053 ("Gessner")

33

4. Thoraval et al., Development Of Paper, Chemical Agent Detector, 3-Way Liquid Containing Non-Mutagenic Dyes. II-Replacement Of The Blue Indicator Dye Ethyl-bis-(2.4-DINITROPHENYL) Acetate (EDA), *available at* http://www.dtic.mil/dtic/tr/fulltext/u2/a193781.pdf ("Thoraval")

5. U.S. Patent Application Publication No. 2006/0224003 ("Kulkarni")

Specifically, Aurobindo contends that Hirsch describes isosulfan blue and its use as a pharmaceutical dye; Kulkarni discloses that isosulfan blue can be prepared by oxidizing the isoleuco acid to isosulfan blue acid; Thoravel teaches the use of silver oxide in a nonpolar solvent with triarylmethane dyes; Kulkarni discloses the use of polar solvents (such as an aqueous solution) during triarylmethane synthesis; Kondo teaches that isosulfan blue can be recovered by filtration and mixed with sodium; and Gessner teaches that triarylmethane dyes can be recovered from a reaction mixture in a conventional manner. *See, e.g.*, Dkt. No. 55-49 ¶¶ 75-78.

When all elements of a claim are found in the prior art, as they are here, there are additional factual questions: "whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that combination, a person of ordinary skill would have had a reasonable expectation of success." *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1380 (Fed. Cir. 2015). The critical gap in Aurobindo's prior art combination is between references such as Hirsch that disclose isosulfan blue for pharmaceutical use and Thoraval—the reference Aurobindo relies on for a disclosure of silver oxide as an oxidizing agent for triarylmethane dyes.

To bridge the gap, Dr. Brown seems to contend that the invention would have been obvious to try based on a disclosure in Thoraval. Dr. Brown highlights that Thoraval "found that the oxidation of a particular triphenylmethane intermediate performed best with silver oxide." Dkt. No. 55-49 ¶ 73. Dr. Brown then concludes that a personal of ordinary skill in the art would

34

Case 17-1645   Document 81   Page: 52   Filed: 03/29/2017

be motivated to "*try* different oxidizing agents to see if any performed better." Dkt. No. 55-49 ¶ 80 (emphasis added). Aurobindo's Response Brief simply states the bare conclusion: "[a] skilled artisan would have had the motivation to combine these prior art references." Dkt. No. 55 at 8.

The Court cannot find the requisite motivation in the prior art or testimony of record. First, the prior art of record either does not recognize the problem with isosulfan blue synthesis at all or does not attribute the problem to the oxidation step or the oxidizing agent, and thus the nature of the problem to be solved would not have provided motivation. *See* § II.A.1.b, *supra*. "One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988).

Second, even if the problem was known, the problem would not have motivated a person of ordinary skill in the art to combine references such as Hirsch and Thoraval. Thoraval does not address the same problem. While Thoraval is not necessarily non-analogous art as Plaintiffs suggest, it is undisputed by both parties' experts that Thoraval discloses a particular class of triarylmethane dyes that are used as chemical weapons detectors. *See* Dkt. No. 79-33 ¶ 132; Dkt. No. 80-2 at 200:9-13. As Dr. Sessler explains, Thoraval's dyes are different in that none of them include diethylamine and sulfonate substituents on the aryl groups. *See* Dkt. No. 79-33 ¶ 132. Thoraval is not concerned with pharmaceutical purity.

Third, a person of ordinary skill in the art would not have expected silver oxide to work with a compound such as isosulfan blue on the basis of Thoraval. Although Thoraval discloses that silver oxide worked best for a particular triarylmethane compound, *see* Dkt. No. 55-49 ¶ 73, Thoraval also teaches that silver oxide was entirely incapable of oxidizing other triarylmethane dyes that were very similar in structure to the compound for which silver oxide was effective.

35

*See* Dkt. No. 79-33 ¶ 132; Thoraval at 31-34. Thoraval does not necessarily teach away from trying silver oxide as Plaintiffs assert, but Thoraval demonstrates that where silver oxide was unsuccessful, stronger oxidizing agents such as lead compounds were successful. *See* Dkt. No. 79-33 ¶ 133; Thoraval at 34. Thoraval establishes that modest structural changes to a triarylmethane dye can render silver oxide ineffective at oxidation. Accordingly, a person of ordinary skill in the art would not have had a reasonable expectation of success when using silver oxide with isosulfan blue because isosulfan blue is structurally different than the triarylmethane dyes disclosed in Thoraval. *See* Dkt. No. 79-33 ¶ 132.

*'050 Patent*

In addition to the Sigma-Aldrich documents discussed above, Aurobindo contends that various combinations of the following references raise a substantial question that the '050 claims are obvious:

1. Newton et al., *Physicochemical Characterization of Patent Blue Violet Dye*, 70(2) JOURNAL OF PHARMACEUTICAL SCIENCES 122 (1981) ("Newton")

2. Hirsch

3. Kulkarni

4. U.S. Patent Application Publication No. 2008/0008658

5. PCT Patent Application Publication No. WO 2004/092122 A2

6. Snyder et al., *Preparative HPLC Separation* in PRACTICAL HPLC METHOD DEVELOPMENT (John Wiley & Sons, Inc. 2d ed. 1997) ("Snyder")

7. Huber and Majors, *Principles in Preparative HPLC* (Agilent Pub. No. 5989-6639EN, April 2007) ("Huber")

8. Papenfuss, U.S. Patent No. 3,671,553

9. Canadian Patent Application No. CA 2 500 803 A1

10. Ranganathan, U.S. Patent No. 5,573,752

11. PCT Patent Application Publication No. WO2005/009423

Certain references such as Newton and Hirsch disclose patent blue violet or isosulfan blue having a purity of about 95%. *See* Dkt. No. 55 at 9. Aurobindo contends that purification of

36

such a mixture to achieve 99% purity would have been obvious because "[t]he law is well-settled that a claim to a purified form of a known compound is not patentable." *Id.* According to Aurobindo, the only exception to this rule is when a purified compound "results in 'properties and characteristics which were different in kind from those of the known product rather than in degree.'" *Id.* (quoting *In re Merz*, 97 F.2d 599 (CCPA 1938)). Thus, because Plaintiffs have not established that the 99% pure form of isosulfan blue is not "different in kind" than the 95% pure mixture known in the prior art, Aurobindo contends that the claims are obvious.

It is true that in the chemical arts, the Federal Circuit has long held that "structural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives a reason or motivation to make the claimed compositions, creates a prima facie case of obviousness." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356 (Fed. Cir. 2007) (quoting *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (en banc)).[7] "The analysis is similar where, as here, a claimed composition is a purified form of a mixture that existed in the prior art." *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007). As the Federal Circuit explained:

> [I]f it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, or if the prior art would provide a person of ordinary skill in the art with reason to believe that this is so, the purified compound is prima facie obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified.

*Id.* Ordinarily, a person of ordinary skill in the art "expects a concentrated or purified ingredient to retain the same properties it exhibited in a mixture, and for those properties to be amplified

---

[7] Whether "prima facie" obviousness of a chemical compound as described by cases like *Takeda* is a concept that survives later precedent such as *In re Cyclobenzaprine*, 676 F.3d 1063, and the Federal Circuit's recent en banc decision in *Apple*, 2016 WL 5864573, is a question that the Court need not answer because the Court addresses each *Graham* factor, including objective considerations, without engaging in burden-shifting.

when the ingredient is concentrated or purified." *Id.* at 1302. Indeed, "isolation of interesting compounds is a mainstay of the chemist's art." *Id.* "If it is known how to perform such an isolation, doing so 'is likely the product not of innovation but of ordinary skill and common sense.'" *Id.* (quoting *KSR*, 127 S.Ct. at 1742).

Critical to the analysis, however, is whether it was "known how to perform" the isolation or purification of the compound. As the Federal Circuit explained in *Aventis*,

> [A] purified compound is not always prima facie obvious over the mixture; for example, it may not be known that the purified compound is present in or an active ingredient of the mixture, *or the state of the art may be such that discovering how to perform the purification is an invention of patentable weight in itself*.

*Id.* (emphasis added). Accordingly, a pure compound may be nonobvious over a prior art mixture when the purification method is inventive or, if the purification method is not inventive, when objective considerations suggest that the pure compound would not have been obvious. *See id.*

The prior art of record universally suggests that isosulfan blue had a purity of no more than 95%. The Court assumes without deciding, based on *Aventis* and other cases, that a person of ordinary skill in the art would have been motivated to purify existing isosulfan blue even further because, generally speaking, the purer the better. The Court also assumes without deciding that Aurobindo is correct that Plaintiffs have not demonstrated that 99% pure isosulfan blue is "different in kind" than the 95% mixture, as that phrase is defined by Federal Circuit precedent.[8]

The Court nevertheless finds that Plaintiffs have established that it is more likely than not that the state of the art was such that a person of ordinary skill in the art would not have been able to purify isosulfan blue to at least 99% purity before the priority date. Apicore's discovery

---

[8] The record is not clear whether the 99% pure isosulfan blue may be "different in kind" from the less pure mixture because of its ability to better withstand regulatory scrutiny by the FDA.

of a process to make highly-pure isosulfan blue is "an invention of patentable weight in itself." *Id.* The '050 patent describes the synthetic process used to obtain 99% pure isosulfan blue in detail. Starting with a commercially-available compound, the specification describes steps for obtaining a benzaldehyde intermediate. '050 patent at Scheme 1, 5:1-7:45. This intermediate is then reacted in a subsequent step, after which the isoleuco-acid "with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture." *Id.* at 6:41-45. The isoleuco-acid is then reacted, in the critical step, under unique conditions to obtain isosulfan blue, which can then simply be filtered, precipitated, and recrystallized to obtain the isosulfan blue with greater than 99% HPLC purity. *Id.* at 7:25-45. Contrary to Aurobindo's suggestion, Apicore did not simply purify the known mixture of isosulfan blue using common methods and then claim the result. Accordingly, Apicore's process provides patentable weight to the resulting 99% pure isosulfan blue because the process is itself patentable.

Dr. Brown contends that the 95% pure isosulfan blue mixture known in the prior art could have been passed through a preparatory HPLC column to obtain highly-pure isosulfan blue. *See* Dkt. No. 55-49 at 45-50. Dr. Brown is correct that the prior art, including Snyder, Huber, the '658 application (to the extent this application is prior art), and other references teach that HPLC can generally be used to purify compounds. Dr. Brown is also correct that the prior art, including the '553 patent to Papenfuss, teaches that triarylamine dyes can be purified in a range from 96% to 98%. *Id.* at 48-49.

The '050 patent, however, indicates that prior art methods used for isosulfan blue synthesis resulted in particularly crude mixtures that made purification to highly-pure levels troublesome. *See* '050 patent at 2:8-19. This is consistent with the prior art of record, which explains that isosulfan blue contains "closely related isomers produced during synthesis." *See,*

39

*e.g.*, Hirsch, Dkt. No. 80-9; Dkt. No. 79-33 at 69. Dr. Brown's explanation of HPLC confirms that a crude mixture of closely related isomers would be difficult to separate with HPLC alone because closely related isomers would have similar affinities for the stationary phase, *see* Dkt. No. 80-2 at 42:-43 (discussing HPLC generally), and could co-elute from an HPLC column at the same time as isosulfan blue, *see* Dkt. No. 44-49 at 53-54.

Dr. Sessler's testimony suggests that the success of HPLC and separation methods in general depends not only on the particular compound but also the mixture in which the compound is present. *See* Dkt. No. 79-33 at 66-69. For a "complex mixture, repeated chromatography will increase the overall purity, but only relative to the impurities for which there is good separation." *Id.* at 67. Repeated chromatography comes at the cost of decreased yield, which explains why a person of ordinary skill in the art would not have tried preparatory HPLC on a mixture of isosulfan blue and its isomers, and certainly not with an expectation of success. *See id.* at 67-69. Accordingly, the Court finds that Aurobindo has not raised a substantial question that the claims of the '050 patent are prima facie obvious.

### iii.    Objective Considerations

Various factors "serve to guard against slipping into use of hindsight, and to resist the temptation to read into the prior art the teachings of the invention in issue." *Apple*, 2016 WL 5864573, at *12 (quoting *Graham*, 383 U.S. at 36). The factors are known as "objective indicia of non-obviousness." *Id.* "These include: commercial success enjoyed by [products] practicing the patented invention, industry praise for the patented invention, copying by others, and the existence of a long-felt but unsatisfied need for the invention." *Id.* As the Federal Circuit recently explained:

> Indeed, evidence of secondary considerations may often be the
> most probative and cogent evidence in the record. It may often
> establish that an invention appearing to have been obvious in light

40

of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.

*Id.* (quoting *Stratoflex*, 713 F.2d at 1538-39). Plaintiffs contend that the following objective considerations support patentability: failure of others, long-felt need, commercial success, praise by others, copying, teaching away, and unexpected results. Dkt. No. 79 at 7-8. Relevant to these factors is the Court's view that objective considerations regarding the patentable process described in the '992 and '616 patents are relevant to the patentability of the '050 patent claims.

*Long-Felt Need*

"Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious." *Apple*, 2016 WL 5864573, at *15. Plaintiffs contend that isosulfan blue suppliers such as Covidien and others searched for years to find a reliable isosulfan blue manufacturer that could meet quantity and purity demands. Dkt. No. 79 at 7-8. The Court agrees. The evidence establishes that for over 30 years, isosulfan blue manufacturers had trouble maintaining supply and meeting purity demands, and it appears from the preliminary record that many of the purity problems may have been associated with the oxidation method used during synthesis. *See, e.g.*, Dkt. No. 80-18; Dkt. No. 80-19; Dkt. No. 81-3; Dkt. No. 80-16; *see also* Dkt. No. 79-33 ¶¶ 259-85.

Aurobindo argues that because Lymphazurin™ was on the market for 30 years "with only a few periods of shortages," Plaintiffs cannot establish long-felt need. Dkt. No. 92 at 4. It may be true as Aurobindo suggests that the market was capable of meeting isosulfan blue demand for extended periods of time during the Lymphazurin™ years, and that certain shortages were attributable to events unrelated to isosulfan blue synthesis, but there is no dispute that suppliers such as Sigma-Aldrich had a long-felt need for a reliable supply of high-purity

41

isosulfan blue. Sigma-Aldrich was itself forced to initiate efforts to purify isosulfan blue acquired from manufacturers, and Sigma-Aldrich eventually began developing its own manufacturing process sometime around 2010. *See* Dkt. No. 80-16; Dkt. No. 81-4, 81-5, 81-6, 81-8. It is undisputed that the claimed invention reliably provides high-purity isosulfan blue. Accordingly, the Court finds that evidence of long-felt need supports the likelihood that Apicore's invention claimed in the '616, '992, and '050 patents will not be found obvious.

### Failure of Others

"Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry." *Cyclobenzaprine*, 676 F.3d at 1081. "While absolute certainty is not necessary to establish a reasonable expectation of success, there can be little better evidence negating an expectation of success than actual reports of failure." *Boehringer Ingelheim*, 320 F.3d at 1354. "This is particularly true when the evidence indicates that others found development of the claimed invention difficult and failed to achieve any success." *Cyclobenzaprine*, 676 F.3d at 1081. "In such circumstances, 'evidence of failed attempts by others could be determinative on the issue of obviousness.'" *Id.* (quoting *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000).

The Court does not find that the record supports a finding that others had failed to develop the invention claimed by the patents-in-suit. Plaintiffs' argument regarding failure of others is too general. Plaintiffs contend that Covidien and others tried to develop a reliable method for synthesizing isosulfan blue, and they were unable to do so. Dkt. No. 79 at 7-8; Dkt. No. 79-33 ¶¶ 277-85. The claimed invention, however, is a method of preparing isosulfan blue using silver oxide and the resulting high-purity isosulfan blue compound. Plaintiffs have not suggested that others tried to use silver oxide to synthesize isosulfan blue but failed. *See, e.g.,*

*Cyclobenzaprine*, 676 F.3d at 1081 (referencing failure of others to develop the "claimed invention"); *Boehringer Ingelheim*, 320 F.3d at 1354. Failure of others therefore is not a factor the Court considers as weighing against a finding of obviousness at this stage.

*Commercial Success*

Plaintiffs argue that commercial success of their isosulfan blue product supports nonobviousness. Dkt. No. 79 at 7-8; Dkt. No. 79-33 ¶¶ 286-292. Though Aurobindo does not dispute this argument, *see* Dkt. Nos. 55, 92, Aurobindo raises arguments concerning nexus with respect to irreparable harm, *see, e.g.*, Dkt. No. 92-12 ¶ 6, and the Court is mindful that the primary concern with evidence of commercial success is establishing a nexus between the claimed invention and the success. *See Ransomes, Inc. v. Great Dane Power Equip., Inc.*, 232 F.3d 911 (Fed. Cir. 2000) ("When a patentee asserts that commercial success supports its contention of nonobviousness, there must be a sufficient relationship between the commercial success and the patented invention."). Nexus is an issue that Aurobindo raises with respect to irreparable harm, and the Court addresses the dispute below.

There is no question that Plaintiffs' commercial isosulfan blue product was commercially successful. Shortly after the FDA approved Synerx's ANDA for the isosulfan blue product, Apicore began generating significant revenue from isosulfan blue sales, despite Covidien's presence in the market. *See* Dkt. No. 20-29 ¶¶ 11-15. Covidien's Lymphazurin™ sales then sharply declined, *see* Dkt. No. 20-14 ¶ 23, and Covidien withdrew Lymphazurin™ from the market by September 2012, *see* Dkt. No. 55-23 at 5561. Sales figures coupled with market data provide strong evidence of commercial success. *See Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360-61 (Fed. Cir. 1999). While the FDA determined that Covidien discontinued Lymphazurin™ for "reasons other than safety or effectiveness," Dkt. No. 55-23 at 5561, the

43

timing of Covidien's exit from the market provides circumstantial evidence that Covidien could not compete with Apicore.

Plaintiffs' commercial success is sufficiently tied to the invention claimed in at least the '919 and '616 patents. "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). If it were not for the process claimed in the '992 and '616 patents, it is likely that neither Apicore nor Aurobindo would be in the market. *See, e.g.*, Dkt. No. 55-19; *See also Akzo N.V. v. Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed. Cir. 1986) (finding commercial success where a product made by a patented method was commercially successful). The commercial success of the invention claimed in the '919 and '616 patents increases the likelihood that the claims would withstand an obviousness challenge. In addition, even if Aurobindo is correct that the market demand for isosulfan blue is not sufficiently tied to the 99% purity limitation of the '050 patent, the nonobviousness of the '919 and '616 patent claims supports the patentability of the '050 patent claims. *See Aventis*, 499 F.3d at 1301-02.

### Copying and Praise by Others

"The copying of an invention may constitute evidence that the invention is not an obvious one. This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed." *Vandenberg v. Dairy Equip. Co., a Div. of DEC Int'l*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (citations omitted). Aurobindo admitted to the FDA that it searched the literature for a suitable process for preparing isosulfan blue and decided to use the invention disclosed in Apicore's '992 patent, though Aurobindo substituted

44

manganese dioxide for silver oxide. *See* Dkt. No. 80-14. Aurobindo's Indian patent application also reveals similarities to the invention claimed in Apicore's patents. *See* Dkt. No. 20-3 ¶¶ 49-53.

Copying may not always weigh against obviousness because copying may be explained by something other than the superiority of the patented invention, such as disrespect for patent rights, the inability of the patentee to enforce the patent, or "contempt for the specific patent in question." *See, e.g., Cable Elec. Prod., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999). In this case, however, Aurobindo told the FDA that isosulfan blue synthesis is described in a "number of patents," and after having "studied all these patents," Aurobindo selected the process described in the '992 patent. *See* Dkt. No. 80-14 at 3. Even if Aurobindo's likely insubstantial modification to the claimed process diminishes the significance of Aurobindo's copying, Aurobindo's statements to the FDA at least constitute praise of Apicore's invention.

Aurobindo contends that this alleged evidence of copying supports a finding of obviousness because Aurobindo resorted to preparatory HPLC to achieve greater than 99.5% purity. Dkt. No. 55 at 10. The Court does not agree. Aurobindo's process involving preparatory HPLC is not prior art. Neither are internal documents from Apicore discussing preparatory HPLC. *See, e.g.*, Dkt. No. 92 at 3 (Aurobindo arguing that Apicore lab notebook entries support obviousness); *See also* § 103 ("Patentability shall not be negated by the manner in which the invention was made.").

More importantly, Aurobindo's preparatory HPLC step was carried out on an isosulfan blue mixture prepared according to the process described and claimed by the '992 patent.

45

Aurobindo did not simply run a crude isosulfan blue mixture from the prior art through a preparatory HPLC column and achieve greater than 99% purity. Aurobindo started from something the '992 patent provided. Finally, the fact that Aurobindo made the effort to achieve greater than 99% purity for its FDA submission suggests that highly-pure isosulfan blue may be "different in kind" than less pure mixtures. *See Aventis*, 499 F.3d at 1301-02. Accordingly, the Court finds that evidence of copying and Aurobindo's praise of the invention to the FDA would weigh against a finding of obviousness.[9]

### Unexpected Results and Teaching Away

Plaintiffs contend that the Apicore inventors unexpectedly found that high-purity isosulfan blue could be prepared by a process that used silver oxide, and the prior art taught away from this invention. Dkt. No. 79 at 7-8. Aurobindo appears not to dispute this point, arguing instead that objective considerations cannot "suffice to overcome a strong showing of obviousness in a case in which obviousness is clear from a comparison of the prior art references and the patent in suit." *See* Dkt. No. 92 at 4 (quoting *Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp. 3d 656, 675 (E.D. Tex. 2015)). As the Court has explained, Aurobindo has not established a substantial question concerning obviousness. Although the Court does not find that the record supports Plaintiffs' assertion of teaching away, there is significant evidence that the purity levels achieved by the claimed invention were unexpected. The Court therefore finds that unexpected results would weigh against a finding of obviousness.

### iv.    Obviousness Conclusion

Aurobindo does not raise a substantial question regarding motivation to combine prior art references to achieve the claimed invention with a reasonable expectation of success, and

---

[9] Plaintiffs present additional evidence of praise by others, *see* Dkt. No. 79-33 ¶¶ 293-300, but the Court finds this evidence insufficient.

objective considerations overwhelmingly weigh against a finding of obviousness. Accordingly, the Court finds that Plaintiffs have established that Aurobindo will not likely prove that the patents-in-suit are invalid as obvious. *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).

## B.  Irreparable Harm

As the party seeking emergency relief, Plaintiffs "must make a clear showing that [they are] at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *See Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). The patentee must also establish that the harm is related to the infringement, a requirement referred to as the "causal nexus" requirement. *Id.* at 1324.

### 1.  Substantial and Immediate Irreparable Injury

''Irreparable injury encompasses different types of losses that are often difficult to quantify.'' *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). ''Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.'' *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930-31 (Fed. Cir. 2012). A showing of lost market share and sales can support a finding of irreparable harm. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861–62 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). A patentee can also demonstrate irreparable harm from a diminished ability to invest in research and development. *See Bio–Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996). In addition, ''[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.'' *Douglas Dynamics*, 717 F.3d at 1345; *see also Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d

47

1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").

With respect to lost sales, research and development, and price erosion, Apicore's Chief Financial Officer, Mr. Rahul Devnani, testified that isosulfan blue sales constituted a significant portion of Apicore's total revenue before Aurobindo entered the market, and profit from isosulfan blue sales fueled research and development. Dkt. No. 20-29 at 3-5. Mr. Devnani testified that if half or more of Apicore's revenue from isosulfan blue is lost as Apicore projects, Apicore would need to eliminate or delay the research and development of new products currently in development. Dkt. No. 20-29 ¶ 16. Mr. Devnani testified further at the hearing that private financing would be unavailable to temporarily make up for lost isosulfan blue revenue through trial because of another significant loan obligation. In addition, Mr. Devnani testified that two of Apicore's employees had already left the company since Apicore had ceased isosulfan blue manufacturing, and that employee morale was down because manufacturing activity at the Apicore facility was at a standstill. There is no question that Apicore will lose most if not all of its isosulfan blue sales to Aurobindo if infringement is allowed to continue. *See Automated Merch. Sys., Inc. v. Crane Co.*, 357 Fed.Appx. 297, 301 (Fed. Cir. 2009) ("To the extent that failing to grant a preliminary injunction would permit Crane to drop its prices in order to drive AMS out of the market entirely, this might support a finding of irreparable harm sufficient to warrant a preliminary injunction."). Finally, there is undisputed evidence that Aurobindo's infringement has and is continuing to result in significant price erosion. *See, e.g.*, Dkt. No. 20-2 ¶¶ 41-61.

Aurobindo admits that it manufactures its own isosulfan blue product, and thus Apicore is directly competing with Aurobindo. Plaintiffs will likely establish that Aurobindo's competition is being fueled by its infringement of Apicore's valid patents. This supports a finding of irreparable injury. *Douglas Dynamics*, 717 F.3d at 1345; *Presidio Components*, 702 F.3d at 1363; *see also Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) (''Trebro and FireFly are direct competitors selling competing products in this market. Thus, the record strongly shows a probability for irreparable harm.'').

Accordingly, the Court finds that Apicore has demonstrated that it has and will continue to suffer irreparable injury from Aurobindo's infringement in the form of lost sales, lost research and development ability, price erosion, and having to compete with an infringing competitor. Plaintiffs' expert testimony of record supports this finding.[10]

## 2. Causal Nexus

"[T]he causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition—e.g., sales [that] would be lost even if the offending feature were absent from the accused product." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (internal quotation omitted). "The former type of harm may weigh in favor of an injunction, whereas the latter does not." *Id.*

Aurobindo argues at length that the causal nexus requirement has not been satisfied, and Aurobindo presents extensive expert testimony from a physician and economist on the subject. The Court is not persuaded. Plaintiffs have demonstrated that Apicore's irreparable injury is the direct result of Aurobindo's infringement. Without infringing the '992, '616, and '050 patents, Aurobindo would not be able to make the isosulfan blue product described in its ANDA. And

---

[10] The Court does not decide whether Mylan will suffer irreparable harm.

without a preliminary injunction, Aurobindo would continue using Apicore's patented process to produce a product that has already begun destroying Apicore's isosulfan blue business.

Aurobindo's arguments are for another product and another market that is not regulated by the FDA. In a nutshell, Aurobindo argues that Plaintiffs have not presented evidence that the patented features "actually drive consumer demand" for isosulfan blue. *See, e.g.*, Dkt. No. 55 at 14. The law on which Aurobindo bases this argument, however, is readily distinguishable. Unlike *Apple* and similar cases, this case does not involve a complex, multi-featured product. The finished drug product is isosulfan blue in an injectable solution, which is more like the "relatively simple products" the Federal Circuit contrasted with smart-phones and tablets in the *Apple* cases. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1362 (Fed. Cir. 2013). In addition, at least with respect to the '992 and '616 patents, the *Apple* cases dealt with features of a consumer good, not chemicals such as silver oxide that are used in a patented process. It is not possible to separate Apicore's patented process from the commercial isosulfan blue product for purposes of evaluating consumer demand and nexus. *See, e.g.*, *Amgen Inc. v. F. Hoffman–La Roche Ltd.*, 580 F.3d 1340, 1386 (Fed. Cir. 2009) (affirming injunction in part based on finding of infringement of process patents under § 271(g)); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1356 (Fed. Cir. 2006) (affirming injunction for infringement of patented process).

### 3.  Balance of Equities

The balance of equities weighs in favor of Apicore. If an injunction is not granted, Apicore stands to lose its entire isosulfan blue business, a business which Apicore relies on to fund ongoing research and development. Aurobindo was aware of Apicore's process, and Aurobindo copied it. *See* Dkt. No. 80-14. "One who elects to build a business on a product found [likely] to infringe cannot be heard to complain if an injunction against continuing infringement

50

destroys the business so elected." *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed. Cir. 1986).

### 4. Public Interest

"[T]he public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. The Federal Circuit "has long acknowledged the importance of the patent system in encouraging innovation. Indeed, the 'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.'" *Sanofi Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (quoting *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985)). Disclosure of how to make and use an invention is the "quid pro quo" of the patent grant. *See JEM Ag Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124 (2001). Apicore satisfied its end of the bargain by disclosing to the public its method for preparing isosulfan blue. Apicore would not likely have made such a disclosure if it had known that a competitor would use it to destroy Apicore's isosulfan blue business before Apicore could make it to trial.

Aurobindo argues that the public interest "favors competition and less expensive generic drugs." Dkt. No. 55 at 19. According to Aurobindo, denying an injunction would "restore the policy of the Hatch-Waxman Act" because Plaintiffs enjoyed the benefit of the statute by allegedly "piggy-backing" on Covidien's brand product and then creating a monopoly after Covidien exited the market, keeping isosulfan blue prices high. Dkt. No. 55 at 19. The Court disagrees. The policy of the Hatch-Waxman Act does not preclude or discourage district courts from promoting innovation in the generic drug market. "[W]hile the statutory framework . . . does seek to make low cost generic drugs available to the public, it does not do so by entirely eliminating the exclusionary rights conveyed by pharmaceutical patents. Nor does the statutory framework encourage or excuse infringement of valid pharmaceutical patents." *Pfizer,*

51

*Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). Accordingly, the Court

finds that the public interest will not be disserved by granting a preliminary injunction.

## III.   CONCLUSION

Plaintiffs have satisfied the burden required for preliminary relief. The Court therefore

RECOMMENDS that Defendants be enjoined from manufacturing, selling or offering for sale,

using, or importing the accused product within the United States until further order of the Court.

Pursuant to Federal Rule of Civil Procedure 65(c), the Court RECOMMENDS that, following

input from the parties, Plaintiffs be required to post bond "in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully

enjoined." *See* Fed. R. Civ. P. 65(c).

A party's failure to file written objections to the findings, conclusions,

and  recommendations contained in this report by **December 4, 2016** shall bar that party

from de novo review by the district judge of those findings, conclusions, and

recommendations and, except on grounds of plain error, from appellate review of

unobjected-to factual findings and legal conclusions accepted and adopted by the district

court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415,

1430 (5th Cir. 1996) (en banc).

**SIGNED this 19th day of November, 2016.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

APPEAL,CASREF,JURY,MEDIATION,PATENT/TRADEMARK,PROTECTIVE−ORDER,RWS1

## U.S. District Court [LIVE]
### Eastern District of TEXAS (Marshall)
### CIVIL DOCKET FOR CASE #: 2:16−cv−00491−RWS−RSP

| | |
|---|---|
| Mylan Institutional LLC et al v. Aurobindo Pharma Ltd et al | Date Filed: 05/11/2016 |
| Assigned to: Judge Robert W. Schroeder, III | Jury Demand: Both |
| Referred to: Magistrate Judge Roy S. Payne | Nature of Suit: 830 Patent |
| Case in other court:  5CA, 17−01645 | Jurisdiction: Federal Question |
| Cause: 35:271 Patent Infringement | |

**Mediator**

**Hon Faith Hochberg**
870 United Nations Plaza
Suite 13F
New York, NY 10017
201−400−8400
*judgehochberg@judgehochberg.com*

**Plaintiff**

**Mylan Institutional LLC**                    represented by    **Nicole W Stafford**
Wilson Sonsini Goodrich & Rosati −
Austin
900 South Capital of Texas Highway
Las Cimas IV
Fifth Floor
Austin, TX 78746−5546
512/338−5402
Fax: 512/338−5499
Email: nstafford@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aden Martin Allen**
Wilson Sonsini Goodrich & Rosati −
Austin
900 South Capital of Texas Highway
Las Cimas IV
Fifth Floor
Austin, TX 78746−5546
512−338−5437
Fax: 512−338−5499
Email: aallen@wsgr.com
*ATTORNEY TO BE NOTICED*

**Anna Grace Phillips**
Wilson Sonsini Goodrich & Rosati −
Austin
900 South Capital of Texas Highway
Las Cimas IV
Fifth Floor
Austin, TX 78746−5546
512−338−5400
Fax: 512−338−5499
Email: anphillips@wsgr.com
*ATTORNEY TO BE NOTICED*

**David Sidney Steuer**
Wilson Sonsini Goodrich & Rosati PC −
Palo Alto
650 Page Mill Rd
Palo Alto, CA 94304−1050

650−493−9300
Fax: 16505655100
Email: dsteuer@wsgr.com
*ATTORNEY TO BE NOTICED*

**Olin Ray Hebert , III**
Wilson Sonsini Goodrich & Rosati −
Austin
900 South Capital of Texas Highway
Las Cimas IV
Fifth Floor
Austin, TX 78746−5546
512.338.5400
Fax: 512.338.5499
Email: thebert@wsgr.com
*TERMINATED: 08/25/2016*

**Sami Sedghani**
Wilson Sonsini Goodrich & Rosati − San
Francisco
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105
415−947−2053
Fax: 415−947−2099
Email: ssedghani@wsgr.com
*ATTORNEY TO BE NOTICED*

**Melissa Richards Smith**
Gillam & Smith, LLP
303 South Washington Avenue
Marshall, TX 75670
903/934−8450
Fax: 903/934−9257
Email: melissa@gillamsmithlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Apicore US LLC**                    represented by   **David J Galluzzo**
Sharma & DeYoung LLP
555 Fifth Avenue, 17th Floor
New York, NY 10017
212.856.7236
Email: David@sharmadeyoung.com
*ATTORNEY TO BE NOTICED*

**Himanshu Rajan Sharma**
Sharma & DeYoung LLP
555 Fifth Avenue, 17th Floor
New York, NY 10017
212.856.7236
Email: hrajan@sharmadeyoung.com
*ATTORNEY TO BE NOTICED*

**Joanna Garelick Goldstein**
Sharma & DeYoung LLP
555 Fifth Avenue, 17th Floor
New York, NY 10017
212.856.7236
Email: joanna@sharmadeyoung.com
*ATTORNEY TO BE NOTICED*

**Melissa Richards Smith**
(See above for address)

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Aurobindo Pharma Ltd**                                        represented by    **Sailesh Patel**
Schiff Hardin LLP−Chicago
233 S Wacker Dr
Suite 6600
Chicago, IL 60606
312−258−5698
Fax: 312−258−5700
Email: spatel@schiffhardin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cindy S Ahn**
Schiff Hardin LLP−Chicago
233 S Wacker Dr
Suite 6600
Chicago, IL 60606
312.258.5526
Fax: 312.258.5600
Email: cahn@schiffhardin.com
*ATTORNEY TO BE NOTICED*

**George Chih−lun Yu**
Schiff Hardin LLP − San Francisco
One Market, Spear Street #3100
San Francisco, CA 94105
415.901.8700
Fax: 415.901.8701
Email: gyu@schiffhardin.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaimin H Shah**
Schiff Hardin LLP−Chicago
233 S Wacker Dr
Suite 6600
Chicago, IL 60606
312.258.5500
Fax: 312.258.5600
Email: jshah@schiffhardin.com
*ATTORNEY TO BE NOTICED*

**Michael E Jones**
Potter Minton, a Professional Corporation
110 N College Avenue
Suite 500
Tyler, TX 75702
903−597−8311
Fax: 903−593−0846
Email: mikejones@potterminton.com
*ATTORNEY TO BE NOTICED*

**Neil Lloyd**
Schiff Hardin LLP−Chicago
233 S Wacker Dr
Suite 6600
Chicago, IL 60606
312−258−5500
Fax: 312−258−5700
Email: nlloyd@schiffhardin.com

*ATTORNEY TO BE NOTICED*

**Patrick Colbert Clutter , IV**
Potter Minton, a Professional Corporation
110 N College Avenue
Suite 500
Tyler, TX 75702
903/597−8311
Email: patrickclutter@potterminton.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Aurobindo Pharma USA Inc.**          represented by    **Sailesh Patel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cindy S Ahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Chih−lun Yu**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaimin H Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Neil Lloyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Colbert Clutter , IV**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AuroMedics Pharma LLC**          represented by    **Sailesh Patel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cindy S Ahn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Chih−lun Yu**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jaimin H Shah**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Neil Lloyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Colbert Clutter , IV**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2016 | 1 | COMPLAINT *for Patent Infringement* against AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. ( Filing fee $ 400 receipt number 0540−5738432.), filed by Mylan Institutional LLC, Apicore US LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Civil Cover Sheet)(Smith, Melissa) (Entered: 05/11/2016) |
| 05/11/2016 | 2 | DEMAND for Trial by Jury by Apicore US LLC, Mylan Institutional LLC. (Smith, Melissa) (Entered: 05/11/2016) |
| 05/11/2016 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Mylan Institutional LLC identifying Other Affiliate Abbott Laboratories, Other Affiliate Mylan Inc., Other Affiliate Mylan N.V. for Mylan Institutional LLC. (Smith, Melissa) (Entered: 05/11/2016) |
| 05/11/2016 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Apicore US LLC identifying Corporate Parent Apicore Inc. for Apicore US LLC. (Smith, Melissa) (Entered: 05/11/2016) |
| 05/11/2016 | 5 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Smith, Melissa) (Entered: 05/11/2016) |
| 05/12/2016 |  | Case assigned to Judge Robert W. Schroeder, III. (ch, ) (Entered: 05/12/2016) |
| 05/12/2016 | 6 | ORDER REFERRING CASE to Magistrate Judge Roy S. Payne. Signed by Judge Robert W. Schroeder, III on 5/12/2016. (ch, ) (Entered: 05/12/2016) |
| 05/12/2016 | 7 | NOTICE of Attorney Appearance by Nicole W Stafford on behalf of Mylan Institutional LLC (Stafford, Nicole) (Entered: 05/12/2016) |
| 05/12/2016 | 8 | NOTICE of Attorney Appearance by Anna Grace Phillips on behalf of Mylan Institutional LLC (Phillips, Anna) (Entered: 05/12/2016) |
| 05/12/2016 | 9 | NOTICE of Attorney Appearance by Aden Martin Allen on behalf of Mylan Institutional LLC (Allen, Aden) (Entered: 05/12/2016) |
| 05/12/2016 | 10 | SUMMONS Issued as to AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: # 1 Summons(es), # 2 Summons(es))(ch, ) (Entered: 05/12/2016) |
| 05/20/2016 | 11 | NOTICE of Attorney Appearance by Olin Ray Hebert, III on behalf of Mylan Institutional LLC (Hebert, Olin) (Entered: 05/20/2016) |
| 05/31/2016 | 12 | AMENDED COMPLAINT *for Patent Infringement* against AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc., filed by Mylan Institutional LLC, Apicore US LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Smith, Melissa) (Entered: 05/31/2016) |

| 06/03/2016 | 13 | **\*FILED IN ERROR. PLEASE SEE CORRECTED DOCUMENT AT DKT # 14** <br> \* Unopposed MOTION for Extension of Time to File Answer re 12 Amended Complaint, by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: <br> # 1 Exhibit A − Waiver, <br> # 2 Text of Proposed Order)(Jones, Michael) Modified on 6/3/2016 (mrm, ). (Entered: 06/03/2016) |
|---|---|---|
| 06/03/2016 | 14 | Unopposed MOTION for Extension of Time to File Answer re 13 Unopposed MOTION for Extension of Time to File Answer re 12 Amended Complaint, by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: <br> # 1 Exhibit A − Waiver, <br> # 2 Text of Proposed Order)(Jones, Michael) (Entered: 06/03/2016) |
| 06/03/2016 | | **\*\*\*FILED IN ERROR. Document # 13, Unopposed MOTION for Extension of Time to File Answer. PLEASE IGNORE.\*\*\*** <br><br> (mrm, ) (Entered: 06/03/2016) |
| 06/03/2016 | 15 | NOTICE of Attorney Appearance − Pro Hac Vice by Himanshu Rajan Sharma on behalf of Apicore US LLC. Filing fee $ 100, receipt number 0540−5773923. (Sharma, Himanshu) (Entered: 06/03/2016) |
| 06/03/2016 | 16 | NOTICE of Attorney Appearance − Pro Hac Vice by Joanna Garelick Goldstein on behalf of Apicore US LLC. Filing fee $ 100, receipt number 0540−5773930. (Goldstein, Joanna) (Entered: 06/03/2016) |
| 06/03/2016 | 17 | NOTICE of Attorney Appearance − Pro Hac Vice by David J Galluzzo on behalf of Apicore US LLC. Filing fee $ 100, receipt number 0540−5773940. (Galluzzo, David) (Entered: 06/03/2016) |
| 06/05/2016 | 18 | NOTICE of Attorney Appearance − Pro Hac Vice by Joanna Garelick Goldstein on behalf of Apicore US LLC. Filing fee $ 100, receipt number 0540−5774840. (Goldstein, Joanna) (Entered: 06/05/2016) |
| 06/09/2016 | 19 | Unopposed MOTION to File Plaintiffs' Motion for Preliminary Injunction Under Seal by Apicore US LLC, Mylan Institutional LLC. (Attachments: <br> # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 06/09/2016) |
| 06/09/2016 | 20 | SEALED MOTION *for Preliminary Injunction* by Apicore US LLC, Mylan Institutional LLC. (Attachments: <br> # 1 Text of Proposed Order, <br> # 2 Exhibit Declaration of Heather Paton, <br> # 3 Exhibit Declaration of Jonathan L. Sessler, <br> # 4 Exhibit Declaration of Aden M. Allen, <br> # 5 Exhibit A, <br> # 6 Exhibit B, <br> # 7 Exhibit C, <br> # 8 Exhibit D, <br> # 9 Exhibit E, <br> # 10 Exhibit F, <br> # 11 Exhibit G, <br> # 12 Exhibit H, <br> # 13 Exhibit I, <br> # 14 Exhibit Declaration of Michael J. Dansky, <br> # 15 Exhibit Dansky Exhibit A, <br> # 16 Exhibit Danksy Exhibit B, <br> # 17 Exhibit Dansky Exhibit D, <br> # 18 Exhibit Dansky Exhibit E, <br> # 19 Exhibit Dansky Exhibit F, <br> # 20 Exhibit Dansky Exhibit G, <br> # 21 Exhibit Dansky Exhibit H, <br> # 22 Exhibit Dansky Exhibit I, <br> # 23 Exhibit Dansky Exhibit J, <br> # 24 Exhibit Dansky Exhibit K, <br> # 25 Exhibit Dansky Exhibit L, |

| | | |
|---|---|---|
| | | # 26 Exhibit Dansky Exhibit M,<br># 27 Exhibit Dansky Exhibit N,<br># 28 Exhibit Dansky Exhibit O,<br># 29 Exhibit Declaration of Rahul Devnani,<br># 30 Exhibit Dansky Exhibit C)(Smith, Melissa) (Entered: 06/09/2016) |
| 06/09/2016 | 21 | MOTION for Leave to File Excess Pages *re Motion for Preliminary Injunction* by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order)(Smith, Melissa) (Entered: 06/09/2016) |
| 06/10/2016 | 22 | ORDER granting 19 Motion to File Under Seal Motion for Preliminary Injunction. Signed by Magistrate Judge Roy S. Payne on 06/10/2016. (nkl, ) (Entered: 06/10/2016) |
| 06/13/2016 | 23 | Additional Attachments to Main Document: 20 SEALED MOTION *for Preliminary Injunction (Certificate of Conference) (Smith, Melissa) Modified on 6/14/2016 (sm, ). (Entered: 06/13/2016)* |
| 06/13/2016 | 24 | ***FILED IN ERROR PER ATTORNEY***<br><br>Additional Attachments to Main Document: 21 MOTION for Leave to File Excess Pages *re Motion for Preliminary Injunction*.. (Smith, Melissa) Modified on 6/14/2016 (ch, ). (Entered: 06/13/2016) |
| 06/13/2016 | 25 | Additional Attachments to Main Document (Certificate of Conference): 21 MOTION for Leave to File Excess Pages *re Motion for Preliminary Injunction*.. (Smith, Melissa) Modified on 6/14/2016 (sm, ). (Entered: 06/13/2016) |
| 06/14/2016 | | ***FILED IN ERROR. PER ATTORNEY Document # 24, Additional Attachment to 21 . PLEASE IGNORE.***<br><br>(DOCUMENT REFILED AT #25)(ch, ) (Entered: 06/14/2016) |
| 06/14/2016 | 26 | ORDER granting 14 Unopposed MOTION for Extension of Time to File Answer. AuroMedics Pharma LLC answer due 7/12/2016; Aurobindo Pharma Ltd answer due 7/12/2016; Aurobindo Pharma USA Inc. answer due 7/12/2016.. Signed by Magistrate Judge Roy S. Payne on 6/14/2016. (ch, ) (Entered: 06/14/2016) |
| 06/17/2016 | 27 | MOTION to Change Venue *Under 28 USC Sec. 1404(a)* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments:<br># 1 Ex A − Declaration of R. Quadrel,<br># 2 Ex B − Google Maps,<br># 3 Text of Proposed Order)(Jones, Michael) (Entered: 06/17/2016) |
| 06/21/2016 | 28 | Joint MOTION to File Under Seal Joint Scheduling Proposal for Preliminary Injunction and Motion to Transfer Hearing by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order)(Smith, Melissa) (Entered: 06/21/2016) |
| 06/21/2016 | 29 | ***FILED IN ERROR, PLEASE IGNORE***Sealed Joint Scheduling Proposal for Preliminary Injunction and Motion to Transfer Hearing (Attachments:<br># 1 Text of Proposed Order)(Smith, Melissa) Modified on 6/22/2016 (sm, ). (Entered: 06/21/2016) |
| 06/22/2016 | | ***FILED IN ERROR, WRONG EVENT USED, ATTY MUST REFILE AS A SEALED MOTION. Document # 29, Sealed Document. PLEASE IGNORE.***<br><br>(sm, ) (Entered: 06/22/2016) |
| 06/22/2016 | 30 | Joint SEALED MOTION *Scheduling Proposal for Preliminary Injunction and Motion to Transfer Hearing* by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order)(Smith, Melissa) (Entered: 06/22/2016) |
| 06/22/2016 | 31 | ORDER − Evidentiary Hearing set for 9/21/2016 09:00 AM before Magistrate Judge Roy S. Payne to consider both Plaintiffs Motion for Preliminary Injunction (Dkt. No. 20) and Defendants Motion to Transfer Venue Under 28 U.S.C. §1404(a) (Dkt. No. 27). Signed by Magistrate Judge Roy S. Payne on 6/22/2016. (ch, ) (Entered: 06/22/2016) |

| 06/22/2016 | 32 | NOTICE of Attorney Appearance by Patrick Colbert Clutter, IV on behalf of AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. (Clutter, Patrick) (Entered: 06/22/2016) |
|---|---|---|
| 06/29/2016 | 33 | Joint MOTION for Extension of Time to File *Joint Briefing Schedule* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: # 1 Text of Proposed Order)(Clutter, Patrick) (Entered: 06/29/2016) |
| 06/30/2016 | 34 | Joint SEALED MOTION *for Briefing and Other Deadlines Related to Preliminary Injunction and Motion to Transfer Evidentiary Hearing in Response to June 22, 2016 Order* by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Exhibit 1 − Plaintiff's Proposed Order, # 2 Exhibit 2 − Defendants' Proposed Order, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Smith, Melissa) (Entered: 06/30/2016) |
| 06/30/2016 | 35 | Joint MOTION to File Under Seal re 34 Joint SEALED MOTION *for Briefing and Other Deadlines Related to Preliminary Injunction and Motion to Transfer Evidentiary Hearing in Response to June 22, 2016 Order* by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 06/30/2016) |
| 07/05/2016 | 36 | RESPONSE to 31 Order, Set Deadlines/Hearings,, *Partial Objection to June 22, 2016 Order* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Jones, Michael) (Entered: 07/05/2016) |
| 07/07/2016 | 37 | NOTICE of Attorney Appearance − Pro Hac Vice by George C Yu on behalf of All Defendants. Filing fee $ 100, receipt number 0540−5825913. (Yu, George) (Entered: 07/07/2016) |
| 07/08/2016 | 38 | NOTICE of Attorney Appearance − Pro Hac Vice by Neil Lloyd on behalf of All Defendants. Filing fee $ 100, receipt number 0540−5826980. (Lloyd, Neil) (Entered: 07/08/2016) |
| 07/12/2016 | 39 | ORDER granting 33 Motion for Extension of Time to File. Signed by Magistrate Judge Roy S. Payne on 7/12/2016. (nkl, ) (Entered: 07/12/2016) |
| 07/12/2016 | 40 | ANSWER to 12 Amended Complaint, by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc..(Jones, Michael) (Entered: 07/12/2016) |
| 07/12/2016 | 41 | DEMAND for Trial by Jury by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Jones, Michael) (Entered: 07/12/2016) |
| 07/12/2016 | 42 | CORPORATE DISCLOSURE STATEMENT filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. identifying Corporate Parent Aurobindo Pharma Ltd. for AuroMedics Pharma LLC, Aurobindo Pharma USA Inc.; Corporate Parent None for Aurobindo Pharma Ltd. (Jones, Michael) (Entered: 07/12/2016) |
| 07/12/2016 | 43 | RESPONSE to 36 Response to Non−Motion *(Plaintiffs' Response to Defendants' Partial Objection to the Court's June 22, 2016 Order Setting a Simultaneous Hearing Date) filed by Apicore US LLC, Mylan Institutional LLC*. (Smith, Melissa) (Entered: 07/12/2016) |
| 07/13/2016 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non−jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event *Notice Regarding Consent to Proceed Before Magistrate Judge*. (sm, ) (Entered: 07/13/2016) |
| 07/13/2016 | 44 | NOTICE of Attorney Appearance − Pro Hac Vice by Cindy S Ahn on behalf of All Defendants. Filing fee $ 100, receipt number 0540−5832249. (Ahn, Cindy) (Entered: 07/13/2016) |

| 07/13/2016 | 45 | NOTICE of Attorney Appearance by David Sidney Steuer on behalf of Mylan Institutional LLC (Steuer, David) (Entered: 07/13/2016) |
|---|---|---|
| 07/13/2016 | 46 | NOTICE of Readiness for Scheduling Conference by Apicore US LLC, Mylan Institutional LLC (Smith, Melissa) (Entered: 07/13/2016) |
| 07/22/2016 | 47 | ORDER granting 21 Motion for Leave to File Excess Pages. Signed by Magistrate Judge Roy S. Payne on 7/21/2016. (ch, ) (Entered: 07/22/2016) |
| 07/23/2016 | 48 | ORDER granting 34 Sealed Motion BRIEFING SCHEDULE. Signed by Magistrate Judge Roy S. Payne on 7/22/16. (ch, ) (Entered: 07/23/2016) |
| 08/18/2016 | 49 | Unopposed MOTION to Withdraw as Attorney *as to Olin Ray Hebert, III* by Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order)(Smith, Melissa) (Entered: 08/18/2016) |
| 08/25/2016 | 50 | ORDER granting 49 Motion to Withdraw as Attorney. Attorney Olin Ray Hebert, III terminated. Signed by Magistrate Judge Roy S. Payne on 8/24/2016. (ch, ) (Entered: 08/25/2016) |
| 09/01/2016 | 51 | Unopposed MOTION for Leave to File Excess Pages *for its Response in Opposition to Plaintiffs' Motion for Preliminary Injunction 20* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments:<br># 1 Text of Proposed Order)(Clutter, Patrick) (Entered: 09/01/2016) |
| 09/01/2016 | 52 | Joint MOTION for Protective Order by Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order Joint Stipulated Protective Order)(Allen, Aden) (Entered: 09/01/2016) |
| 09/02/2016 | 53 | JOINT STIPULATED PROTECTIVE ORDER. Signed by Magistrate Judge Roy S. Payne on 9/2/2016. (nkl, ) (Entered: 09/02/2016) |
| 09/02/2016 | 54 | ORDER granting 51 Motion for Leave to File Excess Pages. Signed by Magistrate Judge Roy S. Payne on 9/2/16. (ch, ) (Entered: 09/02/2016) |
| 09/09/2016 | 55 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 20 SEALED MOTION *for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc..* (Attachments:<br># 1 Appendix A,<br># 2 Declaration of G. Yu,<br># 3 Yu Exhibit 1,<br># 4 Yu Exhibit 2,<br># 5 Yu Exhibit 3,<br># 6 Yu Exhibit 4,<br># 7 Yu Exhibit 5,<br># 8 Yu Exhibit 6,<br># 9 Yu Exhibit 7,<br># 10 Yu Exhibit 8,<br># 11 Yu Exhibit 9,<br># 12 Yu Exhibit 10,<br># 13 Yu Exhibit 11,<br># 14 Yu Exhibit 12,<br># 15 Yu Exhibit 13,<br># 16 Yu Exhibit 14,<br># 17 Yu Exhibit 15,<br># 18 Yu Exhibit 16,<br># 19 Yu Exhibit 17,<br># 20 Yu Exhibit 18,<br># 21 Yu Exhibit 19,<br># 22 Yu Exhibit 20,<br># 23 Yu Exhibit 21,<br># 24 Yu Exhibit 22,<br># 25 Yu Exhibit 23,<br># 26 Yu Exhibit 24,<br># 27 Yu Exhibit 25,<br># 28 Yu Exhibit 26,<br># 29 Yu Exhibit 27,<br># 30 Yu Exhibit 28, |

# 31 Yu Exhibit 29,
# 32 Yu Exhibit 30,
# 33 Yu Exhibit 31,
# 34 Yu Exhibit 32,
# 35 Yu Exhibit 33,
# 36 Yu Exhibit 34,
# 37 Yu Exhibit 35,
# 38 Yu Exhibit 36,
# 39 Yu Exhibit 37,
# 40 Yu Exhibit 38,
# 41 Yu Exhibit 39,
# 42 Yu Exhibit 40,
# 43 Yu Exhibit 41,
# 44 Yu Exhibit 42,
# 45 Yu Exhibit 43,
# 46 Yu Exhibit 44,
# 47 Yu Exhibit 45,
# 48 Yu Exhibit 46,
# 49 Declaration of Dr. Brown,
# 50 Declaration of M. Fedele,
# 51 Fedele Exh. A,
# 52 Declaration of Dr. Krag,
# 53 Krag A,
# 54 Krag B,
# 55 Krag C,
# 56 Krag D,
# 57 Krag E,
# 58 Krag F,
# 59 Krag G,
# 60 Krag H,
# 61 Krag I,
# 62 Krag J,
# 63 Krag K,
# 64 Krag L,
# 65 Krag M,
# 66 Krag N,
# 67 Krag O,
# 68 Krag P,
# 69 Declaration of Bakewell,
# 70 Bakewell Exhibits A − H,
# 71 Bakewell Exhibit I,
# 72 Bakewell Exhibit J − R,
# 73 Bakewell Exhibit S,
# 74 Bakewell Exhibit T − HH,
# 75 Bakewell Exhibit II−PP,
# 76 Bakewell Exhibit QQ−TT,
# 77 Text of Proposed Order)(Jones, Michael) (Entered: 09/09/2016)

| | | |
|---|---|---|
| 09/09/2016 | 56 | SEALED RESPONSE to Motion re 27 MOTION to Change Venue *Under 28 USC Sec. 1404(a)* filed by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order,<br># 2 Exhibit A,<br># 3 Exhibit B,<br># 4 Exhibit C − Supplemental Declaration of Michael Dansky,<br># 5 Exhibit Dansky Decl. Ex. P,<br># 6 Exhibit Dansky Decl. Ex. Q,<br># 7 Exhibit Dansky Decl. Ex. R,<br># 8 Exhibit Dansky Decl. Ex. S,<br># 9 Exhibit Dansky Decl. Ex. T,<br># 10 Exhibit Dansky Decl. Ex. U,<br># 11 Exhibit Dansky Decl. Ex. V,<br># 12 Exhibit Dansky Decl. Ex. W)(Smith, Melissa) (Entered: 09/09/2016) |
| 09/16/2016 | 57 | NOTICE of Attorney Appearance − Pro Hac Vice by Sami Sedghani on behalf of Mylan Institutional LLC. Filing fee $ 100, receipt number 0540−5942726. (Sedghani, |

| | | |
|---|---|---|
| | | Sami) (Entered: 09/16/2016) |
| 09/19/2016 | 58 | NOTICE of Attorney Appearance − Pro Hac Vice by Jaimin H Shah on behalf of AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. Filing fee $ 100, receipt number 0540−5943968. (Shah, Jaimin) (Entered: 09/19/2016) |
| 09/19/2016 | | NOTICE of Hearing: Evidentiary Hearing RESET for 10/11/2016 09:00 AM before Magistrate Judge Roy S. Payne. (bga, ) (Entered: 09/19/2016) |
| 09/21/2016 | 59 | Opposed SEALED MOTION *to Compel Defendants' Production of Costs of Goods Sold and Profits Information* by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B)(Smith, Melissa) (Entered: 09/21/2016) |
| 09/21/2016 | 60 | Unopposed MOTION for Expedited Briefing re 59 Opposed SEALED MOTION *to Compel Defendants' Production of Costs of Goods and Profits Information* by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 09/21/2016) |
| 09/23/2016 | 61 | Joint MOTION to Move Evidentiary Hearing Date to November 2, 2016 by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 09/23/2016) |
| 09/26/2016 | 62 | ORDER granting 61 Joint MOTION to Move Evidentiary Hearing Date to November 2, 2016. Evidentiary Hearing set for 11/2/2016 09:00 AM before Magistrate Judge Roy S. Payne. Signed by Magistrate Judge Roy S. Payne on 9/26/2016. (ch, ) (Entered: 09/26/2016) |
| 09/27/2016 | | NOTICE of Hearing on Motion 59 Opposed SEALED MOTION *to Compel Defendants' Production of Costs of Goods Sold and Profits Information* : Motion Hearing set for 10/5/2016 09:00 AM before Magistrate Judge Roy S. Payne. (bga, ) (Entered: 09/27/2016) |
| 09/27/2016 | 63 | ORDER granting 60 Motion for Expedited Briefing on Plaintiffs Motion to Compel Defendant's Production of Costs of Goods sold and Profits Information. Signed by Magistrate Judge Roy S. Payne on 9/26/2016. (ch, ) (Entered: 09/27/2016) |
| 09/28/2016 | 64 | NOTICE of Attorney Appearance − Pro Hac Vice by Sailesh Patel on behalf of AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. Filing fee $ 100, receipt number 0540−5958431. (Patel, Sailesh) (Entered: 09/28/2016) |
| 09/28/2016 | 65 | NOTICE of Designation of Attorney in Charge to Sailesh Patel on behalf of AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. (Patel, Sailesh) (Entered: 09/28/2016) |
| 09/30/2016 | 66 | STATUS REPORT *(Joint Report Regarding Motion to Compel Set for Hearing on October 5, 2016)* by Apicore US LLC, Mylan Institutional LLC. (Smith, Melissa) (Entered: 09/30/2016) |
| 10/03/2016 | 67 | ORDER denying 59 Sealed Motion to Compel. Hearing for 10/5/2016 is canceled. Signed by Magistrate Judge Roy S. Payne on 10/3/2016. (ch, ) (Entered: 10/03/2016) |
| 10/03/2016 | 68 | Joint MOTION for Extension of Deadline re 62 Order, Terminate Motions, Set Deadlines/Hearings by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 10/03/2016) |
| 10/04/2016 | 69 | ORDER granting 68 Motion for Extension of Certain Deadlines. Signed by Magistrate Judge Roy S. Payne on 10/4/2016. (ch, ) (Entered: 10/04/2016) |
| 10/12/2016 | 70 | Unopposed MOTION for Leave to File *Supplemental Brief in Support of 55 its Opposition to Plaintiffs' Motion for Preliminary Injunction* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 10/12/2016) |
| 10/12/2016 | 71 | SEALED PATENT DOCUMENT − Supplemental Brief in Support of its Opposition to Plaintiffs' Motion for Preliminary Injunction. (Attachments: # 1 Declaration of J. Shah, |

| | | |
|---|---|---|
| | | # 2 Ex. A − Subpoena to Sigma Aldrich,<br># 3 Ex. B − SIGMA007527−61,<br># 4 Ex. C − SIGMA008297−313,<br># 5 Ex. D − SIGMA010312−36,<br># 6 Ex. E − SIGMA010337−84,<br># 7 Ex. F − SIGMA006866−78,<br># 8 Ex. G − SIGMA000004,<br># 9 Ex. H − SIGMA000005,<br># 10 Ex. I − SIGMA006142−82,<br># 11 Ex. J − SIGMA006935,<br># 12 Ex. K − SIGMA006838−48)(Jones, Michael) (Entered: 10/12/2016) |
| 10/13/2016 | 72 | SEALED PATENT DOCUMENT − Aurobindo's Notice of Corrected Exhibit C to 71 Supplemental Brief in Support of the Opposition to Plaintiffs' Motion for Preliminary Injunction. (Attachments:<br># 1 Ex C − SIGMA008297−313 Corrected)(Jones, Michael) (Entered: 10/13/2016) |
| 10/13/2016 | 73 | ORDER granting 70 Motion for Leave to File Supplemental Brief in Support of its Opposition to Plaintiffs Motion for Preliminary Injunction. Signed by Magistrate Judge Roy S. Payne on 10/13/2016. (ch, ) (Entered: 10/13/2016) |
| 10/24/2016 | 74 | Emergency SEALED PATENT MOTION *to Strike Plaintiffs' Reply Declarations, or Alternatively, to File Sur−Reply and Extend Preliminary Injunction Motion Hearing Date* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments:<br># 1 Ex A − Dkt 62 Order,<br># 2 Ex B − 092316 email from Stafford,<br># 3 Ex C − Aurobindo Opposition Chart,<br># 4 Ex D− Plaintiffs Reply Chart,<br># 5 Ex E − Rebuttal Dec of Dansky,<br># 6 Ex F − 081116 Dansky Depo,<br># 7 Ex G − Flow Chart,<br># 8 Ex H − Rebuttal Dec Tarantino,<br># 9 Ex I − Rebuttal Dec Bleicher,<br># 10 Ex J − Declaration of Kovi,<br># 11 Ex K − Devnani Depo,<br># 12 Text of Proposed Order)(Jones, Michael) (Entered: 10/24/2016) |
| 10/24/2016 | 75 | Unopposed MOTION to Expedite *Briefing on 74 Emergency Motion to Strike Plaintiffs' Reply Declarations, or Alternatively, to File Sur−Reply and Extend Preliminary Injunction Motion Hearing Date* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments:<br># 1 Text of Proposed Order)(Jones, Michael) (Entered: 10/24/2016) |
| 10/25/2016 | 76 | ORDER granting 75 Motion to Expedite. Signed by Magistrate Judge Roy S. Payne on 10/25/2016. (ch, ) (Entered: 10/25/2016) |
| 10/25/2016 | 77 | Joint MOTION for Leave to File Excess Pages *regarding Reply Briefs in Support of 27 and 20* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments:<br># 1 Text of Proposed Order)(Jones, Michael) (Entered: 10/25/2016) |
| 10/25/2016 | 78 | SEALED PATENT REPLY to Response to PATENT Motion re 27 MOTION to Change Venue *Under 28 USC Sec. 1404(a) filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.*. (Attachments:<br># 1 Ex A − Quadrel Depo)(Jones, Michael) (Entered: 10/25/2016) |
| 10/25/2016 | 79 | SEALED REPLY to Response to Motion re 20 SEALED MOTION *for Preliminary Injunction* filed by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Exhibit Declaration of Aden M. Allen,<br># 2 Exhibit A − Allen,<br># 3 Exhibit B− Allen,<br># 4 Exhibit C− Allen,<br># 5 Exhibit D− Allen,<br># 6 Exhibit E− Allen,<br># 7 Exhibit F− Allen,<br># 8 Exhibit G− Allen, |

| | | |
|---|---|---|
| | | # 9 Exhibit H− Allen,<br># 10 Exhibit I− Allen,<br># 11 Exhibit Declaration of Ravishanker Kovi,,<br># 12 Exhibit A− Kovi,<br># 13 Exhibit B− Kovi,<br># 14 Exhibit C− Kovi,<br># 15 Exhibit D− Kovi,<br># 16 Exhibit E Kovi (Part 1),<br># 17 Exhibit F− Kovi (Part 2),<br># 18 Exhibit Declaration of Michael J. Dansky,<br># 19 Exhibit A− Dansky,<br># 20 Exhibit B− Dansky,<br># 21 Exhibit C− Dansky,<br># 22 Exhibit D− Dansky,<br># 23 Exhibit E− Dansky,<br># 24 Exhibit F− Dansky,<br># 25 Exhibit G− Dansky,<br># 26 Exhibit H− Dansky,<br># 27 Exhibit Declaration of Richard Bleicher,<br># 28 Exhibit 1− Bleicher,<br># 29 Exhibit 2− Bleicher,<br># 30 Exhibit 3− Bleicher,<br># 31 Exhibit Declaration of Ralph Tarantino,<br># 32 Exhibit Supplemental Declaration of Jonathan L. Sessler,<br># 33 Exhibit Declaration of Jonathan L. Sessler)(Smith, Melissa) (Entered: 10/25/2016) |
| 10/25/2016 | 80 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 79 Sealed Reply to Response to Motion,,,,. (Attachments:<br># 1 Appendix A−C to Declaration of Jonathan L. Sessler,<br># 2 Exhibit 1− Sessler,<br># 3 Exhibit 2− Sessler,<br># 4 Exhibit 3− Sessler,<br># 5 Exhibit 4− Sessler,<br># 6 Exhibit 5− Sessler,<br># 7 Exhibit 6− Sessler,<br># 8 Exhibit 7− Sessler,<br># 9 Exhibit 8− Sessler,<br># 10 Exhibit 9− Sessler,<br># 11 Exhibit 10− Sessler,<br># 12 Exhibit 11− Sessler,<br># 13 Exhibit 12− Sessler,<br># 14 Exhibit 13− Sessler,<br># 15 Exhibit 14− Sessler,<br># 16 Exhibit 15− Sessler,<br># 17 Exhibit 16− Sessler,<br># 18 Exhibit 17− Sessler,<br># 19 Exhibit 18− Sessler,<br># 20 Exhibit 19 − Sessler)(Smith, Melissa) (Entered: 10/25/2016) |
| 10/25/2016 | 81 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 79 Sealed Reply to Response to Motion,,,,. (Attachments:<br># 1 Exhibit 20 − Sessler,<br># 2 Exhibit 21− Sessler,<br># 3 Exhibit 22− Sessler,<br># 4 Exhibit 23− Sessler,<br># 5 Exhibit 24− Sessler,<br># 6 Exhibit 25− Sessler,<br># 7 Exhibit 26− Sessler,<br># 8 Exhibit 27− Sessler,<br># 9 Exhibit 28− Sessler,<br># 10 Exhibit 29− Sessler,<br># 11 Exhibit 30− Sessler,<br># 12 Exhibit 31− Sessler,<br># 13 Exhibit 32− Sessler, |

| | | |
|---|---|---|
| | | # 14 Exhibit 33− Sessler,<br># 15 Exhibit 34− Sessler,<br># 16 Exhibit 35− Sessler,<br># 17 Exhibit 36− Sessler,<br># 18 Exhibit 37− Sessler,<br># 19 Exhibit 38− Sessler)(Smith, Melissa) (Entered: 10/25/2016) |
| 10/25/2016 | 82 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 79 Sealed Reply to Response to Motion,,,,. (Attachments:<br># 1 Exhibit 39− Sessler,<br># 2 Exhibit 40− Sessler,<br># 3 Exhibit 41− Sessler,<br># 4 Exhibit 42− Sessler,<br># 5 Exhibit 43− Sessler,<br># 6 Exhibit 44− Sessler,<br># 7 Exhibit 45− Sessler,<br># 8 Exhibit 46− Sessler,<br># 9 Exhibit 47− Sessler,<br># 10 Exhibit 48− Sessler,<br># 11 Exhibit 49− Sessler,<br># 12 Exhibit 50− Sessler,<br># 13 Exhibit 51− Sessler,<br># 14 Exhibit 52− Sessler,<br># 15 Exhibit 53− Sessler,<br># 16 Exhibit 54− Sessler,<br># 17 Exhibit 55− Sessler,<br># 18 Exhibit 56− Sessler,<br># 19 Exhibit 57− Sessler)(Smith, Melissa) (Entered: 10/25/2016) |
| 10/25/2016 | 83 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 79 Sealed Reply to Response to Motion,,,,. (Attachments:<br># 1 Exhibit 58− Sessler,<br># 2 Exhibit 59− Sessler,<br># 3 Exhibit 60− Sessler,<br># 4 Exhibit 61− Sessler,<br># 5 Exhibit 62− Sessler,<br># 6 Exhibit 63− Sessler,<br># 7 Exhibit 64− Sessler,<br># 8 Exhibit 65− Sessler,<br># 9 Exhibit 66− Sessler,<br># 10 Exhibit 67− Sessler,<br># 11 Exhibit 69− Sessler,<br># 12 Exhibit 69− Sessler,<br># 13 Exhibit 70− Sessler,<br># 14 Exhibit 71− Sessler,<br># 15 Exhibit 72− Sessler,<br># 16 Exhibit 73− Sessler,<br># 17 Exhibit 74−Sessler,<br># 18 Exhibit 75−Sessler,<br># 19 Exhibit 76− Sessler,<br># 20 Exhibit Compendium to Exhibits to Declaration of Jonathan L. Sessler)(Smith, Melissa) (Entered: 10/25/2016) |
| 10/26/2016 | 84 | ORDER granting 77 Motion for Leave to File Excess Pages. Signed by Magistrate Judge Roy S. Payne on 10/26/2016. (ch, ) (Entered: 10/26/2016) |
| 10/27/2016 | 85 | SEALED PATENT DOCUMENT. Defendants' Notice of Supplemental Declaration of Sigma−Aldrich Corporation (regarding Supplemental Brief in Support of Opposition to Plaintiffs' Motion for Preliminary Injunction − Dkt. 71) (Attachments:<br># 1 Ex. A − Supplemental Declaration)(Jones, Michael) (Entered: 10/27/2016) |
| 10/27/2016 | 86 | SEALED RESPONSE to Motion re 74 Emergency SEALED PATENT MOTION *to Strike Plaintiffs' Reply Declarations, or Alternatively, to File Sur−Reply and Extend Preliminary Injunction Motion Hearing Date* filed by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order, |

| | | |
|---|---|---|
| | | # 2 Exhibit A,<br># 3 Exhibit B,<br># 4 Exhibit C,<br># 5 Exhibit D,<br># 6 Exhibit E,<br># 7 Exhibit F,<br># 8 Exhibit G,<br># 9 Exhibit H,<br># 10 Exhibit I,<br># 11 Exhibit J,<br># 12 Exhibit K)(Smith, Melissa) (Entered: 10/27/2016) |
| 10/27/2016 | 87 | NOTICE by AuroMedics Pharma LLC, Aurobindo Pharma Ltd *Defendants' Notice of Identification of Witnesses for the Evidentiary Hearing Scheduled 11/2/16* (Jones, Michael) (Entered: 10/27/2016) |
| 10/27/2016 | 88 | Sealed Document. Plaintiffs' Witness List (Smith, Melissa) (Entered: 10/27/2016) |
| 10/28/2016 | 89 | NOTICE by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. re 76 Order on Motion to Expedite −− *Joint Notice Regarding Need for Additional Briefing on Defendants' Emergency Motion to Strike Plaintiffs' Reply Declarations* −− (Jones, Michael) (Entered: 10/28/2016) |
| 10/28/2016 | 90 | ORDER denying 74 Sealed Patent Motion to Strike or Continue. Signed by Magistrate Judge Roy S. Payne on 10/28/16. (ch, ) (Entered: 10/28/2016) |
| 10/31/2016 | 91 | SEALED RESPONSE by Mylan Institutional LLC, Apicore US LLC to 85 Sealed Notice of Supplemental Declaration filed by Mylan Institutional LLC, Apicore US LLC. (Attachments:<br># 1 Exhibit A,<br># 2 Exhibit B,<br># 3 Exhibit C,<br># 4 Exhibit D)(Smith, Melissa) (Entered: 10/31/2016) |
| 10/31/2016 | 92 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 20 SEALED MOTION *for Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.*. (Attachments:<br># 1 Appendix,<br># 2 Yu Declaration,<br># 3 Yu Ex 1 − 102216 Sessler depo,<br># 4 Yu Ex 2 − 092716 Krag depo,<br># 5 Yu Ex 3 − 102916 Bleicher depo,<br># 6 Yu Ex 4 − 102716 Kovi depo,<br># 7 Yu Ex 5 − 081116 Sessler depo,<br># 8 Brown Declaration,<br># 9 Brown Ex 1 − Still Article,<br># 10 Krag Declaration,<br># 11 Krag Ex 1 − Review article by Peek,<br># 12 Bakewell Declaration,<br># 13 Bakewell Ex A − 081116 Dansky depo,<br># 14 Bakewell Ex B −102516 Dansky depo,<br># 15 Bakewell Ex C − 102716 Kovi depo,<br># 16 Bakewell Ex D − 092916 Bleicher depo)(Jones, Michael) (Entered: 10/31/2016) |
| 11/02/2016 | 93 | Minute Entry for proceedings held before Magistrate Judge Roy S. Payne: Evidentiary Hearing held on 11/2/2016. (Court Reporter Tammy Goolsby.) (Attachments:<br># 1 Attorney Sign−in Sheet) (jml) (Entered: 11/03/2016) |
| 11/04/2016 | 94 | Sealed Document. Plaintiffs' Deposition Designations and Counter Designations (Attachments:<br># 1 Exhibit 1,<br># 2 Exhibit 2,<br># 3 Exhibit 3,<br># 4 Exhibit 4)(Smith, Melissa) (Entered: 11/04/2016) |
| 11/04/2016 | 95 | SEALED PATENT DOCUMENT − Defendants' Deposition Designations and Counter−Desigantions. (Attachments: |

| | | |
|---|---|---|
| | | # 1 EXHIBIT A − Bleicher dep designations PART 1,<br># 2 EXHIBIT A − Bleicher dep designations PART 2,<br># 3 EXHIBIT B − Tarantino dep designations PART 1,<br># 4 EXHIBIT B − Tarantino dep designations PART 2,<br># 5 EXHIBIT C − Devnani depo designations,<br># 6 EXHIBIT D − Fedele depo designations)(Jones, Michael) (Entered: 11/04/2016) |
| 11/07/2016 | 96 | Sealed Document. Plaintiffs' November 2, 2016 Hearing Exhibit List (Attachments:<br># 1 Exhibit Plaintiffs' 11/2 Hearing Exhibit List)(Smith, Melissa) (Entered:<br>11/07/2016) |
| 11/08/2016 | 97 | Sealed Document. Plaintiffs' Notice of Filing of Presentation Slides (November 2,<br>2016 Preliminary Injunction Hearing) (Attachments:<br># 1 Exhibit 1,<br># 2 Exhibit 2,<br># 3 Exhibit 3,<br># 4 Exhibit 4)(Smith, Melissa) (Entered: 11/08/2016) |
| 11/08/2016 | 98 | SEALED PATENT DOCUMENT − Defendants' Disclosure of Exhibits and<br>Demonstratives for the November 2, 2016 Preliminary Injunction and Motion to<br>Transfer Venue Hearing. (Attachments:<br># 1 EXHIBIT A − list of exhibits for witnesses,<br># 2 EXHIBIT B − presentation slides,<br># 3 EXHIBIT C − slides during Brown direct exam,<br># 4 EXHIBIT D − slides during Krag direct exam,<br># 5 EXHIBIT E − slides during Bakewell direct exam,<br># 6 EXHIBIT F − slides during Quadrel direct exam)(Jones, Michael) (Entered:<br>11/08/2016) |
| 11/09/2016 | 99 | ORDER − Scheduling Conference set for 12/19/2016 09:00 AM before Magistrate<br>Judge Roy S. Payne. Signed by Magistrate Judge Roy S. Payne on 11/9/2016. (ch, )<br>(Entered: 11/09/2016) |
| 11/14/2016 | 100 | MEMORANDUM OPINION AND ORDER denying 27 Motion to Change Venue.<br>Signed by Magistrate Judge Roy S. Payne on 11/14/16. (mrm, ) (Entered: 11/14/2016) |
| 11/21/2016 | 101 | REPORT AND RECOMMENDATIONS re 20 SEALED MOTION for Preliminary<br>Injunction filed by Apicore US LLC, Mylan Institutional LLC.. Signed by Magistrate<br>Judge Roy S. Payne on 11/19/2016. (ch, ) (Entered: 11/21/2016) |
| 11/22/2016 | | REPORT AND RECOMMENDATIONS re 20 SEALED MOTION for Preliminary<br>Injunction filed by Apicore US LLC, Mylan Institutional LLC. This entry clarifies that<br>the live hearing testimony referred to on page 48 of the Court's REPORT AND<br>RECOMMENDATION 101 was given by Mr. Ravishanker Kovi, not Mr. Devnani.<br>Signed by Magistrate Judge Roy S. Payne on 11/22/2016. (crs, ) (Entered: 11/22/2016) |
| 11/28/2016 | 102 | RESPONSE to 100 Order on Motion to Change Venue Objection to Order Denying<br>Aurobindo's Motion to Transfer by AuroMedics Pharma LLC, Aurobindo Pharma Ltd,<br>Aurobindo Pharma USA Inc.. (Jones, Michael) (Entered: 11/28/2016) |
| 12/01/2016 | 103 | Unopposed MOTION for Leave to Extend the Filing Date for Written Objections re<br>101 Report and Recommendations and Joint Motion to File Excess Pages by<br>AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc..<br>(Attachments:<br># 1 Text of Proposed Order)(Jones, Michael) (Entered: 12/01/2016) |
| 12/05/2016 | 104 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 11/2/16<br>(Motion Hearing) before Judge Roy Payne. Court Reporter/Transcriber: Tammy<br>Goolsby, CSR,Telephone number: (903) 445−5355.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7)<br>business days to file with the Court a Notice of Intent to Request Redaction of this<br>transcript. If no such Notice is filed, the transcript will be made remotely<br>electronically available to the public without redaction after 90 calendar days.<br>The policy is located on our website at www.txed.uscourts.gov** |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 12/29/2016. Redacted Transcript Deadline set for 1/8/2017. Release of Transcript Restriction set for 3/8/2017. (sholmes, ) (Entered: 12/05/2016) |
| 12/05/2016 | 105 | ORDER granting 103 Motion for Extension to File Objections. Signed by Magistrate Judge Roy S. Payne on 12/5/2016. (ch, ) (Entered: 12/05/2016) |
| 12/07/2016 | 106 | SEALED PATENT DOCUMENT − Defendants' Objections to the Report and Recommendation 101 . (Attachments: # 1 Ex. A − Apicore v. Aurobindo PI hearing transcript (excerpts))(Jones, Michael) (Entered: 12/07/2016) |
| 12/12/2016 | 107 | SEALED PATENT RESPONSE by Mylan Institutional LLC, Apicore US LLC to 102 RESPONSE to 100 Order on Motion to Change Venue Objection to Order Denying Aurobindo's Motion to Transfer (Smith, Melissa) (Entered: 12/12/2016) |
| 12/13/2016 | 108 | NOTICE by Apicore US LLC, Mylan Institutional LLC *of Compliance Regarding Infringement Contentions* (Smith, Melissa) (Entered: 12/13/2016) |
| 12/14/2016 | 109 | CORPORATE DISCLOSURE STATEMENT filed by Apicore US LLC identifying Corporate Parent Apicore Inc., Other Affiliate Medicure Inc. for Apicore US LLC. (Smith, Melissa) (Entered: 12/14/2016) |
| 12/19/2016 | | Minute Entry for proceedings held before Judge Roy Payne: Scheduling Conference held on 12/19/16. Counsel for the parties appeared and were asked if they consented to a trial before the magistrate judge. The parties were then given Markman and jury selection dates. The parties were directed to meet and confer regarding any changes to the Courts proposed docket control order and discovery order, and the parties are to submit the proposed orders by January 9, 2017. The parties were also instructed to submit the name of an agreed mediator within 3 days. (bga, ) (Entered: 12/22/2016) |
| 12/20/2016 | 110 | SEALED PATENT RESPONSE by Mylan Institutional LLC, Apicore US LLC to 106 Sealed Objections to R&R *filed by Mylan Institutional LLC, Apicore US LLC.* (Attachments: # 1 Exhibit A)(Smith, Melissa) (Entered: 12/20/2016) |
| 12/22/2016 | 111 | NOTICE of Intent to Request Redaction by Melissa Richards Smith re 104 Transcript,,,. (Smith, Melissa) (Entered: 12/22/2016) |
| 12/22/2016 | 112 | Joint NOTICE regarding Designation of a Mediator (NO Agreement Reached) filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Jones, Michael) (Entered: 12/22/2016) |
| 01/05/2017 | 113 | ORDER REFERRING CASE to Mediator Judge Faith Hochberg, 870 United Nations Plaza, Suite 13 F, New York, New York 10017, telephone number 201−400−8400, and email: judgehochberg@judgehochberg.com, is hereby appointed as mediator. Signed by Magistrate Judge Roy S. Payne on 1/4/2017. (ch, ) (Entered: 01/05/2017) |
| 01/09/2017 | 114 | Joint MOTION for Entry of Discovery Order by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 01/09/2017) |
| 01/09/2017 | 115 | Joint MOTION for Entry of Docket Control Order by Apicore US LLC, Mylan Institutional LLC. (Attachments: # 1 Text of Proposed Order)(Smith, Melissa) (Entered: 01/09/2017) |
| 01/09/2017 | 116 | NOTICE by Apicore US LLC, Mylan Institutional LLC *of Compliance Regarding Initial and Additional Disclosures* (Smith, Melissa) (Entered: 01/09/2017) |
| 01/09/2017 | 117 | NOTICE of Discovery Disclosure by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. *regarding Compliance with Initial and Additional Disclosures* (Jones, Michael) (Entered: 01/09/2017) |
| 01/10/2017 | 118 | DOCKET CONTROL ORDER − Pretrial Conference set for 3/20/2018 09:00 AM before Magistrate Judge Roy S. Payne., Amended Pleadings due by 7/4/2017., Jury Selection set for 4/16/2018 09:00 AM in Ctrm 106 (Marshall) before Judge Robert W. Schroeder III., Markman Hearing set for 9/19/2017 09:00 AM before Magistrate Judge |

| | | |
|---|---|---|
| | | Roy S. Payne., Motions due by 3/5/2018., Proposed Pretrial Order due by 3/12/2018. Signed by Magistrate Judge Roy S. Payne on 1/10/2017. (ch, ) (Entered: 01/10/2017) |
| 01/10/2017 | 119 | DISCOVERY ORDER. Signed by Magistrate Judge Roy S. Payne on 1/10/2017. (ch, ) (Entered: 01/10/2017) |
| 01/17/2017 | | ORDER granting 28 Motion to Seal. Signed by Magistrate Judge Roy S. Payne on 1/17/2017. (rsp1, ) (Entered: 01/17/2017) |
| 01/17/2017 | | ORDER finding as moot 30 Sealed Motion. Signed by Magistrate Judge Roy S. Payne on 1/17/2017. (rsp1, ) (Entered: 01/17/2017) |
| 01/17/2017 | | ORDER granting 35 Motion to Seal. Signed by Magistrate Judge Roy S. Payne on 1/17/2017. (rsp1, ) (Entered: 01/17/2017) |
| 02/02/2017 | 120 | ORDER Overruling Objections re 102 Response filed by Aurobindo Pharma Ltd, AuroMedics Pharma LLC, Aurobindo Pharma USA Inc re 100 order.. Signed by Judge Robert W. Schroeder, III on 2/1/2017. (sm, ) (Entered: 02/02/2017) |
| 02/06/2017 | 121 | NOTICE of Discovery Disclosure by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. *of Compliance regarding PR 3−3 and 3−4* (Jones, Michael) (Entered: 02/06/2017) |
| 02/07/2017 | 122 | ORDER ADOPTING 101 Report and Recommendations ORDERING Defendants to submit a brief within 14 days of this order and Plaintiffs to respond within 7 days after service of brief.. Signed by Judge Robert W. Schroeder, III on 2/7/2017. (sm, ) (Entered: 02/07/2017) |
| 02/09/2017 | 123 | ***FILED IN ERROR, PLEASE IGNORE***NOTICE by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. *of Appeal* (Jones, Michael) Modified on 2/10/2017 (sm, ). (Entered: 02/09/2017) |
| 02/09/2017 | 124 | SEALED PATENT MOTION *to Stay Injunction Pending Appeal* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: # 1 Ex. A − Fedele Decl., # 2 Ex. B 110216 motions hearing transcript, # 3 Text of Proposed Order)(Clutter, Patrick) (Entered: 02/09/2017) |
| 02/09/2017 | 125 | MOTION to Expedite *Briefing regarding 124 Motion to Stay Injunction Pending Appeal* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments: # 1 Text of Proposed Order)(Clutter, Patrick) (Entered: 02/09/2017) |
| 02/10/2017 | | ***FILED IN ERROR, WRONG EVENT USED, ATTORNEY MUST REFILE USING NOTICE OF APPEAL EVENT. Document # 123, Notice. PLEASE IGNORE.*** <br><br> (sm, ) (Entered: 02/10/2017) |
| 02/10/2017 | 126 | NOTICE OF APPEAL − FEDERAL CIRCUIT as to 122 Order Adopting Report and Recommendations by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. Filing fee $ 505, receipt number 0540−6150278. (Jones, Michael) (Entered: 02/10/2017) |
| 02/10/2017 | 127 | ORDER granting 125 Motion to Expedite Briefing Regarding the Motion to Stay Injunction Pending Appeal. Signed by Magistrate Judge Roy S. Payne on 2/10/2017. (ch, ) (Entered: 02/10/2017) |
| 02/10/2017 | | Transmission of Notice of Appeal, 122 Order Adopting and certified copy of Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 126 Notice of Appeal − FEDERAL CIRCUIT (dlc, ) (Entered: 02/10/2017) |
| 02/10/2017 | 128 | ACKNOWLEDGMENT OF RECEIPT on 2/10/17, by USCA−Federal Circuit as to 122 Order Adopting Report and Recommendations, 126 Notice of Appeal − FEDERAL CIRCUIT and certified copy of Docket Sheet (dlc, ) (Entered: 02/10/2017) |
| 02/13/2017 | 129 | ORDER to submit a joint proposed preliminary injunction Order by February 28, 2017. Signed by Magistrate Judge Roy S. Payne on 2/13/2017. (slo, ) (Entered: 02/13/2017) |

| | | |
|---|---|---|
| 02/16/2017 | 130 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 124 SEALED PATENT MOTION *to Stay Injunction Pending Appeal filed by Apicore US LLC, Mylan Institutional LLC.* (Attachments:<br># 1 Text of Proposed Order,<br># 2 Exhibit Declaration of Aden M. Allen,<br># 3 Exhibit 1,<br># 4 Exhibit 2,<br># 5 Exhibit 3,<br># 6 Exhibit 4,<br># 7 Exhibit 5,<br># 8 Exhibit 6,<br># 9 Exhibit 7)(Smith, Melissa) (Entered: 02/16/2017) |
| 02/17/2017 | 131 | NOTICE of Docketing Notice of Appeal from USCA−Federal Circuit re 126 Notice of Appeal − FEDERAL CIRCUIT filed by Aurobindo Pharma Ltd, AuroMedics Pharma LLC, Aurobindo Pharma USA Inc.. USCA−FEDERAL CIRCUIT Case Number 17−1645 (Attachments:<br># 1 Key Rule Changes)(dlc, ) (Entered: 02/17/2017) |
| 02/17/2017 | 132 | SEALED PATENT MOTION *to Defer Entry of Preliminary Injunction Pending the Court's Ruling on Defendants' Motion to Stay* by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc.. (Attachments:<br># 1 Text of Proposed Order)(Clutter, Patrick) (Entered: 02/17/2017) |
| 02/21/2017 | 133 | SEALED PATENT REPLY to Response to PATENT Motion re 124 SEALED PATENT MOTION *to Stay Injunction Pending Appeal filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc..* (Jones, Michael) (Entered: 02/21/2017) |
| 02/21/2017 | 134 | SEALED PATENT DOCUMENT − Defendants' Opening Brief on the Preliminary Injunction Bond. (Clutter, Patrick) (Entered: 02/21/2017) |
| 02/22/2017 | 135 | ORDER denying 124 Sealed Patent Motion; and denying as moot 132 Sealed Patent Motion. Signed by Magistrate Judge Roy S. Payne on 2/21/17. (slo, ) (Entered: 02/22/2017) |
| 02/22/2017 | 136 | NOTICE by Apicore US LLC, Mylan Institutional LLC *of Filing of Preliminary Injunction Bond and Power of Attorney* (Attachments:<br># 1 Exhibit A− Preliminary Injunction Bond)(Smith, Melissa) (Entered: 02/22/2017) |
| 02/22/2017 | 137 | Sealed Document − Plaintiffs' Brief For Appropriate Bond Amount (Attachments:<br># 1 Ex. 1 − A. Allen Email,<br># 2 Ex. 2 − N. Stafford Email,<br># 3 Ex. 3 − N. Stafford Email,<br># 4 Ex. 4 − S. Patel Email,<br># 5 Ex. 5 − S. Patel Email,<br># 6 Ex. 6 − HPG Notification,<br># 7 Text of Proposed Order)(Smith, Melissa) (Entered: 02/22/2017) |
| 02/23/2017 | 138 | Emergency SEALED PATENT MOTION *to Expedite Entry of a Preliminary Injunction* by Apicore US LLC, Mylan Institutional LLC. (Attachments:<br># 1 Text of Proposed Order,<br># 2 Exhibit 1,<br># 3 Exhibit 2,<br># 4 Exhibit 3,<br># 5 Exhibit 4,<br># 6 Exhibit 5,<br># 7 Exhibit 6,<br># 8 Exhibit 7,<br># 9 Exhibit 8)(Smith, Melissa) (Entered: 02/23/2017) |
| 02/24/2017 | 139 | ORDER Preliminarily Enjoining Defendants. Signed by Judge Robert W. Schroeder, III on 2/24/2017. (slo, ) (Entered: 02/24/2017) |
| 02/27/2017 | 140 | AMENDED NOTICE OF APPEAL − PATENT CASE as to 126 Notice of Appeal − FEDERAL CIRCUIT by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc. (Jones, Michael) (Entered: 02/27/2017) |

| 02/28/2017 | | Transmission of Amended Notice of Appeal, 122 Order Adopting, 139 Order, 101 Report & Recommendation, and certified copy of Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 140 Amended Notice of Appeal − FEDERAL CIRCUIT (dlc, ) (Entered: 02/28/2017) |
|---|---|---|
| 02/28/2017 | 141 | ACKNOWLEDGMENT OF RECEIPT on 2/28/17, by USCA−Federal Circuit as to 101 Report and Recommendations, 140 Amended Notice of Appeal − PATENT CASE, 139 Order, 122 Order Adopting Report and Recommendations, and certified copy of Docket Sheet. (dlc, ) (Entered: 02/28/2017) |
| 02/28/2017 | 142 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 138 Emergency SEALED PATENT MOTION *to Expedite Entry of a Preliminary Injunction filed by AuroMedics Pharma LLC, Aurobindo Pharma Ltd, Aurobindo Pharma USA Inc..* (Attachments: # 1 Exhibit A − 022317 email from Patel, # 2 Exhibit B − 020717 email from Ahn, # 3 Exhibit C − 022117 email from Stafford, # 4 Exhibit D − 021817 email from Patel, # 5 Exhibit E − Scholle v. Rapak Opinion, # 6 Text of Proposed Order)(Clutter, Patrick) (Entered: 02/28/2017) |
| 03/01/2017 | 143 | SEALED PATENT DOCUMENT. Joint Submission Regarding Preliminary Injunction Order (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Smith, Melissa) (Entered: 03/01/2017) |
| 03/01/2017 | 144 | ORDER of USCA−FEDERAL CIRCUIT directing appellees to respond to the motion for a stay pending appeal no later than 5pm on March 6, 2017. Any reply in support of the motion is due no later than 5pm on March 9, 2017. The request for an immediate stay is denied. (dlc, ) (Entered: 03/01/2017) |
| 03/02/2017 | | NOTICE of Hearing: Telephone Conference set for 3/3/2017 03:00 PM before Magistrate Judge Roy S. Payne regarding the scope of the injunction. Plaintiff's counsel is responsible for setting up conference call. Contact the Court AFTER all parties have joined the call. The Court's conference telephone number is 903−938−7803.(bga, ) (Entered: 03/02/2017) |
| 03/03/2017 | 145 | Sealed Document. Notice of Supplement to 138 Plaintiffs' Emergency Motion to Expedite Entry of a Preliminary Injunction and 143 Joint Submission Regarding Preliminary Injunction Order (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Smith, Melissa) (Entered: 03/03/2017) |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.: 2:16-cv-491

**Jury Trial Demanded**

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Apicore US LLC ("Apicore") and Mylan Institutional LLC ("Mylan") (collectively, "Plaintiffs") bring this Complaint for patent infringement against Aurobindo Pharma Ltd ("Aurobindo India"), Aurobindo Pharma USA Inc. ("Aurobindo USA"), and AuroMedics Pharma LLC ("AuroMedics") (collectively, "Defendants").

**THE PARTIES**

1.     Apicore is a limited liability company organized and existing under the laws of the State of Delaware, and having a place of business at 49 Napoleon Court, Somerset, NJ 08873.

2.     Apicore is a pharmaceutical company that provides innovative solutions to the pharmaceutical industry in the field of active pharmaceutical ingredient manufacturing.

3.     Apicore developed a process for the manufacture of a high purity isosulfan blue product that is vastly superior to other methods of isosulfan blue synthesis and has entered into an exclusive arrangement with Mylan to commercialize this innovation.

1

4.      Mylan is a limited liability company organized and existing under the laws of the State of Delaware, and having a place of business at 1718 Northrock Court, Rockford, IL 61103.

5.      Mylan is a pharmaceutical company that develops and commercializes injectable pharmaceutical products.

6.      On information and belief, Aurobindo India is an Indian corporation having a place of business at Plot No. 2, Maitri Vihar, Ameerpet, Hyderabad – 500 038, Andhra Pradesh, India.

7.      On information and belief, Aurobindo India develops and manufactures certain pharmaceutical drug products for sale in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.  In 2013, Aurobindo India commenced marketing injectables products in the United States through its subsidiary AuroMedics.  In the past, Aurobindo India has designated Aurobindo USA as its U.S. agent before the FDA.  In the past, Aurobindo India has designated AuroMedics as its U.S. agent before the FDA.  On information and belief, AuroMedics and/or Aurobindo USA is the U.S. agent before the FDA for ANDA No. 206831.

8.      On information and belief, Aurobindo USA is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810.  Aurobindo USA is a wholly-owned subsidiary and agent of Aurobindo India.

9.      On information and belief, Aurobindo USA markets, offers to sell, manufactures, distributes, and sells certain pharmaceutical drug products in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.

2

10.     On information and belief, AuroMedics is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810.  AuroMedics is a wholly-owned subsidary of Aurobindo India.

11.     On information and belief, AuroMedics markets, manufactures, offers to sell, distributes, and sells certain pharmaceutical drug products in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.

12.     On information and belief, Aurobindo India, Aurobindo USA, and AuroMedics operate and act in concert as an integrated, unitary business for purposes of manufacturing, marketing, offering to sell, selling, and distributing generic pharmaceutical products throughout the United States, including in Texas and in this district.  For example, in several of Aurobindo India's Earnings Conference Calls, including the call on February 10, 2016, Mr. Robert Cunard – CEO, Aurobindo USA and Mr. Ronald Quadrel – CEO, AuroMedics, along with individuals at Aurobindo India, were stated as representing the senior management team.

## NATURE OF THE ACTION

13.     This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, Sections 1 *et seq*., involving United States Patent No. 7,662,992 (the "'992 patent") and United States Patent No. 8,969,616 (the "'616 patent") (collectively, the "Patents-in-Suit").

14.     This action arises out of Defendants' offering to sell and selling in the United States and/or importing into the United States isosulfan blue, which is manufactured by the processes, or equivalents thereof, claimed in the Patents-in-Suit.

3

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

16.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

17.     This Court has personal jurisdiction over Aurobindo India because, on

information and belief, *inter alia,* Aurobindo India collaborated with Aurobindo USA and

AuroMedics for the purpose of preparing and submitting ANDA No. 206831.  Aurobindo India

conducts business through and with Aurobindo USA and/or AuroMedics, its wholly-owned

subsidiaries.  On information and belief, Aurobindo India has affiliations with Texas and this

district that are pervasive, continuous, and systematic.  Aurobindo India directly or through its

affiliates and agents develops, formulates, synthesizes, manufactures, markets, imports, offers to

sell, and/or sells pharmaceutical drug products.  On information and belief, Aurobindo India

engages in direct marketing, offering to sell, distribution, and/or sale of pharmaceutical drug

products, including isosulfan blue, within Texas and this district and to the residents of Texas

and this district.  On information and belief, Aurobindo India regularly conducts and/or solicits

business, directly or through its subsidiaries Aurobindo USA and/or AuroMedics.

18.     This Court has personal jurisdiction over Aurobindo USA because Aurobindo

USA has affiliations with Texas and this district that are pervasive, continuous, and systematic.

Furthermore, Aurobindo USA has a Texas Taxpayer Number, which is 32038681568.  In

addition, Aurobindo USA is licensed with the Texas Department of State Health Services under

License Number 0103142 and engages in direct marketing, distribution, offering for sale, and/or

sale of pharmaceutical drug products, including isosulfan blue, within Texas and this district and

to the residents of this district.

4

19.     This Court has personal jurisdiction over AuroMedics because AuroMedics has affiliations with Texas and this district that are pervasive, continuous, and systematic. Furthermore, AuroMedics is licensed with the Texas Department of State Health Services under License Number 1000855 and engages in direct marketing, distribution, offering for sale, and/or sale of pharmaceutical drug products, including isosulfan blue, within Texas and this district and to the residents of Texas and this district.

20.     Moreover, because the acts giving rise to infringement by Aurobindo India, Aurobindo USA, and AuroMedics have occurred within Texas and this district, personal jurisdiction is proper within this district.

## PATENTS-IN-SUIT

21.     Apicore was formed in 2003.  For several years, the entire company was devoted to the development of isosulfan blue, a small molecule active pharmaceutical ingredient ("API"). After years of extraordinary effort and significant expense, Apicore developed a vastly superior manufacturing process that allowed for the commercial synthesis of isosulfan blue at a purity level much greater than had been previously achieved by others.  That superior process is the basis for the Patents-in-Suit.

22.     The '992 patent, entitled "Process for Preparation of Isosulfan Blue," was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on February 16, 2010.  The named inventors of the '992 patent are Ravishanker Kovi, Satyam Nampalli, and Peter Xavier Tharial.  A true and correct copy of the '992 patent is attached hereto as Exhibit A.

23.     The '616 patent, entitled "Process for Preparation of Isosulfan Blue," was duly and legally issued by the USPTO on March 3, 2015.  The named inventors of the '616 patent are Ravishanker Kovi, Satyam Nampalli, and Peter Xavier Tharial.  A true and correct copy of the '616 patent is attached hereto as Exhibit B.

24.     The '616 Patent is a continuation of U.S. Application No. 13/310,019 (the "'019 App'n"). The '019 App'n, entitled "Process for Preparation of Isosulfan Blue," was filed on December 2, 2011. The '019 App'n was published on March 29, 2012 as U.S. Publication No. 2012/0078007 A1 (the "'007 Pub'n"). The named inventors of the '007 Pub'n are Ravishanker Kovi, Satyam Nampalli, and Peter Xavier Tharial. The pending claims of the '019 App'n were granted allowance and the issue fee was paid on April 11, 2016. The Issue Notification for the '019 App'n was mailed on May 11, 2016. The allowed claims of the '019 App'n are substantially identical to the claims published in the '007 Pub'n. A true and correct copy of the '007 Pub'n, a true and correct copy of the allowed claims of the '019 App'n, and a true and correct copy of the transaction history for the '019 App'n as of May 11, 2016, available from the USPTO Public Patent Application Information Retrieval ("PAIR") system website, are attached hereto as Exhibits C, D, and E respectively.

25.     Apicore is the lawful owner of the Patents-in-Suit and the '019 App'n. and has all right, title and interest in and to the Patents-in-Suit and the '019 App'n.

26.     Mylan, which now owns Synerx, is an exclusive licensee to the Patents-in-Suit and the '019 App'n.

27.     Neither Apicore nor Mylan has authorized or licensed Defendants to use any of the inventions claimed in the Patents-in-Suit or the '019 App'n.

28.     On information and belief, Defendants collaborate in the manufacture, marketing, offering for sale, and sale of many pharmaceutical products (including generic drug products manufactured and sold pursuant to an approved abbreviated new drug application) within the United States generally, and in Texas and in this district specifically.

6

29.     On information and belief, Defendants actively review pharmaceutical patents and seek opportunities to challenge those patents.

30.     On information and belief, Defendants were aware of and reviewed the Patents-in-Suit and the '019 App'n prior to launching their isosulfan blue product.

31.     On information and belief, Aurobindo India submitted to the FDA ANDA No. 206831 seeking approval to engage in the commercial manufacture, use, marketing, offer for sale and sale of isosulfan blue.  On information and belief, AuroMedics and/or Aurobindo USA served as Aurobindo India's U.S. Agent before the FDA with respect to ANDA No. 206831.

32.     On information and belief, Aurobindo India received approval of its ANDA No. 206831 on February 2, 2016.  Aurobindo India announced publicly its intent to begin offering for sale and selling isosulfan blue in the United States in March 2016.  The FDA approved label for Defendants' isosulfan blue product states that Aurobindo India is the manufacturer of the isosulfan blue product.  A true and correct copy of Defendants' isosulfan blue label is attached as Exhibit F.

33.     On or about March 1, 2016, Defendants began providing pricing information for Defendants' isosulfan blue to U.S. customers, including current customers of Plaintiffs.

34.     Currently, on information and belief, major pharmaceutical wholesalers offer Defendants' isosulfan blue in the United States, including in Texas and in this district.  Further, on information and belief, Defendants have approached and contracted with group purchasing organizations ("GPOs") to provide Defendants' isosulfan blue to their members throughout the United States, including in Texas and in this district

35.     On March 2, 2016, Plaintiffs sent Aurobindo India and Aurobindo USA each a letter identifying the Patents-in-Suit and advising that Plaintiffs believe that to commercially

make isosulfan blue, Aurobindo India and/or Aurobindo USA likely infringe one or more claims of the Patents-in-Suit.

36.     On March 3, 2016, Plaintiffs sent a similar letter to AuroMedics identifying the Patents-in-Suit and advising that Plaintiffs believe that to commercially make isosulfan blue, Aurobindo India and/or Aurobindo USA likely infringe one or more claims of the Patents-in-Suit.

37.     On March 7, 2016, Defendants replied that they believed they did not infringe the Patents-in-Suit.

38.     On March 8, 2016, Plaintiffs sent Defendants a letter seeking more information regarding Defendants' process steps and specifically requesting, among other things, "whether any silver-containing ingredients are utilized [and] what oxidizing agents are employed . . . in the oxidation step to yield Aurobindo's isosulfan blue product."  Also, the letter requested a sample of Defendants' isosulfan blue product.  Further, a copy of the '007 Pub'n was enclosed with the letter in which Plaintiffs informed Defendants of their belief that the claims of the '019 App'n in their current form would be allowed by the USPTO without additional amendments and that the current claims of the '019 App'n are substantially identical to the claims in the '007 Pub'n.

39.     On March 14, 2016, Defendants, Mylan and Apicore entered into a non-disclosure agreement concerning the exchange of additional information from Defendants for outside counsel and expert eyes only, and for the sole purpose of Plaintiffs' infringement analyses. Following the agreement, Defendants replied on March 14, 2016, disclosing the oxidizing agent it used, but without any supporting documentation.

40.     On March 17, 2016, Plaintiffs sent another letter to Defendants requesting additional information and supporting documentation for the purpose of Plaintiffs' infringement analyses.

41.     On March 18, 2016, Defendants responded with a letter and a single-paged document that did not disclose the additional information requested by Plaintiffs.

42.     On March 23, 2016, Plaintiffs sent a letter to Defendants detailing the specific information needed for analyses both under theories of literal infringement and under the doctrine of equivalents.

43.     On March 28, 2016, Defendants replied asserting their position that they had disclosed sufficient information, and refusing to disclose further information without explanation from Plaintiffs concerning their theories of infringement under the doctrine of equivalents.

44.     On March 29, 2016, Plaintiffs sent a final letter to Defendants reiterating their request for additional information and describing why the requested information was needed.

45.     On April 1, 2016, Defendants sent a few additional documents that did not address the scope of Plaintiffs' prior requests for information or product samples.

## **ACTS GIVING RISE TO THIS ACTION**

46.     On information and belief, Defendants have directly, or through affiliates and subsidiaries, made and/or imported Defendants' isosulfan blue product into the United States.

47.     On information and belief, Defendants have directly, or through affiliates and subsidiaries, provided notice to potential customers in the United States, that Defendants' isosulfan blue product is commercially available throughout the United States, including in Texas and in this district.

9

48. On information and belief, Defendants have directly, or through affiliates and subsidiaries, offered for sale and/or sold Defendants' isosulfan blue product in the United States, including in Texas and in this district.

49. On information and belief, Defendants have directly, or through affiliates and subsidiaries, offered to sell and/or sold Defendants' isosulfan blue product to Mylan's customers at a price significantly below Mylan's contract price with those customers.

## COUNT 1
## INFRINGEMENT OF THE '992 PATENT

50. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

51. Upon information and belief, Defendants' making, using, offering to sell and/or selling within the United States and/or importation into the United States of Defendants' isosulfan blue products without authorization infringes one or more claims of the '992 patent, including at least Claim 1, under 35 U.S.C. §§ 271(a), 271(b), and/or 271(g), literally and/or under the doctrine of equivalents.

52. On information and belief, Defendants infringe the '992 patent because Defendants' isosulfan blue product is prepared by the same process, or its equivalent, as claimed in the '992 patent.

53. On information and belief, Defendants' isosulfan blue product made by Plaintiffs' patented process is not materially changed by subsequent processes and is not a trivial and nonessential component of another product.

54. Defendant Aurobindo India cited the '992 patent in its Indian Patent application published as Publication Number IN3509/CHE/2012, which was filed on August 27, 2012.

10

55.     Defendant Aurobindo India had knowledge of the '992 patent at least as early as August 23, 2013 and no later than the service of this Complaint.

56.     Defendant Aurobindo USA had knowledge of the '992 patent at least as early as March 3, 2016, and no later than the service of this Complaint.

57.     Defendant AuroMedics had knowledge of the '992 patent at least as early as March 4, 2016, and no later than the service of this Complaint.

58.     Defendants have had constructive notice of the '992 patent as of its date of issuance on February 16, 2010.

59.     Upon information and belief, Defendants were and are aware of the existence of the '992 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '992 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

60.     Plaintiffs have and will continue to be substantially and irreparably damaged and harmed if Defendants' infringement of the '992 patent is not enjoined by this Court.

61.     Defendants' infringement of the '992 patent has caused Plaintiffs substantial harm.

## COUNT 2
## INFRINGEMENT OF THE '616 PATENT

62.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

63.     Upon information and belief, Defendants' making, using, offering to sell and/or selling within the United States and/or importation into the United States of Defendants' isosulfan blue products without authorization infringes one or more claims of the '616 patent, including at least Claim 1, under 35 U.S.C. §§ 271(a), 271(b), and/or 271(g), literally and/or under the doctrine of equivalents.

11

64.     On information and belief, Defendants infringe the '616 patent because Defendants' isosulfan blue product is prepared by the same process, or its equivalent, as claimed in the '616 patent.

65.     On information and belief, Defendants' isosulfan blue product made by Plaintiffs' patented process is not materially changed by subsequent processes and is not a trivial and nonessential component of another product.

66.     Defendant Aurobindo India had knowledge of the '616 patent at least as early as March 7, 2016, and no later than the service of this Complaint.

67.     Defendant Aurobindo USA had knowledge of the '616 patent at least as early as March 3, 2016, and no later than the service of this Complaint.

68.     Defendant AuroMedics had knowledge of the '616 patent at least as early as March 4, 2016, and no later than the service of this Complaint.

69.     Defendants have had constructive notice of the '616 patent as of its date of issuance on March 3, 2015.

70.     Upon information and belief, Defendants were and are aware of the existence of the '616 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '616 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

71.     Plaintiffs have and will continue to be substantially and irreparably damaged and harmed if Defendants' infringement of the '616 patent is not enjoined by this Court.

72.     Defendants' infringement of the '616 patent has caused Plaintiffs substantial harm.

Appx90

## JURY DEMAND

73.    Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully

requests a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.    A judgment that Defendants have infringed the Patents-in-Suit under 35 U.S.C. §§

271(a), 271(b), and/or 271(g) by making, using, selling, offering to sell within the United

States and/or importing into the United States Defendants' isosulfan blue products and/or

by inducing others to infringe the Patents-in-Suit;

B.    An order preliminarily and/or permanently enjoining Defendants, its officers,

agents, servants, employees, parents, subsidiaries, affiliate corporations, other business

entities and all other persons acting or attempting to act in concert or privity with them,

their successors, and assigns, or acting on their behalf, from infringing, contributorily

infringing, or inducing others to infringe the Patents-in-Suit, and upon its issuance the

'019 App'n, including engaging in the offer to sell and selling in the United States, and/or

importation into the United States, of Defendants' isosulfan blue products that are the

subject of ANDA No. 206831 until the expiration of the Patents-in-Suit, inclusive of any

extension(s) and additional period(s) of exclusivity to which Plaintiffs are or may become

entitled;

C.    A judgment awarding Plaintiffs damages or other monetary relief under 35 U.S.C.

§ 281 as appropriate;

D.    A judgment ordering Defendants to pay damages to Plaintiffs to compensate for

their infringement of each of the Patents-in-Suit, including supplemental damages for any

post-verdict infringement up until entry of the final judgment with an accounting as

needed, together with pre-judgment and post-judgment interest on the damages awarded,

with all of these damages to be enhanced in an amount up to treble the amount of the

calculated compensatory damages as justified under 35 U.S.C. § 284;

E.      A judgment declaring that Defendants' infringement of the Patents-in-Suit was

willful, and awarding treble damages under 35 U.S.C. § 284;

F.      That this is an exceptional case under 35 U.S.C. § 285, and that Plaintiffs be

awarded reasonable attorneys' fees and costs; and

G.      Such further and other relief as this Court may deem just and proper.

Dated: May 11, 2016                         Respectfully submitted,

                                            _/s/ Melissa R. Smith_____
                                            Melissa R. Smith
                                            GILLAM & SMITH, LLP
*Of Counsel*                                TX State Bar No. 24001351
Nicole W. Stafford *(Lead Counsel)*         melissa@gillamsmithlaw.com
Aden M. Allen                               303 S. Washington Ave.
Anna G. Phillips                            Marshall, Texas 75670
Olin Ray Hebert, III                        Telephone: (903) 934-8450
WILSON SONSINI GOODRICH & ROSATI            Facsimile: (903) 934-9257
900 S. Capital of Texas Hwy
Las Cimas IV, Fifth Floor
Austin, TX  78732
Telephone: (512) 338-5400

*Attorneys for Plaintiff Mylan Institutional*
*LLC*

H. Rajan Sharma
Neal DeYoung
Joanna Garelick Goldstein
David Galluzzo
Sharma & DeYoung
55 Fifth Avenue, 17th Floor
New York, NY 10017

*Attorneys for Plaintiff Apicore US LLC*

# EXHIBIT A

US007662992B2

(12) **United States Patent**
Kovi et al.

(10) Patent No.: **US 7,662,992 B2**
(45) Date of Patent: **Feb. 16, 2010**

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(75) Inventors: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam Nampalli**, Belle Mead, NJ (US); **Peter Xavier Tharial**, Piscataway, NJ (US)

(73) Assignee: **Apicore, LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/180,057**

(22) Filed: **Jul. 25, 2008**

(65) **Prior Publication Data**

US 2008/0293963 A1 Nov. 27, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**
*C07C 309/00* (2006.01)

(52) **U.S. Cl.** .......................................... **562/46**; 562/59

(58) **Field of Classification Search** ................... 568/30
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1 * | 10/2006 | Kulkarni et al. ............. 552/111 |

OTHER PUBLICATIONS

Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US07/84051.

* cited by examiner

*Primary Examiner*—Jafar Parsa
*Assistant Examiner*—Chukwuma O Nwaonicha
(74) *Attorney, Agent, or Firm*—Timothy X. Gibson; Gibson & Dernier LLP

(57) **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**23 Claims, No Drawings**

US 7,662,992 B2

1

### PROCESS FOR PREPARATION OF ISOSULFAN BLUE

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 11/747,291 filed May 11, 2007, the entirety of which is incorporated herein by reference.

#### FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

#### BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula

(5)



is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triarylmethane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazard-

2

ous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531, 507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726, 252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks. The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

#### SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

US 7,662,992 B2

3

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED
EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention.

4

Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme

The following provides a process for the production of isosulfan blue of formula (5):

5
6

## Experimental Procedures

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).



(2)

In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N, N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.



(3)

In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N,N-diethylaniline to provide isoleuco acid of the formula (4).



(4)

In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

US 7,662,992 B2

7



(5)

In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic Acid, Sodium Salt of the Formula (2)

113.82 g (based on SO₃ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford

8

150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

Benzaldehyde-2,5-disulfonic Acid, Sodium Salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of Na₂SO₃ and 5.97 g (10% of Na₂SO₃) of NaHSO₃ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic Acid, Sodium Salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel.

The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension,

US 7,662,992 B2

9

15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

What is claimed is:

1. A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula



(4)

in a polar solvent with 2.0 to 3.0 equivalents of silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

10

2. The process according to claim 1 comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula



(2)

followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

3. The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) according to claim 2 comprising reacting one equivalent of 2-chlorobenzaldehyde with 2 equivalents, based on $SO_3$ content, of 20% fuming sulfuric acid.

4. The process according to claim 1 wherein the polar solvent is methanol.

5. The process according to claim 2 of preparing free benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula



(3)

wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

6. The process according to claim 5 wherein the reaction is carried out in a pressure vessel at 170-180° C. for 5 to 7 hours.

US 7,662,992 B2

11

**7**. The process according to claim **6** wherein the reaction is carried out under a pressure of 140 to 150 psi.

**8**. The process according to claim **2** comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

**9**. The process according to claim **2** in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

**10**. The process according to claim **9** wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

**11**. The process according to claim **1** wherein the isoleuco acid of the formula (4)

is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

with N,N-diethylaniline, and urea and glacial acetic acid.

**12**. The process according to claim **11** performed at reflux conditions for 20-25 hours at 115 to 120° C.

**13**. The process according to claim **11** comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

12

**14**. The process according to claim **11** in which the crude solid is further purified using water.

**15**. The process according to claim **1** comprising oxidation of isoleuco acid of the formula (4) with 2.5 equivalents of silver oxide in methanol, resulting in a reaction mass, stirring the reaction mass at 20 to 25° C. for 12-14 hours, and filtering the silver oxide to provide a filtrate.

**16**. The process according to claim **15** comprising passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

**17**. The process according to claim **16** further comprising passing the filtrate through a 0.2 micron filtration unit.

**18**. The process according to claim **15** comprising precipitating the filtrate using a non-polar solvent miscible with the filtrate.

**19**. The process according to claim **18** wherein the non-polar solvent is isopropyl ether.

**20**. The process according to claim **1** comprising adjusting the N-[4-[[4-(diethylamino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N -ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

**21**. The process according to claim **20** wherein the pH is adjusted using sodium bicarbonate solution.

**22**. The process according to claim **1** comprising recrystallization of N-[4-[[4-(diethylamino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1 -ylidene]-N -ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%

**23**. The process according to claim **22** wherein the solvent is selected from an aqueous acetone medium and 80%_aqueous isopropanol/acetone.

\*     \*     \*     \*     \*

# EXHIBIT B

US008969616B2

(12) **United States Patent**
Kovi et al.

(10) Patent No.: **US 8,969,616 B2**
(45) Date of Patent: *** Mar. 3, 2015**

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(71) Applicants: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam S. Nampalli**, Hunt Valley, MD (US); **Peter Xavier Tharial**, Edison, NJ (US)

(72) Inventors: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam S. Nampalli**, Hunt Valley, MD (US); **Peter Xavier Tharial**, Edison, NJ (US)

(73) Assignee: **Apicore US LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/951,034**

(22) Filed: **Jul. 25, 2013**

(65) **Prior Publication Data**

US 2013/0310600 A1      Nov. 21, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/310,019, filed on Dec. 2, 2011, which is a continuation of application No. 12/643,056, filed on Dec. 21, 2009, now abandoned, which is a continuation of application No. 12/180,057, filed on Jul. 25, 2008, now Pat. No. 7,662,992, which is a continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**
C07C 309/00          (2006.01)
C07C 303/02          (2006.01)
C07C 303/22          (2006.01)

(52) **U.S. Cl.**
CPC ............. **C07C 303/02** (2013.01); **C07C 303/22** (2013.01)
USPC ............................................. **562/43**; 562/41

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1* | 10/2006 | Kulkarni et al. .............. 552/111 |

OTHER PUBLICATIONS

Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US2007/084051.
Office Action for corresponding U.S. Appl. No. 12/180,057, dated Feb. 23, 2009.
Office Action for corresponding U.S. Appl. No. 11/747,291, dated Feb. 7, 2008.
Office Action for corresponding U.S. Appl. No. 12/643,056, dated Jul. 19, 2011.
Coleman et al., "Unexplained Decrease in Measured Oxygen Saturation by Pulse Oximetry Following Injection of Lymphazurin 1% (isosulfan Blue) During a Lymphatic Mapping Procedure", Journal of Surgical Oncology 1999, 70: 126-129.
Office Action for corresponding U.S. Appl. No. 13/310,019, dated Jul. 10, 2012.

* cited by examiner

*Primary Examiner* — Karl J Puttlitz
(74) *Attorney, Agent, or Firm* — Timothy X. Gibson, Esq.; Gibson & Dernier LLP

(57) **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**23 Claims, No Drawings**

US 8,969,616 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# PROCESS FOR PREPARATION OF ISOSULFAN BLUE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 13/310,019, filed Dec. 2, 2011, which is a continuation of U.S. patent application Ser. No. 12/643,056, filed Dec. 21, 2009, now abandoned, which is a continuation of U.S. Ser. No. 12/180,057 filed Jul. 25, 2008, now U.S. Pat. No. 7,662,992, which is a continuation of U.S. Ser. No. 11/747,291 filed May 11, 2007, now abandoned, the entireties of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

## BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino) phenyl](2,5-disulfophenyl) methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula



(5)

is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triarylmethane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazardous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531,507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726,252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

US 8,969,616 B2

**3**

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific

**4**

details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention. Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme The following provides a process for the production of isosulfan blue of formula (5):

US 8,969,616 B2

5

**Experimental Procedures**

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).



(2)

In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N,N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

6



(3)

In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline to provide isoleuco acid of the formula (4).



(4)

In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

US 8,969,616 B2

7

(5)



In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic acid, Sodium Salt of the Formula (2)

113.82 g (based on SO₃ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford 150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

8

Benzaldehyde-2,5-disulfonic acid, Sodium Salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of Na₂SO₃ and 5.97 g (10% of Na₂SO₃) of NaHSO₃ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic acid, Sodium Salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel. The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension, 15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as

US 8,969,616 B2

9

10

the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

The invention claimed is:

**1**. A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula

(4)



in a polar solvent with silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

**2**. The process according to claim **1** comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula

(2)



followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

**3**. The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) according to claim **2** comprising reacting 2-chlorobenzaldehyde with sulfuric acid.

**4**. The process according to claim **1** wherein the polar solvent is methanol.

**5**. The process according to claim **2** of preparing free benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula

(3)



wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

**6**. The process according to claim **5** wherein the reaction is carried out in a pressure vessel at 170-180° C. for 5 to 7 hours.

**7**. The process according to claim **6** wherein the reaction is carried out under a pressure of 140 to 150 psi.

**8**. The process according to claim **2** comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

US 8,969,616 B2

11

**9**. The process according to claim **2** in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

**10**. The process according to claim **9** wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

**11**. The process according to claim **1** wherein the isoleuco acid of the formula (4) is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)

with N,N-diethylaniline, and urea and glacial acetic acid.

**12**. The process according to claim **11** performed at reflux conditions for 20-25 hours at 115 to 120° C.

**13**. The process according to claim **11** comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

**14**. The process according to claim **11** in which the crude solid is further purified using water.

12

**15**. The process according to claim **1** comprising oxidation of isoleuco acid of the formula (4) with silver oxide in methanol to obtain a reaction mass.

**16**. The process according to claim **15** comprising stirring the reaction mass for 12-14 hours, and filtering the silver oxide to provide a filtrate.

**17**. The process according to claim **16** comprising passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

**18**. The process according to claim **17** further comprising passing the filtrate through a 0.2 micron filtration unit.

**19**. The process according to claim **16** comprising precipitating the filtrate using a non-polar solvent miscible with the filtrate.

**20**. The process according to claim **19** wherein the non-polar solvent is isopropyl ether.

**21**. The process according to claim **1** comprising adjusting the N-[4-[[4-(diethylamino) phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

**22**. The process according to claim **21** wherein the pH is adjusted using sodium bicarbonate solution.

**23**. The process according to claim **1** comprising recrystallization of N-[4-[[4-(diethylamino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%.

\* \* \* \* \*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC )))) | |
| Plaintiffs, | Civil Action No.: 2:16-cv-491-RWS-RSP |
| v. | **Jury Trial Demanded** |
| AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC | |
| Defendants. | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Apicore US LLC ("Apicore") and Mylan Institutional LLC ("Mylan") (collectively, "Plaintiffs") file this First Amended Complaint for Patent Infringement ("FAC") against Aurobindo Pharma Ltd ("Aurobindo India"), Aurobindo Pharma USA Inc. ("Aurobindo USA"), and AuroMedics Pharma LLC ("AuroMedics") (collectively, "Defendants").

## THE PARTIES

1.      Apicore is a limited liability company organized and existing under the laws of the State of Delaware, and having a place of business at 49 Napoleon Court, Somerset, NJ 08873.

2.      Apicore is a pharmaceutical company that provides innovative solutions to the pharmaceutical industry in the field of active pharmaceutical ingredient manufacturing.

3.      Apicore developed a process for the manufacture of a high purity isosulfan blue product that is vastly superior to other methods of isosulfan blue synthesis and has entered into an exclusive arrangement with Mylan to commercialize this innovation.

1

4.      Mylan is a limited liability company organized and existing under the laws of the State of Delaware, and having a place of business at 1718 Northrock Court, Rockford, IL 61103.

5.      Mylan is a pharmaceutical company that develops and commercializes injectable pharmaceutical products.

6.      On information and belief, Aurobindo India is an Indian corporation having a place of business at Plot No. 2, Maitri Vihar, Ameerpet, Hyderabad – 500 038, Andhra Pradesh, India.

7.      On information and belief, Aurobindo India develops and manufactures certain pharmaceutical drug products for sale in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.  In 2013, Aurobindo India commenced marketing injectable products in the United States through its subsidiary AuroMedics.  In the past, Aurobindo India has designated Aurobindo USA as its U.S. agent before the FDA.  In the past, Aurobindo India has designated AuroMedics as its U.S. agent before the FDA.  On information and belief, AuroMedics and/or Aurobindo USA is the U.S. agent before the FDA for ANDA No. 206831.

8.      On information and belief, Aurobindo USA is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810.  Aurobindo USA is a wholly-owned subsidiary and agent of Aurobindo India.

9.      On information and belief, Aurobindo USA markets, offers to sell, manufactures, distributes, and sells certain pharmaceutical drug products in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.

2

10.     On information and belief, AuroMedics is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810.  AuroMedics is a wholly-owned subsidiary of Aurobindo India.

11.     On information and belief, AuroMedics markets, manufactures, offers to sell, distributes, and sells certain pharmaceutical drug products in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.

12.     On information and belief, Aurobindo India, Aurobindo USA, and AuroMedics operate and act in concert as an integrated, unitary business for purposes of manufacturing, marketing, offering to sell, selling, and distributing generic pharmaceutical products throughout the United States, including in Texas and in this district.  For example, in several of Aurobindo India's Earnings Conference Calls, including the call on February 10, 2016, Mr. Robert Cunard – CEO, Aurobindo USA and Mr. Ronald Quadrel – CEO, AuroMedics, along with individuals at Aurobindo India, were stated as representing the senior management team.

## NATURE OF THE ACTION

13.     This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, Sections 1 *et seq*., involving United States Patent No. 7,662,992 (the "'992 patent") United States Patent No. 8,969,616 (the "'616 patent") and United States Patent No. 9,353,050 (the "'050 patent) (collectively, the "Patents-in-Suit").

14.     This action arises out of Defendants' offering to sell and selling in the United States and/or importing into the United States isosulfan blue, which is, or is manufactured by processes, or equivalents thereof, claimed in the Patents-in-Suit.

3

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

16.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

17.     This Court has personal jurisdiction over Aurobindo India because, on

information and belief, *inter alia,* Aurobindo India collaborated with Aurobindo USA and

AuroMedics for the purpose of preparing and submitting ANDA No. 206831.  Aurobindo India

conducts business through and with Aurobindo USA and/or AuroMedics, its wholly-owned

subsidiaries.  On information and belief, Aurobindo India has affiliations with Texas and this

district that are pervasive, continuous, and systematic.  Aurobindo India directly or through its

affiliates and agents develops, formulates, synthesizes, manufactures, markets, imports, offers to

sell, and/or sells pharmaceutical drug products.  On information and belief, Aurobindo India

engages in direct and/or indirect marketing, offering to sell, distribution, and/or sale of

pharmaceutical drug products, including isosulfan blue, within Texas and this district and to the

residents of Texas and this district.  On information and belief, Aurobindo India regularly

conducts and/or solicits business in Texas and this district, directly or through its subsidiaries

Aurobindo USA and/or AuroMedics.

18.     This Court has personal jurisdiction over Aurobindo USA because Aurobindo

USA has affiliations with Texas and this district that are pervasive, continuous, and systematic.

Furthermore, Aurobindo USA has a Texas Taxpayer Number, which is 32038681568.  In

addition, Aurobindo USA is licensed with the Texas Department of State Health Services under

License Number 0103142 and engages in direct and/or indirect marketing, distribution, offering

for sale, and/or sale of pharmaceutical drug products, including isosulfan blue, within Texas and

this district and to the residents of this district.

4

19.     This Court has personal jurisdiction over AuroMedics because AuroMedics has affiliations with Texas and this district that are pervasive, continuous, and systematic. Furthermore, AuroMedics is licensed with the Texas Department of State Health Services under License Number 1000855 and engages in direct and/or indirect marketing, distribution, offering for sale, and/or sale of pharmaceutical drug products, including isosulfan blue, within Texas and this district and to the residents of Texas and this district.

20.     On information and belief, Defendants collaborate in the manufacture, marketing, offering for sale, and sale of many pharmaceutical products (including generic drug products manufactured and sold pursuant to an approved abbreviated new drug application) within the United States generally, and in Texas and in this district specifically.

21.     On information and belief, Defendants actively review pharmaceutical patents and seek opportunities to challenge those patents.

22.     Moreover, because the acts of selling and/or offering for sale that give rise to infringement by Aurobindo India, Aurobindo USA, and AuroMedics have occurred within Texas and this district, personal jurisdiction is proper within this district.

## **PATENTS-IN-SUIT**

23.     Apicore was formed in 2003. For several years, the entire company was devoted to the development of isosulfan blue, a small molecule active pharmaceutical ingredient ("API"). After years of extraordinary effort and significant expense, Apicore developed a vastly superior manufacturing process that allowed for the commercial synthesis of isosulfan blue at a purity level much greater than had been previously achieved by others. That superior process is the basis for the technology claimed in the Patents-in-Suit.

24.     The '992 patent, entitled "Process for Preparation of Isosulfan Blue," was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on February 16,

2010.  The named inventors of the '992 patent are Ravishanker Kovi, Satyam Nampalli, and Peter Xavier Tharial.  Apicore is the assignee of the '992 patent.  A true and correct copy of the '992 patent is attached hereto as Exhibit A.

25.     The '616 patent, entitled "Process for Preparation of Isosulfan Blue," was duly and legally issued by the USPTO on March 3, 2015.  The named inventors of the '616 patent are Ravishanker Kovi, Satyam Nampalli, and Peter Xavier Tharial.  Apicore is the assignee of the '616 patent.  A true and correct copy of the '616 patent is attached hereto as Exhibit B.

26.     The '050 patent, entitled "Process for Preparation of Isosulfan Blue," was duly and legally issued by the USPTO on May 31, 2016.  The named inventors of the '050 patent are Ravishanker Kovi, Satyam Nampalli, and Peter Xavier Tharial.  Apicore is the assignee of the '050 patent.  A true and correct copy of the '050 patent is attached hereto as Exhibit C.

27.     The '050 patent issued from U.S. Application No. 13/310,019 (the "'019 App'n").  Pursuant to 35 U.S.C. § 122(b), the '019 App'n was first published on March 29, 2012 as U.S. Publication No. 2012/0078007 A1 (the "'007 Pub'n").  The claims of the '050 patent are substantially identical to the claims published in the '007 Pub'n.  A true and correct copy of the '007 Pub'n is attached hereto as Exhibit D.

28.     Apicore is the lawful owner of the Patents-in-Suit and has all right, title and interest in and to the Patents-in-Suit.

29.     Mylan is an exclusive licensee of each of the Patents-in-Suit.

30.     Neither Apicore nor Mylan has authorized or licensed Defendants to make, use, sell, or offer for sale any of the inventions claimed in the Patents-in-Suit.

6

31. On information and belief, Defendants were aware of and reviewed the '992 patent, the '616 patent, and the '019 App'n prior to the commencement of this lawsuit and prior to launching their isosulfan blue product.

32. On information and belief, Aurobindo India submitted to the FDA ANDA No. 206831 seeking approval to engage in the commercial manufacture, use, marketing, offer for sale and sale of isosulfan blue. On information and belief, AuroMedics and/or Aurobindo USA served as Aurobindo India's U.S. Agent before the FDA with respect to ANDA No. 206831.

33. On information and belief, Aurobindo India received approval of its ANDA No. 206831 on February 2, 2016. Aurobindo India thereafter announced publicly its intent to begin offering for sale and selling isosulfan blue in the United States in March 2016. The FDA-approved label for Defendants' isosulfan blue product states that Aurobindo India is the manufacturer of the isosulfan blue product and includes directions to healthcare professionals for the proper use of the product. A true and correct copy of Defendants' isosulfan blue label is attached as Exhibit E.

34. On information and belief, the only use for Defendants' isosulfan blue is as an API for use in their isosulfan blue injection 1% and there are no known substantial non-infringing uses for isosulfan blue.

35. On or about March 1, 2016, Defendants began providing pricing information for Defendants' isosulfan blue to U.S. customers, including current customers of Plaintiffs.

36. Currently, on information and belief, Defendants have contracted with major pharmaceutical wholesalers to offer Defendants' isosulfan blue in the United States, including in Texas and in this district. Further, on information and belief, Defendants have approached and

contracted with group purchasing organizations ("GPOs") to provide Defendants' isosulfan blue
to their members throughout the United States, including in Texas and in this district

37.    On March 2, 2016, Plaintiffs sent Aurobindo India and Aurobindo USA each a
letter identifying the '992 patent and the '616 patent and advising that Plaintiffs believe that
Aurobindo India and/or Aurobindo USA infringe one or more claims of the '992 patent and the
'616 patent.

38.    On March 3, 2016, Plaintiffs sent a similar letter to AuroMedics identifying the
'992 patent and the '616 patent and advising that Plaintiffs believe that Aurobindo India and/or
Aurobindo USA infringe one or more claims of the '992 patent and the '616 patent.  This letter
provided constructive notice to AuroMedics that to sell or offer for sale Defendants' isosulfan
blue product would also constitute an act of infringement.

39.    On March 7, 2016, Defendants replied that they believed they did not infringe the
'992 patent and the '616 patent.

40.    On March 8, 2016, Plaintiffs sent Defendants a letter seeking more information
regarding Defendants' process steps and specifically requesting, among other things, "whether
any silver-containing ingredients are utilized [and] what oxidizing agents are employed . . . in the
oxidation step to yield Aurobindo's isosulfan blue product."  Also, the letter requested a sample
of Defendants' isosulfan blue product.  Further, a copy of the '007 Pub'n was enclosed with the
letter in which Plaintiffs informed Defendants of their belief that the claims of the '019 App'n in
their current form would be allowed by the USPTO without additional amendments and that the
current claims of the '019 App'n are substantially identical to the claims in the '007 Pub'n.  The
'019 App'n was issued as the '050 patent on May 31, 2016 with the same claims as those
presented to Defendants on March 8, 2016.

8

41.     On March 14, 2016, Plaintiffs and Defendants entered into a non-disclosure agreement concerning the exchange of additional information from Defendants for outside counsel and expert eyes only, and for the sole purpose of Plaintiffs' infringement analyses. Following execution of the agreement, Defendants replied on March 14, 2016, disclosing an oxidizing agent it allegedly used, but absent any documentation to support the claim.

42.     On March 17, 2016, Plaintiffs sent another letter to Defendants requesting additional information and supporting documentation for the purpose of Plaintiffs' infringement analyses.

43.     On March 18, 2016, Defendants responded with a letter and a single-paged document that did not disclose the additional information requested by Plaintiffs.

44.     On March 23, 2016, Plaintiffs sent a letter to Defendants detailing the specific information needed for analyses under both the theories of literal infringement and the doctrine of equivalents.

45.     On March 28, 2016, Defendants replied, asserting their position that they had disclosed sufficient information, and refusing to disclose further information without explanation from Plaintiffs concerning their theories of infringement under the doctrine of equivalents.

46.     On March 29, 2016, Plaintiffs sent a final letter to Defendants reiterating their request for additional information and describing why the requested information was needed.

47.     On April 1, 2016, Defendants sent a few additional documents that did not address the scope of Plaintiffs' prior requests for information or product samples.

## ACTS GIVING RISE TO THIS ACTION

48.     On information and belief, Defendants have directly, or through affiliates and subsidiaries, made and/or imported Defendants' isosulfan blue product into the United States.

9

49.     On information and belief, Defendants have directly, or through affiliates and subsidiaries, provided notice to potential customers in the United States, that Defendants' isosulfan blue product is commercially available throughout the United States, including in Texas and in this district.

50.     On information and belief, Defendants have directly, or through affiliates and subsidiaries, offered for sale and/or sold Defendants' isosulfan blue product in the United States, including in Texas and in this district.

51.     On information and belief, Defendants have directly, or through affiliates and subsidiaries, offered to sell and/or sold Defendants' isosulfan blue product to Mylan's customers at a price significantly below Mylan's contract price with those customers.

52.     On information and belief, Defendants knew that wholesalers would sell Defendants' isosulfan blue product to their customers, who would then use Defendants' isosulfan blue product during sentinel lymph node mapping; thus these wholesalers and customers directly infringe the '050 patent.  Because Defendants had knowledge of the '050 patent, and specifically intended that the wholesalers would sell Defendants' isosulfan blue product and thus infringe the '050 patent, Defendants induced infringement.

53.     On information and belief, Defendants' isosulfan blue product has been used in lymphatic mapping procedures in the United States, including in Texas and in this district.

## COUNT 1
## INFRINGEMENT OF THE '050 PATENT

54.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

55.     Defendants infringe (literally and/or under the doctrine of equivalents) the '050 patent, including at least Claims 1, 11, and 15, by making, using, offering to sell and/or selling

10

within the United States and/or importing into the United States isosulfan blue products without authorization, and/or by contributing to or inducing infringement.

56.     Defendants infringe at least claim 1 of the '050 patent because Defendants' isosulfan blue, which it sells without authority in the U.S., has a purity of at least 99.0% by HPLC.  Moreover, Defendants infringe at least claims 11 and 15 of the '050 patent because Defendants package their isosulfan blue having a purity of at least 99.0% by HPLC in a solution (i.e., isosulfan blue injection 1%), which it sells without authority in the U.S.

57.     Defendant Aurobindo India had knowledge of the '050 patent at least as early as May 31, 2016 and no later than the service of this First Amended Complaint ("FAC").

58.     Defendant Aurobindo USA had knowledge of the '050 patent at least as early as May 31, 2016, and no later than the service of this FAC.

59.     Defendant AuroMedics had knowledge of the '050 patent at least as early as May 31, 2016, and no later than the service of this FAC.

60.     Defendants have had constructive notice of the '050 patent as of its date of issuance on May 31, 2016.  Furthermore, Defendants were aware of the '007 Pub'n, which issued as the '050 patent with substantially identical claims, at least as early as March 8, 2016, when Plaintiffs sent to Defendants the a copy of the '007 Pub'n.

61.     Upon information and belief, Defendants were and are aware of the existence of the '050 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '050 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

62.     Plaintiffs have and will continue to be substantially and irreparably damaged and harmed if Defendants' continued infringement of the '050 patent is not enjoined by this Court.

11

63.    Defendants' infringement of the '050 patent has caused Plaintiffs substantial harm.

## COUNT 2
## RECOVERY UNDER 35 U.S.C. § 154(d)

64.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

65.    The invention as claimed in the '050 patent is substantially identical to the invention as claimed in the '007 Pub'n.

66.    Prior to the issuance of the '050 patent, Defendants had actual notice of the published '007 Pub'n.

67.    With actual notice of the published '007 Pub'n, and before the issuance of the '050 patent on May 31, 2016, Defendants violated Plaintiffs' rights under 35 U.S.C. §154(d), by making, using, selling, offering for sale and/or importing the invention as claimed in the '007 Pub'n and/or by contributing to or inducing violations.

68.    Defendants' violation of Plaintiffs' rights under 35 U.S.C. §154(d) was willful and caused Plaintiffs to suffer substantial damages.

## COUNT 3
## INFRINGEMENT OF THE '992 PATENT

69.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

70.    Defendants infringe (literally and/or under the doctrine of equivalents) the '992 patent, including at least Claim 1, by making, using, offering to sell and/or selling within the United States and/or importing into the United States isosulfan blue products without authorization, and/or by inducing infringement.

71.     Defendants infringe the '992 patent because Defendants' isosulfan blue product is prepared by the same process, or its equivalent, as claimed in the '992 patent. Defendants' isosulfan blue product is not materially changed by subsequent processes, nor is it a trivial and nonessential component of another product.

72.     Defendant Aurobindo India cited the '992 patent in its Indian Patent application published as Publication Number IN3509/CHE/2012, which was filed on August 27, 2012.

73.     Defendant Aurobindo India had knowledge of the '992 patent at least as early as August 23, 2013 and no later than the service of the Complaint (ECF No. 1).

74.     Defendant Aurobindo USA had knowledge of the '992 patent at least as early as March 3, 2016, and no later than the service of the Complaint (ECF No. 1).

75.     Defendant AuroMedics had knowledge of the '992 patent at least as early as March 4, 2016, and no later than the service of the Complaint (ECF No. 1).

76.     Defendants have had constructive notice of the '992 patent as of its date of issuance on February 16, 2010.

77.     Upon information and belief, Defendants were and are aware of the existence of the '992 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '992 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

78.     Plaintiffs have and will continue to be substantially and irreparably damaged and harmed if Defendants' continued infringement of the '992 patent is not enjoined by this Court.

79.     Defendants' infringement of the '992 patent has caused Plaintiffs substantial harm.

## COUNT 4
## INFRINGEMENT OF THE '616 PATENT

80.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

81.     Defendants infringe (literally and/or under the doctrine of equivalents) the '616 patent, including at least Claim 1, by making, using, offering to sell and/or selling within the United States and/or importing into the United States isosulfan blue products without authorization, and/or by inducing infringement.

82.     Defendants infringe the '616 patent because Defendants' isosulfan blue product is prepared by the same process, or its equivalent, as claimed in the '616 patent.  Defendants' isosulfan blue product is not materially changed by subsequent processes, nor is it a trivial and nonessential component of another product.

83.     Defendant Aurobindo India had knowledge of the '616 patent at least as early as March 7, 2016, and no later than the service of the Complaint (ECF No. 1).

84.     Defendant Aurobindo USA had knowledge of the '616 patent at least as early as March 3, 2016, and no later than the service of the Complaint (ECF No. 1).

85.     Defendant AuroMedics had knowledge of the '616 patent at least as early as March 4, 2016, and no later than the service of the Complaint (ECF No. 1).

86.     Defendants have had constructive notice of the '616 patent as of its date of issuance on March 3, 2015.

87.     Upon information and belief, Defendants were and are aware of the existence of the '616 patent and acted without a reasonable basis for believing that it would not be liable for infringement of the '616 patent, thus rendering this case "exceptional" under 35 U.S.C. § 285.

14

88.     Plaintiffs have and will continue to be substantially and irreparably damaged and harmed if Defendants' continued infringement of the '616 patent is not enjoined by this Court.

89.     Defendants' infringement of the '616 patent has caused Plaintiffs substantial harm.

## JURY DEMAND

90.     Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully request a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.      A judgment that Defendants have infringed the '050 patent under 35 U.S.C. §§ 271(a), 271(b), 271(c), and/or 271(g) by making, using, selling, offering to sell within the United States and/or importing into the United States Defendants' isosulfan blue products and/or by contributing to the infringement of or inducing others to infringe the Patents-in-Suit;

B.      A judgment that Defendants have infringed the '992 patent under 35 U.S.C. §§ 271(a), 271(b), and/or 271(g) by making, using, selling, offering to sell within the United States and/or importing into the United States Defendants' isosulfan blue products and/or by inducing others to infringe the Patents-in-Suit;

C.      A judgment that Defendants have infringed the '616 patent under 35 U.S.C. §§ 271(a), 271(b), and/or 271(g) by making, using, selling, offering to sell within the United States and/or importing into the United States Defendants' isosulfan blue products and/or by inducing others to infringe the Patents-in-Suit;

D.      An order preliminarily and/or permanently enjoining Defendants, their officers, agents, servants, employees, parents, subsidiaries, affiliate corporations, other business entities and all other persons acting or attempting to act in concert or privity with them, their successors, and assigns, or acting on their behalf, from infringing, contributorily infringing, or inducing others to infringe the Patents-in-Suit, including engaging in the offer to sell and selling in the United States, and/or importation into the United States, of Defendants' isosulfan blue products that are the subject of ANDA No. 206831 until the expiration of the Patents-in-Suit, inclusive of any extension(s) and additional period(s) of exclusivity to which Plaintiffs are or may become entitled;

E.      A judgment awarding Plaintiffs damages or other monetary relief under 35 U.S.C. § 281 as appropriate;

F.      A judgment ordering Defendants to pay damages to Plaintiffs to compensate for their infringement of each of the Patents-in-Suit, including supplemental damages for any post-verdict infringement up until entry of the final judgment with an accounting as needed, together with pre-judgment and post-judgment interest on the damages awarded, with all of these damages to be enhanced in an amount up to treble the amount of the calculated compensatory damages as justified under 35 U.S.C. § 284;

G.      A judgment ordering Defendants to pay damages to Plaintiffs based on violations of Plaintiffs' rights under 35 U.S.C. § 154(d);

H.      A judgment declaring that Defendants' infringement of the Patents-in-Suit was willful, and awarding treble damages under 35 U.S.C. § 284;

I.      That this is an exceptional case under 35 U.S.C. § 285, and that Plaintiffs be awarded reasonable attorneys' fees and costs; and

J.      Such further and other relief as this Court may deem just and proper.

Dated: May 31, 2016

Respectfully submitted,

 /s/ Melissa R. Smith  _____
Melissa Smith
Gillam & Smith
303 S. Washington Ave.
Marshall, TX  75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

*Of Counsel*
Nicole W. Stafford
Aden M. Allen
Anna G. Phillips
Olin Ray Hebert, III
WILSON SONSINI GOODRICH & ROSATI
900 S. Capital of Texas Hwy
Las Cimas IV, Fifth Floor
Austin, TX  78732
Telephone: (512) 338-5400

*Attorneys for Plaintiff Mylan Institutional
LLC*

H. Rajan Sharma
Neal DeYoung
Joanna Garelick Goldstein
David Galluzzo
Sharma & DeYoung
55 Fifth Avenue, 17th Floor
New York, NY 10017

*Attorneys for Plaintiff Apicore US LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic service, on May 31, 2016.

 /s/ Melissa Smith

Melissa Smith

17

# EXHIBIT A

US007662992B2

(12) **United States Patent**
Kovi et al.

(10) **Patent No.:** **US 7,662,992 B2**

(45) **Date of Patent:** **Feb. 16, 2010**

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(75) Inventors: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam Nampalli**, Belle Mead, NJ (US); **Peter Xavier Tharial**, Piscataway, NJ (US)

(73) Assignee: **Apicore, LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/180,057**

(22) Filed: **Jul. 25, 2008**

(65) **Prior Publication Data**

US 2008/0293963 A1   Nov. 27, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**
*C07C 309/00*   (2006.01)

(52) **U.S. Cl.** .......................................... **562/46**; 562/59

(58) **Field of Classification Search** .................... 568/30
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1 * | 10/2006 | Kulkarni et al. ............. 552/111 |

OTHER PUBLICATIONS

Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US07/84051.

* cited by examiner

*Primary Examiner*—Jafar Parsa
*Assistant Examiner*—Chukwuma O Nwaonicha
(74) *Attorney, Agent, or Firm*—Timothy X. Gibson; Gibson & Dernier LLP

(57) **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**23 Claims, No Drawings**

US 7,662,992 B2

1

## PROCESS FOR PREPARATION OF ISOSULFAN BLUE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 11/747,291 filed May 11, 2007, the entirety of which is incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

### BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula

(5)



is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triaryl-methane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triaryl-methane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazard-

ous oxidizing agents (lead oxide, chloranil, iron phthalocya-nine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531, 507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726, 252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks. The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

US 7,662,992 B2

3

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention.

4

Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme

The following provides a process for the production of isosulfan blue of formula (5):

US 7,662,992 B2

**5**

Experimental Procedures

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).



(2)

In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N, N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

**6**



(3)

In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N,N-diethylaniline to provide isoleuco acid of the formula (4).



(4)

In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

US 7,662,992 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>



(5)

In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic Acid, Sodium Salt of the Formula (2)

113.82 g (based on SO$_3$ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford

150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

Benzaldehyde-2,5-disulfonic Acid, Sodium Salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of Na$_2$SO$_3$ and 5.97 g (10% of Na$_2$SO$_3$) of NaHSO$_3$ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic Acid, Sodium Salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel.

The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension,

US 7,662,992 B2

9 | 10

15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

What is claimed is:

1. A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula

(4)



in a polar solvent with 2.0 to 3.0 equivalents of silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

2. The process according to claim 1 comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula

(2)



followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

3. The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) according to claim 2 comprising reacting one equivalent of 2-chlorobenzaldehyde with 2 equivalents, based on SO₃ content, of 20% fuming sulfuric acid.

4. The process according to claim 1 wherein the polar solvent is methanol.

5. The process according to claim 2 of preparing free benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula

(3)



wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

6. The process according to claim 5 wherein the reaction is carried out in a pressure vessel at 170-180° C. for 5 to 7 hours.

US 7,662,992 B2

11

**7**. The process according to claim **6** wherein the reaction is carried out under a pressure of 140 to 150 psi.

**8**. The process according to claim **2** comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

**9**. The process according to claim **2** in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

**10**. The process according to claim **9** wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

**11**. The process according to claim **1** wherein the isoleuco acid of the formula (4)
is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



with N,N-diethylaniline, and urea and glacial acetic acid.

**12**. The process according to claim **11** performed at reflux conditions for 20-25 hours at 115 to 120° C.

**13**. The process according to claim **11** comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

12

**14**. The process according to claim **11** in which the crude solid is further purified using water.

**15**. The process according to claim **1** comprising oxidation of isoleuco acid of the formula (4) with 2.5 equivalents of silver oxide in methanol, resulting in a reaction mass, stirring the reaction mass at 20 to 25° C. for 12-14 hours, and filtering the silver oxide to provide a filtrate.

**16**. The process according to claim **15** comprising passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

**17**. The process according to claim **16** further comprising passing the filtrate through a 0.2 micron filtration unit.

**18**. The process according to claim **15** comprising precipitating the filtrate using a non-polar solvent miscible with the filtrate.

**19**. The process according to claim **18** wherein the non-polar solvent is isopropyl ether.

**20**. The process according to claim **1** comprising adjusting the N-[4-[[4-(diethylamino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N -ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

**21**. The process according to claim **20** wherein the pH is adjusted using sodium bicarbonate solution.

**22**. The process according to claim **1** comprising recrystallization of N-[4-[[4-(diethylamino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1 -ylidene]-N -ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%

**23**. The process according to claim **22** wherein the solvent is selected from an aqueous acetone medium and 80%_aqueous isopropanol/acetone.

\*   \*   \*   \*   \*

Case: 17-1645 Document: 81 Page: 145 Filed: 05/31/18 Page 2 of 3

# EXHIBIT B

US008969616B2

(12) **United States Patent**                     (10) **Patent No.:**       **US 8,969,616 B2**
Kovi et al.                                       (45) **Date of Patent:**       *Mar. 3, 2015

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(71) Applicants: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam S. Nampalli**, Hunt Valley, MD (US); **Peter Xavier Tharial**, Edison, NJ (US)

(72) Inventors: **Ravishanker Kovi**, Monroe, NJ (US); **Satyam S. Nampalli**, Hunt Valley, MD (US); **Peter Xavier Tharial**, Edison, NJ (US)

(73) Assignee: **Apicore US LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/951,034**

(22) Filed: **Jul. 25, 2013**

(65) **Prior Publication Data**

US 2013/0310600 A1       Nov. 21, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/310,019, filed on Dec. 2, 2011, which is a continuation of application No. 12/643,056, filed on Dec. 21, 2009, now abandoned, which is a continuation of application No. 12/180,057, filed on Jul. 25, 2008, now Pat. No. 7,662,992, which is a continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**
  *C07C 309/00*        (2006.01)
  *C07C 303/02*        (2006.01)
  *C07C 303/22*        (2006.01)

(52) **U.S. Cl.**
  CPC ............ *C07C 303/02* (2013.01); *C07C 303/22* (2013.01)
  USPC ............................................ **562/43**; 562/41

(58) **Field of Classification Search**
  None
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1* | 10/2006 | Kulkarni et al. ............. 552/111 |

OTHER PUBLICATIONS

Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US2007/084051.
Office Action for corresponding U.S. Appl. No. 12/180,057, dated Feb. 23, 2009.
Office Action for corresponding U.S. Appl. No. 11/747,291, dated Feb. 7, 2008.
Office Action for corresponding U.S. Appl. No. 12/643,056, dated Jul. 19, 2011.
Coleman et al., "Unexplained Decrease in Measured Oxygen Saturation by Pulse Oximetry Following Injection of Lymphazurin 1% (isosulfan Blue) During a Lymphatic Mapping Procedure", Journal of Surgical Oncology 1999, 70: 126-129.
Office Action for corresponding U.S. Appl. No. 13/310,019, dated Jul. 10, 2012.

* cited by examiner

*Primary Examiner* — Karl J Puttlitz
(74) *Attorney, Agent, or Firm* — Timothy X. Gibson, Esq.; Gibson & Dernier LLP

(57) **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**23 Claims, No Drawings**

US 8,969,616 B2

1

## PROCESS FOR PREPARATION OF ISOSULFAN BLUE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 13/310,019, filed Dec. 2, 2011, which is a continuation of U.S. patent application Ser. No. 12/643,056, filed Dec. 21, 2009, now abandoned, which is a continuation of U.S. Ser. No. 12/180,057 filed Jul. 25, 2008, now U.S. Pat. No. 7,662,992, which is a continuation of U.S. Ser. No. 11/747,291 filed May 11, 2007, now abandoned, the entireties of which are incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in substantially pure form.

### BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino) phenyl](2,5-disulfophenyl) methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula

(5)



is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to

2

leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triarylmethane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazardous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531, 507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726, 252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

US 8,969,616 B2

3

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific

4

details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention. Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme The following provides a process for the production of isosulfan blue of formula (5):

US 8,969,616 B2

5

6

Experimental Procedures

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).

(2)



In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N,N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

(3)



In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline to provide isoleuco acid of the formula (4).

(4)



In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

US 8,969,616 B2

7

(5)



In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic acid, Sodium Salt of the Formula (2)

113.82 g (based on SO$_3$ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford 150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

8

Benzaldehyde-2,5-disulfonic acid, Sodium Salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of Na$_2$SO$_3$ and 5.97 g (10% of Na$_2$SO$_3$) of NaHSO$_3$ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic acid, Sodium Salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel. The above process was repeated twice. The final product thus obtained was then washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension, 15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as

US 8,969,616 B2

9

the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

The invention claimed is:

**1**. A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula

(4)



in a polar solvent with silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

**2**. The process according to claim **1** comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula

10

(2)



followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

**3**. The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) according to claim **2** comprising reacting 2-chlorobenzaldehyde with sulfuric acid.

**4**. The process according to claim **1** wherein the polar solvent is methanol.

**5**. The process according to claim **2** of preparing free benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula

(3)



wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

**6**. The process according to claim **5** wherein the reaction is carried out in a pressure vessel at 170-180° C. for 5 to 7 hours.

**7**. The process according to claim **6** wherein the reaction is carried out under a pressure of 140 to 150 psi.

**8**. The process according to claim **2** comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

US 8,969,616 B2

**11**

9. The process according to claim **2** in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

10. The process according to claim **9** wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

11. The process according to claim **1** wherein the isoleuco acid of the formula (4) is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



with N,N-diethylaniline, and urea and glacial acetic acid.

12. The process according to claim **11** performed at reflux conditions for 20-25 hours at 115 to 120° C.

13. The process according to claim **11** comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

14. The process according to claim **11** in which the crude solid is further purified using water.

**12**

15. The process according to claim **1** comprising oxidation of isoleuco acid of the formula (4) with silver oxide in methanol to obtain a reaction mass.

16. The process according to claim **15** comprising stirring the reaction mass for 12-14 hours, and filtering the silver oxide to provide a filtrate.

17. The process according to claim **16** comprising passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

18. The process according to claim **17** further comprising passing the filtrate through a 0.2 micron filtration unit.

19. The process according to claim **16** comprising precipitating the filtrate using a non-polar solvent miscible with the filtrate.

20. The process according to claim **19** wherein the non-polar solvent is isopropyl ether.

21. The process according to claim **1** comprising adjusting the N-[4-[[4-(diethylamino) phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

22. The process according to claim **21** wherein the pH is adjusted using sodium bicarbonate solution.

23. The process according to claim **1** comprising recrystallization of N-[4-[[4-(diethylamino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%.

\* \* \* \* \*

Case: 17-1645 Document: 12-3 Page: 153 Filed: 03/29/2017

# EXHIBIT C

US009353050B2

(12) **United States Patent**
Kovi et al.

(10) Patent No.: **US 9,353,050 B2**
(45) Date of Patent: **May 31, 2016**

(54) **PROCESS FOR PREPARATION OF ISOSULFAN BLUE**

(75) Inventors: **Ravishanker Kovi**, Monroe, NJ (US);
**Satyam Nampalli**, Belle Mead, NJ (US);
**Peter Xavier Tharial**, Piscataway, NJ (US)

(73) Assignee: **Apicore US LLC**, Somerset, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 584 days.

(21) Appl. No.: **13/310,019**

(22) Filed: **Dec. 2, 2011**

(65) **Prior Publication Data**

US 2012/0078007 A1      Mar. 29, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/643,056, filed on Dec. 21, 2009, now abandoned, which is a continuation of application No. 12/180,057, filed on Jul. 25, 2008, now Pat. No. 7,662,992, which is a continuation of application No. 11/747,291, filed on May 11, 2007, now abandoned.

(51) **Int. Cl.**
**C07C 303/02**      (2006.01)
**C07C 303/22**      (2006.01)

(52) **U.S. Cl.**
CPC ............. **C07C 303/02** (2013.01); **C07C 303/22** (2013.01)

(58) **Field of Classification Search**
CPC ...... C09B 11/10; C07C 309/22; C07C 309/52
USPC ....................................... 564/80; 562/58, 59
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,507 | A | 3/1925 | Rosenbaum |
| 1,805,925 | A | 5/1931 | Schmidt |
| 1,878,530 | A | 9/1932 | Kyrides |
| 2,422,445 | A | 6/1947 | Stryker |
| 2,726,252 | A | 12/1955 | Balon |
| 4,330,476 | A | 5/1982 | Hermann |
| 4,710,322 | A | 12/1987 | Metz |
| 5,659,053 | A | 8/1997 | Gessner et al. |
| 2006/0224003 | A1 | 10/2006 | Kulkarni |

OTHER PUBLICATIONS

Dan et al., "1% Lymphazurin vs. 10% Fluorescein for Sentinel Node Mapping in Colorectal Tumors," Arch. Surg., 139, 1180-1184, 2004.*
Argentine et al., "Strategies for the investigation and control of process-related impurities in drug substances," Advanced Drug Delivery Reviews, 59, 12-28, 2007.*
Hiranaka et al., "Chemical Structure and Purity of Dyes Used in Lymphangiograms," Investigative Radiology, 10(1), 79, 1975.*
Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition vol. III Part F 110-113.
International Search and Written Opinion of Apr. 23, 2003 of International Application No. PCT/US07/84051.
Office Action for corresponding U.S. Appl. No. 12/180,057, dated Feb. 23, 2009.
Office Action for corresponding U.S. Appl. No. 11/747,291, dated Feb. 7, 2008.
Office Action for corresponding U.S. Appl. No. 12/643,056, dated Jul. 19, 2011.
Coleman et al., "Unexplained Decrease in Measured Oxygen Saturation by Pulse Oximetry Following Injection of Lymphazurin 1% (isosulfan Blue) During a Lymphatic Mapping Procedure", Journal of Surgical Oncology 1999, 70: 126-129.

* cited by examiner

*Primary Examiner* — Paul A Zucker
*Assistant Examiner* — Mark Luderer
(74) *Attorney, Agent, or Firm* — Timothy X. Gibson; Gibson & Dernier LLP

(57)      **ABSTRACT**

A process for the preparation of isosulfan blue (Active Pharmaceutical Ingredient) is provided. A process is also provided for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), used in the preparation thereof and a procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3). Also provided is a process for the preparation of an isoleuco acid of formula (4), which upon mild oxidation gives rise to isosulfan blue of pharmaceutical grade which can be used for preparation of pharmaceutical formulations. The isolation and purification procedures provided in the process provide substantially pure isosulfan blue with HPLC purity 99.5% or greater.

**18 Claims, No Drawings**

US 9,353,050 B2

1

## PROCESS FOR PREPARATION OF ISOSULFAN BLUE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation application, and claims the benefit, of U.S. patent application Ser. No. 12/643,056, filed Dec. 21, 2009, which is a continuation of U.S. Ser. No. 12/180,057 filed Jul. 25, 2008, now U.S. Pat. No. 7,662,992, which is a continuation of U.S. Ser. No. 11/747,291 filed May 11, 2007, now abandoned, the entireties of which are incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates to a process for the production of isosulfan blue, and in particular, to a process for the production of isosulfan blue in a substantially pure form.

### BACKGROUND OF THE INVENTION

Isosulfan blue, having a chemical name, N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclo-hexadien-1-ylidene]-N-ethylethanaminium, sodium salt and the formula



(5)

is a triarylmethane dye used as a contrast agent for the delineation of lymphatic vessels and is particularly useful as a cancer diagnostic agent. Also known chemically as sulfan blue or patent blue, isosulfan blue is an active pharmaceutical ingredient used in the Lymphazurin™ blue dye pharmaceutical dosage form, available as 1% (10 mg/ml) 5 ml solution in phosphate buffer for injection. It is commonly used in a procedure called "mapping of the sentinel lymph nodes". It is an adjunct to lymphography for visualization of the lymphatic system draining the region of injection. It has been used with increasing frequency in localizing sentinel lymph nodes in breast cancer patients. Isosulfan blue-guided surgical removal of cancerous tissue has been on the rise as it is cost effective and safer to use than technetium 99M radioisotope-labeled sulfur colloid. Isosulfan blue is a structural isomer of sulphan blue; both belong to the family of triarylmethane dyestuffs. Generally, preparation of triarylmethane dyes involves condensation of suitably substituted aryl aldehydes with 2 equivalents of alkyl-aryl amines giving rise to leuco-bases or leuco-acids followed by oxidation. Although the literature is replete with methods of preparing triaryl-

2

methane dyes, most of the methods involve strong acids for condensation resulting in leuco-bases or leuco-acids, hazardous oxidizing agents (lead oxide, chloranil, iron phthalocyanine/oxone) for converting to triarylmethane dyes, and crude methods (precipitation with sodium sulfate) of purification. See for example U.S. Pat. Nos. 4,330,476, 4,710,322, 1,531,507, 5,659,053, 1,805,925, 2,422,445, 1,878,530 and 2,726,252. Prior art methods of isolation of the crude leuco-acids or leuco-bases involve tedious neutralization/basification with strong bases and typically using the reaction mixtures in the oxidation step, giving rise to crude triarylmethane dyes. The triarylmethane dyestuffs thus prepared are used mainly for dyeing fabric, coloring paper, and printing inks. The literature cites utilization of the same aforementioned synthetic and isolation methods for the preparation of diagnostically important dyes, such as isosulfan blue, sulphan blue and patent blue V. See, Rodd's Chemistry of Carbon Compounds by S. Coffey, 1974 2nd Edition, Volume III Part F, 110-133.

Therefore there is a need in the art for an improved method in the process chemistry of isosulfan blue to be prepared in the purest form which is suitable for large scale cGMP production for its pharmaceutical formulation manufacturing.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention is to provide a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form. "Substantially pure" is defined herein as 99.0% or greater.

Another object of the invention is to provide a simple, cost-effective and reliable process for preparation of the intermediate, 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2), required in the preparation of isosulfan blue. This embodiment provides a process step that does not require tedious neutralization with very large quantities of sodium carbonate and effervescence, as is the case in prior art processes.

Another object of the invention is to provide a simplified procedure for the isolation of benzaldehyde-2,5-disulfonic acid, di-sodium salt of the formula (3) that does not include acidifying the reaction mixture with concentrated sulfuric acid and boiling until excess sulfurous acid is expelled, as is taught in the prior art.

Yet another object of the invention is to provide a procedure for obtaining the benzaldehyde-2,5-disulfonic acid, sodium salt of formula (3) free of inorganic salts, which essentially simplifies the isolation procedures to be implemented during isolation of isoleuco acid.

Yet another, object of the invention is to provide a process for the preparation of an isoleuco acid of formula (4), through the urea derivative as an in-situ intermediate. The isoleuco acid of formula (4) on further oxidation gives rise to the target compound, isosulfan blue (5). Still another object of the invention is to use very mild oxidation agent to avoid any over oxidized products and also to improve the stability of the isosulfan blue under reaction conditions.

According to this invention, there is provided a simple procedure for the isolation of benzaldehyde-2,5-disulfonic acid, isoleuco acid and isosulfan blue at acid stage and also at sodium salt formation stage by incorporating crystallization techniques, thereby avoiding distillation and other techniques using high temperatures which jeopardize the compound stability during the manufacturing process.

US 9,353,050 B2

3

These and other aspects of the invention will be apparent to those skilled in the art.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the following description, for purposes of explanation, specific numbers, materials and configurations are set forth in order to provide a thorough understanding of the invention. It will be apparent, however, to one having ordinary skill in the art that the invention may be practiced without these specific details. In some instances, well-known features may be omitted or simplified so as not to obscure the present invention.

4

Furthermore, reference in the specification to phrases such as "one embodiment" or "an embodiment" means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the invention. The appearances of phrases such as "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment. In accordance with one embodiment the present invention relates to a process for the preparation of isosulfan blue.

Scheme

The following provides a process for the production of isosulfan blue of formula (5):



Appx167

US 9,353,050 B2

5

6

Experimental Procedures

In accordance with one embodiment of the present invention a first step involves sulfonation of the commercially available starting material of the formula (1) to 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula (2).



(2)



(3)

In accordance with one embodiment of the present invention, a third step of the process involved condensing benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N,N-diethylaniline to provide isoleuco acid of the formula (4).



(4)

In one example, the sulfonation process involved reacting one equivalent of the 2-chlorobenzaldehyde of formula (1) with 2.0 equivalents of 20% fuming sulfuric acid at 15° C. to 70° C. for 16 hrs. The reaction mixture was poured into ice-water carefully followed by stirring with solid sodium chloride resulting in a cream colored precipitate, which upon filtration, washing with ether and drying afforded 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) in 86% yield.

In accordance with one embodiment of the present invention, a second step of the process involves nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid of the formula (2) with an alkali metal sulfite/bisulfite such as sodium sulfite/sodium bisulfite at elevated temperatures under closed conditions.

In one example, this reaction was carried out in a Parr pressure vessel equipped with overhead magnetic stirring. 2-Chlorobenzaldehyde-5-sulfonic acid (2), sodium sulfite (2.29 equivalents), sodium bisulfite (10% of sodium sulfite), and water (3.45 mL/g) were charged into the Parr pressure vessel. The reaction mixture in the vessel was stirred and heated at 170-180° C. for 5-7 hours generating 140-150 psi pressure.

The reaction mixture, after cooling, was poured into methanol while stirring, so as to make 20% aqueous content of the whole volume. This process ensured total precipitation of the inorganic salts, which could be removed by filtration. The solvent from the filtrate was removed under reduced pressure to obtain a solid residue, which was triturated with methanol and filtered to afford light yellow colored compound, benzaldehyde-2,5-disulfonic acid, di sodium salt of the formula (3) in 93.9% yield.

In accordance with one embodiment a purification procedure for removing the inorganic salts essentially involves dissolving the crude solid in N,N dimethylformamide and stirring the contents for 1-2 hours at ambient temperature followed by filtration. The filtrate is precipitated by dichloromethane to afford the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% and with HPLC assay greater than 90% w/w.

In one example, pure isoleuco-acid of the formula (4) with chromatographic purity greater than 98.0% was obtained in the solid form out of the reaction mixture. A mixture of benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3), N,N-diethylaniline (2.2 equivalents), and urea (0.75 equivalents) in glacial acetic acid was stirred and refluxed for 20-25 hrs. The reaction progressed through the intermediate formation in-situ which is a urea derivative of benzaldehyde-2,5-disulfonic acid disodium salt. To the above cooled reaction mixture after 20-25 hrs reflux, methanol was added to form a precipitate, which was collected by vacuum filtration and washed with diethyl ether to afford the isoleuco acid of the formula (4) in 56.8% yield.

The purification of isoleuco acid was carried out by dissolving the crude solid in 5 volumes of water and stirred for 1-2 hours at ambient temperature and filtering the solid. The above process was repeated twice before the final solid was washed with acetone to generate isoleuco acid of the formula (4) with chromatographic purity greater than 99.5%.

In accordance with one embodiment of the present invention a fourth step of the process involves conversion of the isoleuco acid (4) to isosulfan blue of the formula (5) under conditions that employ milder oxidizing agents with no strong acidic reagents and are less hazardous than the prior art.

US 9,353,050 B2

7

8



(5)

In an example of the present inventive process, a suspension of isoleuco acid of the formula (4) in methanol was stirred at room temperature for 12-14 hrs with silver oxide (2.5 equivalents). The blue colored reaction mixture was filtered through a pad of silica gel and Celite followed by filtration through an acidic zeolite bed and further through a 0.2 micron membrane filtration unit. The filtrate was then precipitated with isopropyl ether at room temperature to obtain crude isosulfan blue acid.

The isosulfan blue acid thus obtained was then purified by recrystallization from aqueous isopropyl alcohol/acetone to afford isosulfan blue acid of chromatographic purity NLT 99.5% performed by High Performance Liquid Chromatography.

The final product of isosulfan blue sodium (formula 5) was obtained when isosulfan blue acid was adjusted to a pH greater than 6.0 in aqueous acetone medium using sodium bicarbonate solution for pH adjustment. The reaction mass was filtered to give isosulfan blue sodium of formula (5) having purity greater than 99.5% by HPLC and also free of silver with silver content estimated by Atomic absorption spectrometer less than 20 ppm.

EXAMPLES

2-Chlorobenzaldehyde-5-sulfonic acid, sodium salt of the Formula (2)

113.82 g (based on $SO_3$ molecular weight, 569 mL) of 20% fuming sulfuric acid (FSA) was charged into a 1 L three-neck flask fitted with a dropping funnel, overhead stirrer, and thermometer. The reaction mass was cooled to 15 to 20° C. 100 g of 2-chlorobenzaldehyde of the formula (1) was added dropwise to the stirred and cooled FSA over a period of 40 minutes, so that the temperature didn't rise above 20° C. The reaction mixture was stirred and heated at 70° C. for 16 hours to obtain a dark-brown colored reaction solution. The HPLC results indicated the absence of the starting material. The dark-brown colored reaction solution was carefully poured into a beaker containing 1200 g of crushed ice and stirred. 500 g of solid sodium chloride was added portion wise to the stirred colored acidic solution to precipitate a light-yellow

colored solid. The light-yellow colored solid was collected by vacuum filtration and washed with diethyl ether to afford 150.0 g (86.92%) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2).

Benzaldehyde-2,5-disulfonic acid, sodium salt of the Formula (3)

50 g (0.206 mol) of 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of the formula (2), 59.75 g (0.474 mol, 2.3 eq.) of $Na_2SO_3$ and 5.97 g (10% of $Na_2SO_3$) of $NaHSO_3$ were dissolved in 400 mL of water. The solution was charged into a 600 mL capacity Parr pressure cylinder equipped with stirring and heating. The reaction mixture was stirred (300-310 RPM) and heated at 180° C. (generates ~150 psi pressure) for 5-7 hours. HPLC results indicate the absence of the starting material. After cooling and releasing the pressure, the reaction mixture was poured into 1600 mL of stirred methanol and stirred for 15-30 minutes to precipitate the unwanted inorganic salts. The inorganic salts were filtered off using a pad of Celite and the filtrate evaporated under reduced pressure to obtain a solid residue. The solid residue obtained was triturated with 200 mL methanol, collected by filtration and washed with ether to give 60 g (93.9%) of benzaldehyde-2, 5-disulfonic acid, sodium salt of formula (3).

Purification of Benzaldehyde-2,5-disulfonic acid, sodium salt Formula (3)

60 g of crude benzaldehyde-2,5-disulfonic acid, disodium salt prepared as per the procedure above was dissolved in 500 mL of N,N-dimethylformamide and stirred for 2 hours at 20-25° C. The mixture was filtered through a buchner funnel and the filtrate was precipitated using 1500 mL of dichloromethane to afford 20 g of the light yellow colored compound, benzaldehyde-2,5-disulfonic acid disodium salt of formula (3) with chromatographic purity NLT 99.0% w/w.

Isoleuco Acid of the Formula (4)

60 g of benzaldehyde-2,5-disulfonic acid sodium salt of formula (3), 8.76 g of urea (0.75 eq), and 1000 mL of glacial acetic acid were charged into a 3 L 3-neck flask fitted with a mechanical stirrer and reflux condenser. 65.61 mL (2.2 eq) of N,N-diethyl aniline was added to the stirred mixture and refluxed for 20-25 hrs. When the HPLC results indicated the content of starting material was less than 5%, the reaction mass was cooled to room temperature. After cooling to room temperature, 600 mL of methanol was added and the separated solid collected on a sintered funnel by vacuum filtration. The collected solid was washed with methanol to obtain 55-60 g (56.8%) of crude isoleuco acid of the formula (4).

Purification of Isoleuco Acid of Formula (4)

50 g of crude isoleuco acid along with 250 ml of water was charged into a 1 L 3-neck round bottom flask fitted with a mechanical stirrer. The reaction mixture was stirred for 1 hour at 20-25° C. The solid was filtered through a buchner funnel.

US 9,353,050 B2

9

The above process was repeated twice. The final product thus obtained was washed with 25 ml of acetone and then dried to obtain 40-45 g of the desired isoleuco acid of formula (4).

### Isosulfan Blue of the Formula (5)

15 g (0.027 mol) of isoleuco acid of the formula (4) and 225 mL of Methanol were charged into a 1 L round bottomed flask and the suspension was stirred. To the stirred suspension, 15.91 g (0.068 mol, 2.5 eq.) of silver oxide was added in one portion at room temperature and stirred at room temperature for 12-14 hours. The reaction mixture turned blue in color as the oxidation to the desired product progressed. The HPLC results indicated the absence of starting material. The blue colored reaction mixture was filtered through a buchner funnel and the solid silver oxide collected was taken into the reaction flask and the filtrate was kept aside. 225 ml of methanol was added to the silver oxide taken in the reaction flask and stirred at 20-25° C. for 30 minutes and filtered through the buchner funnel. This silver oxide washing procedure with methanol was carried out twice more.

The combined filtrates along with the initial filtrate were then filtered through a bed of silica gel/celite (2 inch silica gel/1 inch of celite) and finally the bed was washed with 50 mL of methanol.

The filtrate was then subjected to a filtration through an acidic zeolite bed of 2 inch height (pH of the zeolite bed was adjusted to acidic pH by using 0.1N hydrochloric acid aqueous solution) followed by filtration through a 0.2 micron filtration unit.

Isopropyl ether was added three times the volume of the filtrate and the isosulfan blue acid was precipitated as a solid at about 10 gram (68.8%) yield.

In order to prepare the Isosulfan blue sodium salt of the formula (5), 10.0 g of the solid obtained above was dissolved in 30 mL deionized water. Saturated sodium bicarbonate solution was added drop wise to adjust the pH to 8.0. To this 300 mL of acetone was added and stirred at 20-25° C. for 30 minutes. The crystallized product was then filtered through a buchner funnel and the solid thus obtained was dried at 40° C. under vacuum to obtain the isosulfan blue sodium salt of formula (5).

While the preferred embodiments have been described and illustrated it will be understood that changes in details and obvious undisclosed variations might be made without departing from the spirit and principle of the invention and therefore the scope of the invention is not to be construed as limited to the preferred embodiment.

The invention claimed is:

**1**. A compound N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at least 99.0% by HPLC.

**2**. The compound according to claim **1** having a purity between 99.0% and 99.5% by HPLC.

**3**. The compound according to claim **1** having less than 20 ppm silver.

**4**. The compound according to claim **3** having a purity greater than 99.5% by HPLC.

**5**. The compound according to claim **1** prepared by a process comprising combining a suspension of isoleuco acid of the formula

10

(4)



in a polar solvent with silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

**6**. The compound according to claim **5** wherein the process comprises sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula

(2)



followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfate to obtain benzaldehyde-2,5-disulfonic acid, disodium salt of the formula

(3)



and condensing the benzaldehyde-2,5-disulfonic acid, disodium salt of the formula (3) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (4).

**7**. The compound according to claim **6** wherein the process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (2) comprises reacting 2-chlorobenzaldehyde with sulfuric acid.

**8**. The compound according to claim **5** wherein the polar solvent is methanol.

11

9. The compound according to claim 5 wherein the iso-leuco acid of the formula



(4)

is prepared by combining a benzaldehyde-2,5-disulfonic acid, disodium salt of the formula



(3)

with N, N-diethylaniline, and urea and glacial acetic acid.

12

10. The compound according to claim 5 wherein the process comprises recrystallization of N-[4-[[4-(diethylamino) phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%.

11. A solution containing N-[4-[[4-(diethyl amino)phenyl] (2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt, the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at least 99.0% by HPLC.

12. The solution according to claim 11 wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity between 99.0% and 99.5% by HPLC.

13. The solution according to claim 11 having less than 20 ppm silver.

14. The solution according to claim 13 wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity greater than 99.5% by HPLC.

15. A composition consisting essentially of N-[4-[[4-(di-ethyl amino)phenyl](2,5-disulfophenyl)methylene]-2,5-cy-clohexadien-1-ylidene]-N-ethylethanaminium, sodium salt, the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)me-thylene]-2,5-cyclohexadien-1-ylidene]-N-ethyletha-naminium, sodium salt having a purity of at least 99.0% by HPLC.

16. The composition according to claim 15 wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methyl-ene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity between 99.0% and 99.5% by HPLC.

17. The composition according to claim 15 having less than 20 ppm silver.

18. The composition according to claim 17 wherein the N-[4-[[4-(diethyl amino)phenyl](2,5-disulfophenyl)methyl-ene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt has a purity greater than 99.5% by HPLC.

* * * * *

# EXHIBIT E

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use ISOSULFAN BLUE INJECTION safely and effectively. See full prescribing information for ISOSULFAN BLUE INJECTION.**

**ISOSULFAN BLUE injection, for subcutaneous use only**
**Initial U.S. Approval: 1981**

-------------------------- **INDICATIONS AND USAGE** --------------------------
Isosulfan blue injection 1% upon subcutaneous administration, delineates the lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; lymph node response to therapeutic modalities (1.1).

------------------------ **DOSAGE AND ADMINISTRATION** ------------------------
Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected (2.1).

------------------------ **DOSAGE FORMS AND STRENGTHS** ------------------------
1% aqueous solution (isosulfan blue) (3)

------------------------------ **CONTRAINDICATIONS** ------------------------------
Hypersensitivity to triphenylmethane or related compounds (4).

------------------------- **WARNINGS AND PRECAUTIONS** -------------------------
• Life-threatening anaphylactic reactions have occurred after isosulfan blue 1% administration. Monitor patients closely for at least 60 minutes after administration of isosulfan blue 1% (5.1).

• The admixture of isosulfan blue 1% with local anesthetics results in an immediate precipitation of 4 to 9% drug complex. Use a separate syringe for anesthetics (5.2).
• Isosulfan blue 1% interferes with measurements in peripheral blood pulse oximetry. Arterial blood gas analysis may be needed (5.3).

------------------------------- **ADVERSE REACTIONS** -------------------------------
*Hypersensitivity Reactions:* Hypersensitivity reactions occurring approximately 2% of patients and include life-threatening anaphylactic reactions with respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following I.V. administration of a similar compound (6).

**To report SUSPECTED ADVERSE REACTIONS, contact AuroMedics Pharma LLC at 1-866-850-2876 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

------------------------------- **DRUG INTERACTIONS** -------------------------------
No drug interactions have been identified for isosulfan blue 1% (7).

---------------------------- **USE IN SPECIFIC POPULATIONS** ----------------------------
• Caution should be exercised when isosulfan blue 1% is administered to nursing mothers (8.3).
• Safety and effectiveness of isosulfan blue 1% in children has not been established (8.4).

**See 17 for PATIENT COUNSELING INFORMATION.**

Revised: 12/2015

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**1 INDICATIONS AND USAGE**
  1.1 Lymphatic Vessel Delineation
**2 DOSAGE AND ADMINISTRATION**
  2.1 Subcutaneous administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Hypersensitivity Reactions
  5.2 Precipitation of Isosulfan Blue 1% by Lidocaine
  5.3 Interference with Oxygen Saturation and Methemoglobin Measurements
**6 ADVERSE REACTIONS**
  6.1 Postmarketing Experience
**7 DRUG INTERACTIONS**

**8 USE IN SPECIFIC POPULATIONS**
  8.3 Nursing Mothers
  8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
  13.2 Teratogenic Effects
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**
\* Sections or subsections omitted from the full prescribing information are not listed.

---

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

**1.1 Lymphatic Vessel Delineation**

Isosulfan blue injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

**2 DOSAGE AND ADMINISTRATION**

**2.1 Subcutaneous administration**

Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected.

**3 DOSAGE FORMS AND STRENGTHS**

1% aqueous solution (isosulfan blue)

**4 CONTRAINDICATIONS**

Isosulfan blue injection 1% is contraindicated in those individuals with known hypersensitivity to triphenylmethane or related compounds.

**5 WARNINGS AND PRECAUTIONS**

**5.1 Hypersensitivity Reactions**

Life-threatening anaphylactic reactions (respiratory distress, shock, angioedema) have occurred after isosulfan blue 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue 1%. Trained personnel should be available to administer emergency care including resuscitation.

**5.2 Precipitation of Isosulfan Blue 1% by Lidocaine**

The admixture of isosulfan blue 1% (with local anesthetics i.e. lidocaine)) in the same syringe results in an immediate precipitation of 4 to 9% drug complex. Use a separate syringe to administer a local anesthetic.

**5.3 Interference with Oxygen Saturation and Methemoglobin Measurements**

Isosulfan blue 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by four hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan blue 1% may also cause falsely elevated readings of methemoglobin by arterial blood gas analyzer. Therefore, co-oximetry may be needed to verify methemoglobin level.

**6 ADVERSE REACTIONS**

These highlights do not include all the information needed to use ISOSU...     https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=42f2d6...

Case 2:16-cv-00491-RWS-RSP Document 81-5 Filed 03/29/2017
Case 17-1645, Document 12-5, Filed 05/31/16, Page 9 of 5 PageID #: 128

### 6.1 Postmarketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life-threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following administration of a similar compound employed to estimate the depth of a severe burn. Reactions are more likely to occur in patients with a personal or family history of bronchial asthma, significant allergies, drug reactions or previous reactions to triphenylmethane dyes *[see Warnings and Precautions (5)]*.

Laboratory Tests: Isosulfan blue 1% interferes with measurements of oxygen saturation by pulse oximetry and of methemoglobin by gas analyzer *[see Warnings and Precautions (5)]*.

Skin: transient or long-term (tattooing) blue coloration.

## 7 DRUG INTERACTIONS

No drug interactions have been identified with isosulfan blue 1%.

## 8 USE IN SPECIFIC POPULATIONS

### 8.3 Nursing Mothers

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when isosulfan blue 1% is administered to a nursing mother.

### 8.4 Pediatric Use

Safety and effectiveness of isosulfan blue 1% in children have not been established.

## 10 OVERDOSAGE

Do not exceed indicated recommended dosage as overdosage levels have not been identified for isosulfan blue 1%.

## 11 DESCRIPTION

The chemical name of isosulfan blue is N-[4-[[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium hydroxide, inner salt, sodium salt. Isosulfan blue is a greenish blue color hygroscopic powder. Its structural formula is:



Isosulfan blue injection 1% is a sterile, non-pyrogenic, aqueous dark blue color solution for subcutaneous administration. Phosphate buffer in water for injection is added in sufficient quantity to yield a final pH of 6.8 to 7.4. Each mL of solution contains 10 mg isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate. The solution contains no preservative. Isosulfan blue injection 1% is a contrast agent for the delineation of lymphatic vessels

## 12 CLINICAL PHARMACOLOGY

### 12.2 Pharmacodynamics

Following subcutaneous administration, isosulfan blue 1% binds to serum proteins and is picked up by the lymphatic vessels. Thus, the lymphatic vessels are delineated by the blue dye.

### 12.3 Pharmacokinetics

Up to 10% of the subcutaneously administered dose of isosulfan blue 1% is excreted unchanged in the urine in 24 hours in human.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of isosulfan blue 1%. Reproduction studies in animals have not been conducted and, therefore, it is unknown if a problem concerning mutagenesis or impairment of fertility in either males or females exists.

### 13.2 Teratogenic Effects

Pregnancy Category C. Animal reproduction studies have not been conducted with isosulfan blue 1%. It is not known whether isosulfan blue 1% can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Isosulfan blue 1% should be given to a pregnant woman only if clearly needed.

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Isosulfan blue injection 1% is a sterile, non-pyrogenic, aqueous dark blue color solution and is supplied as follows:

**Isosulfan blue injection 1%**

**50 mg per 5 mL (10 mg / mL):**
5 mL Single Dose Vials
in a Carton of 6            NDC 55150-240-05

**Store at** 20° to 25°C (68° to 77°F). [See USP Controlled Room Temperature]. Avoid excessive heat.

**Appx182**

Discard Unused Portion.

The vial stoppers are not made with natural rubber latex.

**17 PATIENT COUNSELING INFORMATION**

Inform patients that urine color may be blue for 24 hours following administration of isosulfan blue injection 1%.

Manufactured for:
**AuroMedics Pharma LLC**
6 Wheeling Road
Dayton, NJ 08810

Manufactured by:
**Aurobindo Pharma Limited**
IDA, Pashamylaram - 502307
India

**PACKAGE LABEL-PRINCIPAL DISPLAY PANEL - 1% [50 mg per 5 mL (10 mg / mL)] - Container Label**

**Rx only          NDC 55150-240-05**
**Isosulfan Blue**
**Injection 1%**
**50 mg per 5 mL**
**(10 mg / mL)**
**For Lymphography**
**For Subcutaneous Use Only**
**5 mL          Single Dose Vial**



**PACKAGE LABEL-PRINCIPAL DISPLAY PANEL - 1% [50 mg per 5 mL (10 mg / mL)] - Container-Carton (6 Vials)**

**Rx only          NDC 55150-240-05**
**Isosulfan Blue**
**Injection 1%**
**50 mg per 5 mL**
**(10 mg / mL)**
**For Lymphography**
**For Subcutaneous Use Only**
**Sterile          6 X 5 mL**
**Non-Pyrogenic          Single Dose Vials**
**AUROMEDICS**



**Appx183**

These highlights do not include all the information needed to use ISOSU...    https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=42f2d6...

Case 2:16-cv-00491-RWS-RSP Document 81-5 Page 165 Filed 03/29/2017
Case 2:16-cv-00491-RWS-RSP Document 12-5 Filed 05/31/16 Page 5 of 5 PageID #: 130

## ISOSULFAN BLUE
isosulfan blue injection, solution

### Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:55150-240 |
|---|---|---|---|
| Route of Administration | SUBCUTANEOUS | | |

### Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| ISOSULFAN BLUE (UNII: 39N9K8S2A4) (ISOSULFAN BLUE INNER SALT - UNII:NS6Q291771) | ISOSULFAN BLUE | 50 mg in 5 mL |

### Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| SODIUM PHOSPHATE, DIBASIC DIHYDRATE (UNII: 94255I6E2T) | |
| POTASSIUM PHOSPHATE, MONOBASIC (UNII: 4J9FJ0HL51) | |
| WATER (UNII: 059QF0KO0R) | |

### Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:55150-240-05 | 6 in 1 CARTON | | |
| 1 | | 5 mL in 1 VIAL; Type 0: Not a Combination Product | | |

### Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA206831 | 02/02/2016 | |

**Labeler -** AuroMedics Pharma LLC (968961354)

### Establishment

| Name | Address | ID/FEI | Business Operations |
|---|---|---|---|
| Aurobindo Pharma Limited | | 918917662 | API MANUFACTURE(55150-240) |

### Establishment

| Name | Address | ID/FEI | Business Operations |
|---|---|---|---|
| Aurobindo Pharma Limited | | 650498244 | ANALYSIS(55150-240) , MANUFACTURE(55150-240) |

Revised: 2/2016

AuroMedics Pharma LLC

**Appx184**

**REDACTED – CONFIDENTIAL**

**APPX185-APPX205**

**REDACTED - CONFIDENTIAL**

**APPX206–APPX222**

**REDACTED - CONFIDENTIAL**

**APPX224-APPX250**

# Exhibit D

This site is for Healthcare Professionals. Patients can
**visit our Patient Website**

**Prescribing Information**

**Important Safety Information**



## ISOSULFAN BLUE
### INJECTION 1%

# Standouts know it *stands out*.

**Isosulfan Blue Injection 1% is**



- ○ FDA-approved for sentinel lymph node mapping and has been a trusted tool of surgeons for more than 30 years[†]

- ○ Isosulfan Blue Injection 1% upon subcutaneous administration delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities

- ○ Isosulfan Blue Injection 1% is contraindicated in patients with known hypersensitivity to triphenylmethane or related compounds

**Please see Indications and Important Safety Information below.**

**Isosulfan Blue is an important part of Mylan's growing oncology portfolio**

○ Mylan now offers more than 20 therapies, from treatments for solid tumors and cancers of the blood to supportive care

Learn more about Mylan's full health systems product portfolio              

**INDICATIONS AND USAGE**

Isosulfan Blue Injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

**IMPORTANT SAFETY INFORMATION**

Isosulfan Blue Injection 1% is contraindicated in patients with known hypersensitivity to triphenylmethane or related compounds.

**WARNINGS:** Life-threatening anaphylactic reactions have occurred after Isosulfan Blue Injection 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue injection 1%. Trained personnel should be available to administer emergency care including resuscitation.

Admixture of Isosulfan Blue Injection 1% with local anesthetics results in an immediate precipitation. Use a separate syringe for local anesthetics.

Isosulfan Blue Injection 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by 4 hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan Blue Injection 1% may also cause falsely elevated reading of methemoglobin by arterial blood gas analyzer. Therefore, cooximetry may be needed to verify methemoglobin level.

**ADVERSE REACTIONS: Post-Marketing Experience**

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus.

Transient or long-term (tattooing) blue coloration of skin.

No drug interactions have been identified with Isosulfan Blue Injection 1%.

**USE IN SPECIAL POPULATIONS:** It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Isosulfan Blue Injection 1% is administered to a nursing mother.

Safety and effectiveness of Isosulfan Blue Injection 1% in children have not been established.

To report SUSPECTED ADVERSE REACTIONS, contact Mylan Institutional at 1-877-446-3679 (1-877-4-INFO-RX) or FDA at 1-800-FDA-1088 or **www.fda.gov/medwatch**.

**Appx393**

**Click here for full Prescribing Information.**

Results may vary from depicted visual.

†Lymphazurin is now listed as discontinued in the Orange Book.  Isosulfan Blue was approved as bioequivalent to Lymphazurin.

‡IMS Health Procedure Data 2013.

§In the study by Hirsch and colleagues, the 543 patients who received Isosulfan Blue were divided into 3 groups according to the clinical indication for the lymphangiogram. Group 1 (n=508) included patients with possible lymph node  involvement by primary or secondary malignancy; group 2 (n=28) included patients with possible primary lymphatic  disease; and group 3 (n=7) included patients with chyluria, chylous ascites or chylothorax. Inadequate identification of  lymphatics occurred in 5, 9 and 0 patients in groups 1, 2 and 3, respectively.

¶These therapies include certain medicines used for heart or high blood pressure called angiotensin-converting enzyme (ACE) inhibitors, such as captopril, enalapril, lisinopril and ramipril, or angiotensin II antagonists such as losartan and valsartan.

**References:**

1. Hirsch JI, Tisnado J, Cho SR, Beachley MC. Use of isosulfan blue for identification of lymphatic vessels: experimental and clinical evaluation. *AJR Am J Roentgenol*. 1982;139(6):1061-1064.
2. Isosulfan Blue 1% injection [package insert]. Rockford, IL: Mylan Institutional LLC; 2013.
3. Daley MD, Norman PH, Leak JA, et al. Adverse events associated with the intraoperative injection of isosulfan blue. *J Clin Anesth*. 2004;16(5):332-341.

Mylan.com
©2016 Mylan Institutional ISB-2016-0033 04/16
The Mylan logo is a registered trademark of Mylan Inc.

**Privacy Statement**

**Copyright and Legal Disclaimer**

**Contact Us**

# Exhibit F

# Bioniche Pharma and Synerx Launch Isosulfan Blue Injection 1%

The first and only generic for Lymphazurin™ 1% (isosulfan Blue Injection 1%)

Jul 28, 2010, 12:00 ET from Bioniche Pharma
(http://www.prnewswire.com/news/bioniche+pharma)




.slides li img { height: auto; max-width: 100%; max-height: 600px; }

LAKE FOREST, Ill., July 28 /PRNewswire/ -- Bioniche Pharma, a leading developer and manufacturer of injectable pharmaceuticals, and Synerx Pharma, LLC announced today the FDA approval and launch of Isosulfan Blue Injection 1%.

(Photo:  http://photos.prnewswire.com/prnh/20100728/CG42156)

(Photo:  http://www.newscom.com/cgi-bin/prnh/20100728/CG42156)

(Logo:  http://photos.prnewswire.com/prnh/20080702/AQW070LOGO)

(Logo:  http://www.newscom.com/cgi-bin/prnh/20080702/AQW070LOGO)

# REDACTED - CONFIDENTIAL

# APPX422-APPX441

# Exhibit O

**REDACTED - CONFIDENTIAL**

**APPX544-APPX573**

**REDACTED - CONFIDENTIAL**

**APPX574-APPX598**

# EXHIBIT 4

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of:
 Ravishanker Kovi, et al.

Application No.: 12/180,057

Filed: July 25, 2008

For:    PROCESS FOR PREPARATION OF
    ISOSULFAN BLUE

Confirmation No.: 9285

Group Art Unit:  1621

Examiner: Chukwuma O. Nwaonicha

Attorney Docket No.: 536/7x2

**MS: Amendment**
Commissioner of Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE TO OFFICE ACTION

Sir:

In response to the Office Action mailed on February 23, 2009, please enter the following amendments and reconsider the application in view of these amendments and the following remarks.

**Petition for Extension of Time** appears on page 2 of this paper.

**Amendments to the claims** begin on page 3 of this paper.

**Remarks/Arguments** begin on page 8 of this paper.

MYL-AUR_00028404

Response to Office Action                                      Attorney Docket No. 536/7x2
July 17, 2009
Page 2 of 10

## PETITION FOR EXTENSION OF TIME

It is hereby petitioned that the period permitted for response be extended by two (2) months, pursuant to 37 C.F.R. § 1.136(a), so that it will expire on July 23, 2009.

2

MYL-AUR_00028405

Response to Office Action
July 17, 2009
Page 3 of 10

Attorney Docket No. 536/7x2

## IN THE CLAIMS

1. (currently amended)    A process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula



**(4)**

in a polar solvent ~~methanol~~ with 2.0 to 3.0 equivalents of silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution.

2. (original)    The process according to claim 1 comprising sulfonation of 2-chlorobenzaldehyde to obtain 2-chlorobenzaldehyde-5-sulfonic acid sodium salt of the formula



**(2)**

followed by nucleophilic displacement of the chloride in 2-chlorobenzaldehyde-5-sulfonic acid sodium salt with an alkali metal sulfite and bisulfite to obtain benzaldehyde-2, 5-disulfonic acid, disodium salt of the formula

3

MYL-AUR_00028406

Response to Office Action
July 17, 2009
Page 4 of 10

Attorney Docket No. 536/7x2



**(3)**

and condensing the benzaldehyde-2, 5-disulfonic acid, disodium salt of the formula (**3**) with N, N-diethylaniline using urea and glacial acetic acid to provide isoleuco acid of the formula (**4**).

3. (currently amended)    ~~A~~ The process of preparing 2-chlorobenzaldehyde-5-sulfonic acid, sodium salt of formula (**2**) according to claim 2 comprising reacting one equivalent of 2-chlorobenzaldehyde with 2 equivalents, based on $SO_3$ content, of 20% fuming sulfuric acid.

4. (currently amended) The process according to claim ~~3~~ 1 wherein the polar solvent is methanol ~~comprising employing an isolation medium comprising crushed ice and sodium chloride~~.

5. (original) The process according to claim 2 of preparing free benzaldehyde-2, 5-disulfonic acid, di-sodium salt of the formula



**(3)**

wherein the alkali metal sulfite and bisulfite comprise sodium sulfite and sodium bisulfite salts.

4

MYL-AUR_00028407

Response to Office Action                                      Attorney Docket No. 536/7x2
July 17, 2009
Page 5 of 10

6. (original) The process according to claim 5 wherein the reaction is carried out in a pressure vessel at 170-180°C for 5 to 7 hours.

7. (original) The process according to claim 6 wherein the reaction is carried out under a pressure of 140 to 150psi.

8. (original) The process according to claim 2 comprising precipitating inorganic salts which will hinder the rate of reaction using methanol or one or more $C_{1-4}$ lower alcohols.

9. (original) The process according to claim 2 in which the benzaldehyde-2,5-disulfonic acid disodium salt is purified by extracting with a non-aqueous polar solvent followed by its precipitation in a halogenated or non-halogenated non-polar solvent which is miscible with the non-aqueous polar solvent.

10. (original) The process according to claim 9 wherein the nonaqueous polar solvent is N,N dimethylformamide and the nonpolar solvent is dichloromethane.

11. (currently amended) A̶ The process according to claim 1 wherein the p̶r̶o̶c̶e̶s̶s̶ ̶o̶f̶ p̶r̶e̶p̶a̶r̶i̶n̶g̶ isoleuco acid of the formula



(4)

c̶o̶m̶p̶r̶i̶s̶i̶n̶g̶ is prepared by combining a benzaldehyde-2, 5-disulfonic acid, disodium salt of the formula

5

MYL-AUR_00028408

Response to Office Action
July 17, 2009
Page 6 of 10

Attorney Docket No. 536/7x2



**(3)**

with N, N-diethylaniline, and urea and glacial acetic acid.

12. (original)  The process according to claim 11 performed at reflux conditions for 20-25 hours at 115 to 120°C.

13. (original) The process according to claim 11 comprising precipitating a crude solid using methanol or a $C_{1-4}$ lower alcohol.

14. (original) The process according to claim 11 in which the crude solid is further purified using water.

15. (currently amended) The process according to claim 1 comprising oxidation of isoleuco acid of the formula (4) with 2.5 equivalents of silver oxide in methanol, resulting in a reaction mass, [[.]] ~~and~~ stirring the reaction mass at 20 to 25°C for 12-14 hours, and filtering the silver oxide to provide a filtrate.

16.  (currently amended) The process according to claim 15 comprising ~~filtering the silver oxide,~~ passing the filtrate through a bed of silica gel and celite and passing the filtrate through a zeolite bed optionally treated with an acid or base.

17. (original) The process according to claim 16 further comprising passing the filtrate through a 0.2 micron filtration unit.

18. (original) The process according to claim 15 comprising precipitating the filtrate

6

MYL-AUR_00028409

Response to Office Action                                     Attorney Docket No. 536/7x2
July 17, 2009
Page 7 of 10

using a non-polar solvent miscible with the filtrate.

19.  (original) The process according to claim 18 wherein the non-polar solvent is isopropyl ether.

20. (original) The process according to claim 1 comprising adjusting the N-[4-[[4-(diethylamino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium to a pH greater than 6.0 using an aqueous inorganic or organic derivative of sodium or a combination thereof.

21. (original) The process according to claim 20 wherein the pH is adjusted using sodium bicarbonate solution.

22. (original) The process according to claim 1 comprising recrystallization of N-[4-[[4-(diethylamino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium using a solvent selected from the group consisting of a polar solvent, a non-polar solvent and a combination thereof to afford HPLC purity greater than 99.5%.

23. (currently amended) The process according to claim 22 wherein the solvent is selected from an aqueous acetone medium and 80% aqueous isopropanol/acetone.

7

MYL-AUR_00028410

## REMARKS/ARGUMENTS

Claims 1-23 are pending and stand rejected. Claims 1, 3, 4, 11, 15, 16 and 23 are amended. No new matter has been added by way of the amendments herein. Support for the amendments is found in the specification as filed, for example, at paragraphs [0026] and [0037].

In the Office Action on page 2 claim 1 stands rejected under 35 U.S.C. §112, second paragraph as being indefinite and 35 U.S.C. §101 for not reciting a proper process claim. Amended claim 1 clearly reflects process steps and is an appropriate process claim. Applicants submit these rejections are overcome.

In the Office Action on page 3 claims 1, 3, 8, 11 and 22 stand rejected under 35 U.S.C. §112, second paragraph as being indefinite The rejection as to claim 1 is overcome by virtue of the foregoing amendment to claim 1 which includes sodium. The rejection as to claim 3 is overcome by virtue of the amendment of claim 3 to depend from claim 2. The rejection of claim 11 is overcome by the amendment to include formula 3. Applicants traverse the rejection with respect to claim 8 in which the Examiner alleges "the phrases 'inorganic salts and inorganic or organic derivatives of sodium'" are not clear. These phrases are not in claim 8. Claim 8 is clear on its face, and one skilled in the art would understand what is meant by the claim language. This rejection should be withdrawn.

Applicants believe the rejection of claim 22 was a typographical error, and a rejection of claim 23 was intended. The amendment to claim 23 providing a space between the terms "80%" and "aqueous" overcomes the rejection as to claim 23, therefore the rejection should be withdrawn.

In the Office Action on page 4 claims 1-23 stand rejected under 35 U.S.C. §103(a) as being unpatentable over Kulkarni et al. (US 20060224003, "Kulkarni"). Applicants traverse this rejection. Amended claim 1 recites a novel process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid in a polar solvent with silver oxide. As noted by the examiner Kulkarni teaches an oxidizing step using ammonium dichromate. Applicants submit the use in claim 1 of silver oxide provides unexpectedly superior results over any prior art process, including Kulkarni, for making isosulfan blue sodium salt, and that the process of claim 1 is patentable.

8

MYL-AUR_00028411

Claim 1 recites in part a process of preparing N-[4-[[4-(diethyl amino) phenyl] (2, 5-disulfophenyl) methylene]-2, 5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt comprising combining a suspension of isoleuco acid of the formula (4) in a polar solvent with 2.0 to 3.0 equivalents of silver oxide, recovering isosulfan blue acid, and treating the isosulfan blue acid with a sodium solution. By way of background, the applicants have invented a process which provides a simple, safe, cost-effective, time saving and reliable process for the preparation of isosulfan blue in bulk scale and in substantially pure form, *i.e.*, 99.0% or greater, for pharmaceutical applications. The process produces isosulfan blue that is easily purified to a purity greater than 99.5% by HPLC with silver content less than 20ppm (specification, paragraph [0026]). Impurity and metal removal in the present process is vastly more efficient than that which must be performed in any prior art process.

By contrast, the process disclosed in Kulkarni produces a product that is not suitable for applications requiring commercial-scale production and high purity, such as pharmaceutical applications. The Kulkarni reference describes a bench-scale process that achieves an isosulfan blue compound suitable only for industrial uses such as for dyes, where purity is not of paramount importance. The product made by the process disclosed in Kulkarni would not meet the standards necessary for pharmaceutical grade isosulfan blue.

In making the argument for patentability over prior art processes for making isosulfan blue, the applicants in Kulkarni submitted data comparing the product made using ammonium dichromate in the Kulkarni claimed process Step IV (oxidation step) to that made using potassium dichromate per the prior art teaching. The data presented by the Kulkarni applicants alleged the process using ammonium dichromate achieved crude isosulfan blue HPLC purity of 86.36% compared to 79.68% achieved by the prior art process, and a higher yield from crude (about 60% compared to about 42%). The overall purity difference was less than 7%. On the basis of this data the Kulkarni process was found to be nonobvious over the prior art reference which taught potassium dichromate as an oxidizer.

Here, the applicants provide a process which does not use a dichromate and surprisingly and unexpectedly achieves isosulfan blue sodium salt having a purity in excess of 99%, a significant improvement (over 12 percentage points) over what was allegedly achieved in Kulkarni over the

MYL-AUR_00028412

prior art.

The totality of the prior art must be considered, and proceeding contrary to accepted wisdom in the art is evidence of nonobviousness. *In re Hedges,* 783 F.2d 1038, 228 USPQ 685 (Fed. Cir. 1986). Processes for making isosulfan blue have been in existence for over 100 years, and yet no artisan has ever used silver oxide in accordance with the process of claim 1. Artisans have typically used lead or chrome oxides with an acid to make isosulfan blue. All the teachings in the art have been to employ oxides of these types, with or without a solvent, with acid. One skilled in the art viewing Kulkarni and in view of the totality of the prior art teachings would have been led to use a dichromate compound as an oxidizer. The use by applicants of silver oxide without acid is significantly different than the use in Kulkarni of sulfuric acid and ammonium dichromate, and would not be obvious to a skilled artisan.

In view of the foregoing applicants submit claim 1 is patentable and request this rejection be withdrawn. Claims 2-23 depend from claim 1 and recite additional patentable features and are likewise allowable. Applicants submit all claims are in condition for allowance. Early and favorable allowance of this application is earnestly solicited.

The fee for a two-month extension of time is included herewith. In the event there are any fees due and owing in connection with this matter, please charge same to our Deposit Account No. 11-0223.

Dated: July 17, 2009

Respectfully submitted,

By: s/Timothy X. Gibson/
Timothy X. Gibson
Registration No.: 40,618
GIBSON & DERNIER LLP
900 Route 9 North, Suite 504
Woodbridge, New Jersey 07095
Telephone (732) 634-7634
Attorneys for Applicant

536-7x2_response-to-2-23-09OA.doc

10

MYL-AUR_00028413

# EXHIBIT 5

TOPICS IN APPLIED CHEMISTRY

# CHEMISTRY AND APPLICATIONS OF LEUCO DYES

## EDITED BY
## RAMAIAH MUTHYALA

AURO_ISO 0018360

TP918
.V37C47
1997

Library of Congress Cataloging-in-Publication Data

Chemistry and applications of leuco dyes / edited by Ramaiah Muthyala.
    p.   cm. -- (Topics in applied chemistry)
  Includes bibliographical references and index.
  ISBN 0-306-45459-9
  1. Vat dyes.   I. Muthyala, Ramaiah.  II. Series.
TP918.V37C47  1997
667'.2--dc21                                      97-11194
                                                    CIP

ISBN 0-306-45459-9

© 1997 Plenum Press, New York
A Division of Plenum Publishing Corporation
233 Spring Street, New York, N. Y. 10013

http://www.plenum.com

10 9 8 7 6 5 4 3 2 1

All rights reserved

No part of this book may be reproduced, stored in a retrieval system, or transmitted in any form
or by any means, electronic, mechanical, photocopying, microfilming, recording, or otherwise,
without written permission from the Publisher

Printed in the United States of America

# 5

# The Chemistry of Leuco Triarylmethanes

RAMAIAH MUTHYALA and XIANGFU LAN

## 5.1.  INTRODUCTION

Di- or triarylmethane leuco dyes are those with electron-donating groups such as amino, or hydroxyl substituted at the *para* or less frequently at the *ortho* position of phenyl rings. To be of value as dye precursors, at least two amino groups or a combination of hydroxyl and amino groups are required. The amino groups can be primary, secondary, or tertiary. Additional substituents such as carboxylic acids, sulfonic acids, or halogens can also be present. The number, nature, and position of these substituents determine the hue or color of the dye and the type of application. For example, introduction of sulfonic acid group converts the basic dyes into acid dyes; a carboxylic group *ortho* to the phenolic hydroxyl group converts basic dyes into mordant dyes.

Arylmethane leuco dyes are converted into di- or triarylmethane dyes on oxidation. This class of dye precursors sometimes is referred to as leuco di- or triphenylmethane dyes, or di- or triphenylmethane leuco dyes. The use of the term di- or triarylmethane dyes can be misleading as the central carbon atom is a carbonium ion. Instead, the term di- and triarylmethine dye is recommended for this class as it correlates with the well-known polymethine dyes. Nevertheless, it has not been commonly used.

RAMAIAH MUTHYALA • 3M Company, St. Paul, Minnesota 55144.     XIANGFU LAN • Clariant Corporation, Charlotte, North Carolina 28269.
*Chemistry and Applications of Leuco Dyes*, edited by Muthyala. Plenum Press, New York, 1997.

125

Triphenylmethane dyes show inferior lightfastness properties. They are, however, still one of the most important groups of synthetic dyes due to their brilliance, high tinctorial strength, and low cost. Several reviews have appeared on di- and triphenylmethane dyes.[1−5] However, the color-forming precursors — leuco dyes — have received less attention in the literature.

In general, the triarylmethane leuco skeleton can be represented by structures **1–4**. Traditional leuco di- and triphenylmethane dyes frequently include compounds of type **1** and **3**. The closely related compounds **2** and **4** are derived from **1** and **3**. Another closely related type is the lactone or phthalide **5** (see Chapter 4). In all of these leuco dyes, one or more of the phenyl rings can be replaced by a hetaryl ring or by a fused aromatic ring such as a naphthalene.



| (1) | X = H | (3) | X = H | (5) |
|-----|-------|-----|-------|-----|
| (2) | X = -NR$_2$, -SO$_2$R | (4) | X = -OH, -OR, -NR$_2$, -CN, N-Heterocycle, -P(O)OR$_2$ | |

$$R^1, R^2, R^3 = -NH_2, NR_2, -OH$$

While the classical leuco dyes **1** or **3** form colors by hydride abstraction or oxidation, the leuco dyes **4** or **5** give colored substances on contact with an acid.

Triphenylmethane leuco dyes are far more important than the diphenylmethanes in terms of practical value. Use of triphenylmethane dyes for traditional applications of dyes is limited to dyeing wool, silk, leather, and polyacrylonitrile fibers. The largest portion of the annual production of this class of leuco dyes is consumed in the manufacturing of various copying papers.

The leuco triphenylmethanes are generally stable substances. However, IR studies have shown that in the solid state, some leuco dyes such as **6a–c**

(6)                                  (7)

(a)  $R^1$ = OH,  $R^2$ - $R^4$ = H          (d)  $R^1$ = $R^4$ = H,  $R^2$ = $R^3$ = OH

(b)  $R^1$ = $R^4$ = OH,  $R^2$ = $R^4$ = H          (e)  $R^1$ = $R^2$ = H,  $R^3$ = $R^4$ = OH

(c)  $R^1$ = $R^2$ = OH,  $R^3$ = $R^4$ = H          (f)  $R^1$ = $R^3$ = OH,  $R^2$ = $R^4$ = H

                                                  (g)  $R^1$ = $R^2$ = $R^4$ = H,  $R^3$ = OH

exist as a mixture of phenol and the quinone carboxylic acids **7a–c**, whereas
**6d–g** exist exclusively as lactone.[6]

## 5.2.  PROPERTIES OF DI- AND TRIARYLMETHANES

### 5.2.1.  Color-Formation Reactions

Colorless triarylmethane leuco materials **8** can be converted to carbon-
ium ion (**9**)-colored materials, either by hydride abstraction or by chemical
or photooxidation. In addition, some leuco compounds such as **11** can be
converted to colored materials by treatment with an acid. The latter case is
similar to the chemistry observed for fluoran (see Chapter 6) or phthalide
(see Chapter 4) leuco compounds (Scheme 1).

#### 5.2.1.1.  Via Oxidation

Direct oxidation of diphenylmethanes is of little practical value as color
formers. In liquid sulfur dioxide, leuco diphenylmethane **12** (Scheme 2)
undergoes hydride abstraction by triphenylcarbenium perchlorate at the
benzylic amine position to form immonium ion[7] **13**, whereas in acetonitrile

**Scheme 1**

diphenylmethane dye **14** is formed. This example demonstrates the influence that the solvent can have directing effect on the hydride abstraction.

The practical route for oxidizing leuco diphenylmethanes **15** demands inital conversion to an imine salt **16**. The imine salt is obtained by heating a mixture of diphenylmethane, sulfur, ammonium chloride, and sodium chloride at 175°C in a current of ammonia; or by heating a mixture of diphenylmethane, urea, sulfamic acid, sulfur, and ammonia at 175°C (Scheme 3). Dyes **16** can be represented as the quinonoid resonance structure **17**. Dyes of this class, known as auramines, are all yellow, with the only commercial representative being auramine O **16a**. Due to its poor lightfastness and instability to hot acids and bases, its use has been restricted to dyeing and printing cotton, paper, silk, leather, and jute.

The chemical oxidants for triphenylmethanes are categorized into two groups: the strong oxidant group consists of $PbO_2$, $Na_2Cr_2O_7/H^+$, and $MnO_2$, while the mild oxidant group consists of oxygen or air, hydrogen peroxide, nitrobenzene, peroxomonosulfuric acid or its salts. Care must be taken in selecting the proper oxidant and the reaction conditions in order to prevent overoxidation. For example, oxidation of leuco Malachite Green with excess $PbO_2$ leads to decomposition products to quinoneimine and benzoic acid.

The Chemistry of Leuco Triarylmethanes                                    **129**



**Scheme 2**



(a)  $R^1 = R^2 = CH_3$,  $R_3 = R_4 = H$
(b)  $R^1 = R^2 = Et$,  $R_3 = R_4 = H$
(c)  - $NR_2^1 = NR_2^2 = -NHMe$
       $R^3 = R^4 = 3$-Me

**Scheme 3**

Although $PbO_2$ in HCl has been commonly used, an ecologically safer oxidant is $MnO_2$ in the presence of $H_3PO_4$[8-11] or HCl.[9,12] In general, oxidation utilizing oxygen[13] or hydrogen peroxide[14] requires a catalyst, usually a metal complex. A catalytic amount of halo- or cyano-substituted benzoquinones,[15,16] or nitro-substituted phenanthrenequinone[13,17] has been used in conjunction with metal catalysts. The metal catalysts can be Mn, Fe, Cu, or Cr complexes of porpharines, tetraaza[14]annulene, phthalocyanine, or tetraazacyclodecane[14,18] or molybdic acid, and $VO_2^+$. The oxidation reaction is carried out in a solvent such as glacial acetic acid.[18] For example, leuco Malachite Green in glacial acetic acid has been oxidized with chloranil[14] and air in the presence of an iron tetraaza[14]annulene complex at 50°C.

The kinetics for the oxidation of leuco bases using oxygen has been studied.[19] The oxidation involves complex formation between the protonated leuco base and the peroxy radical formed by air oxidation of the solvent. Addition of a radical initiator (AIBN) facilitates the reaction, while radical inhibitors retard the dye formation. In addition, oxidation reactions employing 2,3-dichloro-5,6-dicyanoquinone have shown large isotope effects in acetonitrile.[20]

Anodic oxidation has been employed for water-soluble triphenylmethane dyes. It has been shown that the formation of dye is an irreversible two-electron oxidation process.[21-23] This method has been used for the oxidation of diamino triphenylmethane leuco compounds containing two to four sulfonic acid groups to obtain food-grade colored materials.[24]

The photochemical oxidation of triphenylmethanes has been studied.[25-28] In general, triarylmethanes are photooxidized to dyes under UV irradiation in the presence of hexaarylbisimidazoles.[29-32] The mechanism of the bisimidazole-sensitized photooxidation of leuco Crystal Violet has been studied.[33] The first step of the reaction involves an electron-exchange reaction between 2-(*o*-chlorophenyl)-4,5-diphenylimidazolyl radical **18** (generated from the corresponding dimer) and the leuco dye, forming a solvated electron and a radical cation[26,34,35] **19**. Decay of the radical cation results in the formation of a dye cation **20** and a hydrogen atom. The presence of the radical cation **19**, the dye cation **20** as well as radical **21** has been shown by conventional and laser flash photolysis and by spin trap[36] experiments. Photolysis of leuco nitriles of Malachite Green and Crystal Violet suggests charge transfer between the electron-donor (–NMe$_2$) and electron-acceptor (–CN) groups.[37]

When a benzene solution of benzaldehyde and leuco Crystal Violet is irradiated in air, it undergoes an exceptionally fast photochemical reaction and the dye is formed in an excellent yield.[38]

(18)



(19)



(20)



(21)

### 5.2.1.2.  Action of Acids

The formation of colored materials from leuco bases such as **4** and **5** is accomplished by treatment with acids such as acid clay, bisphenol A, acetic acid, or silica gel.[39] For leuco base **4** the leaving group is hydroxy, alkoxy, or cyanide, or a nitrogen-containing heterocycle.

### 5.2.1.3.  Alkylation of Triheteroarylmethanes

The formation of color from triheteroarylmethanes differs from the methodology employed for triphenylmethane leuco dyes[40] (Scheme 4). Dyes are initially formed by alkylation of the pyridyl nitrogen, followed by deprotonation at the central methine carbon. Thus, treatment of the colorless 3,3′-diindolyl-4-pyridylmethane **22** with excess methyl iodide produces colorless compound **23**. Subsequent treatment of **23** with hydroxide

Scheme 4

yields a yellow dye **24**, which undergoes rapid oxidation to give a blue dye **26** followed by slow dealkylation to yield the red dye **27**.

### 5.2.1.4. Miscellaneous

Some dyes can be formed from triphenylmethane leuco materials by simple thermolysis. For example, when **28** is heated an irreversible intramolecular alkylation reaction occurs to form the stable dye[41] **29** (Eq. 1).



(1)

(**28**) R = C, X = O
(**30**) R = S, X = O$_2$

(**29**)

**Scheme 5**

Besides the formation of colored compounds, leuco dyes can undergo other chemical reactions. For example, leuco bases can be sulfonated[42] or nitrated.[43] Leuco dyes containing phenolic groups can be converted into phosphonate esters by treatment with $(PhO)_3P$ or $(PhO)_2P$—OH.[44] Triphenylmethanecarbinols react with phenylmethylpyrazoles to form C—C bond compounds of type B (Scheme 5). The carbinol can be regenerated on treatment with a diazonium salt. Furthermore, the addition of Grignard

reagents to triphenylmethane carbinols forms **31A** via a Tserevetinov reaction (Eq. 2). Triphenylmethane carbinol methyl ethers of **31** undergo similar reactions with Grignard reagents.[45]

### 5.2.2. Effect of Substituents on Color

Like most dyes, substituents on di- and triphenylmethane dyes have a significant effect on the absorption spectra. Acetylation of the imino nitrogen of auramine O (**32**) results in shift to longer wavelength (Eq. 3). A

(3)



(32)                                          (33)

general rule for triphenylmethane dyes is that the greater the fraction of positive charge that is on the auxochromes, the longer the wavelength of absorption. A bathochromic shift can be achieved by introduction of electron-donating groups. For example, 4-aminotriphenylmethane **34** is orange yellow, 4,4′-diaminotriphenylmethane **35** is red-violet, and 4,4′,4″-triaminotriphenylmethane **36** is bluish red. Alkyl groups on nitrogen result in further bathochromic shift. Phenylation of amine nitrogen leads to even



Orange Yellow              Red-Violet              Bluish red

(34)                       (35)                    (36)

greater bathochromic shifts. Replacement of the aromatic amino group with phenolic substituents results in hypochromic shifts. However, the sodium salt of phenolic dyes have similar absorption to the amine-substituted derivatives.

Steric effects play an important role in the absorption of triphenylmethane dyes. Introduction of *ortho* substituents on the phenyl rings results in bathochromic shifts. This is due to the twisting of the phenyl rings resulting in a greater localized positive charge on the auxochromic nitrogens.[46] For example, tris(4-diethylaminophenyl)methane gives a purple dye on oxidation, while tris(4-diethylamino-2-methylphenyl)methane gives a blue material.

## 5.3.  SYNTHESIS

### 5.3.1.  Diphenylmethanes

Diphenylmethanes that have two identical phenyl groups are synthesized by the condensation of formaldehyde or its equivalent with an arylamine in the presence of concentrated hydrochloric acid.[47−51] However, it is usually difficult to stop the reaction at the diphenylmethane stage.

Magnesium phenolates react with triethylorthoformate regiospecifically at the *ortho* position of the phenoxy group (normally phenols give alkyl ethers) giving diarylmethanes. This reaction is complex and the product composition depends on the phenol and the reaction conditions.[52]

Reaction of 4-hydroxymethylaniline **37** with a variety of arylamines in the presence of an acid catalyst gives both symmetrical and unsymmetrical diphenylmethanes.[53−55] This reaction proceeds via intermediate **38**.

Aniline or *N,N*-dialkylanilines are readily alkylated by 1-(hydroxymethyl)benzotriazole to give 4-(benzotriazol-1-yl-methyl)anilines **39** (Scheme 6). Subsequent displacement of the benzotriazole group with



(37)                                         (38)

Ramaiah Muthyala and Xiangfu Lan



$NR_2^1 = NH_2$ , NHMe, NMe$_2$ , NEt$_2$

**Scheme 6**

arylamines or *N,N*-dialkylamines gives either symmetrical or unsymmetrical 4,4-methylene-bis-*N,N*-dialkylphenylamines.[56,57]

A general experimental procedure[57] for a diarylmethane leuco compound via a benzotriazole: To a stirred solution of the corresponding (benzotriazol-1-yl-methyl)aniline (5 mmol) in methanol (30 ml) under reflux was added a solution of the appropriate aromatic compound (5 mmol) and concentrated hydrochloric acid (1 ml) in water (30 ml). The resulting mixture was heated under reflux followed by the addition of aqueous KOH (1 M, 50 ml). The product was isolated by filtration or by extraction with ether, and further purified by recrystallization or by column chromatography.

Oxidation of dimethylaniline with organometallic compounds such as osmiumcarbonyl,[58] or palladium(II) compounds[59] or $t$-butylperesters[60] give bis(4-$N$,$N$-dimethylaminophenyl)methanes. The reaction of monohalogeno-alkyl mercurials with aromatic amines **40** in a molar ratio of 1:4 gives bis(4-aminophenyl)alkanes[61] **41** (Eq. 4)..



(40)                                                    (41)

Treatment of $N$,$O$-acetals **42** in which the *para* position is unsub-stituted, with a twofold excess of the corresponding amine HCl in boiling 50% aqueous methanol gives rise to the bis(4-aminoaryl)methane deriva-tives[62] **43**. This method is suitable only for 4-$N$,$N'$-unsubstituted diarylamines (Eq. 5).



(42)                                                    (43)

R = 2-Me, H;  3-Me, 3-OMe

Reduction of benzophenones with $FeCl_2$/$NaB(Et)_3H$[63] or $LiAlH_4$[64] or with $NaBH_4$/$CH_3SO_3H$[65] gives bis-phenylmethanes in low yields. Alterna-tively, bidentate or monodentate aromatic mercury salts reduce thioketones to diarylmethanes.[66]

Leuco diarylmethane compounds which have received a good deal of attention are the leuco auramines. Reaction of Michler's hydrol with a

suitable amine, hydrazine, or sulfonamide gives auramine derivatives. These derivatives have low volatility with increased solubility in oil and show good stability in the leuco state.[16]

### 5.3.2.  Triphenylmethanes and Carbinol Bases

#### 5.3.2.1.  Via One-Carbon Synthons

Triethyl orthoformate or chloroform can react with arene nucleophiles to give triphenylmethanes with three identical aryl groups.[5,52,67] In addition, dialkylarylamines, when treated with dialkoxycarbenium tetrafluoroborates under thermodynamic conditions or with triethyl orthoformate/zinc chloride in ether under anhydrous conditions, give triarylmethanes.[68] For example, 4-methoxycarbazole and triethyl orthoformate in the presence of acid catalyst give **44** in 66% yield[69] (Scheme 7). In general, phenolic or



(44)



**Scheme 7**

arylamino aldehydes or their orthoesters yield a mixture of di- and triaryl-methane compounds. This synthetic method is best used for preparing triarylmethanes.

### 5.3.2.2.  Via Benzhydrols

The benzhydrols are obtained by reacting an aromatic aldehyde with an arylamine or by oxidation[70] of a diphenylmethane derivative with $PbO_2$ or $MnO_2$. The benzhydrol intermediate is then treated with an arene nucleophile in the presence of acid catalysts such as aluminum chloride,[71] concentrated hydrochloric acid,[55] phosphoric acid,[72] or sulfuric acid[73] to give triphenylmethane leuco dyes.[74,75] Under these conditions, the benzhydrol is protonated at the hydroxy group on the central carbon atom. A carbocation is formed by the loss of water (Eq. 6). Electrophilic substitution then occurs on the *meso* carbon atom yielding the desired product. Amino,[75]



(6)

$$X = -OH, -NH_2, -NH-CO-NH_2$$

ureido, or bisureido groups[15,73,76] have also served as leaving groups. The compounds **45–50** are prepared by this method. The aromatic nucleophiles



(45)

(46)

(47)



(48)



(49)



(50)

usually contain electron-donating groups, but comparatively deactivated aromatic nucleophiles such as sulfonated arylamines and naphthalenes can also be used. For example, 4,4′-bis(dimethylamino)benzhydrol (Michler's hydrol) reacts with $\beta$-naphthyl-3,6-disulfonic acids to give leuco compound **51**.



(51)

AURO_ISO 0018377

(7)

(52)                                        (53)

Carbinol bases are obtained by treating cationic triphenylmethine dyes with alkali.[77] However, not all carbinol bases are stable. For example, **52** readily eliminates water to form the neutral quinonimide[45] **53** (Eq. 7).

Hydroxy leuco bases can be converted into the corresponding amino leuco bases by allowing the leuco compound to react with a secondary amine in the presence of acetic acid.[78] Examples, **54**, of amine bases utilized in this manner are imidazole, 1,2,4-triazine, aryl amine, and cyclohexayl amine.



(54)

*Experimental Procedure*[79] *for* 3-[α-(4-*dimethylaminophenyl)benzyl*]*indole* (**45**). To a solution of 4-*N*,*N*-dimethylaminobenzhydrol (0.45 g, 2 mmol) in MeOH (25 ml) under reflux, was added a solution of indole and concentrated hydrochloric acid (0.8 ml) in water (25 ml). The mixture was heated under reflux for 90 min, followed by the addition of KOH solution (5%, 30 ml). After the reaction was allowed to cool, the product was isolated by filtration (0.63 g, 97%).

### 5.3.2.3.  Via Aromatic Aldehydes

The reaction of an aromatic aldehyde with an aromatic nucleophile containing hydroxy or amino groups gives products with at least two identical phenyl groups[79–83] e.g., **55**, **56**. Use of two different nucleophiles generally results in lower yield.



| (**55**) | a) R= —OCH$_3$ | (**56**) | a) R= —OCH$_3$ |
|---|---|---|---|
|  | b) R= —$^t$Bu |  | b) R= —$^t$Bu |

Benzene and naphthalene compounds can be formylated under Vilsmeir conditions. The formyl compounds, with or without isolating, can be condensed with amino arenes to give leuco compounds. In this reaction, the benzhydrol intermediate is not isolated.[21,79,84–86] The reaction is generally carried out in an alcohol solvent such as isopropanol, butanol, or pentanol and an acid catalyst such as hydrochloric acid, sulfuric acid, or methanesulfonic acid.[87] Acetic acid can also be used both as catalyst and as the solvent. Urea sometimes is added as catalyst.[84,88] Terephthaldehyde reacts with *N*,*N*-diethyl-3-methylaniline[89] and substituted azulenes to give a bis-triphenylmethane[21] **57** and **58**, respectively.

AURO_ISO 0018379

(57)



(58)

*Experimental Procedure*[79] *for 4-bis(4-dimethylaminophenyl)methyl-2,6-dimethoxyphenol* (**55a**).  A mixture of syringaldehyde (5.46 g, 30 mmol), *N,N*-dimethylaniline (7.26 g, 60 mmol), urea (2.7 g), and concentrated sulfuric acid (4.41 g) in isopropanol (100 ml) was heated at 90°C under a nitrogen atmosphere for 24 h. The reaction was cooled to room temperature and 40 ml of water added followed by 50% NaOH until alkaline. The mixture was filtered and the residue washed with 200 ml of cold water. The solid was recrystallized from ethanol and yielded 12.0 g (97%), mp 136–138°C.

Two different nucleophiles can be used but lower yields of the triaryl-methane leuco dyes containing three different rings are obtained. For



(59)

example, a mixture of benzaldehyde, 2-naphthol, and *N,N*-dimethylaniline gives only 24% yield of the triarylmethane **59**. Water-soluble triaryl methanes **60** are also prepared from 4-cyanobenzaldehyde and tetrahydroquinolines.[90]



R = Electron Withdrawing group

**(60)**

In place of aromatic aldehyde, a hetaryl aldehyde such as 2-pyridinecarboxaldehyde can also be used.[84] If a hetaryl aldehyde such as 4-pyridinecarboxaldehyde and a hetaryl nucleophile such as indole **61** are used, a trihetarylmethane of type **62** is formed[91] (Eq. 8). The reaction normally occurs at the 3-position of indole. However, when the 3-position is substituted, the reaction occurs at the 2-position. Use of two different indoles



**(8)**

**(61)**

**(62)**

(63)



(64)                                                            (65)

| | $R_1$ | R2 | Ar | X | Ref. |
|---|---|---|---|---|---|
| a) | MeO- | MeO- |  | OH | 83, 134 |
| b) | EtO- | EtO |  | OEt | 80, 114 |
| c) | H | Ph-N-Ph |  | OMe | 81 |
| d) | H | H |  | OH OMe | 82 |
| e) | MeO- | MeO- |  |  | 84 |

Scheme 8

affords the unsymmetrical analogues in low yields, as expected. This product is usually accompanied by the formation of the two symmetrical analogues.

Unlike triarylmethane dyes, comparatively little work has been done with diaryl heteryl-, and aryl diheteryl methane compounds. Analogous to triarylmethanes, triheterylmethane dyes are also prepared using $POCl_3$ and a ketone. The intermediate leuco compounds (similar to **65**, see Scheme 8) are not isolated[40] in the case of triheterylmethane leuco dyes.

*Experimental   Procedure*[91]  for  *3,3′-diindolyl-4-pyridylmethane*  (**62**, $R^1 = R^2 = R^3 = H$).  Indole  (2.34 g,  0.02 mol)  and  4-pyridinecarboxaldehyde  (1.07 g,  0.01 mol)  are  dissolved  in  ethanol  (100 ml).  Concentrated HCl (20 ml) was added and the mixture allowed to stand at 25°C for 2 h. Water (300 ml) was added giving a fine white precipitate. The milky suspension was neutralized with concentrated $NH_4OH$, yielding a light yellow precipitate. After filtration and drying, **62** was obtained (2.87 g, 89%), mp 156–158°C.

### 5.3.2.4.  Via Aromatic Ketones

Formation of leuco compounds from ketones is generally a two-step process. The reaction of aromatic ketone with an arene nucleophile is normally carried out in the presence of excess $POCl_3$ with $P_2O_5$, $ZnCl_2$, or $SOCl_2$. $POCl_3$ serves as solvent and also as water acceptor. Usually dyes are formed directly in this reaction. Without isolation, they are treated with a base such as NaOH,[77] NaOMe,[92,93] NaOEt,[94] or a heterocycle such as imidazole[78] to give the carbinol base, or the nitrogen substituent analogue, respectively. Benzophenone and substituted benzophenones containing an alkoxy or amino substituent are often used. Anilines, substituted anilines, and heterocycles such as N-ethylcarbazole,[92] indole, 1,2-dimethylindole,[40] tetrahydroquinolines, and quinoxaline[93,95] have been used as nucleophiles. This reaction proceeds via intermediate **63** (Scheme 8). Replacement of the chlorine atom by the aromatic nucleophile gives the dye cation **64** followed by quenching with a base to give leuco compounds. For example, *N*-methyldiphenylamine reacts with N-methylcarbazole in this way to give the bis-triarylmethane leuco compound[68] (e.g., **65a**) and other similar compounds[96−98] **66−68**.



(66)

(67)



(68)

$R = OCH_3$  $-N(CH_3)_2$

*Experimental Procedure*[96] *for 4,4'-diethoxy-4''-[N-methyl-N-(4-cyano-phenyl)amino]-ethoxytriphenylmethane* (**65b**). 14.1 g of $P_2O_5$ added at room temperature to a mixture of 4,4'-diethoxybenzophenone (13.5 g, 0.05 mol) and 4-cyanodiphenylamine (10.4 g, 0.05 mol) in 38.2 g of $POCl_3$. The mixture was stirred at 40°C for 20 h, poured into 500 ml of ice water, and stirred at room temperature for about 10–15 h until the dyestuff separated out as crystals. The crystals were isolated by filtration and washed with water and dried in vacuum at 40°C to give 24.1 g (97%) dark red-violet crystals mp 69–75°C. 19.9 g (0.04 mol) of this dye in 200 ml of EtOH was slowly added dropwise to 120 ml of 1 M NaOEt solution at room temperature. The mixture was stirred at room temperature for 20 h, and filtered. The solvent was removed and the oily residue was stirred with 500 ml of water and then cooled to 10–15°C. The reaction mixture was filtered and the residue was dried in vacuum at room temperature to give 18.5 g (91%) of colorless crystal mp 48–55°C.

5.3.2.5.  Benzotriazole Method

Use of benzotriazole in the preparation of diphenylmethanes and triphenylmethanes has been reviewed.[99] Benzotriazole is condensed with an aldehyde and then allowed to react with naphthols to form a diphenyl-methane benzotriazole derivative such as **69** (Scheme 9). The benzotriazole moiety in **69** is displaced by a Grignard reagent to give triphenyl-methanes.[79,100] This method allows for the preparation of triarylmethanes which contain three different aromatic rings. Compounds **70–72** are prepared by this method.



Scheme 9

*Experimental Procedure*[79] *for 1,4-bis(4-dimethylaminophenyl) (1-hydroxynaphthalen-2-yl)methylbenzene* (**72**).    To a solution of 1,4-bis(benzotriazol-1-yl) (1-hydroxynaphthalen-2-yl)benzene (3.74 g, 6 mmol) in dry THF (240 ml) at −78°C was added a solution of 4-dimethylaminophenyl-magnesium bromide (60 mmol, 1.0 M in THF, 60 ml). The mixture was allowed to warm to room temperature and stirred overnight. It was then poured into water (100 ml), acidified with HCl (2 N), and extracted with $Et_2O$ (4 × 100 ml). The ether extracts were dried ($MgSO_4$) and concentrated to give solid. The solid was purified by column chromatography with gradient eluent (hexane/$CH_2Cl_2$ 4:1, then $CH_2Cl_2$) to give product (1.42 g, 38%) as glassy solid.

### 5.3.2.6.    Miscellaneous Methods

Sulfonated triphenylmethane leuco dye **73** is prepared[42] by sulfonating the leuco dye **74** with 20–30% of the theoretical amount of 20–65% oleum at 30–50°C. The dye, derived from leuco base **73** by oxidation, is used in the



(74)                                                        (73)

production of black-and-white photographic film. Crystal Violet reacts with tributyl phosphite in chloroform to give Crystal Violet dibutyl phosphonate[101] **75** which is claimed to have improved light stability.

The leuco forms of Basic Fuchsin, Crystal Violet, and Malachite Green are prepared by reduction of the corresponding dyes using $Na_2S/H_2SO_4$ at pH 8.2–9.6. Acid Fuchsine, Brilliant Green, and Malachite Green have been reduced by using $H_2S$ gas bubbled in ammonium hydroxide solution.[102]

Ramaiah Muthyala and Xiangfu Lan



(75)

The reaction of 2,4,6-trihalophenols with tropylium perchlorates in the presence of triethylamine gives phenolate dye (Scheme 10) followed by acetylation to give dye **76** from which the leuco compounds **77** can be prepared[103] by catalytic reduction using Pd-C/$H_2$.



Scheme 10

4$H$-3,1-Benzothiazine derivatives **78** are synthesized according to Scheme 11. This process is carried out by reacting an $o$-amino-α,α-disubstituted benzyl alcohol **80** to yield a thioisocyanate followed by ring closure



(81)

**Scheme 11**

of the resulting $o$-thiourido-$\alpha,\alpha$-disubstituted benzyl alcohol **79** by means of hydrogen bromide or hydrogen chloride. Alternatively, they can also be prepared by the oxidation of thioamide derivatives of triarylmethanes **81** using manganese dioxide or lead dioxide.[104] Dyes prepared from these leuco compounds are resistant to light.

## 5.4.  APPLICATIONS

Triphenylmethanes are used mainly for nontextile purposes. Almost all of the leuco bases of triphenylmethane dyes are used in the color-forming applications, e.g., in novel types of colorless copying papers. Other applications include pressure-sensitive heat-sensitive materials, high-speed photo duplicating copying papers, light-sensitive papers, ultrasonic recording papers, electrothermic heat-sensitive recording papers, inks, crayons, type-written ribbons, and photoimaging systems. Many of these applications generally involve microencapsulation of the leuco dye in one layer, an electron acceptor or acid in another layer. When they are brought into

contact either by pressure, heat, or light, electron-transfer reactions occur and a color image is generated. Images are generated by a variety of techniques. For example, a leuco dye and an acid solution can be dispersed and printed on a rayon unwoven cloth. When a pattern is used to partially cover the sheet and then a solvent such as ethanol is sprayed on the surface, a copy of the pattern on a colored background is generated.[105]

### 5.4.1.   Pressure-Sensitive Recording Materials

Pressure-sensitive recording materials are obtained by dissolving a triphenylmethane leuco dye in a solvent composed of paraffin oils. The microcapsules are formed from a water-soluble[106] or water-dispersible material.[107,108] Leuco dyes dissolved in sunflower oil are microencapsulated in a solution containing a melamine-HCHO precondensate and coated on the back side of a paper sheet. Contact of the microcapsule-coated sheet with an acid-coated receptor sheet allows the color formation to occur.

A clay mineral and/or its acid-treated products[109,110] are used as color developers. A diphenylmethane derivative of structure **82** has been micro-



A = N-Heterocycle, - NHNH-, -O-, -OR, NHR

**(82)**

capsulated and used as pressure-sensitive recording material[111] to give light-, water-, and plasticizer-resistant colors.[112] Normal triphenylmethane derivatives are good solvents for the triphenylmethane color formers.[113]

### 5.4.2.   Thermal Recording Materials

Thermal recording materials consist of a heat-sensitive layer made by dispersing a leuco triphenylmethane dye and a phenol in a binder where the

two reactive materials are kept apart by a water- or nonpolar solvent-soluble polymer surface film. The phenolic materials are generally solids at room temperature. At the thermographic copying temperature the phenolic materials become liquid or gas and this allows for the reaction of the leuco dyes to produce a colored image.[114]

### 5.4.3.  Photosensitive Recording Materials

Triphenylmethane leuco dyes are used for photographic materials. The photographic system requires a polymer binder such as acrylic acid–methyl methacrylate copolymer[115] or a copolymer of isophthalic and terephthalic acids[116]; a sensitizer such as 4-(4-n-amyloxyphenyl)-2,6-bis(3-ethylphenyl)-thiapyrilium perchlorate,[117] a photo initiator such as hexaarylbisimidazole,[118] and phenyl tribromomethyl sulfone, cycloalkane such as 1,2,3, 4,5-pentabromo-6-chlorocyclohexane,[119] or 3-benzylidene-9-methyl-2,3-dihydro-1H-cyclopenta[b]quinoline.[120]

The redox system consists of pyrene or 9,10-phenanthrene quinone as oxidant and an alkyl ester of 3,3′,3″-nitrilopropionic acid as reductant.[121] This system deactivates oxidation by bisimidazole when irradiated at 380–550 nm, since the quinone is reduced to hydroquinone and thus stabilizing the previously generated dye image.[122,123]

### 5.4.4.  Miscellaneous Applications

Besides their major use in pressure-sensitive, thermal, and photographic recording materials, triphenylmethane leuco dyes are extensively used in biological and analytical applications. They are used for detection of hydrogen peroxide in medical diagnostic kits (e.g., glucose determination, by glucose oxidase), in biotechnology process control,[124,125] in analysis of biological fluids, and in wastewater treatment plants.[126]

The color formation property is also used for detection of carboxylic acids,[102] anionic surfactants by spectrophotometric method[127] in the 0–1500 ppm range. This procedure is suitable for automation. Triphenylmethane carbinol bases and leuco cyanides have found use in making photoresponsive polymers. UV irradiation of polymers containing triphenylmethane leuco bases produces intensely colored cations through photodissociation followed by recombination of the cation with counterions on heating. This property can be used to produce reversible photomechanical transfer material.[128] An acrylamide gel with a triphenylmethane nitrile shows reversible photostimulated dilation effect.[129] When irradiated, dye cation is formed allowing creation of osmotic pressure differentials, causing swelling of gel. When in the dark, the gel deswells to its initial size due to the re-formation of the leuco nitrile.

Hexa(hydroxyethyl)pararosaniline nitrile has been used in a chemical radiochromic dosimeter.[130] Ferricyanide oxidation of leuco Crystal Violet to Crystal Violet dye finds use in detection of various heavy metals[131] at trace quantities. Oxidation of leuco triphenylmethanes by chloramine-T is catalyzed by iodide and therefore is used for detection of iodide.[132] On the other hand, the inhibition of the catalytic effect of iodide by some ions can be used for determining traces of Ag(I), Hg(II), Pd(II). In addition, the triphenylmethane leuco dyes, phenolphthalein or phenol red are used extensively as indicators in calorimetric and titrimetric determinations.

## 5.5.  REFERENCES

1. Venkataraman, K. (ed.), *The Chemistry of Synthetic Dyes*, Vol. 2, Academic Press, New York (1952).
2. Lubs, H. A. (ed.), *The Chemistry of Synthetic Dyes and Pigments*, American Chemical Society Monograph Series, Reinhold, New York (1955).
3. Witterholt, V. G., in: *Encyclopedia of Chemical Technology* (R. E. Kirk and D. F. Othmer, eds.), 2nd edn., Vol. 20, Wiley, New York (1969).
4. Banister, D., and Elliott, J., in: *Encyclopedia of Chemical Technology* (R. E. Kirk and D. F. Othmer, eds.), 3rd edn., Vol. 23, Wiley, New York (1983).
5. Zollinger, H., in: *Color Chemistry*, p. 59, VCH, New York (1987).
6. Chamoli, R. P., Naithani, K. P., Gupta, P. C., and Himalayan, *Chem. Pharm. Bull. 1*, 18 (1984) [*CA 103*, 143350v].
7. Bychkov, N. N., Milakov, V. V., Lavrov, D. V., and Stepanov, B. I., *Zh. Org. Khim. 23*, 1516 (1987).
8. Engelman, A., Ger. Offen. DE 3,309,726 (1984) [*CA 102*(4), 26391C].
9. Berneth, H., Raue, R., Ger. Offen. DE 3,842,014 (1990) [*CA 114*, 64261s].
10. Rines, S. P., and Zullig, C. J., European Patent Application EP 491,256 (1992) [*CA 117*, 193606t].
11. Sosnowski, C., Wardyn, S., Gmaj, J., Sobolewski, B., Kowalczyk, J., and Jaworski, L., PL 126,654 (1983) [*CA 105*(18), 154680v].
12. Berneth, H., and Raue, R., U.S. Patent 5,013,857 (1991).
13. Kast, H., Baumann, H., Mayer, U., and Oberlinner, A., Ger. Offen. DE 2,138,931 (1973) [*CA 78,* 1379647c].
14. Kast, H., U.S. Patent 4,000,135 (1976).
15. Hermann, K. H., Ger. Offen. DE 2,853,822 (1978) [*CA 93*(20), 187749m].
16. Kast, H., Baumann, H., and Mayer, U., Badische, Anilin- & Soda Fabrik, U.S. Patent 3,828,071 (1974).
17. Kast, H., Ger. Offen. DE 2,334, 918 (1975) [*CA 83*, 1202u].
18. Gessner, T., and Mayer, U., Ger. Offen. DE 4,211,783 (1993) [*CA 120,* 220390p]
19. Fedorova, T. M., and Kaliya, O. L., *Zh. Org. Khim. 19*, 1498 (1983).
20. Lewis, E. S., Perry, J. M., and Grinstein, R. H., *J. Am. Chem. Soc. 92*, 899 (1970).
21. Kuder, J. E., Limburg, W. W., Stolka, M., and Turner, S. R., *J. Org. Chem. 44*, 761 (1979).
22. Bruder, H., Habermann, W., Mayer, U., and Hammes, P., Ger. Offen. DE 3,513,246 (1986) [*CA 106*(16), 121399c].

23. Habermann, W., Mayer, U., Hammes, P., and Landmann, B., Ger. Offen. DE 3,628,354 (1988) [*CA 109*(9), 72351g].
24. Habermann, W., Mayer, O., Hammes, P., and Landmann, B., U.S. Patent 4,775,451 (1988).
25. Shigorin, D. N., and Pak, M. A., *Russ. J. Phys. Chem. (Engl.) 41*, 1584 (1967).
26. Pak, M. A., and Shigorin, D. N., *Russ. J. Phys. Chem. (Engl.) 42*, 887 (1968).
27. Pak, M. A., Shigorin, D. N., and Ozerova, G. A., *Dokl. Akad. Nauk SSSR 186*, 369 (1969).
28. Shigorin, D. N., Pak, M. A., and Kozlov, Y. I., *Russ. J. Phys. Chem. (Engl. Transl.) 41*, 652 (1967).
29. Du Pont, British Patent 1,047,569 (1966) [*CA 66*(12), 50700m].
30. Cescon, L. A., Dessauer, R., and Looney, C. E., U.S. Patent 3,423,427 (1969).
31. Cescon, L. A., U.S. Patent 3,445,233 (1969).
32. Cescon, L. A., and Dessauer, R., U.S. Patent 3,445,234 (1969).
33. MacLachlan, A., and Riem, R. H., *J. Org. Chem. 36*, 2275 (1971).
34. Shigorin, D. N., Pak, M. A., and Kozlov, Y. I., *Zh. Fiz. Khim. 41*, 1220 (1967) [*CA 67*, 118075q].
35. Pak, M. A., and Shigorin, D. N., *Zh. Fiz. Khim. 42*, 1694 (1968) [*CA 70*(6), 20963q].
36. Hinzmann, G., Grummi, U. W., and Paetzold, R., *J. Prakt. Chem. 326*, 899 (1984).
37. Szychlinski, J., *Rocz. Chem. 41*, 2123 (1967) [*CA 68*, 115678y].
38. Hartzler, H. D., *Pure Appl. Chem. 49*, 353 (1977).
39. Kondo, M., Kiyoshi, Y., Makoto, M., Hiroshi, I., and Tetsuo, S., Kazaki Paper Mfg. Co., DE 2 629 937 [*CA 86*, 191135w].
40. Naef, R., *Dyes Pigm. 2*, 57 (1981).
41. Ellis, E. W., U.S. Patent 4,839,335 (1987) [*CA 111*, 244432u].
42. Sakar, L., Chaloupka, J., and Hlinovska, Z., Czechoslovakian Patent CS 213,158 (1984) [*CA 100*, 211665s].
43. Takizawa, A., and Kinoshita, T., Jpn. Kokai Tokkyo Koho JP 62 275,127 [87 275,127] (1987).
44. Sanyo Chem. JP 5 918 889.
45. Abrahart, E. N., *Chem. Ind. 1512* (1962).
46. Platt, J. R., and Klevens, A. B., *J. Am. Chem. Soc.* 1714 (1945).
47. Scanlan, J. T., *J. Am. Chem. Soc. 57*, 887 (1935).
48. Corvin, J. H., *J. Chem. Soc.* 83 (1955).
49. Cadogan, J. I. G., Hey, D. H., and Sanderson, W. A., *J. Chem. Soc.* 3203 (1960).
50. Pollak, I. E., and Grillot, G. F., *J. Org. Chem. 32*, 3101 (1967).
51. Peesapati, V., Pauson, P. L., and Pathrick, R. A., *J. Chem. Res. (S)* 194 (1987).
52. Casiraghi, G., Casnati, G., and Cornia, M., *Tetrahedron Lett.* 679 (1973).
53. Sunagawa, G., Ichii, T., and Yoshida, N., *Pharm. Bull. Jpn. 3*, 109 (1955).
54. Yanagihara, N., and Iwakura, K., Jpn. Kokai Tokkyo Koho JP 01 216,941 (JP88-41,281) (1989) [*CA 112*, 79439n].
55. N. Yanagihara, Fuji, Japanese Patent 5247 357 (1993).
56. Katritzky, A. R., Lan, X., and Lam, J. N., *Synthesis* 341 (1990).
57. Katritzky, A. R., Lan, X., and Lam, J. N., *J. Org. Chem. 5*, 4397 (1991).
58. Yin, C. C., and Deeming, A. J., *J. Organomet. Chem. 144*, 351 (1978).
59. Sakakibara, T., Karasumaru, S., and Kawano, I., *J. Am. Chem. Soc. 107*, 6417 (1985).
60. Sosnovsky, G., and Yang, N. C., *J. Org. Chem. 25*, 899 (1960).
61. Barluenga, J., Campos, P. J., Roy, M. A., and Asensio, G., *J. Chem. Soc. Perkin I* 1420 (1980).
62. Manring, L. E., and Peters, K. S., *J. Phys. Chem. 88*, 3516 (1984).
63. Alper, H., Ripley, S., and Prince, T. L., *J. Org. Chem. 48*, 250 (1983).
64. Conover, L. H., and Tarbell, D. S., *J. Am. Chem. Soc. 72*, 3586 (1950).

65. Wann, S. R., Thorsen, P. T., and Kreevoy, M. M., *J. Org. Chem. 46*, 2579 (1981).

66. Wuest, J. D., and Zacharie, B., *J. Am. Chem. Soc. 107*, 6121 (1985).

67. Pindur, U., and Flo, C., *J. Heterocycl. Chem. 26*, 1563 (1989).

68. Eckstein, U., European Patent Application EP 431,422 (1991) [*CA 115*, 258296x].

69. Witzel, H., and Pindur, U., *J. Heterocycl. Chem. 25*, 907 (1988).

70. Fuji Photo Film Co., Ltd., Jpn, Kokai Tokkyo Koho JP 59 142,545 (1984) [84 142,545].

71. Burmester, A., and Stegmann, H. B., *Synthesis* 125 (1981).

72. Hughes, N., Ger. Offen. DE 2,141,406 (1972) [*CA 77*(6), 36408t].

73. Clark, M. C., and Hart, D. A., European Patent Application EP 57,661 (1982) [*CA 98*, 91038f].

74. Wakasugi, K., Kikkawa, K., Kaneko, K., and Yamaguchi, M., European Patent Application EP 486,749 (1992) [*CA 117*, 173436j].

75. Miyazawa, Y., Ozutsumi, M., and Kondo, M., Jpn. Kokai JP 76 48,639 (1976) [*CA 85*, 144715q].

76. Yanagihara, N., Fuji Photo, JP5 247 357 (1993).

77. Eckstein, U., and Psaar, H., Ger. Offen. DE 3,605,552 (1987) [*CA 108*(2), 7513b].

78. Eckstein, U., and Raue, R., European Patent Application EP 433, 813 (1991) [*CA 115*, 28072s].

79. Muthyala, R., Katritzky, A. R., and Lan, X., *Dyes Pigm. 25*, 303 (1994).

80. Ungnade, H. E., and Crandall, E. W., *J. Am. Chem. Soc. 71*, 2209 (1949).

81. Pratt, E. F., and Green, L. Q., *J. Am. Chem. Soc. 75*, 275 (1953).

82. Snyder, H. R., and Konecky, M. S., *J. Am. Chem. Soc. 80*, 4388 (1958).

83. Casiraghi, G., Casnati, G., Cornia, M., Sartori, G., and Ungaro, R., *J. Chem. Soc. Perkin Trans I* 2077 (1974).

84. Hodogaya Chemical Co., Ltd., Ricoh Co., Ltd., Jpn. Kokai Tokkyo Koho JP 80 108, 459 (1980) [*CA 94*, 32193x].

85. Mitsui Toatsu Chemicals, Jpn. Kokai Tokkyo Koho JP 58 96,046 (1983).

86. Tsujimoto, M., Akahori, H., Hasegawa, K., and Asano, M., WO 8,303,840 (1983) [*CA 100*(10), 69872m].

87. Lodolini, M., and Maggiulli, C. A., U.S. Patent 3,739,000 (1973) [*CA 79*(10), 54882p].

88. Neumer, J. F., Ger. Offen. DE 2,220,383 (1972) [*CA 78*, 99071u].

89. Asao, T., Maeda, S., and Mitsuhashi, K., Japanese Patent 632 746 (1994).

90. Kiekens, E., Agfa-Gevaert, European Patent 0611807 (1994).

91. Novak, T. J., Kramer, D. N., Klapper, H., and Daasch, L. W., *J. Org. Chem. 41*, 870 (1976).

92. Eckstein, U., Psaar, H., and Jabs, G., European Patent Application EP 303,942 (1989) [*CA 111*, 59551u].

93. Eckstein, U., European Patent Application EP 330,040 (1989) [*CA 12*, 100676g].

94. Eckstein, U., Psaar, H., and Raue, R., European Patent Application EP 281,891 (1988) [*CA 110*, 214760m].

95. Eckstein, U., Bayer, U.S. Patent 5097034 (1992).

96. Eckstein, U., Psaar, H., and Raue, R., U.S. Patent 4,897,223 (1990).

97. Eckstein, U., and Psaar, H., Bayer, U.S. Patent 4,783,196 (1988).

98. Eckstein, U., and Psaar, H., Bayer, U.S. Patent 4,923,641 (1990).

99. Katritzky, A. R., and Lan, X., *Chem. Soc. Rev.* 363 (1994).

100. Katritzky, A. R., Lan, X., and Lam, J. N., *Chem. Ber. 124*, 1809 (1991).

101. Nishimura, S., Kuriyama, S., Uno, K., and Oda, R., Jpn. Kokai JP 74 90, 731 (1974) [*CA 100*, 87695v].

102. Thakore, P. V., *Sci. Cult. 55*, 105 (1989) [*CA 113*(2), 17234d].

103. Morita, T., Takahashi, K., and Nozoe, T., *Bull. Chem. Soc. Jpn. 66*, 337 (1993).

104. Usui, H., and Ishige, S., Fuji Photo Film Co., Japanese Patent 4,119,777.
105. Japan Vilene Co., Ltd., Dainippon Printing Co., Ltd., Jpn. Kokai Tokkyo Koho JP 59 024, 687 [JP82-134,996] (1984) [*CA 101*, 81710k].
106. Milichovska, S., and Milichovsky, M., CS 247 538 (1987) [*CA 109*, 160670r].
107. Feldmuehle, A.-G., Ger. Offen. DE 3,633,116 (1988) [*CA 109*, 160670r].
108. Hilterhaus, B., and Hunger, G., U.S. Patent 4,859,650 (1989).
109. Sugahara, Y., Miyazawa, K., Nakazawa, T., and Maeno, M., U.S. Patent 3,753,761 (1973) [*CA 80*, 21448u].
110. Daicel Chemical Industries, Ltd., Jpn. Kokai Tokkyo Koho JP 60 070,444 [JP83-179,769] (1985).
111. Tsuchida, T., Koga, Y., Omura, H., Tanaka, M., and Danou, N., European Patent Application EP 587,184 (1994) [*CA 122*, 278235z].
112. Tsuchida, T., Danno, N., Omura, H., and Arai, N., Jpn. Kokai Tokkyo Koho JP 07 96,657 [95 96,657] (1995) [*CA 123*, 156529y].
113. Satomura, M., Kiritani, M., and Nishimura, T., JP 53 042,909 [76–117, 719] (1978).
114. Adachi, K., Jpn. Kokai JP 48 051, 644 [JP-86,073] (1973) [*CA 79*, 131373c].
115. Frommeld, H. D., Ger. Offen. DE 3,602,215 (1987).
116. Wilson, C. V., Kodak, British Patent 10 51 201 (1964).
117. Wilson, C. V., Ger. Offen. DE 1,237,900 (1963) [*CA 67*(14), 69477m].
118. Ricoh Co., Ltd., Jpn. Kokai Tokkyo Koho JP 56 012, 638 [JP 79–89, 070] (1981).
119. Roos, L., and Jolly, J. L., WO 8,001,846 (1980).
120. Toya, K., Nakayama, T., Takenaka, F., and Ito, M., Jpn. Kokai Tokkyo Koho JP 62 106,450 [JP85-245,593] (1987).
121. Cescon, L. A., U.S. Patent 3,390,994 (1968) [*CA 69*(14), 56227w].
122. Harder, R. J., and Yembrick, C., Jr., U.S. Patent 3,359,109 (1967) [*CA 68*(12), 50986a].
123. Yembrick, C., Jr., U.S. Patent 3,360,370 (1967).
124. Dittrich, F., Scholz, M., (East) German Patent DD 235,115 (1986) [*CA 107*(13), 112216j].
125. Babb, B. E., and Daniel, D. S., European Patent Application EP 162,685 (1985) [*CA 104*, 105638h].
126. Zepp, R. G., Skurlatov, Y. I., and Ritmiller, L. F., *Environ. Technol. Lett. 9*, 287 (1988) [*CA 108*(24), 209891j].
127. Pobiner, H., and Hoffman, H. J., Jr., *Anal. Chim. Acta 141*, 419 (1982).
128. Irie, M., and Kungwatchakun, D., *Makromol. Chem. Rapid Commun. 5*, 829 (1985).
129. Irie, M., and Kungwatchakun, D., *Macromolecules 19*, 2476 (1986).
130. Farahani, M., Liang, J. H., and McLaughlin, W. L., *Appl. Radiat. Isot. 41*, 5 (1990) [*CA 112*(16), 147525q].
131. Smith, I. L., *Analytical Applications of the Heavy Metal Induced Oxidation of the Leuco Bases of Triphenylmethane Dyes*, Ph.D. dissertation, The University of Alabama (1974) Chem. Abs. *83*(8), 71097m.
132. Perez Ruiz, T., Martinez Lozano, C., and Hernandez Lozano, M., *An. Univ. Murcia Cienc.* (1984–1985) *43*, 251 (1984) [*CA 103*(8), 63983].

# EXHIBIT 12

US005198558A

# United States Patent [19]

## Rines et al.

[11] Patent Number: 5,198,558

[45] Date of Patent: Mar. 30, 1993

[54] **PROCESS FOR THE PREPARATION OF TRIPHENYLMETHANE DYES**

[75] Inventors: **Steven P. Rines**, Guilderland; **Charles J. Zullig**, Schenectady, both of N.Y.

[73] Assignee: **BASF Corporation**, Parsippany, N.J.

[21] Appl. No.: **629,521**

[22] Filed: **Dec. 18, 1990**

[51] Int. Cl.$^5$ ............................................. C07C 221/00
[52] U.S. Cl. .................................. **552/108**; 552/114
[58] Field of Search ...................... 552/108, 113, 114

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,927,044 | 12/1975 | Foster et al. | 552/109 |
| 4,566,999 | 1/1986 | Engelmann | 552/108 |
| 5,013,857 | 5/1991 | Berneth et al. | 552/114 |

*Primary Examiner*—C. Warren Ivy
*Assistant Examiner*—Raymond Covington

[57] **ABSTRACT**

A process for the preparation of triphenylmethane dye of the formula



wherein

$R_1$ and $R_2$ each denote hydrogen, $C_1$–$C_4$ alkyl, benzyl or sulfobenzyl,

$R_3$ and $R_4$ each denote hydrogen, $C_1$–$C_4$ alkyl or sulfonic acid

$R_5$ denotes a phenyl, sulfophenyl, dialkylaminophenyl, $C_1$–$C_4$ alkylphenyl, $C_1$–$C_4$ alkyl-dialkylaminophenyl, halogenophenyl, naphthyl, sulfonaphthyl, disulfonaphthyl, or alkyldisulfonaphthyl by oxidation of the leuco compound of the corresponding triphenylmethane dye with manganese dioxide in the presence of an aqueous phosphoric acid at a temperature of about 20° C. to about 100° C.,

by the addition of a base selected from the group consisting of ammonia, amines, aminoalcohols, metal hydroxides of Groups IA, IIA, IIIA and mixtures thereof in an amount sufficient to neutralize the aqueous solution,

by filtration from the precipitate and

by isolation of the triphenylmethane dye.

**32 Claims, No Drawings**

5,198,558

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## PROCESS FOR THE PREPARATION OF TRIPHENYLMETHANE DYES

### FIELD OF THE INVENTION

The present invention relates to a process for the preparation of triphenylmethane dyes, more particularly, it relates to a process of preparing such dyes with a very low content of heavy metal residues.

### BACKGROUND OF THE INVENTION

Triphyenylmethane dyes are known and it has been established that transition metal oxides like dichromate or manganese dioxide will convert the corresponding leuco compound to the triphenylmethane dye. However, large amounts of transition metal salts are produced in the dyes. The dyes have to be salted out of the aqueous solution with ammonium, alkali metal or alkaline earth metal chlorids or sulfates. The resulting dyes contained therefore more or less amounts of salts.

The U.S. Pat. No. 4,566,999 discloses a process for the preparation of acid dyestuffs of low electrolyte content by the oxidation of the leuco compound with manganese dioxide in the presence of phosphoric acid and ammonia.

An object of the present invention is to provide a process for the preparation of triphenylmethane dyes, which are substantially free of heavy metal residues.

### SUMMARY OF THE INVENTION

The present invention provides a process for the preparation of triphenylmethane dyes of the formula:



wherein

$R_1$ and $R_2$ each denote hydrogen, $C_1$–$C_4$ alkyl, benzyl or sulfobenzyl,

$R_3$ and $R_4$ each denote hydrogen, $C_1$–$C_4$ alkyl or sulfonic acid

$R_5$ denotes a phenyl, sulfophenyl, dialkylaminophenyl, $C_1$–$C_4$ alkylphenyl, $C_1$–$C_4$ alkyl-dialkylaminophenyl, halogenophenyl, naphthyl, sulfonaphthyl, disulfonaphthyl, or alkyldisulfonaphthyl

comprising

I. oxidation of the leuco compound of the corresponding triphenylmethane dye with manganese dioxide in the presence of aqueous phosphoric acid at a temperature of about 20° C. to about 100° C.

II. adding a base selected from the group consisting of ammonia, amines, aminoalcohols, metal hydroxides of Groups IA, IIA, IIIA and mixtures thereof in an amount sufficient to neutralize the aqueous solution,

III. filtration from the precipitate and

IV. isolation of the triphenylmethane dye.

### DETAILED DESCRIPTION OF THE INVENTION

The triphenylmethane dyes of the present invention have the general formula



wherein

$R_1$ and $R_2$ each denote hydrogen, $C_1$–$C_4$ alkyl, benzyl or sulfobenzyl,

$R_3$ and $R_4$ each denote hydrogen, $C_1$–$C_4$ alkyl or sulfonic acid

$R_5$ denotes a phenyl, sulfophenyl, dialkylaminophenyl, $C_1$–$C_4$ alkylphenyl, $C_1$–$C_4$ alkyl-dialkylaminophenyl, halogenophenyl, maphthyl, sulfonaphthyl, disulfonaphthyl, or alkyldisulfonaphthyl

comprising

I. oxidation of the leuco compound of the corresponding triphenylmethane dye with manganese dioxide in the presence of aqueous phosphoric acid at a temperature of about 20° C. to about 100° C.,

II. adding a base selected from the group consisting of ammonia, amines, aminoalcohols, metal hydroxides of Groups IA, IIA, IIIA and mixtures thereof in an amount sufficient to neutralize the aqueous solution,

III. filtration from the precipitate and

IV. isolation of the triphenylmethane dye.

Suitable examples are 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-sulfonate, 4',4'' bis [diethylamino]-triphenylmethane-2,4-disulfonic acid, 4',4'' bis [N-ethyl-N-benzylamino]-triphenylmethane-2,4-disulfonic acid, 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2- methyl-4-dimethylamine and 4,4',4'' tris [dimethylamino]-triphenylmethane.

Preferred are 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-sulfonate, 4,4',4'' tris [dimethylamino]-triphenylmethane and 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-methyl-4-dimethylamine.

The oxidation step I is conducted in water with manganese dioxide in the presence of phosphoric acid. The leuco compound may be formed in situ in aqueous solution, or added to the water. Phosphoric acid and manganese dioxide is added to the slurry of the leuco compound in water. The molar ratio of manganese dioxide to leuco compound is from about 1.0 to 1.5, preferably 1.0 to 1.3 mol manganese dioxide per mol leuco compound.

Most important for a complete precipitation in the following step II is the molar ratio of phosphoric acid to manganese dioxide. This molar ratio is from about 1.0 to 1.5, preferably 1.0 to 1.15 mol phosphoric acid per mol manganese dioxide, calculated from the pure reagents. The purity of manganese dioxide is determined by atomic absorption.

In a variation of this process phosphoric acid could be replaced partly or completely by another organic or inorganic acid in an amount sufficient that the pH is

AURO_ISO 0018464

5,198,558

**3**

from about 0.9 to about 3.0. All known organic and inorganic acids can be used if they are water soluble. Suitable organic or inorganic acids in addition to phosphoric acid are for example sulfuric acid, hydrochloric acid, oxalic acid, p-toluenesulfonic acid and the like.

Important for this process variation is, that in step II a salt of phosphoric acid is needed for a complete precipitation of manganase ions.

The oxidation is exothermic and the temperature is maintained at from about 20° to about 100° C. for a time period of 2 to 12 hours.

After the oxidation step I, the reaction mixture is kept at a temperature in the range of from about 65° to about 85° C. The pH of the reaction mixture is from about 0.9 to about 3.0. A base is added in an amount effective to neutralize the aqueous solution, which means to reach a pH of the solution of about 7 to 8.

The base is selected from the group consisting of ammonia, amines, aminoalcohols, metal hydroxides of Groups IA, IIA, IIIA and mixtures thereof.

Suitable amines are $C_1$ to $C_{20}$ amines, including trimethylamine, triethylamine, butylamine, piperidine, hexylamine, dodecylamine and the like. Suitable aminoalcohols are $C_2$ to $C_{20}$ aminoalcohols, including ethanolamine, diethanolamine, triethanolamine and the like. Preferred are trimethylamine, triethylamine and ethanolamine.

Suitable metal hydroxides are sodium hydroxide, potassium hydroxide, lithium hydroxide, calcium hydroxide and aluminum hydroxide. Preferred metal hydroxides are sodium hydroxide and potassium hydroxide.

The bases may be used singly, as a mixture, at once or stepwise. The pH of the reaction mixture after the oxidation step is from about 0.9 to about 3.0. For example, by a first addition of sodium hydroxide the pH is rised to about 2 to 3. Then ammonia is added until a pH of 4 to 5 is reached. At this point, precipitation occurs. Finally, the pH is rised until a pH of 7 to 8 is reached.

The equivalent ratio of the base to the phosphoric acid is from about 1.0 to about 5.0, preferably 1.0 to about 2.0 equivalents base per equivalent phosphoric acid.

The precipitate is an insoluble solid of the formula

$Mn_a(X)_b(PO_4)_c$ where

x is hydrogen, a metal cation of Groups IA, IIA, IIIA, a protonated ammonia or protonated amine or mixtures thereof and
a=1, 2 or 3;
b=1 or 2;
c=1, 2 or 3.
Examples of precipitates are $MnNH_4PO_4$ $MnNa_2PO_4$, $MnKPO_4$, $Mn(HOC_2H_4NH_3)PO_4$, $MnHPO_4$ or mixtures thereof.

In the variation of the process, mentioned in step I, a salt of phosphoric acid is added in step II.

All water soluble salts of phosphoric acid can be used. Suitable salts have the formula

$(X)_b(PO_4)_c$ where

X is hydrogen, a metal cation of Groups IA, IIA or IIIA, a protonated ammonia or protonated amine or mixtures thereof and
b=1, 2 or 3;
c=1 or 2.

**4**

Examples of salts are ammoniumdihydrogenphosphate, ammoniumhydrogenphosphate, ammoniumphosphate, sodiumphosphate, potassiumphosphate, sodiumdihydrogenphosphate, sodiumhydrogenphosphate or mixtures thereof.

If only a part of phosphoric acid is replaced by another acid in step I the molar ratio of the sum of phosphoric acid, used in step I, and the salt of phosphoric acid, used in step II is from about 1.0 to 1.5, preferably 1.0 to 1.15 mol per mol manganase dioxide.

If no phosphoric acid is used in step I, the molar ratio of the salt of the phosphoric acid, used in step II is from about 1.0 to 1.5, preferably 1.0 to 1.15 mol per mol manganese dioxide.

The salt of the phosphoric acid can be added in step II before, during, after or together with the addition of the base. Preferred is the addition of the salt before the addition of the base.

The addition of the base is basically the same as it is described in the principal process for step II and is in an amount sufficient to reach a pH of 7 to 8. In addition to the precipitation in step II of the principal process it is possible to precipitate salts of the inorganic or organic acid. For example if sulfuric acid is used in step I, bariumsulfate can be precipitated by adding variumchloride to the solution.

The precipitate is filtered from the aqueous solution of the dye and washed several times with water in step III.

The resulting aqueous solution of the triphenylmethane dye contains no more than 5 ppm, preferably less than 3 ppm manganeous ions. In step IV, the dye can also be isolated from the solution by evaporation of the water in a known manner. The dry triphenylmethane dye contains from about 5 to 15 ppm, preferably about 5 to 10 ppm manganeous ions.

## EXAMPLE 1

In a 250 ml. three-necked, round-bottomed flask, equipped with condenser, overhead mechanical stirrer, and thermowatch system, was placed 28.5 g ethyl-(3-sulfobenzyl) aniline (92.2 mmoles) and 10.0 g 2-sulfobenzaldehyde (46.1 mmoles) and washed in with 69 ml of water. The slurry was heated to 102° C. for 40 hours, and then cooled to 45° C. 14.9 g phosphoric acid (135.0 mmoles) was added followed by 12.0 g manganese dioxide (135.0 mmoles). The reaction was exothermic and the temperature rose to 68° C. The reaction mixture was then heated to 70° C. for 3 hours. The mixture was then transferred into a 400 ml beaker and stirred at 50° C. while 18.35 g aqueous ammonia (29.4% by weight, 138.0 mmoles) was added. During this period the pH rose from 3.50 to 8.46. The solution was stirred only 15 minutes before clarification. The solution was filtered and the filtercake was washed three times with 10.0 g of water to yield 174.5 g of aqueous solution of 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-sulfonate and 15.1 g of salts. The manganese concentration in the solution was 1.0 ppm.

## EXAMPLE 2

In a 1000 ml round bottom flask, equipped as in Example 1, was placed 99.83 g 2-sulfobenzaldehyde (450.4 mmoles), 332.3 g ethyl-(3-sulfobenzyl) aniline (900.8 mmoles) and 255 g water.

The mixture was heated to 102° to 105° C. for 40 hours. 64.61 g phosphoric acid (560.5 mmoles) was added after cooling the reaction mixture to 50° C. This

5,198,558

**5**

was followed by 55.35 g manganese dioxide (572.0 mmoles). The temperature rose due to the exothermic reaction to 74° C. and was held for 4 hours at 70° to 75° C. Finally with the reaction at 1.80, 38.1 g 10 molar sodium hydroxide solution (285.1 mmoles) was added to attain a pH of 2.65; this was followed with 22.0 g 29.4% by weight of aqueous ammonia (379.8 mmoles) to precipitate the manganous ions and give a pH of 4.45. Finally the pH was raised to 7.15 with 7.8 g 10 molar sodium hydroxide solution (58.4 mmoles). The solution was filtered and the filtercake was washed 4 times with 50 ml of water. Received was 867.53 g of aqueous dye containing 3 ppm of manganese. After removing the water 373.3 g 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-sulfonate was obtained with 8 ppm manganese content.

We claim:

1. A process for the preparation of triphenylmethane dyes of the formula:



wherein

$R_1$ and $R_2$ each denote hydrogen, $C_1$–$C_4$ alkyl, benzyl or sulfobenzyl,

$R_3$ and $R_4$ each denote hydrogen, $C_1$–$C_4$ alkyl or sulfonic acid

$R_5$ denotes a phenyl, sulfophenyl, dialkylaminophenyl, $C_1$–$C_4$ alkylphenyl, $C_1$–$C_4$ alkyl-dialkylaminophenyl, halogenophenyl, naphthyl, sulfonaphthyl, disulfonaphthyl, or alkyldisulfonaphthyl

comprising

I. oxidation of the leuco compound of the corresponding triphenylmethane dye with manganese dioxide in the presence of aqueous phosphoric acid at a temperature of about 20° C. to about 100° C.,

II. adding a base selected from the group consisting of ammonia, amines, aminoalcohols, metal hydroxides of Groups IA, IIA, IIIA and mixtures thereof in an amount sufficient to neutralize the aqueous solution,

III. filtration from the precipitate and

IV. isolation of said triphenylmethane dye.

2. A process according to claim 1, wherein said triphenylmethane dyes are 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-sulfonate, 4',4'' bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-methyl-4-dimethylamine.

3. A process according to claim 1, wherein at least one mol phosphoric acid is used per mol manganese dioxide in the oxidation step I.

4. A process according to claim 1, wherein said base is ammonia.

5. A process according to claim 1, wherein said base is an organic amine with 1 to 20 carbon atoms.

6. A process according to claim 1, wherein said base is an aminoalcohol with 2 to 20 carbon atoms.

7. A process according to claim 1, wherein said base is trimethylmaine, triethylamine or ethanolamine.

**6**

8. A process according to claim 1, wherein said metal hydroxide is sodium hydroxide, potassium hydroxide, lithium hydroxide or aluminum hydroxide.

9. A process according to claim 1, wherein said base is a mixture of ammonia and sodium hydroxide.

10. A process according to claim 1, wherein said base is added stepwise.

11. A process according to claim 1, wherein in step II at least two different bases are added stepwise and separately.

12. A process according to claim 1, wherein in step II a metal hydroxide of Groups IA, IIA or IIIA is added until a pH of 2.0 to 3.0 is reached, then ammonia is added until a pH of 4.0 to 5.0 is reached followed by adding said metal hydroxide until a pH of 7.0 to 8.0 is reached.

13. A process according to claim 12, wherein said metal hydroxide is sodium hydroxide or potassium hydroxide.

14. A process according to claim 1, wherein said precipitate is a solid of the formula

$$Mn_a(X)_b(PO_4)_c \text{ where}$$

X is hydrogen, a metal cation of Groups IA, IIA or IIIA, a protonated ammonia or protonated amine or mixtures thereof and

a=1, 2 or 3;

b=1 or 2;

c=1, 2 or 3.

15. A process for the preparation of triphenylmethane dyes of the formula:



wherein

$R_1$ and $R_2$ each denote hydrogen $C_1$–$C_4$ alkyl, benzyl or sulfobenzyl,

$R_3$ and $R_4$ each denote hydrogen, $C_1$–$C_4$ alkyl or sulfonic acid

$R_5$ denotes a phenyl, sulfophenyl, dialkylaminophenyl, $C_1$–$C_4$ alkylphenyl, $C_1$–$C_4$ alkyl-dialkylaminophenyl, halogenophenyl, naphthyl, sulfonaphthyl, disulfonaphthyl, or alkyldisulfonaphthyl

comprising

I. oxidation of the leuco compound of the corresponding triphenylmethane dye with manganese dioxide in the presence of an aqueous organic or inorganic acid in an amount sufficient that the pH is from about 0.9 to about 3.0 at a temperature of about 20° C. to about 100° C.,

II. adding a salt of phosphoric acid and a base selected from the group consisting of ammonia, amines, aminoalcohols, metal hydroxides of Groups IA, IIA, IIIA and mixtures thereof in an amount sufficient to neutralize the aqueous solution,

III. filtration from the precipitate and

IV. isolation of said triphenylmethane dye.

16. A process according to claim 15, wherein said triphenylmethane dyes are 4',4'' bis [N-ethyl-N-sul-

5,198,558

7

fobenzylamino]-triphenylmethane-2-sulfonate, 4′,4″ bis [N-ethyl-N-sulfobenzylamino]-triphenylmethane-2-methyl-4-dimethylamine.

**17.** A process according to claim **15**, wherein said organic or inorganic acid is selected from the group consisting of phosphoric acid, sulfuric acid, hydrochloric acid, oxalic acid, p-toluenesulfonic acid or mixtures thereof.

**18.** A process according to claim **15**, wherein said salt of phosphoric acid is a salt of the formula

$(X)_b(PO_4)_c$ where

    X is hydrogen, a metal cation of Groups IA, IIA or IIIA, a protonated ammonia or protonated amine or mixtures thereof and
    b=1, 2 or 3;
    c=1 or 2.

**19.** A process according to claim **15**, wherein said salt is selected from the group consisting of ammoniumdihydrogenphosphate, ammoniumhydrogenphosphate, ammoniumphosphate, sodium phosphate, potassium phosphate, sodiumdihydrogenphosphate, sodiumhydrogenphosphate or mixtures thereof.

**20.** A process according to claim **15**, wherein at least one mol of the salt of phosphoric acid or if the inorganic acid is completely or partly phosphoric acid one mol of the sum of phosphoric acid and the salt of phosphoric acid is used per mol manganese dioxide.

**21.** A process according to claim **15**, wherein said base is ammonia.

**22.** A process according to claim **15**, wherein said base is an organic amine with 1 to 20 carbon atoms.

**23.** A process according to claim **15**, wherein said base is an aminoalcohol with 2 to 20 carbon atoms.

8

**24.** A process according to claim **15**, wherein said base is trimethylamine, triethylamine or ethanolamine.

**25.** A process according to claim **15**, wherein said metal hydroxide is sodium hydroxide, potassium hydroxide, lithium hydroxide or aluminum hydroxide.

**26.** A process according to claim **15**, wherein said base is a mixture of ammonia and sodium hydroxide.

**27.** A process according to claim **15**, wherein said salt is added before said base.

**28.** A process according to claim **15**, wherein said base is added stepwise.

**29.** A process according to claim **15**, wherein in step II at least two different bases are added stepwise and separately.

**30.** A process according to claim **15**, wherein in step II said salt and a metal hydroxide of Groups IA, IIA or IIIA is added until a pH of 2.0 to 3.0 is reached, then ammonia is added until a pH of 4.0 to 5.0 is reached followed by adding said metal hydroxide until a pH of 7.0 to 8.0 is reached.

**31.** A process according to claim **15**, wherein said metal hydroxide is sodium hydroxide or potassium hydroxide.

**32.** A process according to claim **15**, wherein said precipitate is a solid of the formula

$Mn_a(X)_b(PO_4)_c$ where

    X is hydrogen, a metal cation of Groups IA, IIA or IIIA, a protonated ammonia or protonated amine or mixtures thereof and
    a=1, 2 or 3;
    b=1 or 2;
    c=1, 2 or 3.

* * * * *

AURO_ISO 0018467

# EXHIBIT 14

US 20060224003A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2006/0224003 A1**
KULKARNI et al. (43) **Pub. Date:** **Oct. 5, 2006**

(54) **A PROCESS FOR THE PREPARATION OF ISOSULPHAN BLUE**

(76) Inventors: **BALKRISHNA K. KULKARNI**, KHOPOLI (IN); **SANKAR CHINNAKULANDAI**, KHOPOLI (IN); **GIRISH M. KHANDEKAR**, KHOPOLI (IN); **HAWALDAR T. MAURYA**, KHOPOLI (IN); **ASHOK V. ARJUN**, KHOPOLI (IN); **SANDEEP S. SOPE**, KHOPOLI (IN); **SUMIT KAR**, KHOPOLI (IN)

Correspondence Address:
**LUCAS & MERCANTI, LLP**
**475 PARK AVENUE SOUTH**
**15TH FLOOR**
**NEW YORK, NY 10016 (US)**

(21) Appl. No.: **11/278,641**

(22) Filed: **Apr. 4, 2006**

(30) **Foreign Application Priority Data**

Apr. 4, 2005 (IN).................................. 420/MUM/2005

**Publication Classification**

(51) Int. Cl.
*C09B  11/10* (2006.01)

(52) U.S. Cl. ........................................................... **552/111**

(57) **ABSTRACT**

A process for the preparation of Isosulphan Blue is disclosed. The process comprises the following steps: Sulphonating orthochlorobenzaldehyde, treatment with sodium sulphite, basification, condensation and oxidation to obtain Isosulphan Blue.

AURO_ISO 0018540

US 2006/0224003 A1                                                Oct. 5, 2006

1

## A PROCESS FOR THE PREPARATION OF ISOSULPHAN BLUE

### FIELD OF INVENTION

[0001] This invention relates to an improved process for the manufacturing of Isosulphan Blue, which avoids usage of stronger oxidizing agent for the oxidation reaction.

[0002] More particularly, this method relates to a process for manufacturing Isosulphan Blue from orthochlorobenzaldehyde.

### DEFINITIONS

[0003] "Lower alkanols" means respective alcohols of lower alkanes containing 1 to 4 carbon atoms, such as Methyl alcohol, Ethyl alcohol, Propyl alcohol, Butyl alcohol.

[0004] "Sulphonation" means addition of sulphonic acid group to the compound by reacting it with a sulphonating agent like sulfuric acid, oleum.

[0005] "Condensation" means a chemical reaction in which two molecules or moieties react and become covalently bonded to one another by the concurrent loss of a small molecule.

[0006] "TLC" means Thin layer chromatography.

[0007] "HPLC" means High Performance Liquid Chromatography.

### BACKGROUND

[0008] 1. Introduction

[0009] Isosulphan Blue is a reagent used in diagnostic kits for detecting cancer cells.

[0010] Isosulphan Blue (Molecular formula: $C_{27}H_{31}N_2NaO_6S_2$) is also known as sodium salt of N-[4-[4-(diethylamino)phenyl](2,5-disulfophenyl)methylene]2,5-cyclohexadien-1-ylidene]-N-ethyl-ethanaminium hydroxide.

Chemical Structure:



Isosulphan Blue

[0011] 2. Prior Art

[0012] Isosulphan Blue has been manufactured by using 4-formyl benzene-1,3-disulphonic acid and Diethylaniline followed by oxidation with lead oxide or potassium dichromate as an oxidizing agent.

[0013] U.S. Pat. No. 1,531,507 has disclosed a scheme in which the intermediate 4-formyl benzene-1,3-disulphonic acid sodium salt is prepared by sulphonation of orthochlorobenzaldehyde using oleum 26% and oleum 65% followed by reaction with sodium sulphite.

[0014] The process disclosed in the above mentioned patent is shown in scheme I below:



Scheme.I

2

-continued



ISOSULFAN BLUE

$$\xrightarrow[\text{H}_2\text{SO}_4]{\text{K}_2\text{Cr}_2\text{O}_7}$$



IV

[0015]   However, oxidising agents like lead oxide or potassium dichromate lead to over oxidized products.

[0016]   Furthermore, traces of lead remaining in the final compound can produce toxic effects (lead poisoning) in the recipients.

[0017]   This is a significant limitation of the prior art manufacturing process mentioned above.

### SUMMARY OF THE INVENTION

[0018]   The present invention provides for an improved process for the preparation of Isosulphan Blue, wherein the drawbacks of the prior art processes mentioned hereinabove are overcome by use of suitable reagents.

[0019]   In accordance with this invention, there is envisaged a process which does not use potentially carcinogenic or toxic agents for the oxidation reaction.

[0020]   In accordance with another aspect of this invention, there is provided a process for the manufacture of Isosulphan Blue using a mild oxidising agent and thereby preventing over oxidation of the substrates.

[0021]   According to this invention, there is provided a process for the preparation of Isosulphan Blue, said process comprising the following steps:

[0022]   (a) sulphonating orthochlorobenzaldehyde with a sulphonating agent to obtain 4-chloro-3-formyl sulphonic acid.

[0023]   (b) treating 4-chloro-3-formyl sulphonic acid with sodium sulphite and subsequent basification to obtain 1-formyl benzene-2,5-sulphonic acid disodium salt.

[0024]   (c) condensation of 1-formyl benzene-2,5-sulphonic acid disodium salt with N,N-diethylaniline using Hydrchloric acid to obtain a 4-[Bis[4-(diethylamino)phenyl]methyl]benzene-2,5-disulphonic acid disodium salt.

[0025]   (d) oxidation of 4-[Bis[4-(diethylamino)phenyl]methyl]benzene-2,5-disulphonic acid with an oxidizing agent, using an acid and a solvent, to obtain Isosulphan Blue.

[0026]   Typically, oleum in the concentration range of 20% to 70% are used to obtain 4-chloro-3-formyl sulphonic acid.

[0027]   Typically, condensation is carried out at a temperature range of 80-110° C.

[0028]   Typically, condensation is carried out for 6 to 20 hours.

[0029]   Typically, 4-[Bis[4-(diethylamino)phenyl]methyl]benzene 2,5 disulphonic acid disodium salt is isolated at a pH range of 9 to 13.

[0030]   Typically, Ammonium dichromate is used as the oxidizing agent.

[0031]   Typically, the solvent is selected from a group of solvents consisting of loweralkanols of $C_{(1-4)}$.

[0032]   Typically, an acid is aqueous sulphuric acid in the concentration range of 20 to 60%.

### DETAILED DESCRIPTION

Synthetic Reaction Parameters

[0033]   For Step (c):

[0034]   This step is carried out at temperatures ranging from 45 to 110° C., preferably 80-110°, more preferably 100-110° C. for the time ranging from 6 to 20 hours, preferably 10 to 14 hours, more preferably 12 hours.

[0035]   The crude product is crystallized in ethanol, preferably 95% ethanol. For isolation the product pH is maintained at 9 to 13, preferably 11.5 to 12

[0036]   For step (d)

[0037]   Oxidation of the intermediate compound to Isosulphan Blue is achieved by oxidation using ammonium dichromate and sulphuric acid at temperature ranging from 0 to 50° C., preferably 0 to 5° C.

[0038]   Solvents that can be used in step (d) are $C_{(1-4)}$ alkanols preferably methanol and ethanol, most preferably methanol.

[0039]   The concentration of sulphuric acid is in the range of 20 to 60%, preferably 40%.

[0040]   The pH of the alcohol solution is adjusted to 7 to 12 preferably 8 to 9. Maintenance for pH adjustment is carried out for 8 to 16 hours, preferably 10-14 hours, most preferably 12 hours.

Details of the Processes

[0041]   This invention provides a process for manufacturing Isosulphan Blue starting from orthochlorobenzaldehyde by the following steps as shown in Scheme-II

Scheme-II



[0042] Step (a) sulphonating orthochlorobenzaldehyde with a sulphonating agent to obtain 4-chloro-3-formyl sulphonic acid.

[0043] In this step, sulphonation of orthochlorobenzaldehyde is carried out with a sulphonating agent. Typically oleum 23% and oleum 65% are used to obtain 4-chloro-3-formyl sulphonic acid.

[0044] Step (b) treating 4-chloro-3-formyl sulphonic acid with sodium sulphite and subsequent basification thereof to obtain 1-formyl benzene-2,5-sulphonic acid disodium salt.

[0045] In this step, sodium salt of 4-chloro-3-formyl sulphonic acid is further reacted with sodium sulphite followed by basification (alkalination) resulting in the formation of disodium salt of 2,5-disulphonic benzaldehyde.

[0046] Step (c) condensation of 1-formyl benzene-2,5-sulphonic acid disodium salt with N,N-diethylaniline using Hydrchloric acid. 2,5-disulphonic benzaldehyde disodium salt is condensed with diethyl aniline in the presence of hydrochloric acid to obtain, 4-[Bis[4-(diethylamino)phenyl] methyl]benzene-2,5-disulphonic acid disodium salt as an intermediate compound.

[0047] This step is typically carried out at a temperature range of 80-110° C. for 6 to 20 hours.

[0048] Step (d) Oxidation of the intermediate compound with a mild oxidizing agent

[0049] The intermediate compound obtained in step (c) is oxidized with a mild oxidising agent and with aqueous sulphuric acid with concentration in the range of 20 to 60% to obtain Isosulphan Blue.

[0050] Typically ammonium dichromate is used as a mild oxidizing agent.

[0051] Typically the solvent is selected from a group of solvents consisting of alkanols of $C_{(1-4)}$ like methanol.

[0052] The following specific examples are presented to illustrate the preferred mode of carrying out the process of the present invention. The examples are not limited to the particular embodiments illustrated herein but include the permutations, which are obvious as set forth in the forgoing description.

EXAMPLES

Preparation of
2-Chloro-1-formylbenzene-5-sulphonic acid (II)

[0053] 2-chlorobenzaldehyde 500 g (3.35 moles) was added to 23% oleum 1050 g (1.35 moles), and the contents were cooled to 0 to 5° C. The reaction mixture was stirred for 2.5 hours between 0-15° C. To this stirred solution, 660 g of 65% oleum (2.41 moles) was added over a period of 2.5 hours, maintaining the temperature below 15° C. The reaction mass was stirred and allowed to come to a temperature of 25-30° C.

4

[0054] The reaction mass was then heated to 80-85° C. and was maintained at that temperature for 3 hours.

[0055] The reaction was monitored by HPLC. After completion of the reaction, the mass was quenched with 1500 gms of cold water over a period of two hours, maintaining the temperature below 40° C. It was further cooled to 20-25° C. At this temperature, finely powdered sodium chloride (1200 gms) was added under stirring.

[0056] The reaction mass was further cooled to 0-5° C. and was stirred for three hours. The precipitated product was filtered and dried to give 1900 gms of the product including inorganics.

Preparation of 1-formyl benzene-2,5-sulphonic acid disodium salt (III)

[0057] 1900 gms of 2-chloro-1-formyl-benzene-5-sulphonic acid (along with inorganics) was added to 4200 gms of water and was stirred for 30 minutes at 25-30° C. till complete dissolution of the material. pH of the solution was adjusted to 6.5 to 7.5 with 40% sodium hydroxide solution (~6.25 moles) keeping the temperature below 45° C.

[0058] The clear solution was cooled to 30° C. and sodium sulphite powder 440 g (3.49 moles) was added followed by addition of water (640 g).

[0059] The reaction mass pH was between 11.5 to 12.5.

[0060] The reaction temperature was increased to 100-105° C. This temperature was maintained for 12 hours. The reaction completion was monitored by HPLC.

[0061] After the completion of the reaction, water was distilled out from the reaction mass at 500-600 mm vacuum maintaining the temperature below 85° C. The thick residual mass was cooled to 25-30° C. and this was taken as such for the next step.

Preparation of 4-[Bis[4-(diethylamino)phenyl]methyl]benzene-2,5-disulphonic acid disodium salt (IV)

[0062] A mixture of 1-formyl benzene-2,5-sulphonic acid disodium salt from the above reaction and N,N-diethylaniline 1696 g (11.38 moles) were stirred at 30° C. to form a uniform slurry.

[0063] To this concentrated hydrochloric acid 530 gms (5.06 moles) was added below 45° C.

[0064] The content was refluxed for twelve hours. The reaction was monitored by HPLC.

[0065] When the assay reached more than 60%, reaction mass was cooled to 30° C., filtered in vacuum and suction dried, the residue was washed with 500 gms of water thrice and suction dried for one hour. Wet cake thus obtained, was further washed with 250 ml of methanol to give 540 gms of crude product.

[0066] To the crude product, 95% ethanol (1500 ml) was added and stirred for 30 minutes, pH of the mass was adjusted to 11.5 to 12 with concentrated sodium hydroxide solution (250 gms of sodium hydroxide in 305 ml of water). Stirring was continued for 30 minutes and pH was checked again. pH was maintained at 11.5-12.

[0067] The precipitated salt was filtered, washed with 200 ml of 95% ethanol. The filtrate was concentrated under vacuum (150 mm of Hg) till dryness.

[0068] Hexane (500 ml) was added to the cooled residue and was stirred for 1 hour. The product was filtered and dried in vacuum oven at 60-70° C. to yield 500 gms of product.

(N-4-[4-(Diethylamino)phenyl]2,5-disulphophenyl)methylene]2,5-cyclohexadien-1)ylidene]-N-ethylethanaminium inner salt sodium salt

[0069] 500 gms (0.847 moles) of N-4-[4-Diethylamino]phenyl]2,5-disulphonic acid disodium salt was dissolved in 1000 ml of methanol.

[0070] The solution was cooled to 0-5° C. under stirring. Ammonium dichromate salt 82.6 g (0.327 moles) was added in five equal lots. To the reaction mass, 40% sulphuric acid (1060 ml) was added drop wise at 0 to 5° C. over a period of 45 minutes. The reaction mixture was then stirred at 0 to 5° C. for 2 hours.

[0071] Reaction was monitored by TLC. After completion of the reaction, reaction mass was filtered through Buchner funnel to remove the inorganics.

[0072] The residue was washed with 200 ml of methanol. Filtrates were mixed and sodium carbonate 625 g (5.89 moles) was added to adjust the pH. Stirring was continued for 12 hours more, to get pH between 8 to 9. The inorganics were filtered and the wet cake was washed with 1000 ml of methanol. The filtrate was concentrated under vacuum below 50° C. to get 400 g of Isosulphan Blue (83%).

[0073] Isosulphan Blue is also used as a contrast agent to identify lymphatic vessels in high retroperitoneal ligation of adolescent varicocele and for detecting post operative lymphatic vessel leaks. It is an adjunct to lymphography (in primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; for visualization of the lymphatic system draining the region of injection).

[0074] It is a very safe dye though some cases of anaphylactic shock following administration of Isosulphan Blue have been reported. It does interfere with the estrogen-receptor protein (ERP) binding capacity assay, when used in localization of occult breast cancer unlike methylene blue.

[0075] While considerable emphasis has been placed herein on the specific steps of the preferred process, it will be appreciated that many steps can be made and that many changes can be made in the preferred steps without departing from the principles of the invention. These and other changes in the preferred steps of the invention will be apparent to those skilled in the art from the disclosure herein, whereby it is to be distinctly understood that the foregoing descriptive matter is to be interpreted merely as illustrative of the invention and not as a limitation.

**1.** A process for the preparation of Isosulphan Blue, said process comprising the following steps:

(a) sulphonating orthochlorobenzaldehyde with a sulphonating agent to obtain 4-chloro-3-formyl sulphonic acid;

(b) treating 4-chloro-3-formyl sulphonic acid with sodium sulphite and subsequent basification thereof to obtain 1-formyl benzene-2,5-sulphonic acid disodium salt;

(c) condensation of 1-formyl benzene-2,5-sulphonic acid disodium salt with N,N-diethylaniline using Hydrchloric acid to obtain a 4-[Bis[4-(diethylamino)phenyl]methyl]benzene-2,5-disulphonic acid disodium salt;

(d) oxidation of 4-[Bis[4-(diethylamino)phenyl]methyl]benzene-2,5-disulphonic acid with an oxidizing agent, using an acid and a solvent, to obtain Isosulphan Blue.

**2**. A process as claimed in claim 1, wherein a sulfonating agent is oleum in the concentration range of 20 to 70%.

**3**. A process as claimed in claim 1, wherein condensation is carried out at temperature in the range of 80-110° C.

**4**. A process as claimed in claim 1, wherein condensation is carried out for 6 to 20 hours.

**5**. A process as claimed in claim 1, wherein 4-[Bis[4-(diethylamino)phenyl]methyl]benzene-2,5-disulphonic acid disodium salt is isolated at a pH range of 9 to 13.

**6**. A process as claimed in claim 1, wherein the oxidizing agent is Ammonium dichromate.

**7**. A process as claimed in claim 1, wherein the solvent is selected from a group of solvents consisting of loweralkanols of $C_{(1-4)}$.

**8**. A process as claimed in claim 1, wherein the acid is aqueous sulphuric acid in the concentration range of 20 to 60%.

* * * * *

AURO_ISO 0018545

# EXHIBIT 15

Am J Hosp Pharm 32:928–930 (Sep) 1975

# Quality control and drug analysis

edited by
Jayant A. Patel, M.S., Pharm.D.

## Chemical Structure and Purity of Dyes Used in Lymphograms

**Paul K. Hiranaka, Larry M. Kleinman, Edward A. Sokoloski and Henry M. Fales**

Because of confusion in the literature, studies were performed on several samples of patent blue violet and Alphazurine 2G to determine their chemical structure and purity.

Nuclear magnetic resonance studies revealed that three distinct compounds and one mixture had all been labeled as the same compound. The purity of the dyes varied from batch to batch, as shown by thin-layer chromatography. Caution should be exercised in the use of these dyes for lymphograms.

Key words: Chromatography, thin-layer; Dyes; Nomenclature; Patent blue; Purity; Spectrometry, nuclear magnetic resonance; Structure

During 1973, Direct Sky Blue Injection, the only product approved by the Food and Drug Administration for vital staining of regional lymphatics, was withdrawn from commercial sale by its manufacturer, Wyeth Laboratories. As this product had been used at the National Institutes of Health by the Clinical Center's Diagnostic Radiology Department to perform dorsal pedal lymphograms, the Pharmaceutical Development Service was requested to find a suitable replacement.

Patent blue violet and Alphazurine 2G[1,2] had been mentioned as possible alternatives to Direct Sky Blue. The names[a] of the former two dyes are commonly used synonomously; however, two different structures are list-



*Figure 1. Structures of dyes used in lymphograms*

A.  C.I. Acid Blue 1 (C.I. 42045)      $R_1 = SO_3Na, R_2 = H, R_3 = C_2H_5$

B.  Alphazurine 2G®                    $R_1 = H, R_2 = SO_3Na, R_3 = C_2H_5$

C.  C.I. Acid Blue 3 (C.I. 42051)      $R_1 = SO_3Ca/2, R_2 = OH, R_3 = C_2H_5$

D.  FD & C Blue # 1 (C.I. 42090)       $R_1 = H, R_2 = H, R_3 = CH_2$⬡$SO_3Na$

ed by the *Colour Index* (C.I.)[3] under the name "patent blue violet," i.e., C.I. 42045 (Figure 1, A) and C.I. 42051 (Figure 1, C). *Chemical Abstracts*[4] lists Alphazurine 2G as structure C.I. 42045. Alphazurine 2G, however, is a registered trademark of the National Aniline Division of the Allied Chemical Corporation,[b] which lists yet another structure (Figure 1, B) for their product.[5]

This confusion in names made it imperative to find an analytical method providing precise structural information. Nuclear magnetic resonance (NMR) was an obvious choice, but we were unable to find many literature references to its use in this field.[c]

Spectra were recorded for a lot of Alphazurine 2G from

**Paul K. Hiranaka,** B.S., is Assistant Chief, Pharmaceutical Development Service, Pharmacy Department, Clinical Center, National Institutes of Health, Bethesda, Maryland 20014. **Larry M. Kleinman,** M.S., was formerly Supervisor, Pharmaceutical Development Service, and is now Staff Pharmacist, Clinical Drug Distribution Section, Drug Development Branch, Drug Research and Development, Division of Cancer Treatment, National Cancer Institute. **Edward A. Sokoloski,** B.S., is Chemist, Laboratory of Chemistry, National Heart and Lung Institute, National Institutes of Health. **Henry M. Fales,** Ph.D., is Chief, Laboratory of Chemistry, National Heart and Lung Institute, National Institutes of Health.

Editor's Note: A related article, Evaluation of Preparations of Patent Blue (Alphazurine 2G) Dye for Parenteral Use, by Newton et al, is also published in this issue.

[a] The authors feel that to reliably designate the structure of any of the older dyes, reliance should be placed exclusively on the Colour Index (C.I.) number.

Copyright © 1975, American Society of Hospital Pharmacists, Inc. All rights reserved.

[b] National Aniline Division, Allied Chemical Corporation, New York, New York.
[c] NMR has been recommended recently for the identification of certifiable food colors (MarmionDM: *J Assoc Off Anal Chem* 57: 495, 1974). The author does not present detailed resonance assignments but the potential of the method is well demonstrated. Their spectrum of FD&C Blue #1 is essentially identical with ours. *Chemical Abstracts* lists only one other reference to the use of NMR under the title "dyes": Ghagwanth MRR, Manjrekar TG, Ramarad AV et al: Physicochemical aspects interaction dyes solution fibre systems, Proc Symp 1969, p 22–31. (Unfortunately this reference was not availabe to us.)

National Aniline as well as several samples from other chemical suppliers that were variously labeled "Alphazurine 2G," "Patent Blue Violet" and "FD&C Blue #1" (another triphenylmethane dye mentioned as an alternative to Direct Sky Blue). In addition, the dyes were examined with thin-layer chromatography (TLC) to check their identity and purity.

## Experimental

NMR spectra were obtained at 100 MHz on a Varian XL-100-15[d] spectrometer equipped for Fourier transform with the Digilab 410H[e] pulser and associated electronics using the Data General Nova 4K[e] computer system. Solubility limitations required sample concentrations between 0.25-0.5 mg/ml in methanol-$d_4$ ($CD_3OD$). Between 400 and 1000 50° transients (35 $\mu$sec pulse) were accumulated using 8K data points and 2-second recycle time.

Thin-layer chromatography was carried out using 20 cm × 20 cm Analtech Uniplates[f] which had been precoated with a 250-$\mu$m layer of Silica Gel GF. Two microliters of an aqueous solution (5 $\mu$g/ml) of each dye were placed on the plate and the plate developed in a solvent system consisting of N-butanol: acetic acid:water (4:1:5-top layer).

## Nuclear Magnetic Resonance Results

*All Compounds.* All compounds had resonances in the aliphatic region from the -$N$-$CH_2CH_3$ fragment, shifted downfield by the immonium character of the nitrogen (Figure 1). In addition, compound D had a singlet at $\delta4.92$ for the benzylic protons shifted downfield from an ordinary benzylic methylene by the partial positive charge on the nitrogen and the *para* sulfonic acid grouping (compare the methylene group of benzylamine hydrochloride: $\delta4.27$).

*Compound A.* In addition to the aliphatic resonance two aromatic patterns are discernible. One could be described as an AA'BB' arising from a *para* substituted phenyl; the second was confirmed as an ABX by decoupling experiments. The proton $H_x$ displayed only *meta*- and *para*-coupling and was shifted considerably downfield from normal benzene ($\delta7.26$). The spectrum of m-benzenedisulfonic acid disodium salt[g] contains a two proton *ortho-meta* coupled resonance ($\delta7.90 \pm 0.02$ ppm), single *ortho*-coupled proton ($\delta7.50 \pm 0.02$ ppm) and a one proton downfield resonance ($\delta8.36 \pm 0.02$ ppm) having only *meta*-coupling, assignable to the proton flanked by sulfonic acid groups. Proton $H_x$ in compound A is reasonably assigned to a similar relationship dictating a 2,4-disulfonic acid substitution pattern.

*Compound B.* The spectra differed from that of compound A by having the proton with *meta*- and *para*-coupling ($H_x$) shifted by 1.11 ppm to higher field. Either 2,5- or 3,4-sulfonic acid substitution would remove this proton from the *ortho*-influence of one of the sulfonic acid groups to account for the upfield shift. The combination of the chemical shifts of the other protons and the remaining 0.3 ppm downfield shift of $H_x$ strongly suggested a 2,5-arrangement, in agreement with the structure given by National Aniline.

*Compound C.* This material gives the AA'BB' spectral pattern (rings $A_1A_2$) and only two other single proton aromatic resonances, one of which is shifted to abnormally high field consistent with a phenolic ring system.[6] The lack of visible coupling dictates a *para*-proton arrangement and the low field position of $H_B$ is reminiscent of $H_x$ in compound A, allowing assignment as a 2,4-disulfonic acid 5-hydroxy system to ring B. The correct name for this compound is C.I. acid blue 3.

*Compound D.* The NMR spectra of this material were too complex in the aromatic region to be readily analyzed. If, in fact, Figure 1 is the correct structure, the complexity should be expected. The $\delta4.92$ resonance might be assigned to the benzylic methylene. Work is continuing on this compound.

### Thin-layer Chromatography Results

The thin-layer chromatography studies were carried out on nine samples of the triphenylmethane dyes. The TLC data showed that all four of the samples labeled as Alphazurine 2G were impure and that only two of the nine were chromatographically pure, namely patent blue VF Ex. Conc.[h] and the same compound labeled as Erio Glaucine Supra.[i] The results of both the NMR and TLC studies are summarized in Table 1.

### Discussion and Conclusion

Several idiosyncratic reactions have been reported with the use of Alphazurine 2G.[7–9] Kinmouth[2] states, "The discrepancies in the incidence (of side effects) in different series were explicable by the use of patent blue from different manufacturers." Possible explanations for these reactions could be the presence of impurities in the product used or the use of different dyes.

It was found that three different compounds and one mixture were available, all labeled as "patent blue violet." In one case, two identically labeled samples, one in powder form and one in solution, were in fact different compounds. It has also been observed that the purity of these dyes may vary from batch to batch. Radiologists should be aware that literature involving the use of "patent blue violet" may refer to any of the above preparations, and in the absence of analytical controls, it is obvious that caution should be exercised in the use of these dyes.

[d] Varian Associates, Palo Alto, California.
[e] Digilab Corporation, Cambridge, Massachusetts.
[f] Analtech, Inc., Newark, Delaware.
[g] Aldrich Chemical Co, Cedar Knolls, New Jersey.

[h] GAF Corporation, Chemical Division, New York, New York.
[i] Ciba-Geigy Dyestuffs and Chemicals Division, Ciba-Geigy Corporation, Ardsley, New York.

Appx841    AURO_ISO 0018547

Table 1. Summary of NMR and TLC Data

| STRUC-TURE (from Figure 1) | SUPPLIER | AS LABELED | CHROMATOGRAPHY | NMR DATA | |
|---|---|---|---|---|---|
| | | | | ALIPHATIC REGION | AROMATIC REGION |
| A | GAF Corporation | Patent Blue VF Ex. Conc. | 1 spot Rf 0.30 | δ 1.28 (T) 6H<br>δ 3.66 (Q) 4H | δ 6.95, 4H]<br>δ 7.46, 4H] AA'BB' |
| A | Ciba-Geigy Corp. | Erio Glaucine Supra | 1 spot Rf 0.30 | | $H_A$ δ 7.26 (D of D)<br>J 7.5, 0.5 |
| A | Matheson Coleman and Bell | Patent Blue (C.I. 42045) | 2 spots, major spot Rf 0.30, minor spot Rf 0.42 is trace impurity | | $H_B$ δ 8.05 (D of D)<br>J 7.5, 1.5<br>$H_X$ δ 8.70 (D of D)<br>J 1.5, 0.5 |
| B | National Aniline Division, Allied Chemical Corp. | Alphazurine 2G (Patent Blue V) C.I. 42045 | 2 spots, major spot Rf 0.34, minor spot Rf 0.22 is trace impurity, tails from origin | δ 1.28 (T) 6H<br>δ 3.67 (Q) 4H | δ 6.92, 4H]<br>δ 7.44, 4H] AA'BB'<br>$H_X$ δ 7.59 (D of D)<br>J 1.5, 0.5<br>$H_A$ δ 8.09 (D of D)<br>J 7.5, 1.5 |
| B | Sigma Chemical Co. | Patent Blue Violet (α-Zurine 2G) 11% Sterile Solution | 4-5 spots, major spot Rf 0.34, tails from origin | | $H_B$ δ 8.23 (D of D)<br>J 7.5, 0.5 |
| C | Sigma Chemical Co. | Patent Blue Violet (α-Zurine 2G) | 2 spots, major spot Rf 0.32 minor spot Rf 0.22 is trace impurity, tails from origin | δ 1.28 (T)<br>δ 3.66 (Q) | δ 6.92, 4H<br>δ 7.45, 4H<br>$H_A$ δ 6.59 (S)<br>$H_B$ δ 8.49 (S) |
| B & D | K&K Laboratories | Alphazurine 2G (Patent Blue V) | 3-4 spots, major spots Rf 0.20, 0.34, tails from origin, 4:1 mixture of B & D (NMR) | δ 1.29 (T) 6H<br>δ 3.67 (Q) 4H<br>δ 4.95 (S) ≅1H | δ 6.94, 4H]<br>δ 7.44, 4H] AA'BB'<br>$H_X$ δ 7.56 (D of D)<br>J 1.5<br>J 7.5, 1.5<br>δ 8.06 (D of D)<br>$H_B$ δ 8.22 (D)<br>J 7.5 |
| D | Bates Chemical Co. | FD&C Blue #1 | 4-5 spots, major spot Rf 0.20, tails from origin | δ 1.31 (T) 6H<br>δ 3.75 (Q) 4H<br>δ 4.92 (S) 4H | δ 6.98 – 7.9 (>36 lines)<br>δ 8.1 – 8.2 (5 lines) |
| D | Hilton-Davis Co. | FD&C Blue #1 | 4-5 spots, major spot Rf 0.20, tails from origin | | |

### References

1. Fuchs WA, Davidson JW and Fischer HW: Lymphography in cancer, Springer, Berlin, 1969, p 20.

2. Kinmouth J: The lymphatics, diseases, lymphography and surgery, Edward Arnold Ltd, London, 1972, p 1–19.

3. Anon: Colour index, second edition, volume 4, The American Association of Textile Chemists and Colorists, Lowell, Massachusetts, 1958, p 4124 and p 4390.

4. Anon: Chemical abstracts, seventh collective index, The American Chemical Society, Columbus, Ohio, 1969, p 6013S and 1153S.

5. Personal communication from Allied Chemical Corporation, New York, New York.

6. Brown JM: Proton magnetic resonance spectra of phenoxide ions, *Tetr Let 32*:2215 (Aug) 1964.

7. Hepp S and Dollinger M: Anaphylactic death after administration of triphenylmethane dye to determine burn depth, *N Eng J Med 272*:1281 (Jun 17) 1965.

8. Kopp WL: Anaphylaxis from Alphazurine 2G during lymphography, *J Am Med Assoc 198*:668 (Nov 7) 1966.

9. Personal communication from Irwin S. Johnsrude, M.D., Department of Radiology, Duke University Medical Center, Durham, North Carolina.

The analytical methods described in this column are for the assay of products in hospital pharmacies. Also, from time to time, we shall include analytical procedures for drugs in biological fluids to point out new avenues for pharmacy service in hospitals.

We invite contributions on "methods of choice" from laboratories engaged in drug analysis.

Address all communication to:

Jayant A. Patel, M.S., Pharm. D.
Drug Analysis Laboratory, Room W3540
University of Michigan Medical Center
Ann Arbor, Michigan 48104

# EXHIBIT 16

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

1061

# Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation

Jerry I. Hirsch[1]
Jaime Tisnado
Shao-Ru Cho
Michael C. Beachley

Use of vital dyes for identification of lymphatic vessels before cannulation has heretofore not been approved by the Food and Drug Administration (FDA). The suitability of isosulfan blue, the 2,5 disulfonic acid isomer of Patent Blue, for this purpose was evaluated experimentally in the rat and clinically in 11 volunteers and 543 patients under an investigational new drug application. FDA approval for this drug has been obtained. Volunteers and patients received up to 15 mg of a 1% sterile, pyrogen-free solution per extremity (total dose of 0.4 mg/kg in the average patient). Excellent identification of lymphatic vessels was achieved in 100% of volunteers and in 97.4% of patients. In the other 2.6%, lymphatic vessels were not identified mainly due to congenital lymphatic vascular (Milroy) disease. Baseline blood chemistry in volunteers was not altered after administration of the dye. No adverse reactions were found in volunteers and minimal allergic reactions occurred in less than 1% of patients. Acute toxicity studies demonstrated an $LD_{50}$ greater than 150 mg/kg in the rat. Isosulfan blue was excreted unchanged in the urine (7%) and feces. Comparable excretion was found in volunteers. Isosulfan blue is a safe and efficacious vital dye for lymphangiography.

Lymphangiography remains a very useful diagnostic procedure [1–3]. We estimate that the number of lymphangiograms performed in the United States exceeds 30,000 per year.

Although some authors have performed lymphangiography without the aid of blue dyes [4], lymphatic cannulation, as usually performed in the United States since the early 1960s, requires the subcutaneous or intradermal administration of a vital blue dye into the interdigital web spaces of the extremity to be studied. Selective absorption of the dye by the lymphatics facilitates their identification.

It is widely known that dye materials unapproved by the Food and Drug Administration (FDA) are used for lymphangiography in clinical centers throughout the United States. Although no major problems have been reported, their clinical use may result in risk to the patient or liability to the radiologist.

We present our experimental and clinical experience with isosulfan blue* (adopted by the United States Adopted Name Council, June 13, 1979), a drug recently approved by the FDA for identifying the lymphatics during lymphangiography.

## Materials and Methods

### Preparation

Isosulfan blue is the monosodium salt of a 2,5 disulfonated triphenylmethane dye (fig. 1). The compound was prepared in high purity of 94.5% dye content of the 2,5 isomer as determined by high-pressure liquid chromatography. The remaining 5.5% consists of

Received May 24, 1982; accepted after revision August 23, 1982.

Presented at the annual meeting of the American Roentgen Ray Society, New Orleans, May 1982.

[1] All authors: Department of Radiology, Virginia Commonwealth University, Medical College of Virginia, Box 1, MCV Station, Richmond, VA 23298. Address reprint requests to J. I. Hirsch.

AJR 139:1061–1064, December 1982
0361–803X/82/1396–1061 $00.00
© American Roentgen Ray Society

* Commercial availability of isosulfan blue dosage form is tentatively scheduled for the autumn of 1982. For further information please contact author J. I. Hirsch.

AURO_ISO 0018549

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

HIRSCH ET AL.

Fig. 1.—Structural formula of isosulfan blue.

C.I. No. 42051
C.I. FOOD BLUE 5
C.I. ACID BLUE 3
PATENT BLUE V

C.I. No. 42045
C.I. FOOD BLUE 3
C.I. ACID BLUE 1
PATENT BLUE VF
SULFAN BLUE

ALPHAZURINE - 2G®

Fig. 2.—Structural formulae of Alphazurine 2G, Patent VF, and Patent Blue V with synonyms.

closely related isomers produced during synthesis.

Isosulfan blue injection was prepared as a 1% solution. Phosphate buffer in sterile pyrogen-free water was used as diluent in sufficient quantity to yield a final pH of 6.8–7.5. The solution was subdivided into 5 ml single-dose vials, sterilized, and quality control performed.

*Phase I Preclinical Trials*

*Acute Toxicity.* A 14 day acute toxicity study was performed in both genders of Sprague-Dawley rats. Rats were 5–6 weeks old on arrival, quarantined for 1 week, and allowed to grow to at least 200 g for females and 250 g for males. Ten animals of each gender were injected intravenously with the contents of one vial (5 ml) of isosulfan blue injection (1%) via the lateral tail vein. Three rats of each gender received an equivalent amount of diluent but no dye.

Mortality and gross signs of toxicity were evaluated twice daily. Body weights were determined before drug administration and again before necropsy on the final day of study. Animal behavior responses were monitored over the first 8 hr after administration of the drug and then daily.

All animals were sacrificed on day 14 of the study and gross necropsy was performed. Tissues were removed and fixed in 10% neutral buffered formalin. The tissues were sectioned at 6 $\mu$m and stained with hematoxylin and eosin.

*Pharmacology.* Three rats of each gender were studied for urinary excretion of the drug. Animals were injected subcutaneously with 0.5 ml isosulfan blue injection (1%) and housed separately in metabolic cages. Urine samples were collected daily for 3 days and evaluated spectrophotometrically for dye content. Determination of metabolites in urine was done by thin-layer chromatography. A 2 $\mu$l sample of urine was spotted on 250 $\mu$m silica gel plate, allowed to dry, and eluted with acetone:ammonium hydroxide:1-butanol:water (37:19:37:7).

*Phase II Clinical Trials*

Clinical trials were conducted in 11 volunteer subjects. Six men and five women aged 22–32 years were studied. No pregnant or

lactating women or individuals with known hypersensitivity to triphenylmethane compounds were administered the drug. Permission from the Committee for the Conduct of Human Research at the Medical College of Virginia was obtained.

Volunteers received 30 mg (3 ml) of isosulfan blue injection (1%) administered subcutaneously. Local anesthetic was not admixed with the dye preparation. Five-tenths (0.5) ml was injected in three interdigital web spaces of each foot. Subjects were observed after the administration of the drug every 15 min for 3 hr and then daily for 2 weeks for adverse reactions and changes in vital signs or any other evidence of intolerance to the drug.

Venous blood samples were obtained before the administration of the drug and at 1, 24, and 48 hr after administration. Samples were analyzed by the Sequential Multiple Analyzer Computer (SMAC) system (Technicon Instrument Corp., Tarrytown, NY), Coulter-S, absolute eosinophils, white blood cell differential, and platelets. Total urine was collected daily for 2 days and dye excretion was measured.

Efficacy or the ability to identify the lymphatics through the intact skin was assessed by two independent radiologists. Lymphatics were scored as either adequately (+) or inadequately (−) identified about 10 min after the administration of the drug.

*Phase III Clinical Trials*

Clinical trials were conducted in 543 patients (296 men, 247 women) referred for lymphangiography at 17 cooperative hospitals in the United States. Permission from respective Committees for the Conduct of Human Research was obtained. Patients received 1–3 ml of isosulfan blue injection (1%) per dose, administered subcutaneously, in the interdigital web spaces of the extremity to be studied. No local anesthetic was admixed with the dye preparation except in a few selected cases. Lymphatics were scored in the manner previously described.

**Results**

*Phase I Toxicology and Pharmacology*

All animals studied for acute toxicity demonstrated no adverse effects and all survived the 14 day period. At

AURO_ISO 0018550

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

necropsy, no organ accumulation of the drug was seen. Gross pathology was normal except for slightly gray discoloration of the kidneys. However, kidneys did not exhibit any gross histopathologic changes and were essentially normal histologically. This study suggested that the acute $LD_{50}$ of isosulfan blue in the rat is greater than 150 mg/kg. This suggests that the average patient dose of 0.4 mg/kg has a safety factor of at least 375 times the animal toxic dose.

It was determined spectrophotometrically that up to 10% of the subcutaneously administered dose of isosulfan blue is excreted in the urine during the first 24 hr collection period. No drug could be detected in urine samples collected during subsequent time intervals. Urine samples subjected to thin-layer chromatography demonstrated a single spot equivalent to that of isosulfan blue. This suggests that the drug is excreted unchanged in the urine.

Feces from rats studied were found to be stained dark blue. Techniques for the determination of dye in fecal material are inaccurate and, therefore, none were performed. It was presumed that 90% of the isosulfan blue administered was excreted through the feces through biliary excretion.

### Phase II Clinical Trials

No adverse effects, changes in vital signs, or significant ($p < 0.05$) changes in blood chemistry were observed in any of the volunteers studied. All laboratory values were within normal limits at each time period.

A mean value of 7% of the administered dose was recovered in the urine from the initial 24 hr collection period. No measurable drug could be found within the 24–48 hr period. Subjects reported blue discoloration of feces as well.

Excellent identification of the lymphatics was achieved in all 11 subjects.

### Phase III Clinical Trials

Five (0.9%) of 543 patients studied had an adverse reaction within 15 min after administration of isosulfan blue. These reactions were all of a relatively mild allergic type. Patients received no or minimal symptomatic therapy and all recovered within 1 hr or less. Four of these reactions occurred in patients who received blue dye admixed with local anesthetic.

The 543 patients who received isosulfan blue injection were evaluated for identification of the lymphatics. Patients were divided into three groups according to the clinical indication for the lymphangiogram (table 1). Group 1 included patients with possible lymph node involvement by primary or secondary malignancy; group 2 included patients with possible primary lymphatic disease; and group 3 included patients with chyluria, chylous ascites, or chylothorax.

In group 1, 503 (99%) of 508 patients demonstrated excellent identification of the lymphatics. In five (1%) of 508 patients, inadequate identification was achieved. In retrospect, these five patients received less than the recommended 30 mg dosage of isosulfan blue which may have accounted for these results. In group 2, 19 (67.9%) of 28

**TABLE 1: Identification of Lymphatics**

| Group: Clinical Indication | No. Patients Studied | No. Patients in Whom Lymphatics were Identified (%) |
|---|---|---|
| 1: Possible lymph node involvement by primary or secondary malignancy | 508 | 503 (99.0) |
| 2: Possible primary lymphatic disease | 28 | 19 (67.9) |
| 3: Chyluria, chylous ascites, chylothorax | 7 | 7 (100.0) |
| Total | 543 | 529 (97.4) |

showed excellent identification of the lymphatics. The other nine patients without identification had evidence of primary vascular disease manifested by dermal backflow of the drug. All of these patients were found to have Milroy disease. In group 3, all seven patients had excellent lymphatic identification.

Overall, isosulfan blue injection (1%) improved identification of the lymphatics in 97.4% of patients. The failure of identification of the lymphatics in the other 2.6% can be mainly attributed to primary lymphatic vascular disease.

### Discussion

Blue dyes have been used since the early 1960s for the identification of lymphatics before lymphangiography. These dyes may be grouped into two categories: (1) miscellaneous blue dyes with questionable lymphatic selectivity, marketed before 1938, which have not been reviewed for safety and efficacy by the FDA (e.g., methylene blue, Evan's blue); and (2) the family of Patent Blue dyes providing selective lymphatic localization but not approved for human use by the FDA. The second category includes the triphenylmethane dyes Alphazurine 2G (Allied Chemical Corp., Morristown, NJ), Patent Blue VF, and Patent Blue V (fig. 2). The exact purity of these dyes and the impurities they contain may not be known and therefore, the nature and toxicity of the material is uncertain. Solutions prepared of these dyes may, therefore, be of variable concentration, sterility, pyrogenicity, and stability.

A 1% solution of isosulfan blue was chosen because of the work of Gangolli et al. [5] who described the relation between concentration of triphenylmethane dyes and subsequent tissue reaction after their subcutaneous administration. Dye concentration closely correlated with the severity of necrosis and type of connective tissue reaction that evolved. These reactions varied from no necrosis for a 1% solution to widespread necrosis for a 3% solution.

Complications of the use of blue dye during lymphangiography are uncommon but do occur. Several reports [6–13] of allergic reactions to blue dye have been published. The first report on adverse effects from Patent Blue during lymphangiography was published by Kopp in 1966 [14]. In his series, two patients suffered from anaphylactic reactions after an injection of 0.25 ml of an 11% solution of the dye. Both patients recovered. At the International Symposium on Lymphology (Zurich, 1966) general reports of adverse reactions to blue dyes used during lymphangiography were given [15]. A probable incidence of 1/1000 hypersensitivity

HIRSCH ET AL.                          AJR:139, December 1982

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

reactions was concluded.

Koehler [16] compiled the incidence of complications associated with lymphangiography from a survey of individuals performing this study. From 32,000 examinations there were 57 (1:600) instances of hypersensitivity reactions to vital dyes. In 50 of these cases, either Patent Blue Violet or Alphazurine 2G was used. The hypersensitivity reactions ranged from hives to angioneurotic edema, with or without laryngospasm, to vasomotor collapse. In many instances, a local anesthetic was mixed with the vital dye; however, since this complication also occurred in patients who had negative skin reactions to the local anesthetic, it was suggested that the vital blue was the allergic component. The role of anesthetics mixed with dyes in these hypersensitivity reactions is not always elucidated; some authors believe that these agents may increase the frequency of adverse reactions [7, 8, 17].

Castellino et al. [17] identified Patent Blue as the causative agent for minor allergic complications in one patient and the possible cause in another two from their series of 659 lymphangiograms performed in children. An allergic manifestation incidence of 0.15%–0.5% attributable to Patent Blue may be derived.

In four of our cases, hypersensitivity reactions were associated with the administration of blue dye with a local anesthetic. Which of the two agents was responsible is not known. In the fifth patient who received blue dye alone, the reaction was due to the dye, so that the incidence of mild reactions is at least 0.2%, but could be as high as 1%. All reactions, however, were mild and of short duration.

The use of local anesthetics admixed with solutions of blue dye was first recommended by Wallace et al.[18] to minimize transitory pain which occurred when Evan's Blue dye was injected alone. This method was subsequently applied to the use of the triphenylmethane dye Alphazurine 2G [19]. Newton et al. [20] described a physicochemical instability of this admixture resulting in the formation of a sticky precipitate undesirable for administration to patients. Dye in amounts of 4% and 9% was found in a dye/anesthetic complex when solutions of lidocaine, unpreserved and preserved with 0.1% methylparaben, respectively, were used in the formulation of dosage forms.

Since the potential for drug hypersensitivity reactions and physicochemical incompatibility exists, the admixture of local anesthetics and blue dyes in the same syringe is not recommended. Furthermore, our patients reported good tolerance of the injection of isosulfan blue dye alone.

Isosulfan blue injection (1%) is a safe and efficacious drug for the identification of lymphatics during lymphangiography. FDA approval for human use has been obtained. Commercial introduction of this drug is forthcoming under the trade name Lymphazurin (1%).

## ACKNOWLEDGMENTS

Coinvestigators in the isosulfan blue study were Thomas A. Sos, New York Hospital–Cornell Medical Center, New York, NY; Michael A. Mertens, Georgetown University Medical Center, Washington, DC; Ronald L. McCartney, Hamot Medical Center, Erie, PA; Claire A. Beetlestone, Strong Memorial Hospital, Rochester, NY; Thomas P. James, Providence Hospital, Southfield, MI; Thomas E. Quinn, Orlando Regional Medical Center, Orlando, FL; Walter L. Grubb, Charlotte Memorial Hospital, Charlotte, NC; C. W. Reade, USPHS Hospital, Seattle, WA; Paul A. Richardson, St. Agnes Medical Center, Philadelphia, PA; Donald C. Jackson, Duke University Medical Center, Durham, NC. Coinvestigators in the Richmond, VA area were William E. Wheeler, St. Mary's Hospital; James J. Zelenak, Retreat for the Sick; William M. Fogel, Doctor's Hospital; William F. Proctor, St. Luke's Hospital; Maurice F. Mullins, Stuart Circle Hospital; Allen A. Frey, Johnston-Willis Hospital; and William R. Fields, VA Medical Center.

## REFERENCES

1. Zelch MG, Haaga JR. Clinical comparison of computed tomography and lymphangiography for detection of retroperitoneal lymphadenopathy. *Radiol Clin North Am* 1979;17:157–168
2. Harell GS, Breiman RS, Glatstein EJ, Marshall WH, Castellino RA. Computed tomography of the abdomen in the malignant lymphomas. *Radiol Clin North Am* 1977;15:391–400
3. Dunnick NR, Javadpour N. Value of CT and lymphography: distinguishing retroperitoneal metastases from nonseminomatous testicular tumors. *AJR* 1981;136:1093–1099
4. Kapdi CC. Lymphography without the use of vital dyes. *Radiology* 1979;133:795–796
5. Gangolli SD, Grasso P, Golberg L. Physical factors determining the early local tissue reactions produced by food colourings and other compounds injected subcutaneously. *Food Cosmet Toxicol* 1967;5:601–621
6. Collard M, Collette JM. Les modalities cliniques de l'allergie au bleu patente violet. *J Belge Radiol* 1967;50:407–410
7. von Sieber F. Zwischenfalle nach der subkutanen Installation von Patentblau zur Lymphographie. *Med Bild* 1968;11:102–103
8. Sinclair DJ, Perera FA. Allergic reactions following patent blue dye administration. *Can Med Assoc J* 1969;101:100–101
9. Mortazavi SH, Burrows BD. Allergic reactions to patent blue dye in lymphangiography. *Clin Radiol* 1971;22:389–390
10. von Meseg W, Melzer KJ. Einfall von Patentblau-allergie bei Fußlymphographie. *Z Urol* 1972;65:945–947
11. Pevny I, Bohdorf W. Gruppenallergische Untersuchung bei Patentblau-sensibilisierung. *Med Klin* 1972;20:698–702
12. Biran S, Hochman A. Allergic reaction to patent blue during lymphangiography. *Radiol Clin Biol* 1973;42:166–168
13. Molnar Z, Böhm K, Varga Gy. Patentblau-allergie bei der Lymphographie. *Rontgenblatter* 1976;29:100–103
14. Kopp WL. Anaphylaxis from alphazurine 2G during lymphography. *JAMA* 1966;198:200–201
15. Koehler PR. Complications and accidents. In: Ruttiman A, ed. *Progress in lymphology: proceedings of the International Symposium on Lymphology, Zurich, 1966.* Stuttgart: Georg Thieme, 1967:306–308
16. Koehler PR. Complications of lymphography. *Lymphology* 1968;1:116–120
17. Castellino RA, Bergiron C, Markovits P. Experience with 659 consecutive lymphograms in children. *Cancer* 1977;40:1097–1101
18. Wallace S, Jackson L, Schaffer B, et al. Lymphangiograms: their diagnostic and therapeutic potential. *Radiology* 1961;1:157–173
19. Greening RR, Wallace S. Further observations in lymphangiography. *Radiol Clin North Am* 1963;1:157–173
20. Newton DW, Rogers AG, Becker CH, Torosian G. Evaluation of preparations of patent blue (Alphazurine 2G) dye for parenteral use. *Am J Hosp Pharm* 1975;32:912–917

AURO_ISO 0018552

# EXHIBIT 17

**REDACTED - CONFIDENTIAL**

**APPX849-APPX852**

# EXHIBIT 18

**REDACTED - CONFIDENTIAL**

**APPX854-APPX888**

# EXHIBIT 19

**U.S. Food and Drug Administration**
Protecting and Promoting *Your* Health

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

**f** SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?
U=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=A&APPL_NO=090874)

**🐦** TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&URL=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=A&APPL_NO=090874)

**+**

**✉** EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&BODY=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=A&APPL_NO=090874)

**Home (default.cfm?resetfields=1)** | **Back to Search Results**

## Product Details for NDA 090874

ISOSULFAN BLUE (ISOSULFAN BLUE)
1%                                                                Marketing Status: Prescription

**Active Ingredient:** ISOSULFAN BLUE
**Proprietary Name:** ISOSULFAN BLUE
**Dosage Form; Route of Administration:** INJECTABLE; INJECTION
**Strength:** 1%
**Reference Listed Drug:** Yes
**TE Code:** AP
**Application Number:** A090874
**Product Number:** 001
**Approval Date:** Jul 20, 2010
**Applicant Holder Full Name:** MYLAN INSTITUTIONAL LLC
**Marketing Status:** Prescription
**Patent and Exclusivity Information (patent_info.cfm?
Appl_type=A&Appl_No=090874&Product_No=001)**

Appx890                          AURO_ISO 0018553

# EXHIBIT 21



in the **Federal Register** of December 8, 2014. In the notice, FDA requested that any industry organizations interested in participating in the selection of a nonvoting industry representative to serve on the Food Advisory Committee (the Committee) for the Center for Food Safety and Applied Nutrition (CFSAN) notify FDA in writing. FDA is also requesting nominations for a nonvoting industry representative(s) to serve on the Committee. The Agency is taking this action in response to requests for an extension to allow interested persons additional time to submit letters of interests and nominations.

**DATES:** FDA is extending the closing date in the notice published December 8, 2014 (79 FR 72690). Any industry organization interested in participating in the selection of an appropriate nonvoting member to represent industry interests must send a letter stating that interest to FDA by February 27, 2015. Concurrently, nomination materials for prospective candidates should be sent to FDA by February 27, 2015.

**ADDRESSES:** All statements of interest from industry organizations interested in participating in the selection process of nonvoting industry representative nomination should be sent to Karen Strambler (see **FOR FURTHER INFORMATION CONTACT**). All nominations for nonvoting industry representatives may be submitted electronically by accessing the FDA Advisory Committee Membership Nomination Portal: *https://www.accessdata.fda.gov/scripts/FACTRSPortal/FACTRS/index.cfm* or by mail to Advisory Committee Oversight and Management Staff, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 32, Rm. 5103, Silver Spring, MD 20993–0002. Information about becoming a member of an FDA advisory committee can also be obtained by visiting FDA's Web site at *http://www.fda.gov/AdvisoryCommittees/default.htm.*

**FOR FURTHER INFORMATION CONTACT:** Karen Strambler, Office of Regulations, Policy, and Social Science, Center for Food Safety and Applied Nutrition, 5100 Paint Branch Pkwy., Rm. 1C–016, College Park, MD 20740, 240–402–2589, *karen.strambler@fda.hhs.gov.*

**SUPPLEMENTARY INFORMATION:** The Agency intends to add a nonvoting industry representative(s) to the following advisory committee:

**I. CFSAN Advisory Committee, Food Advisory Committee**

The Committee reviews and evaluates emerging food safety, nutrition and other food- or cosmetic-related health issues that FDA considers of primary importance for its food and cosmetics programs. The Committee may be charged with reviewing and evaluating available data and making recommendations on matters such as those relating to: (1) Broad scientific and technical food- or cosmetic-related issues; (2) the safety of food ingredients and new foods; (3) labeling of foods and cosmetics; (4) nutrient needs and nutritional adequacy; and (5) safe exposure limits for food contaminants. The Committee may also be asked to provide advice and make recommendations on ways of communicating to the public the potential risks associated with these issues and on approaches that might be considered for addressing the issues.

**II. Selection Procedure**

Any industry organization interested in participating in the selection of an appropriate nonvoting member to represent industry interests should send a letter stating that interest to the FDA contact (see **FOR FURTHER INFORMATION CONTACT**) within 30 days of publication of this document (see **DATES**). Within the subsequent 30 days, FDA will send a letter to each organization that has expressed an interest, attaching a complete list of all such organizations; and a list of all nominees along with their current curriculum vitae. The letter will also state that it is the responsibility of the interested organizations to confer with one another and to select a candidate, within 60 days after the receipt of the FDA letter, to serve as the nonvoting member to represent industry interests for the committee. The interested organizations are not bound by the list of nominees in selecting a candidate. However, if no individual is selected within 60 days, the Commissioner will select the nonvoting member to represent industry interests.

**III. Application Procedure**

Individuals may self-nominate and/or an organization may nominate one or more individuals to serve as a nonvoting industry representative. Contact information, a current curriculum vitae, and the name of the committee of interest should be sent to the FDA Advisory Committee Membership Nomination Portal (see **ADDRESSES**) within 30 days of publication of this document (see **DATES**). FDA will forward all nominations to the organizations expressing interest in participating in the selection process for the committee. (Persons who nominate themselves as nonvoting industry representatives will not participate in the selection process).

FDA seeks to include the views of women, and men, members of all racial and ethnic groups and individuals with and without disabilities on its advisory committees and, therefore encourages nominations of appropriately qualified candidates from these groups.

This notice is issued under the Federal Advisory Committee Act (5 U.S.C. app. 2) and 21 CFR part 14, relating to advisory committees.

Dated: *January 26, 2015.*

**Leslie Kux,**
*Associate Commissioner for Policy.*
[FR Doc. 2015–01881 Filed 1–30–15; 8:45 am]
**BILLING CODE 4164–01–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**[Docket No. FDA–2015–N–0175]**

**Determination That LYMPHAZURIN (Isosulfan Blue) Injectable and Other Drug Products Were Not Withdrawn From Sale for Reasons of Safety or Effectiveness**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA or Agency) has determined that the drug products listed in this document were not withdrawn from sale for reasons of safety or effectiveness. This determination means that FDA will not begin procedures to withdraw approval of abbreviated new drug applications (ANDAs) that refer to these drug products, and it will allow FDA to continue to approve ANDAs that refer to the products as long as they meet relevant legal and regulatory requirements.

**FOR FURTHER INFORMATION CONTACT:** Amy Hopkins, Center for Drug Evaluation and Research, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 51, Rm. 6223, Silver Spring, MD 20993–0002, 301–796–5418, *Amy.Hopkins@fda.hhs.gov.*

**SUPPLEMENTARY INFORMATION:** In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) (the 1984 amendments), which authorized the approval of duplicate versions of drug products approved under an ANDA procedure. ANDA applicants must, with certain exceptions, show that the drug for which they are seeking approval contains the same active ingredient in the same strength and dosage form as

 **AURO_ISO 0018554**

the "listed drug," which is a version of the drug that was previously approved. ANDA applicants do not have to repeat the extensive clinical testing otherwise necessary to gain approval of a new drug application (NDA).

The 1984 amendments include what is now section 505(j)(7) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)), which requires FDA to publish a list of all approved drugs. FDA publishes this list as part of the "Approved Drug Products With Therapeutic Equivalence Evaluations," which is generally known as the "Orange Book." Under FDA regulations, a drug is removed from the list if the Agency withdraws or suspends

approval of the drug's NDA or ANDA for reasons of safety or effectiveness or if FDA determines that the listed drug was withdrawn from sale for reasons of safety or effectiveness (21 CFR 314.162).

Under § 314.161(a) (21 CFR 314.161(a)), the Agency must determine whether a listed drug was withdrawn from sale for reasons of safety or effectiveness: (1) Before an ANDA that refers to that listed drug may be approved, (2) whenever a listed drug is voluntarily withdrawn from sale and ANDAs that refer to the listed drug have been approved, and (3) when a person petitions for such a determination under 21 CFR 10.25(a) and 10.30. Section 314.161(d) provides that if FDA

determines that a listed drug was withdrawn from sale for safety or effectiveness reasons, the Agency will initiate proceedings that could result in the withdrawal of approval of the ANDAs that refer to the listed drug.

FDA has become aware that the drug products listed in the table in this document are no longer being marketed. (As requested by the applicants, FDA withdrew approval of NDA 018310 for LYMPHAZURIN (isosulfan blue) Injectable in the **Federal Register** of December 5, 2014 (79 FR 72186) and NDA 020151 for EFFEXOR (venlafaxine HCl) Tablets in the **Federal Register** of July 19, 2013 (78 FR 43210).)

| Application No. | Drug | Applicant |
|---|---|---|
| NDA 018310 ................ | LYMPHAZURIN (isosulfan blue) Injectable; Injection, 1% | Covidien, 60 Middletown Ave., North Haven, CT 06473. |
| NDA 019966 ................ | TEMOVATE (clobetasol propionate) Solution; Topical, 0.05%. | Fougera Pharmaceuticals Inc., 1 Health Plaza, Bldg. 434, East Hanover, NJ 07936. |
| NDA 020151 ................ | EFFEXOR (venlafaxine hydrochloride (HCl)) Tablet; Oral, Equivalent to (EQ) 12.5 milligram (mg) Base; EQ 25 mg Base; EQ 37.5 mg Base; EQ 50 mg Base; EQ 75 mg Base; EQ 100 mg Base. | Wyeth Pharmaceuticals Inc., 235 East 42nd St., New York, NY 10017. |
| NDA 020214 ................ | ZEMURON (rocuronium bromide) Injectable; Injection 100 mg/10 milliliter (mL); 50 mg/5 mL; 10 mg/mL. | Organon USA Inc., 351 North Sunmeytown Pike, North Wales, PA 19454. |
| NDA 021040 ................ | PREFEST (estradiol; norgestimate) Tablet; Oral, 1 mg, 1 mg/0.09 mg. | Teva Branded Pharmaceutical Products R&D, Inc., 41 Moores Rd., P.O. Box 4011, Frazer, PA 19355. |
| NDA 021621 ................ | CHILDREN'S ZYRTEC ALLERGY (cetirizine HCl) and CHILDREN'S ZYRTEC HIVES RELIEF (cetirizine HCl) Chewable Tablet; Oral, 5 mg; 10 mg. | McNeil Consumer Healthcare, 7050 Camp Hill Rd., Fort Washington, PA 19034. |
| NDA 050783 ................ | PERIOSTAT (doxycycline hyclate) Tablet; Oral, EQ 20 mg Base. | Galderma Laboratories, L.P., 14501 North Freeway, Fort Worth, TX 76177. |

FDA has reviewed its records and, under § 314.161, has determined that the drug products listed in this document were not withdrawn from sale for reasons of safety or effectiveness. Accordingly, the Agency will continue to list the drug products listed in this document in the "Discontinued Drug Product List" section of the Orange Book. The "Discontinued Drug Product List" identifies, among other items, drug products that have been discontinued from marketing for reasons other than safety or effectiveness.

Approved ANDAs that refer to the NDAs listed in this document are unaffected by the discontinued marketing of the products subject to those NDAs. Additional ANDAs that refer to these products may also be approved by the Agency if they comply with relevant legal and regulatory requirements. If FDA determines that labeling for these drug products should be revised to meet current standards, the Agency will advise ANDA applicants to submit such labeling.

Dated: January 26, 2015.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2015–01859 Filed 1–30–15; 8:45 am]

**BILLING CODE 4164–01–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Resources and Services Administration**

**Agency Information Collection Activities: Submission to OMB for Review and Approval; Public Comment Request**

**AGENCY:** Health Resources and Services Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** In compliance with Section 3507(a)(1)(D) of the Paperwork Reduction Act of 1995, the Health Resources and Services Administration (HRSA) has submitted an Information Collection Request (ICR) to the Office of Management and Budget (OMB) for review and approval. Comments submitted during the first public review of this ICR will be provided to OMB.

OMB will accept further comments from the public during the review and approval period.

**DATES:** Comments on this ICR should be received no later than March 4, 2015.

**ADDRESSES:** Submit your comments, including the Information Collection Request Title, to the desk officer for HRSA, either by email to *OIRA_submission@omb.eop.gov* or by fax to 202–395–5806.

**FOR FURTHER INFORMATION CONTACT:** To request a copy of the clearance requests submitted to OMB for review, email the HRSA Information Collection Clearance Officer at *paperwork@hrsa.gov* or call (301) 443–1984.

**SUPPLEMENTARY INFORMATION:**

*Information Collection Request Title:* Evaluation and Initial Assessment of the HRSA Teaching Health Centers Graduate Medical Education Program.

OMB No. 0906–xxxx—New.

*Abstract:* Section 5508 of the Affordable Care Act of 2010 amended section 340H of the Public Health Service Act to establish the Teaching Health Center Graduate Medical Education (THCGME) program to provide funding support for new and

# EXHIBIT 22

**U.S. Food and Drug Administration**
Protecting and Promoting *Your* Health

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

**f** SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?
U=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=A&APPL_NO=206831)

**🐦** TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&URL=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=A&APPL_NO=206831)

**+**

**✉** EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE
EVALUATIONS&BODY=HTTP://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=A&APPL_NO=206831)

**Home (default.cfm?resetfields=1)** | **Back to Search Results**

## Product Details for NDA 206831

ISOSULFAN BLUE (ISOSULFAN BLUE)
1%                                            Marketing Status: Prescription

**Active Ingredient:** ISOSULFAN BLUE
**Proprietary Name:** ISOSULFAN BLUE
**Dosage Form; Route of Administration:** INJECTABLE; INJECTION
**Strength:** 1%
**Reference Listed Drug:** No
**TE Code:** AP
**Application Number:** A206831
**Product Number:** 001
**Approval Date:** Feb 2, 2016
**Applicant Holder Full Name:** AUROBINDO PHARMA LTD
**Marketing Status:** Prescription
**Patent and Exclusivity Information (patent_info.cfm?
Appl_type=A&Appl_No=206831&Product_No=001)**

# EXHIBIT 27

**REDACTED - CONFIDENTIAL**

**APPX1058-APPX1071**

# EXHIBIT 31



US 20080008658A1

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2008/0008658 A1**

De Haen    (43) Pub. Date:    **Jan. 10, 2008**

(54) **CONTRAST AGENT FORMULATIONS FOR THE VISUALIZATION OF THE LYMPHATIC SYSTEM**

(75) Inventor:    **Christoph De Haen**, Thalwil (CH)

Correspondence Address:
**BRACCO RESEARCH USA INC.
305- COLLEGE ROAD EAST
PRINCETON, NJ 08540 (US)**

(73) Assignee:    **Bracco Imaging SpA**, Milano (IT)

(21) Appl. No.:    **11/664,662**

(22) PCT Filed:    **Oct. 6, 2005**

(86) PCT No.:    **PCT/EP05/55071**

§ 371(c)(1),
(2), (4) Date:    **Apr. 4, 2007**

(30)    **Foreign Application Priority Data**

Oct. 8, 2004    (EP) ........................................ 04024102.8

**Publication Classification**

(51) **Int. Cl.**
*A61K   49/22*    (2006.01)
(52) **U.S. Cl.** ........................................... **424/9.52**; 424/9.5

(57)    **ABSTRACT**

The present invention relates to the field of diagnostic imaging and provides compositions of ultrasound contrast agents, particularly gas-filled microvesicles suspensions, in combination with vital dyes. The compositions of the invention are advantageously used in the visualization of the lymphatic system, particularly for the detection of the sentinel lymph node or nodes of a tumor.



AURO_ISO 0018724

Patent Application Publication    Jan. 10, 2008    US 2008/0008658 A1

Fig. 1



US 2008/0008658 A1

Jan. 10, 2008

1

### CONTRAST AGENT FORMULATIONS FOR THE VISUALIZATION OF THE LYMPHATIC SYSTEM

[0001] The present invention relates to the field of diagnostic imaging and, more particularly, it relates to formulations of ultrasound contrast agents in combination with visible marking agents, in particular vital dyes.

[0002] The formulations of the invention may be used in a variety of diagnostic imaging situations including ultrasound echographic and intraoperative optical visualization of the lymphatic system and, more particularly, of the sentinel lymph node or nodes of a tumor.

### BACKGROUND OF THE INVENTION

[0003] Development of ultrasound techniques and diagnostic applications thereof has taken advantage, in recent years, from a variety of formulations of contrast agents useful in the imaging of blood and lymph vessels, organs and tissues, of human or animal bodies. Most of the above formulations are primarily designed for intravenous or intra-arterial administration in conjunction with the use of medical echographic equipment.

[0004] A first class of injectable formulations of ultrasound contrast agents include, for instance, suspensions of gas bubbles having a proper diameter of a few microns dispersed in aqueous media.

[0005] Of particular interest, within this class, are gas bubbles which are stabilized by means of suitable additives or ingredients such as, for instance, fatty acids and phospholipids, or by entrapping or encapsulating the gas or a precursor thereof in a variety of systems. These stabilized gas bubbles are widely known in the art and are generally referred to as "microvesicles".

[0006] Microvesicles, in their turn, may be conveniently divided into two main categories. A first category of stabilized bubbles or microvesicles is generally referred to as "microbubbles". Microbubbles comprise aqueous suspensions in which the bubbles of gas are bound at the gas/liquid interface by a very thin envelope (film) involving a stabilizing amphiphilic material disposed at the gas to liquid interface.

[0007] A few methods are known in the art for preparing the microbubble suspension. Typically, the microbubble suspension is prepared by suspending, in a suitable aqueous solution for injection, a suitably prepared solid formulation containing the amphiphilic material, e.g. freeze-dried pre-formed liposomes or freeze-dried or spray-dried phospho-lipid solution, kept under an atmosphere of a suitable gas, for instance air or nitrogen or perfluorinated gases or mixtures thereof The microbubble suspension thus generated can be administered, preferably shortly after its preparation.

[0008] In a second way, the microbubble suspension is prepared from a suspension of gas-free particles containing the amphiphilic material kept under the aforementioned gas atmosphere which, under vigorous agitation, forms a suspension of microbubbles.

[0009] In a third way, the microbubble suspension is prepared by suspending, in a suitable aqueous solution for injection, a suitably prepared solid formulation containing the amphiphilic material together with materials that pro-duce a gas upon contact with water, or that liberate a gas from the suspension medium or the blood plasma or both, once injected.

[0010] Non limiting examples of aqueous suspensions of the above gas microbubbles and preparations thereof are disclosed, for instance, in U.S. Pat. No. 5,271,928, U.S. Pat. No. 5,445,813, U.S. Pat. No. 5,413,774, U.S. Pat. No. 5,556,610, U.S. Pat. No. 5,597,549, U.S. Pat. No. 5,827,504, WO 97/29783, WO 04/069284, EP 0855186, U.S. Pat. No. 5,141,738, U.S. Pat. No. 6,306,366, EP 0365467, all of which are herewith incorporated by reference in their entirety.

[0011] A second category of injectable formulations of ultrasound contrast agents comprises formulations containing microvesicles of the kind generally referred to as "microballoons" or "microcapsules" and includes suspensions in which the gas bubbles are surrounded by a solid material envelope of a lipid or of natural or synthetic polymers.

[0012] Non limiting examples of microballoons and preparations thereof are disclosed, for instance, in U.S. Pat. No. 5,711,933, U.S. Pat. No. 6,333,021, U.S. Pat. No. 5,611,344, U.S. Pat. No. 6,045,777, U.S. Pat. No. 6,132,699 and WO 01/12071, all of which herein incorporated by reference in their entirety.

[0013] Ultrasound contrast agents, hence including the above microbubbles and microballons, are currently used in a variety of diagnostic applications for the visual imaging of organs and tissues through known echographic instrumentations and techniques. Among the said diagnostic application is, for instance, the imaging of the lymphatic system.

[0014] The lymphatic system comprises vessels or ducts that begin in tissues and are designed to collect interstitial fluid and to carry it as lymph to local lymph nodes. The lymph is therein filtered and processed and sent to the next of a series of consecutive lymph nodes down the line, until it enters the blood.

[0015] During filtration the macrophages inside the nodes remove, via phagocytosis, particulate and cell material from the lymph. Large particles such as cells may become trapped in the small lymphatic passages in the nodes. When cancer occurs in tissues or organs, dislodging of cancerous cells into the lymphatic system may occur as well. These cancerous cells may thus become entrapped in the lymph node where they adhere to tissue and grow, forming metastatic foci.

[0016] However, whilst in early stages of cancer development in the node the cancer remains limited to the node itself, the nodal deposit can also subsequently grow to totally replace the node and/or can spread downstream to the next node. The lymph nodes that drain the tissue or organ of interest, like the cancerous tissue, are the so-called regional lymph nodes and the first node that traps the cancer-derived metastatic cells is referred to as the sentinel lymph node (see, for a general reference, WO 04/030651). In rare cases the tumor lymph drains into more than one drainage basin, leading to multiple sentinel lymph nodes.

[0017] In cancer surgery, known techniques like lym-phadenectomies are often performed with the aim of elimi-nating cancer disease which has spread to lymph nodes. The

AURO_ISO 0018726

2

intervention may be made by open surgery or by endoscopically guided surgery. Typically, the surgeon removes the fat tissue strings which, from experience, are known to include the lymph nodes and which are located close to the large blood vessels, and above all the veins.

[0018]    The outcome of this type of surgery may vary to a great extent as it may depend, essentially, upon the identification of the single lymph nodes in the fat masses, all having similar colour and consistency (see, for a reference, WO 00/35490). In the light of the above limitations, the need of easily detecting and inspecting the lymphatic system and, more particularly, the sentinel lymph node, is of utmost importance in the early stage of cancer diagnosis and therapy.

[0019]    Certain lymphatic pathways may be visualized by various imaging techniques after injection of appropriate contrast agents directly into lymphatic vessels (direct lymphography). This approach is applicable to X-ray imaging, magnetic resonance imaging, echographic imaging and nuclear imaging. Direct lymphography is a skill-requiring open surgery procedure under anesthesia. It is only practical when large lymphatic vessels are accessible. For example, after administration of X-ray contrast agents into lymphatic vessels of the foot, a few leg lymph nodes and pelvic and abdominal lymph nodes may be thus visualized. However, direct lymphography is not usually suitable for the identification of the sentinel lymph node(s) of a tumor.

[0020]    Several means specifically intended for the identification of the sentinel lymph node(s) and based on the use of contrast agents are known in the art. They may involve indirect lymphography, i.e. the imaging of the lymphatic system after injection of contrast agents outside the lymphatic system, e.g. interstitially, subcutaneously, subdermally, intradermally, subareolarly, periareolarly, intraperitoneally or intravenously. Contrast agents injected into tissue interstitium in general, e.g. into peritumoral regions in particular, do reach the lymphatic system but to degrees depending on their nature. In this respect, as truly soluble agents with molecular diameters substantially below 3 nm tend to enter the blood vasculature just as easily as the lymphatic system, they do not offer a good lymphatic contrast.

[0021]    Commonly available soluble contrast agents are much smaller than the above limit and, hence, do not get trapped in lymph nodes, yet do get into the vasculature. As a result, their concentration in the nodes does not reach sufficient levels to permit good visualization.

[0022]    Particulate contrast agents, instead, enter the lymphatic system preferentially over blood vessels, provided they contain particulates of a suitable size range, typically with diameters between 3 and 900 nm.

[0023]    Particles having a diameter up to about 900 nm have been found to enter lymphatic systems from the interstitium, whereas particles substantially larger are reported not to do so (see Wolf G. et al.; Percutaneous lymphography using particulate fluorocarbon emulsions; U.S. Pat. No. 5,114,703).

[0024]    As an example, WO 01/12071 describes an ultrasound contrast agent composition with diameters in the range of about 100 to 800 nm for sentinel lymph node detection after subcutaneous administration.

[0025]    Suitably sized particulate contrast agents injected interstitially allow imaging of the lymph nodes, in part because after opsonization they get trapped by macrophages in the nodes; passage from interstitium to the lymphatic system is reported to be accelerated by massaging the interested area.

[0026]    Subcutaneous and subdermal injection of contrast agents has requirements and limitations for successful imaging of the lymphatic system very similar to the interstitial injection. The process of diffusion of the contrast agent, in fact, is rather slow and requires as well the massaging at the injection site.

[0027]    Among the currently used methods for the identification of the sentinel lymph nodes is lymphoscintigraphy that, despite the above limitations, is today mostly performed by subcutaneous or interstitial injection. More recently in the case of breast subareolar and periareolar injection is being proposed.

[0028]    The scintigraphic contrast agents used are colloidal contrast agents prepared from commercial products by further filtration in the hospitals. No scintigraphic contrast agent, at present, is registered with the indication for sentinel lymph node detection. In the case of breast tumor scintigraphic sentinel lymph node detection involves the injection, under local or general anesthesia, of a scintigraphic contrast agent, usually administered several hours before the start of the diagnostic imaging. Typically, the biopsy of the identified sentinel lymph node(s) can be performed the subsequent day only.

[0029]    As an additional drawback, scintigraphy requires to be performed within a Nuclear Medicine Department with heavy and immobile imaging equipment, a nuclear pharmacy and authorized personnel which, in many hospitals, are not available. For biopsy of the sentinel lymph node(s) the patient usually has to be transferred to the surgical department. The whole procedure is thus lengthy and involves, at least, two distinct hospital departments.

[0030]    Another known method for detecting sentinel lymph nodes involves the injection of a blue vital dye.

[0031]    The visual identification of the sentinel lymph node(s) is then performed intraoperatively, that is by observing the dye at the region suspected to contain the sentinel lymph node. In particular, when intraoperative lymphatic mapping is performed with a blue dye, the sentinel lymph node may be identified by following a blue-stained lymphatic channel draining from the primary tumor site to a blue stained node, the sentinel lymph node (see, for a reference, Donald L. Morton et al.; Ann. Surg. Oncol., Vol. 6, No. 1, 1999).

[0032]    Moreover, the blue dye allows the labeling of all of the lymph nodes and the sentinel one needs to be identified through the earliest time of arrival of the dye. So far, given the size of the area to be kept under observation together with the fact that the dye tends to spread around all of the lymphatic structures, this visualization is rather troublesome. Clearly, this method may suffer from excessive surgical exploration.

[0033]    Combined techniques have been also developed which may comprise, for instance, preoperative lymphoscintigraphy by using Tc-99m labeled sulfur colloid followed by blue dye administration.

[0034] Nevertheless, whilst the blue dye is injected 5-15 min before intraoperative lymphatic mapping and sentinel lymph node detection, additional injections of labeled sulfur colloid may be required if more than 24 h has passed since preoperative lymphoscintigraphy (see Donald L. Morton et al.).

[0035] U.S. Pat. No. 6,205,352 describes the detection of the sentinel lymph node(s) of a tumor by injection of a non-radioactive contrast agent followed by imaging with a modality capable of detecting the contrast agent. Among the contrast agents and imaging modalities, ultrasound contrast agents and echographic detection methods are also claimed therein.

[0036] In addition, it is therein reported that such agents "are preferably about 10 to about 200 nanometers in diameter". According to this latter aspect, however, it is known to the skilled man that with those sizes ultrasound contrast agents have essentially no echographic efficacy.

[0037] It is also known in the art that flexible microbubbles injected interstitially, subcutaneously or intradermally can reach the lymphatic system even if they are larger than 900 nm in diameter. Probably these products can deform on their own or under the action of massage, thereby assuming adaptive shapes for entering the lymphatic system. U.S. Pat. No. 6,444,192 describes the echographic imaging of the lymphatic ducts and nodes after the administration, into an appropriate site other than blood or lymph structures, of a particulate ultrasound contrast agent.

[0038] From all of the above there is the need, in the field of diagnostics, of a technique for the imaging of the lymphatic system that allows an easy, rapid, reproducible and robust detection of the sentinel lymph node(s).

DESCRIPTION OF THE INVENTION

[0039] We have now found that visualization of the lymphatic system, in particular identification of the sentinel lymph node or nodes of a tumor, can be advantageously achieved by combining ultrasound imaging techniques with vital dyes techniques.

[0040] We have thus found, unexpectedly, that ultrasound contrast agents may be conveniently formulated in combination with vital dyes and thus administered, preferably shortly before diagnostic imaging.

[0041] It is therefore a first object of the present invention a composition comprising an ultrasound contrast agent in combination with a vital dye.

[0042] Once administered to a subject undergoing diagnostic imaging, for instance of the lymphatic system, the composition of the invention allows optimal visualization and inspection of the sentinel lymph node and minimizes surgical exploration during sentinel lymph node excision.

[0043] Very advantageously, in fact, the use of the composition of the invention enables the surgeon to locate the sentinel lymph node by ultrasound imaging and, hence, the optimal site of operative incision just prior to surgery, whilst allowing visual recognition of the lymphatic structures and the lymph nodes before their optional excision.

[0044] From the above, it is clear to the skilled man that in the composition of the invention, a diagnostically effective amount of both the components is required.

[0045] With the terms "diagnostically effective amount" we intend, unless otherwise provided, any amount of both the ultrasound contrast agent and the dye which is sufficient to enable echographic imaging and visual imaging, respectively.

[0046] Typically, the amounts of the ultrasound contrast agent and the vital dye substantially correspond to the same amount that would have been administered by using each of them separately, according to known techniques.

[0047] Preferably, the composition of the invention is administered so as to provide amounts of the ultrasound contrast agent ranging from about 0.01 μl to about 6.0 μl of gas, inside microvesicles, per patient.

[0048] Likewise, through the administration of the composition of the invention, amounts of vital dye ranging from about 1 μmol to about 100 μmol may be thus administered, in one or multiple sites.

[0049] In the present description, unless otherwise indicated, with the term vital dye we intend any known dye being developed as suitable for the parenteral administration to human and animal bodies.

[0050] Preferably, with the aim of providing optimal ocular visibility, the dye is characterized by having at least one light absorption maximum at wavelengths comprised between 500 nm and 900 nm and, even more preferably, between 520 and 750 nm. Suitable vital dyes according to the invention may include, for instance, water soluble dyes selected among the classes of triphenylmethane dyes, cyanine dyes, mero-cyanine dyes, styryl dyes, thiazine dyes, diazo dyes, porphyrins and their ring-enlarged higher homologues and phthalocyanins and their ring-enlarged higher homologues dyes.

[0051] Additional vital dyes according to the invention may also comprise suitable complexes with metals, e.g. gadolinium, copper, cobalt and magnesium, so as to give rise, for instance, to metalloporphyrins, metallochlorins, metallophthalocyanins and higher homologues thereof.

[0052] Non limiting examples of vital dyes according to the invention may thus include, for instance, Evans blue [CAS 61-73-4], patent blue V [CAS 3536-49-0], patent blue VF [CAS 129-17-9], isosulfan blue [also known as Patent blue violet, CAS 68238-36-8], indocyanine green monosodium salt [CAS 3599-32-4], methylene blue [CAS 314-13-6], sulfobromophthaleine [123359-42-2], copper phthalocyanine tetrasulfonate [27360-85-6], gadolinium texaphyrin [156436-89-4]. According to a preferred embodiment of the invention, the vital dye is selected between Evans blue and patent blue VF.

[0053] Vital dyes are commercially available compounds or may be easily obtained by well known chemical syntheses. Commercial products may be further purified by classical means such as dissolution, filtration and reprecipitation as well as by chromatography.

[0054] In particular, available solutions of these products may be purified from contaminant salts by electrodialysis and from particulates and endotoxins by ultrafiltration. Thus, they may be purified until they reach the required degree of purity for parenteral administration to mammals, including humans.

AURO_ISO 0018728

[0055] In the present description, unless otherwise specified, with the term ultrasound contrast agent we intend any contrast agent known to be used for echographic diagnostic imaging techniques.

[0056] Preferably, said ultrasound contrast agents are those previously reported and shortly referred to as gas-containing or gas-filled microbubble or microballoon suspensions. For details about the gas-filled microvesicles, their main components and optional excipients, the gases themselves, their appearance as well as the method for their preparation, see the following extensive section.

[0057] Ultrasound Contrast Agents: Gas-Filled Microvesicles

[0058] The gas-filled microbubbles are those known in the art and comprise bubbles of gas dispersed in an aqueous medium which are stabilized by a thin envelope comprising an amphiphilic compound disposed at the gas to liquid interface. Said stabilizing envelope, sometimes referred to as an "evanescent envelope", has in general a thickness of less than 5 nm, typically of about 2-3 nm, thus often amounting to a substantially monomolecular layer.

[0059] The amphiphilic compound included in the microbubbles' envelope can be a synthetic or naturally-occurring biocompatible compound and may include, for example a film forming lipid, in particular a phospholipid. Examples of amphiphilic compounds include, for instance, phospholipids; lysophospholipids; fatty acids, such as palmitic acid, stearic acid, arachidonic acid or oleic acid; lipids bearing polymers, such as chitin, hyaluronic acid, polyvinylpyrrolidone or polyethylene glycol (PEG), also referred as "pegylated lipids"; lipids bearing sulfonated mono- di-, oligo- or polysaccharides; cholesterol, cholesterol sulfate or cholesterol hemisuccinate; tocopherol hemisuccinate; lipids with ether or ester-linked fatty acids; polymerized lipids; diacetyl phosphate; dicetyl phosphate; ceramides; polyoxyethylene fatty acid esters (such as polyoxyethylene fatty acid stearates), polyoxyethylene fatty alcohols, polyoxyethylene fatty alcohol ethers, polyoxyethylated sorbitan fatty acid esters, glycerol polyethylene glycol ricinoleate, ethoxylated soybean sterols, ethoxylated castor oil or ethylene oxide (EO) and propylene oxide (PO) block copolymers; sterol aliphatic acid esters including, cholesterol butyrate, cholesterol iso-butyrate, cholesterol palmitate, cholesterol stearate, lanosterol acetate, ergosterol palmitate, or phytosterol n-butyrate; sterol esters of sugar acids including cholesterol glucuronides, lanosterol glucuronides, 7-dehydrocholesterol glucuronide, ergosterol glucuronide, cholesterol gluconate, lanosterol gluconate, or ergosterol gluconate; esters of sugar acids and alcohols including lauryl glucuronide, stearoyl glucuronide, myristoyl glucuronide, lauryl gluconate, myristoyl gluconate, or stearoyl gluconate; esters of sugars with aliphatic acids including sucrose laurate, fructose laurate, sucrose palmitate, sucrose stearate, glucuronic acid, gluconic acid or polyuronic acid; saponins including sarsasapogenin, smilagenin, hederagenin, oleanolic acid, or digitoxigenin; glycerol or glycerol esters including glycerol tripalmitate, glycerol distearate, glycerol tristearate, glycerol dimyristate, glycerol trimyristate, glycerol dilaurate, glycerol trilaurate, glycerol dipalmitate,; long chain alcohols including n-decyl alcohol, lauryl alcohol, myristyl alcohol, cetyl alcohol, or n-octadecyl alcohol; 6-(5-cholesten-3β-yloxy)-1-thio-β-D-galactopyranoside; digalactosyl-diglyc-

eride; 6-(5-cholesten-3β-yloxy)hexyl-6-amino-6-deoxy-1-thio-β-D-galactopyranoside; 6-(5-cholesten-3β-yloxy-)hexyl-6-amino-6-deoxyl-1-thio-β-D-mannopyranoside; 12-(((7'-diethylaminocoumarin-3-yl)carbonyl)methylamino)octadecanoic acid; N-[1 2-(((7'-diethylaminocoumarin-3-yl)carbonyl)methylamino)octadecanoyl]-2-aminopalmitic acid; N-succinyldioleylphosphatidylethanolamine; 1 ,2-dioleyl-sn-glycerol; 1,2-dipalmitoyl-sn-3-succinylglycerol; 1,3-dipalmitoyl-2-succinylglycerol; 1-hexadecyl-2-palmitoylglycerophosphoethanolamine or palmitoylhomocysteine; alkylamines or alkylammonium salts, comprising at least one ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), alkyl chain, such as, for instance, N-stearylamine, N,N'-distearylamine, N-hexadecylamine, N,N'-dihexadecylamine, N-stearylammonium chloride, N,N'-distearylammonium chloride, N-hexadecylammonium chloride, N,N'-dihexadecylammonium chloride, dimethyldioctadecylammonium bromide (DDAB), hexadecyltrimethylammonium bromide (CTAB); tertiary or quaternary ammonium salts comprising one or preferably two ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), acyl chain linked to the N-atom through a ($C_3$-$C_6$) alkylene bridge, such as, for instance, 1,2-distearoyl-3-trimethylammonium-propane (DSTAP), 1,2-dipalmitoyl-3-trimethylammonium-propane (DPTAP), 1,2-oleoyl-3-trimethylammonium-propane (DOTAP), 1,2-distearoyl-3-dimethylammonium-propane (DSDAP); and mixtures or combinations thereof.

[0060] Depending on the combination of components and on the manufacturing process of the microbubbles, the above listed exemplary compounds may be employed as main compound for forming the microbubble's envelope or as simple additives, thus being present only in minor amounts.

[0061] According to a preferred embodiment, at least one of the compounds forming the microbubbles' envelope is a phospholipid, optionally in admixture with any of the other above cited film-forming materials. According to the present description, the term phospholipid is intended to encompass any amphiphilic phospholipid compound, the molecules of which are capable of forming a stabilizing film of material (typically in the form of a mono-molecular layer) at the gas-water boundary interface in the final microbubbles suspension. Accordingly, these materials are also referred to in the art as "film-forming phospholipids".

[0062] Amphiphilic phospholipid compounds typically contain at least one phosphate group and at least one, preferably two, lipophilic long-chain hydrocarbon group.

[0063] Examples of suitable phospholipids include esters of glycerol with one or preferably two (equal or different) residues of fatty acids and with phosphoric acid, wherein the phosphoric acid residue is in turn bound to a hydrophilic group, such a, for instance, choline (phosphatidylcholines—PC), serine (phosphatidylserines—PS), glycerol (phosphatidylglycerols—PG), ethanolamine (phosphatidylethanolamines—PE), inositol (phosphatidylinositol). Esters of phospholipids with only one residue of fatty acid are generally referred to in the art as the "lyso" forms of the phospholipid or "lysophospholipids". Fatty acids residues present in the phospholipids are in general long chain aliphatic acids, typically containing from 12 to 24 carbon atoms, preferably from 14 to 22; the aliphatic chain may contain one or more unsaturations or is preferably completely saturated. Examples of suitable fatty acids included

AURO_ISO 0018729

5

in the phospholipids are, for instance, lauric acid, myristic acid, palmitic acid, stearic acid, arachidic acid, behenic acid, oleic acid, linoleic acid, and linolenic acid. Preferably, saturated fatty acids such as myristic acid, palmitic acid, stearic acid and arachidic acid are employed.

[0064] Further examples of phospholipid are phosphatidic acids, i.e. the diesters of glycerol-phosphoric acid with fatty acids; sphingolipids such as sphingomyelins, i.e. those phosphatidylcholine analogs where the residue of glycerol diester with fatty acids is replaced by a ceramide chain; cardiolipins, i.e. the esters of 1,3-diphosphatidylglycerol with a fatty acid; glycolipids such as gangliosides GM1 (or GM2) or cerebrosides; glucolipids; sulfatides and glycosphingolipids.

[0065] As used herein, the term phospholipids include either naturally occurring, semisynthetic or synthetically prepared products that can be employed either singularly or as mixtures. Examples of naturally occurring phospholipids are natural lecithins (phosphatidylcholine (PC) derivatives) such as, typically, soya bean or egg yolk lecithins.

[0066] Examples of semisynthetic phospholipids are the partially or fully hydrogenated derivatives of the naturally occurring lecithins. Preferred phospholipids are fatty acids di-esters of phosphatidylcholine, ethylphosphatidylcholine, phosphatidylglycerol, phosphatidic acid, phosphatidylethanolamine, phosphatidylserine, phosphatidylinositol or of sphingomyelin.

[0067] Examples of preferred phospholipids are, for instance, dilauroyl-phosphatidylcholine (DLPC), dimyristoyl-phosphatidylcholine (DMPC), dipalmitoyl-phosphatidylcholine (DPPC), diarachidoyl-phosphatidylcholine (DAPC), distearoyl-phosphatidylcholine (DSPC), dioleoyl-phosphatidylcholine (DOPC), 1,2 Distearoyl-sn-glycero-3-Ethylphosphocholine (Ethyl-DSPC), dipentadecanoyl-phosphatidylcholine (DPDPC), 1-myristoyl-2-palmitoyl-phosphatidylcholine (MPPC), 1-palmitoyl-2-myristoyl-phosphatidylcholine (PMPC), 1-palmitoyl-2-stearoyl-phosphatidylcholine (PSPC), 1-stearoyl-2-palmitoyl-phosphatidylcholine (SPPC), 1-palmitoyl-2-oleylphosphatidylcholine (POPC), 1-oleyl-2-palmitoyl-phosphatidylcholine (OPPC), dilauroyl-phosphatidylglycerol (DLPG) and its alkali metal salts, diarachidoylphosphatidyl-glycerol (DAPG) and its alkali metal salts, dimyristoylphosphatidylglycerol (DMPG) and its alkali metal salts, dipalmitoylphosphatidylglycerol (DPPG) and its alkali metal salts, distearoylphosphatidylglycerol (DSPG) and its alkali metal salts, dioleoylphosphatidylglycerol (DOPG) and its alkali metal salts, dimyristoyl phosphatidic acid (DMPA) and its alkali metal salts, dipalmitoyl phosphatidic acid (DPPA) and its alkali metal salts, distearoyl phosphatidic acid (DSPA), diarachidoylphosphatidic acid (DAPA) and its alkali metal salts, dimyristoyl-phosphatidylethanolamine (DMPE), dipalmitoylphosphatidylethanolamine (DPPE), distearoyl phosphatidyl-ethanolamine (DSPE), dioleylphosphatidyl-ethanolamine (DOPE), diarachidoylphosphatidylethanolamine (DAPE), dilinoleylphosphatidylethanolamine (DLPE), dimyristoyl phosphatidylserine (DMPS), diarachidoyl phosphatidylserine (DAPS), dipalmitoyl phosphatidylserine (DPPS), distearoylphosphatidylserine (DSPS), dioleoylphosphatidylserine (DOPS), dipalmitoyl sphingomyelin (DPSP), and distearoylsphingomyelin (DSSP), dilau-

royl-phosphatidylinositol (DLPI), diarachidoylphosphatidylinositol (DAPI), dimyristoylphosphatidylinositol (DMPI), dipalmitoylphosphatidylinositol (DPPI), distearoylphosphatidylinositol (DSPI), dioleoylphosphatidylinositol (DOPI).

[0068] The term phospholipid further includes modified phospholipid, e.g. phospholipids where the hydrophilic group is in turn bound to another hydrophilic group. Examples of modified phospholipids are phosphatidylethanolamines modified with polyethylenglycol (PEG), i.e. phosphatidylethanolamines where the hydrophilic ethanolamine moiety is linked to a PEG molecule of variable molecular weight (e.g. from 300 to 5000 daltons), such as DPPE-PEG (or DSPE-, DMPE- or DAPE-PEG), i.e. DPPE (or DSPE, DMPE, or DAPE) having a PEG polymer attached thereto. For example, DPPE-PEG2000 refers to DPPE having attached thereto a PEG polymer having a mean average molecular weight of about 2000.

[0069] Particularly preferred phospholipids are DAPC, DSPC, DPPA, DSPA, DMPS, DPPS, DSPS and Ethyl-DSPC. Most preferred are DPPS or DSPC.

[0070] Mixtures of phospholipids can also be used, such as, for instance, mixtures of DPPE, DPPC, DSPC and/or DAPC with DSPS, DPPS, DSPA, DPPA, DSPG, DPPG, Ethyl-DSPC and/or Ethyl-DPPC.

[0071] In preferred embodiments, the phospholipid is the main component of the stabilizing envelope of microbubbles, amounting to at least 50% (w/w) of the total amount of components forming the envelope of the gas filled microbubbles. In some of the preferred embodiments, substantially the totality of the envelope (i.e. at least 90% and up to 100% by weight) can be formed of phospholipids.

[0072] The phospholipids can conveniently be used in admixture with any of the above listed amphiphilic compounds. Thus, for instance, lipids such as cholesterol, ergosterol, phytosterol, sitosterol, lanosterol, tocopherol, propyl gallate or ascorbyl palmitate, fatty acids such as myristic acid, palmitic acid, stearic acid, arachidic acid and derivatives thereof or butylated hydroxytoluene and/or other nonphospholipid compounds can optionally be added to one or more of the foregoing phospholipids in proportions ranging from zero to 50% by weight, preferably up to 25%. Particularly preferred is palmitic acid.

[0073] According to a preferred embodiment, the envelope of microbubbles includes a compound bearing an overall (positive or negative) net charge. Said compound can be a charged amphiphilic material, preferably a lipid or a phospholipid.

[0074] Examples of phospholipids bearing an overall negative charge are derivatives, in particular fatty acid di-ester derivatives, of phosphatidylserine, such as DMPS, DPPS, DSPS; of phosphatidic acid, such as DMPA, DPPA, DSPA; of phosphatidylglycerol such as DMPG, DPPG and DSPG or of phosphatidylinositol, such as DMPI, DPPI or DPPI. Also modified phospholipids, in particular PEG-modified phosphatidylethanolamines, such as DMPE-PEG1000, DMPE-PEG2000, DMPE-PEG3000, DMPE-PEG4000, DMPE-PEG5000, DPPE-PEG1000, DPPE-PEG2000, DPPE-PEG3000, DPPE-PEG4000, DPPE-PEG5000, DSPE-PEG1000, DSPE-PEG2000, DSPE-PEG3000, DSPE-PEG4000, DSPE-PEG5000, DAPE-

AURO_ISO 0018730

PEG1000, DAPE-PEG2000, DAPE-PEG3000, DAPE-PEG4000 or DAPE-PEG5000 can be used as negatively charged molecules. Also the lyso- form of the above cited phospholipids, such as lysophosphatidylserine derivatives (e.g. lyso-DMPS, -DPPS or -DSPS), lysophosphatidic acid derivatives (e.g. lyso-DMPA, -DPPA or -DSPA) and lyso-phosphatidylglycerol derivatives (e.g. lyso-DMPG, -DPPG or -DSPG), can advantageously be used as negatively charged compound. Examples of negatively charged lipids are bile acid salts such as cholic acid salts, deoxycholic acid salts or glycocholic acid salts; and ($C_{12}$-$C_{24}$), preferably ($C_{14}$-$C_{22}$) fatty acid salts such as, for instance, palmitic acid salt, stearic acid salt, 1,2-dipalmitoyl-sn-3-succinylglycerol salt or 1,3-dipalmitoyl-2-succinylglycerol salt.

[0075]    Preferably, the negatively charged compound is selected among DPPA, DPPS, DPSG, DSPE-PEG2000, DSPE-PEG5000 or mixtures thereof.

[0076]    The negatively charged component is typically associated with a corresponding positive counter-ion, which can be mono- (e.g. an alkali metal or ammonium), di- (e.g. an earth-alkali metal) or tri-valent (e.g. aluminium). Preferably the counter-ion is selected among alkali metal cations, such as Li$^+$, Na$^+$, or K$^+$, more preferably Na$^+$.

[0077]    Examples of phospholipids bearing an overall positive charge are derivatives of ethylphosphatidylcholine, in particular di-esters of ethylphosphatidylcholine with fatty acids, such as 1,2-Distearoyl-sn-glycero-3-Ethylphospho-choline (Ethyl-DSPC or DSEPC), 1,2-Dipalmitoyl-sn-glyc-ero-3-Ethylphosphocholine (Ethyl-DPPC or DPEPC). The negative counterion is preferably an halogen ion, in particular chlorine or bromine. Examples of positively charged lipids are alkylammonium salts with a halogen counter ion (e.g. chlorine or bromine) comprising at least one ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), alkyl chain, such as, for instance mono or di-stearylammonium chloride, mono or di-hexadecylam-monium chloride, dimethyldioctadecylammonium bromide (DDAB), hexadecyltrimethylammonium bromide (CTAB). Further examples of positively charged lipids are tertiary or quaternary ammonium salts with a halogen counter ion (e.g. chlorine or bromine) comprising one or preferably two ($C_{10}$-$C_{20}$), preferably ($C_{14}$-$C_{18}$), acyl chain linked to the N-atom through a ($C_3$-$C_6$) alkylene bridge, such as, for instance, 1,2-distearoyl-3-trimethylammonium-propane (DSTAP), 1,2-dipalmitoyl-3-trimethylammonium-propane (DPTAP), 1,2-oleoyl-3-trimethylammonium-propane (DOTAP), 1,2-distearoyl-3-dimethylammonium-propane (DSDAP). DSEPC, DPEPC and/or DSTAP are preferably employed as positively charged compounds in the microbubbles envelope.

[0078]    The positively charged component is typically associated with a corresponding negative counter-ion, which can be mono- (e.g. halogen), di- (e.g. sulphate) or tri-valent (e.g. phosphate). Preferably the counter-ion is selected among halogen ions, such as F$^-$ (fluorine), Cl$^-$ (chlorine) or Br$^-$ (bromine).

[0079]    Mixtures of neutral and charged compounds, in particular of phospholipids and/or lipids, can be satisfactorily employed to form the microbubbles envelope. The amount of charged lipid or phospholipid may vary from about 95% to about 1% by mole, with respect to the total amount of lipid and phospholipid, preferably from 80% to 20% by mole.

[0080]    Preferred mixtures of neutral phospholipids and charged lipids or phospholipids are, for instance, DPPG/DSPC , DSTAP/DAPC, DPPS/DSPC, DPPS/DAPC, DPPE/DPPG, DSPAIDAPC, DSPAIDSPC and DSPG/DSPC.

[0081]    Other excipients or additives may be present either in the dry formulation of the microbubbles or may be added together with the aqueous carrier used for the reconstitution thereof, without necessarily being involved (or only partially involved) in the formation of the stabilizing envelope of the microbubble. These include pH regulators, osmolality adjusters, viscosity enhancers, emulsifiers, bulking agents, etc. and may be used in conventional amounts. For instance compounds like polyoxypropylene glycol and polyoxyeth-ylene glycol as well as copolymers thereof can be used. Examples of viscosity enhancers or stabilizers are compounds selected from linear and cross-linked poly- and oligo-saccharides, sugars, hydrophilic polymers like poly-ethylene glycol.

[0082]    As the preparation of gas-filled microbubbles may involve a freeze drying or spray drying step, it may be advantageous to include in the formulation a lyophilization additive, such as an agent with cryoprotective and/or lyo-protective effect and/or a bulking agent, for example an amino-acid such as glycine; a carbohydrate, e.g. a sugar such as sucrose, mannitol, maltose, trehalose, glucose, lactose or a cyclodextrin, or a polysaccharide such as dextran; or a polyglycol such as polyethylene glycol.

[0083]    The microbubbles can be produced according to any known method in the art. Typically, the manufacturing method involves the preparation of a dried powdered material comprising an amphiphilic material as above indicated, preferably by lyophilization (freeze drying) of an aqueous or organic suspension comprising said material.

[0084]    For instance, as described in WO 91/15244 film-forming amphiphilic compounds can be first converted into a lamellar form by any liposome forming method. To this end, an aqueous solution comprising the film forming lipids and optionally other additives (e.g. viscosity enhancers, non-film forming surfactants, electrolytes etc.) can be submitted to high-speed mechanical homogenisation or to sonication under acoustical or ultrasonic frequencies, and then freeze dried to form a free flowable powder which is then stored in the presence of a gas. Optional washing steps, as disclosed for instance in U.S. Pat. No. 5,597,549, can be performed before freeze drying.

[0085]    According to an alternative embodiment (described for instance in U.S. Pat. No. 5,597,549) a film forming compound and a hydrophilic stabiliser (e.g. polyethylene glycol, polyvinyl pyrrolidone, polyvinyl alcohol, glycolic acid, malic acid or maltol) can be dissolved in an organic solvent (e.g. tertiary butanol, 2-methyl-2-butanol or $C_2Cl_4F_2$) and the solution can be freeze-dried to form a dry powder.

[0086]    Preferably, as disclosed in WO 04/069284, a phospholipid (selected among those cited above and including at least one of the above-identified charged phospholipids) and a lyoprotecting agent (such as those previously listed, in particular carbohydrates, sugar alcohols, polyglycols and mixtures thereof) can be dispersed in an emulsion of water with a water immiscible organic solvent (e.g. branched or linear alkanes, alkenes, cycloalkanes, aromatic hydrocar-

AURO_ISO 0018731

bons, alkyl ethers, ketones, halogenated hydrocarbons, perfluorinated hydrocarbons or mixtures thereof) under agitation. The emulsion can be obtained by submitting the aqueous medium and the solvent in the presence of at least one phospholipid to any appropriate emulsion-generating technique known in the art, such as, for instance, sonication, shaking, high pressure homogenization, micromixing, membrane emulsification, high speed stirring or high shear mixing. For instance, a rotor-stator homogenizer can be employed, such as Polytron PT3000. The agitation speed of the rotor-stator homogenizer can be selected depending from the components of the emulsion, the volume of the emulsion, the relative volume of organic solvent, the diameter of the vessel containing the emulsion and the desired final diameter of the microdroplets of solvent in the emulsion. Alternatively, a micromixing technique can be employed for emulsifying the mixture, e.g. by introducing the organic solvent into the mixer through a first inlet (at a flow rate of e.g. 0.05-5 ml/min), and the aqueous phase a second inlet (e.g. at a flow rate of 2-100 ml/min). The outlet of the micromixer is then connected to the vessel containing the aqueous phase, so that the aqueous phase drawn from said vessel at subsequent instants and introduced into the micromixer contains increasing amounts of emulsified solvent. When the whole volume of solvent has been added, the emulsion from the container can be kept under recirculation through the micromixer for a further predetermined period of time, e.g. 5-120 minutes, to allow completion of the emulsion. Depending on the emulsion technique, the organic solvent can be introduced gradually during the emulsification step or at once before starting the emulsification step. Alternatively the aqueous medium can be gradually added to the water immiscible solvent during the emulsification step or at once before starting the emulsification step. Preferably, the phospholipid is dispersed in the aqueous medium before this latter is admixed with the organic solvent. Alternatively, the phospholipid can be dispersed in the organic solvent or it may be separately added the aqueous-organic mixture before or during the emulsification step. The so obtained microemulsion, which contains microdroplets of solvent surrounded and stabilized by the phospholipid material (and optionally by other amphiphilic film-forming compounds and/or additives), is then lyophilized according to conventional techniques to obtain a lyophilized material, which is stored (e.g. in a vial in the presence of a suitable gas) and which can be reconstituted with an aqueous carrier to finally give a gas-filled microbubbles suspension where the dimensions and size distribution of the microbubbles are substantially comparable with the dimensions and size distribution of the suspension of microdroplets.

[0087] A further process for preparing gas-filled microbubbles comprises generating a gas microbubble dispersion by submitting an aqueous medium comprising a phospholipid (and optionally other amphiphilic film-forming compounds and/or additives) to a controlled high agitation energy (e.g. by means of a rotor stator mixer) in the presence of a desired gas and subjecting the obtained dispersion to lyophilisation to yield a dried reconstitutable product. An example of this process is given, for instance, in WO 97/29782, here enclosed by reference.

[0088] Spray drying techniques (as disclosed for instance in U.S. Pat. No. 5,605,673) can also be used to obtain a dried powder, reconstitutable upon contact with physiological aqueous carrier to obtain gas-filled microbubbles.

[0089] The dried or lyophilised product obtained with any of the above techniques will generally be in the form of a powder or a cake, and can be stored (e.g. in a vial) in contact with the desired gas. The product is readily reconstitutable in a suitable physiologically acceptable aqueous liquid carrier, which is typically injectable, to form the gas-filled microbubbles, upon gentle agitation of the suspension. Suitable physiologically acceptable liquid carriers are sterile water, aqueous solutions such as saline (which may advantageously be balanced so that the final product for injection is not hypotonic), or solutions of one or more tonicity adjusting substances such as salts or sugars, sugar alcohols, glycols or other non-ionic polyol materials (eg. glucose, sucrose, sorbitol, mannitol, glycerol, polyethylene glycols, propylene glycols and the like).

[0090] Mean dimensions and size distribution of the final reconstituted microbubbles can be in general be determined by suitably acting on the parameters of the preparation process. In general, different values of mean size and size distribution of a final preparation can be obtained by selecting different envelope-stabilizing phospholipids and/or (when required by the process) by the selection of different organic solvents and/or different volumes thereof (relative to the volume of aqueous phase). In addition, for the specific preparation processes disclosed in WO 04/069284 or W097/29782, a variation of the mixing speed generally results in a variation of the mean dimensions of the final microbubble preparation (typically, the higher the mixing speeds, the smaller the obtained microbubbles).

[0091] According to a preferred alternative embodiment, the composition of the invention may comprise any suitable ultrasound contrast agent in the form of microballons.

[0092] As formerly reported, gas-filled microballoons as defmed herein comprise microvesicles having a material envelope, the thickness of which is in general much greater than the thickness of microbubbles stabilizing film-envelope. Depending from the material forming said envelope (which can be e.g. polymeric, proteinaceous, of a water insoluble lipid or of any combination thereof), said thickness is in general of at least 50 nm, typically of at least 100 nm, up to few hundred nanometers (e.g. 300 nm). Microballoons also generally differ from microbubbles in terms of acoustic response to ultrasonication. While the ultrasonic behavior of microbubbles is in fact closer to the behavior of "free" gas bubbles, microballoons (probably because of a higher stiffness of the envelope) are in general less responsive (in terms of intensity of the reflected echo signal) when irradiated at low levels of acoustic pressure energy (e.g. at a mechanical index of about 0.1).

[0093] Preferred examples of microballoons are those comprising a stabilizing polymeric envelope, preferably comprising a biodegradable polymer, or a stabilizing envelope based on biodegradable water-insoluble lipids, such as, for instance those described in U.S. Pat. No. 5,711,933 and U.S. Pat. No. 6,333,021, herein incorporated by reference in their entirety. Microballoons having a proteinaceous envelope, i.e. made of natural proteins (albumin, haemoglobin) such as those described in U.S. Pat. No. 4,276,885 or EP-A-0 324 938, can also be employed. Polymers forming the envelope of the injectable microballoons are preferably hydrophilic, biodegradable physiologically compatible polymers. Examples of such polymers, which may be natu-

US 2008/0008658 A1

Jan. 10, 2008

8

ral or synthetic, are substantially insoluble polysaccharides (e.g. chitosan or chitin), polycyanoacrylates, polylactides and polyglycolides and their copolymers, copolymers of lactides and lactones such as γ-caprolactone or **67**-valero-lactone, copolymers of ethyleneoxide and lactides, polyethyleneimines, polypeptides, and proteins such as gelatin, collagen, globulins or albumins. Other suitable polymers mentioned in the above cited U.S. Pat. No. 5,711,933 include poly-(ortho)esters, polylactic and polyglycolic acid and their copolymers (e.g. DEXONO, Davis & Geck, Montreal, Canada); poly(DL-lactide-co-γ-caprolactone), poly(DL-lactide-co-δ-valerolactone), poly(DL-lactide-co-γ-butyrolactone), polyalkylcyanoacrylates; polyamides, polyhydroxybutyrate; polydioxanone; poly-β-aminoketones; polyphosphazenes; and polyanhydrides. Polyamino-acids such as polyglutamic and polyaspartic acids can also be used, as well as their derivatives, such as partial esters with lower alcohols or glycols. Copolymers with other amino acids such as methionine, leucine, valine, proline, glycine, alanine, etc. can also be used.

[0094] Derivatives of polyglutamic and polyaspartic acid with controlled biodegradability (such as those described in WO87/03891, U.S. Pat. No. 4,888,398 or EP 130935, all herein incorporated by reference) can also be used. These polymers (and copolymers with other amino-acids) have formulae of the following type: —(NH—CHA—CO)$_w$—(NH—CHX—CO)$_y$—where X designates the side chain of an amino acid residue (e.g. methyl, isopropyl, isobutyl, or benzyl); A is a group of formulae —(CH$_2$)$_n$COOR$^1$R$^2$—OCOR, —(CH$_2$)$_n$ COO—CHR$^1$COOR, —(CH$_2$)$_n$CO(NH—CHX—CO)$_m$NH—CH(COOH)—(CH$_2$)$_p$COOH, or the respective anhydrides thereof, wherein R$^1$ and R$^2$ represent H or lower alkyls, and R represents alkyl or aryl; or R and R$^1$ are connected together by a substituted or unsubstituted linking member to provide 5- or 6- membered rings; n, m and p are lower integers, not exceeding 5; and w and y are integers selected for having molecular weights not below 5000.

[0095] Non-biodegradable polymers (e.g. for making microballoons to be used in the digestive tract) can be selected from most water-insoluble, physiologically acceptable, bioresistant polymers including polyolefins (polystyrene), acrylic resins (polyacrylates, polyacrylonitrile), polyesters (polycarbonate), polyurethanes, polyurea and their copolymers. ABS (acryl-butadiene-styrene) is a preferred copolymer.

[0096] Biodegradable water-insoluble lipids useful for forming a microballoon comprise, for instance, solid water insoluble mono-, di- or tri-glycerides, fatty acids, fatty acid esters, sterols such as cholesterol, waxes and mixtures thereof Mono-, di- and tri- glycerides include mainly the mono-, di- and tri-laurin compounds as well as the corresponding -myristin, -palmitin, -stearin, -arachidin and -behenin derivatives. Mono-, di- and tri-arachidin, -palmitin -stearin and mixed triglycerides such as dipalmitoylmonooleyl glyceride are particularly useful; tripalmitin and tristearin are preferred. Fatty acids include solid (at room temperature, about 18-25° C.) fatty acids (preferably saturated) having 12 carbon atoms or more, including, for instance, lauric, arachidic, behenic, palmitic, stearic, sebacic, myristic, cerotinic, melissic and erucic acids and the fatty acid esters thereof. Preferably, the fatty acids and their esters are used in admixture with other glycerides.

[0097] The sterols are preferably used in admixture with the other glycerides and/or fatty acids and are selected from cholesterol, phytosterol, lanosterol, ergosterol, etc. and esters of the sterols with the above mentioned fatty acids; however, cholesterol is preferred.

[0098] Preferred biodegradable lipids are triglycerides such as tripalmitin, triarachidin, tristearin or mixtures of the above mentioned triglycerides.

[0099] Optionally, up to 75% by weight of a biodegradable polymer, such as those listed previously, can be admixed together with the biodegradable water insoluble lipid forming the envelope of the microballoon.

[0100] Advantageously, ionic polymers (i.e. polymers bearing ionic moieties in their structure), preferably biodegradable ionic polymers, can also be used to form the stabilizing envelope of the microballoons, thus conferring the desired overall net charge thereto. Ionic polymers can be used as main components of the stabilizing envelope or they can be admixed in various amounts (e.g. from 2 to 80% by weight) with non ionic polymers. Suitable ionic polymers are, for instance, polymers comprising a quaternized nitrogen atom, such as quaternized amines or polymers comprising an carboxylic, sulfate, sulfonate or phosphonate moieities. Examples of suitable ionic polymers include, without limitation, polyethylenimine, poly(diallyldimethylammonium chloride), poly{bis(2-chloroethyl)ether-alt- 1,3-bis[3-(dimethylamino)propyl]urea}quaternized (Polyquaternium®-2), poly(4-vinylpyridinium tribromide), hydroxyethylcellulose ethoxylate quaternized (Polyquaternium®-4, poly(p-xylene tetrahydrothiophenium chloride), poly(L-lysine), chitin, diethyleneaminoethyl dextran, poly(acrylic acid), poly(methacrylic acid), poly(styrene-alt-maleic acid), poly(amino acids), alginic acid, poly(uridylic acid), hyaluronic acid, i.e. poly(B-glucuronic acid-alt-β-N-acetylglucosamide), poly(galacturonic acid), poly(vinyl acetate-co-crotonic acid), DNA, poly(3,3',4,4'-benzophenonetetracarboxylic dianhydride-co-4,4'-oxydianiline), poly(isoprene-graft-maleic acid monomethyl ether), copolymer of glutamic acid with alkyl glutamate, heparin, poly(styrene sulfonate), sulfonated poly(isophthalic acid), poly-(vinyl sulfonate, potassium salt), poly(vinyl sulfate, potassium salt), chondroitin sulfate A, dextran sulfate, fucoidan, polyphosphoric acid, sodium polyphosphate, sodium polyvinylphosphonate, poly-L-lysine hydrobromide, chitosan, chitosan sulfate, sodium alginate, alginic acid and ligninsulfonate.

[0101] Conventional additives can also be incorporated into the envelope of the microballoons, to modify physical properties thereof, such as dispersibility, elasticity and water permeability. In particular, effective amounts of amphiphilic materials can be added to the emulsion prepared for the manufacturing of said microballoons, in order to increase the stability thereof. Said materials can advantageously be selected among those amphiphilic compounds, such as lipids, phospholipids and modified phospholipids, listed in the foregoing of this specification.

[0102] The added amphiphilic material can advantageously be a compound bearing an overall net charge. Preferred charged lipids, phospholipids and modified phospholipids are those previously listed. Preferably the amount of charged compound, when present, is from about 2% to 40% of the total weight of the material forming the stabilizing envelope.

AURO_ISO 0018733

[0103] Other excipients or additives, in particular used for the preparation of microballoons, can be incorporated into the envelope such as redispersing agents or viscosity enhancers.

[0104] Biodegradable polymer-containing microballoons can be prepared, for instance, according to the process disclosed in U.S. Pat. No. 5,711,933, herein incorporated by reference, which comprises (a) emulsifying a hydrophobic organic phase into a water phase so as to obtain droplets of said hydrophobic phase as an oil-in-water emulsion in said water phase; (b) adding to said emulsion a solution of at least one polymer in a volatile solvent insoluble in the water phase, so that said polymer forms a layer around said droplets; (c) evaporating said volatile solvent so that the polymer deposits by interfacial precipitation around the droplets which then form beads with a core of said hydrophobic phase encapsulated by a membrane of said polymer, said beads being in suspension in said water phase; (d) removing said encapsulated hydrophobic phase by evaporation by subjecting said suspension to reduced pressure; and (e) replacing said evaporated hydrophobic phase with a suitable gas.

[0105] Biodegradable lipid-containing microballoons can be prepared, for instance, according to the process disclosed in U.S. Pat. No. 6,333,021 (herein incorporated by reference), by dispersing a mixture of one or more of the solid constituents of the microcapsule envelope dissolved in an organic solvent in a water carrier phase, so as to produce an oil-in-water emulsion. The emulsion water phase may contain an effective amount of amphiphilic materials which are used to stabilise the emulsion.

[0106] A certain amount of redispersing agent and/or of a cryoprotecting or lyoprotecting agent, such as those previously indicated, is then added to the emulsion of tiny droplets of the organic solution in the water phase, prior to freezing at a temperature below −30° C. Any convenient redispersing agent may be used; redispersing agents selected from sugars, albumin, gelatine, polyvinyl pyrolidone (PVP), polyvinyl alcohol (PVA), polyethylene glycol (PEG) and ethyleneoxide-propyleneoxide block copolymer (e.g. Pluronico, or Synperonico) or mixtures thereof are preferred. The redispersing agents which are added to prevent particle agglomeration are particularly useful when the microcapsules are in the form of non-coalescent, dry and instantly dispersible powders. The frozen emulsion is then subjected to reduced pressure to effect lyophilisation, i.e. the removal by sublimation of the organic solvent from the droplets and of the water of the carrier phase, and the freeze-dried product is then contacted with the desired gas.

[0107] The microballoons can then be reconstituted by contacting the dried powder with a suitable aqueous carrier under gentle agitation.

[0108] As far as the gas filling in the above microbubbles or microballoons is concerned, any biocompatible gas, gas precursor or mixture thereof may be employed for the preparation of the above microvesicles.

[0109] The gas may comprise, for example; air; nitrogen; oxygen; carbon dioxide; hydrogen; nitrous oxide; a noble or inert gas such as helium, argon, xenon or krypton; a radio-active gas such as $Xe^{133}$ or $Kr^{81}$; a hyperpolarized noble gas such as hyperpolarized helium, hyperpolarized xenon or hyperpolarized neon; a low molecular weight hydrocarbon (e.g. containing up to 7 carbon atoms), for example an alkane such as methane, ethane, propane, butane, isobutane, pentane or isopentane, a cycloalkane such as cyclobutane or cyclopentane, an alkene such as propene, butene or isobutene, or an alkyne such as acetylene; an ether; a ketone; an ester; halogenated gases, preferably fluorinated gases, such as or halogenated, fluorinated or prefluorinated low molecular weight hydrocarbons (e.g. containing up to 7 carbon atoms); or a mixture of any of the foregoing. Where a halogenated hydrocarbon is used, preferably at least some, more preferably all, of the halogen atoms in said compound are fluorine atoms.

[0110] Fluorinated gases are preferred, in particular per-fluorinated gases, especially in the field of ultrasound imaging. Fluorinated gases include materials which contain at least one fluorine atom such as, for instance fluorinated hydrocarbons (organic compounds containing one or more carbon atoms and fluorine); sulfur hexafluoride; fluorinated, preferably perfluorinated, ketones such as perfluoroacetone; and fluorinated, preferably perfluorinated, ethers such as perfluorodiethyl ether. Preferred compounds are perfluori-nated gases, such as $SF_6$ or perfluorocarbons (perfluorinated hydrocarbons), i.e. hydrocarbons where all the hydrogen atoms are replaced by fluorine atoms, which are known to form particularly stable microbubble suspensions, as disclosed, for instance, in EP 0554 213, which is herein incorporated by reference.

[0111] The term perfluorocarbon includes saturated, unsaturated, and cyclic perfluorocarbons. Examples of biocompatible, physiologically acceptable perfluorocarbons are: perfluoroalkanes, such as perfluoromethane, perfluoroet-hane, perfluoropropanes, perfluorobutanes (e.g. perfluoro-n-butane, optionally in admixture with other isomers such as perfluoro-isobutane), perfluoropentanes, perfluorohexanes or perfluoroheptanes; perfluoroalkenes, such as perfluoro-propene, perfluorobutenes (e.g. perfluorobut-2ene) or per-fluorobutadiene; perfluoroalkynes (e.g. perfluorobut-2-yne); and perfluorocycloalkanes (e.g. perfluorocyclobutane, per-fluoromethylcyclobutane, perfluorodimethylcyclobutanes, perfluorotrimethylcyclobutanes, perfluorocyclopentane, per-fluoromethylcyclopentane, perfluorodimethylcyclopen-tanes, perfluorocyclohexane, perfluoromethylcyclohexane and perfluorocycloheptane). Preferred saturated perfluoro-carbons have the formula $C_nF_{n+2}$, where n is from 1 to 12, preferably from 2 to 10, most preferably from 3 to 8 and even more preferably from 3 to 6. Suitable perfluorocarbons include, for example, $CF_4$, $C_2F_6$, $C_3F_8$, $C_4F_8$, $C_4F_{10}$, $C_5F_{12}$, $C_6F_{12}$, $C_6F_{14}$, $C_7F_{14}$, $C_7F_{16}$, $C_8F_{18}$, and $C_9F_{20}$.

[0112] Particularly preferred gases are $SF_6$ or perfluoro-carbons selected from $CF_4$, $C_2F_6$, $C_3F_8$, $C_4F_8$, $C_4F_{10}$ or mixtures thereof; $SF_6$, $C_3F_8$ or $C_4F_{10}$ are particularly preferred.

[0113] It may also be advantageous to use a mixture of any of the above gases in any ratio. For instance, the mixture may comprise a conventional gas, such as nitrogen, air or carbon dioxide and a gas forming a stable microbubble suspension, such as sulfur hexafluoride or a perfluorocarbon as indicated above. Examples of suitable gas mixtures can be found, for instance, in WO 94/09829, which is herein incorporated by reference. The following combinations are particularly preferred: a mixture of gases (A) and (B) in

US 2008/0008658 A1

10

Jan. 10, 2008

which the gas (B) is a fluorinated gas, preferably selected from $SF_6$, $CF_4$, $C_2F_6$, $C_3F_6$, $C_3F_8$, $C_4F_6$, $C_4F_8$, $C_4F_{10}$, $C_5F_{10}$, $C_5F_{12}$ or mixtures thereof, and (A) is selected from air, oxygen, nitrogen, carbon dioxide or mixtures thereof The amount of gas (B) can represent from about 0.5% to about 95% v/v of the total mixture, preferably from about 5% to 80%.

[0114]   In certain circumstances it may be desirable to include a precursor to a gaseous substance (i.e. a material that is capable of being converted to a gas in vivo). Preferably the gaseous precursor and the gas derived therefrom are physiologically acceptable. The gaseous precursor may be pH-activated, photo-activated, temperature activated, etc. For example, certain perfluorocarbons may be used as temperature activated gaseous precursors. These perfluorocarbons, such as perfluoropentane or perfluorohexane, have a liquid/gas phase transition temperature above room temperature (or the temperature at which the agents are produced and/or stored) but below body temperature; thus, they undergo a liquid/gas phase transition and are converted to a gas within the human body. For ultrasonic echography, the biocompatible gas or gas mixture is preferably selected from air, nitrogen, carbon dioxide, helium, krypton, xenon, argon, methane, halogenated hydrocarbons (including fluorinated gases such as perfluorocarbons and sulfur hexafluoride) or mixtures thereof. Advantageously, perfluorocarbons (in particular $C_4F_{10}$ or $C_3F_8$) or $SF_6$ can be used, optionally in admixture with air or nitrogen.

[0115]   For the use in MRI the microvesicles will preferably contain a hyperpolarized noble gas such as hyperpolarized neon, hyperpolarized helium, hyperpolarized xenon, or mixtures thereof, optionally in admixture with air, $CO_2$, oxygen, nitrogen, helium, xenon, or any of the halogenated hydrocarbons as defined above.

[0116]   For use in scintigraphy, the microvesicle will preferably contain radioactive gases such as $Xe^{133}$ or $Kr^{81}$ or mixtures thereof, optionally in admixture with air, $CO_2$, oxygen, nitrogen, helium, kripton or any of the halogenated hydrocarbons as defmed above.

[0117]   Going back to the compositions of the present invention and according to an additional preferred embodiment, the suspension of gas-containing microvesicles are selected from aqueous suspensions of amphiphile-stabilized microbubbles or microballoons.

[0118]   More preferably, the said suspended microvesicles are characterized by a gaseous core and a stabilizing coat wherein said coat comprises a layer or multiple layers of self-assembling amphiphilic compounds or a solid layer of elastic polymeric material or a solid or liquid layer of a fat.

[0119]   Preferably, the stabilizing coat comprises: phospholipids; phosphatidic acids; biocompatible and biodegradable polymers; triglycerides; detergents, preferably fatty acids; or any mixture thereof.

[0120]   According to another embodiment of the invention, the gas of the gas-containing microvesicles is selected from nitrogen, oxygen, fluorine containing gases, noble gases and mixtures thereof.

[0121]   Among the fluorine containing gases, perfluoroalkanes and sulphur hexafluoride are preferred, particularly

when employed in amounts not lower than 1% (v/v) with respect to the total amount of gas.

[0122]   From all of the above, non limiting examples of preferred compositions of the invention comprise ultrasound contrast agents selected from SonoVue® (Bracco), Definity® (Dupont Pharmaceutical), Imagent® (Imcor Pharmaceutical), Optison® (Amersham Health), A1700 (Acusphere) and Cardiosphere® (Point Biomedical).

[0123]   According to an additional embodiment of the invention, as the targeting of cells and tissues by means of suitable ligands having a high affinity to the said cells and tissues is a rather well-known technique, for instance in the occurrence of targeted delivery of bioactive(s), the ultrasound contrast agent of the invention may also be bound to a suitable ligand which provides affinity to the cells of the lymphatic system or of the tumor.

[0124]   Suitable ligands may be thus comprise, for instance, polypeptides and antibodies or their fragments and drugs, all of which having selectivity for macrophages or tumor cells. Examples of a ligands selective for certain tumor cells are: gastrin-related polypeptide, octreotide, rituximab, infliximab, trastuzumab, adalimumab, omalizumab, tositumomab, efalizumab, cetuximab.

[0125]   The contrast agent of the invention contains the echographic component at microvesicle concentrations between $10^6$/mL and $10^{10}$/mL, preferably between $10^7$/mL and $10^9$/mL.

[0126]   The wide concentration range is justified by the facts that: a) the echographic signal is approximatively proportional to the logarithm of the concentration; and b) reconstitution of echographic agents leads to concentrations with a substantial, but echographically irrelevant, variation.

[0127]   The contrast agent of the invention contains the echographic dye at concentrations in the range from $5 \times 10^{-6}$ M to $2 \times 10^{-4}$ M, preferably in the range from $10^{-5}$ M to $5 \times 10^{-5}$ M. The indicated wide range of concentrations reflects the fact that molar extinction coefficients of different dyes may vary greatly.

[0128]   With respect to the manufacturing process, any of the aforementioned methods for preparing microbubbles and microballoons as known ultrasound contrast agents, comprehensive of any variant thereof, may apply as well to the preparation of the compositions of the invention.

[0129]   Typically, the vital dye can be either present in the dried powdered material or solid or fluffy cake to be reconstituted in the form of microbubbles or microballoons before administration or, alternatively, it can be present in the solution to be used for their reconstitution.

[0130]   In the former case, a suitable solution of the vital dye is properly admixed with the components of the microbubbles or microballoons themselves, for instance phospholipid components, and properly processed as above indicated, e.g. freeze-dried, so as to obtain the desired dried powdered material.

[0131]   According to a preferred embodiment, however, the compositions of the invention may be prepared by reconstituting the powdered material or solid or fluffy cake with a physiological solution also comprising a proper amount of the vital dye.

**AURO_ISO 0018735**

[0132] Therefore, it represents a further object of the invention a process for manufacturing the compositions of the invention which process comprises reconstituting a dried powdered material or solid or fluffy cake, properly stored in the presence of a suitable microvesicle-forming gas, with a suitable aqueous carrier for injection, wherein the vital dye is present in the dried powdered material or solid or fluffy cake or in the aqueous carrier.

[0133] Preferably, as formerly indicated, the selected vital dye is present in the aqueous carrier. In the present description, unless otherwise provided, with the term solid or fluffy cake we intend the material in the state in which it is found after a lyophilization step.

[0134] Alternatively, as formerly reported, the compositions of the invention may be also prepared by converting amphiphile containing particles, being suspended in a vital dye-containing aqueous carrier for injection under a microbubble-forming gas, into a suspension of gas-containing microbubbles by vigorous agitation.

[0135] For additional details concerning the preparation processes of the compositions of the invention see, also, the subsequent experimental section.

[0136] According to the above alternative embodiments for preparing the compositions of the invention, each comprising any one of the aforementioned variants, stable formulations of ultrasound contrast agents in combination with vital dyes are thus obtained.

[0137] For an optimal visualization of the lymphatic system, the compositions of the invention may comprise microbubbles or microballons having a mean particle diameter size not exceeding about 6 μm, and preferably ranging from about 0.5 μm to about 5 μm.

[0138] Clearly, as the particles size and their frequency of distribution is known to depend on several factors, among which are the formerly reported preparation steps, possible deviations from the above mean size have to be also considered.

[0139] Even so, despite the fact that minor alteration in the chemical composition may strongly influence the yield, the distribution size and, importantly, the stability of the compositions themselves, the finding that known ultrasound contrast agents could be successfully formulated in combination with vital dyes, as per the invention, has to be certainly regarded as unexpected.

[0140] In this respect, experimental evidence is given to demonstrate the stability of some representative compositions of the invention.

[0141] More in particular, upon reconstitution of suitable freeze-dried cakes with aqueous carriers also comprising the selected vital dye, tests were performed to analyze the bubble size distribution of the microbubbles thus formed.

[0142] A combined composition according to the invention is preferably stored in dried powdered form and as such can advantageously be packaged in a two component diagnostic kit. The kit preferably comprises a first container, containing the lyophilized composition in contact with a selected microvesicle-forming gas and a second container, containing a physiologically acceptable aqueous carrier, wherein any one between the lyophilized composition or the physiologically acceptable carrier comprises the vital dye. Examples of suitable carriers are water, typically sterile, pyrogen free water (to prevent as much as possible contamination in the intermediate lyophilized product), aqueous solutions such as saline (which may advantageously be balanced so that the final product for injection is not hypotonic), or aqueous solutions of one or more tonicity adjusting substances such as salts or sugars, sugar alcohols, glycols or other non-ionic polyol materials (eg. glucose, sucrose, sorbitol, mannitol, glycerol, polyethylene glycols, propylene glycols and the like).

[0143] Preferably, the said physiologically acceptable water carrier also comprises the vital dye.

[0144] Said two component kit can include two separate containers or a dual-chamber container. In the former case the container is preferably a conventional septum-sealed vial, wherein the vial containing the lyophilized residue is sealed with a septum through which the carrier liquid may be injected using an optionally prefilled syringe. In such a case the syringe used as the container of the second component may be also then used for injecting the composition of the invention. In the latter case, the dual-chamber container is preferably a dual-chamber syringe and once the lyophilisate has been reconstituted and then suitably mixed or gently shaken, the container can be used directly for injecting the composition.

[0145] The compositions of the present invention may be used in a variety of diagnostic ultrasound imaging techniques comprising, for instance, fundamental and harmonic B- mode imaging, pulse or phase inversion imaging and fundamental and harmonic Doppler imaging, imaging of ultrasound-provoked contrast agent rupture; if desired three-dimensional imaging techniques may be used.

[0146] As the compositions of the invention and, in particular, the gas-filled microvesicles, upon injection remain intact in sufficient proportion, both the microvesicles themselves as well as the vital dye are taken up by the lymphatic system and retained in the sentinel lymph node.

[0147] Taking advantage of it, the surgeon may perform a very sensitive and effective ultrasound detection of the sentinel lymph node and thus identify the optimal site of operative incision just prior to surgery, whilst allowing optical visualization of the color marked sentinel lymph node or nodes of the tumor and optionally providing for its excision, for instance for any subsequent tissue evaluation and biopsy.

[0148] From the above, it should be clear to the skilled man that the above method allows the identification of the sentinel lymph node with a particularly non invasive technique. In addition, the possibility of properly preparing and administering a single stable composition of the invention, also minimizes the need for subsequent administrations of the single components, for instance comprising two separated injections of the ultrasound contrast agent and of the vital dye.

[0149] It is therefore an additional object of the invention a method for the identification of the sentinel lymph node or nodes of a tumor in a mammal, which method comprises:

[0150] a) administering to said mammal a composition comprising an ultrasound contrast agent in combination with a vital dye;

AURO_ISO 0018736

[0151] b) observing by ecography the area of the lymphatic system or systems draining the tumor so as to determine the lymph node or nodes;

[0152] c) visually localizing the sentinel lymph node or nodes by surgery being guided by the coloration of the vital dye; and, optionally,

[0153] d) excising the sentinel lymph node or nodes.

[0154] Preferably, according to the method of the invention, the mammal is a human.

[0155] According to step (a), the compositions of the invention are preferably administered intradermally, subdermally, subcutaneously upstream of the lymphatic area under investigation, or specifically in the breast, also subareolarly or periareolarly.

[0156] The compositions of the invention may be typically administered at a dose corresponding to the range from about 0.001 μL to about 10 μL, preferably from about 0.01 μL to about 1 μL, of gas, depending on their respective composition, the tissue or organ to be imaged. This general dose range can of course vary further depending on specific imaging modality used, e.g. lower doses may be used when imaging with highly sensitive techniques, such as imaging based on contrast agent rupture or power pulse inversion.

[0157] In the imaging of the lymphatic system and, more particularly, of the sentinel lymph node or nodes, volumes of the compositions of the invention to be injected may preferably range from about 5 μL to about 1000 μL and, even more preferably, from about 50 μL to about 500 μL.

[0158] According to step (b) of the above method, echographic observation of the territory of interest may occur immediately after the beginning of the administration and up to a time varying from a 10 s to hours after termination of the administration, depending on the exact characteristics of the contrast composition, the administration regime and the lymphatic area under examination.

[0159] Typically, the lymph node or nodes in step (b) are those being first filled by the composition of the invention and so identified because of the echographic contrast. According to step (c), the ocular visualization of the lymph node or nodes occurs through a minimally invasive surgical access to the interested area, the said access being guided by the coloration of the lymphatic system brought about by the vital dye of the composition of the invention.

[0160] Once finally detected and visualized, the said lymph node or nodes may be thus subsequently analysed or anyway properly treated.

[0161] As an example, according to optional step (d), the sentinel lymph node or nodes can be surgically excised so as get histological information or, alternatively, it may be imaged in situ, for instance through magnetic resonance microscopy or single plane optical microscopy.

[0162] Alternatively, according to an additional embodiment, the compositions of the invention may be also administered as an intradermal bolus at rates preferably not exceeding 100 μL/(min and needle), followed by quantitative monitoring of the signal intensity in the lymph nodes as a function of time. The time-course may be thus used to characterize perfusion rates and sinusoidal residence times

of the lymph nodes, both parameters known to be altered by the presence of obstructing tumor masses.

[0163] From all of the above, it is an additional object of the invention the use of the aforementioned compositions for the imaging of the lymphatic system and, even more particularly, for the identification of the sentinel lymph node or nodes.

[0164] With the aim of better illustrating the present invention, without posing any limitation to it, the following examples are now given.

EXAMPLE 1

[0165] A 5% (w/v) solution of Evans blue (CAS [61-73-4]), obtained from E. Merck AG, Dietikon, Switzerland, in 0.9% sodium chloride was prepared and the pH was adjusted to 7.0 with hydrochloric acid. The solution was filtered on a 0.45 μm filter. Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVueo, Bracco Imaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

[0166] With the sole aim of verifying that the presence of the dye did not interfere with the known echographic contrast enhancement, once administered, the above suspension was injected intravenously at a dose of 0.03 mL/kg to a rabbit, where it provided outstanding echocardiographic views of the right and left ventricle. Even a ten fold dilution of this suspension showed strong contrast enhancement.

EXAMPLE 2

[0167] A 5% (w/v) solution of patent blue VF (CAS [129-17-9]; CI [42045]; sulphane blue), obtained from ACROS Organics Inc./Fisher Scientific, Wohlen, Switzerland, was prepared in 0.9% (w/v) sodium chloride. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide. The solution was filtered on a 0.22 μm single use filter.

[0168] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Imaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

EXAMPLE 3

[0169] A 8% (w/v) solution of patent blue VF (CAS [129-17-9]; CI [42045]; sulphane blue), obtained from ACROS Organics Inc./Fisher Scientific, Wohlen, Switzerland, was prepared in pharmaceutical grade water for injection, yielding an essentially isotonic solution. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide. The solution was filtered on a 0.22 μm single use filter. Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Imaging SA, Geneva, Switzerland) containing the specially for-

13

mulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

### EXAMPLE 4

[0170] A 4% (w/v) solution of isosulfan blue (USAN) (CAS [68238-36-8]), obtained from Sigma-Aldrich / Fluka Chemie GmbH, Buchs, Switzerland, as patent blue violet (Code # P 1888), was prepared in 0.9% (w/v) sodium chloride. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide. The solution was filtered on a 0.22 μm single use filter.

[0171] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Inaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

### EXAMPLE 5

[0172] A 8% (w/v) solution of leuco patent blue violet (CAS [133978-89-9]), obtained from Sigma-Aldrich/Fluka Chemie GmbH, Buchs, Switzerland, Code # L 1275, was prepared in pharmaceutical grade water for injection. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid. The solution was filtered on a 0.22 μm single use filter.

[0173] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Inaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark blue suspension of microbubbles was obtained.

### EXAMPLE 6

[0174] A 2.5% (w/v) solution of indocyanine green (USP) monosodium salt (CAS [3599-32-4]); sulphobromophthalein (BAN) monosodium salt; cardiogreen; foxgreen), obtained from Fluka Chemie GmbH, Buchs, Switzerland, Code # 21981, was prepared in 0.9% (w/v) sodium chloride. After complete solubilization, the pH was adjusted to 7.0. The solution was filtered on a 0.22 μm single use filter.

[0175] Vials of the ultrasound contrast agent, sulphur hexafluoride, phospholipids stabilized microbubbles for injection (SonoVue®, Bracco Imaging SA, Geneva, Switzerland) containing the specially formulated phospholipids cake, were reconstituted using the standard procedure, but with 5 mL of the dye solutions instead of the 0.9% sodium chloride solution. After 30 s of vigorous mixing, a dark green suspension of microbubbles was obtained.

### EXAMPLE 7

[0176] From a 2 mL vial of perflutren lipid microbubbles (Definity®, Bristol-Myers Squibb Medical Imaging, Inc., North Billerica, Mass., USA) and before its activation, 1 mL of liquid was withdrawn and replaced by a 8% (w/v) solution of isosulfan blue (USAN) (CAS [68238-36-8]). Isosulfan blue was obtained from Sigma-Aldrich/Fluka Chemie

GmbH, Buchs, Switzerland, as patent blue violet (Code # P 1888) and dissolved in pharmaceutical grade water for injection. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide and the solution was filtered on a 0.22 μm single use filter. Upon activation of the product by agitation in the Vialmixo equipment (Bristol-Myers Squibb) the microbubble suspension formed regularly.

### EXAMPLE 8

[0177] From a 3 mL vial of perflutren protein-type A microspheres for injection (USP) (Optison®, Amersham Buchler GmbH & Co. KG, Braunschweig, Germany) 1 mL of liquid was withdrawn and replaced by a 8% (w/v) solution of isosulfan blue (USAN) (CAS [68238-36-8]). Upon gentle agitation a suspension with $4.8\times10^8$/mL microbubbles was obtained. The dye solution was prepared in the following manner: the dye was obtained from Sigma-Aldrich/Fluka Chemie GmbH, Buchs, Switzerland, as patent blue violet (Code # P 1888) and dissolved in pharmaceutical grade water for injection. After complete solubilization, the pH was adjusted to 7.0 with hydrochloric acid and sodium hydroxide and the solution was filtered on a 0.22 μm single use filter.

### EXAMPLE 9

[0178] Echogenic microballoons are prepared as described in Example 3 of WO 96/15815. Then, floating microcapsules are recovered, suspended in a 5% (w/v) mannitol solution containing Evans Blue (5% w/v) at a concentration of $5\times10^8$ microballoons/mL. 1 mL of the suspension is then lyophilized. After reconstitution with 5 mL of water for injection, the resulting bubble suspension can be used for sentinel lymph node detection (see following Examples 13 and 14).

### EXAMPLE 10

[0179] Dye-containing suspensions of gas-containing ultrasound contrast agents of the invention were analyzed for the particle size distributions in the Coulter® Multisizer (Beckman Coulter Inc. Fullerton, Calif., USA). Depending of the preparation the suspension could contain, besides the gas-containing particles that do produce ultrasound contrast, also gas-free particles that do not. Two methods may be used to determine the distribution of just the gas-containing particles in the compositions of the invention.

[0180] Method a) The frequency distribution of the diameter of gas-containing particles is obtained as the difference between the particle size distribution before and after destruction of the gas-containing particles, in a Branson bath sonicator (Branson Ultrasonics). This method is preferable in those cases wherein, in the initial suspension, the insoluble material in the gas-containing particles is small with respect to the material in gas-free particles.

[0181] Method b) The frequency distribution of the diameter of gas-containing particles is obtained after purification of the initial particle suspension from gas-free particles. Purification is achieved by flotation of the gas-containing particles in a centrifuge and substitution of the infranatant containing the gas-free particles with fresh saline. The procedure is executed once or twice depending on the initial contamination by gas-free particles. This method is preferable in those cases wherein the amount of insoluble material in the gas-containing particles exceeds 10% of the total insoluble material, in the initial suspension.

AURO_ISO 0018738

14

[0182]    The results may be represented either in the form of plots of the frequency distributions (e.g. example 11 and FIG. 1) or as parameters elaborated therefrom, i. e. total microbubble concentration, total microbubble surface, microbubble volume concentration and mean diameter in number (e.g. example 12).

## EXAMPLE 11

[0183]    Dye-containing suspensions of sulphur hexafluoride, phospholipids stabilized microbubbles for injection of the invention were analyzed for the bubble size distribution according to the method (a) of Example 10.

[0184]    The analysis, in particular, was carried out with the composition of the invention of example 2 (see FIG. 1).

[0185]    FIG. 1: Bubbles reconstituted with Patent blue VF (5% w/v in saline) wherein the number concentration of particles of each diameter (left scale) and the integral of the corresponding number concentration over increasing diameters (right scale) were plotted against the logarithm of the particle diameter.

[0186]    The ragged curves represent particle diameter frequency distributions and the smooth curves report the corresponding integrals. The thin solid curves (★) represent the situation before destruction of the microbubbles. The dashed curves (▲) represent the situation after destruction of the microbubbles, and the thick solid curves (●) represent those that characterize the size distribution which is due to gas-filled microbubbles of the invention only.

[0187]    These distributions are essentially identical to those of regularly prepared ultrasound contrast agent Sono-Vue®, that is, in the absence of the dye.

## EXAMPLE 12

[0188]    Analysis of the preparations particle size distributions in the Coulter® Multisizer (Beckman Coulter Inc. Fullerton, CA, USA) was carried out according to example 10 (method b).

[0189]    By working as therein described, the following four parameters were derived for the compositions of the invention (microbubble suspensions of example 1) in comparison with the same known microbubbles (that is in the absence of the dye): total microbubble concentration, total microbubble surface, microbubble volume concentration and mean diameter in number (see Table I).

[0190]    In consideration of the fact that the echographic efficacy of a contrast agent is approximately proportional to the logarithm of the total microbubble concentration, comparison of SonoVue® being reconstituted with saline (hereinafter regular SonoVue®) over SonoVue® being reconstituted with saline also containing Evans blue, has unexpectedly shown that Evans blue interfered with the regular formation of microbubbles to a degree that from an echographic perspective may be considered negligible.

[0191]    In addition, by comparing the above results at time 0 (that is upon microbubbles formation) and after 3 h, the presence of the Evans blue did not jeopardize the stability of the microbubbles.

## EXAMPLE 13

[0192]    A patient in which a breast carcinoma has been diagnosed by any combination of imaging modality and biopsy may be readied on an operating table for breast lymph node resection. Based on the imaging information the clock position (quadrant, ICD-O code) of the tumor, i.e. the direction between tumor and nipple, may be determined. Under general anesthesia an appropriate dose depending on the patient, of the blue ultrasound contrast agent of example 3 is injected intradermally, using a needle of 26 G introduced in a bevel-upward orientation at a 15° angle to the skin, stopping when the bevel dips under the skin, but the outline of the needle remains visible. The site of injection is chosen in the periareolar region in the direction of the tumor. During the whole time of injection the lymph basin draining the tumor is monitored with an ultrasound probe (15L8, Sequoia 512 from Acuson/Siemens). The first lymph node with enhanced echographic signal is identified as the sentinel lymph node. Its position is marked on the skin. About 10 min later the surgeon makes an incision and begins the search for the sentinel lymph node in the site indicated by echography, letting himself be helped further by the blue staining of the lymphatic system visible on the video screen connected to his fiberoptic telescope.

## EXAMPLE 14

[0193]    A patient in which a breast carcinoma has been diagnosed by any combination of imaging modality and biopsy may be readied on an operating table for breast lymph node resection. Under imaging guidance, e.g. by

TABLE I

| Parameters | Formulation | | | |
| | Formulation A | Formulation B | Formulation C | Formulation D |
| --- | --- | --- | --- | --- |
| Total microbubble concentration [×10$^8$/mL] | 3.9 | 3.3 | 2.3 | 2.0 |
| Total microbubble surface [×10$^9$ μm$^2$/mL] | 6.8 | 6.2 | 5.5 | 5.6 |
| Total microbubble volume Concentration [μL/mL] | 6.1 | 5.6 | 5.3 | 5.4 |
| Total microbubble diameter in number [μm] | 1.8 | 1.9 | 2.2 | 2.5 |

Formulation A: SonoVue reconstituted in saline, at time 0;
Formulation B: SonoVue reconstituted in saline, after 3 h;
Formulation C: SonoVue reconstituted in Evans blue, at time 0 (see example 1);
Formulation B: SonoVue reconstituted in Evans blue, after 3 h (see example 1);

ultrasound imaging, the blue ultrasound contrast agent of example 3 is injected at appropriate doses into various sites immediately around the tumor. The tissue is then massaged and the sentinel lymph node is identified as the first lymph node to show increase echo. Its position is marked on the skin. About 10 min later the surgeon makes an incision and begins the search for the sentinel lymph node in the site indicated by echography, letting himself be helped further by the blue staining of the lymphatic system visible on the video screen connected to his fiberoptic telescope.

**1**. A composition comprising an ultrasound contrast agent in combination with a vital dye.

**2**. A composition according to claim 1 wherein the ultrasound contrast agent comprises a suspension of gas-containing microvesicles.

**3**. A composition according to claim 2 wherein the ultrasound contrast agent is selected from the group consisting of SonoVue®, Definity®, Imagent®, Optison®, A1700 and Cardiosphere® (Point Biomedical).

**4**. A composition according to claim 3 wherein the ultrasound contrast agent is SonoVue®.

**5**. A composition according to claim 1 wherein the vital dye is a water soluble vital dye.

**6**. A composition according to claim 5 wherein the vital dye is selected from patent blue V, patent blue VF, isosulfan blue, indocyanine green monosodium salt, methylene blue, sulfobromophthaleine, copper phthalocyanine tetrasulfonate and gadolinium texaphyrin.

**7**. A composition according to claim 5 wherein the vital dye is selected from Evans blue and patent blue VF.

**8**. A process for manufacturing the composition of claim 1 which process comprises reconstituting a dried powdered material or solid or fluffy cake, properly stored in the presence of a suitable microvesicle-forming gas, with a suitable aqueous carrier for injection, wherein the vital dye is present in the dried powdered material or solid or fluffy cake or in the aqueous carrier.

**9**. A process according to claim 8 wherein the vital dye is present in the aqueous carrier.

**10**. A kit for preparation of a composition comprising an ultrasound contrast agent in combination with a vital dye comprising a first container containing the lyophilized composition in contact with a selected microvesicle-forming gasp and a second container containing a physiologically acceptable aqueous carrier, wherein any one of the lyophilized composition or the physiologically acceptable carrier comprises the vital dye.

**11**. A kit according to claim 10 wherein the physiologically acceptable carrier comprises the vital dye.

**12**. A composition according to claim 1 for use in the preparation of a formulation for the imaging of the lymphatic system.

**13**. A method for the imaging of the lymphatic system comprising administering to a mammal the composition of claim 1.

**14**. A method for the identification of the sentinel lymph nodes or nodes of a tumor in a mammal which method comprises:

a) administering to said mammal a composition comprising an ultrasound contrast agent in combination with a vital dye;

b) observing by ecography the area of the lymphatic system or systems draining the tumor so as to determine the lymph node or nodes; and

c) visually localizing the sentinel node or nodes by surgery being guided by the coloration of the vital dye.

**15**. The method of claim 13, further comprising the step of:

d) excising the sentinel lymph node or nodes, so identified.

\* \* \* \* \*

# EXHIBIT 35

This site is for Healthcare Professionals. Patients can visit our Patient Website

Prescribing Information

Important Safety Information

# ISOSULFAN BLUE
## INJECTION 1%

# Standouts know it *stands out*.

**Isosulfan Blue Injection 1% is**



○ FDA-approved for sentinel lymph node mapping and has been a trusted tool of surgeons for more than 30 years[†]

○ Isosulfan Blue Injection 1% upon subcutaneous administration delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities

○ Isosulfan Blue Injection 1% is contraindicated in patients with known hypersensitivity to triphenylmethane or related compounds

## Please see Indications and Important Safety Information below.

## Isosulfan Blue is an important part of Mylan's growing oncology portfolio

○ Mylan now offers more than 20 therapies, from treatments for solid tumors and cancers of the blood to supportive care

Appx1237     AURO_ISO 0018826

Learn more about Mylan's full health systems product portfolio                    

## INDICATIONS AND USAGE

Isosulfan Blue Injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

## IMPORTANT SAFETY INFORMATION

Isosulfan Blue Injection 1% is contraindicated in patients with known hypersensitivity to triphenylmethane or related compounds.

**WARNINGS:** Life-threatening anaphylactic reactions have occurred after Isosulfan Blue Injection 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue injection 1%. Trained personnel should be available to administer emergency care including resuscitation.

Admixture of Isosulfan Blue Injection 1% with local anesthetics results in an immediate precipitation. Use a separate syringe for local anesthetics.

Isosulfan Blue Injection 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by 4 hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan Blue Injection 1% may also cause falsely elevated reading of methemoglobin by arterial blood gas analyzer. Therefore, cooximetry may be needed to verify methemoglobin level.

### ADVERSE REACTIONS: Post-Marketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus.

Transient or long-term (tattooing) blue coloration of skin.

No drug interactions have been identified with Isosulfan Blue Injection 1%.

**USE IN SPECIAL POPULATIONS:** It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Isosulfan Blue Injection 1% is administered to a nursing mother.

Safety and effectiveness of Isosulfan Blue Injection 1% in children have not been established.

To report SUSPECTED ADVERSE REACTIONS, contact Mylan Institutional at 1-877-446-3679 (1-877-4-INFO-RX) or FDA at 1-800-FDA-1088 or **www.fda.gov/medwatch**.

**Click here for full Prescribing Information.**


Results may vary from depicted visual.

†Lymphazurin is now listed as discontinued in the Orange Book.  Isosulfan Blue was approved as bioequivalent to Lymphazurin.

‡IMS Health Procedure Data 2013.

§In the study by Hirsch and colleagues, the 543 patients who received Isosulfan Blue were divided into 3 groups  according to the clinical indication for the lymphangiogram. Group 1 (n=508) included patients with possible lymph node  involvement by primary or secondary malignancy; group 2 (n=28) included patients with possible primary lymphatic  disease; and group 3 (n=7) included patients with chyluria, chylous ascites or chylothorax. Inadequate identification of  lymphatics occurred in 5, 9 and 0 patients in groups 1, 2 and 3, respectively.

¶These therapies include certain medicines used for heart or high blood pressure called angiotensin-converting enzyme  (ACE) inhibitors, such as captopril, enalapril, lisinopril and ramipril, or angiotensin II antagonists such as losartan and  valsartan.

**References:**

1. Hirsch JI, Tisnado J, Cho SR, Beachley MC. Use of isosulfan blue for identification of lymphatic vessels: experimental and clinical evaluation. *AJR Am J Roentgenol*. 1982;139(6):1061-1064.
2. Isosulfan Blue 1% injection [package insert]. Rockford, IL: Mylan Institutional LLC; 2013.
3. Daley MD, Norman PH, Leak JA, et al. Adverse events associated with the intraoperative injection of isosulfan blue. *J Clin Anesth*. 2004;16(5):332-341.

Mylan.com
©2016 Mylan Institutional ISB-2016-0033 04/16
The Mylan logo is a registered trademark of Mylan Inc.

Privacy Statement

Copyright and Legal Disclaimer

Contact Us

**Appx1239**                              **AURO_ISO 0018828**

# EXHIBIT 36

This site is for Healthcare Professionals. Patients can
visit our Patient Website

Prescribing Information

Important Safety Information



ISOSULFAN BLUE
INJECTION 1%

## Efficacy profile highlights

○ More than 500,000 sentinel lymph node mapping procedures are performed every year in the United States[‡]

○ Isosulfan Blue Injection 1% offers clinicians a ready-to-inject blue dye, with no reconstitution or dilution required prior to administration



97.4%



EFFECTIVE
in lymphatic vessel visualization[§1]

Appx1241                    AURO_ISO 0018829

**Please see Indications and Important Safety Information below.**

## INDICATIONS AND USAGE

Isosulfan Blue Injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

## IMPORTANT SAFETY INFORMATION

Isosulfan Blue Injection 1% is contraindicated in patients with known hypersensitivity to triphenylmethane or related compounds.

**WARNINGS:** Life-threatening anaphylactic reactions have occurred after Isosulfan Blue Injection 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue injection 1%. Trained personnel should be available to administer emergency care including resuscitation.

Admixture of Isosulfan Blue Injection 1% with local anesthetics results in an immediate precipitation. Use a separate syringe for local anesthetics.

Isosulfan Blue Injection 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by 4 hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan Blue Injection 1% may also cause falsely elevated reading of methemoglobin by arterial blood gas analyzer. Therefore, cooximetry may be needed to verify methemoglobin level.

**ADVERSE REACTIONS: Post-Marketing Experience**

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus.

Transient or long-term (tattooing) blue coloration of skin.

No drug interactions have been identified with Isosulfan Blue Injection 1%.

**USE IN SPECIAL POPULATIONS:** It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Isosulfan Blue Injection 1% is administered to a nursing mother.

Safety and effectiveness of Isosulfan Blue Injection 1% in children have not been established.

To report SUSPECTED ADVERSE REACTIONS, contact Mylan Institutional at 1-877-446-3679 (1-877-4-INFO-RX) or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

**Click here for full Prescribing Information.**

Results may vary from depicted visual.

†Lymphazurin is now listed as discontinued in the Orange Book.  Isosulfan Blue was approved as bioequivalent to Lymphazurin.

‡IMS Health Procedure Data 2013.

§In the study by Hirsch and colleagues, the 543 patients who received Isosulfan Blue were divided into 3 groups  according to the clinical indication for the lymphangiogram. Group 1 (n=508) included patients with possible lymph node  involvement by primary or secondary malignancy; group 2 (n=28) included patients with possible primary lymphatic  disease; and group 3 (n=7) included patients with chyluria, chylous ascites or chylothorax. Inadequate identification of  lymphatics occurred in 5, 9 and 0 patients in groups 1, 2 and 3, respectively.

¶These therapies include certain medicines used for heart or high blood pressure called angiotensin-converting enzyme  (ACE) inhibitors, such as captopril, enalapril, lisinopril and ramipril, or angiotensin II antagonists such as losartan and  valsartan.

AURO_ISO 0018830

**References:**

1. Hirsch JI, Tisnado J, Cho SR, Beachley MC. Use of isosulfan blue for identification of lymphatic vessels: experimental and clinical evaluation. *AJR Am J Roentgenol*. 1982;139(6):1061-1064.
2. Isosulfan Blue 1% Injection [package insert]. Rockford, IL: Mylan Institutional LLC; 2013.
3. Daley MD, Norman PH, Leak JA, et al. Adverse events associated with the intraoperative injection of isosulfan blue. *J Clin Anesth*. 2004;16(5):332-341.

Mylan.com
©2016 Mylan Institutional ISB-2016-0033 04/16
The Mylan logo is a registered trademark of Mylan Inc.

Privacy Statement

Copyright and Legal Disclaimer

Contact Us

Appx1243                              AURO_ISO 0018831

# EXHIBIT 37

This site is for Healthcare Professionals. Patients can
visit our Patient Website

Prescribing Information

Important Safety Information



**ISOSULFAN BLUE**

**INJECTION 1%**

## Safety profile highlights

Safety and risk features of Isosulfan Blue

○ Overall incidence of hypersensitivity reaction in approximately 2% of patients, including life-threatening anaphylactic reactions[2]

   ○ In a study of 543 patients, <1% receiving Isosulfan Blue experienced an allergic reaction, all of whom recovered within 1 hour with no or minimal symptomatic therapy[§1]

○ Trained personnel should be available to carry out emergency care, including resuscitation, for at least 60 minutes after administration[2]

○ Adverse skin reactions include transient or long-term blue coloration[2]

○ No drug interactions have been reported in the full Prescribing Information[2]

   ○ Postmarketing cases report drug interactions with chronic preoperative use of angiotensin-converting enzyme inhibitors and angiotensin receptor blocking agents[§3]

**Please see Indications and Important Safety Information below.**

**INDICATIONS AND USAGE**

Isosulfan Blue Injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

**IMPORTANT SAFETY INFORMATION**

Isosulfan Blue Injection 1% is contraindicated in patients with known hypersensitivity to triphenylmethane or related compounds.

**WARNINGS:** Life-threatening anaphylactic reactions have occurred after Isosulfan Blue Injection 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue injection 1%. Trained personnel should be available to administer emergency care including resuscitation.

Admixture of Isosulfan Blue Injection 1% with local anesthetics results in an immediate precipitation. Use a separate syringe for local anesthetics.

Isosulfan Blue Injection 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by 4 hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan Blue Injection 1% may also cause falsely elevated reading of methemoglobin by arterial blood gas analyzer. Therefore, cooximetry may be needed to verify methemoglobin level.

**ADVERSE REACTIONS: Post-Marketing Experience**

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus.

Transient or long-term (tattooing) blue coloration of skin.

No drug interactions have been identified with Isosulfan Blue Injection 1%.

**USE IN SPECIAL POPULATIONS:** It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Isosulfan Blue Injection 1% is administered to a nursing mother.

Safety and effectiveness of Isosulfan Blue Injection 1% in children have not been established.

To report SUSPECTED ADVERSE REACTIONS, contact Mylan Institutional at 1-877-446-3679 (1-877-4-INFO-RX) or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

**Click here for full Prescribing Information.**


Results may vary from depicted visual.

[†]Lymphazurin is now listed as discontinued in the Orange Book.  Isosulfan Blue was approved as bioequivalent to Lymphazurin.

[‡]IMS Health Procedure Data 2013.

[§]In the study by Hirsch and colleagues, the 543 patients who received Isosulfan Blue were divided into 3 groups  according to the clinical indication for the lymphangiogram. Group 1 (n=508) included patients with possible lymph node  involvement by primary or secondary malignancy; group 2 (n=28) included patients with possible primary lymphatic  disease; and group 3 (n=7) included patients with chyluria, chylous ascites or chylothorax. Inadequate identification of  lymphatics occurred in 5, 9 and 0 patients in groups 1, 2 and 3, respectively.

[¶]These therapies include certain medicines used for heart or high blood pressure called angiotensin-converting enzyme  (ACE) inhibitors, such as captopril, enalapril, lisinopril and ramipril, or angiotensin II antagonists such as losartan and  valsartan.


**References:**

1. Hirsch JI, Tisnado J, Cho SR, Beachley MC. Use of isosulfan blue for identification of lymphatic vessels: experimental and clinical evaluation. *AJR Am J Roentgenol*. 1982;139(6):1061-1064.
2. Isosulfan Blue 1% injection [package insert]. Rockford, IL: Mylan Institutional LLC; 2013.
3. Daley MD, Norman PH, Leak JA, et al. Adverse events associated with the intraoperative injection of isosulfan blue. *J Clin Anesth*. 2004;16(5):332-341.

Mylan.com
©2016 Mylan Institutional ISB-2016-0033 04/16
The Mylan logo is a registered trademark of Mylan Inc.

Privacy Statement

Copyright and Legal Disclaimer

Contact Us

# EXHIBIT 38

HIGHLIGHTS OF PRESCRIBING INFORMATION
**These highlights do not include all the information needed to use ISOSULFAN BLUE INJECTION safely and effectively. See full prescribing information for ISOSULFAN BLUE INJECTION.**

**ISOSULFAN BLUE injection, for subcutaneous use only**
**Initial U.S. Approval: 1981**

------------------------------INDICATIONS AND USAGE----------------------------

Isosulfan blue injection 1% upon subcutaneous administration, delineates the lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; lymph node response to therapeutic modalities (1.1).

------------------------------DOSAGE AND ADMINISTRATION-------------------

Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected (2.1).

----------------------DOSAGE FORMS AND STRENGTHS-------------------

1% aqueous solution (isosulfan blue)

------------------------------CONTRAINDICATIONS-----------------------------

Hypersensitivity to triphenylmethane or related compounds (4).

----------------------WARNINGS AND PRECAUTIONS----------------------

- Life-threatening anaphylactic reactions have occurred after isosulfan blue 1% administration. Monitor patients closely for at least 60 minutes after administration of isosulfan blue 1% (5.1).

- The admixture of isosulfan blue 1% with local anesthetics results in an immediate precipitation of 4 to 9% drug complex. Use a separate syringe for anesthetics (5.2).
- Isosulfan blue 1% interferes with measurements in peripheral blood pulse oximetry. Arterial blood gas analysis may be needed (5.3).

------------------------------ADVERSE REACTIONS------------------------------

*Hypersensitivity Reactions:* Hypersensitivity reactions occurring approximately 2% of patients and include life-threatening anaphylactic reactions with respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following I.V. administration of a similar compound (6).

**To report SUSPECTED ADVERSE REACTIONS, contact AuroMedics Pharma LLC at 1-866-850-2876 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

------------------------------DRUG INTERACTIONS-----------------------------

No drug interactions have been identified for isosulfan blue 1% (7).

------------------------USE IN SPECIFIC POPULATIONS------------------

- Caution should be exercised when isosulfan blue 1% is administered to nursing mothers (8.3).
- Safety and effectiveness of isosulfan blue 1% in children has not been established (8.4).

**See 17 for PATIENT COUNSELING INFORMATION**

**Revised: December 2015**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**1    INDICATIONS AND USAGE**

  1.1    Lymphatic Vessel Delineation

**2    DOSAGE AND ADMINISTRATION**

  2.1    Subcutaneous administration

**3    DOSAGE FORMS AND STRENGTHS**

**4    CONTRAINDICATIONS**

**5    WARNINGS AND PRECAUTIONS**

  5.1    Hypersensitivity Reactions
  5.2    Precipitation of Isosulfan Blue 1% by Lidocaine
  5.3    Interference with Oxygen Saturation and Methemoglobin Measurements

**6    ADVERSE REACTIONS**

  6.1    Postmarketing Experience

**7    DRUG INTERACTIONS**

**8    USE IN SPECIFIC POPULATIONS**

  8.3    Nursing Mothers
  8.4    Pediatric Use

**10    OVERDOSAGE**

**11    DESCRIPTION**

**12    CLINICAL PHARMACOLOGY**

  12.2    Pharmacodynamics
  12.3    Pharmacokinetics

**13    NONCLINICAL TOXICOLOGY**

  13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
  13.2    Teratogenic Effects

**16    HOW SUPPLIED/STORAGE AND HANDLING**

**17    PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

i

**Appx1249**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# FULL PRESCRIBING INFORMATION

## 1     INDICATIONS AND USAGE

### 1.1     Lymphatic Vessel Delineation

Isosulfan blue injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

## 2     DOSAGE AND ADMINISTRATION

### 2.1     Subcutaneous administration

Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected.

## 3     DOSAGE FORMS AND STRENGTHS

1% aqueous solution (isosulfan blue)

## 4     CONTRAINDICATIONS

Isosulfan blue injection 1% is contraindicated in those individuals with known hypersensitivity to triphenylmethane or related compounds.

## 5     WARNINGS AND PRECAUTIONS

### 5.1     Hypersensitivity Reactions

Life-threatening anaphylactic reactions (respiratory distress, shock, angioedema) have occurred after isosulfan blue 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue 1%. Trained personnel should be available to administer emergency care including resuscitation.

### 5.2     Precipitation of Isosulfan Blue 1% by Lidocaine

The admixture of isosulfan blue 1% (with local anesthetics (i.e. lidocaine)) in the same syringe results in an immediate precipitation of 4 to 9% drug complex. Use a separate syringe to administer a local anesthetic.

2

**Appx1250**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

### 5.3    Interference with Oxygen Saturation and Methemoglobin Measurements

Isosulfan blue 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by four hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan blue 1% may also cause falsely elevated readings of methemoglobin by arterial blood gas analyzer. Therefore, co-oximetry may be needed to verify methemoglobin level.

## 6    ADVERSE REACTIONS

### 6.1    Postmarketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life-threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following administration of a similar compound employed to estimate the depth of a severe burn. Reactions are more likely to occur in patients with a personal or family history of bronchial asthma, significant allergies, drug reactions or previous reactions to triphenylmethane dyes *[see Warnings and Precautions (5)]*.

Laboratory Tests: Isosulfan blue 1% interferes with measurements of oxygen saturation by pulse oximetry and of methemoglobin by gas analyzer *[see Warnings and Precautions (5)]*.

Skin: transient or long-term (tattooing) blue coloration.

## 7    DRUG INTERACTIONS

No drug interactions have been identified with isosulfan blue 1%.

## 8    USE IN SPECIFIC POPULATIONS

### 8.3    Nursing Mothers

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when isosulfan blue 1% is administered to a nursing mother.

### 8.4    Pediatric Use

Safety and effectiveness of isosulfan blue 1% in children have not been established.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY                                      AURO_ISO 0003630

## 10    OVERDOSAGE

Do not exceed indicated recommended dosage as overdosage levels have not been identified for isosulfan blue 1%.

## 11    DESCRIPTION

The chemical name of isosulfan blue is N-[4-[[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium hydroxide, inner salt, sodium salt. Isosulfan blue is a greenish blue color hygroscopic powder. Its structural formula is:



Isosulfan blue injection 1% is a sterile, non-pyrogenic, aqueous dark blue color solution for subcutaneous administration. Phosphate buffer in water for injection is added in sufficient quantity to yield a final pH of 6.8 to 7.4. Each mL of solution contains 10 mg isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate. The solution contains no preservative. Isosulfan blue injection 1% is a contrast agent for the delineation of lymphatic vessels.

## 12    CLINICAL PHARMACOLOGY

### 12.2    Pharmacodynamics

Following subcutaneous administration, isosulfan blue 1% binds to serum proteins and is picked up by the lymphatic vessels. Thus, the lymphatic vessels are delineated by the blue dye.

### 12.3    Pharmacokinetics

Up to 10% of the subcutaneously administered dose of isosulfan blue 1% is excreted unchanged in the urine in 24 hours in human.

4

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY    AURO_ISO 0003631

## 13    NONCLINICAL TOXICOLOGY

### 13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of isosulfan blue 1%. Reproduction studies in animals have not been conducted and, therefore, it is unknown if a problem concerning mutagenesis or impairment of fertility in either males or females exists.

### 13.2    Teratogenic Effects

Pregnancy Category C. Animal reproduction studies have not been conducted with isosulfan blue 1%. It is not known whether isosulfan blue 1% can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Isosulfan blue 1% should be given to a pregnant woman only if clearly needed.

## 16    HOW SUPPLIED/STORAGE AND HANDLING

Isosulfan blue injection 1% is a sterile, non-pyrogenic, aqueous dark blue color solution and is supplied as follows:

**Isosulfan blue injection 1%**

**50 mg per 5 mL (10 mg / mL):**

5 mL Single Dose Vials
in a Carton of 6                                    NDC 55150-240-05

**Store at** 20° to 25°C (68° to 77°F). [See USP Controlled Room Temperature]. Avoid excessive heat.

Discard Unused Portion.

The vial stoppers are not made with natural rubber latex.

## 17    PATIENT COUNSELING INFORMATION

Inform patients that urine color may be blue for 24 hours following administration of isosulfan blue injection 1%.

5

**Appx1253**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY                    AURO_ISO 0003632

Manufactured for:
**AuroMedics Pharma LLC**
6 Wheeling Road
Dayton, NJ 08810

Manufactured by:
**Aurobindo Pharma Limited**
IDA, Pashamylaram - 502307
India

6

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**                    AURO_ISO 0003633

# EXHIBIT 40

**REDACTED - CONFIDENTIAL**

**APPX1264-APPX1280**

# EXHIBIT 41

**REDACTED - CONFIDENTIAL**

**APPX1283-APPX1287**

# EXHIBIT 43

# Physicochemical Characteristics of Patent Blue Violet Dye

**DAVID W. NEWTON \*x, PHILIP J. BREEN, DAVID E. BROWN ‡, JOSEPH F. MACKIE, Jr., and RONALD B. KLUZA §**

Received April 3, 1980, from the *Department of Pharmaceutics, Massachusetts College of Pharmacy and Allied Health Sciences, Boston, MA 02115.* Accepted for publication July 16, 1980. \*Present address: Department of Pharmaceutics, College of Pharmacy, University of Nebraska Medical Center, Omaha, NE 68105. ‡Present address: Pharmacy Department, Lynn Hospital, Lynn, MA 01904. §Present address: Department of Pharmaceutics, College of Pharmacy, University of Arkansas for Medical Sciences, Little Rock, AR 72201.

**Abstract** □ Physicochemical data for patent blue violet dye (I) are reported. The pKa for protonation of the first diethylanilino group was 2.78 ± 0.03. The absorptivity values calculated for a 1% (w/v) solution of previously defined I at pH 7.4 were 1650, 170, and 309 at 638, 412, and 309 nm, respectively. A table of wavelength maxima and observed solution color as a function of pH and $H_o$ and five spectra of I at certain pH and $H_o$ values are included. The solution chemistry of I is explained, and a scheme showing its two protonated carbonium ions and its triphenyl-carbinol derivative is presented. The distribution coefficients of I in *n*-octanol or chloroform and pH 7.4 phosphate buffer systems were 0.013 and 0.12, respectively. The approximate solubilities at 25° of I in six organic solvents and the solubility analysis of I in distilled water are reported. Results of the latter analysis suggest that I forms a lyotropic mesophase in high aqueous concentrations. Compound I is poorly water soluble. Samples of 1.000% I in 0.9% NaCl, formulated with and without 1% (v/v) benzyl alcohol and autoclaving, varied not more than 5% from the initial I content during storage in the dark and under constant fluorescent light at 25 ± 5° for 20 months. Data from the TLC of I in several eluents indicated a high degree of purity of the dye. The half-lives for the loss of color in 5 × 10⁻⁴% I solutions in potassium hydroxide solutions of pH 13.7, 12.7, 11.3, and 10.0 were 1.2 hr, 17.0 hr, 9.5 days, and 180 days, respectively. The fraction of I bound to 4% (w/v) human serum albumin at 37° and pH 7.4 ranged from 0.05 to 0.83, corresponding to unbound I in the postdialysis concentration range of 1.7 × 10⁻⁴ to 2.0% (w/v). A Scatchard plot of the albumin binding data of I revealed one high-affinity binding site, $K = 6235\ M^{-1}$, and five low-affinity sites, with average affinity constants of 33 $M^{-1}$. The data support the fact that the spectrophotometric determination of I at 639 ± 2 nm appears to comprise a stability-indicating analysis.

**Keyphrases** □ Patent blue violet—physicochemical characteristics □ Dyes—patent blue violet, physicochemical characteristics

Patent blue violet (I) is the monosodium salt of a disulfonated triphenylmethane vital stain, which is used to delineate the patency of lymph vessels in the dorsum of the hands or feet prior to injection of an iodinized contrast medium and subsequent lymphangiography (1–3). Certain injectable formulation and nomenclature[1] problems (1), as well as some structural formula and purity discrepancies of I, have been reviewed (4).

The purpose of this study was to determine values for several physicochemical characteristics of I that pertain to its pharmaceutical analysis and unique clinical use. The concentration of I used for most research studies and all injectable solutions prepared under the investigational new drug application for administration to humans was limited to 1% (w/v) or less because higher concentrations are reported (5–8) to produce sarcomas in rodents at the sites of repeated subcutaneous injections. The usual human dose of I injected subcutaneously to assist in visualizing lymph vessels is 2–3 ml of a 1% solution normally prepared in 0.9% NaCl.

## EXPERIMENTAL

**Materials**—Purified patent blue violet[2] was used as received unless otherwise specified. Human serum albumin[3] and sterile water for irrigation[4] were used as received, and other reagents and solvents were analytical grade.

**Procedures**—Spectral data and the pKa titration were obtained[5] in 5 × 10⁻⁴% solutions of I[6]. Chloroacetic acid (0.01 *M*), adjusted to the appropriate pH with 0.50 *N* NaOH or HCl, was used for samples in the pKa studies, and dilutions of 1.00 *N* KOH or H₂SO₄ (ACS reagent) in distilled water were used for other spectral studies. The pKa was calculated (9) using the absorbance values of I solutions determined at 638 nm:

$$pKa = pH + \log\left[(A_0 - A)/(A - A_+)\right] \qquad (Eq.\ 1)$$

where $A_0$ is the absorbance of the nonprotonated species[7], $A_+$ is the absorbance of the protonated species[8], and $A$ represents the absorbance values of the I solutions adjusted to pH values in the range of approximate pKa ± 1 unit.

Loss on drying was determined by placing three accurately weighed samples of ~0.5 g of I into tared glass containers with ground-glass caps unaffixed, heating at 135° for 3 hr, tightly placing the caps on the containers, allowing the samples to cool to ambient temperature in a desiccator, and determining the weight until it was constant at ±0.5 mg.

Distribution coefficients were determined with triplicate samples of 5 × 10⁻⁴ and 5.0 × 10⁻³% solutions of I in 0.1 *M* phosphate buffer (pH 7.40) previously saturated with *n*-octanol or chloroform. A 7.0-ml portion of aqueous I was transferred to a 15-ml glass tube, 7.0 ml of either *n*-octanol or chloroform saturated previously with the phosphate buffer was added, a polyethylene-lined screw cap was tightly affixed, and the tube was rotated at 45 rpm for 15 min at 25 ± 0.5° in a water bath in a bottle apparatus similar to that described previously (10). The samples were allowed to stand at 25° until phase separation occurred. The absorbance of the aqueous layer or an appropriate dilution thereof was determined at 638 nm, the concentrations of I in both phases were computed, and the lipid–aqueous distribution ratio was calculated.

The approximate solubilities of I in certain organic solvents were determined in triplicate by combining accurately weighed samples of I, ~1.5 g with 95% ethanol and 0.1 g with other solvents, with a specific volume of solvent, 5.0 ml of 95% ethanol and 50.0 ml of chloroform, ether, ethyl acetate, hexane, and toluene, in a glass tube of appropriate size. The mouths of the tubes were covered with aluminum foil, polyethylene-lined screw caps were tightly affixed, and the samples were rotated for 24 hr at 45 rpm and 25° in the bottle apparatus. The samples were filtered through a 0.45-μm membrane[9], and 1.0 ml of the 95% ethanol solution and 25.0 ml of the other solutions were evaporated and dried to constant weight in a tared dish. The weights of the solute residues then were determined to the nearest 0.1 mg.

The equilibrium phase solubility analysis of I in water for irrigation[4] was conducted as follows. Accurately weighed samples of I ranging from

[1] Synonyms for I (as the 2,4-disulfonate) include patent blue V, blue VRS, alphazurine 2G, sulfan blue, and acid blue 1.

[2] Product P-1888 FD, lot 4-1-1, monosodium salt, dark-green luminous powder, dye content of ~85%, mol. wt. 566.67, Sigma Chemical Co., St. Louis, Mo.

[3] Product A 9511, lot 34C-8120, mol. wt. 66,300, Sigma Chemical Co., St. Louis, Mo.

[4] Lot 89-388-DE-5, Abbott Laboratories, North Chicago, Ill.

[5] A Beckman DB-GT, Perkin-Elmer Hitachi 200, or Bausch & Lomb Spectronic 2000 double-beam spectrophotometer was used to record spectra and absorbance values.

[6] The specimen of I was previously dried to constant weight at 135°.

[7] $A_0 = 0.82$ over the pH range of 5.0–11.0 in freshly prepared solutions.

[8] $A_+ = 0$ in 2.36 $N$ H₂SO₄ ($H_o \approx 0.4$).

[9] MF-Millipore, cellulose esters, Millipore Corp., Bedford, Mass.

0022-3549/81/0200-0122$01.00/0
© 1981, American Pharmaceutical Association

AURO_ISO 0018835

Table I—Spectral Data for Patent Blue Violet (I) at 5 × 10⁻⁴% in 0.05 M Phosphate Buffer (pH 7.40) at 25°

| Wavelength, nm | Absorptivity[a] | |
| --- | --- | --- |
| | I as Received | I Dried Previously[b] |
| 638 ± 1 | 1540 | 1650 |
| 412 ± 1 | 170 | 170 |
| 309 ± 1 | 250 | 250 |

[a] Calculated for a 1% solution of I in a 1-cm quartz cell. [b] Dried to constant weight at 135°.

~0.1 g to 5.5 g in 0.5-g increments were combined with 10.0 g of water in a 15-ml glass tube. A polytef-lined screw cap was tightly affixed, and the cap and tube neck were sealed with silicone rubber cement, which was allowed to cure under ambient conditions for 12–16 hr. The samples then were rotated at 45 rpm and 25 ± 0.5° for 24 hr. They were centrifuged at 2000 rpm for 10 min, and 7–8 ml of the supernate was removed and filtered through a 0.45-μm membrane[9]. A 5.0-ml tared flask was filled to volume (±0.1 ml) with the filtrate and weighed, and the contents were transferred quantitatively to a tared evaporating dish and dried to constant weight at 70–75° in an oven. The weights of the solute residues were recorded to the nearest 0.1 mg.

A 2.5000-g sample of I was adjusted to 250.0 ml with 0.9% NaCl or 1.0% (v/v) benzyl alcohol in 0.9% NaCl. This solution was filtered through a 0.22-μm membrane[9] into clean type I glass vials[10] and sealed with rubber closures[11] and one-piece aluminum seals. Half of each lot was autoclaved at 121° and 15 psi for 30 min. Several vials from each formulation group then were stored at 25 ± 5° in the dark or 35 cm from a 15-w fluorescent bulb illuminated continuously. The absorbance at 638 nm of a sample representing each set of formulation variables was determined on six occasions during a 20-month storage period.

Solutions of I[6] at 5 × 10⁻⁴% were prepared in 0.900, 0.090, 0.009, and 9 × 10⁻⁴ N KOH and had pH values of 13.71, 12.67, 11.31, and 10.04, respectively. The solutions were stored in amber glass bottles sealed with plastic screw caps, and their absorbance at 638 nm was recorded at appropriate times to quantitate the rate of color fading of I in alkaline solution at 23 ± 2°.

Seventeen solutions of I, 2 × 10⁻⁴–5.00% (w/v), were prepared in the 0.067 M phosphate buffer (μ = 0.2) to suppress the Donnan effect (pH 7.40 ± 0.05). A 4.00% (w/v) human serum albumin solution also was prepared in the phosphate buffer. Exactly 1.0 ml of sample solution was delivered into one side of a dialysis cell[12] partitioned by a cellulose membrane[13],



Figure 1—Spectra of patent blue violet (I) at 5 × 10⁻⁴% (A–C) or 1.0 × 10⁻³% (D and E) at specified pH or H₀. Key: A, pH 7.00; B, pH 2.75; C, 1.0 ≥ H₀ ≥ −5.8; D, −7.0 ≥ H₀ ≥ −10.0; and E, after 24 hr in 0.90 N KOH (pH 13.7).

[10] Wheaton 400, 5-ml serum bottle, Wheaton Scientific, Millville, N.J.
[11] Type S-63, formulation 1816 gray butyl rubber, West Co., Millville, N.J.
[12] Constructed of plexiglass, Technilab Instrument Inc., Pequannock, N.J.
[13] Nominal pore size ≈ 4.8 nm, impermeable to molecules with mol. wt. >6000, Technilab Instrument Inc., Pequannock, N.J.

and 1.0 ml of albumin solution was placed into the other cell compartment. The dialysis samples were incubated for 48 hr at 37 ± 1° in an oven. An accurately measured portion of I solution was removed from the cell, an appropriate dilution was made when necessary, and the absorbance at 638 nm was recorded. The percent of I bound to albumin was determined by reading the concentration of the dialyzed I solution from a linear Beer's plot for I and subtracting this value from the predialysis concentration of I.

The TLC of I was conducted with 250-μm silica gel plates[14] on which 2 μl of 0.01% methanolic I was spotted and allowed to dry before elution. The TLC plates were eluted with several single- and multicomponent solvent systems for a distance of 10.0 cm in a developing tank lined with paper to ensure saturation of the atmosphere with eluent vapor. After developing and drying under ambient conditions, the plates were observed in a chamber[15] under incandescent and UV light of ~254 and 375 nm. In some eluent systems, the TLC plate was developed a second time at a 90° angle to the first trial to assess any interaction between I and the eluent. The Rf values of all samples were measured to the nearest 1.0 mm.

## RESULTS AND DISCUSSION

The structure of I shown in Scheme I is that of its recently proposed 2,5-disulfonate derivative[16] (11). However, most publications have assigned sulfonation to positions 2 and 4 (12–14). As depicted by the dotted lines, the cationic nitrogen atom exists in resonance between the two diethylanilino groups until either the diethylanilino groups are protonated (II and III) or the central carbon atom is hydroxylated (IV). The mesomerism of diamino- and triaminotriphenylmethane dyes producing quinoidal and benzenoidal (carbonium) ions via resonance equilibrium in aqueous solutions has been demonstrated and rationalized (12, 15–20).

Spectral data and color descriptions of I solutions are reported in Tables I and II. Figure 1 shows the spectra of several I solutions. The pKa for the equilibrium between I and II (Scheme I) was determined spectrophotometrically at 25° to be 2.78 ± 0.03 based on seven samples of pH 2.78 ± 0.56. The titration spectra exhibited an isosbestic point at 505 ± 2 nm. The protonation of one of the diethylanilino groups decreases by 50% the length of the quinoid–benzenoid resonance system in I. This result would be expected to reduce the overlapping of electron orbitals, thereby producing the hypsochromic absorbance shift from 638 to 418 ± 2 nm evidenced in Fig. 1 and Table II as the acidity of I solutions increases from pH 4 to H₀ −5.8. As indicated in Scheme I, the protonation of I also generates a carbonium ion (II) from the central carbon atom of the triphenylmethane molecule.

It has been shown that the second p-diethylamino substituent further stabilizes the already stable triphenylcarbonium (trityl) ion (20). In sulfuric acid solutions of H₀ −7.0 and stronger, the second diethylanilino group of I is protonated, thereby precluding quinoidal resonance in the trityl ion (III) (15), which causes a hypsochromic shift from 418 (II) to 273 nm. The pKa for the equilibrium between II and III was not quantitated accurately, possibly because of the interfering association of the sulfonate groups, in the solutions of H₀ < −5.8.

Finally, the effect of ethylating the anilino nitrogens and ortho-sulfonating the nonanilino ring of I is to cause a bathochromic shift, as

Table II—Observed Colors of Patent Blue Violet (I) Solutions over Certain pH and H₀ Ranges

| pH or H₀ Range | Observed Color | Approximate Wavelength Maximum, nm[a] |
| --- | --- | --- |
| 4.0–11.0 | Blue | 638 |
| 2.7–3.5 | Green–blue[b] | 638, 412 |
| 1.5–2.5 | Yellow–green[b] | 412 |
| −5.8–1.0[c] | Yellow | 418 |
| −10.0–−7.0[c] | Colorless | 273 |

[a] The 273-nm value was determined in 0.01% I; other values were determined in 5 × 10⁻⁴% I. [b] Colors change from left to right corresponding to pH shifts. [c] H₀ values via dilutions of sulfuric acid.

[14] Redi-Plates, silica gel GF, 5 × 20 cm or 20 × 20 cm, Fisher Scientific Co., Fair Lawn, N.J.
[15] Model CC-20 Chromato-Vue Cabinet, Ultra-Violet Products Inc., San Gabriel, Calif.
[16] The proposed USAN is isosulfan blue.



### Table III—Approximate Solubilities of Patent Blue Violet (I) in Various Solvents at 25°

| Solvent | Solubility, % w/v[a] |
|---|---|
| Alcohol USP | $9.8 \pm 0.4$ |
| Distilled water | $\geq 42$ |
| Chloroform | $4 \times 10^{-5}$ |
| Ether | $<1 \times 10^{-5}$ |
| Ethyl acetate | $<1 \times 10^{-5}$ |
| Hexanes | $<1 \times 10^{-5}$ |
| Toluene | $<1 \times 10^{-5}$ |

[a] A ±2% volume error in reading the meniscus of alcohol and water solutions of I.

*Scheme I*

compared, for instance, to the quinoidal form of 4,4′-diaminotriphenyl-methane (12, 13, 15, 20). One sulfonate group of I confers water solubility on the dye, whereas the second group forms a zwitterion with a diethyl-amino group during the final synthetic oxidation step (13).

Three samples of I dried at 135° to constant weight showed a loss on drying of 8.65 ± 0.15%. This weight loss apparently represents water since thin-layer chromatograms and UV spectra of ether extracts of I showed no evidence of a major starting compound, diethylaniline.

The distribution coefficients (P) for I in n-octanol–pH 7.4 buffer and chloroform–pH 7.4 buffer were 0.013 and 0.12, respectively. The experimental value of P in the chloroform system was 20 times larger than that calculated using the value of P obtained from the n-octanol system (21):

$$\log P_{\text{chloroform}} = 1.276 \log P_{n\text{-octanol}} + 0.171 \qquad \text{(Eq. 2)}$$

The poor lipophilicity of I may be attributed to its highly polar nature in solutions at physiological pH, i.e., two dissociated sulfonate groups and one diethylanilinium ion. These results corroborate the microscopic observations that I enters frog capillaries via pores between endothelial cells and not via diffusion through the tissue (22) and that it does not stain the spinal cord or brain tissues of small mammals (23).

The approximate solubilities of I in several solvents are reported in Table III. As expected from its P values in n-octanol and chloroform, I is virtually insoluble in organic solvents with low dielectric constants. The data from the phase solubility analysis of I in distilled water are illustrated in Fig. 2. This graph of solute versus I added appears to be analogous to that expected from a plot of a colligative property versus electrolyte concentration in which more extensive ion association elicits a progressive diminishing of the colligative effect (24). It is not discernible why at 25° the solubility of sodium chloride is 26.5% (w/w) (25) whereas

that of I appears to exceed 37% (w/w) (Fig. 2). Furthermore, the molecular weight ratio of I to sodium chloride is 9.7. One possibility is that the commercially obtained sample of I consisted of various triphenylmethane isomers with diethylamino groups in other than just the 4,4′-positions on two of the benzene rings and/or sulfonate groups in other than positions 2 and 5 on the third ring. A mixture of such isomers could result in a phase solubility plot comprised of several linear segments (26–28). However, the following evidence appears to discredit such conjecture.

1. The data points on the curve of Fig. 2 cannot be plotted readily as a series of, for instance, three- or four-point segments, the intersections of which can be delineated clearly.

2. The precision of the pKa value, 2.78 ± 0.03, for the equilibrium between I and II (Scheme I), as well as the isosbestic point of 505 ± 2 nm for the pKa titration, indicates that the diethylamino group in only a single substituent position, i.e., para to the central triphenylmethyl carbon atom, was protonated. The transition from I to II causes a hypsochromic shift of ∼220 nm, from blue to yellow. This shift could result only from shortening of the I resonance system. Furthermore, the intense blue color of aqueous I can be attributed only to the quinoidal resonance system, which occurs when the two diethylamino groups are para to the central triphenylmethyl carbon atom (12, 13, 15–20). The occurrence of meta-quinones is highly unlikely, and the para-forms are more favored than the ortho-forms (12, 29).

3. The dialkylamino group is a highly activating, predominantly para-directing, stable quinoidal intermediate, which, when augmented by steric hindrance effects, virtually precludes competitive electrophilic substitution at the ortho- and, less likely, meta-positions (29). The synthesis of I requires condensing benzaldehyde-2,5-disulfonic acid with diethylaniline (13). It is ostensible that steric hindrance of the former to ortho- and meta-attack on diethylaniline should be expected.

The negative curvature of the Fig. 2 plot most likely is the result of a phenomenon involving the association of solvated solute molecules or the presence of impurity (26–28). The terms solid solutions (26, 27), liquid crystals, mesophases, and lyotropic mesomorphism have been used to define or describe these complex systems (30–34). It is relevant that the centrifuged supernates of those aqueous phase solubility analysis samples of I that exceeded ∼15% (w/w) required an unusually high force on the syringe plunger to effect filtration through the 0.45-μm membrane. Furthermore, the filtered supernates of the aqueous I solubility samples,



**Figure 2**—Plot of phase solubility analysis data for patent blue violet (I) in distilled water at 25 ± 0.5°.



**Figure 3**—*Scatchard plot of γ/D_f versus γ for patent blue violet (I) over the concentration range of $2 \times 10^{-4}$–5.00% (w/v) ($3.0 \times 10^{-6}$–0.075 M) I dialyzed against 4% (w/v) ($6.03 \times 10^{-4}$ M) human serum albumin at pH 7.4 and 37°.*

when wiped onto a tissue paper, possessed a luster and did not exhibit capillary migration, which is inherent to isotropic liquids.

Derivatives of naphthylaminedisulfonic acid have been shown to produce lyotropic mesophases in water but not in alcohol (30, 35). Furthermore, none of the aqueous and all of the alcoholic I solubility analysis samples were observed to contain undissolved solid material following both rotation at 45 rpm for 24 hr and centrifugation at 2000 rpm for 10 min. This finding suggests that the alcoholic samples consisted of two distinct phases whereas the aqueous samples were comprised of a single mesophase. Lyotropic mesophases are characterized by unusually high viscosity (30, 36) and occurrence in high concentrations of extensively hydrated solutes with large dipole moments (24, 30, 37). Because I appears to be highly dipolar (Scheme I) and its aqueous solutions were atypically viscous in concentrations exceeding the solubility of sodium chloride, it was concluded that the plot in Fig. 2 represents a lyotropic mesophase of I. Several sulfonated and other dyes have shown lyotropic mesomorphism in aqueous systems (32).

The I concentration of samples formulated with 1.000% of I with and without 1.0% (v/v) benzyl alcohol, autoclaved and not autoclaved, and stored in the dark or under continuous illumination from a fluorescent bulb varied from −0.01 to 0.04% (w/v) of I during 20 months of storage at 25 ± 5°. However, autoclaving at 121° and 15 psi for 30 min appeared to cause a 3% initial decrease in the I concentration of samples formulated with and without 1.0% (v/v) benzyl alcohol. Similarly, a decrease of ~10% in the benzyl alcohol concentration[17] was detected upon autoclaving. Interaction of I and benzyl alcohol with the rubber closures of the samples could be one reason for the decrease in the solution concentrations that resulted from autoclaving.

The half-lives for the loss of I absorbance at 638 nm of $5 \times 10^{-4}$% I dissolved in 0.900, 0.090, 0.009, and $9 \times 10^{-4}$ N KOH at 23 ± 2° are reported in Table IV. The loss of I absorbance at 638 nm in strongly alkaline solutions was accompanied by increasing absorbance at ~265 nm and followed apparent first-order kinetics. The conversion rate of the quinoidal form of triphenylmethane dyes to their colorless carbinol or leuco bases in alkaline media is a recognized means of assessing color fastness (12, 38). Although reversible, the conversion of I to IV (Scheme I) can be rapid in strong alkali, whereas the conversion from IV to II is comparatively slow, even in more concentrated acid. For instance, 1.0 × 10⁻³% I in 0.80 N KOH was 99.9% converted to IV in 20 hr at 23 ± 2°. However, when this solution was prepared in 3.60 N H₂SO₄ ($H_o$ −0.7, equivalent I concentration of $8.9 \times 10^{-4}$%), the dehydroxylation of IV to regenerate II required 30 days. This slowness of the triphenylcarbinol (IV) to trityl ion (II) conversion was reported elsewhere (12). Fastness to color fading of I in alkaline media is enhanced in decreasing order by the addition of a

sulfonate, chloro, or methyl group *ortho* to the central triphenylmethyl carbon atom (12).

It has been demonstrated that sulfonated triphenylmethane vital stains are bound to serum albumin prior to their endocytosis by macrophages (39). Furthermore, the weaker association between I and albumin compared to other dyes resulted in its more rapid clearance from, and lesser toxicity to, local tissues following repeated subcutaneous injections of 1% solutions (6).

A Scatchard plot (40–42) of the data for the binding of I to human serum albumin appears in Fig. 3. Because transmembrane equilibrium time increased proportionately with I concentration, the data were normalized to 100% equilibrium via the results of dialyzing I solutions against albumin-free phosphate buffer. These blank specimens also accounted for contributions of I binding to the dialysis membrane, which did not exceed 2% in any case.

The numbers of binding sites in two classes, $n_1$ and $n_2$, and their corresponding affinity constants, $K_1$ and $K_2$, were estimated by an iterative procedure of drawing ordinate (γ/D_f) and abscissa (γ) asymptotes to the original data plot (41, 43). These asymptotic lines were omitted from Fig. 3 to avoid obscuring the raw data (solid line) and fitted (dashed line) curves. One graphical iteration sufficed to produce a curve that was superimposable with a subsequent iteration of the method used (41, 43). This method normalized the raw binding data to yield the fitted curve for the special case of $n_{H1} = n_{H2} = 1$ (41, 42):

$$\gamma = \frac{n_1(K_1 D_f)^{n_{H1}}}{1 + (K_1 D_f)^{n_{H1}}} + \frac{n_2(K_2 D_f)^{n_{H2}}}{1 + (K_2 D_f)^{n_{H2}}} \qquad (Eq.\ 3)$$

where γ is the molar concentration ratio of albumin-bound I to that of albumin, $D_f$ is the molar concentration of unbound I at dialysis equilibrium, $n_{H1}$ and $n_{H2}$ are the binding cooperativity or Hill coefficients, and $n_1$, $n_2$, $K_1$, and $K_2$ are the parameters described earlier. The molarity of I was based on its nominal 85% purity[2], and that of human serum albumin was based on a molecular weight of 66,300 (44, 45).

The error bars on the solid curve in Fig. 3 represent $\chi \pm 1\sigma$ for triplicate dialysis samples. These bars become more horizontal with increasing γ because they extend radially in the direction of constant $D_f$ (41). Variability of the data tended to increase with increasing values of γ/D_f because of the greater sensitivity of γ/D_f to small changes in $D_f$ attributed to experimental imprecision. Several error bars at high values on the

**Table IV—Half-Lives for the Loss of Absorbance at 638 nm of 5 × 10⁻⁴% Patent Blue Violet (I) in Potassium Hydroxide Solutions at 23°**

| Potassium Hydroxide Concentration, N | pH | Half-Life |
|---|---|---|
| 0.900 | 13.7 | 1.2 hr |
| 0.090 | 12.7 | 17.0 hr |
| 0.009 | 11.3 | 9.5 days[a] |
| 9 × 10⁻⁴ | 10.0 | 180 days[a] |

[a] One day = 24.0 hr.

**Table V—Fraction of Patent Blue Violet (I) Bound to 4% (w/v) Human Serum Albumin at 37° and pH 7.4 Corresponding to Concentrations of I before and after Equilibrium Dialysis**

| Fraction of I Bound | Concentration of I, % w/v | |
|---|---|---|
| | Predialysis | Postdialysis[a] |
| 0.83 | $2.0 \times 10^{-3}$ | $1.7 \times 10^{-4}$ |
| 0.79 | $3.1 \times 10^{-3}$ | $3.4 \times 10^{-4}$ |
| 0.77 | $9.8 \times 10^{-3}$ | $1.1 \times 10^{-3}$ |
| 0.76 | $4.8 \times 10^{-3}$ | $5.7 \times 10^{-4}$ |
| 0.75 | $1.95 \times 10^{-2}$ | $2.4 \times 10^{-3}$ |
| 0.68 | $3.24 \times 10^{-2}$ | $5.2 \times 10^{-3}$ |
| 0.59 | $5.23 \times 10^{-2}$ | $1.07 \times 10^{-2}$ |
| 0.48 | $7.57 \times 10^{-2}$ | $1.98 \times 10^{-2}$ |
| 0.46 | 0.1020 | $2.72 \times 10^{-2}$ |
| 0.34 | 0.2030 | 0.0068 |
| 0.26 | 0.3490 | 0.1300 |
| 0.19 | 0.4930 | 0.1980 |
| 0.13 | 0.7700 | 0.3340 |
| 0.14 | 1.0100 | 0.4350 |
| 0.09 | 1.9500 | 0.8880 |
| 0.07 | 3.2000 | 1.4800 |
| 0.05 | 4.9600 | 2.3600 |

[a] Refers to unbound I.

[17] Determined *via* UV absorbance at 258 nm.

Appx1306                                    AURO_ISO 0018838

$\gamma$-axis could have resulted from experimental uncertainty in reading the meniscuses of I solutions exceeding 0.5% (w/v); they are colored so intensely as to preclude light transmission.

The abscissa intercept was extrapolated asymptotically to be 0.8, indicating a single class of binding site, $i.e.$, $n_1 = 1$. The total $\gamma$-axis intercept was 5.6, indicating between five and six total binding sites. Thus, by difference, the $\gamma$-axis intercept for a second class of lower affinity binding sites was 4.8, thereby indicating that five binding sites occurred in this class, $i.e.$, $n_2 = 5$. The total ordinate intercept from the fitted curve was 6400 $M^{-1}$, and $K_1$ was extrapolated asymptotically to be 6235 $M^{-1}$. The intercept for the second class of binding sites was, by difference, 165 $M^{-1}$. Thus, each of the five binding sites in the second class was assigned an average $K_2 = 33 \, M^{-1}$.

It was established elsewhere that protein binding has a clinically significant effect on $in \, vivo$ drug distribution only when $K \geq 1 \times 10^4 \, M^{-1}$ (46). Therefore, it is understandable why, with $K_1 \simeq 6000$, I can be observed in the urine of lymphangiography patients within minutes after subcutaneous injection[18] (47) and has been used to measure renal clearance (48). In fact, when 5–10% (w/v) solutions of I were used in the past for lymphangiography, the rapid secretion of I into saliva and tears was regularly seen[18].

Table V lists the albumin-bound fractions of I at varying concentrations of I before and after equilibrium dialysis. A plot of the fraction of albumin-bound I $versus$ the concentration of unbound I at dialysis equilibrium yielded a curve similar to the curves in Fig. 3. If the total I in a 2–3-ml injection of 1% solution were distributed in plasma and extracellular fluid, $\sim$12 liters in an adult (49), then the I concentration $in \, vivo$ would be in the range of $1.7 \times 10^{-4} - 2.5 \times 10^{-4}\%$ (w/v), for which Table V indicates >80% of I to be albumin bound. Other brief studies of I binding to albumin appear to be clinically irrelevant because the I concentration used ranged from 0.1 to 11.0% (8, 50).

Based on derived thermodynamic parameters, it has been proposed that the binding of sulfonated dyes to albumin involves electrostatic attraction between the sulfonate anions and the cationic arginine and lysine residues of albumin as well as hydrogen bonds and van der Waals forces (51–53). The evidence for both hydrophobic and electrostatic bonding was provided in a study (51) that found no binding of a sulfonated dye to the unpolymerized amino acids arginine and lysine, whereas significant binding to bovine serum albumin and salmine occurred. Salmine is a protamine with an arginine content of 87% (51), while human serum albumin contains 23 and 58 residues of arginine and lysine per molecule, respectively (45).

Hill plots (42, 54, 55), $i.e.$, log ($\bar{y}/1 - \bar{y}$) $versus$ log $D_f$, where $\bar{y} = \gamma/(n_1 + n_2)$, were constructed for both the 17 experimental data points on the solid curve and the 17 points on the fitted (dashed) curve corresponding to the same $D_f$ values (Fig. 3). Regression lines computed for these plots had slopes of 0.615 and 0.613 and correlation coefficients of 0.992 and 0.989, respectively. When solved for several sets of coordinates describing the locus of the fitted curve (Fig. 3), the values of the Hill coefficients in Eq. 3 were $n_{H1} = n_{H2} = 1$, which mathematically confirmed this curve to be a hyperbola. Furthermore, the condition of $n_{H1} = n_{H2} = 1$ occurs for two different classes of binding sites only when there is no cooperativity within the ligand–protein binding system (42, 54, 55). Therefore, it was concluded that neither positive nor negative cooperative binding occurred between I and human serum albumin, as evidenced by the insignificant difference between the slopes of the Hill plots of the two curves in Fig. 3; $i.e.$, the experimental (solid) data curve represents a nearly hyperbolic function where $n_{H1} = n_{H2} \simeq 1$.

The compositions of Eluents A, B, and C, used for the TLC of I, are reported in Table VI. Systems A (4) and B[19] were used in other TLC studies, and System C is similar to that reported elsewhere (56). The $R_f$ values for the TLC of I, spotted as 2 $\mu$l of a 0.01% (w/v) solution in methanol and developed over 10.0 cm, allowed to dry for 24 hr, and redeveloped at a 90° angle in Eluents A–C, are reported in Table VII. Only a single major spot, indicating a high degree of organic content purity in I, was observed following initial development in each eluent. The second development in Eluent B resulted in a 0.10-unit decrease in the $R_f$ value, which could be attributed to the formation of some IV (Scheme I) during the first trial, although only a single visible spot was observed under incandescent and UV lamps. The second TLC elution of I with Eluent C produced a second, faintly visible spot with $R_f$ 0.31, the explanation for which is not evident. However, it is apparent from

**Table VI—Compositions of Eluents Used for TLC of Patent Blue Violet (I)**

| Eluent | Acetone | Acetic Acid | Ammonium Hydroxide | 1-Butanol | Ethanol | Water |
|---|---|---|---|---|---|---|
| A[a] | — | 1 | — | 4 | — | 5 |
| B | 37 | — | 19 | 37 | — | 7 |
| C | — | 1 | — | 60 | 15 | 15 |

$^a$ Upper phase of system used.

**Table VII—$R_f$ Values of Patent Blue Violet (I) Spotted as 2 $\mu$l of 0.01% (w/v) Methanolic Solution and Developed for 10.0 cm in Eluents A–C**

| | $R_f$ Values | |
|---|---|---|
| Eluent[a] | First Trial | Second Trial[b] |
| A | 0.26 | 0.26 |
| B | 0.58 | 0.48[c] |
| C | 0.26 | 0.26[d] and 0.31 |

$^a$ Compositions are listed in Table VI. $^b$ Developed at a 90° angle to the first trial. $^c$ Because of eluent volatility, the second trial was conducted with fresh eluent. $^d$ Major spot.

Scheme I and evidence supporting it that the exposure of I to TLC eluents containing acid or alkali could produce I derivatives of different polarity.

As expected from its lipophobic nature, no measurable $R_f$ values were observed when the TLC of I was conducted in the following solvents of increasing dielectric constant: toluene, ether, chloroform, and ethyl acetate. However, the TLC of I in the more polar solvents $n$-butanol, acetone, and methanol produced visible spots with $R_f$ 0.05, 0.42, and 0.72, respectively. Preliminary TLC studies showed that 2-$\mu$l spots of methanolic I solutions exceeding 0.01%, although suggested (56), elicited trailing and tailing effects which impaired the resolution of $R_f$ values. Perhaps this effect is why 2-$\mu$l samples of $5 \times 10^{-4}\%$ aqueous I specimens were evaluated by TLC in an earlier study (4).

## CONCLUSIONS

Based on the results of spectrophotometric studies of I solutions prepared in solvents ranging from 0.90 $N$ KOH (pH 13.7) to 96% (w/w) $H_2SO_4$ ($H_o$ –10.0), the quantitative determination of I at 639 $\pm$ 2 nm appears to represent a stability-indicating assay. The results of distribution coefficient, solubility analysis, and human serum albumin binding studies corroborate other evidence suggesting that the $in \, vivo$ distribution of I is limited to plasma and extracellular fluid. Based on the pKa for the equilibrium between I and II (Scheme I) and on the results of TLC determinations, I appears to be essentially pure with respect to its organic compound content.

## REFERENCES

(1) D. W. Newton, A. G. Rogers, C. H. Becker, and G. Torosian, $Am. \, J. \, Hosp. \, Pharm.$, 32, 912 (1975).

(2) J. R. Wilder, $Surgery$, 56, 881 (1964).

(3) J. B. Kinmonth, G. W. Taylor, and R. K. Harper, $Br. \, Med. \, J.$, 1, 940 (1955).

(4) P. K. Hiranaka, L. M. Kleinman, E. A. Sokoloski, and H. M. Fales, $Am. \, J. \, Hosp. \, Pharm.$, 32, 928 (1975).

(5) J. Hooson, P. Grasso, and S. D. Gangolli, $Br. \, J. \, Cancer$, 27, 230 (1973).

(6) S. D. Gangolli, P. Grasso, L. Goldberg, and J. Hoosan, $Food \, Cosmet. \, Toxicol.$, 10, 449 (1972).

(7) P. Grasso, S. D. Gangolli, L. Goldberg, and J. Hoosan, $ibid.$, 9, 463 (1971).

(8) S. D. Gangolli, P. Grasso, and L. Goldberg, $ibid.$, 5, 601 (1967).

(9) A. Albert and E. P. Serjeant, "The Determination of Ionization Constants," 2nd ed., Chapman and Hall, London, England, 1971, p. 45.

(10) J. C. Souder and W. C. Ellenbogen, $Drug \, Stand.$, 26, 77 (1958).

(11) "Sigma Price List," Sigma Chemical Co., St. Louis, Mo., Jan. 1980, p. 450.

(12) "Organic Chemistry: An Advanced Treatise," vol. 3, H. Gilman,

[18] Dr. Francis J. Scholz, Department of Diagnostic Radiology, Lahey Clinic Foundation, Boston, Mass., personal communication.
[19] Walter C. Stern, Sigma Chemical Co., St. Louis, Mo., personal communication.

     AURO_ISO 0018839

Ed., Wiley, New York, N.Y., 1953, pp. 295–305.

(13) "Rodd's Chemistry of Carbon Compounds," 2nd ed., vol. 3, part F, S. Coffey, Ed., Elsevier, New York, N.Y., 1974, pp. 129–131.

(14) R. D. Lillie, "H. J. Conn's Biological Stains," 9th ed., Williams & Wilkins, Baltimore, Md., 1977, p. 252.

(15) C. R. Bury, J. Am. Chem. Soc., 57, 2115 (1935).

(16) G. E. K. Branch and B. M. Tolbert, ibid., 71, 781 (1949).

(17) M. S. Newman and N. C. Deno, ibid., 73, 3644 (1951).

(18) R. Cigen, Acta Chem. Scand., 13, 1113 (1959).

(19) A.-M. Anthony-Barbier, P. Rumpf, and C. Viel, Bull. Soc. Chim. Fr., 1959, 1474.

(20) H. H. Freedman, in "Carbonium Ions," G. A. Olah and P. von R. Schleyer, Eds., Wiley, New York, N.Y., 1973, pp. 1501–1504, 1530–1536.

(21) A. Leo, C. Hansch, and D. Elkins, Chem. Rev., 71, 525 (1971).

(22) C. C. Michel, J. Physiol. (London), 204, 62P (1969).

(23) V. Augulis and E. B. Sigg, Stain Technol., 46, 183 (1971).

(24) A. N. Martin, J. Swarbrick, and A. Cammarata, "Physical Pharmacy," 2nd ed., Lea & Febiger, Philadelphia, Pa., 1969, pp. 178–182.

(25) "The Merck Index," 9th ed., Merck & Co., Rahway, N.J., 1976, p. MISC-69.

(26) T. J. Webb, Anal. Chem., 20, 100 (1948).

(27) W. Tarpley and M. Yudis, ibid., 25, 121 (1953).

(28) T. Higuchi and K. A. Connors, Adv. Anal. Chem. Instrum., 4, 117 (1965).

(29) J. March, "Advanced Organic Chemistry: Reactions, Mechanisms and Structure," 2nd ed., McGraw-Hill, New York, N.Y., 1977, pp. 461–464.

(30) G. W. Gray, "Molecular Structure and the Properties of Liquid Crystals," Academic, New York, N.Y., 1962, pp. 13–16.

(31) B. Jirgensons and M. E. Straumanis, "A Short Textbook of Colloid Chemistry," 2nd rev. ed., Macmillan, New York, N.Y., 1962, pp. 414, 415.

(32) G. H. Brown and W. G. Shaw, Chem. Rev., 57, 1049 (1957).

(33) A. W. Adamson, "A Textbook of Physical Chemistry," Academic, New York, N.Y., 1973, pp. 1006, 1007.

(34) E. B. Priestly, P. J. Wojtowicz, and P. Sheng, "Introduction to Liquid Crystals," Plenum, New York, N.Y., 1975, pp. 1–13.

(35) I. E. Balaban and H. King, J. Chem. Soc., 1927, 3068.

(36) A. N. Martin, J. Swarbrick, and A. Cammarata, "Physical Pharmacy," 2nd ed., Lea & Febiger, Philadelphia, Pa., 1969, pp. 537–539.

(37) H. L. Booij, in "Colloid Science," vol. 2, H. R. Kruyt, Ed., Elsevier, New York, N.Y., 1949, p. 682.

(38) R. D. Lillie, "H. J. Conn's Biological Stains," 9th ed., Williams & Wilkins, Baltimore, Md., 1977, pp. 27, 28, 246, 247.

(39) M. Kojima and Y. Imai, Proc. Jpn. Soc. RES, 1, 61 (1961).

(40) G. Scatchard, Ann. N.Y. Acad. Sci., 51, 660 (1949).

(41) H. G. Weder, J. Schildkneckt, R. A. Lutz, and P. Kesselring, Eur. J. Biochem., 42, 475 (1974).

(42) G. Schwarz, Biophys. Struct. Mech., 2, 1 (1976).

(43) S. A. Berson and R. S. Yalow, J. Clin. Invest., 38, 1996 (1959).

(44) F. W. Putnam, in "The Plasma Proteins," 2nd ed., vol. 1, F. W. Putnam, Ed., Academic, New York, N.Y., 1975, pp. 63–70.

(45) T. Peters, Jr., in ibid., pp. 133–181.

(46) B. K. Martin, Nature, 207, 274 (1965).

(47) S. A. Threefoot, Proc. Soc. Exp. Biol. Med., 103, 780 (1960).

(48) N. Parekh, G. Popa, R. Galaske, W. Galaske, and M. Steinhausen, Pfluegers Arch. (Eur. J. Physiol.), 343, 1 (1973).

(49) R. R. Levine, "Pharmacology Drug Action and Reactions," Little, Brown, Boston, Mass., 1973, p. 100.

(50) S. A. Threefoot, J. Appl. Physiol., 15, 925 (1960).

(51) I. M. Klotz, J. Am. Chem. Soc., 68, 2299 (1946).

(52) H. J. Weder and M. H. Bickel, J. Pharm. Sci., 59, 1563 (1970).

(53) R. D. Lillie, "H. J. Conn's Biological Stains," Williams & Wilkins, Baltimore, Md., 1977, p. 24.

(54) A. V. Hill, J. Physiol. (London), 40, iv (1910).

(55) F. W. Dahlquist, FEBS Lett., 49, 267 (1974).

(56) H. Schweppe, in "The Analytical Chemistry of Synthetic Dyes," K. Venkataraman, Ed., Wiley, New York, N.Y., 1977, pp. 23–51.

## ACKNOWLEDGMENTS

The authors thank Dr. Elton Watkins, Jr., Division of Research, Lahey Clinic Foundation, Boston, Mass., for providing the patent blue violet dye and other materials used in the investigation. They also thank Mr. Richard A. Klose, Jr., for assistance in TLC determinations, Ms. Elaine G. Howard for assistance in preparing the manuscript, and Dr. William O. Foye for critiquing parts of the Results and Discussion section.

# Utility of Chloranil in Assay of Naphazoline, Clemizole, Penicillin G Sodium, and Piperazine

## SAIED BELAL, M. ABDEL-HADY ELSAYED *x, MOHAMED E. ABDEL-HAMID, and HASSAN ABDINE

Received October 15, 1979, from the Department of Pharmaceutical Analytical Chemistry, Faculty of Pharmacy, University of Alexandria, Alexandria, Egypt.    Accepted for publication July 15, 1980.    *Present address: Department of Pharmacy, University of Nigeria, Nsukka, Nigeria.

**Abstract** ▢ A simple and sensitive spectrophotometric method is described for the assay of naphazoline, clemizole, penicillin G sodium, and piperazine. The method was based on the formation of a charge transfer complex between these drugs as n-donors and chloranil, the π-acceptor. Conformity with Beer's law enabled the assay of dosage forms of these drugs. Compared with official methods, the results obtained were of equal accuracy. A more detailed investigation of the naphazoline–chloranil complex was made with respect to its composition, association constant, and free energy change.

**Keyphrases** ▢ Naphazoline—spectrophotometric assay in dosage forms using complex formation with chloranil ▢ Clemizole—spectrophotometric assay in dosage forms using complex formation with chloranil ▢ Penicillin G sodium—spectrophotometric assay in dosage forms using complex formation with chloranil ▢ Piperazine—spectrophotometric assay in dosage forms using complex formation with chloranil

Naphazoline and clemizole (antihistamines), penicillin G sodium (antibiotic), and piperazine (anthelmintic) are widely used in pharmaceutical practice. The official compendia describe a nonaqueous titration for naphazoline (1), an iodometric titration (2) and microbiological assay (3) for penicillin G sodium, and a gravimetric method (1) and nonaqueous titration (3) for piperazine. Among the methods described for the assay of naphazoline are UV

0022-3549/81/0200-0127$01.00/0
© 1981, American Pharmaceutical Association

Journal of Pharmaceutical Sciences / 127
Vol. 70, No. 2, February 1981

# EXHIBIT 44

# PRACTICAL HPLC METHOD DEVELOPMENT

# PRACTICAL HPLC METHOD DEVELOPMENT

## Second Edition

**LLOYD R. SNYDER**
LC Resources, Inc.
Walnut Creek, California

**JOSEPH J. KIRKLAND**
Rockland Technologies, Inc.
Newport, Delaware

**JOSEPH L. GLAJCH**
DuPont Merck Pharmaceutical Company
North Billerica, Massachusetts



A Wiley-Interscience Publication
**JOHN WILEY & SONS, INC.**

**Appx1311    AURO_ISO 0018873**

This text is printed on acid-free paper.

Copyright © 1997 by John Wiley & Sons, Inc.

**All rights reserved. Published simultaneously in Canada.**

No part of this publication may be reproduced, stored in a retrieval system or transmitted
in any form or by any means, electronic, mechanical, photocopying, recording, scanning
or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States
Copyright Act, without either the prior written permission of the Publisher, or
authorization through payment of the appropriate per-copy fee to the Copyright
Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax
(978) 750-4470. Requests to the Publisher for permission should be addressed to the
Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030,
(201) 748-6011, fax (201) 748-6008, E-Mail: PERMREQ@WILEY.COM.
To order books or for customer service please, call 1(800)-CALL-WILEY (225-5945).

***Library of Congress Cataloging in Publication Data:***

Snyder, Lloyd R.
     Practical HPLC method development / Lloyd R. Snyder, Joseph J. Kirkland, Joseph L.
Glajch.—2nd ed.
          p.   cm.
     Includes index.
     ISBN 0-471-00703-X (cloth : alk. paper)
     1. High performance liquid chromatography—Methodology.
I. Kirkland, J. J. (Joseph Jack), 1925–          II. Glajch, Joseph L.
III. Title.
QP519.9.H53S69   1997
543'.0894—dc20                                                              96-34296

Printed in the United States of America

18  17  16  15  14

*Practical HPLC Method Development, Second Edition*
by Lloyd R. Snyder, Joseph J. Kirkland and Joseph L. Glajch
Copyright © 1997 John Wiley & Sons, Inc.

# 13

# PREPARATIVE HPLC SEPARATION

13.1  Introduction
13.2  Developing a Preparative HPLC Separation
    13.2.1  General Considerations
    13.2.2  Effect of Sample Size: Touching-Band Separation
    13.2.3  Optimizing Conditions for Preparative HPLC
    13.2.4  Gradient Separations
    13.2.5  Trace Recovery
13.3  Practical Aspects of Preparative HPLC
    13.3.1  Sample Solubility
    13.3.2  Equipment Requirements
13.4  Quantitative Prediction of Preparative HPLC Separation
    13.4.1  General Relationships
    13.4.2  Column Saturation Capacity
    13.4.3  Gradient Elution Separations
    13.4.4  Heavily Overloaded Separation
    13.4.5  Unusual Isotherm Behavior
13.5  Summary and Example of Method Development for Preparative HPLC
    13.5.1  Process-Scale HPLC Separations

## 13.1  INTRODUCTION

Other chapters in this book assume that the purpose of HPLC separation is the analysis of different samples. This chapter deals with preparative HPLC (prep LC), where the goal is the isolation of purified material (product) for further use. The goals and characteristics of preparative vs. analytical HPLC are compared in Table 13.1. When only small amounts of pure product are required, an analytical HPLC method (e.g., 0.46-cm column ID) can be used to recover nanogram-to-sub-milligram quantities of product. The sample band is observed as it passes through the detector, and the band is collected at the detector outlet. Removal of the mobile phase by evaporation or lyophilization

**616**

**TABLE 13.1   Analytical vs. Preparative HPLC: Differences in Goals and Characteristics**

| Analytical HPLC | Preparative HPLC |
| --- | --- |
| *Goals* | |
| Information about sample composition | Recovery of purified product |
| Most or all sample components often of interest | Usually only one or a few sample components (products) of interest |
| *Characteristics* | |
| Sample weight just large enough for adequate detection | Largest possible sample weight for maximum yield of pure product |
| Reversed-phase HPLC most convenient | Normal-phase HPLC most convenient |
| Column ID 1–5 mm | Column ID 1–10 cm (or larger) |
| Column particles 5 $\mu$m or smaller | Column particles 7 $\mu$m or larger |
| HPLC pumps provide up to 10 mL/min | HPLC pumps provide $\gg$ 10 mL/min |
| Sample injection usually not a problem | Sample injection more difficult, requires more attention |
| Detection conditions selected for maximum sensitivity | Detection conditions often selected for reduced sensitivity |
| Solubility of sample in mobile phase usually not important | Sample solubility usually very important |
| Mobile-phase volatility unimportant | Mobile phase should be volatile; no involatile additives |

then furnishes purified product. Larger amounts of purified material can be obtained by injecting larger samples and/or by repetitive injections with pooling of product fractions.

When milligram or greater amounts of purified product are needed, it is usually best to operate the column under *overload* conditions [where the sample weight is large enough to distort the band and reduce resolution (Section 2.4.2)]. This is illustrated in Fig. 13.1. For sample injections that contain no more than 25 $\mu$g of product (Fig. 13.1*a*, 0.46-cm column), bandwidth and retention times are usually not a function of sample size, and the appearance of the chromatogram remains the same regardless of sample weight. The injection of a much larger sample weight under the same conditions leads to separation as in Fig. 13.1*b*. The product band Y (*) has widened to the point where it touches the adjacent impurity band X (called *touching-band separation;* see Refs. 1 and 2). However, product recovery and purity are still ≈100% in the separation of Fig. 13.1*b*, while a much larger yield or production rate of purified product is possible than in Fig. 13.1*a*.

A maximum production of purified product per injection is usually a major goal in prep LC. Often, the yield of purified product per run can be increased beyond that of Fig. 13.1*b* by injecting a still greater weight of sample (Fig.



**FIGURE 13.1** Hypothetical separations as a function of sample weight. (*a*) Analytical conditions; (*b*) lightly overloaded (touching band) separation; (*c*) heavily overloaded (overlapping band) separation. A column internal diameter of 0.46 cm is assumed in the discussion of these separations.

13.1*c*). Now the product band overlaps one or more impurity bands. However, small fractions can be collected across the product band and analyzed by the HPLC procedure of Fig. 13.1*a*. Fractions containing purified product can be pooled, followed by removal of the mobile phase and recovery of the final product. Although this procedure is more complicated and requires additional experimental effort, it can be cost-effective when large amounts of purified product are required.

For the recovery of purified product from an impure starting material, it is convenient to use the same optimized HPLC conditions that were developed initially for analysis of the sample. Sample size can then be increased, as in Fig. 13.1, to the point where the required amount of purified product can be recovered from one or more runs. When larger amounts of product are required, column diameter can be increased and larger samples injected (other conditions, except flow rate, the same). If relatively large amounts of purified product are required, however, it is usually best to redesign the analytical method so that it is optimum for prep LC.

## 13.2 DEVELOPING A PREPARATIVE HPLC SEPARATION

### 13.2.1 General Considerations

Usually, an analytical HPLC procedure will be developed first and can be used as a starting point for a preparative method. Several considerations

peculiar to prep LC separation should be kept in mind, however. First, it will be necessary to remove the mobile phase from collected product fraction(s). For this reason, normal-phase chromatography with organic solvents as the mobile phase is often preferred. The removal of volatile organic solvents from the product will be easier than for reversed-phase HPLC with aqueous mobile phases. Similarly, non-volatile mobile-phase components should be avoided, if possible, making ion-pair chromatography (Section 7.4) less desirable. If a buffer must be added to the mobile phase, volatile buffers are preferred (e.g., acetic or formic acid, ammonium carbonate, formate, or acetate). Otherwise, a second separation for removal of the buffer ("desalting") will be required.

A second aspect of prep LC separation is illustrated in Fig. 13.2, for the separation of a crude product from its impurities. When analysis is the goal, baseline resolution of all the bands in the sample is usually desirable. The separation of Fig. 13.2a provides $R_s > 1.5$ for each pair of bands in the chromatogram and is therefore suitable for the analysis of this sample. However, if the conditions of Fig. 13.2a are used for the recovery of purified product (large band eluting at 12.2 min), the weight of sample that can be separated in each run will be quite limited. As sample size is increased ($> 25$ $\mu$g), the product band will broaden and quickly overlap the adjacent impurity bands. The separation of Fig. 13.2b, on the other hand, provides poor resolution of impurity bands eluting at 7 to 9 min but much better resolution of the product band from adjacent impurities (larger values of $\alpha$). A much larger sample can be injected in the separation of Fig. 13.2b for recovery of purified product. The separation of Fig. 13.2b is poorly suited for the analysis of this sample, but it is well designed for the purification of this product by prep LC.

A third consideration for prep LC is the solubility of the sample in the mobile phase. Whereas sample solubility is seldom important in developing an analytical method, solubility is often a major factor in prep LC, because it is desirable to inject a large weight of sample dissolved in a relatively small volume of mobile phase. For organic-soluble compounds, normal-phase chromatography usually will be preferred. Sample solubility is discussed further in Section 13.3.1.

A final consideration in prep LC is the relative importance of $N$ and $\alpha$. As sample size is increased to the point of column overload and sample bandwidths begin to increase (as in Figs. 2.13 and 2.15), the column plate number (as measured by bandwidth) becomes more a function of sample size than of column conditions (column length, flow rate, particle size). As a result, it is often advantageous in prep LC to use larger particles and higher flow rates than is the case for analytical separations, because a high column plate number is no longer required. Large values of $\alpha$ are extremely advantageous in prep LC because they allow much larger sample weights.

Method development for a preparative HPLC method should be carried out in the same general way as for an analytical procedure (Chapters 6 to 9, 11, 12), by adjusting conditions for optimum $k$, $\alpha$, and (less important, but



620

significant) *N for the product band* (as in Fig. 13.2*b*). As indicated above, normal-phase (rather than reversed-phase) HPLC will often be a good starting point. If normal-phase conditions are used, unmodified silica is the preferred column packing. Larger (more expensive) columns are often required for preparative separation, and silica is less expensive than polar-bonded-phase packings such as cyano or diol. Using silica, there is also no loss of bonded phase to contaminate collected product fractions (however, silica is somewhat soluble in aqueous mobile phases when the mobile phase pH > 6).

### 13.2.2   Effect of Sample Size: Touching-Band Separation

After suitable HPLC conditions have been selected for a prep LC separation (as in Fig. 13.2*b*), it is desirable to inject a sample that is large enough to maximize the amount of purified product recovered from each run. For laboratory-scale prep LC, it is preferable to work under lightly overloaded or touching-band conditions, as in Fig. 13.1*b*. Such separations have several advantages:

- · Convenient recovery of highly purified (99%+) product
- · Nearly complete recovery (95%+) of purified product
- · Simple separation procedures; no need to analyze fractions for pooling of purified product (as in the overlapping-band separation of Fig. 13.1*c*)
- · Easy development of a touching-band separation

The maximum weight of sample ($w_{max}$) that can be injected for touching-band separation is usually determined by trial and error. For the first experiment, a sample weight equal to $w_{max}$ can be estimated from the chromatogram obtained for injection of a small weight of sample (< 10 $\mu$g). The maximum sample weight is a function of the separation factor $\alpha$ for the product band and the closest impurity band (Table 13.2). If this separation factor $\alpha$ is increased by a suitable choice of conditions, the value of $w_{max}$ increases rapidly. For example, with an analytical column (25 × 0.46 cm) and $\alpha$ = 1.05, ≈ 30 $\mu$g of product can be injected for touching-band separation. If $\alpha$ = 3, ≈ 6 mg of product can be injected (2000-fold larger sample). The importance of large values of $\alpha$ in prep LC is another reason for preferring normal-phase separation, because large changes in selectivity are more readily obtainable compared to reversed-phase HPLC (Section 6.6).

Table 13.2 also illustrates some other features of prep LC separation. First, the required plate number $N$ for these separations depends on values of $\alpha$ and $k$ for the product band (as is the case for analytical separation, Eq. 2.3).

---

**FIGURE 13.2**   Hypothetical separations suitable for (*a*) analysis and (*b*) preparative separation of a crude product. See the text for details.

**TABLE 13.2  Optimum Values of $N$ and Sample Weight $w$ as a Function of Selectivity $\alpha$ and Retention $k^a$ for Touching-Band Separation[b]**

| | | | | Sample Weight (mg)[c] | | |
|---|---|---|---|---|---|---|
| | $N$ | | | 25-cm Column | | |
| $\alpha$ | $k = 0.5$ | $k = 1.0$ | $k = 3.0$ | 0.46 cm ID | 1 in. OD | 4 in. OD |
| 1.05 | 180,000 | 81,000 | 37,000 | 0.03 | 0.6 | 10 |
| 1.10 | 46,000 | 21,000 | 10,000 | 0.09 | 2 | 30 |
| 1.20 | 12,000 | 6,000 | 2,800 | 0.3 | 6 | 100 |
| 1.50 | 2,400 | 1,200 | 650 | 1.3 | 27 | 400 |
| 2.0 | 800 | 430 | 260 | 3 | 60 | 1000 |
| 3.0 | 300 | 190 | 130 | 6 | 130 | 2000 |

*Source:* Ref. 1.

[a] Value of $k$ refers to product band or largest of two bands to be separated.

[b] See the text and Fig. 13.1 for details.

[c] Values shown are for touching-band separation, assuming that the product and adjacent impurity band(s) are present in the sample at the same concentration; if the product concentration is $x$-fold greater than that of the impurity, the maximum sample size can be increased approximately $x$-fold [or decreased $(1/x)$-fold].

An increase in $\alpha$ (by selection of appropriate HPLC conditions) not only increases the weight of sample that can be separated in each run, it also lowers the column plate number that is required [e.g., $N = 130$ for $\alpha = 3$ and $k = 3$ (Table 13.2)]. Smaller values of $N$ (larger particles, higher flow rates) reduce the run time and increase production rate (weight per hour of purified product). Shorter run times also favor an increased recovery of the product, since less time in the column is allowed for possible degradation of the product during separation.

A second consideration related to Table 13.2 is the choice of $k$ for the product band. Larger $k$ values require more solvent to produce each gram of purified product. The cost of the solvent can be a major consideration in prep LC, so that smaller values of $k$ (other factors equal) are preferred. Table 13.2 provides a means of evaluating the advantage of smaller values of $k$ vs. the larger plate numbers that are required.

The data of Table 13.2 are intended as approximate guidelines. The use of larger values of $N$ allows somewhat larger sample weights to be injected; lower values of $N$ may require much smaller sample weights. Prep LC separations are often carried out at lower pressures (e.g., $< 1000$ psi) than are analytical separations, especially if larger particles and wider-diameter columns are used. However, higher pressures (with higher flow rates and/or longer columns) can achieve increased amounts of purified product per hour.

### 13.2.3  Optimizing Conditions for Preparative HPLC

The following steps provide a systematic approach to acceptable conditions for touching-band prep LC separation [1,2], which is usually the preferred

approach for the recovery of less than a gram of purified material. An example
will be used to illustrate its application.

STEP 1. For most samples, select either a normal- or reversed-phase method.
Organic-soluble samples favor the use of normal-phase HPLC with a silica
column. Separations on silica can also be monitored easily by analyzing product
fractions with thin-layer chromatography [3].

STEP 2. Select an analytical-scale column (e.g., $25 \times 0.46$ cm). For reversed-
phase separations, choose the packing type that would be appropriate for an
analytical separation (e.g., for a basic sample, a non-acidic $C_8$ or $C_{18}$ packing).
If the separation is likely to be scaled up to a larger column diameter, it is
recommended that the packing used in both the initial and final columns be
identical. Some column suppliers are willing to supply columns of different
diameter packed with material from the same batch.

STEP 3. Carry out method development in the same way as for an analytical
separation (Chapters 6 to 9, 11, 12), optimizing both solvent strength and
selectivity ($k < 2$ for the product band, if possible). Try to avoid gradient
elution, although step gradients can be useful for removing late-eluting impuri-
ties from the column. In prep LC, keep in mind that good resolution is required
only for compounds that it is necessary to recover in purified form (Fig. 13.2).
Also, there is a large advantage to maximizing selectivity for the product
($\alpha > 1.5$ if possible). Therefore, the study of additional separation conditions
that affect $\alpha$ is often worthwhile.

In this example, steps 1 to 3 resulted in the reversed-phase separation of
Fig. 13.3a. These two xanthines are more than baseline resolved with $N =
5400$, an average value of $k = 4$, and $\alpha = 1.20$, in a run time of 16 min.

STEP 4. Once conditions have been selected for the small-sample run as in
Fig. 13.3a (1 $\mu$g), a larger sample can be injected for touching-band separation.
Table 13.2 provides information relating to further experiments for this separa-
tion where $\alpha = 1.20$. The recommended sample size is 0.3 mg of product;
since the sample is a 50/50 mixture of two compounds, this means 0.6 mg of
total sample. The recommended plate number from Table 13.2 is about 2500
($N = 2800$ for $k = 3$). The next step is to adjust the actual plate number
($N = 5400$) closer to the recommended value, although this is less important.
The flow rate for the separation of Fig. 13.3a is 1.0 mL/min and the pressure
is 500 psi. Therefore, an increase in flow rate is possible, which will shorten
run time and bring the plate number closer to the target value of $N = 2500$.
A flow rate of 3.4 mL/min was found to give $N = 2600$ and a pressure of
1700 psi. Figure 13.3b shows the separation of a 1-$\mu$g sample at 3.4 mL/min.
The separation of a 0.6-mg sample (same conditions as in Fig. 13.3b was
somewhat poorer than expected, so the sample size was reduced to 0.5 mg,
as shown in Fig. 13.3c. The latter separation is close to the desired result



**FIGURE 13.3** Example of systematic method development of a preparative HPLC separation. Sample: theophylline (TP) and 3-α-hydroxyethyltheophilline (HET). (*a*) Initial, small-sample (1-μg) separation; 25 × 0.46-cm 10-μm $C_{18}$ column; 15% methanol/water mobile phase; 1.0 mL/min; ambient; (*b*) same as (*a*), except 3.4 mL/min; (*c*) same as (*b*), except 0.50-mg sample (0.25-mg TP and HET); (*d*) same as (*c*), except 1-in.-diameter column, 72 mL/min and 5.3-mg sample. (Reprinted with permission from Ref. 1.)

(touching bands), so no further changes in conditions were made with the small-diameter (0.46-cm) column. At this stage of method development, sample solubility is often limiting. The first priority is to increase the volume of the sample as much as possible (Eq. 13.1). If this is insufficient to dissolve the desired sample weight, other means must be explored (Section 13.3.1).

STEP 5. The final step in prep LC method development is to increase the amount of sample that can be separated in each run by increasing the column diameter. The same mobile phase, column packing (type and particle size), and column length should be used for the small- and large-diameter columns. Sample size (weight and volume) and flow rate should be changed in proportion to the weight of column packing, equal to a factor of $(d_2/d_1)^2$; $d_1$ and $d_2$ are the internal diameters of the first (small-diameter) and second (large-diameter) columns. The same separation will then be achieved on the large-diameter column as on the starting column. The product band will elute over the same time interval, and the percentage recovery of product of some defined purity (e.g., $> 99\%$) will be the same for both columns.

In the example of Fig. 13.3, a 1-in.-diameter column was used for scale-up (2.12-cm ID). The square of the ratio of column diameters is $(2.12/0.46)^2 = 21$, so both flow rate and sample size were increased by this factor: 72 mL/min and 10.5 mg of sample. The resulting separation is shown in Fig. 13.3d. By repetitive injections of sample every 5 min, it was possible to recover about 60 mg of each pure compound per hour. If several grams of pure product had been required, a larger-diameter column would have been necessary for faster production of purified product. Alternatively, a further optimization of selectivity might have led to larger values of $\alpha$ and allowed a much larger sample (Table 13.2).

### 13.2.4  Gradient Separations

As discussed in Section 8.3, when comparable separation conditions are used, isocratic and gradient elution give similar resolution of the critical band pair. It is only necessary to adjust gradient steepness so that retention in the gradient run ($k^*$, Eq. 8.1) is equal to retention in the isocratic run ($k$) for the critical band pair. This similarity of gradient and isocratic elution exists for prep LC separation as well. The main visual difference for isocratic vs. gradient elution as sample weight increases is in peak shape. Isocratic separation yields right-triangle shaped bands under column-overload conditions, whereas gradient elution results in "shark-fin"-shaped bands. This is illustrated in Fig. 13.4a for a series of superimposed bands from the injection of different sample sizes in gradient elution. Figure 13.4a can be compared with the isocratic curves of Fig. 2.14.

Figure 13.4b illustrates the similarity of isocratic and gradient elution for the column-overloaded separation of the xanthine sample of Fig. 2.15. Each example of Fig. 13.4b corresponds to three superimposed separations (injections of each xanthine and the mixture); see the related discussion of Fig. 2.15. The sample weights shown in Fig. 13.4b are for the individual xanthines (e.g., 1.0 mg each for the chromatograms at the left, 2.5 and 25 mg, respectively, at the right). Isocratic separations are shown above and gradient separations below in Fig. 13.4b. A comparison of these various experiments shows essentially the same resolution and recovery of purified product by either isocratic or gradient elution, when other conditions are the same and $k = k^*$. Because

**Appx1322    AURO_ISO 0018884**



Appx1323    AURO_ISO 0018885

of this similarity of prep LC separation under either isocratic or gradient conditions, Table 13.2 and the approach described in Section 13.2.3 for isocratic prep LC method development can also be used for gradient elution. See the related discussion of Chapter 8 for the development of the initial small-sample separation as in Fig. 13.1a, then proceed exactly as described in steps 4 and 5 of Section 13.2.3.

### 13.2.5  Trace Recovery

The preceding discussion assumes that the purified compound(s) to be recovered is present in the sample in relatively high concentration (e.g., prep LC separation of an 80 to 90% pure product). When one or more minor components are to be isolated from a sample in significant quantities, it can be advantageous to use a two-step procedure. In the first separation, the column is overloaded beyond the point of touching-band separation. For example, assume that band X of Fig. 13.1 is to be isolated and purified. A large sample is injected, resulting in the separation of Fig. 13.1c. All fractions that contain X are collected and pooled, which results in the enrichment of compound X relative to Y. A much larger weight of this X-enriched fraction can then be reseparated under touching-band conditions (single injection), because most of compound Y has been eliminated from the sample.

## 13.3  PRACTICAL ASPECTS OF PREPARATIVE HPLC

The selection of HPLC conditions and sample size for a prep LC method is governed by additional considerations beyond those summarized in Section 13.2 and earlier chapters. The final method will usually be a compromise among several factors.

### 13.3.1  Sample Solubility

Apart from achieving maximum selectivity, sample solubility is often the major challenge in developing a preparative HPLC method. In many cases, the sample will not be sufficiently soluble in the mobile phase to permit dissolution of the desired sample weight in a solvent volume that can be accommodated by the column. A maximum sample volume $V_{max}$ can be estimated as follows ([2,6], assuming that the sample solvent and mobile phase are the same):

---

**FIGURE 13.4**   Effects of column overload in gradient elution. (a) Computer simulations of peak shape as a function of increasing sample mass. (Reprinted with permission from Ref. 4.) (b) Similar effects of column overload for isocratic and gradient elution. (From Ref. 5.) See the text for details.

Appx1324   AURO_ISO 0018886

$$V_{max} \approx 0.5F(t_2 - t_1) \tag{13.1}$$

Here $V_{max}$ is in mL, $F$ is flow rate (mL/min), and $t_1$ and $t_2$ are the retention times (min) of the product peak and the closest adjacent impurity peak for a small sample ($<10\ \mu g$). Note that a simple increase in flow rate does not affect $V_{max}$ since retention times $t_1$ and $t_2$ are inversely proportional to $F$. A sample volume larger than $V_{max}$ will result in increased band overlap, necessitating a smaller weight of injected sample.

If the largest possible sample volume ($V_{max}$) does not dissolve enough sample to give touching bands, the next alternative is to explore the use of a sample solvent that is different from the mobile phase. In the case of ionic samples, a change in pH or ionic strength of the sample solvent may result in a greater sample solubility. For normal-phase separations, the use of higher concentrations of a less-polar strong-solvent B can provide greater sample solubility without changing solvent strength [7]. For example, assume that the mobile phase consists of 4% methyl-$t$-butyl ether (MTBE)–hexane. Figure 6.23 indicates that a mobile phase of 60% $CH_2Cl_2$–hexane has the same elution strength as 4% MTBE and could be used as the sample solvent with the same value of $V_{max}$. Because of the higher concentration of the B-solvent ($CH_2Cl_2$) in this new sample solvent, it is likely that it will exhibit greater solubility for the sample.

An increase in temperature of both the injected sample and column is often effective in increasing sample solubility. Additives such as ion-pair reagents or surfactants also can sometimes be used to enhance solubility. Whenever the composition of the sample solvent and mobile phase are different in prep LC, care must be taken to avoid conditions that might result in precipitation of the sample in the column during separation. This can be extremely inconvenient, although it is an ever-present possibility whenever poorly soluble samples are separated by preparative HPLC. For further information on sample solubility, see Ref. 8.

### 13.3.2  Equipment Requirements

Preparative separations usually require larger diameter columns, higher flow rates, and larger sample volumes than for analytical HPLC. In addition, the peaks leaving the column can overload the detector because of their much higher concentrations. For details on columns and equipment for preparative HPLC, see Refs. 9 to 12.

### 13.4   QUANTITATIVE PREDICTION OF PREPARATIVE HPLC SEPARATION

The preceding discussion of prep LC separation is based on a well-developed theory of touching-band separation [2,6]. This theory can provide further insight into the various factors that affect prep LC separation.

### 13.4.1  General Relationships

Lightly overloaded separations behave as if the various sample bands migrate through the column independently of each other, even though each compound may overload the column as in Figs. 2.14 and 2.15. For sample sizes large enough to affect peak width and shape, peak shape can be approximated by a right triangle that begins at $t_R$ for a small-sample peak and extends toward $t_0$; this is illustrated in Fig. 13.5 and is predicted by theory [6]. The baseline width $W$ of the band then determines its separation from adjacent peaks. This bandwidth $W$ for an overloaded separation can be related to sample weight and experimental conditions as follows for isocratic elution [2,6]:

$$W^2 = W_0^2 + W_{th}^2 = \frac{16}{N}t_0^2(1 + k)^2 + 6t_0^2k^2\,\frac{w}{w_s} \qquad (13.2)$$

$$\text{(column effect)} \qquad \text{(sample-weight effect)}$$

According to this equation, bandwidth is affected by two separate contributions: $W_0$ represents the bandwidth for a small sample (see Eq. 2.12); $W_{th}$ describes the increase in bandwidth as a result of a larger sample weight. Here $N$ and $k$ are the plate number and capacity factor, respectively, for a small sample; $t_0$ is the column dead time, $w$ the weight of compound injected, and $w_s$ the saturation capacity of the column (maximum possible uptake of sample by the column). For small sample weights, bandwidth is determined by $k$, $N$, and the column dead time $t_0$; for large sample weights, bandwidth is determined mainly by $k$, $t_0$, and the sample weight. These relationships have important consequences for prep LC method development. Both terms of Eq. 13.2



**FIGURE 13.5**  Representation of a peak in column overload as a right triangle. See the text for discussion.

increase with $t_0$ and $k$ in similar fashion. However, sample weight replaces $N$ as the main determinant of bandwidth for large samples. Therefore, bandwidth and separation are not much affected by $N$ when the sample weight is large.

Equation 13.2 allows the derivation of simple relationships that provide important insights into the principles of preparative HPLC. The weight of product that just results in touching bands is given as [2]

$$w \approx \frac{1}{9} w_s \left( \frac{\alpha - 1}{\alpha} \right)^2 \qquad (13.3)$$

This equation can be used to estimate the optimum sample weight for a particular separation (touching bands). More important, it emphasizes the importance of selectivity $\alpha$ and column capacity $w_s$ in preparative HPLC. Usually, it is desirable to maximize sample size and sample throughput to minimize work and the need for large, expensive columns. According to Eq. 13.3, sample size increases with $\alpha$ as seen in Table 13.2. Analytical separations usually only require $\alpha > 1.1$ for all peaks of interest, but preparative separations benefit strongly when $\alpha$ for the product peak is as large as possible. The guidelines of Chapters 6 and 7 (regular samples) and 11 and 12 (special samples) will often lead to conditions that provide large $\alpha$ values ($\alpha > 1.5$) for the product peak and adjacent impurities in the chromatogram.

Equation 13.3 also calls attention to the importance of column capacity $w_s$ (Section 13.4.2). The larger $w_s$ is, the larger is the weight of sample that can be charged to the column. This effect favors the use of smaller-pore higher-surface-area packings. It is possible to estimate $w_s$ for a particular column, sample, and experimental conditions by means of Eq. 13.2. Two separations are carried out, one with a small sample (10 $\mu$g) and one with a sample large enough to cause appreciable broadening of the product peak. The small-sample run provides values of $N$ and $k$, and the width $W$ of the product band in the large-sample run, then allows the determination of $w_s$. A less exact value of $w_s$ can be obtained from

$$w_s(\text{mg}) \approx 0.4(\text{column surface area, m}^2) \qquad (13.4)$$

See also the discussion in Section 13.4.2.

There will be an optimum value of the small-sample plate number $N$ for every touching-band separation. This can be derived as [2]:

$$N_{\text{opt}} \approx 40 \left( \frac{1 + k}{k} \right)^2 \left( \frac{\alpha}{\alpha - 1} \right)^2 \qquad (13.5)$$

As $k$ or $\alpha$ increases, the required plate number $N_{\text{opt}}$ for touching-band separation decreases (Table 13.2). When selectivity $\alpha$ is maximized, there are two major benefits: A larger sample can be injected, and a smaller plate number

is required. Smaller plate numbers can be traded for shorter run times, using faster flow rates and columns packed with larger particles.

### 13.4.2 Column Saturation Capacity

The effect of sample weight on peak width (Eq. 13.3) is related to the saturation capacity of the column $w_s$. The larger $w_s$ is, the larger is the sample weight that can be injected for a given peak width and degree of separation. Column capacity $w_s$ in reversed- or normal-phase HPLC can be approximated in many cases by Eq. 13.4. For porous particles of column packing, surface area varies inversely with pore diameter. Packings for small-molecule ($< 1000$ Da) separations usually have pore diameters of 8 to 12 nm and surface areas of 100 to 300 m$^2$/g, corresponding to 350 to 1000 m$^2$ for a 25 $\times$ 0.46-cm column. The expected capacity $w_s$ for such a column is therefore 150 to 400 mg. Wider-pore columns are required for the separation of large biomolecules (Chapter 11), which can mean smaller column capacities $w_s$.

Column capacity varies somewhat with sample type [13,14]. When ionized samples are separated by reversed-phase HPLC, a repulsion between sample molecules in the stationary phase can lower capacity by a factor of as much as 10. If cationic samples are retained primarily by interaction with silanol groups in a reversed-phase packing (Section 7.3.3.2), column capacity may be only a few percent of that predicted by Eq. 13.5, because the concentration of accessible silanols can be quite small. When the observed column capacity $w_s$ is less than one-fourth of the value predicted by Eq. 13.4, preparative separations are severely compromised. It is then important to change separation conditions so as to minimize sample ionization and silanol effects (Sections 5.2.1, 7.2, and 7.3.3.2).

### 13.4.3 Gradient Elution Separations

The effect of a larger sample weight on peak width $W$ is similar for both isocratic and gradient elution [4] and for gradient elution is given by:

$$
\begin{aligned}
W^2 \quad &= \quad W_o^2 \quad &+& \quad W_{th}^2 \\
&= \quad \frac{16}{N} t_0^2 (1 + 0.5k^*)^2 \quad &+& \quad 0.9 t_0^2 k^{*2} \frac{w}{w_s}
\end{aligned}
$$

$$\text{(column effect)} \qquad\qquad \text{(sample-weight effect)} \qquad\qquad (13.6)$$

Both $W_0$ and $W_{th}$ increase with $t_0$ and the effective retention factor $k^*$ (Eq. 8.1); $W_0$ varies inversely with $N^{1/2}$, while $W_{th}$ increases with $(w/w_s)^{1/2}$. This is the same behavior as that predicted by Eq. 13.2 for isocratic separations. The similarity of isocratic and gradient elution under column-overload conditions is shown further in Fig. 13.4.

Appx1328   **AURO_ISO 0018890**

### 13.4.4 Heavily Overloaded Separation

Under lightly overloaded conditions, the retention time and width of a peak are not affected by the presence of other compounds in the sample. An increase in sample weight beyond a certain point leads to a change in this situation, as seen in Fig. 13.6. Two important characteristics (displacement and tag-along [15]) of heavily overloaded separation can be recognized in Fig. 13.6 for the separation of two samples as a function of sample weight. The first sample (Fig. 13.6a) is composed mainly of the later-eluting compound B, while the second sample (Fig. 13.6b) is composed mainly of early-eluting compound A (the two effects of heavily overloaded separation are best seen when a sample is enriched in one component or the other and $\alpha$ is small). The relative weights of A and B in the sample are indicated for each chromatogram in Fig. 13.6.

For the sample of Fig. 13.6a, peak B increases in width with increasing sample size, as predicted by Eq. 13.2. Because the concentration of peak A is much smaller, its width is expected to grow more slowly for larger samples. However, the width of peak A actually *decreases* as the sample weight increases. This sharpening of peak A coincides with the partial overlap of the two peaks. Peak B is said to *displace* peak A, and this effect is referred to as *sample displacement* (to distinguish it from displacement chromatography [16]). Sample displacement here and in Fig. 2.15 leads to improved separation compared to that predicted from the separate elution of A and B, because the later-eluting peak B causes the retention of the early-eluting peak A to decrease so as to increase the distance between the two peaks. The compression of peak A by B contributes to this better separation.

In the separation of the sample of Fig. 13.6b, the small amount of B present in the sample should also lead to little change in its peak width as sample weight is increased initially. Consequently, the separation of peaks A and B is expected not to be affected much by sample size. For a sample weight above 5 g, however, the presence of a larger weight of compound B tends to pull peak B toward peak A, resulting in a broadening of peak B with a lower recovery of pure A or B. This is referred to as the *tag-along effect* [15], which distorts the following peak B in such a way as to worsen separation.

The separations of Fig. 13.6 as a function of sample weight are comparable for cases A and B. That is, whether the large band elutes first or last is not of great importance in affecting the yield of pure product. This can be seen better from the data of Table 13.3. The recovery of pure product is always greater for the compound present in larger concentration. The maximum sample weights of Table 13.2 for touching-band separation assume that the product and adjacent impurity bands are present in the sample in comparable concentrations. Often, the product will be present in higher concentrations, so that proportionately larger sample weights then can be injected for 95+% recovery of 99%-pure product.

The effects of heavily overloaded separation illustrated in Fig. 13.6 (displacement and tag-along) are of importance mainly for preparative HPLC

13.4  QUANTITATIVE PREDICTION OF PREPARATIVE HPLC SEPARATION  633



**FIGURE 13.6**  Computer simulations for mass-overloaded separation of a two-component mixture (assumes Langmuir isotherms). Conditions: $N = 800$, $k$ values of 1.0 (compound A) and 1.5 (compound B), weights of A and B indicated in figure. Column: 25 × 5-cm, 7-$\mu$m particles; 210 mL/min. (Data are courtesy of G. Cox, Prochrom R&D.)

Appx1330    AURO_ISO 0018892

**TABLE 13.3   Recovery of 99%-Pure Product from Separations of Fig. 13.6[a]**

| Sample Weights (g) | | Recovery of Pure Product | |
|---|---|---|---|
| A | B | A | B |
| 0.5 | 5 | 97 | 100 |
| 5 | 0.5 | 100 | 97 |
| 1 | 10 | 87 | 100 |
| 10 | 1 | 99 | 82 |
| 2 | 20 | 41 | 78 |
| 20 | 2 | 87 | 50 |

[a] Touching bands predicted for $w/w_s = 0.02$ (Table 13.2).

separation on a pilot-plant or process scale. This book is concerned primarily with separations (analytical or preparative) carried out on a laboratory scale with smaller samples (touching-band separation). For a further discussion of heavily overloaded separation under isocratic conditions, see Ref. 17. For a similar discussion of heavily overloaded gradient separations, see Refs. 18 and 19.

### 13.4.5   Unusual Isotherm Behavior

The guidelines offered in this chapter for the development of preparative HPLC separations are largely predicated on typical behavior, which assumes Langmuir-like isotherms for the product and adjacent impurity bands (Fig. 2.14). Sometimes, it is found that actual isotherms are markedly different. One occasional but important case involves samples whose component isotherms "cross" for some sample concentration. As a result, sample retention order is reversed and sample resolution is lost completely for sample weights greater than some modest amount. An example is shown in Fig. 13.7 for the separation of two different samples; detection at two different wavelengths allowed the separate detection of each compound in this mixture. Values of $N$ and $k$ were similar and values of $\alpha$ were identical ($\alpha = 1.12$) for the small-sample separations (Fig. 13.7c and d ), so similar separations would be expected for comparable larger sample sizes. In Fig. 13.7a, for a more typical isotherm behavior, there is almost no overlap of the two peaks for a sample consisting of 1 mg of phenol (P) plus 3 mg of benzyl alcohol (BA). In Fig. 13.7b, for isotherms that cross, there is almost complete overlap of this sample that consists of 1 mg of p-cresol (C) plus 3 mg of 2-phenylethanol (PE). In other cases, peak shape may differ from the examples of Section 2.4 as sample size is increased (e.g., peaks for larger samples may front instead of tail). Whenever abnormal band behavior is encountered, method development for preparative HPLC becomes less predictable and more trial-and-error experimentation will be required.

Appx1331    AURO_ISO 0018893

13.4  QUANTITATIVE PREDICTION OF PREPARATIVE HPLC SEPARATION  **635**



**FIGURE 13.7**  Example of anomalous isotherm behavior. Conditions: $15 \times 0.46$-cm, 5-$\mu$m $C_{18}$ column; methanol–water mobile phases; 1.0 mL/min. (a) 1 mg of phenol (P) and 3 mg of benzyl alcohol (BA); 30% B; (b) 3 mg of 2-phenylethanol (PE) and 1 mg of p-cresol (C), 35% B; (c) same as (a), except 10-$\mu$g sample; (d) same as (b), except 10-$\mu$g sample. (Reprinted with permission from Ref. 14.)

## 13.5  SUMMARY AND EXAMPLE OF METHOD DEVELOPMENT FOR PREPARATIVE HPLC

Method development for prep LC depends on the intended scale of the separation: < mg, mg-g, g-kg, or process scale. As the required weight of purified product increases, it is worthwhile to invest more time in method development so as to increase the grams per hour of pure product that can be produced with a column of some given size. This is analogous to spending more time on an analytical method in order to shorten run time while preserving acceptable resolution ($R_s > 1.5$). In either case (increasing sample weight or decreasing run time), an increase $\alpha$ is very effective (see Table 13.2).

As an example of how to approach prep LC method development, sample B of Section 9.3.1.2 will be used. Prep LC often starts with a previously developed analytical HPLC procedure. Figure 13.8a shows the analytical separation of sample B from Fig. 9.4 (49% ACN, 25 × 0.46 cm column, 1.0 mL/min). The product peak (band 1) is barely resolved from band 4: $R_s = 1.3$, $k = 1.3$, $\alpha = 1.1$. However, as much as 25 $\mu$g of product can be recovered by injecting a sufficiently large sample (0.46-cm-ID column, regardless of column length [20]). A sample this small normally will not affect retention times or resolution. For sample B the product comprises 60% of the sample, so 25/0.6 = 42 $\mu$g of sample could be injected without affecting the appearance of the chromatogram. If 25 $\mu$g of pure product is sufficient, one prep LC run under these (analytical) conditions would be recommended. The quantity of pure product recovered can be increased further by repeated 42-$\mu$g injections with collection and pooling of the product peak.

The easiest way to improve an analytical separation for purposes of prep LC is to reoptimize solvent strength (% B). The separation of Fig. 13.8a was developed for the best resolution of the total sample, whereas in prep LC it is only necessary to maximize the resolution of the product from adjacent impurity bands (see Fig. 13.2). In most cases the effect of % B on sample resolution will have been studied as part of analytical method development, so few (if any) additional experiments would be required to improve the prep LC separation in this way. The best separation of the product band for sample B is achieved by a change from 49% ACN ($R_s = 1.3$) to 54% ACN (Fig. 13.8b). This results in a slight improvement in resolution ($R_s = 1.4$) and a shortening of run time from 11 min to 8 min. This approach has the further advantage of reducing the amount of solvent used in each run, which will be increasingly important during scale-up of the separation (see below).

When more than about 100 $\mu$g of pure product is needed, it is advisable to investigate a larger sample injection. Table 13.2 can be used to guide experiments of this kind. For the separation of product in Fig. 13.8b, $\alpha = 1.1$, $k = 0.9$, and $N = 16,000$. According to Table 13.2, the maximum weight of injected product for touching-band separation is 90 $\mu$g (90/0.60 = 150 $\mu$g of sample). Because the closest impurity band (4) is only 9% of the sample (ratio



**FIGURE 13.8** Example of preparative HPLC method development. Sample B of Section 9.3.1.2. Conditions the same (25 × 0.46-cm, 5-$\mu$m $C_8$ column) except as noted. (*a*) 49% ACN–water; (*b*) 54% ACN–water; (*c*) 18% ACN–37% MeOH–water; (*d*) same as (*c*), except 50 × 0.46-cm, 10-$\mu$m $C_8$ column, 2.9 mL/min. (Computer simulations based on data of Ref. 21.)

of band 4/band 2 = 9/60 = 1/7), this maximum sample size can be increased by as much as sevenfold, or ≈ 1 mg. The first experiment with a larger sample should use a sample weight that is half as large (0.5 mg), following which the sample weight can be adjusted up or down, depending on the relative overlap of bands 2 and 4 in the latter run.

Assuming that a 1-mg sample results in touching-band separation, pure product in greater than 95% recovery can be obtained by collecting this sample band in repetitive separations. In this way, 5 to 10 mg of purified product can be obtained conveniently. If much larger amounts of product are required (e.g., 0.1 to 1 g), it is necessary to improve selectivity before proceeding further. A larger-diameter column could also be used, but usually this choice should be deferred until different options for varying $\alpha$ have been explored.

A further change in selectivity for this sample was investigated using the approach of Chapter 9. Having optimized the mobile phase in terms of percent ACN, a change from acetonitrile to methanol is the logical next choice. Unfortunately, there is no mixture of methanol and water that gives a separation as good as that of Fig. 13.8$b$. However, the critical band pair (for the product and closest impurity band) is different for MeOH vs. ACN as organic solvent (1/4 in Fig. 13.8$b$, 54% ACN; 1/2 for the best methanol–water mobile phase: 65% MeOH, $R_s$ = 0.6). Therefore, some mixture of methanol and acetonitrile is likely to give an even better separation. This proved to be the case, as shown in Fig. 13.8$c$ for 18% ACN–37% MeOH–water ($\alpha$ = 1.2). Table 13.2 predicts that touching-band separation can be achieved for 0.3 mg of compound 1 (0.5 mg of sample) for the case of equal concentrations of product and bands 2 and 4. The actual concentration ratio is about 7, so a sample weight of about 3.5 mg (2 mg of product) can be injected.

Once the ability to inject ≈3.5 mg of sample onto the 25 × 0.46-cm column has been confirmed experimentally, it is possible to calculate how much sample can be purified with a larger-diameter column and what flow rates will be required. In the present case, initial separations were carried out on a 5-$\mu$m-particle column. Columns of larger diameter usually are available only with larger particles (e.g., 7-$\mu$m or larger). For the present separation, we assume that columns of 10-$\mu$m particles will be used. According to Table 13.2, the value of $N$ required ($k$ = 1.3, $\alpha$ = 1.2) is about 6000 plates. This can be achieved with a 50 × 0.46-cm column operated at 2.9 mL/min (1400 psi). This separation is shown in Fig. 13.8$d$. Table 13.4 summarizes sample weights and flow rates for columns of various diameters, based on the scale-up of the separation of Fig. 13.8$d$. Note that the increase in column length from 25 cm to 50 cm results in a twofold increase in column capacity (from 3.5 to 7 mg for the 0.46-cm column), other factors being equal.

Columns as large as 0.9-cm ID (0.5 in., OD) can be used conveniently with equipment intended for analytical HPLC. The usual HPLC systems allow flow rates as high as 10 mL/min and are well suited for columns this large. If larger-diameter columns are used, either prep pump heads must be purchased (flows to 50 mL/min) or a system designed for prep LC must be used. The scale-up

**TABLE 13.4   Estimated Sample Weight and Flow Rate for the Preparative Separation of Sample B[a]**

| Column Diameter[b] | Sample Weight | Maximum Sample Volume (mL) | Flow Rate (mL/min) |
|---|---|---|---|
| 0.46 cm | 7 mg | 0.6 | 2.9 |
| 0.9 cm | 25 mg | 2.3 | 11 |
| 1 in. | 150 mg | 14 | 61 |
| 2 in. | 600 mg | 56 | 240 |
| 4 in. | 2.5 g | 225 | 960 |

[a] See the text and Fig. 13.8 for details. Conditions: 50-cm, 10-$\mu$m $C_8$ column; 18% ACN–37% MeOH–water mobile phase, 35°C.
[b] Outer diameter for 1-in. and larger columns.

of the separation of Fig. 13.8$d$ for a 0.9-cm-ID column would allow about 15 mg of pure product to be recovered from each 10-min run, corresponding to about 90 mg of product in a 1-h period (six runs).

The maximum sample volume for the separations of Table 13.4 can be calculated from Eq. 13.1. For the 0.46-cm column, the difference in retention times for bands 1 and 2 is 0.41 min. For a flow rate of 2.9 mL/min, the maximum sample volume therefore is $0.5 \times 2.9 \times 0.41 = 0.6$ mL. It is necessary to determine if this volume of mobile phase can dissolve the 7 mg of sample that will provide touching-band separation. If this is not the case, Section 13.3.1 should be consulted.

If much larger amounts of purified product are required than can be obtained conveniently from a 0.9-cm column, a prep LC system will be needed. In the present example, not much effort has been invested so far in optimizing selectivity, so a few further experiments that vary $\alpha$ might be considered before scale-up of the column beyond 0.9 cm ID. Also, the separations described so far assume touching-band conditions. Sample weights can be increased further with band overlap as in Fig. 13.1$c$, but this requires collection and analysis of several fractions from the product band (extra work!). However, the quantity of pure product recovered can be increased by twofold or greater in this way. Using a 4-in.-OD column, this would correspond to 3+ g of product per run, or 30+ g of product in a 2-h period (10 runs). Two hours of continuous separation would also consume about 120 L of mobile phase, which must be kept in mind as part of the cost of product purification. Similarly, the product will be contained in a volume that is about twice the maximum sample volume (see Eq. 13.2), which for the latter example (yielding 30+ g of product) represents 2.2 L of solvent that must be removed from the purified product.

The use of Table 13.2 and other relationships discussed in this chapter can provide rough estimates of what will be required when a small-scale prep LC separation is converted to a larger scale that involves longer, wider columns and/or different column-packing particle sizes (therefore different values of

Appx1336   AURO_ISO 0018898

$N$). It is advisable to carry out such a "paper analysis," followed by confirming experiments on a small scale, prior to the actual purchase and use of very large columns and the associated HPLC equipment.

### 13.5.1  Process-Scale HPLC Separations [22]

This chapter is not intended as a detailed guide for the design of process-scale separations. Unfortunately, separations developed for use in the laboratory to produce relatively small amounts of purified material may suddenly require a rapid conversion for use on a much larger scale. This might be the case when a compound under study abruptly develops unusual commercial promise, and large amounts of material are required for large-scale testing or early deliveries to customers. For this reason it is worth keeping in mind some of the requirements for process-scale HPLC separation.

· Plate numbers higher than suggested by Table 13.2 are often used. The reason is that larger values of $N$ allow somewhat larger sample weights, which reduces the volume of solvent required per gram of purified product (solvent costs are usually the largest cost in process-scale HPLC).

· Maximum sample weights are almost always used in sample overload, rather than touching-band separation; this also reduces solvent (and other) costs.

· Solvents that are unfeasible for use in production (because of cost, toxicity, difficult disposal, etc.) should be avoided from the start.

· The only packing materials that should be used in method development are those which are also available in sufficiently large quantities for the final HPLC process.

· Several batches of a given packing material should be evaluated before making a final decision to use that packing material.

· Solvents are usually recovered (sometimes burned) to minimize costs of replacement and disposal.

· Reversed-phase separation may be cheaper than normal-phase operation. Normal-phase solvents are usually more expensive. Also, membranes can be used to purify water–organic mixtures.

· Columns of special design are required for diameters >>5 cm, to ensure bed stability and avoid column rupture at high pressures.

Many other considerations arise when moving from laboratory-scale to pilot plant- or process-scale application. Among others, there is increasing concern for process safety, due to the use of staff having less technical training. Automation of all parts of the process also becomes more and more important. Finally, HPLC is by itself an expensive procedure on a process scale. Therefore, it is often useful to combine HPLC separation with other, less expensive

purification steps so as to reduce the overall cost of operation. For some examples of method development for process-scale HPLC, see Refs. 23 and 24.

## REFERENCES

1. G. B. Cox and L. R. Snyder, *LC/GC,* **6** (1988) 894.

2. L. R. Snyder, G. B. Cox, and P. E. Antle, *Chromatographia,* **24** (1987) 82.

3. J. C. Touchstone, *Practice of Thin-Layer Chromatography,* 3rd ed., Wiley, New York, 1992.

4. G. B. Cox, L. R. Snyder, and J. W. Dolan, *J. Chromatogr.,* **484** (1989) 409.

5. J. E. Eble, R. L. Grob, P. E. Antle, and L. R. Snyder, *J. Chromatogr.,* **405** (1987) 51.

6. J. H. Knox and H. M. Pyper, *J. Chromatogr.,* **363** (1986) 1.

7. L. R. Snyder and J. J. Kirkland, *Introduction to Modern Liquid Chromatography,* 2nd ed., Wiley-Interscience, New York, 1979, pp. 638–639.

8. B. Porsch, *J. Chromatogr. A,* **658** (1994) 179.

9. H. Colin, in *High Performance Liquid Chromatography,* P. R. Brown and R. A. Hartwick, eds., Wiley-Interscience, New York, 1989, p. 415.

10. W. M. Skea, in *High Performance Liquid Chromatography,* P. R. Brown and R. A. Hartwick, eds., Wiley-Interscience, New York, 1989, p. 479.

11. P. D. McDonald and B. Bidlingmeyer, in *Preparative Liquid Chromatography,* B. A. Bidlingmeyer, ed., Elsevier, Amsterdam, 1987, p. 1.

12. M. Verzele, M. De Conick, J. Vindevogel, and C. Dewaele, *J. Chromatogr.,* **450** (1988) 47.

13. J. E. Eble, R. L. Grob, P. E. Antle, and L. R. Snyder, *J. Chromatogr.,* **387** (1987) 45.

14. G. B. Cox and L. R. Snyder, *J. Chromatogr.,* **483** (1989) 95.

15. S. Ghodbane and G. Guiochon, *J. Chromatogr.,* **440** (1988) 9; **444** (1988) 275; **450** (1988) 27.

16. J. Frenz and C. Horvath, in *High-Performance Liquid Chromatography: Advances and Perspectives,* Vol. 5, C. Horvath, ed., Academic Press, San Diego, CA, 1988, p. 212.

17. L. R. Snyder, J. W. Dolan, and G. B. Cox, *J. Chromatogr.,* **483** (1989) 63.

18. L. R. Snyder, J. W. Dolan, and G. B. Cox, *J. Chromatogr.,* **484** (1989) 437; **540** (1991) 21.

19. G. B. Cox and L. R. Snyder, *J. Chromatogr.,* **590** (1992) 17.

20. H. Poppe and J. C. Kraak, *J. Chromatogr.,* **255** (1983) 395.

21. J. A. Lewis, L. R. Snyder, and J. W. Dolan, *J. Chromatogr. A,* **721** (1996) 15.

22. Section 13.5.1 is based primarily on discussions with G. B. Cox of Prochrom R&D, Champigneulles, France.

23. D. B. Williams, G. T. Carter, F. Pinho, and D. B. Borders, *J. Chromatogr.,* **484** (1989) 381.

24. M. Kodama, S. Ishizawa, A. Koiwa, T. Kanaki, K. Shibata, and H. Motomura, *J. Chromatogr. A,* **707** (1995) 117.

## BIBLIOGRAPHY

1. B. A. Bidlingmeyer, ed., *Preparative Liquid Chromatography*, Elsevier, Amsterdam, 1987.   (a good review of the principles and practice of pre-1985 preparative HPLC, especially the first chapter)

2. J. H. Knox and H. M. Pyper, *J. Chromatogr.*, **363** (1986) 1.   (a difficult paper to follow, but it contains many important concepts for preparative HPLC)

3. L. R. Snyder, G. B. Cox, and P. E. Antle, *Chromatographia*, **24** (1987) 82; L. R. Snyder, J. W. Dolan, and G. B. Cox, *J. Chromatogr.*, **483** (1989) 63, 85, 95. (summary of the contributions of this group to an understanding of preparative HPLC under isocratic conditions; starts with the Knox and Pyper approach)

4. H. Colin, in *High Performance Liquid Chromatography*, P. R. Brown and R. A. Hartwick, eds., Wiley-Interscience, New York, 1989, p. 415.   (some details on experimental aspects of preparative HPLC; many references to older literature)

5. W. M. Skea, in *High Performance Liquid Chromatography*, P. R. Brown and R. A. Hartwick, eds., Wiley-Interscience, New York, 1989, p. 479.   (discussion of process-scale preparative HPLC)

6. B. Porsch, *J. Chromatogr. A*, **658** (1994) 179.   (a practical review of preparative HPLC with useful advice on several aspects of the subject)

**REDACTED - CONFIDENTIAL**

**APPX1382-APPX1436**

# APPENDIX 1

## EDWARD G. BROWN, PH.D.
ED.BROWN@EARTHLINK.NET
**2434 Arbor View Drive**
**CARY, NC  27519**
**(919) 607-4626**

## SCIENCE EDUCATION & POST-DOCTORAL TRAINING:

**Post-Doctoral Fellow:**                    **Yale University,  New Haven,  CT;**             **12/88 - 7/90:**
- Chemistry Research Emphasis: Synthesis of Polypropionates and Trichothecene Mycotoxins;

**Post-Doctoral Fellow:**                    **University of Auckland, Auckland, NZ;**             **8/87 -  8/88:**
- Chemistry Research Emphasis: Synthesis of Anthracyclinone Antibiotics;

**Doctor of Philosophy:**                    **University  of  California,  Davis,  CA;**             **4/83 - 12/88:**
- Chemistry Research Emphasis: Organic Chemistry/ Natural Product Synthesis;
- Chemistry Department Graduate Student of the Year Award: 1987;
- Doctorate in Organic Chemistry Awarded in December, 1988;

**Bachelor of Science:**                    **University of California, Berkeley, CA;**             **10/75 - 6/80:**
- Chemistry: Organic Chemistry Research Emphasis;
- Alumni Association National Merit Scholar: 1975;
- B.S. Degree in Chemistry Awarded in June, 1980;

## WORK EXPERIENCE:

**8/15 - Present:**

**Adjunct Professor of Chemistry at Shaw University;**                    **Ph: (919) 546-8309**
**Present Business Address: 118 E. South St.; Raleigh, NC  27601;**

- I am responsible for teaching undergraduates about organic chemistry and the techniques used for analyzing and purifying chemicals.  I am retained on the Adjunct Staff to teach a lecture course (3 hours per week) and a lab course (3 hours per week)  covering organic chemistry topics during semesters when needed.

**9/07 - Present:**

**President & Founding Consultant at Brown's Chemistry Services;**                    **Ph: (919) 607-4626**
**Present Business Address: 1939 High House Drive #214; Cary,  NC  27519;**

- Currently providing chemistry laboratory research expertise, consulting, data evaluation and expert witness services to clients.
- Serve as an on-site research chemist for clients who need drug intermediates, enzyme inhibitors, chelating agents, etc., synthesized and analyzed at their own laboratory in the RTP area.
- Extremely broad grasp of chemistry: expertise includes chemical analysis techniques, carbohydrates, peptides, amino acids, proteins, nucleotides, heterocyclic chemistry, catalysis, organic synthesis, chemical purifications, chemical analysis techniques, solid phase organic synthesis, and medicinal chemistry.
- Expert services have included data analysis and chemical evaluation of analytical evidence obtained in drug cases; prepared reports and drafted declarations for court cases involving a number of different chemical questions of importance.

**3/11 - 1/12:**

**Patent Examiner at U.S. Patent and Trademark Office;**                    **Ph: (571) 272-0779**
**Business Address: 400 Dulany Street; Alexandria, VA  22314.**

- Primary responsibilities included in-depth analysis of patent applications & evaluation of claims.

- Performed extensive literature searches using USPTO's comprehensive database of patents and published research articles, etc.

**6/06 - 9/07:**

**Intellectual Property Consultant at Voyager Pharmaceuticals, Inc;**          **Ph: (919) 846-4880**
**Business Address: 8540 Colonnade Center Dr #501; Raleigh, NC   27615.**

- Primary responsibilities included analysis of office action rejections & objections then drafting responses to office actions from USPTO and foreign patent offices. Researched and drafted responses rebutting rejections involving U.S.C. 102, 103 and 112 issues.
- Worked on daily basis with outside counsel via phone and email on issues relevant to Voyager's IP prosecution.

**9/05 - 6/06:**

**Principal Information Analyst for Information Analysis-Genetics at GSK;**          **Ph: (919) 483-2100**
**Business Address: 5 Moore Dr;  RTP, NC   27713.**

- Ran electronic literature searches using public & proprietary databases.  Provided analysis reports & updates to GSK's international business leaders and scientific stakeholders, including scientific research teams.
- Responsible for performing literature searches in specific disease areas including: cancer, malaria and obesity.
- Served as Information Analysis-Genetics representative on several large clinical and pre-clinical teams developing new cancer drugs and obesity treatments.   Responsibilities included keeping the IAG group up-to-date with research by these science teams and other business units.

**2/02 - 11/04:**

**Manager, Intellectual Property at Inspire Pharmaceuticals, Inc;**          **Ph: (919) 941-9777**
**Business Address: 4222 Emperor Blvd #200;  Durham,  NC   27713.**

- Gained approximately three years patent prosecution experience in areas of research covering pharmaceutical inventions and medicinal chemistry methodology. Developed literature search expertise using SciFinder as intellectual property science liaison for Discovery Division.
- Worked closely with in-house counsel and outside counsel (via email, express mail and telephone conversations) on Inspire's patent prosecution work.
- Prosecution experience included preparation of science sections and claims in 6 U.S. provisional patent applications and in 8 U.S. non-provisional patent applications; analyzed and summarized technical details cited in rejections in over 70 office actions from the USPTO and foreign patent offices; drafted persuasive rebuttals and arguments.
- Patent drafting experience also included creation of chemical structures, Markush formulas, schemes and chemistry tables in patent applications.   Familiar with both ChemDraw and IsisDraw programs.
- Provided guidance to other Inspire scientists on methods for unraveling and evaluating complicated Markush-type chemical structures, generic protein sequences and nucleotide analog sequences in patents and patent publications.

**5/98 - 2/02:**

**Senior Research Chemist at Inspire Pharmaceuticals, Inc;**          **Ph: (919) 941-9777**
**Business Address: 4222 Emperor Blvd #200;  Durham, NC   27713.**

- Synthesized and purified biologically-active heterocycles, polymers, nucleosides, nucleotides, and novel phosphate esters from complex mixtures for drug-discovery and medicinal chemistry uses.
- Used combinatorial chemistry for synthesis of small-molecule compound libraries.
- Developed new analytical techniques for heterocycles using HPLC and LCMS.
- Served as Chemistry Group Operator for Waters LCMS analytical instrument from 2001 - 2002. Helped to increase group productivity by teaching the research group how to use the new instrument for their own chemical analyses.

- Research led to co-inventorship as listed on 10 Inspire patents and to co-authorship on several publications covering nucleotides and indoles for use in disease treatments.
- Trained and supervised three chemistry interns in medicinal chemistry research projects and chemical analysis techniques.  Four years supervisory experience.

**6/91 - 11/97:**

**President and Consultant at Brown's Chemistry Services;**       **Ph: (510) 906-0989**
**Business Address: 1697 Springbrook Rd; Lafayette, CA  94549.**

- Established an independent chemistry consulting business and gradually built it from a part-time endeavor in 1991 to a full-time business in 1997.  Provided on-site chemistry expertise and expert witness testimony in chemistry, drug and environmental criminal-court cases.
- Furnished contract-chemistry capabilities to San Francisco Bay Area research labs in 1996-1997.
- Successfully completed 3 chemistry-, peptide-, & nucleotide-related research contracts with government investigators at Lawrence Berkeley National Laboratory.
- Assisted attorneys in chemistry-related matters involved in 25+ drug-related court cases.
- Provided court testimony as expert on chemistry issues in 3 Federal and 2 State of California illicit drug-manufacturing cases.
- Acted as science advisor to defense attorneys handling their clients' clandestine drug (LSD, methamphetamine, PCP, etc.) manufacturing cases.

**5/92 - 7/96:**

**Research Scientist II at Chiron Corporation;**       **Ph: (510) 655-8730**
**Business Address: 4560 Horton St; Emeryville, CA 94608.**

- Patented new series of polystyrene resin-bound linkers for use in peptide synthesis and solid-phase organic reactions; co-inventor on a patented solid-phase synthesis method for generating novel heterocycles.  Purified biologically-active substances from complex mixtures chromatographically using HPLC, LCMS.  Analyzed by $^1$H-NMR, $^{13}$C-NMR, FTIR, UV, etc.
- Combinatorial chemistry expert.  Optimized organic reactions for solid-phase synthesis applications (10 mg - 100 g scale) in drug discovery.
- Developed solid-phase $^{13}$C-NMR technique for the chemical analysis of resin-bound linkers and chemical building blocks.
- Supervised one Masters-level research assistant in combinatorial chemistry/ organic synthesis. Three years supervisory experience.
- In addition to inventorship on the two patents listed above, research achievements led to co-authorship on 5 scientific publications.

**10/91 - 5/92:**

**Research Chemist at Seres Laboratory, Inc;**       **Ph: (707) 526-4526**
**Business Address: 3331 Industrial Dr #B; Santa Rosa, CA 95403.**

- Synthesized antiviral agents, heterocycles and crystallization seed materials.  Prepared compounds for contract-laboratory chemistry clients.

**6/90 - 6/91:**

**Staff Scientist at Lawrence Berkeley National Laboratory;**       **Ph: (510) 486-4000**
**Business Address: 1 Cyclotron Rd; Berkeley, CA  94720.**
- Instructed 4 interns in medicinal chemistry projects.  Synthesized $D_1$-dopaminergic drugs, organometallic reagents, heterocycles and starting materials for use in positron emission tomography (PET) studies.

**4/83 - 7/90:**

**Post-Doctoral Training & Graduate Research: Yale University, University of Auckland, UC Davis**

- Research areas focused primarily on natural products synthesis, new chemistry techniques, and stereoselective construction of chiral materials.  Graduate- and post-doctoral research led to co-authorship on seven peer-reviewed research publications and one research presentation.
- See Science Education and Post-Doctoral Training section above as well as Publication List for more details on areas of research emphasis and accomplishments.

- <u>Research Advisor at University of California, Davis:</u>            Mark Kurth, Ph.D.
- <u>Research Advisor at University of Auckland, Auckland NZ:</u>     P. Stewart Rutledge, Ph.D.
- <u>Research Advisor at Yale University:</u>                          Frederick Ziegler, Ph.D.

**10/80 - 2/83:**

**Research Chemist at SRI International, Inc;**                    **Ph: (650) 859-2000**
**Business Address: 333 Ravenswood Ave; Menlo Park, CA  94025.**

- Synthesized and purified folate analogues for use as antineoplastic agents.
- Research successes led to co-authorship on two peer-reviewed journal publications.

**4/79 - 6/80:**

**Undergraduate Research Assistant at University of California, Berkeley;     Ph: (510) 642-5882**
**Business Address: Dept. of Chemistry; UC Berkeley, CA 94720.**

- Developed stereoselective method for epoxidation of homoallylic alcohols.
- Research successes led to one scientific journal publication & one research seminar presentation.

## OTHER QUALIFICATIONS, SKILLS & CERTIFICATIONS:

**Registered Patent Agent:**
- Passed USPTO patent bar exam in October, 2004.
- USPTO Patent Agent Registration No.: 56168; Registration Date:  11/19/2004.

**Computer Hardware and Software Use:**
- Familiar with use of Microsoft products such as Word, Excel and PowerPoint as well as products like ChemDraw, Isis Draw, etc.
- Trained in use of PC and Mac products and formats.
- Able to perform subject and author searches using Google, Yahoo, and other web-based search engines including the USPTO web site patent search tools.  Also able to learn & use proprietary search programs and databases after initial training sessions.

**Scientific Journal Referee:**
- Given my expertise in chemistry, I act as a referee for the ACS journals titled Organic Letters & Journal of Organic Chemistry.  In this capacity, I review and evaluate the scientific merits of manuscripts submitted to these journals by research teams.

**Professional Memberships:**
- American Chemical Society Member.
- Affiliate Member of the International Union of Pure and Applied Chemistry.
- American Intellectual Property Law Association Member.
- North Carolina Bar Association Intellectual Property Division Member.

## PATENTS, PUBLICATIONS, SEMINARS, PRESENTATIONS and  RESEARCH  ABSTRACTS:

- My research has led to over 40 research articles, patents, and abstracts.  Please see attached list.

**PUBLISHED U.S. & P.C.T. PATENT APPLICATIONS and ISSUED U.S. PATENTS:**

1. Yerxa, B.R.; Brown, E.G. "Di(uridine-5'-)Tetraphosphate and Salts Thereof," U.S. Publication No. 2009-0326050 A1 published December 31, 2009. Issued as U.S. Patent 7,939,510 on May 10, 2011.

2. Douglass, J.G., III; Yerxa, B.R.; Shaver, S.R.; Peterson, W.M.; Brown, E.G.; Crean, C.S.; Boyer, J.L. "Degradation-Resistant Mononucleoside Phosphate Compounds," U.S. Publication No. 2009-0076256 A1 published March 19, 2009. Issued as U.S. Patent 7,612,047 on November 3, 2009.

3. Douglass, J.G., III; Yerxa, B.R.; Shaver, S.R.; Peterson, W.M.; Brown, E.G.; Crean, C.S.; Boyer, J.L. "Degradation-Resistant Mononucleoside Phosphate Compounds," U.S. Publication No. 2007-0244068 A1 published October 18, 2007. Issued as U.S. Patent 7,435,724 on October 14, 2008.

4. Yerxa, B.R.; Brown, E.G. "Di(uridine-5'-)Tetraphosphate and Salts Thereof," U.S. Publication No. 2006-0258615 A1 published November 16, 2006. Issued as U.S. Patent 7,528,119 on May 5, 2009.

5. Yerxa, B.R.; Brown, E.G. "Di(uridine-5'-)Tetraphosphate and Salts Thereof," U.S. Publication No. 2005-0148540 A1 published July 7, 2005. Issued as U.S. Patent 7,132,410 on November 7, 2006.

6. Boyer, J.L.; Yerxa, B.R.; Plourde, R., Jr.; Brown, E.G.; Douglass, J.G., III; "Compositions for the Treatment of Glaucoma or Ocular Hypertension," U.S. Publication No. 2005-0130931A1 pub'd June 16, 2005. Abnd: January 14, 2008.

7. Pintor, J.J.; Peral, M.A.; Peterson, W.M.; Plourde, R., Jr.; Brown, E.G.; Yerxa, B.R. "Method for Reducing Intraocular Pressure Using Indole Derivatives," U.S. Publication No. 2004-0198803 A1 published October 7, 2004. Abnd: November 29, 2005.

8. Yerxa, B.R.; Brown, E.G. "Di(uridine-5'-)Tetraphosphate and Salts Thereof," U.S. Publication No. 2004-0014713 A1 published January 22, 2004. Issued as U.S. Patent 6,872,710 on March 29, 2005.

9. Yerxa, B.R.; Plourde, R., Jr.; Brown, E.G.; Peterson, W.M. "Method for Reducing Intraocular Pressure," U.S. Publication No. 2003-0186928 A1 published October 2, 2003. Issued as U.S. Patent 7,084,128; August 1, 2006.

10. Cowlen, M.S.; Yerxa, B.R.; Jones, A.C.; Brown, E.G. "Joint Lubrication with P2Y Purinergic Receptor Agonists," U.S. Publication No. 2003-0027785 A1 published February 6, 2003 and PCT Int'l. Publication No. WO03/000056 A1 published with ISR on January 3, 2003. Issued as U.S. Patent 7,109,181 on September 19, 2006.

11. Yerxa, B.R.; Douglass, J.G., III; Shaver, S.R.; Peterson, W.M.; Brown, E.G.; Crean, C.S. "Compositions and Methods for Treating Epithelial and Retinal Tissue Diseases," U.S. Publication No. 2003-0008834 A1 published January 9, 2003 and PCT Int'l. Publication No. WO 03/072067 A2 published September 4, 2003 and PCT Int'l. Publication No. WO03/072067 A3 republished with Int'l Search Report April 28, 2005. Issued as U.S. Patent 7,115,585 on October 3, 2006.

12. Boyer, J.L.; Yerxa, B.R.; Plourde, R., Jr.; Brown, E.G.; Douglass, J.G., III; "Compositions and Methods for the Treatment of Glaucoma or Ocular Hypertension," U.S. Publication No. 2002-0128224 A1 published September 12, 2002, PCT Int'l. Publication No. WO03/072066 A2 published September 4, 2003 and PCT Int'l. Publication No. WO03/072066 A3 republished with Int'l Search Report November 11, 2004. Issued as U.S. Patent 6,897,201 on May 24, 2005.

13. Pintor, J.J.; Peral, M.A.; Peterson, W.M.; Plourde, R., Jr.; Brown, E.G.; Yerxa, B.R. "Method for Reducing Intraocular Pressure Using Indole Derivatives," U.S. Publication No. 2002-0037887 A1 published March 28, 2002, PCT Int'l. Publication No. WO02/09702 A2 published February 7, 2002, and "Use of Indole Derivatives for the Manufacture of a Medicament for Reducing Intraocular Pressure," PCT Int'l. Publication No. WO02/09702 A3 republished with Int'l Search Report May 8, 2003. Issued as U.S. Patent 6,730,707 on May 4, 2004.

14. Desai, M.C.; Nuss, J.M.; Spear, K.L.; Singh, R.; Renhowe, P.A.; Brown, E.G.; Richter, L.; Scott, B.O. "Combinatorial Libraries of Substrate-Bound Cyclic Organic Compounds," PCT Int'l Publication No. WO96/040201 A1 published with Int'l Search Report Dec. 19, 1996. Issued as U.S. Patent 5,958,792 on September 28, 1999.

15. Brown, E.G.; Nuss, J.M. "Solid Phase Synthesis of N-Alkyl Amides". Issued as U.S. Patent 5,861,532 on January 19, 1999.

## RESEARCH PUBLICATIONS:

1. Shaver, S.R.; Rideout, J.L.; Pendergast, W; Douglass, J.G., III; Brown, E.G.; Boyer, J.L.; Patel, R.I.; Redick, C.C.; Jones, A.C.; Picher, M.; Yerxa, B.R. "Structure-Activity Relationships of Dinucleotides: Potent and Selective Agonists of P2Y Receptors," *Purinergic Signalling*, 1, (2005), 183-191.

2. Moos, W.H.; Banville, S.C.; Blaney, J.M.; Bradley, E.K.; Braeckman, R.A.; Bray, A.M.; Brown, E.G.; Desai, M.C.; Dollinger, G.D.; Doyle, M.V.; Gibbons, J.E.; Goff, D.A.; Goodson, R.J.; Huebner, V.D.; Johnson, D.E.; Kaufman, S.E.; McGuire, L.A.; Maeji, N.J.; Martin, E.J.; Min, H.Y.; Ng, S.; Nuss, J.M.; Richter, L.S.; Rosenberg, S.; Shoemaker, K.R.; Spear, K.L.; Spellmeyer, D.C.; Stauber, G.B.; Stratton-Thomas, J.R.; Wang, L.; Winter, J.; Wolfgang, G.H.I.; Wong, A.K.; Yamamoto, R.; Zimmerman, R.J.; Zuckermann, R.N. "An Integrated Approach to Exploiting Molecular Diversity," *Medicinal Chemistry: Today and Tomorrow, Proceedings of the AFMC International Medicinal Chemistry Symposium, Tokyo, Japan, Sept. 3-8, 1995*; Yamazaki, M., Ed; Blackwell: Oxford, UK., (1997), 137-142.

3. Brown, E.G.; Nuss, J.M. "Alkylation of Rink's Amide Linker on Polystyrene Resin: A Reductive Amination Approach to Modified Amine-Linkers for the Solid Phase Synthesis of N-Substituted Amide Derivatives," *Tetrahedron Lett.*, 38, (1997), 8457-8460.

4. Nuss, J.M.; Desai, M.C.; Zuckermann, R.N.; Singh, R.; Renhowe, P.A.; Goff, D.A.; Chinn, J.P.; Wang, L.; Dorr, H.; Brown, E.G.; Subramanian, S. "Developing a General Strategy for the Solid Supported Synthesis of Heterocycles: Applications to the Generation of Molecular Diversity and Drug Discovery," *Pure & Applied Chemistry*, 69, (1997), 447-452.

5. Zuckermann, R.N.; Figliozzi, G.M.; Banville, S.C.; Kerr, J.M.; Siani, M.A.; Martin, E.J.; Brown, E.G.; Wang, L. "Automated Tools for the Production of Non-Natural Molecular Diversity," *Innovation and Perspectives in Solid Phase Synthesis. Collected Papers, Third International Symposium, Oxford, England, U.K.;* Epton, R., Ed; Mayflower Worldwide Ltd.: Birmingham, U.K., (1994), 397-402.

6. Zuckermann, R.N.; Martin, E.J.; Spellmeyer, D.C.; Stauber, G.B.; Shoemaker, K.R.; Kerr, J.M.; Figliozzi, G.M.; Goff, D.A.; Siani, M.A.; Simon, R.J.; Banville, S.C.; Brown, E.G.; Wang, L.; Richter, L.S.; Moos, W.H. "Discovery of Nanomolar Ligands for 7-Transmembrane G-Protein-Coupled Receptors from a Diverse N-(Substituted) Glycine Peptoid Library," *J. Med. Chem.*, 37, (1994), 2678-85.

7. Ball, G.E.; O'Neill, R.A.; Schultz, J.E.; Lowe, J.B.; Weston, B.W.; Nagy, J.O.; Brown, E.G.; Hobbs, C.J.; Bednarski, M.D. "Synthesis and Structural Analysis Using 2-D NMR of Sialyl Lewis X (SLeˣ) and Lewis X (Leˣ) Oligosaccharides: Ligands Related to E-Selectin [ELAM-1] Binding," *J. Am. Chem. Soc.*, 114, (1992), 5449-51.

8. Ziegler, F.E.; Brown, E.G.; Sobolov, S.B. "Single Step Removal of the Allyl Ether Protecting Group with Hydridotetrakis(triphenylphosphine)rhodium [(Ph₃P)₄RhH] and Trifluoroacetic Acid," *J. Org. Chem.*, 55, (1990), 3691-3.

9. Brown, E.G.; Cambie, R.C.; Holroyd, S.E.; Johnson, M.; Rutledge, P.S.; Woodgate, P.D. "Experiments Directed Towards the Synthesis of Anthracyclinones. XV. Novel Synthetic Homochiral Chloroanthracyclines from Acetal Cyclization," *Aust. J. Chem.*, 43, (1990), 1019-34.

10. Brown, E.G.; Cambie, R.C.; Holroyd, S.E.; Johnson, M.; Rutledge, P.S.; Woodgate, P.D. "Novel Chloroanthracyclines from Acetal-Alkene Cyclization," *Tetrahedron Lett.*, 30, (1989), 4735-6.

11. Kurth, M.J.; Brown, E.G. "Diastereoselective Construction of (α)-Quaternary Carbon Centers in the Chiral-Auxiliary-Mediated Aza-Claisen Rearrangement of Ketene N-Allyl-N,O-Acetals," *Synthesis*, 5, (1988), 362-6.

12. Kurth, M.J.; Brown, E.G.; Lewis, E.J.; McKew, J.C. "Regioselectivity in the Iodolactonization of 1,6-Heptadiene-4-Carboxylic Acid Derivatives," *Tetrahedron Lett.*, 29, (1988), 1517-20.

13. Kurth, M.J.; Brown, E.G. "Double Diastereoselection in the Iodolactonization of 1,6-Heptadiene-4-Carboxylic Acids," *J. Am. Chem. Soc.*, 109, (1987), 6844-5.

14. DeGraw, J.I.; Tagawa, H.; Christie, P.H.; Lawson, J.A., II; Brown, E.G.; Kisliuk, R.L.; Gaumont, Y. "Synthesis of 5,10-Dideazaaminopterin," *J. Heterocyclic Chem.*, 23, (1986), 1-4.

15. Kurth, M.J.; Brown, E.G.; Decker, O.H.W. "N-Methyloxazolinium Salts: Diastereomer Ratios by ¹H-NMR," *J. Org. Chem.*, 50, (1985), 4984-6.

16. Kurth, M.J.; Brown, E.G.; Hendra, E.; Hope, H. "Stereoselective Synthesis of Octahydro-3-oxospiro[benzofuran-2 (3H), 2'-(2H)-pyran] Systems," *J. Org. Chem.*, 50, (1985), 1115-7.

17. DeGraw, J.I.; Christie, P.H.; Brown, E.G.; Kelly, L.F.; Kisliuk, R.L.; Gaumont, Y.; Sirotnak, F.M. "Synthesis and Antifolate Properties of 10-Alkyl-8,10-Dideazaaminopterins," *J. Med. Chem.*, 27, (1984), 376-80.

18. Bartlett, P.A.; Meadows, J.D.; Brown, E.G.; Morimoto, A.; Jernstedt, K.K. "Carbonate Extension. A Versatile Procedure for Functionalization of Acyclic Homoallylic Alcohols with Moderate Stereocontrol," *J. Org. Chem.*, 47, (1982), 4013-8.


## SEMINARS, PRESENTATIONS and RESEARCH ABSTRACTS:

1. Brown, E.G. "Chemistry Expertise in the Courtroom: When Does Methamphetamine Exist in a Clandestine Drug-Lab Manufacturing Evidence Sample? Sometimes It Depends Upon Who You Hired to Evaluate the Analytical Data. A Case Study". Abstract #137 Presented at the 64th Southeastern Regional Meeting of the ACS, Raleigh, NC; November 2012.

2. Brown, E.G. "Chemistry, College Coursework & Career Choices". Invited Speaker for "Careers in Science" presentation at Panther Creek High School, Cary, NC; December, 2010.

3. Brown, E.G. "The Role of the Defense Chemistry Expert in Clandestine Drug Manufacturing Cases: Helping Public Defenders, Defense Attorneys, Prosecutors and Courts Understand Chemistry Facts and Concepts". Abstract #152 Presented at the 59th Southeastern Regional Meeting of the ACS, Greenville, SC; October 2007.

4. Brown, E.G.; Boyer, J.; Shaver, S.R. "Detection of INS316, INS365 and Other Nucleotides in Plasma and Fluids by LC/MS," Poster Presented by EGB at 14th World Congress of Pharmacology, San Francisco, CA; July, 2002. Int'l. Union of Pharmacology; Bethesda, MD: 2002; Abstract: C47; 100.20.

5. Plourde, R., Jr.; Brown, E.G.; Pelaez, T.; Peral, A.; Peterson, W.; Yerxa, B.; Pintor, J. "Design of Novel Melatonin Analogs for Reduction of Intraocular Pressure". Abstracts of Papers, 14th World Congress of Pharmacology, San Francisco, CA; July, 2002. International Union of Pharmacology; Bethesda, MD: 2002; Abstract: A209; 32.24.

6. Shaver, S.R.; Douglass, J.G., III; Brown, E.G.; Patel, R.I.; Redick, C.C.; Jones, A.C.; Boyer, J.L.; Picher, M.; Yerxa, B.R. "P2Y Receptor Agonists: A Comparison of Mixed-Base Dinucleotides Versus Same-Base Dinucleotides and Their Deoxyribo-Analogues". Abstracts of Papers, 14th World Congress of Pharmacology, San Francisco, CA; July, 2002. International Union of Pharmacology; Bethesda, MD: 2002; Abstract: C536; 146.11.

7. Brown, E.G. "New Chemistry Opportunities in the Biotech Industry". Invited Speaker for Careers in Chemistry Symposium, University of California, Davis; October, 1994.

8. Nagy, J.O.; Brown, E.G.; O'Neill, R.A.; de Vries, T.; Schultz, J.B.; Hobbs, C.; Lowe, J.B.; Weston, B.W.; van den Eijnden, D.H.; Bednarski, M.D. "Chemical-Enzymatic Synthesis of Analogs of Sialyl-Lewis X". Abstracts of Papers, 203rd National Meeting, American Chemical Society, San Francisco, CA; April, 1992. American Chemical Society; Washington, D.C.: 1992; Abstract: CARB 58.

9. O'Neill, R.A.; de Vries, T.; Ball, G.E.; Schultz, J.B.; Lowe, J.B.; Weston, B.W.; Nagy, J.O.; Brown, E.G.; Hobbs, C.; van den Eijnden, D.H.; Bednarski, M.D. "Synthesis of Sialyl-Lewis X and Lewis X Oligosaccharides by Combined Chemical and Enzymatic Means". Abstracts of Papers, 203rd National Meeting, American Chemical Society, San Francisco, CA; April, 1992. American Chemical Society; Wash., D.C.: 1992; Abstract: BTEC 27.

10. Kurth, M.J.; Brown, E.G. "Iodolactonization of 1,6-Heptadiene-4-Carboxylic Acids". Paper delivered by EGB at the 193rd National Meeting, American Chemical Society, Denver, CO; April, 1987. American Chemical Society; Washington, D.C.: 1987; Abstract: ORGN 88.

11. Brown, E.G.; Bartlett, P.A. "The Carbonate Extension". Paper presented by EGB at the American Chemical Society Undergraduate Conference, University of California, Santa Cruz; May, 1980.


## PH.D. DISSERTATION:

"Sterically Hindered 4-Pentenoic Acids, 1,6-Heptadiene-4-Carboxylic Acids, and Oxazolines: Their Synthesis, Analysis, and Iodolactonization". Brown, Edward George; University of California, Davis; 1988. Univ. Microfilms Int. #DA8910495; From: Diss. Abstr. Int. B 1989, 50(5), 1937.

# APPENDIX 2

Appendix 2

Materials Considered

1.  U.S. Patent No. 7,662,992
2.  The prosecution file for U.S. Patent No. 7,662,992
3.  U.S. Patent No. 8,969,616
4.  The prosecution file for U.S. Patent No. 8,969,616
5.  U.S. Patent No. 9,393,050
6.  The prosecution file for U.S. Patent No. 9,393,050
7.  "Triphenylmethane and Related Dyes" in *Van Nostrand's Scientific Encyclopedia* (John Wiley & Sons, Inc. 2006)
8.  "The Chemistry of Leuco Triarylmethanes" in *Chemistry and Applications of Leuco Dyes* (Plenum Press 1997)
9.  U.S. Patent No. 1,531,507
10. U.S. Patent No. 1,805,925
11. U.S. Patent No. 1,878,530
12. U.S. Patent No. 2,103,846
13. U.S. Patent No. 2,726,252
14. U.S. Patent No. 3,021,344
15. U.S. Patent No. 3,671,553
16. U.S. Patent No. 4,054,458
17. U.S. Patent No. 5,198,558
18. U.S. Patent No. 5,573,752
19. U.S. Patent No. 5,659,053
20. U.S. Patent Application Publication No. 2006/0224003
21. U.S. Patent Application Publication No. 2008/0008658
22. Canadian Patent Application No. CA 2 500 803 A1
23. PCT Patent Application Publication No. WO 2004/092122 A2
24. PCT Patent Application Publication No. WO2005/009423 A1
25. Hiranaka *et al.*, "Chemical Structure and Purity of Dyes Used in Lymphograms," *American Journal of Hospital Pharmacy* 32:928-930 (1975)
26. Snyder *et al.*, "Preparative HPLC Separation" in *Practical HPLC Method Development* (John Wiley & Sons, Inc. 2nd ed. 1997)
27. Huber and Majors, "Principles in preparative HPLC" (Agilent Pub. No. 5989-6639EN, April 2007)
28. Hirsch et al., "Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation," *American Journal of Roentgenology* 139:1061-64 (1982)
29. Lymphazurin Prescribing Information (United States Surgical Corp.)
30. Isosulfan Blue Prescribing Information (Mylan Institutional LLC)
31. Isosulfan Blue Prescribing Information (AuroMedics Pharma LLC)
32. Thoraval et al., "Development Of Paper, Chemical Agent Detector, 3-Way Liquid Containing Non-Mutagenic Dyes.  II-Replacement Of The Blue Indicator Dye Ethyl-bis-(2.4-DI NITROPHENYL) Acetate (EDA), available at http://www.dtic.mil/dtic/tr/fulltext/u2/a193781.pdf.

-1-

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**

33.   Aurobindo's Drug Master File, Drug Substance, Manufacture
34.   European Patent Publication 0 057 661 B1
35.   Vanysek, "Electrochemical Series." In *CRC Handbook of Chemistry and Physics* (81st ed., 2000)
36.   Documents relating to Patent Blue VF, pure, indicator grade, ACROS Organics™
37.   Stahl, "Peak purity analysis in HPLC and CE using diode-array technology" (Agilent Pub. No. 5988-8647EN, April 2003)
38.   Transcript of the Deposition of Dr. Jonathan Sessler, taken on August 11, 2016

CH2\18545314.3

-2-

**REDACTED - CONFIDENTIAL**

**APPX1448-APPX1454**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC <br><br> Plaintiffs, <br><br> v. <br><br> AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC <br><br> Defendants. | Civil Action No.: 2:16-cv-491-RWS-RSP <br><br> **Jury Trial Demanded** |

**DECLARATION OF DAVID KRAG, M.D.**

I, David Krag, hereby declare as follows:

1.    I am the SD Ireland Professor of Surgical Oncology at University of Vermont in Burlington, Vermont.  I have been in this position since 2000.  I am also licensed as a surgeon in the state of Vermont and am certified by the American Board of Surgery.

2.    I have been retained by Defendants Aurobindo Pharma Ltd. ("Aurobindo Ltd."), Aurobindo Pharma USA Inc. ("Aurobindo USA"), and AuroMedics Pharma LLC ("AuroMedics"; collectively, "Aurobindo") as an expert witness in the above-captioned litigation.  I base my declaration on my experience as a cancer surgeon with over 20 years of experience in using isosulfan blue in my practice and the materials I have reviewed specifically in the course of preparing this Declaration.  I have personal knowledge of the facts set forth in this Declaration unless specified otherwise.

3.    A list of the references I specifically considered during the preparation of this Declaration is attached as Exhibit A.

## I.    INTRODUCTION

### A.    Professional Background

4.    I have more than thirty years of experience as a cancer surgeon.  I am currently the SD Ireland Professor of Surgical Oncology at the University of Vermont, an endowed position I have held since 2000.

5.    In 1977, I obtained my B.A. in Chemistry from the University of the Pacific Stockton, CA.  In 1980, I completed my M.D. at Loyola Stritch School of Medicine in Maywood, IL.  Thereafter, I did my internship at Yale University Medical Center in New Haven, Connecticut from 1980 to 1982 followed by surgery residency at University of California-Davis in Sacramento, California from 1982 to 1986.

6.     I founded University of Vermont's Breast Care Center and was Director of the Center from 1992-1995. I also held the position of Associate Professor of Surgery at the University from 1991 to 1998. I became Professor of Surgery at the University in 1998.

7.     I hold a medical license in the State of Vermont. I have held a Certificate in Breast and Soft Tissue Ultrasonography and a Certificate in Advanced Cardiac Life Support. Further, I have been a Fellow of the American College of Surgeons since 1991. I am also certified by the American Board of Surgery.

8.     I have been an active cancer researcher – particularly in the field of sentinel lymph node mapping and early detection of breast cancer – as demonstrated in the various research contracts and grants I have obtained. I have published about 156 articles in various peer reviewed scientific journals. Several of those articles report research work done in the area of sentinel lymph node biopsy in breast cancer. I have also written books and book chapters pertaining to surgical oncology.

9.     I am also a named inventor on nine United States patents. The patents generally relate to techniques applied in the field of surgical oncology.

10.     A detailed copy of my curriculum vitae, which also includes my professional memberships, thesis committee appointments, recognitions, lectures presentations, and other activities and achievements, is attached as Exhibit B to this Declaration.

**B.     Sentinel Lymph Node Mapping Generally**

11.     Several types of cancer spread through the lymphatic system. Lymph nodes, therefore, are indicators of metastases. Breast cancer spreads from the primary tumor bed to one or more of the lymph nodes and then to other axillary nodes. A sentinel lymph node is the first lymph node to which cancer cells are most likely to spread from the primary tumor. Sentinel lymph node biopsy (SLNB), therefore, is done to detect metastatic nodal disease early on. At least

as early as 1993, SLNB was recognized to be a better approach than noninvasive methods such as computed tomography and magnetic resonance imaging.[1]

12.    Before biopsy can be performed, sentinel lymph nodes need to be localized.  For the localization of the nodes, a dye (such as isosulfan blue or methylene blue) or a radioactive tracer or sometimes both are injected around the tumor site.[2]  The dye stains the afferent lymphatic channels that enter the sentinel nodes, thereby assisting the visualization of the node for biopsy as depicted in the figure below.



Isosulfan blue and methylene blue are two commonly used dyes for SLNB.[3]

---

[1] Alex and Krag, *Gamma-Probe Guided Localization of Lymph Nodes*, Surgical Oncology, 2:137-143 (1993) (attached as Exhibit C).

[2] Bao *et al*, *The staging value of sentinel lymph node biopsy for breast cancer: translating pathologic findings to clinical practice*, 5(3):36 Chin. Clin. Oncol. (2016) (attached as Exhibit D).

[3] Newman & Newman, *Lymphatic Mapping Techniques and Sentinel Lymph Node Biopsy in Breast Cancer*, Surgical Clinics of North America, 87: 353, 356 (2007) (attached as Exhibit E).

-4-

13.    A radioactive tracer works in a similar way except that a gamma counter is needed to detect the tracer.  A general understanding in the art is that the radioactive tracer often detects sentinel nodes that may not be detected by a blue dye.[4]

### C.    The Three FDA-Approved Isosulfan Blue Products for Sentinel Lymph Node Mapping

    i.    Lymphazurin®

14.    The FDA initially approved Lymphazurin® (NDA 018310) in 1981.[5] Lymphazurin® is a 1% solution of isosulfan blue, i.e., N-[4-[[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylehananamunium hydroxide, inner salt, sodium salt.[6]  "Each ml of solution contains 10 mg Isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate."[7]

15.    I have been informed by counsel that Lymphazurin® was discontinued by Covidien in late 2012.  About two years after Covidien stopped manufacturing Lymphazurin®, FDA withdrew the approval of NDA 018310 for Lymhazurin® in December 2014 for reasons other than those related to safety or effectiveness.[8]

---

[4] McMasters *et al*, *Sentinel Lymph Node Biopsy for Melanoma: How Many Radioactive Nodes Should be Removed?*, Annals of Surgical Oncology, 8(3): 192, 193-96 (2001) (attached as Exhibit F); *see also* Newman & Newman, *supra* note 3.

[5] Lymphazurin Prescribing Information (United States Surgical Corp.) at 1 (attached as Exhibit G).

[6] *Id.* at ¶ 11.

[7] *Id.*

[8] Federal Register 80(21):5560-61 (February 2, 2015) (attached as Exhibit H).

ii.    Mylan's Isosulfan Blue Product

16.    Mylan offers a generic isosulfan blue product based on Covidien's brand product. Like Lymphazurin®, Mylan is a 1% solution of isosulfan blue.[9] "Each mL of solution contains 10 mg isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate."[10] I understand that as a generic version of Lymphazurin®, Mylan relied on the safety and efficacy data of Covidien's Lymphazurin® to obtain approval of its isosulfan blue product from the FDA. Mylan also needed to show that its product was bioequivalent to the original Lymphazurin® product, as reported on Mylan's website (http://isosulfanblue.mylan.com/en/efficacy). I understand that Mylan commercialized its generic version in 2010, while Lymphazurin® was still on the market.

iii.    AuroMedics's Isosulfan Blue Product

17.    Auromedics's isosulfan blue product, like Lymphazurin®, is a 1% solution of isosulfan blue. "Each mL of solution contains 10 mg isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate."[11] I understand that AuroMedics released its product in late February 2016.

18.    Based on my review of the package inserts for the three different isosulfan blue products, I did not find significant differences between the three products.

---

[9] Isosulfan Blue Prescribing Information (Mylan Institutional LLC) at ¶ 3 (attached as Exhibit I).

[10] Isosulfan Blue Prescribing Information (AuroMedics Pharma LLC), at ¶ 11 (attached as Exhibit J).

[11] *Id.*

## II. THERE ARE NO SIGNIFICANT DIFFERENCES BETWEEN LYMPHAZURIN® AND MYLAN'S ISOSULFAN BLUE PRODUCT

19.     I have extensively reviewed the literature pertaining to the use of blue dyes for sentinel node mapping.  The literature contained no references indicating that Mylan's generic isosulfan blue product altered the efficacy rate of sentinel node mapping as compared to Lymphazurin®.  This lack of distinguishing factors between the two isosulfan blue products is consistent with my observation that most surgeons just use the blue dye that hospital pharmacies have on hand and do not chose the blue dye based on a particular manufacturer. In fact, the efficacy rate of isosulfan blue reported on Mylan's website (http://isosulfanblue.mylan.com/en/efficacy) refers to an article, Hirsch et al., discussing Lymphazurin®, indicating that the efficacy of both products is comparable.

20.     My review of the pertinent literature also indicated that Mylan's generic isosulfan blue product did not alter the incidence of adverse events resulting from the use of isofulfan blue as compared to Lymphazurin®.  For example, the incidence of allergic reactions resulting from the use of isosulfan blue remained consistent following the launch of Mylan's generic isosulfan blue product. I further note that the safety information provided on Mylan's website (http://isosulfanblue.mylan.com/en/safety) refers to the Hirsch et al. article, which provides data on adverse effects in patients treated with Lymphazurin®, indicating that the two products are comparably safe.

21.     Thus, it is my opinion that there is no significant difference between Lymphazurin® and Mylan's generic isosulfan blue product and that the two products are therefore interchangeable.  It is also my opinion that other practitioners would share my opinion.

III.    **ISOSULFAN BLUE AND METHYLENE BLUE ARE INTERCHANGEABLE FOR SENTINEL NODE MAPPING**

22.    In my several years as a cancer surgeon, I have observed that during periods when isosulfan blue was unavailable, surgeons used another dye called methylene blue for sentinel node mapping.  It is my understanding that, in clinical practice, isosulfan blue is interchangeable with methylene blue.  I can ascribe at least two reasons for the interchangeability.

23.    First, methylene blue leads to similar sentinel node detection rates as that of isosulfan blue.[12]  Based on the information I have reviewed, methylene blue is as effective as isosulfan blue.  My opinion about the similar effectiveness of the two dyes does not change even after Mylan introduced its generic isosulfan blue product in 2012.

24.    Second, while methylene blue may have local tissue reactions, the dye has a lower incidence of serious systemic allergic reactions.[13]  By contrast, several potential adverse events are known to be associated with isosulfan blue, including, for example, staining of tissue and alteration of pulse oximetry readout.[14]  The most concerning adverse events are allergic reactions.

---

[12] *See* Nour A, *Efficacy of methylene blue dye in localization of sentinel lymph node in breast cancer patients*, Breast J. 10(5):388-91 (2004) (attached as Exhibit K);  Varghese *et al*, *Methylene Blue Dye-A Safe and Effective Alternative for Sentinel Lymph Node Localization*, Breast J. 14(1):61-67 (2007) (attached as Exhibit L);   Liu *et al*, *A randomized study comparing the effectiveness of methylene blue dye with lymphazurin blue dye in sentinel lymph node biopsy for the treatment of cutaneous melanoma*, Ann Surg Oncol 15(9):2412-7 (2008) (attached as Exhibit M); Ortiz et al., *A Case of Severe Anaphylactic Reaction Secondary to Isosulfan Blue Dye Injection*, The Ochsner Journal 15:183–186 (2015) (attached as Exhibit N).

[13] *See* Kelley & Holmes, *Tracer agents for the detection of sentinel lymph nodes in breast cancer: current concerns and directions for the future*, 104(1):91-6 (2011) (attached as Exhibit O); Golshan & Nakhlis, *Can Methylene Blue Only Be Used in SLNB?*, Breast J. 12(5):428-430 (2006) (attached as Exhibit P); Varghese, *supra* note 12, at 64-65.

[14] Varghese, *supra* note 12, at 64.

25.     While the use of isosulfan blue is more widespread, it is my opinion that methylene blue is also acceptable for use in sentinel node mapping.

26.     Finally, it is my understanding that methylene blue used in sentinel node mapping does not contain any isosulfan blue.  It is also my understanding that a radioactive tracer used alone for sentinel node mapping does not contain any isosulfan blue.

I hereby declare under penalty of perjury that the foregoing statements made by me are true and correct.

Dated: _9/8/16_

David Krag, M.D.

# EXHIBIT E



SURGICAL
CLINICS OF
NORTH AMERICA

Surg Clin N Am 87 (2007) 353–364

# Lymphatic Mapping Techniques and Sentinel Lymph Node Biopsy in Breast Cancer

Erika A. Newman, MD[a],
Lisa A. Newman, MD, MPH, FACS[b],*

[a]Department of Surgery, University of Michigan, 1500 East Medical Center Drive,
Ann Arbor, MI 48109-0932, USA
[b]Breast Center, University of Michigan Comprehensive Cancer Center, 1500 East Medical
Center Drive, Ann Arbor, MI 48109-0932, USA

The axillary nodal status is accepted universally as the most powerful prognostic tool available for early stage breast cancer. Breast cancer patients routinely undergo surgical staging of the axilla because other primary tumor features are inadequate in predicting the presence versus absence of nodal positivity [1–3]. The status of the axillary lymph nodes also guides treatment options and adjuvant therapies. The removal of level I and level II lymph nodes at axillary node dissection (ALND) is the most accurate method to assess nodal status, and it is the universal standard. ALND is associated with several adverse long-term sequelae including lymphedema, the disruption of nerves in the axilla, chronic shoulder pain, weakness, and joint dysfunction. Additionally, the survival advantage of ALND has been challenged, and less morbid methods of evaluating the axillary nodal basin have been sought.

Breast cancer spreads from the tumor bed to one or a few lymph nodes before it spreads to other axillary nodes. These sentinel nodes can be identified and surgically excised for histological analysis. Lymphatic mapping with sentinel lymph node biopsy (SLNB) has emerged as an effective method of detecting axillary metastases. Veronesi and colleagues [4] randomly assigned 516 women with early stage breast cancer to either SLNB and ALND or SLNB alone (ALND was performed only for axillary metastases in the SLNB-alone arm). The authors demonstrated that SLNB was

* Corresponding author.
E-mail address: lanewman@umich.edu (L.A. Newman).

0039-6109/07/$ - see front matter © 2007 Published by Elsevier Inc.
doi:10.1016/j.suc.2007.01.013

Appx1535   AURO_ISO 0020396

accurate and reliable with a false-negative rate of 8%. There was less pain and better arm mobility in those who underwent SLNB only. Additionally, there were no differences in local recurrence or survival at follow-up. The NSABP-32 trial is the largest multicenter trial to date examining the safety and accuracy of SLNB [5]. The trial randomly assigned women with clinically negative axillae to receive SLNB with an ALND or SLNB alone. Early results have demonstrated that SLNB is safe and reliable, with false-negative rates of 8% to 10%, and lower morbidity than ALND. Although the long-term results are forthcoming, the clinical advantages of SLNB are apparent, and the procedure is becoming the preferred standard by patients and breast cancer surgeons.

Given the rapid growth of lymphatic mapping and SLNB, surgical groups have developed several variations in practice, and many technical aspects of the procedure are evolving. These variations have included the choice of mapping label, radioisotope quantity and processing, label injection site, timing of radioisotope injection, and the use of preoperative lymphoscintigraphy scanning. Because these controversies have not been studied extensively in clinical trials, the method of lymphatic mapping ultimately should be selected based on those methods that have been proven safe, and on the services and resources of a given breast care program. Table 1 summarizes the results of various studies that have analyzed SLNB accuracy as a function of mapping technique [6–18].

### Choice mapping label

*Radioisotope alone*

Krag and colleagues [19] first described the use of radioisotope alone for breast cancer in 1993, using technetium-99m sulfur colloid and a hand-held gamma probe. The sentinel node identification rate was 98%, with a false-negative rate of 11%. Technetium-99m sulfur colloid is the most widely used radioisotope for lymphatic mapping in the United States. In Europe, technetium 99m-colloidal albumin is used most. The specific radioisotope selected for the mapping process is determined largely by availability and by the center's nuclear medicine practices [20]. The doses of radioactive technetium vary by institution and range from 0.1 to 4 mCi.

*Blue dye*

Isosulfan blue dye (Lymphazurin 1%, US Surgical Corp, Norwalk, CT) initially was studied extensively in lymphatic mapping for melanoma. The use of isosulfan blue dye as a single agent in SLNB for breast cancer initially was reported by Giuliano and colleagues [6], with sentinel node identification rates of 98%, without false-negative nodes. The major disadvantage of isosulfan blue dye is the risk of life-threatening allergic and anaphylactic

Table 1
Selected studies evaluating accuracy of sentinel lymph node biopsy as a function of lymphatic mapping technique

| Study | Total # cases | Sentinel lymph node (SLN) identification rate (%) | SLN FN rate (%) | Factors associated with SLN nonidentification | | | | | | Factors associated with SLN FN risk | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Learning curve | Tumor location (medial worse) | Older-age patient | Prior excisional biopsy | Single versus dual mapping agent | Larger-sized tumor | Learning curve | Tumor location (upper outer quadrant worse) | Older-aged patient | Prior excisional biopsy | Single versus dual mapping agent | Larger-sized tumor |
| Canavese [9] | 212 | 97.1% | 6.5% | No | NR | NR | NR | Yes | No | No | NR | NR | NR | No | Yes |
| Albertini [7] | 62 | 92% | 0% | NR | NR | NR | NA[a] | Yes | NR | No | No | No | No | No | No |
| McMasters [10] | 806 | 88% | 7.2% | No | No | Yes | No | Yes | No | No | Yes | No | No | Yes | No |
| Veronesi [8] | 163 | 98% | 4.7% | No | No | No | No | NA (Tc only used) | Yes | No | Yes | No | No | NA | Yes |
| Veronesi [11] | 376 | 98.7% | 6.7% | No | No | NR | NR | No | Yes | No | No | No | No | No | No |
| Cox [12] | 465 | 94.4% | UK | Yes | NR | NR | No | Yes | NR | Yes | NR | NR | NR | No | NR |
| Giuliano [6] | 174 | 65.5% | 8.1% | Yes | NR | NR | NR | NA (dye only used) | NR | Yes | NR | NR | NR | NR | NR |
| Bedrosian [13] | 104[b] | 99% | 3.3% | NR | NR | NR | NR | NR | No | NR | NR | NR | NR | NR | No |
| Haigh [14] | 284[c] | 81.0% | 3.2% | NR | No | NR | No | NR | No | Yes | No | NR | No | NR | No |
| Wong [15] | 2206 | 92.5% | 8.0% | No | No | NR | No | NR | Yes | NR | No | NR | No | NR | Yes |
| Krag [16] | 443 | 93% | 12.8% | Yes | Yes | Yes | Yes | NA (isotope-only used) | No | NR | Yes | No | No | NA (isotope-only used) | No |
| O'Hea [17] | 59 | 93% | 15% | NR | No | NR | No | Yes | No | Yes | No | NR | No | No | Yes |
| Guenther [18] | 260 | 81.9% | NR[d] | Yes | Yes | NR | No | NA (dye only used) | NA[c] | NA[c] | NA[d] | NA[c] | NA[c] | NA[c] | NA[c] |

*Abbreviations:* NR, not reported; NA, not applicable.
[a] Patients with prior excisional biopsy excluded from study.
[b] All T2 and T3 tumors.
[c] Including 181 lymphatic mapping cases with prior excisional biopsy.
[d] Medial location worse.
[e] Analyses limited to 47 patients with unsuccessful mapping procedures.

AURO_ISO 0020398

reactions. The reported allergic reaction rate ranges from 1% to 3% [21,22]. Most reactions consist of urticaria, rash, blue hives, and pruritus [23]. Although rare, anaphylaxis and hypotension also have been reported. Overall, isosulfan blue dye has excellent results for lymphatic mapping in breast cancer, and is the blue dye most commonly used.

Methylene blue also has been successful in SLNB for breast cancer. Simmons and colleagues [24,25] identified the sentinel node in approximately 93% of patients studied in a cohort of more than 100 patients; concordance with radioisotope was observed in 95%.

Additionally, methylene blue was compared with Isosulfan blue dye by Blessing and colleagues [26] in 2002. The authors found that all patients had high concomitant isotope mapping and similar sentinel node identification rates. Methylene blue is preferred by some authors because of its lower costs, and also because of its lower risk of allergic reactions. Methylene blue must be injected in the subcutaneous tissues; inadvertent injection into the dermis has resulted in severe skin reactions including necrosis and dermolysis.

### Combination of blue dye and radioisotope

Several authors have demonstrated that the combination of radioisotope and blue dye for lymphatic mapping improves the sentinel lymph node (SLN) identification rate. Albertini and colleagues [7] first reported the successful use of lymphatic mapping with both blue dye and radioisotopes prospectively. The results have been confirmed with several studies demonstrating that the combination method improves the sentinel node identification rate, and dual-agent lymphatic mapping has been accepted universally [27]. Some centers have elected to rely on radioisotope mapping alone, given the potentially life-threatening allergic reactions of isosulfan blue dye.

### Filtered versus unfiltered radioisotope

Identification of a radioactive lymph node depends upon adequate uptake of the radioisotope from the breast parenchyma by intramammary lymphatics. The radioisotope must travel from the breast to the sentinel node in a timely fashion. Radioisotope uptake and travel times ultimately depend on the size of the labeled carrier and on the amount of carrier fluid used. Large particles may not migrate to regional nodes at all (those greater than 400 nm), and those too small may migrate too quickly to the entire nodal basin, making identification of single sentinel nodes difficult. The size of technitium-99 sulfur colloid may be altered by the selective use of filters and the pore size of filters used. Filtration through 100 or 220 nm filters has been studied, with goals of particle sizes ranging from 50 to 200 nm. Filtered preparations resulting in smaller particles travel more quickly and may potentially reach more SLNs, including the higher echelon nodes, if there is

a prolonged interval between injection of radioisotope and surgery [19]. The unfiltered colloid may be less likely to travel to higher echelon nodes, given its larger size and slower transit time. Linehan and colleagues [28] compared the success of SLNB using filtered versus unfiltered technetium-99m sulfur colloid combined with blue dye mapping. Although the authors found no difference in the overall SLN identification rate, there were significantly more SLNs that were radioactive in the unfiltered group versus the filtered group (88% versus 73%; $P = .03$). These results suggest that filtered smaller particles may pass too quickly from the injection site through the nodal basin before the sentinel nodes are removed.

There has been no consensus on the use of filtered versus unfiltered radioisotopes for lymphatic mapping in breast cancer. The various features may be considered advantages or disadvantages, and selection depends upon the timing of surgery in relation to injection times.

### Injection site for mapping agents

*Peri-tumoral injection*

In efforts to replicate the intramammary lymphatic pathways that may have been traversed by metastases, the initial data regarding SLNB used peri-tumoral injections of the mapping agents [5,6]. For patients who have nonpalpable tumors, this method has proven difficult and time-consuming, because it requires the use of additional imaging modalities to guide the peri-tumoral injection of radioisotopes. Peri-tumoral injections also have a higher potential for shinethrough, where residual radioactivity from the peri-tumoral injection site creates misleading background activity detected by the gamma probe from the axilla. It is for these reasons that alternate injection sites have been pursued.

*Subareolar and dermal injection*

Mammary lymphatics develop as radial extensions from the nipple breast bud. Nearly all breast tissue lymphatic drainage passes through the subareolar plexus of Sappey and then into the axillary nodal basin; hence dermal and subareolar injections are potential approaches for the injection of mapping agents. The sites are particularly advantageous for patients who have nonpalpable or multicentric tumors; they also eliminate the shinethrough effect.

A potential disadvantage to subareolar and dermal injections is that up to 10% of breast cancers may demonstrate nonaxillary lymphatic drainage with sentinel nodes found in the internal mammary or supraclavicular nodal basins; hence not all breast tumors will have the same drainage patterns as the overlying skin and nipple areas. Additionally, subareolar and dermal injection of blue dye may cause considerable postoperative discoloration of the breast (blue breast), which may last for several months.

Veronesi and colleagues [8] first described subdermal injections of technetium-99m labeled albumin into the dermis overlying the tumor of 163 patients undergoing SLNB and ALND. The authors found that the SLN identification rate was 98%, with a false-negative rate of 4.7%. Several authors have confirmed the reliability of dermal injections by direct comparisons between peri-tumoral and skin radioisotope injections. Borgstein and colleagues [29] studied 33 breast cancer patients undergoing lymphatic mapping, consisting of dermal injections of blue dye and peri-tumoral injections of radioisotope. The authors found 100% concordance between blue and radioactive SLNs in 30 of the 33 patients studied, without any false negatives. Linehan and colleagues studied 200 patients undergoing SLNB with peri-tumoral or excisional biopsy site blue dye injections. In the study, half of the patients also received Tc99-sulfur colloid injected peri-tumorally, and the other half received radioisotopes by means of dermal injections. The SLN identification rates were 92% for those patients receiving intraparenchymal injections of both blue dye and radioisotopes. For those patients receiving intraparenchymal injection of blue dye and dermal injection of radioisotopes, the SLN identification rate was 100%. In both subsets of patients, the concordance between blue-stained and radioactive sentinel nodes was also high (97% and 95%, respectively). Those patients receiving dermal injections of radioisotopes had a greater proportion of sentinel nodes radioactive when compared with the group receiving peri-tumoral injections of radioisotopes (97% versus 78%; $P < .001$). A subsequent report compared 134 patients receiving intraparenchymal lymphatic mapping with 164 patients with mapping using intraparenchymal blue dye and dermal injection of radioisotopes [30]. The SLN identification rate was significantly higher in the group receiving dermal injections of radioisotopes (98% versus 89%). There was no difference in the false-negative rates (4.4% and 4.8%).

Several authors have studied the differences between lymphatic drainage pathways of intradermal versus intraparenchymal injections of radioisotopes. Shen and colleagues [31] studied the preoperative lymphoscintigraphy scans of 30 patients undergoing lymphatic mapping for cutaneous breast melanomas and 97 patients undergoing lymphatic mapping with peri-tumoral injection for breast cancer. The authors found that there were a higher percentage of nonaxillary SLNs in the melanoma/dermal injection group (26% versus 5%). In the melanoma cases, there were bilateral axillary and supraclavicular drainage sites detected, whereas the breast cancer cases mapped to the ipsilateral axillae. The results demonstrated that axillary drainage patterns varied between peri-tumoral and dermal lymphatics. Additionally, given the importance of the ipsilateral axillary, mammary, and supraclavicular nodal basins in the staging of breast cancer, if drainage to these sites can be detected with dermal injection, the dermal route may be adequate for the staging of breast cancer.

Klimberg and colleagues [32] compared lymphatic mapping using subareolar injections of radioisotope to peri-tumorally injected blue dye. The

authors found successful mapping in 64 of 68 patients studied (94%). The SLN identification rate for blue dye was 89.9% versus an identification rate of 94.2% for radioisotope. In the study, all blue nodes were also radioactive, indicating that subareolar injection did not miss any axillary SLNs using this method of mapping.

Subareolar and dermal injection sites also have been examined using various areas of the breast for injection. Beitsch and colleagues [33] studied subareolar radioisotope injected into the mirror-image quadrant of the nipple–areolar tissue and peri-tumoral blue dye injections. The SLN identification for blue dye and radioisotopes were 94% and 99%, respectively, and 99% of the blue SLNs were also radioactive. Kern [34,35] reported successful results of lymphatic mapping using subareolar injections of blue dye and radioisotopes at the upper, outer aspect of the nipple–areolar tissue.

Although SLNB has proven reliable in women who have unifocal disease, the studies examining the ideal injection site have set the stage for the consideration of SLNB in multicentric and multifocal disease. Tousimis and colleagues [36] reported results from the largest series examining lymphatic mapping in multicentric and multifocal breast cancer. The authors examined 70 patients who underwent mapping using a combination of radioisotopes and blue dye. In the study, 63 patients received a single intradermal injection of radioisotopes directly over the largest tumor, and five patients received radioisotope peri-tumoral radioisotope injections. Additionally, 67 patients received a single intraparenchymal blue dye injection adjacent to the supero–lateral side of the largest invasive tumor or biopsy cavity. The authors found that the accuracy (SLN identification rate of 96%) and false-negative rate (8%) of SLNB in patients who had multicentric and multifocal breast cancers were comparable to those with unifocal tumors. Though confirmatory studies are warranted, these results demonstrate the feasibility of SLNB in patients who have multicentric and multifocal breast cancer.

**Preoperative lymphoscintigraphy**

Patients undergoing lymphatic mapping with radioisotopes most often receive a preoperative lymphoscintigram (PL) to aid in SLN identification. PL typically consists of anterior and lateral views and specific patient positioning to optimize transit time and radioisotope drainage [37]. Scanning routinely is initiated 20 minutes after radioisotope injection, and images are repeated until the primary SLN basin is identified and there is adequate uptake. The patient then is taken to the operating room for SLNB.

It is controversial whether preoperative scanning is of diagnostic value. Many authors have examined the accuracy of the PL, and given the additional time and cost, question its value in improving the identification of sentinel lymph nodes. Proponents of the technique have argued that the scan may guide the timing of surgery when radioisotope injection is

NEWMAN & NEWMAN

performed on the same day as the operation. Additionally, PL will identify the primary drainage pattern, and also internal mammary (IM) sentinel nodes. There is no consensus regarding the management IM SLNs that have been identified by PL, and current recommendations for adjuvant therapies have been defined mostly by axillary nodal metastases. McMasters and colleagues [38] evaluated the role of PL in breast cancer. In the study, a PL was performed in 348 of 588 patients (59%), and 240 patients did not receive scans. The SLN was identified in 221 of the 240 (92%) patients who did not undergo preoperative scanning. In these patients, the false-negative rate was 1.6%. In those patients receiving a preoperative lymphoscintigram, the SLN was identified in 310 of the 348 (89.1%) patients, with a false-negative rate of 8.7%. The authors found no significant difference in the SLN identification rate, false-negative rate, or number of SLNs removed between patients receiving PL and those proceeding to operation without scanning. Borgstein and colleagues [39] also studied the role of PL in breast cancer patients. The authors found that the intraoperative gamma probe was more sensitive in detecting radioactive nodes in the axilla than the PL, even when delayed images were obtained. In the study, axillary accumulation was absent in 14 of 130 patients receiving PL. The intraoperative gamma probe was unsuccessful in detecting radioactivity in 8 of 130 cases (seven of these patients also had negative PL).

Data have continued to emerge questioning the ability of PL to improve the accuracy of SLNB, and some centers have abandoned the technique, focusing only on resecting SLNs in the axilla, and relying on the intraoperative gamma probe to detect radioactive SLNs. Until there are definitive data regarding the treatment and importance of nonaxillary drainage, the decision to use PL is ultimately the decision of the surgeon and the multidisciplinary breast team.

**Timing of radioisotope injection**

Lymphatic mapping with radioisotopes is performed either as a 1- or 2-day procedure. The half-life of technitium-99 is approximately 6 hours and must be taken into account when planning SLNB.

The single-day procedure requires breast injection on the morning of surgery, followed by serial imaging at 1 to several hours after injection until the SLN is identified. In some cases, the process can take several hours and may significantly delay the operation. The effect of delay on patients and on operating room scheduling has led some centers to use a 2-day mapping procedure, with injection of radioisotopes 1 day before operation. The 2-day procedure has been criticized because of the concern that it may require higher doses of radioisotopes, or that with prolonged exposure, radioisotopes may move into higher-echelon nonsentinel lymph nodes. Winchester and colleagues [40] evaluated lymphatic mapping with radioisotope injection

1 day before operation. The study consisted of 180 patients receiving lymphatic mapping and SLNB, with technitium-99 sulfur colloid injected 1 day preoperatively. The authors found that the SLN identification rate was 90%, and was influenced largely by the surgeon's learning curve. Additionally, mapping was improved when 1.0 mCi-filtered radioisotope was used (versus 0.5 to 1.0 mCi unfiltered radioisotope). McCarter and colleagues [41] also had successful outcomes using the 2-day procedure. The authors studied 933 patients who received 0.1 mCi of dermal technitium-99 sulfur colloid in 0.05 cc normal saline on the day of surgery, and 387 patients who received 0.5 mCi technitium-99 sulfur colloid dermal injections on the day before operation. All of the patients had peri-tumoral blue dye injections intraoperatively. The median number of SLNs identified in the 2-day group was slightly higher than in the 1-day group, and the mean level of isotope counts was similar between the two groups. Likewise, Solorzano and colleagues [42] reported success with the 2-day lymphatic mapping technique. The authors found that injection of 2.5 mCi technetium sulfur colloid (filtered) peri-tumorally on the day before surgery with lymphoscintigraphy to track drainage resulted in an overall SLN identification of 97.5%. All positive SLNs with blue dye staining were also radioactive. Based on the current literature, a 2-day lymphatic mapping procedure is safe and reliable for SLNB in breast cancer.

### The future and controversies

In addition to those previously mentioned controversial areas, the prognostic value of axillary nodal micrometastases identified by immunohisto-chemistry (IHC) analysis for cytokeratin is unknown, although the topic is the subject of ongoing clinical trials. Because it is not proven that micro-metastases have any effect on breast cancer treatment, recurrences, or survival, IHC is generally not included as a routine component of SLNB [43].

Patients who have negative sentinel lymph nodes are safely spared an ALND. The question remains if patients who have positive SLNs gain a survival advantage from completion node dissection. The American College of Surgeons Oncology Group sought to answer this question with a prospective randomized controlled trial of ALND in women with early stage breast cancer and a positive SLNB [44]. The trial was terminated early because of poor patient accrual. Until data from clinical trials are available, completion of ALND remains the standard treatment for patients who have positive SLNs.

Finally, although SLNB is becoming standard for early stage breast cancer, the role of SLNB in patients who have locally advanced disease, and those receiving neoadjuvant chemotherapy (NCTX) is not well established. Breast cancer patients receiving neoadjuvant chemotherapy may undergo pre-chemotherapy sentinel lymph node biopsy (as a definitive staging

procedure at presentation) or post-chemotherapy (to document the post-treatment nodal status). The pre-chemotherapy strategy commits many patients to a completion ALND on the basis of pre-treatment nodal positivity, thereby negating some of the neoadjuvant chemotherapy downstaging benefits. Several groups have studied the performance of SLNB after NCTX [45–47]. This sequence has been criticized for wide variations in the false-negative rates. The optimal strategy for incorporating lymphatic mapping into neoadjuvant chemotherapy regimens has yet to be determined and is the subject of ongoing research.

## Summary

The value of SLNB in the staging and prognosis of breast cancer patients with early stage disease is defined clearly, and lymphatic mapping is becoming the standard of care for most centers. It is projected that SLNB will soon replace ALND completely as the initial evaluation procedure of the axillary nodal basin for metastases. As the specifics of lymphatic mapping evolve, the process should be individualized and tailored to institutional capabilities and the practice preferences of the entire multidisciplinary team to yield the most consistent and reliable results.

## References

[1] Carter CL, Allen C, Henson DE. Relation of tumor size, lymph node status, and survival in 24,740 breast cancer cases. Cancer 1989;63:181–7.

[2] Rivadeneira DE, Simmons RM, Christos PJ, et al. Predictive factors associated with axillary lymph node metastases in T1a and T1b breast carcinomas: analysis in more than 900 patients. J Am Coll Surg 2000;191:1–8.

[3] Gann PH, Colilla SA, Gapstur SM, et al. Factors associated with axillary lymph node metastasis from breast carcinoma: descriptive and predictive analyses. Cancer 1999;86: 1511–9.

[4] Veronesi U, Paganelli G, Giuseppe V, et al. A randomized comparison of sentinel node biopsy with routine axillary dissection in breast cancer. N Engl J Med 2003;349:546–53.

[5] Krag DN, Julian TB, Harlow SP, et al. NSABP-32: phase III, randomized trial comparing axillary resection with sentinel lymph node resection: a description of the trial. Ann Surg Oncol 2004;11S:208–10.

[6] Giuliano AE, Kirgan DM, Guenther JM, et al. Lymphatic mapping and sentinel lymphadenectomy for breast cancer. Ann Surg 1994;220(3):391–8 [discussion: 398–401].

[7] Albertini JJ, Lyman GH, Cox C, et al. Lymphatic mapping and sentinel node biopsy in the patient with breast cancer. JAMA 1996;276(22):1818–22.

[8] Veronesi U, Paganelli G, Galimberti V, et al. Sentinel-node biopsy to avoid axillary dissection in breast cancer with clinically negative lymph nodes. Lancet 1997;349(9069):1864–7.

[9] Canavese G, Gipponi M, Catturich A. Technical issues and pathologic implications of sentinel lymph node biopsy in early-stage breast cancer patients. J Surg Oncol 2001;77:81–7.

[10] McMasters KM, et al. Sentinel lymph node biopsy for breast cancer: a suitable alternative to routine axillary dissection in multi-institutional practice when optimal technique is used. J Clin Oncol 2000;18(13):2560–6.

[11] Veronesi U, Paganelli G, Viale G, et al. Sentinel lymph node biopsy and axillary dissection in breast cancer: results in a large series. J Natl Cancer Inst 1999;91(4):368–73.

[12] Cox CE, Pendas S, Cox JM, et al. Guidelines for sentinel node biopsy and lymphatic mapping of patients with breast cancer. Ann Surg 1998;227(5):645–51 [discussion: 651–3].

[13] Bedrosian I, Reynolds C, Mick R, et al. Accuracy of sentinel lymph node biopsy in patients with large primary tumors. Cancer 2000;88:2540–5.

[14] Haigh PI, Hansen NM, Qi K, et al. Biopsy method and excision volume do not affect success rate of subsequent sentinel lymph node dissection in breast cancer. Ann Surg Oncol 2000; 7(1):21–7.

[15] Wong SL, Edwards MJ, Chao C, et al. The effect of prior breast biopsy method and concurrent definitive breast procedure on success and accuracy of sentinel lymph node biopsy. Ann Surg Oncol 2002;9(3):272–7.

[16] Krag D, Weaver D, Ashikaga T, et al. The sentinel node in breast cancer—a multicenter validation study. N Engl J Med 1998;339(14):941–6.

[17] O'Hea BJ, Hill AD, El-Shirbiny AM, et al. Sentinel lymph node biopsy in breast cancer: initial experience at Memorial Sloan-Kettering Cancer Center. J Am Coll Surg 1998;186(4):423–7.

[18] Guenther JM. Axillary dissection after unsuccessful sentinel lymphadenectomy for breast cancer. Am Surg 1999;65(10):991–4.

[19] Krag DN, et al. Surgical resection and radiolocalization of the sentinel lymph node in breast cancer using a gamma probe. Surg Oncol 1993;2(6):335–9.

[20] Newman LA. Lymphatic mapping and sentinel lymph node biopsy in breast cancer patients: a comprehensive review of variations in performance and technique. J Am Coll Surg 2004; 199(5):804–16.

[21] Lyew MA, Gamblin TC, Ayoub M. Systemic anaphylaxis associated with intramammary isosulfan blue injection used for sentinel node detection under general anesthesia. Anesthesiology 2000;93:1145–6.

[22] Kuerer HM, Wayne JD, Ross MI. Anaphylaxis during breast cancer lymphatic mapping. Surgery 2001;129:119–20.

[23] Montgomery LL, Thorne AC, Van Zee KJ, et al. Isosulfan blue dye reactions during sentinel lymph node mapping for breast cancer. Anesth Analg 2002;95:385–8.

[24] Simmons RM, Smith SM, Osborne MP. Methylene blue dye as an alternative to isosulfan blue dye for sentinel lymph node localization. Breast J 2001;7(3):181–3.

[25] Simmons R, Thevarajah S, Brennan M, et al. Methylene blue dye as an alternative to isosulfan blue dye for sentinel lymph node localization. Ann Surg Oncol 2003;10(3):242–7.

[26] Blessing W, Stolier A, Teng S, et al. A comparison of methylene blue and lymphazurin in breast cancer sentinel node mapping. Am J Surg 2002;184:341–5.

[27] Kim T, Agboola O, Lyman G. Lymphatic mapping and sentinel lymph node sampling in breast cancer. Presented at the Proceedings of the American Society of Clinical Oncology 2002 Annual Symposium. 2002.

[28] Linehan DC, Hill AD, Tran KN, et al. Sentinel lymph node biopsy in breast cancer: unfiltered radioisotope is superior to filtered. J Am Coll Surg 1999;188(4):377–81.

[29] Borgstein PJ, Meijer S, Pijpers R. Intradermal blue dye to identify sentinel lymph node in breast cancer. Lancet 1997;349(9066):1668–9.

[30] Martin RC, Derossis AM, Fey J, et al. Intradermal isotope injection is superior to intramammary in sentinel node biopsy for breast cancer. Surgery 2001;130(3):432–8.

[31] Shen P, Glass EC, DiFronzo LA, et al. Dermal versus intraparenchymal lymphoscintigraphy of the breast. Ann Surg Oncol 2001;8(3):241–8.

[32] Klimberg VS, Rubio IT, Henry R, et al. Subareolar versus peri-tumoral injection for location of the sentinel lymph node. Ann Surg 1999;229(6):860–4 [discussion: 64–5].

[33] Beitsch PD, Clifford E, Whitworth P, et al. Improved lymphatic mapping technique for breast cancer. Breast J 2001;7(4):219–23.

[34] Kern KA. Sentinel lymph node mapping in breast cancer using subareolar injection of blue dye. J Am Coll Surg 1999;189:539–45.

[35] Kern KA. Breast lymphatic mapping using subareolar injections of blue dye and radiocolloid: illustrated technique. J Am Coll Surg 2001;192:545–50.

[36] Tousimis E, Van Zee KJ, Fey JV, et al. The accuracy of sentinel lymph node biopsy in multicentric and multifocal invasive breast cancers. J Am Coll Surg 2003;197(4):529–35.

[37] Haigh PI, Hansen NM, Giuliano AE, et al. Factors affecting sentinel node localization during preoperative breast lymphoscintigraphy. J Nucl Med 2000;41(10):1682–8.

[38] McMasters KM, Wong SL, Tuttle TM, et al. Preoperative lymphoscintigraphy for breast cancer does not improve the ability to identify axillary sentinel lymph nodes. Ann Surg 2000;231(5):724–31.

[39] Borgstein PJ, Pijpers R, Comans EF, et al. Sentinel lymph node biopsy in breast cancer: guidelines and pitfalls of lymphoscintigraphy and gamma probe detection. J Am Coll Surg 1998;186(3):275–83.

[40] Winchester DJ, Sener SF, Winchester DP, et al. Sentinel lymphadenectomy for breast cancer: experience with 180 consecutive patients: efficacy of filtered technetium 99m sulphur colloid with overnight migration time. J Am Coll Surg 1999;188(6):597–603.

[41] McCarter MD, Yeung H, Yeh S, et al. Localization of the sentinel node in breast cancer: identical results with same-day and day-before isotope injection. Ann Surg Oncol 2001; 8(8):682–6.

[42] Solorzano CC, Ross MI, Delpassand E, et al. Utility of breast sentinel lymph node biopsy using day-before-surgery injection of high-dose 99mTc-labeled sulfur colloid. Ann Surg Oncol 2001;8:821–7.

[43] Wilke LG, Giuliano A. Sentinel lymph node biopsy in patients with early-stage breast cancer: status of the national clinical trials. Surg Clin North Am 2003;83(4):901–10.

[44] American College of Surgeons Oncology Group. ACOSOG Z11 protocol. Available at: https://www.acosog.org/studies/organ_site/breast/archives/2004.jsp. Accessed April 3, 2007.

[45] Mamounas EP, Cohen L, Cohen A. Sentinel lymph node biopsy after neoadjuvant systemic therapy for breast cancer. Surg Clin North Am 2003;83(4):931–42.

[46] Breslin TM, Cohen L, Sahin A, et al. Sentinel lymph node biopsy is accurate after neoadjuvant chemotherapy for breast cancer. J Clin Oncol 2000;18(20):3480–6.

[47] Balch GC, Mithani SK, Richards KR, et al. Lymphatic mapping and sentinel lymphadenectomy after preoperative therapy for stage II and III breast cancer. Ann Surg Oncol 2003; 10(6):616–21.

# EXHIBIT G

**LYMPHAZURIN- isosulfan blue injection, solution**
**UNITED STATES SURGICAL CORPORATION**

----------

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use LYMPHAZURIN safely and effectively. See full prescribing information for LYMPHAZURIN.**

**LYMPHAZURIN injection, solution for subcutaneous use**
**Initial U.S. Approval: 1981**

---------------------------------------- **RECENT MAJOR CHANGES** --------------------------------------------
Warnings and Precautions, Interference with Oxygen Saturation and Methemoglobin Measurements (5.3). 10/2007

-------------------------------------- **INDICATIONS AND USAGE** --------------------------------------------
Lymphazurin™ 1% (isosulfan blue) upon subcutaneous administration, delineates the lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; lymph node response to therapeutic modalities (1.1).

----------------------------------- **DOSAGE AND ADMINISTRATION** --------------------------------------------
Lymphazurin™ 1% is to be administered subcutaneously, one-half (1/2) ml into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 ml (30 mg) isosulfan blue is, therefore, injected (2.1).

--------------------------------- **DOSAGE FORMS AND STRENGTHS** --------------------------------------------
1% aqueous solution (isosulfan blue) (3)

--------------------------------------- **CONTRAINDICATIONS** -------------------------------------------------
Hypersensitivity to triphenylmethane or related compounds (4).

--------------------------------- **WARNINGS AND PRECAUTIONS** -----------------------------------------------
- Life-threatening anaphylactic reactions have occurred after Lymphazurin 1% administration. Monitor patients closely for at least 60 minutes after administration of Lymphazurin 1% (5.1).
- The admixture of Lymphazurin 1% with local anesthetics results in an immediate precipitation of 4-9% drug complex. Use a separate syringe for anesthetics (5.2).
- Lymphazurin 1% interferes with measurements in peripheral blood pulse oximetry. Arterial blood gas analysis may be needed (5.3).

--------------------------------------- **ADVERSE REACTIONS** -------------------------------------------------
*Hypersensitivity reactions*: Hypersensitivity reactions occurring approximately 2% of patients and include life-threatening anaphylactic reactions with respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following IV administration of a similar compound (6).

**To report SUSPECTED ADVERSE REACTIONS, contact U.S. Surgical at 1-800-522-0263 option 5 and website or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch**

--------------------------------------- **DRUG INTERACTIONS** -------------------------------------------------
No drug interactions have been identified for Lymphazurin 1% (7).

----------------------------------- **USE IN SPECIFIC POPULATIONS** -------------------------------------------
- Caution should be exercised when Lymphazurin 1% is administered to nursing mothers (8.3).
- Safety and effectiveness of Lymphazurin 1% in children has not been established (8.4).

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 1/2012**

**FULL PRESCRIBING INFORMATION: CONTENTS***
**RECENT MAJOR CHANGES**
**1 INDICATIONS AND USAGE**
   1.1 Lymphatic Vessel Delineation
**2 DOSAGE AND ADMINISTRATION**

2.1 Subcutaneous administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
5.1 Hypersensitivity Reactions
5.2 Precipitation of Lymphazurin 1% by Lidocaine
5.3 Interference with Oxygen Saturation and Methemoglobin Measurements
**6 ADVERSE REACTIONS**
6.1 Postmarketing Experience
**7 DRUG INTERACTIONS**
**8 USE IN SPECIFIC POPULATIONS**
8.3 Nursing Mothers
8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
12.2 Pharmacodynamics
12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
13.2 Teratogenic Effects
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**
\* Sections or subsections omitted from the full prescribing information are not listed.

---

**FULL PRESCRIBING INFORMATION**

## 1 INDICATIONS AND USAGE

### 1.1 Lymphatic Vessel Delineation

Lymphazuirn™ 1% (isosulfan blue) upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

## 2 DOSAGE AND ADMINISTRATION

### 2.1 Subcutaneous administration

Lymphazurin™ 1% is to be administered subcutaneously, one-half (1/2) ml into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 ml (30 mg) isosulfan blue is, therefore, injected.

## 3 DOSAGE FORMS AND STRENGTHS

1% aqueous solution (isosulfan blue)

## 4 CONTRAINDICATIONS

Lymphazurin™ 1% (isosulfan blue) is contraindicated in those individuals with known hypersensitivity to triphenylmethane or related compounds.

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Hypersensitivity Reactions

Life-threatening anaphylactic reactions (respiratory distress, shock, angioedema) have occurred after Lymphazurin 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of Lymphazurin 1%. Trained personnel should be available to administer emergency care including resuscitation.

### 5.2 Precipitation of Lymphazurin 1% by Lidocaine

The admixture of Lymphazurin 1% (with local anesthetics (i.e. lidocaine)) in the same syringe results in an immediate precipitation of $4 - 9\%$ drug complex. Use a separate syringe to administer a local anesthetic.

### 5.3 Interference with Oxygen Saturation and Methemoglobin Measurements

Lymphazurin 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by four hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Lymphazurin 1% may also cause falsely elevated readings of methemoglobin by arterial blood gas analyzer. Therefore, co-oximetry may be needed to verify methemoglobin level.

## 6 ADVERSE REACTIONS

### 6.1 Postmarketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life-threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following administration of a similar compound employed to estimate the depth of a severe burn. Reactions are more likely to occur in patients with a personal or family history of bronchial asthma, significant allergies, drug reactions or previous reactions to triphenylmethane dyes [see Warnings and Precautions (5)].

Laboratory tests: Lymphazurin 1% interferes with measurements of oxygen saturation by pulse oximetry and of methemoglobin by gas analyzer [see Warnings and Precautions (5)].

Skin: transient or long-term (tattooing) blue coloration.

## 7 DRUG INTERACTIONS

No Drug Interactions have been identified with Lymphazurin 1%.

## 8 USE IN SPECIFIC POPULATIONS

## 8.3 Nursing Mothers

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when Lymphazurin™ 1% (isosulfan blue) is administered to a nursing mother.

## 8.4 Pediatric Use

Safety and effectiveness of Lymphazurin™ 1% (isosulfan blue) in children have not been established.

## 10 OVERDOSAGE

Do not exceed indicated recommended dosage as overdosage levels have not been identified for Lymphazurin 1%.

## 11 DESCRIPTION

The chemical name of Lymphazurin 1% (isosulfan blue) is N-[4-[[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylehananamunium hydroxide, inner salt, sodium salt. Its structural formula is:



Lymphazurin 1% is a sterile aqueous solution for subcutaneous administration. Phosphate buffer in sterile, pyrogen free water is added in sufficient quantity to yield a final pH of 6.8-7.4. Each ml of solution contains 10 mg Isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate. The solution contains no preservative. Lymphazurin 1% is a contrast agent for the delineation of lymphatic vessels.

## 12 CLINICAL PHARMACOLOGY

## 12.2 Pharmacodynamics

Following subcutaneous administration, Lymphazurin 1% binds to serum proteins and is picked up by the lymphatic vessels. Thus, the lymphatic vessels are delineated by the blue dye.

## 12.3 Pharmacokinetics

Up to 10% of the subcutaneously administered dose of Lymphazurin 1% is excreted unchanged in the urine in 24 hours in human.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of Lymphazurin 1%. Reproduction studies in animals have not been conducted and, therefore, it is unknown if a problem concerning mutagenesis or impairment of fertility in either males or females exists.

### 13.2 Teratogenic Effects

Pregnancy Category C. Animal reproduction studies have not been conducted with Lymphazurin 1%. It is not known whether Lymphazurin 1% can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Lymphazurin 1% should be given to a pregnant woman only if clearly needed.

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Lymphazurin 1% is supplied as a 5 ml single dose vial, 1% aqueous solution in a phosphate buffer prepared by appropriate manufacturing to be sterile and pyrogen-free.

## 17 PATIENT COUNSELING INFORMATION

Inform patients that urine color may be blue for 24 hours following administration of Lymphazurin 1%.

## PRINCIPAL DISPLAY PANEL

**D.I.N. 00592358**
**NDC 63261-250-21 LYM-100**
**LYMPHAZURIN* 1%**
(isosulfan blue) Single Dose Vial 5 ml.

Mfd. for United States Surgical, a division of
Tyco Healthcare Group LP,
Norwalk, CT 06856 USA.

by Ben Venue Labs, Inc., Bedford, OH 44146 USA

Distributed in Canada by: Tyco Healthcare
Montreal, Quebec
Canada, H9R 5H8



# LYMPHAZURIN
isosulfan blue injection, solution

## Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:63261-250 |
|---|---|---|---|
| Route of Administration | SUBCUTANEOUS | | |

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| ISOSULFAN BLUE (UNII: 39N9K8S2A4) (ISOSULFAN BLUE – UNII:39N9K8S2A4) | ISOSULFAN BLUE | 10 mg in 1 mL |

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| SODIUM PHOSPHATE, DIBASIC, ANHYDROUS (UNII: 22ADO53M6F) | |
| POTASSIUM PHOSPHATE, MONOBASIC (UNII: 4J9FJ0HL51) | |
| WATER (UNII: 059QF0KO0R) | |

## Product Characteristics

| Color | blue | Score | |
|---|---|---|---|
| Shape | | Size | |
| Flavor | | Imprint Code | |
| Contains | | | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:63261-250-21 | 5 mL in 1 VIAL, SINGLE-USE | | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| NDA | NDA018310 | 01/12/2012 | |

## Labeler - UNITED STATES SURGICAL CORPORATION (044680650)

## Establishment

| Name | Address | ID/FEI | Business Operations |
|---|---|---|---|
| BEN VENUE LABORATORIES, INC. | | 004327953 | manufacture |

## Establishment

| Name | Address | ID/FEI | Business Operations |
|---|---|---|---|

| SIGMA-ALDRICH CO LTD | | 397924143 | api manufacture |

Revised: 1/2012                  UNITED STATES SURGICAL CORPORATION

# EXHIBIT H

```
[Federal Register Volume 80, Number 21 (Monday, February 2, 2015)]
[Notices]
[Pages 5560-5561]
From the Federal Register Online via the Government Publishing Office [www.gpo.gov]
[FR Doc No: 2015-01859]


-----------------------------------------------------------------------

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration

[Docket No. FDA-2015-N-0175]


Determination That LYMPHAZURIN (Isosulfan Blue) Injectable and
Other Drug Products Were Not Withdrawn From Sale for Reasons of Safety
or Effectiveness

AGENCY: Food and Drug Administration, HHS.

ACTION: Notice.

-----------------------------------------------------------------------

SUMMARY: The Food and Drug Administration (FDA or Agency) has
determined that the drug products listed in this document were not
withdrawn from sale for reasons of safety or effectiveness. This
determination means that FDA will not begin procedures to withdraw
approval of abbreviated new drug applications (ANDAs) that refer to
these drug products, and it will allow FDA to continue to approve ANDAs
that refer to the products as long as they meet relevant legal and
regulatory requirements.

FOR FURTHER INFORMATION CONTACT: Amy Hopkins, Center for Drug
Evaluation and Research, Food and Drug Administration, 10903 New
Hampshire Ave., Bldg. 51, Rm. 6223, Silver Spring, MD 20993-0002, 301-
796-5418, Amy.Hopkins@fda.hhs.gov.

SUPPLEMENTARY INFORMATION: In 1984, Congress enacted the Drug Price
Competition and Patent Term Restoration Act of 1984 (Pub. L. 98-417)
(the 1984 amendments), which authorized the approval of duplicate
versions of drug products approved under an ANDA procedure. ANDA
applicants must, with certain exceptions, show that the drug for which
they are seeking approval contains the same active ingredient in the
same strength and dosage form as

[[Page 5561]]

the ``listed drug,'' which is a version of the drug that was previously
approved. ANDA applicants do not have to repeat the extensive clinical
testing otherwise necessary to gain approval of a new drug application
(NDA).
    The 1984 amendments include what is now section 505(j)(7) of the
Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(j)(7)), which
requires FDA to publish a list of all approved drugs. FDA publishes
this list as part of the ``Approved Drug Products With Therapeutic
Equivalence Evaluations,'' which is generally known as the ``Orange
Book.'' Under FDA regulations, a drug is removed from the list if the
Agency withdraws or suspends approval of the drug's NDA or ANDA for
reasons of safety or effectiveness or if FDA determines that the listed
drug was withdrawn from sale for reasons of safety or effectiveness (21
CFR 314.162).
```

AURO ISO 00189955
Appx1565

Under Sec. 314.161(a) (21 CFR 314.161(a)), the Agency must determine whether a listed drug was withdrawn from sale for reasons of safety or effectiveness: (1) Before an ANDA that refers to that listed drug may be approved, (2) whenever a listed drug is voluntarily withdrawn from sale and ANDAs that refer to the listed drug have been approved, and (3) when a person petitions for such a determination under 21 CFR 10.25(a) and 10.30. Section 314.161(d) provides that if FDA determines that a listed drug was withdrawn from sale for safety or effectiveness reasons, the Agency will initiate proceedings that could result in the withdrawal of approval of the ANDAs that refer to the listed drug.

FDA has become aware that the drug products listed in the table in this document are no longer being marketed. (As requested by the applicants, FDA withdrew approval of NDA 018310 for LYMPHAZURIN (isosulfan blue) Injectable in the Federal Register of December 5, 2014 (79 FR 72186) and NDA 020151 for EFFEXOR (venlafaxine HCl) Tablets in the Federal Register of July 19, 2013 (78 FR 43210).)

| Application No. | Drug | Applicant |
| --- | --- | --- |
| NDA 018310................. | LYMPHAZURIN (isosulfan blue) Injectable; Injection, 1%. | Covidien, 60 Middletown Ave., North Haven, CT 06473. |
| NDA 019966................. | TEMOVATE (clobetasol propionate) Solution; Topical, 0.05%. | Fougera Pharmaceuticals Inc., 1 Health Plaza, Bldg. 434, East Hanover, NJ 07936. |
| NDA 020151................. | EFFEXOR (venlafaxine hydrochloride (HCl)) Tablet; Oral, Equivalent to (EQ) 12.5 milligram (mg) Base; EQ 25 mg Base; EQ 37.5 mg Base; EQ 50 mg Base; EQ 75 mg Base; EQ 100 mg Base. | Wyeth Pharmaceuticals Inc., 235 East 42nd St., New York, NY 10017. |
| NDA 020214................. | ZEMURON (rocuronium bromide) Injectable; Injection 100 mg/10 milliliter (mL); 50 mg/5 mL; 10 mg/mL. | Organon USA Inc., 351 North Sunmeytown Pike, North Wales, PA 19454. |
| NDA 021040................. | PREFEST (estradiol; norgestimate) Tablet; Oral, 1 mg; 1 mg/0.09 mg. | Teva Branded Pharmaceutical Products R&D, Inc., 41 Moores Rd., P.O. Box 4011, Frazer, PA 19355. |
| NDA 021621................. | CHILDREN'S ZYRTEC ALLERGY (cetirizine HCl) and CHILDREN'S ZYRTEC HIVES RELIEF (cetirizine HCl) Chewable Tablet; Oral, 5 mg; 10 mg. | McNeil Consumer Healthcare, 7050 Camp Hill Rd., Fort Washington, PA 19034. |
| NDA 050783................. | PERIOSTAT (doxycycline hyclate) Tablet; Oral, EQ 20 mg Base. | Galderma Laboratories, L.P., 14501 North Freeway, Fort |

```
                                         Worth, TX 76177.
----------------------------------------------------------------
```

    FDA has reviewed its records and, under Sec. 314.161, has
determined that the drug products listed in this document were not
withdrawn from sale for reasons of safety or effectiveness.
Accordingly, the Agency will continue to list the drug products listed
in this document in the ``Discontinued Drug Product List'' section of
the Orange Book. The ``Discontinued Drug Product List'' identifies,
among other items, drug products that have been discontinued from
marketing for reasons other than safety or effectiveness.
    Approved ANDAs that refer to the NDAs listed in this document are
unaffected by the discontinued marketing of the products subject to
those NDAs. Additional ANDAs that refer to these products may also be
approved by the Agency if they comply with relevant legal and
regulatory requirements. If FDA determines that labeling for these drug
products should be revised to meet current standards, the Agency will
advise ANDA applicants to submit such labeling.

    Dated: January 26, 2015.
Leslie Kux,
Associate Commissioner for Policy.
[FR Doc. 2015-01859 Filed 1-30-15; 8:45 am]
BILLING CODE 4164-01-P

AURO_ISO 0018957

# EXHIBIT I

**ISOSULFAN BLUE- isosulfan blue injection, solution**
**Mylan Institutional LLC**

----------

## HIGHLIGHTS OF PRESCRIBING INFORMATION
**These highlights do not include all the information needed to use isosulfan blue injection 1% safely and effectively. See full prescribing information for isosulfan blue injection 1%.**

**Isosulfan Blue Injection 1%**
**Initial U.S. Approval: 1981**

------------------------------------------ RECENT MAJOR CHANGES ------------------------------------------
Warnings and Precautions, Interference with Oxygen Saturation and Methemoglobin Measurements (5.3). 10/2007

------------------------------------------ INDICATIONS AND USAGE ------------------------------------------
Isosulfan blue injection 1% upon subcutaneous administration, delineates the lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; lymph node response to therapeutic modalities (1.1).

------------------------------------------ DOSAGE AND ADMINISTRATION ------------------------------------------
Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected (2.1).

------------------------------------------ DOSAGE FORMS AND STRENGTHS ------------------------------------------
1% aqueous solution (isosulfan blue) (3)

------------------------------------------ CONTRAINDICATIONS ------------------------------------------
Hypersensitivity to triphenylmethane or related compounds (4).

------------------------------------------ WARNINGS AND PRECAUTIONS ------------------------------------------

- Life threatening anaphylactic reactions have occurred after isosulfan blue injection 1% administration. Monitor patients closely for at least 60 minutes after administration of isosulfan blue injection 1% (5.1).
- The admixture of isosulfan blue injection 1% with local anesthetics results in an immediate precipitation of 4% to 9% drug complex. Use a separate syringe for anesthetics (5.2).
- Isosulfan blue injection 1% interferes with measurements in peripheral blood pulse oximetry. Arterial blood gas analysis may be needed (5.3).

------------------------------------------ ADVERSE REACTIONS ------------------------------------------
*Hypersensitivity Reactions:* Hypersensitivity reactions occur in approximately 2% of patients and include life threatening anaphylactic reactions with respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following IV administration of a similar compound (6).

**To report SUSPECTED ADVERSE REACTIONS, contact Mylan Pharmaceuticals Inc. at 1-877-446-3679 (1-877-4-INFO-RX) or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

------------------------------------------ DRUG INTERACTIONS ------------------------------------------
No drug interactions have been identified for isosulfan blue injection 1% (7).

------------------------------------------ USE IN SPECIFIC POPULATIONS ------------------------------------------

- Caution should be exercised when isosulfan blue injection 1% is administered to nursing mothers (8.3).
- Safety and effectiveness of isosulfan blue injection 1% in children has not been established (8.4).

**See 17 for PATIENT COUNSELING INFORMATION.**

**Revised: 1/2013**

---

# FULL PRESCRIBING INFORMATION: CONTENTS*
# 1 INDICATIONS AND USAGE
  1.1 Lymphatic Vessel Delineation
# 2 DOSAGE AND ADMINISTRATION

2.1 Subcutaneous administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
5.1 Hypersensitivity Reactions
5.2 Precipitation of Isosulfan Blue Injection 1% by Lidocaine
5.3 Interference with Oxygen Saturation and Methemoglobin Measurements
**6 ADVERSE REACTIONS**
6.1 Post-Marketing Experience
**7 DRUG INTERACTIONS**
**8 USE IN SPECIFIC POPULATIONS**
8.3 Nursing Mothers
8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
12.2 Pharmacodynamics
12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
13.2 Teratogenic Effects
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**
\* Sections or subsections omitted from the full prescribing information are not listed.

---

## FULL PRESCRIBING INFORMATION

## 1 INDICATIONS AND USAGE

### 1.1 Lymphatic Vessel Delineation

Isosulfan blue injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

## 2 DOSAGE AND ADMINISTRATION

### 2.1 Subcutaneous administration

Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected.

## 3 DOSAGE FORMS AND STRENGTHS

1% aqueous solution (isosulfan blue)

## 4 CONTRAINDICATIONS

Isosulfan blue injection 1% is contraindicated in those individuals with known hypersensitivity to triphenylmethane or related compounds.

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Hypersensitivity Reactions

Life threatening anaphylactic reactions (respiratory distress, shock, angio-edema) have occurred after isosulfan blue injection 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue injection 1%. Trained personnel should be available to administer emergency care including resuscitation.

### 5.2 Precipitation of Isosulfan Blue Injection 1% by Lidocaine

The admixture of isosulfan blue injection 1% (with local anesthetics (i.e. lidocaine)) in the same syringe results in an immediate precipitation of 4% to 9% drug complex. Use a separate syringe to administer a local anesthetic.

### 5.3 Interference with Oxygen Saturation and Methemoglobin Measurements

Isosulfan blue injection 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by 4 hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan blue injection 1% may also cause falsely elevated readings of methemoglobin by arterial blood gas analyzer. Therefore, cooximetry may be needed to verify methemoglobin level.

## 6 ADVERSE REACTIONS

### 6.1 Post-Marketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following administration of a similar compound employed to estimate the depth of a severe burn. Reactions are more likely to occur in patients with a personal or family history of bronchial asthma, significant allergies, drug reactions or previous reactions to triphenylmethane dyes *[see Warnings and Precautions (5)]*.

Laboratory Tests: Isosulfan blue injection 1% interferes with measurements of oxygen saturation by pulse oximetry and of methemoglobin by gas analyzer *[see Warnings and Precautions (5)]*.

Skin: transient or long-term (tattooing) blue coloration.

## 7 DRUG INTERACTIONS

No drug interactions have been identified with isosulfan blue injection 1%.

## 8 USE IN SPECIFIC POPULATIONS

### 8.3 Nursing Mothers

It is not known whether this drug is excreted in human milk.

Because many drugs are excreted in human milk, caution should be exercised when isosulfan blue

injection 1% is administered to a nursing mother.

## 8.4 Pediatric Use

Safety and effectiveness of isosulfan blue injection 1% in children have not been established.

## 10 OVERDOSAGE

Do not exceed indicated recommended dosage as overdosage levels have not been identified for isosulfan blue injection 1%.

## 11 DESCRIPTION

The chemical name of isosulfan blue injection 1% is N-[4- [[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium hydroxide, inner salt, sodium salt. Its structural formula is:

**ISOSULFAN BLUE**



Isosulfan blue injection 1% is a sterile aqueous solution for subcutaneous administration. Phosphate buffer in sterile, pyrogen free water is added in sufficient quantity to yield a final pH of 6.8 to 7.4. Each mL of solution contains 10 mg isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate. The solution contains no preservative. Isosulfan blue injection 1% is a contrast agent for the delineation of lymphatic vessels.

## 12 CLINICAL PHARMACOLOGY

### 12.2 Pharmacodynamics

Following subcutaneous administration, isosulfan blue injection 1% binds to serum proteins and is picked up by the lymphatic vessels. Thus, the lymphatic vessels are delineated by the blue dye.

### 12.3 Pharmacokinetics

Up to 10% of the subcutaneously administered dose of isosulfan blue injection 1% is excreted unchanged in the urine in 24 hours in humans.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

    AURO_ISO 0018912

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of isosulfan blue injection 1%. Reproduction studies in animals have not been conducted and, therefore, it is unknown if a problem concerning mutagenesis or impairment of fertility in either males or females exists.

## 13.2 Teratogenic Effects

Pregnancy Category C. Animal reproduction studies have not been conducted with isosulfan blue injection 1%. It is not known whether isosulfan blue injection 1% can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Isosulfan blue injection 1% should be given to a pregnant woman only if clearly needed.

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Isosulfan blue injection 1% is supplied as a 5 mL single-use vial, 1% aqueous solution in a phosphate buffer prepared by appropriate manufacturing to be sterile and pyrogen-free.

**Mylan Institutional LLC**
NDC 67457-220-05
5 mL single-use vials

**NOVAPLUS®**
NDC 67457-259-05
5 mL single-use vials

N+ and NOVAPLUS are registered trademarks of Novation, LLC.

**Storage:** Vials should be stored at **20° to 25°C (68° to 77°F). [See USP Controlled Room Temperature.] Avoid excessive heat.**

## 17 PATIENT COUNSELING INFORMATION

Inform patients that urine color may be blue for 24 hours following administration of isosulfan blue injection 1%.

Manufactured for:
**Mylan Institutional LLC**
Rockford, IL 61103 U.S.A.

Manufactured by:
**Afton Scientific, LLC**
2020 Avon Court
Charlottesville, VA 22902

REVISED JANUARY 2013
MI:ISOSIJ:R2

**PRINCIPAL DISPLAY PANEL - 50 mg/5 mL**

**NDC 67457-220-05**

**Isosulfan Blue
Injection 1%**

**50 mg/5 mL**
(10 mg/mL)

**For Lymphography**

**For Subcutaneous Use Only**

**Rx only    6 x 5 mL Single-Use Vials**

Sterile. Non-Pyrogenic. Single-Dose Container.
Contains no preservatives.
Not for Multiple-Use.
Discard Unused Portion.

**Each mL contains:**
Isosulfan Blue . . . . . . . . . . . . . . . . . . . . . . . . 10 mg
Sodium monohydrogen phosphate . . . . . . . 6.6 mg
Potassium dihydrogen phosphate . . . . . . . . 2.7 mg

**Consult Accompanying Prescribing Information
Before Administering Drug.**

**Store at 20° to 25°C (68° to 77°F). [See USP
Controlled Room Temperature.]**

**Avoid excessive heat.**

**MI:220:6C:R2**

Manufactured for:
**Mylan Institutional LLC**
Rockford, IL 61103 U.S.A.
Made in U.S.A.

**Mylan.com**



**PRINCIPAL DISPLAY PANEL - 50 mg/5 mL**

**NDC 67457-259-05**

**Rx only**

**Isosulfan Blue**
**Injection 1%**

**For Lymphography**

**For Subcutaneous Use Only    6 x 5 mL Single-Use Vials**

50 mg per 5 mL (10 mg per mL)

N+ and NOVAPLUS are registered trademarks of Novation, LLC.

**NOVAPLUS®**

Sterile. Non-Pyrogenic. Single Dose Container.

Contains no preservatives.

Not for Multiple-Use.

Discard Unused Portion.

**Each mL contains:**

Isosulfan Blue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10 mg

Sodium monohydrogen phosphate . . . . . . . . . . . 6.6 mg

Potassium dihydrogen phosphate . . . . . . . . . . . . 2.7 mg

**Consult Accompanying Prescribing Information Before**

**Administering Drug.**

**Store at 20° to 25°C (68° to 77°F). [See USP Controlled**

**Room Temperature.]**

**Avoid excessive heat.**

MI:259:6C:R2

Manufactured for:
**Mylan Institutional LLC**
Rockford, IL 61103 U.S.A.

Made in U.S.A.



# ISOSULFAN BLUE

isosulfan blue injection, solution

## Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:67457-220 |
|---|---|---|---|
| Route of Administration | SUBCUTANEOUS | | |

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| ISOSULFAN BLUE (UNII: 39N9K8S2A4) (ISOSULFAN BLUE INNER SALT - UNII:NS6Q291771) | ISOSULFAN BLUE | 10 mg in 1 mL |

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| WATER (UNII: 059QF0KO0R) | |
| SODIUM PHOSPHATE, MONOBASIC, MONOHYDRATE (UNII: 593YOG76RN) | 6.6 mg in 1 mL |
| POTASSIUM PHOSPHATE, MONOBASIC (UNII: 4J9FJ0HL51) | 2.7 mg in 1 mL |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:67457-220-05 | 6 in 1 CARTON | | |

| 1 | NDC:67457-220-00 | 5 mL in 1 VIAL, GLASS; Type 0: Not a Combination Product | | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA090874 | 03/14/2013 | |

## ISOSULFAN BLUE
isosulfan blue injection, solution

### Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:67457-259 |
|---|---|---|---|
| Route of Administration | SUBCUTANEOUS | | |

### Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| ISOSULFAN BLUE (UNII: 39N9K8S2A4) (ISOSULFAN BLUE INNER SALT - UNII:NS6Q291771) | ISOSULFAN BLUE | 10 mg in 1 mL |

### Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| WATER (UNII: 059QF0KO0R) | |
| SODIUM PHOSPHATE, MONOBASIC, MONOHYDRATE (UNII: 593YOG76RN) | 6.6 mg in 1 mL |
| POTASSIUM PHOSPHATE, MONOBASIC (UNII: 4J9FJ0HL51) | 2.7 mg in 1 mL |

### Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:67457-259-05 | 6 in 1 CARTON | | |
| 1 | NDC:67457-259-00 | 5 mL in 1 VIAL, GLASS; Type 0: Not a Combination Product | | |

### Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA090874 | 03/14/2013 | |

## Labeler - Mylan Institutional LLC (790384502)

# EXHIBIT J

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use ISOSULFAN BLUE INJECTION safely and effectively. See full prescribing information for ISOSULFAN BLUE INJECTION.**

**ISOSULFAN BLUE injection, for subcutaneous use only**
**Initial U.S. Approval: 1981**

------------------**INDICATIONS AND USAGE**------------------
Isosulfan blue injection 1% upon subcutaneous administration, delineates the lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax; lymph node involvement by primary or secondary neoplasm; lymph node response to therapeutic modalities (1.1).

-----------**DOSAGE AND ADMINISTRATION**-----------
Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected (2.1).

-----------**DOSAGE FORMS AND STRENGTHS**-----------
1% aqueous solution (isosulfan blue) (3)

-----------**CONTRAINDICATIONS**-----------
Hypersensitivity to triphenylmethane or related compounds (4).

-----------**WARNINGS AND PRECAUTIONS**-----------
● Life-threatening anaphylactic reactions have occurred after isosulfan blue 1% administration. Monitor patients closely for at least 60 minutes after administration of isosulfan blue 1% (5.1).

● The admixture of isosulfan blue 1% with local anesthetics results in an immediate precipitation of 4 to 9% drug complex. Use a separate syringe for anesthetics (5.2).
● Isosulfan blue 1% interferes with measurements in peripheral blood pulse oximetry. Arterial blood gas analysis may be needed (5.3).

-----------------**ADVERSE REACTIONS**-----------------
*Hypersensitivity Reactions*: Hypersensitivity reactions occurring approximately 2% of patients and include life-threatening anaphylactic reactions with respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following I.V. administration of a similar compound (6).

**To report SUSPECTED ADVERSE REACTIONS, contact AuroMedics Pharma LLC at 1-866-850-2876 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch.***

-----------------**DRUG INTERACTIONS**-----------------
No drug interactions have been identified for isosulfan blue 1% (7).

-----------**USE IN SPECIFIC POPULATIONS**-----------
● Caution should be exercised when isosulfan blue 1% is administered to nursing mothers (8.3).
● Safety and effectiveness of isosulfan blue 1% in children has not been established (8.4).

**See 17 for PATIENT COUNSELING INFORMATION.**
**Revised: 12/2015**

---

**FULL PRESCRIBING INFORMATION:**
**CONTENTS\***
**1 INDICATIONS AND USAGE**
1.1 Lymphatic Vessel Delineation
**2 DOSAGE AND ADMINISTRATION**
2.1 Subcutaneous administration
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
5.1 Hypersensitivity Reactions
5.2 Precipitation of Isosulfan Blue 1% by Lidocaine
5.3 Interference with Oxygen Saturation and Methemoglobin Measurements
**6 ADVERSE REACTIONS**
6.1 Postmarketing Experience
**7 DRUG INTERACTIONS**

**8 USE IN SPECIFIC POPULATIONS**
8.3 Nursing Mothers
8.4 Pediatric Use
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
12.2 Pharmacodynamics
12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
13.2 Teratogenic Effects
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**
\* Sections or subsections omitted from the full prescribing information are not listed.

---

**FULL PRESCRIBING INFORMATION**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

AURO_ISO 0003658

AURO_ISO 0020415

# 1 INDICATIONS AND USAGE

## 1.1 Lymphatic Vessel Delineation

Isosulfan blue injection 1% upon subcutaneous administration, delineates lymphatic vessels draining the region of injection. It is an adjunct to lymphography in: primary and secondary lymphedema of the extremities; chyluria, chylous ascites or chylothorax, lymph node involvement by primary or secondary neoplasm; and lymph node response to therapeutic modalities.

# 2 DOSAGE AND ADMINISTRATION

## 2.1 Subcutaneous administration

Isosulfan blue injection 1% is to be administered subcutaneously, one-half (1/2) mL into three (3) interdigital spaces of each extremity per study. A maximum dose of 3 mL (30 mg) isosulfan blue is, therefore, injected.

# 3 DOSAGE FORMS AND STRENGTHS

1% aqueous solution (isosulfan blue)

# 4 CONTRAINDICATIONS

Isosulfan blue injection 1% is contraindicated in those individuals with known hypersensitivity to triphenylmethane or related compounds.

# 5 WARNINGS AND PRECAUTIONS

## 5.1 Hypersensitivity Reactions

Life-threatening anaphylactic reactions (respiratory distress, shock, angioedema) have occurred after isosulfan blue 1% administration. Reactions are more likely to occur in patients with a history of bronchial asthma, allergies, drug reactions or previous reactions to triphenylmethane dyes. Monitor patients closely for at least 60 minutes after administration of isosulfan blue 1%. Trained personnel should be available to administer emergency care including resuscitation.

## 5.2 Precipitation of Isosulfan Blue 1% by Lidocaine

The admixture of isosulfan blue 1% (with local anesthetics (i.e. lidocaine)) in the same syringe results in an immediate precipitation of 4 to 9% drug complex. Use a separate syringe to administer a local anesthetic.

## 5.3 Interference with Oxygen Saturation and Methemoglobin Measurements

Isosulfan blue 1% interferes with measurements of oxygen saturation in peripheral blood by pulse oximetry and can cause falsely low readings. The interference effect is maximal at 30 minutes and minimal generally by four hours after administration. Arterial blood gas analysis may be needed to verify decreased arterial partial pressure of oxygen.

Isosulfan blue 1% may also cause falsely elevated readings of methemoglobin by arterial blood gas analyzer. Therefore, co-oximetry may be needed to verify methemoglobin level.

# 6 ADVERSE REACTIONS

## 6.1 Postmarketing Experience

Hypersensitivity Reactions: Case series report an overall incidence of hypersensitivity reactions in approximately 2% of patients. Life-threatening anaphylactic reactions have occurred. Manifestations include respiratory distress, shock, angioedema, urticaria, pruritus. A death has been reported following administration of a similar compound employed to estimate the depth of a severe burn. Reactions are more likely to occur in patients with a personal or family history of bronchial asthma, significant allergies, drug reactions or previous reactions to triphenylmethane dyes *[see Warnings and Precautions (5)]*.

Laboratory Tests: Isosulfan blue 1% interferes with measurements of oxygen saturation by pulse oximetry and of methemoglobin by gas analyzer *[see Warnings and Precautions (5)]*.

Skin: transient or long-term (tattooing) blue coloration.

# 7 DRUG INTERACTIONS

No drug interactions have been identified with isosulfan blue 1%.

# 8 USE IN SPECIFIC POPULATIONS

## 8.3 Nursing Mothers

It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised when isosulfan blue 1% is administered to a nursing mother.

## 8.4 Pediatric Use

Safety and effectiveness of isosulfan blue 1% in children have not been established.

# 10 OVERDOSAGE

Do not exceed indicated recommended dosage as overdosage levels have not been identified for isosulfan blue 1%.

# 11 DESCRIPTION

The chemical name of isosulfan blue is N-[4-[[4-(diethylamino)phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium hydroxide, inner salt, sodium salt. Isosulfan blue is a greenish blue color hygroscopic powder. Its structural formula is:


Isosulfan Blue Chemical structure

Isosulfan blue injection 1% is a sterile, non-pyrogenic, aqueous dark blue color solution for subcutaneous administration. Phosphate buffer in water for injection is added in sufficient quantity to yield a final pH of 6.8 to 7.4. Each mL of solution contains 10 mg isosulfan blue, 6.6 mg sodium monohydrogen phosphate and 2.7 mg potassium dihydrogen phosphate. The solution contains no preservative. Isosulfan blue injection 1% is a contrast agent for the delineation of lymphatic vessels

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

AURO_ISO 0003660

AURO_ISO 0020417

## 12 CLINICAL PHARMACOLOGY

### 12.2 Pharmacodynamics

Following subcutaneous administration, isosulfan blue 1% binds to serum proteins and is picked up by the lymphatic vessels. Thus, the lymphatic vessels are delineated by the blue dye.

### 12.3 Pharmacokinetics

Up to 10% of the subcutaneously administered dose of isosulfan blue 1% is excreted unchanged in the urine in 24 hours in human.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of isosulfan blue 1%. Reproduction studies in animals have not been conducted and, therefore, it is unknown if a problem concerning mutagenesis or impairment of fertility in either males or females exists.

### 13.2 Teratogenic Effects

Pregnancy Category C. Animal reproduction studies have not been conducted with isosulfan blue 1%. It is not known whether isosulfan blue 1% can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Isosulfan blue 1% should be given to a pregnant woman only if clearly needed.

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Isosulfan blue injection 1% is a sterile, non-pyrogenic, aqueous dark blue color solution and is supplied as follows:

**Isosulfan blue injection 1%**

**50 mg per 5 mL (10 mg / mL):**
5 mL Single Dose Vials
in a Carton of 6                                    NDC 55150-240-05

**Store at** 20° to 25°C (68° to 77°F). [See USP Controlled Room Temperature]. Avoid excessive heat.

Discard Unused Portion.

The vial stoppers are not made with natural rubber latex.

## 17 PATIENT COUNSELING INFORMATION

Inform patients that urine color may be blue for 24 hours following administration of isosulfan blue injection

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

1%.

Manufactured for:
**AuroMedics Pharma LLC**
6 Wheeling Road
Dayton, NJ 08810

Manufactured by:
**Aurobindo Pharma Limited**
IDA, Pashamylaram - 502307
India

**PACKAGE LABEL-PRINCIPAL DISPLAY PANEL - 1% [50 mg per 5 mL (10 mg / mL)] - Container Label**

Rx only          NDC 55150-240-05
Isosulfan Blue
Injection 1%
50 mg per 5 mL
(10 mg / mL)
For Lymphography
For Subcutaneous Use Only
5 mL                    Single Dose Vial

PACKAGE LABEL-PRINCIPAL DISPLAY PANEL - 1% [50 mg per 5 mL (10 mg / mL)] - Container Label

**PACKAGE LABEL-PRINCIPAL DISPLAY PANEL - 1% [50 mg per 5 mL (10 mg / mL)] - Container-Carton (6 Vials)**

Rx only          NDC 55150-240-05
Isosulfan Blue
Injection 1%
50 mg per 5 mL
(10 mg / mL)
For Lymphography
For Subcutaneous Use Only
Sterile                    6 X 5 mL
Non-Pyrogenic          Single Dose Vials
AUROMEDICS

PACKAGE LABEL-PRINCIPAL DISPLAY PANEL - 1% [50 mg per 5 mL (10 mg / mL)] - Container-Carton (6 Vials)

## ISOSULFAN BLUE
isosulfan blue injection, solution

### Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:55150-240 |
|---|---|---|---|
| Route of Administration | SUBCUTANEOUS | | |

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| ISOSULFAN BLUE (UNII: 39N9K8S2A4) (ISOSULFAN BLUE INNER SALT - UNII:NS6Q291771) | ISOSULFAN BLUE | 50 mg in 5 mL |

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| SODIUM PHOSPHATE, DIBASIC DIHYDRATE (UNII: 94255I6E2T) | |
| POTASSIUM PHOSPHATE, MONOBASIC (UNII: 4J9FJ0HL51) | |
| WATER (UNII: 059QF0KO0R) | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:55150-240-05 | 6 in 1 CARTON | | |
| 1 | | 5 mL in 1 VIAL; Type 0: Not a Combination Product | | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA206831 | 01/26/2016 | |

**Labeler -** AuroMedics Pharma LLC (968961354)

## Establishment

| Name | Address | ID/FEI | Business Operations |
|---|---|---|---|
| Aurobindo Pharma Limited | | 650498244 | ANALYSIS(55150-240) , MANUFACTURE(55150-240) |

Revised: 12/2015

AuroMedics Pharma LLC

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**REDACTED - CONFIDENTIAL**

**APPX1621-APPX1664**

# REDACTED - CONFIDENTIAL

# APPX3137-APPX3142

# EXHIBIT B

**REDACTED - CONFIDENTIAL**

**APPX3159-APPX3191**

# EXHIBIT C

**REDACTED - CONFIDENTIAL**

**APPX3195-APPX3211**

# Corrected Exhibit C

**REDACTED - CONFIDENTIAL**

**APPX3364**

**REDACTED - CONFIDENTIAL**

**APPX3381-APPX3403**

# EXHIBIT I

**REDACTED - CONFIDENTIAL**

**APPX3468-APPX3479**

**REDACTED - CONFIDENTIAL**

**APPX3615-APPX3627**

# EXHIBIT D

**REDACTED - CONFIDENTIAL**

**APPX3644-APPX3647**

**REDACTED – CONFIDENTIAL**

**APPX4099-APPX4122**

**REDACTED - CONFIDENTIAL**

**APPX4246-APPX4267**

**REDACTED - CONFIDENTIAL**

**APPX4280-APPX4381**

# EXHIBIT 1

**REDACTED – CONFIDENTIAL**

**APPX4394-APPX4468**

# EXHIBIT 8

Downloaded from www.ajronline.org by 66.28.245.208 on 06//17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

1061

# Use of Isosulfan Blue for Identification of Lymphatic Vessels: Experimental and Clinical Evaluation

Jerry I. Hirsch[1]
Jaime Tisnado
Shao-Ru Cho
Michael C. Beachley

Use of vital dyes for identification of lymphatic vessels before cannulation has heretofore not been approved by the Food and Drug Administration (FDA). The suitability of isosulfan blue, the 2,5 disulfonic acid isomer of Patent Blue, for this purpose was evaluated experimentally in the rat and clinically in 11 volunteers and 543 patients under an investigational new drug application. FDA approval for this drug has been obtained. Volunteers and patients received up to 15 mg of a 1% sterile, pyrogen-free solution per extremity (total dose of 0.4 mg/kg in the average patient). Excellent identification of lymphatic vessels was achieved in 100% of volunteers and in 97.4% of patients. In the other 2.6%, lymphatic vessels were not identified mainly due to congenital lymphatic vascular (Milroy) disease. Baseline blood chemistry in volunteers was not altered after administration of the dye. No adverse reactions were found in volunteers and minimal allergic reactions occurred in less than 1% of patients. Acute toxicity studies demonstrated an $LD_{50}$ greater than 150 mg/kg in the rat. Isosulfan blue was excreted unchanged in the urine (7%) and feces. Comparable excretion was found in volunteers. Isosulfan blue is a safe and efficacious vital dye for lymphangiography.

Lymphangiography remains a very useful diagnostic procedure [1–3]. We estimate that the number of lymphangiograms performed in the United States exceeds 30,000 per year.

Although some authors have performed lymphangiography without the aid of blue dyes [4], lymphatic cannulation, as usually performed in the United States since the early 1960s, requires the subcutaneous or intradermal administration of a vital blue dye into the interdigital web spaces of the extremity to be studied. Selective absorption of the dye by the lymphatics facilitates their identification.

It is widely known that dye materials unapproved by the Food and Drug Administration (FDA) are used for lymphangiography in clinical centers throughout the United States. Although no major problems have been reported, their clinical use may result in risk to the patient or liability to the radiologist.

We present our experimental and clinical experience with isosulfan blue* (adopted by the United States Adopted Name Council, June 13, 1979), a drug recently approved by the FDA for identifying the lymphatics during lymphangiography.

## Materials and Methods

### Preparation

Isosulfan blue is the monosodium salt of a 2,5 disulfonated triphenylmethane dye (fig. 1). The compound was prepared in high purity of 94.5% dye content of the 2,5 isomer as determined by high-pressure liquid chromatography. The remaining 5.5% consists of

Received May 24, 1982; accepted after revision August 23, 1982.

Presented at the annual meeting of the American Roentgen Ray Society, New Orleans, May 1982.

[1] All authors: Department of Radiology, Virginia Commonwealth University, Medical College of Virginia, Box 1, MCV Station, Richmond, VA 23298. Address reprint requests to J. I. Hirsch.

*AJR* 139:1061–1064, December 1982
0361–803X/82/1396–1061 $00.00
© American Roentgen Ray Society

* Commercial availability of isosulfan blue dosage form is tentatively scheduled for the autumn of 1982. For further information please contact author J. I. Hirsch.

HIRSCH ET AL. AJR:139, December 1982

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved



Fig. 1.—Structural formula of isosulfan blue.

C.I. No. 42051
C.I. FOOD BLUE 5
C.I. ACID BLUE 3
PATENT BLUE V

C.I. No. 42045
C.I. FOOD BLUE 3
C.I. ACID BLUE 1
PATENT BLUE VF
SULFAN BLUE

ALPHAZURINE - 2G®

Fig. 2.—Structural formulae of Alphazurine 2G, Patent VF, and Patent Blue V with synonyms.

closely related isomers produced during synthesis.

Isosulfan blue injection was prepared as a 1% solution. Phosphate buffer in sterile pyrogen-free water was used as diluent in sufficient quantity to yield a final pH of 6.8–7.5. The solution was subdivided into 5 ml single-dose vials, sterilized, and quality control performed.

### Phase I Preclinical Trials

*Acute Toxicity.* A 14 day acute toxicity study was performed in both genders of Sprague-Dawley rats. Rats were 5–6 weeks old on arrival, quarantined for 1 week, and allowed to grow to at least 200 g for females and 250 g for males. Ten animals of each gender were injected intravenously with the contents of one vial (5 ml) of isosulfan blue injection (1%) via the lateral tail vein. Three rats of each gender received an equivalent amount of diluent but no dye.

Mortality and gross signs of toxicity were evaluated twice daily. Body weights were determined before drug administration and again before necropsy on the final day of study. Animal behavior responses were monitored over the first 8 hr after administration of the drug and then daily.

All animals were sacrificed on day 14 of the study and gross necropsy was performed. Tissues were removed and fixed in 10% neutral buffered formalin. The tissues were sectioned at 6 $\mu$m and stained with hematoxylin and eosin.

*Pharmacology.* Three rats of each gender were studied for urinary excretion of the drug. Animals were injected subcutaneously with 0.5 ml isosulfan blue injection (1%) and housed separately in metabolic cages. Urine samples were collected daily for 3 days and evaluated spectrophotometrically for dye content. Determination of metabolites in urine was done by thin-layer chromatography. A 2 $\mu$l sample of urine was spotted on 250 $\mu$m silica gel plate, allowed to dry, and eluted with acetone:ammonium hydroxide:1-butanol:water (37:19:37:7).

### Phase II Clinical Trials

Clinical trials were conducted in 11 volunteer subjects. Six men and five women aged 22–32 years were studied. No pregnant or

lactating women or individuals with known hypersensitivity to triphenylmethane compounds were administered the drug. Permission from the Committee for the Conduct of Human Research at the Medical College of Virginia was obtained.

Volunteers received 30 mg (3 ml) of isosulfan blue injection (1%) administered subcutaneously. Local anesthetic was not admixed with the dye preparation. Five-tenths (0.5) ml was injected in three interdigital web spaces of each foot. Subjects were observed after the administration of the drug every 15 min for 3 hr and then daily for 2 weeks for adverse reactions and changes in vital signs or any other evidence of intolerance to the drug.

Venous blood samples were obtained before the administration of the drug and at 1, 24, and 48 hr after administration. Samples were analyzed by the Sequential Multiple Analyzer Computer (SMAC) system (Technicon Instrument Corp., Tarrytown, NY), Coulter-S, absolute eosinophils, white blood cell differential, and platelets. Total urine was collected daily for 2 days and dye excretion was measured.

Efficacy or the ability to identify the lymphatics through the intact skin was assessed by two independent radiologists. Lymphatics were scored as either adequately (+) or inadequately (−) identified about 10 min after the administration of the drug.

### Phase III Clinical Trials

Clinical trials were conducted in 543 patients (296 men, 247 women) referred for lymphangiography at 17 cooperative hospitals in the United States. Permission from respective Committees for the Conduct of Human Research was obtained. Patients received 1–3 ml of isosulfan blue injection (1%) per dose, administered subcutaneously, in the interdigital web spaces of the extremity to be studied. No local anesthetic was admixed with the dye preparation except in a few selected cases. Lymphatics were scored in the manner previously described.

### Results

### Phase I Toxicology and Pharmacology

All animals studied for acute toxicity demonstrated no adverse effects and all survived the 14 day period. At

**AURO_ISO 0018550**

Appx4525

Case: 17-1645     Document: 81     Page: 427     Filed: 03/29/2017

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

necropsy, no organ accumulation of the drug was seen. Gross pathology was normal except for slightly gray discoloration of the kidneys. However, kidneys did not exhibit any gross histopathologic changes and were essentially normal histologically. This study suggested that the acute LD$_{50}$ of isosulfan blue in the rat is greater than 150 mg/kg. This suggests that the average patient dose of 0.4 mg/kg has a safety factor of at least 375 times the animal toxic dose.

It was determined spectrophotometrically that up to 10% of the subcutaneously administered dose of isosulfan blue is excreted in the urine during the first 24 hr collection period. No drug could be detected in urine samples collected during subsequent time intervals. Urine samples subjected to thin-layer chromatography demonstrated a single spot equivalent to that of isosulfan blue. This suggests that the drug is excreted unchanged in the urine.

Feces from rats studied were found to be stained dark blue. Techniques for the determination of dye in fecal material are inaccurate and, therefore, none were performed. It was presumed that 90% of the isosulfan blue administered was excreted through the feces through biliary excretion.

### Phase II Clinical Trials

No adverse effects, changes in vital signs, or significant ($p < 0.05$) changes in blood chemistry were observed in any of the volunteers studied. All laboratory values were within normal limits at each time period.

A mean value of 7% of the administered dose was recovered in the urine from the initial 24 hr collection period. No measurable drug could be found within the 24–48 hr period. Subjects reported blue discoloration of feces as well.

Excellent identification of the lymphatics was achieved in all 11 subjects.

### Phase III Clinical Trials

Five (0.9%) of 543 patients studied had an adverse reaction within 15 min after administration of isosulfan blue. These reactions were all of a relatively mild allergic type. Patients received no or minimal symptomatic therapy and all recovered within 1 hr or less. Four of these reactions occurred in patients who received blue dye admixed with local anesthetic.

The 543 patients who received isosulfan blue injection were evaluated for identification of the lymphatics. Patients were divided into three groups according to the clinical indication for the lymphangiogram (table 1). Group 1 included patients with possible lymph node involvement by primary or secondary malignancy; group 2 included patients with possible primary lymphatic disease; and group 3 included patients with chyluria, chylous ascites, or chylothorax.

In group 1, 503 (99%) of 508 patients demonstrated excellent identification of the lymphatics. In five (1%) of 508 patients, inadequate identification was achieved. In retrospect, these five patients received less than the recommended 30 mg dosage of isosulfan blue which may have accounted for these results. In group 2, 19 (67.9%) of 28

TABLE 1: Identification of Lymphatics

| Group: Clinical Indication | No. Patients Studied | No. Patients in Whom Lymphatics were Identified (%) |
|---|---|---|
| 1: Possible lymph node involvement by primary or secondary malignancy | 508 | 503 (99.0) |
| 2: Possible primary lymphatic disease | 28 | 19 (67.9) |
| 3: Chyluria, chylous ascites, chylothorax | 7 | 7 (100.0) |
| Total | 543 | 529 (97.4) |

showed excellent identification of the lymphatics. The other nine patients without identification had evidence of primary vascular disease manifested by dermal backflow of the drug. All of these patients were found to have Milroy disease. In group 3, all seven patients had excellent lymphatic identification.

Overall, isosulfan blue injection (1%) improved identification of the lymphatics in 97.4% of patients. The failure of identification of the lymphatics in the other 2.6% can be mainly attributed to primary lymphatic vascular disease.

### Discussion

Blue dyes have been used since the early 1960s for the identification of lymphatics before lymphangiography. These dyes may be grouped into two categories: (1) miscellaneous blue dyes with questionable lymphatic selectivity, marketed before 1938, which have not been reviewed for safety and efficacy by the FDA (e.g., methylene blue, Evan's blue); and (2) the family of Patent Blue dyes providing selective lymphatic localization but not approved for human use by the FDA. The second category includes the triphenylmethane dyes Alphazurine 2G (Allied Chemical Corp., Morristown, NJ), Patent Blue VF, and Patent Blue V (fig. 2). The exact purity of these dyes and the impurities they contain may not be known and therefore, the nature and toxicity of the material is uncertain. Solutions prepared of these dyes may, therefore, be of variable concentration, sterility, pyrogenicity, and stability.

A 1% solution of isosulfan blue was chosen because of the work of Gangolli et al. [5] who described the relation between concentration of triphenylmethane dyes and subsequent tissue reaction after their subcutaneous administration. Dye concentration closely correlated with the severity of necrosis and type of connective tissue reaction that evolved. These reactions varied from no necrosis for a 1% solution to widespread necrosis for a 3% solution.

Complications of the use of blue dye during lymphangiography are uncommon but do occur. Several reports [6–13] of allergic reactions to blue dye have been published. The first report on adverse effects from Patent Blue during lymphangiography was published by Kopp in 1966 [14]. In his series, two patients suffered from anaphylactic reactions after an injection of 0.25 ml of an 11% solution of the dye. Both patients recovered. At the International Symposium on Lymphology (Zurich, 1966) general reports of adverse reactions to blue dyes used during lymphangiography were given [15]. A probable incidence of 1/1000 hypersensitivity

AURO_ISO 0018551

Downloaded from www.ajronline.org by 66.28.245.208 on 06/17/16 from IP address 66.28.245.208. Copyright ARRS. For personal use only; all rights reserved

reactions was concluded.

Koehler [16] compiled the incidence of complications associated with lymphangiography from a survey of individuals performing this study. From 32,000 examinations there were 57 (1:600) instances of hypersensitivity reactions to vital dyes. In 50 of these cases, either Patent Blue Violet or Alphazurine 2G was used. The hypersensitivity reactions ranged from hives to angioneurotic edema, with or without laryngospasm, to vasomotor collapse. In many instances, a local anesthetic was mixed with the vital blue; however, since this complication also occurred in patients who had negative skin reactions to the local anesthetic, it was suggested that the vital blue was the allergic component. The role of anesthetics mixed with dyes in these hypersensitivity reactions is not always elucidated; some authors believe that these agents may increase the frequency of adverse reactions [7, 8, 17].

Castellino et al. [17] identified Patent Blue as the causative agent for minor allergic complications in one patient and the possible cause in another two from their series of 659 lymphangiograms performed in children. An allergic manifestation incidence of 0.15%–0.5% attributable to Patent Blue may be derived.

In four of our cases, hypersensitivity reactions were associated with the administration of blue dye with a local anesthetic. Which of the two agents was responsible is not known. In the fifth patient who received blue dye alone, the reaction was due to the dye, so that the incidence of mild reactions is at least 0.2%, but could be as high as 1%. All reactions, however, were mild and of short duration.

The use of local anesthetics admixed with solutions of blue dye was first recommended by Wallace et al.[18] to minimize transitory pain which occurred when Evan's Blue dye was injected alone. This method was subsequently applied to the use of the triphenylmethane dye Alphazurine 2G [19]. Newton et al. [20] described a physicochemical instability of this admixture resulting in the formation of a sticky precipitate undesirable for administration to patients. Dye in amounts of 4% and 9% were found in a dye/anesthetic complex when solutions of lidocaine, unpreserved and preserved with 0.1% methylparaben, respectively, were used in the formulation of dosage forms.

Since the potential for drug hypersensitivity reactions and physicochemical incompatibility exists, the admixture of local anesthetics and blue dyes in the same syringe is not recommended. Furthermore, our patients reported good tolerance of the injection of isosulfan blue dye alone.

Isosulfan blue injection (1%) is a safe and efficacious drug for the identification of lymphatics during lymphangiography. FDA approval for human use has been obtained. Commercial introduction of this drug is forthcoming under the trade name Lymphazurin (1%).

## ACKNOWLEDGMENTS

Coinvestigators in the isosulfan blue study were Thomas A. Sos, New York Hospital–Cornell Medical Center, New York, NY; Michael A. Mertens, Georgetown University Medical Center, Washington, DC; Ronald L. McCartney, Hamot Medical Center, Erie, PA; Claire A. Beetlestone, Strong Memorial Hospital, Rochester, NY; Thomas P. James, Providence Hospital, Southfield, MI; Thomas E. Quinn, Orlando Regional Medical Center, Orlando, FL; Walter L. Grubb, Charlotte Memorial Hospital, Charlotte, NC; C. W. Reade, USPHS Hospital, Seattle, WA; Paul A. Richardson, St. Agnes Medical Center, Philadelphia, PA; Donald C. Jackson, Duke University Medical Center, Durham, NC. Coinvestigators in the Richmond, VA area were William E. Wheeler, St. Mary's Hospital; James J. Zelenak, Retreat for the Sick; William M. Fogel, Doctor's Hospital; William F. Proctor, St. Luke's Hospital; Maurice F. Mullins, Stuart Circle Hospital; Allen A. Frey, Johnston-Willis Hospital; and William R. Fields, VA Medical Center.

## REFERENCES

1. Zelch MG, Haaga JR. Clinical comparison of computed tomography and lymphangiography for detection of retroperitoneal lymphadenopathy. *Radiol Clin North Am* **1979**;17:157–168
2. Harell GS, Breiman RS, Glatstein EJ, Marshall WH, Castellino RA. Computed tomography of the abdomen in the malignant lymphomas. *Radiol Clin North Am* **1977**;15:391–400
3. Dunnick NR, Javadpour N. Value of CT and lymphography: distinguishing retroperitoneal metastases from nonseminomatous testicular tumors. *AJR* **1981**;136:1093–1099
4. Kapdi CC. Lymphography without the use of vital dyes. *Radiology* **1979**;133:795–796
5. Gangolli SD, Grasso P, Golberg L. Physical factors determining the early local tissue reactions produced by food colourings and other compounds injected subcutaneously. *Food Cosmet Toxicol* **1967**;5:601–621
6. Collard M, Collette JM. Les modalities cliniques de l'allergie au bleu patente violet. *J Belge Radiol* **1967**;50:407–410
7. von Sieber F. Zwischenfalle nach der subkutanen Installation von Patentblau zur Lymphographie. *Med Bild* **1968**;11:102–103
8. Sinclair DJ, Perera FA. Allergic reactions: following patent blue dye administration. *Can Med Assoc J* **1969**;101:100–101
9. Mortazavi SH, Burrows BD. Allergic reactions to patent blue dye in lymphangiography. *Clin Radiol* **1971**;22:389–390
10. von Meseg W, Melzer KJ. Einfall von Patentblau-allergie bei Fußlymphographie. *Z Urol* **1972**;65:945–947
11. Pevny I, Bohdorf W. Gruppenallergische Untersuchung bei Patentblau-sensibilisierung. *Med Klin* **1972**;20:698–702
12. Biran S, Hochman A. Allergic reaction to patent blue during lymphangiography. *Radiol Clin Biol* **1973**;42:166–168
13. Molnar Z, Böhm K, Varga Gy. Patentblau-allergie bei der Lymphographie. *Rontgenblatter* **1976**;29:100–103
14. Kopp WL. Anaphylaxis from alphazurine 2G during lymphography. *JAMA* **1966**;198:200–201
15. Koehler PR. Complications and accidents. In: Ruttiman A, ed. *Progress in lymphology: proceedings of the International Symposium on Lymphology, Zurich, 1966.* Stuttgart: Georg Thieme, **1967**:306–308
16. Koehler PR. Complications of lymphography. *Lymphology* **1968**;1:116–120
17. Castellino RA, Bergiron C, Markovits P. Experience with 659 consecutive lymphograms in children. *Cancer* **1977**;40:1097–1101
18. Wallace S, Jackson L, Schaffer B, et al. Lymphangiograms: their diagnostic and therapeutic potential. *Radiology* **1961**;1:157–173
19. Greening RR, Wallace S. Further observations in lymphangiography. *Radiol Clin North Am* **1963**;1:157–173
20. Newton DW, Rogers AG, Becker CH, Torosian G. Evaluation of preparations of patent blue (Alphazurine 2G) dye for parenteral use. *Am J Hosp Pharm* **1975**;32:912–917

AURO_ISO 0018552

EXHIBIT 9

**REDACTED - CONFIDENTIAL**

**APPX4529-APPX4534**

# EXHIBIT 13

REDACTED - CONFIDENTIAL

APPX4621-APPX4629

EXHIBIT 14

**REDACTED - CONFIDENTIAL**

**APPX4672-APPX4674**

# EXHIBIT 15

**REDACTED - CONFIDENTIAL**

**APPX4688-APPX4689**

# EXHIBIT 17

# REDACTED - CONFIDENTIAL

## APPX4727-APPX4755

# EXHIBIT 18

**REDACTED - CONFIDENTIAL**

**APPX4757**

EXHIBIT 19

**REDACTED – CONFIDENTIAL**

**APPX4759-APPX4763**

EXHIBIT 21



**Customer Outage Notification**

DATE

Dear Customer:

<u>We are informing you that our supply of LYMPHAZURIN™ Blue Dye, reorder LYM100 and product kits, reorder numbers LYMPAK01, LYMPAK02, and LYMPAK03 is completely out.</u> As previously communicated during the past 12 months, and most recently in June of this year, the reasons for this shortage are specific to the supply and manufacture of the material and are NOT safety or effectiveness considerations associated with the product.

Since September of 2006, we have been working with you, the FDA and our internal supply team to extend the supply of LYMPHAZURIN as long as possible in a responsible manner. Throughout this process, our primary concern was to minimize the disruption to you and your patients

A supply shortage from a key vendor has contributed to the shortage. The development, supply, and packaging of this product are very complex. As such, it has proven challenging to expedite an effective return to supply of this product. Rest assured that we have a multidisciplinary team working with the FDA to validate a new supply of LYMPHAZURIN™ and to expedite clearance. Many of you have written letters of support in this effort. For that, we thank you. While numerous variables exist in the development and clearance process, our best estimates are predicting a *potential* return to supply in February of 2008.

We have literally talked to hundreds of you personally and we truly appreciate how difficult this situation is for you and your patients. We apologize again for this inconvenience and we ask for your continued patience throughout the process. In the meantime, we continue to encourage healthcare providers to pursue alternative means to the usage of LYMPHAZURIN™.

If you have additional questions relating to this issue, please call Customer Service at 800-722-8772. We will be contacting you directly over the coming months with status updates on our progress. We will immediately notify you when and if product supply returns in 2008.

Sincerely,

Walter Haddick
Covidien
Group Director
US Marketing

COVIDIEN        150 GLOVER AVENUE        203-845-1000 [I]
                NORWALK, CT              800-722-8772 [TOLL FREE]
                06856

**Appx4777**

MYL-AUR_0031520

EXHIBIT 22



## Lymphazurin™ Drug Release

After more than five years of determination and focus to locate and qualify new suppliers, we are pleased to tell you that our Lymphazurin™ allocation and subsequent supply gap situation are resolved and we are once again able to deliver Lymphazurin™ to you for your patients. The product will be available immediately.

We have made modifications to the product, ensuring that we will be able to provide it for the foreseeable future. To date we have:

1. Identified and validated a new source for raw material;
2. Established a new process to refine the crude material; and,
3. Changed the drug product sterilization method.

To approve these process and manufacturing changes, a Prior Approval Supplement to the approved NDA was submitted to the FDA and approved April 22, 2008.

As you may know, we have been selling this proprietary product in the US and Canada since 1998. Literature has shown that Lymphazurin™ is an effective adjunct with radio-colloid lymphatic mapping. It has widespread acceptance and numerous publications by key opinion leaders demonstrating its success. Lymphazurin™ has been used on more than 750,000 patients.

While Covidien Surgical Devices (formerly U.S. Surgical/Autosuture/Tyco Healthcare) is not in the pharmaceutical business, we are committed to providing this product as long as our customers need it. Because of its unique properties, Lymphazurin™ will be a non-bid product and will not be included in any contracts. The new price has been considerably increased to reflect all modifications.

To ease the financial burden on patients, Covidien is actively pursuing Medicare reimbursement for the applicable procedures using Lymphazurin™. Applications for reimbursement are in process and we hope to have them approved in 2008. We are seeking to establish a patient assistance program for those patients unable to afford Lymphazurin™.

To assist in ordering or answer questions, please call our toll free Customer Service number at 800 722-8772. We are honored to work with you to bring this vital product to your patients.

---



*Trademark. © 2008 United States Surgical, a division of Tyco Healthcare Group LP. All rights reserved.

Your use of this information is subject to Terms of Use and Privacy Policy. Products Depicted: RX Only. The products and services depicted on this website may not be available outside of the United States.

EXHIBIT 23

**REDACTED - CONFIDENTIAL**

**APPX4781**

EXHIBIT 25

**REDACTED - CONFIDENTIAL**

**APPX4786**

# EXHIBIT 27

**REDACTED - CONFIDENTIAL**

**APPX4810-APPX4820**

# EXHIBIT 63

**REDACTED - CONFIDENTIAL**

**APPX5810**

# EXHIBIT 66

**REDACTED - CONFIDENTIAL**

**APPX5836-APPX5842**

# EXHIBIT 68

**REDACTED - CONFIDENTIAL**

**APPX5849**

# EXHIBIT A

- CONFIDENTIAL - FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER -

**REDACTED - CONFIDENTIAL**

**APPX5933-5936**

**REDACTED - CONFIDENTIAL**

**APPX5937-APPX5943**

**REDACTED - CONFIDENTIAL**

**APPX5984-APPX5993**

# EXHIBIT A

Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TEXAS
2                   MARSHALL DIVISION
                       -  -  -
3
     MYLAN INSTITUTIONAL LLC    :
4    and APICORE US LLC,        :
                     Plaintiffs,  : Civil Action No.
5                              : 2:16-cv-491-RWS-RSP
          vs.                  :
6                              :
     AUROBINDO PHARMA LTD.,     :
7    AUROBINDO PHARMA USA       :
     INC., and AUROMEDICS       :
8    PHARMA LLC,                :
                     Defendants.  :
9
                       -  -  -
10
             Saturday, October 29, 2016
11
                       -  -  -
12
13          Videotaped deposition of RICHARD
14   J. BLEICHER, taken at the Embassy Suites,
15   1776 Benjamin Franklin Parkway, Philadelphia,
16   Pennsylvania 19103, beginning at 8:11 a.m.,
17   before LINDA ROSSI RIOS, RPR, CCR and Notary
18   Public.
19                     -  -  -
20
21
22
23
24
25

Page 2

1  A P P E A R A N C E S :
2
3  on behalf of the Plaintiff Mylan
     Institutional LLC and the Witness
4
5      WILSON SONSINI GOODRICH & ROSATI
       BY:  NICOLE W. STAFFORD, PhD, ESQUIRE
6      900 South Capital of Texas Highway
       5th Floor
7      Austin, Texas  78746
       512-338-5400
8      nstafford@wsgr.com
9
10
   On behalf of the Defendants, Aurobindo
11  Pharma Ltd., Aurobindo Pharma USA Inc., and
    Auromedics Pharma LLC
12
13     SCHIFF HARDIN LLP
       BY:  JAIMIN SHAH, ESQUIRE
14       and
       SAILESH PATEL, ESQUIRE
15     233 S Wacker Dr
       Suite 6600
16     Chicago, IL 60606
       312.258.5500
17     jshah@schiffhardin.com
       spatel@schiffhardin.com
18
19
   A L S O   P R E S E N T :
20
21     MICHAEL BARANKOVICH, Videographer
22         - - -
23
24
25

Page 4

1  Exhibit 6   Blue dye for                  86
2              identification of
               sentinel nodes in breast
               cancer and malignant
3              melanoma: a systematic
               review and meta-analysis
4              article
5  Exhibit 7   Can Methylene Blue Only  101
               Be Used in Sentinel Lymph
6              Node Biopsy for Breast
               Cancer? article
7
   Exhibit 8   PowerPoint presentation   110
8
   Exhibit 9   Cutaneous Necrosis As a   114
9              Result of Isosulphane
               Blue Injection in
10             Mammarian Sentinel Lymph
               Node Mapping: Report of
11             Two Cases article
12 Exhibit 10  Lymphatic                 134
               Mapping/Sentinel
13             Lymphadenectomy article
14 Exhibit 11  Isosulfan blue            145
               prescribing information
15
16
17         - - -
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2          - - -
3  Testimony of:  RICHARD J. BLEICHER
4  By Mr. Shah           6, 183, 194
5  By Ms. Stafford          150, 190
6          - - -
7
8      E X H I B I T S
9
10 MARKED     DESCRIPTION      PAGE
11
12 Exhibit 1  Rebuttal Declaration of    41
              Richard J. Bleicher, MD,
13            FACS
14 Exhibit 2  Letter to the editor of    51
              the Journal of Clinical
15            Oncology
16 Exhibit 3  Patterns of nodal staging  58
              during breast
17            conservation surgery in
              the medicare patient:
18            will the ACOSAOG Z0011
              trial change the pattern
19            of care? article
20 Exhibit 4  Inflammatory Cutaneous     63
              Adverse Effects of
21            Methylene Blue Dye
              Injection for Lymphatic
22            Mapping/Sentinel
              Lymphadenectomy article
23
   Exhibit 5  Lymphatic Drainage of      73
24            Skin to a Sentinel Lymph
              Node in a Feline Model
25            article

Page 5

1          - - -
2          VIDEOGRAPHER:  We are now on the
3  record.
4          Please note that the microphones
5  are sensitive and may pick up
6  whispering and private conversation.
7  Please turn off all cell phones or
8  place them away from the microphones
9  as they can interfere with the
10 deposition audio.
11         My name is Michael Barankovich
12 representing Veritext Legal Solutions.
13         The date today is October 29,
14 2016, and the time is approximately
15 8:11 a.m.
16         This deposition is being held at
17 the Embassy Suites located at 1776
18 Benjamin Franklin Park, Philadelphia,
19 Pennsylvania.  The caption of this
20 case is Mylan Institutional, et al.
21 versus Aurobindo Pharma, et al.  This
22 case is being held in the United
23 States District Court Eastern District
24 of Texas, Case Number 2:16-cv-491.
25 The name of the witness is Richard

Page 42

```
 1    blue exclusively except in rare instances
 2    where it is used in combination with a
 3    radionuclide."
 4         Is that statement accurate,
 5    Dr. Bleicher?
 6         A.   It is accurate.  The
 7    exclusivity is related to the desirability of
 8    what we should be using.  I can't tell you
 9    whether or not there may have been the
10    occasional case where we had to use isosulfan
11    blue dye.  I don't view the statement as
12    excluding that.
13         MS. STAFFORD:  You may have
14    misspoken.  I think you said the
15    occasional case where we had to use
16    isosulfan blue dye.
17         THE WITNESS:  Excuse me.  Thank
18    you.  The occasional case where we had
19    to use methylene blue dye.
20         So I was trained to use it
21    exclusively, meaning this is the
22    preferred substrate that should be
23    used.
24    BY MR. SHAH:
25         Q.   So you are not trained
```

Page 43

```
 1    intensively in the location -- in the
 2    appropriate location of injection of
 3    methylene blue as intensively as you have
 4    been trained in the application of isosulfan
 5    blue.  Is that accurate?
 6         MS. STAFFORD:  Objection to
 7    form.
 8         THE WITNESS:  Was I trained as
 9    intensively as I was trained for
10    locations regarding injection one
11    versus the other?  So there was not as
12    many cases for methylene blue, no.
13    BY MR. SHAH:
14         Q.   And you mentioned previously
15    that the precise location in the tissue where
16    methylene blue is injected is important in
17    the proper application of the substrate for
18    sentinel node biopsy?
19         A.   I didn't say the precise
20    location, but the location is important.
21         Q.   So you mentioned the location
22    of the injection is important, but you have
23    not received intensive training in the
24    location of the injection of methylene blue
25    in sentinel node biopsy?
```

Page 44

```
 1         MS. STAFFORD:  Objection to
 2    form.
 3         THE WITNESS:  No.  Was I
 4    specifically counseled in how to do
 5    that?  No.
 6    BY MR. SHAH:
 7         Q.   Paragraph 4 of your Declaration
 8    on page 2, you state, "I understand that the
 9    patents-in-suit cover a compound of isosulfan
10    blue sodium salt having substantial purity, a
11    solution containing the substantially pure
12    compound, and a composition containing the
13    substantially pure compound."
14         What do you mean by "substantially
15    pure compound"?
16         A.   So my understanding was from
17    counsel that part of the issue is related to
18    the purity of the medication that we're
19    discussing.  That's my extent of understanding,
20    and that's what this refers to.
21         Q.   Prior to your counsel's --
22    strike that.
23         Do you have any further
24    understanding about the term that you use in
25    paragraph 4 of your Declaration, "substantially
```

Page 45

```
 1    pure compound"?
 2         A.   Beyond what I just told you?
 3         Q.   Yes.
 4         A.   Any understanding regarding?
 5         Q.   What do you mean by
 6    "substantially pure compound"?
 7         A.   The limits of my understanding
 8    are simply that one issue in question, again,
 9    this is from counsel, is the -- how pure or
10    refined one compound is versus another.
11    That's the extent of my understanding.
12         Q.   Prior to your interaction with
13    counsel in this case, did you have any
14    understanding about the differences, if any,
15    in the purities of any isosulfan blue product
16    that you were using, products that you were
17    using as part of your professional
18    engagements at Palo Alto or Fox Chase Center?
19         MS. STAFFORD:  Objection to
20    form.
21         THE WITNESS:  So this is not
22    something that has ever occurred to me
23    to inquire about.  I rely upon the
24    FDA, pharmacy, my institution to
25    obtain compounds that are supposedly
```

12 (Pages 42 - 45)

Page 46

1  of quality. So it's not something
2  that I have actively pursued, inquired
3  about or tried to discern in any way.
4  I ask for medication, I am provided it
5  and I use it.
6  BY MR. SHAH:
7      Q.  You never considered it
8  necessary to inquire about the purity of the
9  substrate that you were using for sentinel
10 node biopsy?
11      MS. STAFFORD: Objection to
12 form.
13      THE WITNESS: Any medication
14 that I request, either as a physician
15 or even as a patient, I rely upon the
16 FDA and other institutions to ensure
17 the safety. So when I go to the
18 pharmacy as a patient or when I
19 request something as a physician, when
20 somebody provides me a medication,
21 it's my assumption that that is safe
22 to use and I don't inquire or question
23 it further.
24 BY MR. SHAH:
25     Q.  In your Declaration, you do not

Page 47

1  provide any opinion as to Dr. Krag's opinion
2  on the interchangeability of Lymphazurin
3  versus Mylan's generic isosulfan blue
4  product. Isn't that correct?
5      MS. STAFFORD: Objection to
6  form.
7      THE WITNESS: Let me review. I
8  believe that's correct, but let me
9  confirm. That is correct.
10 BY MR. SHAH:
11     Q.  Thank you.
12     Dr. Bleicher, do you understand
13 the term "bioequivalence" in the context of
14 an Abbreviated New Drug Application?
15     MS. STAFFORD: Objection to
16 form.
17     THE WITNESS: I'm sorry, the
18 term bioequivalence did you say?
19 BY MR. SHAH:
20     Q.  Yes.
21     A.  No.
22     Q.  Do you know if Mylan's
23 isosulfan blue product is a generic
24 equivalent of Lymphazurin?
25     MS. STAFFORD: Objection to

Page 48

1  form.
2      THE WITNESS: So I have heard
3  the term "generic" and "brand"
4  multiple times, and I really do not
5  anymore understand the difference,
6  certainly not in the context of this
7  case. I read that in Dr. Krag's
8  deposition, and I don't understand
9  what it refers to anymore.
10     MR. SHAH: This might be a good
11 time for a break.
12     VIDEOGRAPHER: The time is now
13 9:01. Going off the video record.
14     - - -
15     (A recess was taken.)
16     - - -
17     VIDEOGRAPHER: The time is now
18 9:12. Back on the video record.
19 BY MR. SHAH:
20     Q.  Dr. Bleicher, for understanding
21 any differences between methylene blue and
22 isosulfan blue, would you -- are you aware of
23 any surveys done on that topic?
24     MS. STAFFORD: Objection to
25 form.

Page 49

1      THE WITNESS: Define "survey."
2  BY MR. SHAH:
3      Q.  Do you understand the term
4  "meta-analysis"?
5      A.  I do.
6      Q.  Can you, please, briefly
7  describe what that term means?
8      A.  A meta-analysis --
9      MS. STAFFORD: Objection to
10 form.
11     THE WITNESS: Sorry. A
12 meta-analysis is a publication in
13 which an author will combine data from
14 multiple series and combine them into
15 a grouped analysis comprised of the
16 data of those series. They're not as
17 good as an individual prospective
18 randomized clinical trial, but they're
19 not infrequently performed.
20 BY MR. SHAH:
21     Q.  Why would you say that they're
22 not as good as an individual prospective
23 randomized clinical trial?
24     A.  Prospective randomized clinical
25 trials are studies which are designed to

13 (Pages 46 - 49)

Page 130

1  BY MR. SHAH:
2      Q.    Where you say it -- okay.
3  Strike that.
4      If there were other reasons
5  other than a patent or a method of production
6  of compound that enhanced the availability of
7  the compound, would that be advantages to
8  patients and surgeons using the dye.
9          MS. STAFFORD:  Objection to
10 form.  Vague.
11         THE WITNESS:  So if anything
12 produced the compound, increasing its
13 availability without sacrificing
14 quality, then that would be an
15 advantage for patients and surgeons
16 using the dye.
17 BY MR. SHAH:
18     Q.    Now, you testified that you
19 were not aware at the time of the precise
20 reason why there were shortages in -- of
21 isosulfan in the market whenever you or your
22 clinic experienced it.  Is that correct?
23     A.    That's correct.
24     Q.    Is it possible that the
25 shortages were because of a supplier or a

Page 131

1  manufacturer of the isosulfan blue dye went
2  out of business?
3          MS. STAFFORD:  Objection to
4  form.  Calls for speculation.
5          THE WITNESS:  You're asking me
6  to say whether or not that's possible?
7  BY MR. SHAH:
8      Q.    Yeah.
9      A.    I guess anything is possible.
10     Q.    Right.  So where you say that
11 if a patent or method of production of a
12 compound increased its availability without
13 sacrificing quality, that is a great
14 advantage to patients, that is a possibility.
15 Is that correct?
16         MS. STAFFORD:  Objection to
17 form.
18         THE WITNESS:  What is a
19 possibility?
20 BY MR. SHAH:
21     Q.    That the patent -- I'll strike
22 that.  I'll withdraw that question.
23         Do you -- so do you know if
24 Lymphazurin is still available?
25     A.    Are you referring to the brand?

Page 132

1      Q.    Yes.
2      A.    I have been advised that it is
3  not still available.
4      Q.    Who has advised you?
5      A.    Counsel.
6      Q.    Prior to counsel's advising you
7  that Lymphazurin is not available, you were
8  not aware that Lymphazurin was out of the
9  market.  Correct?
10         MS. STAFFORD:  Objection to
11 form.
12         THE WITNESS:  I don't believe
13 so.  As I mentioned, I don't concern
14 myself with the brand of drug that I
15 use.  I concern myself with the fact
16 that I have a drug that I need and
17 that is potentially safe.
18 BY MR. SHAH:
19     Q.    Do you continue to use
20 isosulfan blue to date for sentinel node
21 biopsy?
22     A.    I do.
23     Q.    So since you were not aware
24 before counsel informed you that Lymphazurin
25 is no longer available, you would not know

Page 133

1  the reason why the FDA withdrew approval of
2  Lymphazurin.  Is that correct?
3          MS. STAFFORD:  Objection to
4  form.
5          THE WITNESS:  So I don't know
6  anything about FDA approvals, and I
7  don't know anything about any kind of
8  reasons for any sort of withdraw, so
9  there were two potential issues in
10 that question which I can't really
11 comment on.
12         MR. SHAH:  Would this be a good
13 time for a break, Counsel?
14         MS. STAFFORD:  Sure.  How much
15 time do you think you need?
16         VIDEOGRAPHER:  The time is
17 11:42.  Going off the video record.
18         - - -
19         (A recess was taken.)
20         - - -
21         VIDEOGRAPHER:  The time is now
22 12:29.  Back on the video record.
23 BY MR. SHAH:
24     Q.    Dr. Bleicher, I'm going to hand
25 you what will be marked as Bleicher Exhibit 10.

34 (Pages 130 - 133)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC | Civil Action No.: 2:16-cv-491-RWS-RSP |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | **CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY** |
| AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC | **FILED UNDER SEAL** |
| Defendants. | |

**DEFENDANTS' DISCLOSURE OF EXHIBITS AND DEMONSTRATIVES**
**FOR THE NOVEMBER 2, 2016 PRELIMINARY INJUNCTION AND MOTION**
**TO TRANSFER VENUE HEARING**

Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC (collectively, "Aurobindo") hereby disclose a list of potential exhibits they identified to Plaintiffs Mylan Institutional LLC and Apicore US LLC for the November 2, 2016 hearing. It is Aurobindo's understanding that all exhibits cited in the pleadings and declarations for the Motion for Preliminary Injunction and Motion to Transfer Venue are part of the record evidence. Aurobindo discloses the list of those exhibits in this filing for the Court's convenience. Aurobindo also hereby discloses the demonstratives presented to the Court at the hearing for the Court's convenience.

- List of exhibits for Aurobindo's witnesses Dr. Edward G. Brown, Dr. David N. Krag, Mr. W. Christopher Bakewell, and Mr. Ronald Quadrel, attached as Exhibit A.

- Presentation slides used during Aurobindo's opening argument, attached as Exhibit B.

- Presentation slides used during the direct examination of Dr. Edward Brown, attached as Exhibit C.

- Presentation slides used during the direct examination of Dr. David Krag, attached as Exhibit D.

- Presentation slides used during the direct examination of Mr. W. Christopher Bakewell, attached as Exhibit E.

- Presentation slides used during the direct examination of Mr. Ronald Quadrel.

CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Dated:   November 8, 2016

Respectfully submitted,

*Of Counsel:*
SCHIFF HARDIN
Sailesh K. Patel (*pro hac vice*)
Neil Lloyd (*pro hac vice*)
Cindy S. Ahn (*pro hac vice*)
233 S. Wacker Drive
Chicago, IL 60606
312-258-5500
spatel@schiffhardin.com
nlloyd@schiffhardin.com
cahn@schiffhardin.com

George Chih-Lun Yu (*pro hac vice*)
One Market Plaza
Spear Street Tower, Suite 3200
San Francisco, CA 94105
(415) 901-8700
gyu@schiffhardin.com

*/s/ Sailesh K. Patel, with permission by*
*Michael E. Jones*
Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Patrick C. Clutter, IV
State Bar No. 24036374
patrickclutter@potterminton.com
POTTER MINTON
110 N. College, Suite 500
Tyler, TX 75702
Tel: 903.597.8311
Fax: 903.593.0846

*Attorneys for Defendants*
*Aurobindo Pharma Ltd.,*
*Aurobindo Pharma USA Inc., and*
*AuroMedics Pharma LLC*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on November 8, 2016.

I also hereby certify that all counsel of record who have consented to electronic service are being served with a notice of filing of this document, under seal, pursuant to L.R. CV-5(a)(7) on November 8, 2016.

*/s/ Michael E. Jones*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/ Michael E. Jones*

CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY
APPX018

# EXHIBIT B

**REDACTED - CONFIDENTIAL**

**APPX7027-APPX7066**

# EXHIBIT E

**REDACTED - CONFIDENTIAL**

**APPX7161-APPX7174**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4  MYLAN INSTITUTIONAL, LLC,   )(

 5  ET AL                       )(  CIVIL DOCKET NO.

 6                              )(  2:16-CV-00491-RWS-RSP

 7  vs.                         )(  MARSHALL, TEXAS

 8                              )(

 9  AUROBINDO PHARMA LTD, ET AL )(  NOVEMBER 2, 2016

10

11

12                     MOTION HEARING

13         BEFORE THE HONORABLE JUDGE ROY S. PAYNE

14               UNITED STATES MAGISTRATE

15

16

17  APPEARANCES:

18  FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                         minutes of this hearing.)
19

20  FOR THE DEFENDANT:  (See sign-in sheets docketed in
                         minutes of this hearing.)
21

22

23  COURT REPORTER:  Ms. Tammy L. Goolsby, CSR

24  Proceedings taken by Machine Stenotype; transcript was produced
    by a Computer
25
```

 1   infringes these three valid patents.

 2          I want to briefly in the time I'm up here before you

 3   hear the witnesses address some of the key arguments that

 4   Aurobindo has put forward to try to avoid the Court's judgment

 5   against them.  First of the --

 6          THE COURT:  Mr. Steuer, I just want to make sure you

 7   know that this is your time that you're using, and you're

 8   welcome to use it in opening remarks, but I just want you to

 9   know it is counting on your time.

10          MR. STEUER:  Thank you, Your Honor.

11          THE COURT:  Okay.

12          MR. STEUER:  My colleagues here are busy with the

13   chess clock to make sure we're on top of that.

14          THE COURT:  All right.  Good.

15          MR. STEUER:  Your Honor, we have two process patents,

16   and they solved the production issue of isosulfan blue by using

17   a specific mild oxidizing metal, which is silver oxide, instead

18   of the prior art, which was a toxic lead-based oxidizing agent,

19   to make the dye.

20          And we prove infringement of these two patents by the

21   doctrine of equivalence.  The change from silver oxide to

22   magnesium dioxide is an insubstantial change that is equivalent

23   with respect to silver oxide and function way and result.

24          Indeed, the description of the invention recited in

25   the patent states -- and this is what Apicore states -- that an

1          Here's a piece of prior art reference that talks

2    about preparative HPLC.  Everybody in this case agrees that

3    preparative HPLC was known prior to the priority date.

4          Here's another prior art reference Snyder that talks

5    about convenient recovery of highly purified 99 percent pure

6    product that could be done using preparative HPLC, and that's

7    what Aurobindo does.

8          The Sigma documents, what are the Sigma documents?

9    Sigma was a supplier to Covidien for Lymphazurin product.  They

10   had been supplying it for 30 years, and so we subpoenaed them

11   to see what documents they had in terms of what level of purity

12   they were able to obtain, and this is a reference standard.

13         Now, they say that the document was signed in August,

14   but that's the day it was produced.  This is from March 2001,

15   and this is a reference standard, so -- which means the

16   benchmark by which they, when they're making their product,

17   they look at and to see, okay, did we get isosulfan blue?

18         And so for the reference standard, they made it pure.

19   They made it pure to a hundred percent, and discovery is still

20   ongoing with Sigma.  They've produced a few documents, and

21   we're going to see -- they have many more documents that

22   they're continuing to produce, but at the very least, this

23   raises a substantial question of invalidity.

24         It supports our argument that these purification

25   techniques were known, and a person skilled in the art, if they

 1   compound having a purity of at least 99 percent by HPLC, a

 2   solution having a purity of at least 99 percent by HPLC, and a

 3   composition.

 4          The plain English construction of this, as Dr. Brown

 5   has said, means that it must not have more than one percent

 6   extraneous material, material that's not isosulfan blue sodium

 7   salt, as determined by using HPLC with a reproducible set of

 8   conditions.

 9          Here when you look at the compound, the compound is

10   not even made in the United States.  The compound that -- the

11   API, the solid isosulfan blue API that Aurobindo makes, it's

12   made in India, and that is 99 percent, but that never makes its

13   way into the United States.

14          That compound is then processed into a formulation

15   with buffers and solvents to make the final product.  That

16   final product then is imported into the United States by

17   Auromedics and then sold, so claim number one is not infringed

18   as a compound claim.

19          The solution claim, that -- even if you were to take

20   Plaintiff's construction that, well, you have to look at the

21   API as it sits in the final product.  Even if you look at it

22   from that perspective -- and we believe that the claim language

23   doesn't even require that because Aurobindo's isosulfan blue

24   product, like Mylan's and Lymphazurin is one percent isosulfan

25   blue.

1   A    Yes.

2   Q    And are the statements in there true and correct to the

3   best of your knowledge?

4   A    Yes, they are.

5   Q    Now, have you personally been involved in selling

6   isosulfan blue?

7   A    Yes, I have.

8   Q    Okay.  And based on your experience in selling this

9   product, have you learned why a hospital pharmacy might buy one

10  brand of isosulfan blue over another brand?

11  A    Presuming with your question that the customer sees the

12  two products as equivalent and that there is no special

13  features or characteristics that are different in the

14  customer's eyes, price is certainly one of the number one

15  determiners of their decision.  Hospitals are very price

16  sensitive, and they also want to know that there is a trusted

17  and long lasting supply of product.

18  Q    Who sells isosulfan blue today?

19  A    Mylan Institutional sells it and so does Aurobindo.

20  Q    Have any companies formerly sold it?

21  A    Yes.  A company called Covidien, C-O-V-I-D-I-E-N, sold the

22  brand product Lymphazurin, and they came off the market,

23  discontinued their product in September of 2012.

24  Q    In the period from Lymphazurin leaving the market until

25  the beginning of this year, 2016, who supplied isosulfan blue

1   to the U.S. pharmacies and hospitals?

2   A    Exclusively Mylan Institutional.

3   Q    Okay.  Ms. Paton, let me ask you to look at Plaintiff's

4   Exhibit 103.

5   A    I have it.

6   Q    And you see this appears to be an email that you sent to

7   someone named Mark Pittenger.

8   A    Correct.

9   Q    Do you recognize this email?

10  A    Yes, I do.

11  Q    And who is Mark Pittenger?

12  A    Mark Pittenger is a director of national accounts who

13  reports to me.

14  Q    And what did you learn from this email or what were you

15  conveying with this email?

16  A    So this email that was sent September 19th of 2012 from me

17  to Mark, I was forwarding to him a copy of Covidien's kind of

18  dear valued customer memo that they put out to the whole

19  customer base, and it's from Covidien explaining their

20  discontinuation of their brand product Lymphazurin.

21  Q    Is that the second page of your email?

22  A    Yes.

23  Q    And why did you send that email to Mr. Pittenger?

24  A    Mark is responsible for some of our top group purchasing

25  organization, our GPO relationships, and it would have been of

1  calendar year 2013 of significance?

2  A    Yes.  And that's definitely increase in usage because we

3  found ourselves alone in the market with Covidien discontinuing

4  their product in September of 2012.

5  Q    Okay.  And you're aware that Aurobindo has entered the

6  market for isosulfan blue this year.

7  A    Yes, I am.

8  Q    Has that in any way harmed Mylan?

9  A    Significant, yes.

10  Q    How would you describe the harm to Mylan from the entry of

11  Aurobindo into this market?

12  A    Certainly a significant amount of loss in sales and profit

13  for our company that we had anticipated having and also damage

14  to our relationships and the goodwill we've established with

15  many key customers, such as group purchasing organizations and

16  even directly with hospitals, who are the people who are buying

17  the product.

18  Q    Now, has Aurobindo priced the product in a way that's been

19  harmful to Mylan?

20  A    Very aggressively discounted in most cases.  They made

21  unsolicited offers to almost all the top customers almost

22  immediately upon coming to market.  In some of these cases, it

23  was as deep as 40 percent off of Mylan's price that we had in

24  the market.

25  Q    Let me ask you to look at Exhibit Plaintiff's 105, PX 105.

1  This appears to be an email from Howard Martin to you and

2  others dated March 23, 2016.  Do you recognize this exhibit?

3  A    Yes, I do.

4  Q    What is it?

5  A    It's an email from Howard Martin, who is director in

6  Mylan's pricing department, and he's sending it to myself and

7  colleagues in Mylan Institutional.  He is summarizing for us

8  the activity as of that date in March, towards the end of

9  March.

10        Right of first of refusals, also known as a ROFR, R-O-F-R,

11  and that is the situation where we are the incumbent supplier,

12  which is the case essentially everywhere with Iso Blue, where a

13  competitor, in this case, Aurobindo has made an unsolicited

14  offer to that GPO.

15        And so the first example in this was Amerinet, and Premier

16  was also listed and others, and he's summarizing for myself and

17  other people what's the situation with all these right of first

18  refusals that we have as of that date.

19  Q    As an example, what happened with respect to Amerinet?

20  A    With Amerinet, Aurobindo approached them with an

21  unsolicited offer of 40 percent off of our current contract

22  price.  Amerinet came to us giving us the right to meet or beat

23  that price to retain our award, and we were unable and willing

24  to do that at the time, so we have lost that business.

25  Q    Now, if you turn to the second page of Plaintiff's Exhibit

1   to.

2        Third from the bottom has Morris & Dickson, which is very

3   close to where we are right now.  They're close, based in

4   Shreveport, Louisiana, which is about a 45-minute drive from

5   her.

6   Q    And just to explain to us when we talk about GPO's and

7   negotiating prices, why are some sales attributed to the

8   wholesaler instead of the GPO?

9   A    Yes.  And this is important because those sales are really

10  the balance of products that were sold, not at a contract price

11  by the wholesaler to the end customer.

12       So in the case of Morris & Dickson, for example, they sold

13  36 packs in a year to maybe 36 customers or one customer who

14  didn't have access to a contract price.

15       In reality, though, all the customers are purchasing

16  isosulfan blue through a wholesaler, so Morris & Dickson sold a

17  lot more than 36 packs, but that's just the amount we're

18  attributing to them because it's the balance of product that

19  they sold not at a contract price.

20  Q    Now, has Mylan been monitoring the market share that has

21  been taken by Aurobindo in the isosulfan blue market?

22  A    Yes.

23  Q    And what are the latest numbers that Mylan has seen?

24  A    The latest numbers are not great.  Aurobindo has taken

25  59 percent of the market and we have 41 percent.

1  Q    Let me ask you to look at Plaintiff's Exhibit 106.  Excuse

2  me.  That's what we were just looking at.  Okay.  What --

3  A    I have it.

4  Q    Yes.  What is 106?

5  A    It's a print screen from Auromedics' website showing their

6  wholesaler order entry numbers.  Wholesalers assign an order

7  entry number when they stock a product, make it available to

8  end customers, so this indicates to me that they were widely

9  stocked at all five national pharmaceutical wholesalers.

10 Q    Has Aurobindo's entry into the market had an impact on

11 Mylan's inventory forecast?

12 A    Yes.  Significant.

13 Q    What has been that impact?

14 A    Well, we were -- before Aurobindo came to market, Mylan

15 was operating under the assumption in our history of being the

16 only supplier of isosulfan blue.

17      So Aurobindo coming to market, making aggressive

18 unsolicited offers to all the top customers, resulted in us

19 losing a lot of market share, so we've had surplus inventory or

20 excess inventory now that's aging.

21      Pharmaceuticals have an expiration date, and I know of at

22 least planned write-offs of inventory that valued at $3 million

23 at our contract price.

24 Q    Okay.  Let me ask you to turn back, if I may, to

25 Plaintiff's Exhibit 104.

1    A    Okay.

2    Q    I want to call your attention to the second page of Wade

3    Smith's April 28th, 2016, email.  What is -- what do we see on

4    that second page and then the third page?

5         And I'm referring to the CY16 and beyond column.  You

6    might want to switch to that, Mr. Smith.  At the end on the

7    right side.

8    A    Yes.  So column J is the budget that we had set aside for

9    2016, the numbers that we are supposed to try to achieve or

10   exceed in this calendar year that we're in now.

11        So, for example, net sales, which is row number four on

12   that, for the budget for calendar year 2016 is 70.84 million,

13   and then if we go to the third page, column P is calendar year

14   2016 our forecast, and that's the forecast as of Wade's email,

15   which was the end of April.

16        We update forecasts as often as once a month to show how

17   we think we're going to finish the year, but even as of the end

18   of April, you can see the -- in column P, row four, we show

19   that the estimated sales are less than half of what we had

20   budgeted.

21   Q    All right.

22   A    So 34.21 million is what he has as the forecast.

23   Q    And if you went to the pre-competition and current

24   forecast for CY17 through CY20 on this document, would you see

25   a similar drop off or do you see a similar drop off?

1    A    In forecast?

2    Q    Yes.

3    A    Absolutely, yes.

4    Q    Has Mylan now lowered its price for isosulfan blue?

5    A    Yes.

6    Q    Why did Mylan do that?

7    A    To try to extend the tied of market share loss and try to

8    sustain the share we can.

9    Q    Now, if the Court issues an injunction, will Mylan be able

10   to raise its prices all the way back to where they were prior

11   to the entry into the market by Aurobindo?

12   A    In my opinion, it's going to be hard to go all the way

13   back there, and I'll give you a reason for that I think is

14   Mylan sells -- Mylan Institutional, just our business unit,

15   sells hundreds of products into the hospital and through GPO's,

16   so we don't just sell isosulfan blue, so it can't be taken in

17   isolation.

18        Anything we do with that product, which is a top product

19   and has high attention from the customers, has impact on these

20   other products that we currently have and also has impact on

21   future launches.

22        We're in the business that we depend on doing well on

23   launches, so it's important that we have goodwill and good

24   relationships with customers, so making a move back to our old

25   price I think would cement in some of the negative feelings and

1  relationship impacts that we've experienced already due to

2  Aurobindo's entry.

3  Q    Let me change topics a little bit.  We talked about -- you

4  mentioned Morris & Dickson in Shreveport.  Who are they?

5  A    They are a wholesaler, so it's similar to McKesson,

6  Cardinal, or AmerisourceBergen.  Their headquarters and only

7  location is in Shreveport.  They're a well-known,

8  well-respected wholesaler.  I believe they've been in business

9  for 175 years, so they have a lot of loyal customers who look

10  to them to supply them with pharmaceuticals.

11  Q    Does Morris & Dickson distribute Mylan's products in

12  Texas?

13  A    Yes, they do, including isosulfan blue.

14  Q    Have you had personal dealings with this wholesaler?

15  A    Yes, I have.

16  Q    Are there any hospitals in Texas and in East Texas that

17  are customers of Mylan's isosulfan blue?

18  A    Yes.

19  Q    Okay.  Are any of them large?

20  A    Yes.  And, you know, Texas is a big state.  We have a lot

21  of hospitals in the State of Texas, but certainly let me talk

22  about some that are prominent names and also some local places;

23  so East Texas Medical Center, ETMC, is a local health system

24  here in East Texas.

25      We also have Trinity Mother Frances is another health

1    system in this area.  Texas is proud to have world renown

2    cancer center M.D. Anderson in Houston, a big buyer of

3    isosulfan blue; and another example would be Baylor Scott &

4    White, who has -- is a health system that has offices in

5    Temple, Texas, and then also in Dallas.

6    Q    Now, have these large hospitals you've just described all

7    been customers for Mylan's isosulfan blue?

8    A    Yes.

9    Q    And if you were to ask to find documents relating to the

10   business that Mylan does with these hospitals, where would we

11   look for them?

12   A    In Texas.

13   Q    Now, you mentioned, Ms. Paton, that you work from home.

14   Are there any other Mylan Institutional people that work here

15   in Texas?

16   A    Yes.  We have three other Mylan Institutional salespeople;

17   myself in Flower Mound, Texas, is the exact city, F-L-O-W-E-R

18   M-O-U-N-D; and a co-worker of mine, Martin Wingerter,

19   W-I-N-G-E-R-T-E-R, he's a director of national accounts, and he

20   lives in the Dallas area.

21        Another person is Mike Dougan, D-O-U-G-A-N, who is one of

22   our sales representatives, and he lives in Sherman, Texas; and

23   then lastly we have Andre White, another sales representative,

24   and he lives in the Houston area.

25   Q    Does Mr. Dougan have a particular territory he's

1    based on lead.

2        It proved cost effective and suitable for large scale, and

3    it yielded high purity material, greater than 99 percent by

4    HPCL or high pressure liquid chromatography, and that I believe

5    allowed them to meet DMF and ANDA specifications, and I think,

6    as I said, the key point is it avoided a shortage and made this

7    more widely available to patients.

8    Q    And DMF, is that a drug master file that a company sells

9    an active pharmaceutical ingredient or API to?

10   A    Yes, ma'am.

11   Q    And why was it an approved method of preparing pure

12   isosulfan blue necessary at the time of the core inventions?

13   A    An approved method was necessary because, simply put,

14   there was no longer availability of the material.  The

15   standards for purities were increasing from the FDA, so it was

16   an incentive and benefit to making a compound that was closer

17   to current pharmaceutical grade.

18       So we heard already reference to a 1981 article by

19   Dr. Hirsch, and the standards for that were considerably lower

20   than what I would personally like to see in somebody who works

21   to develop new pharmaceutical agents.

22   Q    Would you please discuss the companies that supplied API

23   or active pharmaceutical ingredient for Covidien's Lymphazurin?

24   A    Yes.  I think there's a demonstrative for this, so my

25   understanding is that originally Allied Chemical based in

 1  Chicago provided crude material to Sigma that I believe

 2  re-purified it or certainly made it available to the NDA

 3  holder, which was Covidien.

 4      And Covidien was known by a couple of other names, such as

 5  Tyco Healthcare, AutoSuture, and U.S. Surgical, but they were

 6  all basically one supplier, Covidien.

 7      Based on documents I reviewed, I believe Allied Chemical

 8  used the lead-based manufacturing method, but Allied went out

 9  of business, and nobody really knows the process that they

10  used.

11  Q    Where --

12  A    Because --

13  Q    Go ahead.  I'm sorry.

14  A    Because of this pending shortage, my understanding is

15  Sigma looked for additional suppliers.  Many people turned down

16  that request, either didn't want to or stated they couldn't

17  provide the material.

18      Eventually Innovassynth entered into contract with Sigma,

19  and it was approved as a supplier by the FDA in mid 2008, but

20  it was plagued with unreliable material, including having metal

21  impurities.

22  Q    How did people know that Allied Chemical used a lead-based

23  manufacturing method?

24  A    That's still not -- that's still not completely certain

25  because the method that Allied used wasn't known, but there

1  lymphangiography.

2  Q    So do you believe that the Thoraval reflects the same or

3  different field as is used for the patents?

4  A    I think it's a completely different field.  I don't think

5  what we learn about chemical weapons detection teaches us how

6  to make a pharmaceutical product.

7  Q    Do you believe that Thoraval renders or does not render

8  the process patents obvious?

9  A    I do not believe it renders it obvious.  I think if you

10  read Thoraval carefully, it actually teaches away from the use

11  of silver oxide.  It teaches away from the use of polar

12  solvents as we're construing it here, things that have a proton

13  donor.

14       It states that potassium ferricyanide is the preferred

15  oxidant for making triarylmethane dyes, but a very different

16  type, I note, and some reactions where silver oxide failed,

17  lead acetate was found to be more suitable.

18  Q    And did you also review Defendant's supplemental

19  opposition regarding the obviousness of the '992 and '616

20  patents based on certain Sigma documents?

21  A    I did.

22  Q    And in their supplemental opposition, do you recall

23  defense counsel arguing that from 1994 to 2009 Sigma offered

24  for sale a product containing 98 percent pure Isoleuco form of

25  isosulfan blue through its catalogs?

1   A    Yes.  I saw it, but I think the --

2   Q    Do you agree with that?

3   A    No, I don't agree with that, and I think the Defendants'

4   lawyers were making a chemical mistake.

5   Q    Would you explain that to the Court?

6   A    Yeah.  And maybe there's a demonstrative to this.

7   Q    Maybe it's the slide 18, I think, just so that the record

8   is clear.

9   A    So we're now really down in the weeds for the benefit of

10  the Court.  Again, on the left we have this convergence where

11  three lines come together at a point, and there's a hydrogen

12  there, but we don't usually show that or we don't need to show

13  that.

14       When we go from the left to the right, there's now two

15  lines to that middle point, so that's now double bond there,

16  but the key point here is these groups that have S and some

17  lines to oxygen, there's one there, and if we go down to sort

18  of 4:00 o'clock position, there's another one there.

19       If we go to isosulfan blue, those groups would be at the

20  12:00 o'clock and 6:00 o'clock positions rather than the 12:00

21  o'clock and 4:00 o'clock.

22       So this compound Leuco Patent Blue on the left, so that

23  was the precursor form that even if you succeeded in oxidizing

24  it, which they didn't show all the claim, they said this was 98

25  percent pure.  If you succeed in oxidizing it, you would end up

1  with a different dye.

2      So, unfortunately, this was put forward by Defendants'

3  attorneys, not by Defendants' experts, and it's an

4  understandable mistake maybe because these compounds end up

5  with what are called common names, which are like nicknames,

6  and just like Johnny can refer to more than one person, this

7  nickname Patent Blue Violet actually was used by Sigma to refer

8  to three different compounds, and that's the next --

9  Q    Before you get to the next one, --

10  A    Yes.

11  Q    -- how did you know that Leuco Patent Blue Violet L1275

12  that's listed in Sigma's catalogs is actually the molecule that

13  you have in that box where it has the sulfonyl groups at the

14  noon and the 4:00 position?

15  A    Okay.  So this comes back to this problem of common names

16  or chemical nicknames, so just as I was saying Johnny can

17  refer, that can be the nickname for more than one person.  This

18  particular patent Blue Violet was used for three different

19  compounds by Sigma.

20      And because of that confusion, you look either at the

21  chemical structure which is shown in that box or you look at

22  something called the chemical abstract service or CAS registry

23  number, and those are both unique indicators, and in this case

24  the catalog gave a CAS number, and I went and looked it up and

25  confirmed the structure which is the one shown on the left.

1  Q    So when you looked up the CAS registry number that's

2  listed in the Sigma catalogues for Leuco Patent Blue Violet

3  L1275, you got the structure on the left, which, if you oxide

4  it, you end up with something that's not isosulfan blue?

5  A    That's correct, ma'am.

6  Q    And you said that -- now going to the next slide, I

7  believe you said that there were three things that Sigma sold

8  in its catalog it called by the name of Patent Blue Violet?

9  A    That's correct, ma'am.

10  Q    And is one of those the same structure that was on the

11  right that you said wasn't isosulfan blue?

12  A    Yeah.  The one in the middle is the oxidized form that

13  would come from that oxidation if you were successful in taking

14  the 98 percent Leuco material, so you would end up with the one

15  that's under the red writing.

16      And, again, if we go and look at those S's with the

17  oxidants linked to them, the one under the blue writing

18  isosulfan blue, see how they're at sort of the -- if you define

19  your clock there, that's 12:00 o'clock and 6:00 o'clock between

20  those two.  They're opposite each other or in chemical terms

21  trans, so opposite just like Transylvania.

22      Whereas, the one in the middle, they're at the 12:00

23  o'clock and 4:00 o'clock position, and if you go to the one

24  under the black writing, you have those at the 12:00 o'clock

25  and 4:00 o'clock, and then you have something else at the 6:00

1  o'clock.

2       So we have three different compounds being referred to by

3  the same common name, and so it's again the same problem we

4  have with nicknames and people often -- Johnny refers to more

5  than one person, and so a person of skill in the art would be

6  aware of that and would confirm either the structure or this

7  CAS registry number, which is what I did.

8  Q    And the Sigma catalog included under Patent Blue Violet

9  products that had these three different CAS numbers?

10 A    That's correct.

11 Q    Okay.  Now, do you agree with defense counsel's arguments

12 that Sigma made and sold an isosulfan blue that was a hundred

13 percent pure prior to the earliest party date of the asserted

14 patents?

15 A    No, I don't agree with what.

16 Q    Why not?

17 A    In Defendants' lawyers, not their technical expert, put

18 forward this piece of paper, and it is -- states in writing

19 certificate of analysis, and it is in my view not a real

20 certificate of analysis.

21      It's a piece of paper with those words on it, but a

22 certificate of analysis should be signed contemporaneously, and

23 Sigma's own protocols say that it should have the actual data,

24 in this case the HPLC chromatograph, attached.

25      This document is -- this page is part of a set of

```
 1   documents.  This particular page was only produced with a

 2   signature in August of this year.  This states not isosulfan

 3   blue, but Patent Blue Violet if you read the fine print, and so

 4   we know that that common name could refer to three different

 5   compounds.

 6        The problem with this piece of paper, in addition to not

 7   being a signed certificate of analysis, is that it's both

 8   internally inconsistent with the rest of the document from

 9   which it was produced and it's externally inconsistent with the

10   available data.

11        This is a reference standard re-qualification.  Saying

12   it's a hundred percent is ambiguous because it may be a hundred

13   percent relative to what they're comparing it to.  It's

14   corrected for water content, and it's, as I said, not

15   chemically reasonable.  There's no evidence that this was ever

16   offered for sale.

17        This is, as we can see, reference standard.  Reference

18   standards are closely guarded.  They're the chemical equivalent

19   of trade secrets.  You don't give away -- you don't sell your

20   reference standard.

21        So if you think about it, if you're a farmer, you don't

22   eat your seed corn, and if you're a chemist, you don't sell or

23   give away your reference standard.

24   Q    What lot number does this certificate of analysis purport

25   to relate to?
```

1  30 years, I don't think I've seen it.

2       Dyes and pigments bleach and degrade, so depending on how

3  old you are, you might like your old faded jeans where the

4  indigo dye has degraded with time.  When you have a fancy

5  sports car, with time the paint becomes less bright.

6       So it's just normal that dyes and pigments degrade with

7  time.  It makes no sense that something that's started at this

8  purity would suddenly jump to much higher purity.

9  Q    (By Ms. Stafford) Are there other certificates of analysis

10 for lot 112F5011 that also leads you to doubt the hundred

11 percent document defense counsel referred to?

12 A    Well, I -- so far I don't really consider any of these

13 certificates of analysis.  They weren't signed in

14 contemporaneously dated.  There are to my knowledge a few

15 certificates of analysis that I've seen.

16 Q    That's what I was meaning to refer to, so maybe if you

17 could either turn in your notebook --

18 A    Yeah.

19 Q    -- to PX 40, which is the same thing as Sessler Rebuttal

20 Exhibit 19.  Is that a document you reviewed and relied upon in

21 forming your opinions?

22 A    Yes, ma'am.

23 Q    What is that document?  It's an internal Sigma document,

24 but what is it?

25 A    Yeah.  This is a reference standard qualification.  It

 1  gives the lot number, which is, again, the same.  Let me read

 2  it again, 112F5011, and it's saying purity by HPLC, peak area

 3  percent 95.8 percent.

 4      And this one is signed and contemporaneously dated, so in

 5  my view this is now a real certificate of analysis, and the

 6  signature date are from June of 1995, if I'm reading this

 7  correctly.

 8  Q    You're referring to page Sigma 008930, which is also

 9  depicted in part on slide 22?

10  A    It's up on this slide, yes.  I can't read the small

11  numbers on the slide.

12  Q    I'm sorry about that.  And is there also another

13  certificate of analysis for lot 112F5011 presented in this

14  exhibit?

15  A    Yes.  Here's another, and, again, --

16  Q    That's on slide demonstrative 23 or for the record Sigma

17  8931.

18  A    So, again, let's start at the bottom right where we have

19  dates and contemporaneous signatures, so this rises to the

20  standard of a real certificate of analysis, and this is from

21  2004, and what we see now is a purity is 93.41 percent by HPLC.

22  Q    And can you please turn to slide demonstrative 24, the

23  next one in your presentation, and just explain to the Court

24  what this shows and reflects?

25  A    What this shows is what we would expect for a colored

1  compound with small variables over time which may be limits of

2  the analysis error.

3       The compound is degrading with time, so what we have on

4  the Y axis is purity plotted as percent, and on the axes at the

5  bottom we're plotting time in months and years, and just as the

6  indigo in your blue jeans fades with time, degrades, this is

7  undergoing a small amount of degradation with time, which is

8  why they have to recalibrate the reference standard.

9       Shown with a red arrow and written in red is something I

10 highlight as an inconsistent value, so that's referring to that

11 sheet of paper that was unsigned and without supporting data

12 that doesn't rise in my view to the level of a reference

13 standard that was put forward by the Defendants' attorneys.

14 Q    Do you --

15 A    This makes no sense at all.

16 Q    And how is that inconsistent value that defense counsel

17 pointed to a hundred percent, is that reflective or not

18 reflective of other certificates of analysis that had similar

19 date stamps on August 23 of 2016, but appear to relate to

20 batches that were made before and after 2001?

21 A    So I tried to look at information about purity for Sigma's

22 materials, so I looked at a lot of these.  Some of these were

23 data.  Some of these were certificates of analyses.

24      And what one can do, again, is plot these as a function of

25 time, so we're on the same sort of plot here.  Y axis is purity

1  up to a hundred percent, and what we have are times that sort

2  of bracket that one page we were referring to.

3      And that 100 percent value is completely inconsistent with

4  these well over a dozen, maybe approaching two dozen, other

5  bits of information.  As I said, some of these are certificates

6  of analyses, but I don't think sitting here that all of them

7  are.

8  Q    Okay.  What about batches made by Sigma after 2010 or 2012

9  that are pointed to in their opposition brief?  Do you think

10 they have any relevance at all as to what the purity of ISB

11 Sigma made was prior to 2007?

12 A    Again, Defendants' counsel talked about material that was

13 made several years after my understanding of Apicore's

14 invention.  It was made to my understanding by Innovassynth

15 using a completely new process subject to all the purity

16 problems that we mentioned that is years after what I think is

17 relevant to a 2001.  It's a different chemistry, different

18 time, and I don't -- I frankly don't understand the Defendants'

19 attorneys' argument.

20 Q    Are there any other reasons you believe the patents are

21 not obvious?

22 A    In reviewing obviousness for patents, I tried to consider

23 something that are called secondary considerations, and some of

24 these include long felt but unmet need and that we've discussed

25 already highlighted by the multiple shortages, unreliable

1    supply, and real concerns about not being able to help

2    thousands of patients.

3         We saw in some of the Sigma documents we reviewed that

4    they tried to get other people to prepare isosulfan blue, and

5    people either failed or declined to do so.

6         It's my view that there's tremendous commercial success.

7    I understand that from other experts who will or have

8    testified.  Apicore and Mylan's isosulfan blue is an embodiment

9    of the asserted patents in my expert view, and based on the

10   testimony of other experts it's enjoyed substantial sales.

11        It's my belief that Aurobindo isosulfan blue is also an

12   embodiment and has had substantial sales.  There's praise by

13   others, which is one of the secondary considerations, so both

14   Mylan and Aurobindo praise the high quality impurity of their

15   isosulfan blue, at least based on my understanding of other

16   experts' testimony.

17        It's my view as a person of skill in the art that the

18   Defendants copied the patent, asserted patents, and given all

19   the difficulties associated with making any of these dyes, in

20   particular isosulfan blue, for use in pharmaceuticals long time

21   that we have known since Hirsch and depending or problems

22   associated with supply, that it was unexpected and non-obvious

23   to make isosulfan blue using the process in the asserted

24   patents and obtaining the purity in the '050 as claimed in the

25   '050 patent.

1  Q    I'd like to move now to infringement.  Can you please

2  summarize your opinions with respect to why you believe there

3  was infringement of the asserted patents?

4  A    So it's my belief that the Defendant's manufacturing

5  infringes the process.  The prosecution history which I have

6  reviewed does not surrender in my view claim scope with respect

7  to acids or other non-hazardous metal oxides.  There is no

8  ensnarement.

9       I certainly heard the opening remarks by Defendant's

10  counsel, but there is no prior art that suggests using

11  manganese dioxide to prepare isosulfan blue.

12      And as a chemist doing oxidation reduction, colored

13  compounds synthesis for a living, it is my view that there are

14  mere insubstantial differences between manganese dioxide as

15  used by Aurobindo in their process and the claimed silver oxide

16  and the Defendant's isosulfan blue as represented in or -- and

17  stated in its DMF as a purity of at least 99 percent by HPLC,

18  as I've been able to read those documents.

19  Q    Please jump ahead to slide 31 of your presentation.  Could

20  you just explain to the Court using this slide your opinion as

21  to why you believed that the Defendant's use of manganese

22  dioxide as used in their process for manufacturing isosulfan

23  blue is merely an insubstantial difference to the silver oxide

24  as in the context of the '992 and '616 claims?

25  A    Broadly speaking, they -- it does the same function in the

 1  same way to achieve the same result.  More specifically

 2  manganese dioxide, as used by Aurobindo, is a non-hazardous

 3  mild oxidant.  The '992 and '616 patents recite a non-hazardous

 4  mild oxidant.

 5       They both achieve two electron oxidation of the Leuco

 6  intermediate, so that's the one fact that had the H in the

 7  center where the three lines met.  They oxidize the Leuco

 8  intermediate to isosulfan blue.

 9       The 992, '616 patents for claims oxidation or teaches

10  oxidation of the Leuco intermediate to isosulfan blue, and the

11  result from the Aurobindo process with manganese dioxide is

12  producing isosulfan blue that is readily purifiable to obtain

13  99 percent purity by HPLC, and the asserted patents recite

14  isosulfan blue that is readily purifiable to obtain the

15  99 percent purity by HPLC.

16  Q    You mentioned something in your previous answer that

17  manganese dioxide is a mild oxidant as used by the Aurobindo

18  process.  Is it important to consider the strength of an

19  oxidizing agent in the context of the actual process in which

20  it is used?

21  A    Yes.

22  Q    Why?

23  A    Everything in chemistry is contact specific, so oxygen,

24  given the right conditions, will take all these papers in front

25  of me and burn them up.

1    We think of oxygen as an oxidant, but maybe on the way

2   home I'll find thunderstorms, lightning will hit oxygen, and it

3   will actually oxidize oxygen to ozone.  In that case, oxygen is

4   functioning as a reductant.

5    We have to consider the specific chemistry.  In certain

6   cases in solid form, the rutile crystalline form of manganese

7   dioxide can be a very strong oxidant, but that's not what's

8   being done here.

9    This is a process that's being run at a pH between two and

10   3.6 as per Aurobindo's documents.  Under those conditions,

11   manganese dioxide will function as a mild oxidant.

12    The patents -- asserted patents themselves define what's a

13   mild oxidant.  It's something that doesn't give rise to over

14   oxidation.  Manganese dioxide as practiced by Aurobindo does

15   not give rise to over oxidation.  It's a mild oxidant.

16   Q    Did you reach any opinions with respect to whether or not

17   Defendants literally infringed the purity patent, the '050

18   patent?

19   A    Yes, I did, and claim one of the '050 patent is directed

20   to compound isosulfan blue having a purity of at least 99

21   percent by HPLC.  Claim 11 of the '050 patent is directed to a

22   solution containing isosulfan blue, the isosulfan blue having a

23   purity of at least 99 percent by HPLC.  In the patents

24   themselves, it doesn't say ISB.  They read out the full

25   chemical compound name so there's no ambiguity.

1          THE COURT:  I just have a couple of questions for

2    you, Dr. Sessler.

3          On the issue of the purity, we've talked about the 99

4    percent purity.  Is that to your knowledge a number that

5    originated with the FDA as a requirement or is that something

6    that was just part of the submission made by Apicore?

7    A    It's my understanding that that's now the standard set by

8    the FDA.

9          THE COURT:  And when you say that's now the standard,

10   do you know roughly when that became the standard?  Was that

11   the standard at the time Apicore made its submission?

12   A    Certainly at the time Apicore made its submission.

13         THE COURT:  Okay.

14   A    It was the standard we were using in the 1990s when we

15   were trying to develop experimental drugs, so I don't know how

16   far back that goes, but --

17         THE COURT:  That's fine.

18   A    -- that's the standard.

19         THE COURT:  That just wasn't clear to me from the

20   papers.  Do you know whether Innovassynth in their -- in their

21   manufacture of ISB ever reached 99 percent in the documents

22   you've seen?

23   A    I'm sorry, Your Honor.  I don't recall off hand.  I know

24   they were getting by 2010, 2011 much purer levels than were

25   reached by Allied Chemical, but that purity was tarnished by

1  these heavy metal toxins.

2      So there are two real issues here.  One is reaching this

3  99 percent purity that the FDA would like for everything, but

4  then there's specific call outs, as you might expect, for

5  really hazardous metals like chromium and like lead.

6      So you can reach 99 percent purity in your organic

7  material and still fail specification because you have these

8  metal impurities, and that's my understanding of what was

9  happening with Innovassynth.  They were getting the organic

10 chemistry to work, but they weren't getting to the point where

11 it would be safe and effective for putting into a patient.

12          THE COURT:  So they were reaching the purity level,

13 but having these other problems?

14 A    By -- by the few years after the Apicore patents, I think

15 they were able to do that, yes, sir.

16          THE COURT:  All right.  You made reference to the

17 fact that preparatory HPLC would not be, I think, effective in

18 any event in getting a roughly 95 percent mixture up to 99

19 percent, but you didn't really say why.

20 A    Okay.  I was trying to -- sorry, Your Honor.  I was trying

21 to be brief.

22          THE COURT:  I understand.

23 A    So it really depends on the nature of the compound you're

24 using.  So preparative HPLC, you take what's called a column.

25 It's a much longer column than you would use for analytical

1  Q    And this article, as we have addressed, indicates that the

2  isosulfan blue is 94.5 percent pure by HPLC.

3  A    So what it says is that the 2.5 disulfonated

4  triphenylmethane dye was prepared in high purity 94 percent dye

5  content, so that's -- as determined by high pressure liquid

6  chromatography, so that's talking about part of what's in

7  there, which is the color dye materials.

8  Q    Is this measure of purity that Hirsch presents, is that a

9  different way of measuring purity than is required by the '050

10  patent?

11  A    I don't think so.

12  Q    So for purposes of the '050 patent claims, you would agree

13  that Hirsch's measurement of 94.5 percent purity is a fair

14  measure of purity for his isosulfan blue product.

15  A    Okay.  So I don't -- there's a little bit of a chain of

16  custody issue because I don't know whether he made that

17  measurement or it was appointed by a supplier.

18       But my general position is that HPLC was being used for

19  determining purity in 1981 and can be used for determining

20  purity today and along the way between 1981 and 19 -- 2016.

21  Q    Now, you would agree that this isosulfan blue that's a

22  94.5 percent could be further purified using the preparative

23  HPLC technique by a person of ordinary skill in the art who is

24  trying to purify an organic compound by the filing dates of the

25  Apicore patent in May 11, 2007; right?

1  A    So what I'm aware is that the inventors were able to make

2  under very specific conditions using either silver oxide or

3  from my read of the notebooks prior to that lead oxide, and the

4  inventors and only the inventors of the asserted patents were

5  able to do that.  I'm aware of no one else who succeeded.

6  Q    I understand your testimony is that the inventors made

7  isosulfan blue to 99 percent purity as of a certain date.  I'm

8  asking you whether a person of ordinary skill in the art could

9  take a technique like preparative HPLC, which I believe was

10  known by May of 2007, and use it to purify isosulfan blue

11  having a purity of 94.5 percent.

12  A    That's unknown to me.

13  Q    Okay.  Now, you testified during your deposition that

14  Aurobindo uses preparative HPLC to purify its isosulfan blue

15  product; correct?

16  A    That's after the 2007 date we were just talking about, but

17  I believe that's correct.

18  Q    Okay.  If we could have the Aurobindo manufacturing

19  document at page -- and this is going to be tab 15, and let me

20  ask you to highlight the text by the second arrow.

21      So, Dr. Sessler, you agree that this document is a summary

22  of the process that Aurobindo uses to prepare its isosulfan

23  blue product; correct?

24  A    Yes.

25  Q    And it is indicated here, the text by the second arrow in

1  this process on this page, that Aurobindo purifies its

2  isosulfan blue product using preparative HPLC.

3  A    Again, this is after the asserted patent invention dates,

4  but they do purify it by preparative HPLC.

5  Q    And you would agree that upon your review of the Aurobindo

6  manufacturing documents that the process that Aurobindo uses to

7  purify isosulfan blue using preparative HPLC was available to a

8  person of ordinary skill in the art in May of 2007.

9  A    No, I don't really agree.

10  Q    I'd like to go to Dr. Sessler's first deposition.  This

11  will be tab 21, and go to page 230.

12       Now, Dr. Sessler, you recall that when we met for your

13  first and second deposition -- let's just get this question out

14  of the way.

15  A    Uh-huh.

16  Q    That you swore that you were going to testify truthfully

17  to the best of your ability that day.

18  A    To the best of my ability that day.

19  Q    Okay.

20  A    And at that time I was -- as we talked, I was still

21  thinking about the HPLC --

22  Q    Yes.

23  A    -- questions.

24  Q    So I would like to show lines six through 11 on this page.

25  I believe this gets to the question we were just raising, and

1  Q    Would you consider Dr. Nampalli a person of ordinary skill

2  in the art as to the Apicore patents?

3  A    Yes, because he's worked in this field for a while.

4  Q    Okay.  And would you agree that Dr. Nampalli's experiments

5  in this lab notebook that are in the 2004, 2005 time frame

6  might be relevant to the state of the art in the -- in that

7  time frame?

8  A    Oh, boy.  That -- I'm not sure I can generalize from that.

9  What we have is his experimental work.

10 Q    So maybe we should look at some specific experiments, and

11 you can tell me whether they're state of the art or they

12 somehow go beyond the state of the art.

13           MS. STAFFORD:  Your Honor, I would just like to

14 object to this line of questioning because it appears to be

15 statutory excluded under 103.  The patentability is not negated

16 by the manner of the invention, so we think it's irrelevant at

17 that point.

18           THE COURT:  All right.  I'll overrule the objection,

19 but I'll note it for the record.

20           MS. STAFFORD:  Thank you, Your Honor.

21           MR. YU:  Thank you, Your Honor.  And for the record,

22 Your Honor, this is intended to show the state of the art as to

23 perhaps the motivation to combine as a person of ordinary skill

24 in the art might do.

25           THE COURT:  You can use your time as you want, Mr.

1   point that the priority date was earlier than April of 2006,

2   which I was informed by counsel was an important date.

3   Q    You would agree that the experiment shown on this page

4   4739 shows that Dr. Nampalli was able to obtain isosulfan blue

5   that had a purity of 99.6 percent using purification by flash

6   chromatography.

7   A    Well, again, we have to consider where the starting

8   material came from and from starting material that he

9   presumably or one of his co-inventors presumably, we don't

10  know, made using specific techniques, which we can guess, but

11  don't know, may have involved the use of lead oxide, which

12  allows organic problems to be solved under those very specific

13  conditions, but don't obviate the problem of hazardous

14  oxidizing agents and don't negate concerns associated with

15  heavy metal impurities.

16       So I -- my concern is that I relied on this to try and

17  make a very specific point, and you're now coming to me,

18  counselor, and saying this is all that you put forward,

19  therefore, you're not confirming or refuting my point, which is

20  orthogonally different from the one I was trying to make, so I

21  feel a little bit cornered.  I'm sorry.

22            MR. YU:  Your Honor, I'm sorry.  I lost track of that

23  answer somewhere, and I would -- I can't say exactly where, but

24  I move to strike at least a portion of it as nonresponsive.

25            THE COURT:  All right.  I'll deny the request, but go

1   ahead.

2           MR. YU:   Thank you.

3   Q    (By Mr. Yu)   Now, you testified during your deposition

4   that this flash chromatography technique was developed by a

5   scientist named Clark Still at Columbia at around 1980; right?

6   A    That's my recollection.

7   Q    And, in fact, there was actually an article published by

8   Dr. Still in 1978 that discussed flash chromatography; right?

9   A    Yeah.  My memory was off by two years, but that's the

10  article that's internal organic chemistry article, if I recall

11  correctly, and Dr. Brown in a further declaration attached that

12  article, but that's the one I was referring to on October 22nd

13  of this year.

14  Q    And you, yourself, or working someone with you has used

15  flash chromatography to purify organic substances to purity;

16  correct?

17  A    As I -- I have done this sometimes with success, but

18  often, I'm afraid, with failure.

19  Q    So you would agree, for example, that as to a compound

20  that you named Texaphyrin, that's a color compound; right?

21  A    Yes, it's a color compound.

22  Q    And you -- if you like, we can look at one of your

23  patents, but it indicates that you were able to purify

24  Texaphyrin to pure Texaphyrin using the flash chromatography

25  technique.

```
 1  A    Oh, that's a case where it worked, but I've had lots of

 2  cases, going back even to my graduate school days where flash

 3  chromatography was just coming on the scene, where it didn't

 4  work.

 5  Q    And you testified during your depositions that as a person

 6  of ordinary skill in the art that you would think to try flash

 7  chromatography to purify isosulfan blue prior to May 11th,

 8  2007, didn't you?

 9  A    What I believe I said is that it would be something I

10  would want to try, but I would not necessarily have expectation

11  of success, and if that's not what I said, that's certainly

12  what I mean, the message I meant to convey.

13  Q    So if you --

14  A    So trying and succeeding -- sir, sorry, let me finish, --

15  Q    I'm sorry.

16  A    -- please, if you would be so kind, sir.  Trying and

17  succeeding are often very different.

18  Q    So if you only had a limited amount of isosulfan blue,

19  would you use it on a technique that was not likely to work?

20  A    That's a very hypothetical question.

21  Q    Let me withdraw it then.

22       Let's go to the next page of the lab notebook, page 4740.

23  So the date on this page is also February 21st, 2005; correct?

24  A    That's correct.

25  Q    Same date as the previous page we looked at.
```

1  reloading this, he's able to get it up to about a hundred

2  percent.

3       So he's starting with something that's very high purity,

4  not to the level of the asserted patents, but 97 percent, and

5  is able to carry it a little bit further.

6       But I want to keep underscoring I'm not aware of anybody

7  outside of the inventor's notebooks where this has been

8  described.

9  Q    But you did testify during your second deposition that

10 while it depends on the compound, it depends on the column that

11 this re-purification technique is something a person of

12 ordinary skill in the art could do as of May 11th of 2007.

13 A    Doesn't sound like something I would have said, so let's

14 go back and take a look at what I actually said.  Maybe you can

15 call me to the -- call my attention to the cite.

16 Q    Sure.  Would you like to go to your second deposition?

17 A    Yes.

18 Q    Page 142.

19 A    And that was which tab again, sir?

20 Q    That is tab 22, line six through 11.  And maybe I'll just

21 read it for your benefit.

22 A    Give me a chance, please, to catch up.

23 Q    All right.  And --

24 A    Got it.  Okay.  I'm with you.

25 Q    The question is, Okay.  But you might say purifying

1   Chemical company once on a column and then take that sample and

2   purify it again on another column as of February 21, 2005.

3         Answer, Yeah.  Again, it depends on the compound, depends

4   on the column, depends how well it's working.

5   A    So exactly.  That's completely consistent with everything

6   I'm trying to convey.  These are things you would think about

7   trying, but whether or not you would succeed depends on the

8   compound, depends on the column, and depends on how well it's

9   working.

10  Q    But as you testified earlier, it would be worth a try;

11  right?

12  A    As I keep saying, it's worth a try, but expectation of

13  success, that's in anybody's hands.

14  Q    Now let's turn to page 4747 of the lab notebook.

15  A    That's five; right?  Notebooks are tab five?  No.

16  Q    Eight.

17  A    Eight.

18  Q    And if I can trouble you to highlight the text around the

19  arrow at the top, so Pb02, that's lead oxide, or sometimes

20  referred to as lead dioxide; correct?

21  A    Yes, sir.

22  Q    That's not silver oxide.

23  A    No, sir.

24  Q    So the inventors here are indicating that they're using

25  lead oxide to make isosulfan blue?

1    A    Yes, sir.

2    Q    And this page shows that the inventors took the isosulfan

3    blue that was made using lead oxide and crystallized it as a

4    method of purifying the isosulfan blue; right?

5    A    You have to give me a minute.  I know we went through this

6    in deposition, but --

7    Q    Sure.  And just kind of the heading near the -- over the

8    last section of the page, it says crystallization/PPTNS, and I

9    think you explained to me that PPTNS refers to precipitations.

10    A    Yes.

11    Q    Okay.  So crystallization is precipitations tried.

12    A    Yeah.  They're slightly different, but they're taking

13    something and making it into a solid form.  They actually have

14    different meanings.

15    Q    Right.  And if we go to the bottom of this page, it shows

16    that they got 97.8 percent --

17    A    Right, and that's --

18    Q    -- purity of the isosulfan blue using the crystallization

19    technique.

20    A    Again, as we discussed at deposition, and I -- to the best

21    of my recollection, we actually had a discussion about this,

22    but, again, it's been a long week and I've been ill and I've

23    been overseas.

24        I'm not sure if this is talking about yields or purity.

25    It's my belief it's yield, but I'm not a hundred percent

```
 1   certain.

 2   Q    Okay.  But you would agree, wouldn't you, that

 3   crystallization organic compounds and even of highly color

 4   dyes, that's a pretty common technique to a person of ordinary

 5   skill in the art by large extent 2005 and also by May 11th,

 6   2007.

 7   A    Counselor, I -- we keep coming back to this.  Yes, common

 8   technique, something one would think about trying, but not

 9   necessarily know that it would succeed.  Again, I come back to

10   my 30 plus years of making color compounds.  Sometimes it works

11   and sometimes it doesn't.

12   Q    Understood.  But in your deposition, you said that the

13   expectation of success for purification was high enough that

14   that you would, quote, give it a whirl.  Would you like to see

15   the transcript?

16   A    Yes.

17   Q    Okay.  It's your second deposition.

18   A    Okay.  Tab 22.  I'm starting to learn.

19   Q    Page 148, lines seven through 19, and I believe in the

20   middle you said, It is the expectation of success is high

21   enough that one would give it a whirl.

22   A    Yeah.  Okay.  So now -- now that we have this up, we can

23   continue and --

24   Q    I actually didn't ask a question yet, sir.  I was just

25   reading from the transcript.
```

1           THE COURT:  As long as you give him a chance to

2    explain his answer.

3           MR. YU:  Yes, sir.

4    Q    (By Mr. Yu) And so would you like to change your answer

5    from that, the expectation of success of purification of

6    isosulfan blue was high enough that you would give it a whirl?

7    A    Okay.  Two points I want to make.  First, I believe we

8    went to this because you asked me a question, didn't you

9    testify, and so I was responding to that question.

10          Second, if we put that back up there, if you would be so

11   kind, so that we can actually all see this and allow me to read

12   the full sentence, which provides a little bit more scientific

13   integrity to what I was trying to explain.

14          It's a common technique, but as with flash chromatography,

15   it's something one would try, but the expectation of success is

16   high enough that one would give it a whirl, but not so high

17   that one would be confident it would work.

18          I -- that's not the most articulate enunciation of these

19   ideas, but it's what I'm trying to say over and over again,

20   counselor.  These are standard techniques.  One would think

21   about it, but one cannot be certain it's going to work.

22   Q    I think you did testify that the purification of isosulfan

23   blue using this crystallization/precipitation technique, that

24   wasn't something that was invented by Dr. Nampalli.

25          And this is -- mind you, this is isosulfan blue that's

1  Q    Okay.  You did testify earlier in response to my question

2  that it doesn't matter what your method of synthesizing

3  isosulfan blue is according to claim one of the '050 patent.

4  A    That's true.

5  Q    So if you were able to take isosulfan blue that you had

6  made using lead oxide and purify it to greater than 99 percent

7  purity by HPLC, that would satisfy claim one of the '050

8  patent; right?

9  A    Yes.

10 Q    Okay.  Now, --

11 A    But we have to again keep this in mind.  It's within the

12 pharmaceutical arts, and so the lead itself may, if it's a

13 residual impurity, kick you out from the intended scope of the

14 patent as a whole, which is what I like to read as a general

15 person trying to understand patents.

16 Q    So Lymphazurin was an FDA approved product, wasn't it?

17 A    Yes, that's my understanding.

18 Q    So the references to Lymphazurin, that's within the

19 pharmaceutical arts.

20 A    Yeah, that's correct, yes.

21 Q    And you did testify earlier that you inferred that

22 Lymphazurin, at least for a period of time, was made with lead

23 oxide; correct.

24 A    Well, Lymphazurin we know from Hirsch in 1981, and that's

25 a very different regulatory climate from the current time.  I

1  Hall?  And you see that the claim is to combining a suspension

2  of isoleuco acid.  That's the pre-cursor to isosulfan blue.

3  This is in the middle of the paragraph.

4  A    Yes, sir.

5  Q    And you combine that with a polar solvent with silver

6  oxide; right?

7  A    That's correct.

8  Q    Okay.  And so the Kulkarni uses another compound, not

9  silver oxide, to oxidize the leuco form of the isosulfan blue;

10  right?

11  A    Yes.  They use ammonium dichromate and their preferred

12  embodiment in 60 percent sulfuric acid.

13  Q    Okay.  What would happen if you added sulfuric acid to the

14  reaction with the silver oxide?  You would get silver sulfate,

15  wouldn't you?

16  A    I don't know.  I'm not -- I wouldn't do that.  That would

17  be quite dangerous.

18  Q    Right.  That's actually quite a dangerous reaction to do.

19  A    And I don't think you would get that product, no, sir.

20  Q    Right.  So if we could go back to the manufacturing docket

21  document for Aurobindo, this is going to be tab 15.

22  A    Do you want me to go to page 6729?

23  Q    Yes, please.  If we take a look at the text by the first

24  arrow in the middle of the page, I think we've looked at this

25  before, but Aurobindo uses manganese dioxide, purified water,

1   and phosphoric acid; right?

2   A    That's correct.

3   Q    And what would happen if you added phosphoric acid to

4   silver oxide?  You would get silver phosphate, wouldn't you,

5   not silver oxide any more?

6   A    No, I don't agree.

7   Q    Oh, so phosphoric acid wouldn't react with silver oxide?

8   A    Phosphoric acid is a really mild acid, so earlier I was

9   coughing a lot, and so during lunch I decided to have a soda

10  pop, a Diet Dr. Pepper, and just for fun I was looking at the

11  ingredients.

12       Number one ingredient was carbonated water.  Number two

13  was caramel color.  Number three was Aspartame, and number four

14  was phosphoric acid.

15       Phosphoric acid is not anywhere equivalent to 60 percent

16  sulfuric acid.  This is a moderate, mild acid that we can drink

17  in my soda pop, and I wish I had one now because my voice is

18  hurting.

19  Q    I'm sorry.  We're almost done.  Thank you.

20       Now, we did -- you did see that in Mr. Patel's opening, he

21  referred to the Muthyala chapter from the leuco dyes treatise

22  that indicated that manganese dioxide is a strong oxidizing

23  agent.

24  A    So, again, that's a generic treatise.  It is a little bit

25  funny because if you look at that, it says that manganese

1    dioxide is a strong oxidant.

2         And if you go one line below, it will say that oxygen,

3    which has the same formal redox potential, is a weak oxidant,

4    and silver oxide doesn't appear anywhere in that treatise, and

5    nor to my level of scholarship and memory as I sit here does

6    isosulfan blue.

7    Q    And you recall in our second deposition, we looked at the

8    Merck Index.  You know what the Merck Index is; right?

9    A    Yes, sir.

10   Q    It's a journal reference that characterizes many different

11   chemical compounds; right?

12   A    Well, we usually use this as exactly that, an index to

13   then go get further information, so we don't -- as people do in

14   chemistry for a living, it's a good place to start.  It gives

15   us insight into the literature, but none of the people I like

16   to think I've trained would rely on this as the sole source of

17   information.  It's an index.  It's not a recipe.

18   Q    And so you recall your deposition we looked at the Merck

19   Index entry for manganese dioxide, and it indicated that

20   manganese dioxide was a strong oxidant.

21   A    Well, it was talking -- to the best of my recollection,

22   that was talking about the solid rutile form of manganese

23   dioxide, and that's completely different than how it's being

24   used by Aurobindo at dilute phosphoric acid.

25   Q    Besides your testimony, can you point to any reference

1  | that refers to manganese dioxide as a mild oxidant?

2  | A    Well, that's a good question.

3  | Q    You haven't yet, have you?

4  | A    Nor have I tried.  I'm not sure that was in the scope of

5  | things because --

6  | Q    The --

7  | A    Let me try and explain my thinking for the benefit of the

8  | Court, if you'll indulge me.

9  |      So I was trying to read these patents within the context

10 | of their normal meaning, trying my best to be a person of

11 | ordinary skill in the art, and they gave an operative

12 | definition of a mild oxidant in terms of avoiding over

13 | oxidation, and I saw manganese dioxide being practiced by

14 | Aurobindo.

15 |      And I did check that there are not a lot of over oxidized

16 | iced impurities, if any.  Certainly we've discussed already the

17 | purities over 99 percent by HPLC for the Aurobindo product.

18 | Q    Well, --

19 | A    So I -- I didn't think I had a charge to go scouring

20 | around looking for that particular reference, sir.

21 | Q    And I think it's a good point you raise, and perhaps I'd

22 | like to get back to a point that the Judge asked you about a

23 | question before lunch.  If we can go back to the Aurobindo

24 | manufacturing document, please, and to the page that we were

25 | on?

1    A    Yes, sir.

2    Q    Could you call out both of the -- the text from both of

3    the arrows?

4        So I think the Judge asked you doesn't Aurobindo get a

5    lower purity of isosulfan blue using manganese dioxide, and I'm

6    not sure I understood what your answer was.

7        Can you answer that question, please, Dr. Sessler?  Does

8    Aurobindo get a lower purity of isosulfan blue using manganese

9    dioxide?

10   A    Sitting here right now, I don't recall.  I would have to

11   go and take a careful look.  I know Your Honor asked me this,

12   but for yield I do recall.  For purity I'm not so sure.

13   Q    You do understand that Aurobindo has to use preparative

14   HPLC to further purify isosulfan blue before it can be used as

15   a pharmaceutical product.

16   A    Well, I don't know if it has to.  That's what it's elected

17   to do, and Apicore has elected to use a different purification

18   method.

19       What I was trying -- I hope it was helpful for Your Honor.

20   I was trying to make the point that once we knew that you can

21   get to these high levels of purity, then one has confidence in

22   forging ahead using maybe a different approach, but prior to

23   that, one is in uncertain territory.  That was the point I was

24   trying to make.

25   Q    And just looking at the process that Aurobindo uses on

1  this page, you would agree that manganese dioxide and

2  phosphoric acid have been used in the prior art to oxide

3  oxidize triarylmethane dyes.

4  A    Different from isosulfan blue and to the best of my

5  recollection recollection, they were outside of the

6  pharmaceutical arts.

7  Q    Thank you, Dr. Sessler.

8           MR. YU:  Nothing further.

9           MS. STAFFORD:  Further questions?

10          THE COURT:  Ms. Stafford, go ahead.

11                      REDIRECT EXAMINATION

12  BY MS. STAFFORD:

13  Q    Just following up on a few questions on that last point,

14  do the asserted patents teach further purification after the

15  oxidation step with silver oxide to get to 99 percent purity by

16  HPLC?

17  A    So it's in the specification, but not to my understanding

18  in the claims.

19  Q    All right.  And is there any difference between the purity

20  of isosulfan blue that can be achieved after further

21  purification using the mild oxidants of silver oxide versus

22  magnesium dioxide?

23  A    To the extent that we're both give above 99 percent purity

24  by HPLC, then they're the same.  If we go further, 99.99 or --

25  there may be some differences.

1    Q    Prior to Apicore's inventions, are you aware of anyone

2    ever having made isosulfan blue having a greater than 99

3    percent purity by HPLC?

4          MR. YU:  Your Honor, objection, leading.

5          THE COURT:  I'll give leeway given the time

6    constraints.

7          MR. YU:  Thank you, Your Honor.

8    A    No, I'm not aware of anybody.

9    Q    (By Ms. Stafford) And before Apicore demonstrated it was

10   possible to make 99 percent pure isosulfan blue by HPLC, did

11   FDA require it, to your knowledge?

12   A    No, they did not.

13   Q    Did that standard change after Apicore's invention and

14   they demonstrated that it was possible to make 99 percent pure

15   isosulfan blue as determined by HPLC?

16   A    Well, counsel, I'm not a regulatory expert, but my general

17   understanding is that once the bar has been raised, the FDA is

18   not very keen to lower it.

19   Q    And then one final question.  Do you recall being asked

20   about your deposition where you testified that for claim one of

21   the '050 patent water can count as an impurity?

22   A    I do, ma'am.

23   Q    In your opinion, does water count as an impurity if it is

24   added intentionally as an excipient?

25   A    No, it does not.

1  Q    Thank you.

2          MS. STAFFORD:  Plaintiff has no further questions.

3          THE COURT:  Mr. Yu, if you have anything based on the

4  Redirect, I'll give you an opportunity.

5          MR. YU:  No, Your Honor.  Thank you.

6          THE COURT:  All right.  In that case, thank you,

7  Doctor.  You may step down.

8  A    Thank you.

9          THE COURT:  Who is your next witness?

10          MS. GOLDSTEIN:  Your Honor, we call Ravi Kovi.  He's

11  just outside.

12          THE COURT:  All right.

13          MS. GOLDSTEIN:  My apologies, Your Honor.  We had

14  asked the witness to sit outside during the prior testimony,

15  and he seems to have just stepped away.

16          THE COURT:  All right.  Do you want to wait or do you

17  have another witness?

18          MS. GOLDSTEIN:  Here he comes.

19          RAVISHANKER KOVI, PLAINTIFF'S WITNESS, SWORN

20                        DIRECT EXAMINATION

21  BY MS. GOLDSTEIN:

22  Q    Good morning sir.

23          MS. GOLDSTEIN:  Your Honor, I'm Joanna Goldstein.  I

24  represent Apicore.

25  Q    (By Ms. Goldstein) Can you please state your name, your

1  full name for the record?

2  A    Ravishanker Kovi.

3  Q    And what is your current position, sir?

4  A    President and CEO of Apicore U.S., LLC.

5  Q    And how long have you been in that position?

6  A    Since 2014.

7  Q    And how long have you been with Apicore?

8  A    Since 2004.

9  Q    Were you a co-founder of Apicore?

10  A    Yes.

11  Q    What is the highest degree that you hold in the area of

12  study?

13  A    Ph.D. in pharmacy.

14  Q    Dr. Kovi, in front of you there is a binder.  If you could

15  turn to PX 17, tab 17, is this your complete CV?

16  A    Tab 17 has U.S. Patent Office.

17        THE COURT:  I think it's a different notebook.  The

18  one your hand is on is the right one?

19  A    This one?

20        THE COURT:  Yes.

21  A    Thank you.

22  Q    (By Ms. Goldstein) The one that has your name on the

23  front.

24  A    Yes.

25  Q    Okay.  Dr. Kovi, how many API projects have you worked on

1    throughout your career?

2    A    Approximately about 200 API's.

3    Q    And in what stages of development?

4    A    All stages of development.

5    Q    Can you describe the work of Apicore?

6    A    Yeah.  Apicore is a developer and manufacturer of active

7    pharmaceutical ingredients and intermediates and also we

8    develop and manufacture other products.

9    Q    Are you involved in all the work or business that Apicore

10   conducts?

11   A    Yes.

12   Q    And who selects the projects that Apicore is going to

13   pursue?

14   A    Myself.

15   Q    What is Apicore's most successful product to date?

16   A    Isosulfan blue.

17   Q    When did Apicore first begin working on isosulfan blue?

18   A    2004.

19   Q    Was that at Apicore's inception?

20   A    Yes.

21   Q    And why did Apicore pick isosulfan blue as its first

22   project?

23   A    As a start-up company, we are looking for products which

24   are having less competition from the players already in the

25   market, and isosulfan blue presented a great opportunity for us

1  to look at to bring the product back into the market very close

2  after drug shortages for a while and it was on and off the

3  market frequently.

4       So that presented an opportunity for us to develop the

5  process, which is a participant which can be produced on a

6  continuous basis at a commercial scale.

7  Q    And what has Apicore done to protect its investment in

8  isosulfan blue?

9  A    We have filed three patents and we filed a drug master

10 file.

11 Q    And you've received three patents on the product?

12 A    Yes.

13 Q    And you are -- are you one of the inventors on the patents

14 that Apicore holds for isosulfan blue?

15 A    Yes.

16 Q    Are there benefits of Apicore's isosulfan blue invention?

17 A    Yes.

18 Q    Can you describe those, please?

19 A    We were able to produce isosulfan blue at the highest

20 purity possible for -- for our customers to put it into the

21 drug product, and at the same time we were able to do it on the

22 continuous reproducible process, which is commercial scale.

23 Q    When did Apicore begin sales of its isosulfan blue API in

24 commercial quantities?

25 A    Early 2011.

1  Q    And that was to Synerx or Mylan?

2  A    Yes.

3           MS. GOLDSTEIN:  Your Honor, I'm going to go into some

4  financial details, sales, gross margins, projections,

5  information that is highly confidential and not public for

6  Apicore that is a small privately held company, and I would

7  like to request that the courtroom and the transcript be sealed

8  on this area of testimony.

9           THE COURT:  Is there any objection to that from the

10  Defendant?

11           MR. PATEL:  No objection, Your Honor.

12           THE COURT:  All right.  Ms. Goldstein, it's important

13  to me that you only do this once during the course of this

14  witness's testimony.

15           So if you have other matters that you think require

16  this, I'd like you to group them so that we won't have people

17  forced to leave on a regular basis.  If this is the time, then

18  we'll do it.

19           MS. GOLDSTEIN:  That's fine, Your Honor.  I can --

20  I'll start with sales and projections and talk about projects

21  and I'll condense everything into this sealed portion.

22           THE COURT:  So you're ready to do it now?

23           MS. GOLDSTEIN:  Yes, sir.

24           THE COURT:  All right.  In that case I would ask that

25  anyone who has -- is not subject to the protective order that's

**REDACTED - CONFIDENTIAL**

**APPX7346-APPX7355**

1          MR. PATEL:  No, there should just be one binder.  I

2    don't know what those numbers mean.  I think there's just one

3    binder.

4                        CROSS-EXAMINATION

5    BY MR. PATEL:

6    Q    Good afternoon, Dr. Kovi.  How are you?  It's good to see

7    you again.  We met last week in New Jersey at your deposition.

8    I have a number of follow-up questions.

9          You are one of the named inventors on the Patents-in-Suit;

10   correct?

11   A    Correct.

12   Q    Okay.  And you co-founded the company with a couple of

13   other partners who are no longer with you; is that correct?

14   A    One more co-partner who is not -- who is not with the

15   company now.

16   Q    Okay.  And in 2000 -- is it correct that Apicore was first

17   approached by Synerx in 2004 to develop isosulfan blue?

18   A    Yes.

19   Q    And Synerx is the successor of -- or I should say one of

20   the predecessors of Mylan; right?  Synerx was later acquired by

21   Mylan?

22   A    That's correct.

23   Q    Okay.  And so at that time when Synerx approached you,

24   Apicore had not yet developed any process for making isosulfan

25   blue; is that correct?

1    A    No.

2    Q    And isn't it true that when Synerx asked Apicore to create

3    an isosulfan blue API, they did not specify any specific purity

4    level; correct?

5    A    No.

6    Q    And as far as you were aware, there wasn't a 99 percent

7    purity requirement by the FDA; correct?

8    A    At the time of starting the project, they hadn't given me

9    the specifications, but over a period of time during the

10    process of developing the API, they did ask for specific

11    specifications, which has to be accepted by the agency.

12    Q    But all they asked you for is an identification of the

13    amount of impurities; correct?

14    A    No.  It has to be the purity as well.

15    Q    But they did not ask for 99 percent impurity; is that

16    correct?

17    A    No, specifically 99 percent they didn't ask for.

18    Q    And in your declaration that you submitted in this case,

19    you identified a number of challenges; correct?

20    A    That's correct.

21    Q    Manufacturing challenges; is that correct?

22    A    Yes.

23    Q    Okay.  And if we can bring up paragraph eight of your

24    declaration, and looking at the sentence, you said, There were

25    market shortages due to manufacturing challenges.  Do you see

1  Q    Now, if you look at paragraph 21 of your declaration, you

2  state that Apicore anticipates -- pull it up.  You state that

3  Apicore -- at the bottom.  I think it's the last sentence.

4  Apicore anticipates making only 80 percent of its total

5  projected revenue of over $30 million in 2016.  Do you see

6  that?

7  A    Yes.

8  Q    Would you agree with me that 20 percent of 30 million is

9  $6 million; correct?

10  A    I don't have a calculator.  Approximately.

11  Q    695 is 30.

12  A    Yeah, approximately.

13  Q    All right.  But ISB, as we've talked and established, was

14  only projected to account for only $2 million of the revenue in

15  2016; correct?

16  A    Yes.

17  Q    So the other $4 million that Apicore doesn't expect to

18  reach must be due to some other reasons; correct?

19  A    Well, this is a projection as of now that we will not be

20  able to get $30 million, and that is mainly due to the

21  recession development which we were supposed to do using the

22  isosulfan blue revenue coming in, which leads to the further

23  selling of those products which generates the revenue for the

24  company, due to which we are not seeing that here.  It's an

25  impact on the total performance of the company.

1  Q    Now, with respect to the R&D that you're talking about,

2  Apicore produces active pharmaceutical ingredients; correct?

3  A    Correct.

4  Q    And those active pharmaceutical ingredients are used in

5  generic ANDA products; correct?

6  A    Correct.

7  Q    And -- and I believe you testified in your deposition that

8  the projects that Apicore is currently working on, none of the

9  potential ANDA's actually have FDA approval yet; is that

10  correct?

11  A    I don't understand exact question.

12  Q    The projects that you're working on on developing API's

13  for certain ANDA's, those ANDA's don't have other generic

14  versions on the market as of now; correct?

15  A    I think you're talking about the other generic products on

16  the market for those specific products which are affected in

17  the process?

18  Q    Yes.

19  A    I have no idea.  I have to look at the orange book to see

20  how many are there on those products.

21  Q    And you identified a number of projects that you stated,

22  you know, have been suspended or stopped since the time

23  Aurobindo launched.  Isn't it also true that there have -- that

24  Apicore has added a number of projects since Aurobindo

25  launched?

1   A    Not in the active pharmaceutical ingredients.  We have

2   used some of the existing products and tried to move into the

3   other markets.

4   Q    And with respect to the -- isn't it true that the number

5   of projects and the specific projects that Apicore is working

6   on is a dynamic process?

7   A    That's correct.

8   Q    You also mentioned that you lost two Apicore employees.  I

9   believe one was a human resource employee; correct?

10  A    Correct.

11  Q    And isn't it correct that Apicore has already rehired a

12  replacement for that human resource?

13  A    Yes.

14  Q    And who was the other employee?

15  A    QA.

16  Q    Quality --

17  A    Quality assurance.

18  Q    Quality assurance, and his name was Avinash?

19  A    Yes.

20  Q    And you claim that he left for another company because

21  they were offering him a higher salary?

22  A    That's what he said, yes.

23  Q    But in your deposition you testified that you didn't even

24  ask him what that higher salary was; correct?

25  A    Correct.  He was saying.  I didn't ask for it.  He said.

1    Q    Thank you very much.

2              MR. PATEL:  I have no further questions.

3              MS. GOLDSTEIN:  I have no further questions, Your

4    Honor.

5              THE COURT:  All right.  We will unseal the courtroom.

6    You may step down, Doctor, and we'll take the afternoon recess.

7              COURT SECURITY OFFICER:  All rise.

8              (Recess taken.)

9              COURT SECURITY OFFICER:  All rise.

10             THE COURT:  Good afternoon, please be seated.

11             Let's see.  Who is our next witness?

12             MR. STEUER:  Your Honor, Plaintiffs call as their

13   last witness Mr. Michael Dansky.

14             MICHAEL DANSKY, PLAINTIFF'S WITNESS, SWORN

15                        DIRECT EXAMINATION

16   BY MR. STEUER:

17   Q    Good afternoon, Mr. Dansky.

18   A    Good afternoon.

19   Q    Mr. Dansky, what do you do for a living?

20   A    I run an intellectual property consulting group for a

21   large company called BRG Consulting.  I value intellectual

22   property.  I do some expert work, but primarily I'm evaluating

23   intellectual property in a range of markets and clients ask me

24   to advise them on those issues.

25   Q    What qualifies you to do that type of work?

1    here.  Perhaps it's --

2    A    That's correct.

3    Q    Okay.

4    A    That's correct.

5    Q    How has Apicore been harmed by Defendant's conduct?

6    A    If we go to the next slide just very quickly, one of the

7    things I wanted to show here that just in the very rapid period

8    of time this year since Aurobindo has been in the market,

9    they've now captured in excess of 50 percent of the market, and

10   that's very rapid, and that's had a significant effect as we've

11   heard on Apicore's business.

12   Q    Were you just here for Dr. Kovi's testimony?

13   A    Yes, I was.

14   Q    Do you remember how much isosulfan blue he said he

15   expected Mylan to actually purchase in 2016?

16   A    None.

17   Q    Okay.  Now, does this inform the irreparable harm analysis

18   that you've conducted with respect to Apicore?

19   A    It does, and they also have very little expectation of

20   purchases in 2017 and possibly into 2018.  So given the history

21   of the market and the size of Mylan's expectations of the

22   business, this is going to be a sizable loss for Apicore.

23   Q    Do you have an opinion as to whether the loss of revenue

24   Apicore due to the Defendant's entry into the market causes

25   irreparable harm to Apicore?

1   A    I do, yes.

2   Q    And what is your opinion?

3   A    I think we take maybe one more slide forward, two more.

4   Sorry.  Okay.  So we'll go back up.

5        So this project has been profitable, as we heard.  It's

6   about twice as profitable as any other product that they have,

7   and we've had significant loss of revenue and cash flow, and as

8   Mr. Kovi indicated, a lot of this additional revenue that

9   they've earned is really earmarked for specific projects.

10       So the money from isosulfan blue has really been the free

11  cash that's allowed the company to grow, invest in other

12  products, and over the next few years, the likely losses are

13  going to be substantial and really constrain their business.

14  Q    Have you also looked at whether the assumed infringement

15  by Aurobindo has caused irreparable harm to Mylan?

16  A    Yes, I have.

17  Q    And what is your opinion as to whether Mylan has suffered

18  irreparable harm?

19  A    I believe that Mylan has suffered irreparable harm and I

20  think that that harm is going to be expand unless Aurobindo is

21  enjoined.

22  Q    How has Aurobindo's entry resulted in irreparable harm to

23  Mylan?

24  A    If we go back a few slides which shows -- I think there

25  was a slide put up earlier today where Aurobindo now has

1  captured 59 percent of the market, and that's significant over

2  a relatively short period of time, so that's for one lost

3  sales.

4       We've also heard that they're suffering price erosion, so

5  they're not only losing sales, but they're being forced to

6  lower their price on the existing customers that they've been

7  able to retain, and that's going to affect their overall

8  business, you know, going forward as well.

9       And they're very concerned, and I think rightfully so, the

10 impact on their goodwill with their customers.  They've got a

11 competitor offering something -- you know, a valuable product a

12 lot cheaper.  They're getting pressure from their customers to

13 lower the price.

14      And so their choice is one of two things.  Either they

15 lower the price and suffer price erosion and possibly never get

16 that money back, or they don't lower the price, lose sales, and

17 have customers that are unhappy with them in that way, too, and

18 both of those possibilities are potential losses of goodwill

19 for them.

20 Q    Let me turn to another issue, and the issue is the causal

21 nexus between infringement and the harm to Mylan and Apicore.

22 Have you taken a look at that?

23 A    I have.

24 Q    In your opinion, is there a causal nexus between the

25 alleged infringement and harm to the two Plaintiffs?

1  polls, or any other evidence that you have identified that

2  specifically note that these consumers purchased ISB product

3  because of the 99 percent purity?

4  A    Not that I recall.

5  Q    And, similarly, you do not identify any evidence to show

6  that any consumer purchases the ISB product because it was

7  manufactured using silver oxide; correct?

8  A    I don't recall whether -- whether that was something

9  required between Mylan and Apicore, but outside of that, I

10  would say no.

11  Q    Let's -- let's talk about Mylan as the consumer of the ISB

12  API.  You heard Dr. Kovi testify that he entered into a term

13  sheet agreement with Synerx in 2004; correct?

14  A    That is correct, yes.

15  Q    And if I can turn your attention to your binder, it is tab

16  number 17.  Do you recognize this to be the -- oh, I'm sorry.

17  It's Mylan 1103.  There we go.

18       And you recognize this to be the term agreement entered

19  into between Apicore and Synerx?

20  A    That's correct.  It's entitled term sheet, and I believe

21  this is the agreement they entered into to begin some

22  development work.

23  Q    Right.  And in this agreement, Synerx was asking Apicore

24  to develop an API for potential use in a future ANDA product

25  for isosulfan blue; is that correct?

1   A    That's true, and to register with the FDA an ANDA to

2   receive marketing approval.

3   Q    Sure.  And you were here for Mr. Kovi's testimony where he

4   admitted that Synerx never requested 99 percent purity in any

5   API that Apicore was supposed to deliver; correct?

6   A    No, that's correct, and that's the interesting thing about

7   intellectual property and novelty is that sometimes when you

8   start a project, you get unusual results and you end up with

9   patents, and so you end up with inventions, and that's --

10  that's what happened in this arrangement.

11  Q    Right.  So you agree that Synerx never specifically

12  identified 99 percent as a demand for a characteristic of an

13  ISE API that they were contracting for in terms of supplies --

14  excuse me -- the term agreement; correct?

15  A    Right.  They didn't have any specification really.  This

16  is a term sheet, and term sheets generally are documents that

17  are eventually superseded by agreements, and I'm sure that they

18  got into business with Apicore expecting they were going to

19  develop a product and a good result, and I think that's what

20  came out.

21  Q    Can we turn to the next page, which is 1105?  And if you

22  look at the definition of product there right in the middle,

23  you agree that product is defined simply as isosulfan blue

24  active pharmaceutical ingredient as required by Synerx in order

25  to develop, manufacture, and register with FDA an abbreviated

1   new drug application in order to receive marketing approval for

2   an AP rated injectable generic equivalent to Lymphazurin as

3   marketed by U.S. Surgical, and this would be the scope of the

4   product that was being contracted between the parties; correct?

5   A    I believe that's correct, yes.

6   Q    And there's no mention of 99 percent purity; correct?

7   A    There's no mention of any real details specifications.

8   Q    Let's turn your attention to your opinion -- well, let me

9   back up.

10       You have an opinion that Apicore's pre-litigation forecast

11  was understated for isosulfan blue revenues, but overstated for

12  non-isosulfan blue.

13  A    That's correct.  I looked at the forecast in detail.  I

14  looked at their actual sales that they were making at the times

15  during various years.  Even their forecast for 2015 is

16  $3 million.  The result is two to $3 million less than what

17  they have projected.

18       So looking through this in detail, yes, I viewed it to not

19  be particularly accurate, and then in the context of knowing

20  Mylan's information, which Apicore couldn't possibly know, they

21  tremendously understated the size of the market and the sales

22  they would make on isosulfan blue.

23           MS. AHN:  This is the portion of the program where I

24  will be referencing Mylan's forecast.  I don't know if you want

25  to --

1    A    So one of the objects of the invention was to use a mild

2    oxidizing agent to avoid any over oxidized products in their

3    synthesis of isosulfan blue.

4    Q    And you'll recall -- I'm sorry.  Let me back up a minute.

5    And you reviewed also the prosecution history of the '992

6    patent.

7    A    Yes, I did.

8    Q    What do you recall the inventors discussed was used in the

9    prior art to make isosulfan blue?

10   A    So the prior art used lead oxide and chromium oxide to

11   oxidize the isoleuco form of isosulfan blue.

12   Q    And what is the reason the applicants gave to the examiner

13   that the prior art processes for making isosulfan blue employed

14   as acids?

15   A    I'm sorry.  Can you repeat the question?

16   Q    Sure.  What is the reason that the applicants gave to the

17   examiner as to why the prior methods to make isosulfan blue

18   employed an acid?

19   A    So the prior art methods worked in the presence of acid,

20   and the presence of acid was required for those oxidations to

21   occur.

22   Q    Would the prior methods of making isosulfan blue work if

23   you didn't use an acid?

24   A    I do not believe so.

25   Q    Now, let me direct you to claim one of the '616 patent.

1    these claims under the doctrine of equivalence?

2    A    I do.

3    Q    And what is that opinion?

4    A    My opinion is that the Aurobindo process does not infringe

5    these claims under the doctrine of equivalence either.

6    Q    Why is that, sir?

7    A    Well, for at least two reasons.  Manganese dioxide is not

8    silver oxide, and the -- furthermore, the reaction is done

9    acidic conditions instead of basic conditions like silver oxide

10   is a base, yes.

11   Q    You've heard some testimony and presentation in Court

12   today as to whether manganese dioxide is a strong oxidizing

13   agent or a mild oxidizing agent.  What is your opinion as to

14   whether manganese dioxide is a strong or mild oxidizing agent?

15   A    Manganese dioxide is a strong oxidizing agent.  It's very

16   close in chemical reactivity to dichromate salts.

17   Q    And we've looked at some references today relating to

18   manganese dioxide being called a strong oxidizing agent.

19   You've seen that; right?

20   A    Yes.

21   Q    So I'd like to sort of put that aside so that we don't

22   retread that ground, but you also heard some testimony from Dr.

23   Sessler regarding the redox potential of an oxidizing agent;

24   right?

25   A    Yes.

1   ability with more potential -- chemical potential than silver

2   oxide does.

3       It's -- manganese dioxide is very close in chemical

4   potential to actually the dichromate salt down below Cr2O72

5   minus.  That's manganese oxide is much closer to dichromate,

6   which is known as a strong dioxidizing agent, than it is to

7   silver oxide, which is a weak oxidizing agent.

8   Q    And manganese being a strong oxidizing agent, what effect,

9   if any, does that have on Aurobindo process to make isosulfan

10  blue?  And perhaps we could go back to slide 15.  Sorry.

11  Fourteen.

12  A    Okay.  I'm sorry.  I -- I'm lost.  What's your question

13  again?

14  Q    Sure.  Given your opinion that manganese dioxide is a

15  strong oxidizing agent, what is your opinion, if any, as to the

16  effect of manganese dioxide on Aurobindo's process for making

17  isosulfan blue?

18  A    Well, Aurobindo's process uses manganese dioxide with

19  purified water and phosphoric acid under acidic conditions to

20  oxidize the isoleuco form of the acid, which is the top

21  structure on the page to the material, which is the blue dye

22  form in the middle, and then they treat with sodium to create

23  the sodium salt at the bottom.

24  Q    Based on your review of documents from Aurobindo, does

25  that oxidation process lead to -- by itself to isosulfan blue

1  that's 99 percent pure or greater?

2  A    No, I don't believe it does.

3  Q    Why not?

4  A    Well, manganese oxide is a more powerful oxidizing agent,

5  and so it has a tendency of reacting with other things such as

6  the product instead of the reactant that -- and so you'll start

7  getting side products forming in the chemical process of making

8  isosulfan blue with manganese oxide.

9  Q    Does that mean that Aurobindo has to undertake a further

10 purification step after to reach 99 percent purity?

11 A    Yes, it does.

12 Q    Now, you also in your declaration addressed prior art that

13 disclosed the use of manganese dioxide with respect to triaryl

14 or triphenylmethane dyes; right?

15 A    Yes, I did.

16 Q    Could we go to slide 20, please?  Are you familiar with

17 U.S. Patent No. 5,158,558?

18 A    5,198,558, yes.

19 Q    Please tell us what is being shown in this slide.

20 A    So here the process for the preparation of the

21 triphenylmethane dyes involves the oxidation of the leuco

22 compound with manganese dioxide and the presence of aqueous

23 phosphoric acid at room temperature to about a hundred degrees.

24     Then you add a base, which they've given a list of basic

25 compounds that can be used.  They filter the precipitate that

1  forms and they isolate the triphenylmethane dye.

2  Q    Based on your review of this '558 patent, is the process

3  to make the triphenylmethane dyes comparable to what Aurobindo

4  uses to make isosulfan blue?

5  A    Yes, I believe this is identical or nearly identical to

6  that process.

7  Q    I'd now like to skip ahead to slide 25, please.  And just

8  to reiterate, how does Aurobindo purify its isosulfan blue

9  product?

10 A    So Aurobindo uses HPLC -- preparative HPLC for

11 purification of its product.

12 Q    Have you prepared some slides to illustrate how one

13 conducts preparative HPLC?

14 A    Yes, I have.

15 Q    Please tell us what you are showing here.

16 A    Okay.  So this first slide shows little blue dots and

17 little orange dots.  The blue dots represent the presence of a

18 blue dye in a sample.  The orange dots represent impurities

19 that are present in the sample.  So ultimately it's a dye

20 solution with impurities in it.

21 Q    And what are you showing in this next slide?

22 A    So in the next slide, we show that this is the way that an

23 HPLC operates really.  There's a column that's filled with a

24 solid material that absorbs materials at different rates or

25 different strengths.

1   blue compound comes off first, and it's much higher than the --

2   or much larger an area than the small orange compound, which

3   comes off second.

4       And -- let's see.  I didn't notice this before, but

5   actually the -- the orange compound would have been on the left

6   side of the blue dye peak rather than the red side since it

7   comes off second.

8       So they've -- it shows that the fractions have been

9   collected and such that the blue dye comes off in one test tube

10  and then some intermediate amount of solvent comes through and

11  is collected in other test tubes, followed by the impurities at

12  the end.

13  Q    All right.  If you put yourself in the shoes of a person

14  of ordinary skill in the art, as of May 11th, 2007, based on

15  the preparative HPLC techniques that were known at that time,

16  would one have -- if you used, say, Lymphazurin as the starting

17  material, 94.5 percent pure, would that person of ordinary

18  skill in the art -- I'm sorry.  Let me start over.

19      Given the information about preparative HPLC that was

20  available as of May 11th, 2007, and if you use Lymphazurin,

21  which is 94.5 percent pure by HPLC, as a starting material,

22  what would have been the expectation of a person of ordinary

23  skill in the art of being able to reach 99 percent purity or

24  greater using preparative HPLC?

25  A    Well, preparative HPLC by this time was a very well-known

1    technique and had been used in many different circumstances to

2    purify compounds to better than 99 percent purity.

3         So as a person of skill in the art, one would expect that

4    raising the purity from something like 95 percent to something

5    like 99 percent would be possible using chromatography

6    technique like HPLC preparative column chromatography.

7    Q    You've also heard testimony today about some other

8    purification techniques, haven't you?

9    A    Yes, I have.

10   Q    And those techniques that you've heard about today, were

11   those known to a person of ordinary skill in the art by May

12   11th, 2007?

13   A    Yes.  Column chromatography was well-known, as well as

14   flash chromatography, which was reported by Clark Still in

15   1998, in '98 or '88, I forget, as well as crystallization and

16   precipitation techniques.

17   Q    Let's take those one at a time.  Putting yourself in the

18   shoes of a person of ordinary skill in the art -- actually, let

19   me back up a minute.

20        You did hear Dr. Sessler testify that as a person of

21   ordinary skill in the art, he would have tried a technique like

22   flash chromatography to purify isosulfan blue as of the filing

23   date of the asserted patents; correct?

24   A    Yes.

25   Q    What is your opinion as to what the expectation of a

1   person of ordinary skill in the art would be of the ability to

2   use flash chromatography to purify isosulfan blue to a purity

3   of greater than 99 percent?

4   A    As a person of skill in the art, at that point I would

5   be -- I would have a reasonable expectation of success for

6   being able to purify the material isosulfan blue away from its

7   impurities to 99 percent or greater.

8   Q    And how about for the crystallization technique?  You

9   heard that -- Dr. Sessler testify that a person of ordinary

10  skill in the art would have given crystallization a whirl as to

11  isosulfan blue; correct?

12  A    Yes.

13  Q    And what was the -- would be the expectation of a person

14  of ordinary skill in the art as of the filing date of the

15  Apicore patents as to whether one should use crystallization to

16  purify isosulfan blue to a purity of at least 99 percent?

17  A    I would think there is a high expectation of success in

18  that process.

19  Q    I would now like to move to slide 40, please.  We've heard

20  some testimony from Dr. Sessler regarding how one determines

21  that the isosulfan blue has a purity of at least 99 percent by

22  HPLC.  What information do the Apicore patents provide as to

23  how you determine purity by HPLC?

24  A    I saw no experimental section on how to determine purity

25  by HPLC.

1    Apicore purity levels.

2    Q    Why is that?

3    A    Well, because other compounds other than dyes, for

4    example, phosphates or other organic compounds from solvents,

5    they don't absorb in the blue region of the visible range of

6    light.

7         So only the -- so the only compounds that would be

8    detected would be the -- the compounds that went into the -- or

9    that absorbed in the blue region or somewhere around the blue

10   region of light.

11        So all the other compounds would not be detected and you

12   would think that you had over 99 percent pure material if there

13   were no other blue compounds present.

14   Q    Now I'd like to switch gears just slightly for the last

15   issue that I'd like to address.

16        In terms of the term having a purity of 99.0 percent by

17   HPLC, did you provide your opinion as to what that meant?

18   A    Yes, I did.

19   Q    I would ask that we go to slide 44, please.  Is this a --

20   is this your opinion as to the meaning of having a purity of at

21   least 99 percent by HPLC?

22   A    Yes, having not more than one percent extraneous material,

23   that is material that is not isosulfan blue sodium salt, as

24   determined with HPLC with a reproducible set of conditions.

25   Q    Now, there was a document that Plaintiffs presented during

 1   the deposition of Dr. Krag.  It was, I believe, a document that

 2   discussed ICH guidelines.  Have you heard of ICH guidelines?

 3            MS. STAFFORD:  Your Honor, we object.  That's outside

 4   the scope of the expert designations.

 5            THE COURT:  All right.

 6            MR. YU:  Your Honor, this was a document that we

 7   presented during deposition of Dr. Krag, our surgical expert,

 8   and we feel that it's only fair to have our chemistry expert

 9   testify as to what is addressed in terms of purity in this

10   document.

11            MS. STAFFORD:  It wasn't in his rebuttal declaration

12   that he just filed on Monday.

13            THE COURT:  With respect to expert testimony, I think

14   it is appropriate that the opinions be those reflected in the

15   declarations.  Mr. Yu, was this covered in Dr. Brown's

16   declaration?

17            MR. YU:  This document specifically was not.  He

18   addressed the general issue.

19            THE COURT:  All right.  Well, then stick to the scope

20   of his declaration and you can continue.

21            MR. YU:  Very good, Your Honor.

22   Q    (By Mr. Yu)  If you'll go to slide 46, please, what is

23   your opinion as to whether -- let me back up a minute.

24        There are three patents from the '050 patent that are

25   asserted against Aurobindo; correct?

1  A    Yes.

2  Q    And let's take those one at a time.  What is your opinion

3  as to whether Aurobindo infringes claim one of the '050 patent?

4  A    I don't believe it does infringe.

5  Q    Why not, sir?

6  A    Well, the Aurobindo process does not use silver oxide as

7  an oxidizing agent in the process.

8  Q    Okay.  I think we're maybe confusing patents here.  The

9  '050 patent.

10  A    Oh, so Aurobindo's process actually has one percent of the

11  dye present.  The manufactured goods has one percent of the dye

12  present, and other compounds present in the solution to buffer

13  the solution.

14  Q    So does that have 99 percent purity by HPLC?

15  A    No, because there are phosphate buffers and that sort of

16  thing.  It's not 99 percent pure.  It's more like 50 percent

17  pure.

18  Q    Okay.  And you recall that claim 11 of the '050 patent

19  claims a solution containing isosulfan blue having a purity of

20  99 percent by HPLC; right?

21  A    Yes.

22  Q    What is your opinion as to whether Aurobindo infringes

23  claim 11 of the '050 patent?

24  A    My opinion is it does not infringe the claim 11 of the

25  '050 patent.

1   Q    And the presence of impurities can cause different side

2   effects in a pharmaceutical; correct?

3   A    I believe so.

4   Q    And that's one of the reasons why a chemist would want to

5   have as high a purity product that they could if it was going

6   to go into a pharmaceutical product; correct?

7   A    If it was going to go into a pharmaceutical product, yes.

8   Q    Now, in your declaration, you indicated that a reference

9   to Hironaka that was published in 1975 provided a motivation

10  for a pure blue dye for use in lymphatic mapping; correct?

11  A    Yes.

12  Q    And if a motivation was provided in 1975 for pure blue

13  dyes, you had opined in your declaration you just don't have

14  any idea why it took 30 years to actually obtain it; correct?

15  A    Well, there's no publications involved that I've seen, but

16  that doesn't mean that people didn't do it to purify it.

17  Q    Well, when I asked you during your deposition if a

18  motivation was provided in 1975 for pure blue dye, do you know

19  why it took 30 years to actually obtain it, and you said,

20  answer, No, I don't.  Does that sound like your testimony?

21  A    Yes.

22  Q    And you don't even know or even consider why Mylan decided

23  to purchase API from Apicore, do you?

24  A    I don't believe so.

25  Q    And you would agree that Aurobindo's reaction scheme using

1   manganese dioxide produces a relatively pure form of isosulfan

2   blue; correct?

3   A    I'm not sure of that.

4   Q    Well, let's go to your deposition at page 158.  It's line

5   four through 14, if you can find it, and you were asked the

6   question, Well, isn't manganese dioxide a mild oxidizing agent

7   with respect to at least the way that the asserted patents

8   characterize mild oxidizing agents because it avoids over

9   oxidized products and minimizes them?

10        And your answer, Well, I can't say that it's a mild

11   oxidizing agent.  I can say that it -- apparently, based on

12   what I know now, that the reaction produces a relatively pure

13   form of isosulfan blue.

14   A    Yes, I said that.

15   Q    And that was your truthful, accurate testimony at your

16   deposition.

17   A    Yes.

18          THE COURT:  Ms. Stafford, I know that time is short,

19   but we'll get a better record if you slow down just a little.

20          MS. STAFFORD:  I'm sorry.  I'm sorry, Your Honor.

21   I'll try.

22          THE COURT:  All right.

23          MS. STAFFORD:  Apologies.

24   Q    (By Ms. Stafford)  And, in fact, the use of manganese

25   dioxide Aurobindo allows for the preparation of isosulfan blue

1   of greater than 99 percent purity by HPLC; correct?

2   A     After purification, yes.

3   Q     And you would agree that Aurobindo's API is prepared with

4   a purity of greater than 99 percent as determined by HPLC.

5   A     I believe that's true.

6   Q     And you would agree that silver oxide and manganese

7   dioxide are both metal oxide oxidants; correct?

8   A     That is true.

9   Q     And in the asserted claim, silver oxide functions to

10  oxidize the Leuco form of isosulfan blue to produce isosulfan

11  blue; correct?

12  A     It does.

13  Q     And in Aurobindo's process, manganese dioxide functions to

14  say oxidize the leuco form of isosulfan blue to isosulfan blue;

15  correct?

16  A     It does.

17  Q     And when you talked a little bit about oxidation potential

18  and maybe that being a factor for whether something is a strong

19  or mild oxidant in your opinion; correct?

20  A     Yes.

21  Q     You would agree with me that there are a number of factors

22  that go into the actual oxidation potential of an agent in a

23  process; correct?

24  A     Yes, that's true.

25  Q     And some of those things include the concentration of acid

1    or base.

2    A     That is true.

3    Q     The temperature.

4    A     Yes.

5    Q     The pressure of the chemical reaction?

6    A     In some cases yes.

7    Q     Concentrations of reagents?

8    A     Yes.

9    Q     So there are a whole number of things that can change the

10   oxidation potential of something; correct?

11   A     That is true.

12   Q     And you would agree with me as you go to a higher pH,

13   manganese oxide becomes a weaker and milder oxidizing agent;

14   correct?

15   A     I believe it becomes -- has a less of a redox potential

16   than it did.

17   Q     But in forming your opinions, you didn't consider the pH

18   in Aurobindo's procedure at all, did you?

19   A     I guess I did not.

20   Q     And, in fact, during your deposition, you thought

21   erroneously that the Aurobindo was operating at a range of a

22   minus one to one pH; correct?

23   A     That is true.  And it actually operates, I believe,

24   between two and three pH, something like that.

25   Q     Or maybe 3.8?

1    A    Okay.

2    Q    And in reaching your opinions on infringement, including

3    infringement of the doctrine of equivalence, you didn't

4    actually consider Aurobindo's procedure directly, did you?

5    A    I'm sorry.  Could you repeat that?

6    Q    In reaching your opinions on infringement and whether

7    there was infringement under the doctrine of equivalence, 00you

8    didn't look at Aurobindo's procedure directly, did you?

9    A    No, I did not.

10    Q    And you talked a little bit on direct about standard half

11    sell reduction potential; correct?

12    A    Yes.

13    Q    And those were done under standard conditions; correct?

14    A    I believe so.

15    Q    And there is a set pH that's closer to like minus one or

16    zero; correct?

17    A    Yes, I believe it's zero.

18    Q    And that's -- that's a much more acidic environment than

19    what Aurobindo's process is; correct?

20    A    It is more acidic.  I would say slightly more acidic

21    compared to a pH 14, for example.

22    Q    You never actually in forming your opinions you never even

23    took into account the fact that the Aurobindo's processes

24    allowed a range from two all the way up to 3.8, did you?

25    A    I did not.

1    Q    Now, you say it's your opinion that the term having purity

2    of at least 99 percent by HPLC will mean having not more than

3    one percent extraneous material?

4    A    Yes.

5    Q    Now, you would agree with me that the term extraneous

6    material was never mentioned in the specification of any of the

7    patents; correct?

8    A    No, I didn't see that.

9    Q    And when discussing purity, you equate extraneous material

10   with unwanted impurities?

11   A    I do just impurities, yes.

12   Q    But in your slide that you showed where you talked about

13   preparative HPLC, I noticed that -- I think it was slide 26 --

14   you only included the little orange dots for individual

15   impurities.  You didn't label everything that wasn't a blue dot

16   orange and call it impurity, did you?

17   A    I didn't label the blue dots orange.  Is that what you're

18   saying?

19   Q    No.  I'm just saying in the -- in the -- in your own

20   presentation today when you talked about the difference between

21   an impurity and the dye, you only -- you didn't consider

22   everything else that was present other than the dyes an

23   impurity.

24   A    No.  This was a simple example where I wanted to show the

25   way that HPLC can work to separate compound.  I didn't want to

1   make it too complex.

2   Q    Well, that's because persons of ordinary skill in the art,

3   they don't consider things that are added intentionally as

4   impurities, do they?

5   A    I believe if they're present, that they are impurities.

6   Q    Well, you would agree with me the FDA doesn't consider

7   excipients that are added intentionally to pharmaceuticals to

8   be impurities, do they?

9   A    I believe that's true.

10  Q    You would agree with me that Aurobindo's specification for

11  its product specifically states that it doesn't allow for more

12  than one percent of impurities by HPLC; correct?

13  A    That's true.

14  Q    And you would agree with me that claim 11 of the '050

15  patent is directed to a solution in which the starting sodium

16  salt has a purity of at least 99 percent; correct?

17  A    I read it that the solution of the material dye is -- has

18  a purity of 99 percent.

19  Q    You would agree with me that there is no solvent in which

20  one could prepare a 99 percent straight solution of isosulfan

21  blue; correct?

22  A    Well, because it's a solution, you don't count the solvent

23  itself.  In this case it would be water.

24  Q    And, in fact, when asked about that in your deposition,

25  you said that that means that you infer that claim 11, it's the

1  A    Yes.

2  Q    You would agree that a person of skill in the art would

3  know that purity by HPLC is typically used to describe purity

4  levels allowed in an API or finished dosage form by the FDA;

5  correct?

6  A    I believe so.

7  Q    And you don't know if changing any HPLC parameters in a

8  method to determine purity would have any affect on the results

9  objection, do you?

10  A    Well, I believe there are certain parameters that would

11  change the detector's response for determinations of purity.

12  Q    When asked during your deposition, I believe you testified

13  that without doing the experiment, a person could not predict

14  whether the HPLC analysis at different wavelengths would lead

15  to a different determination of purity; is that correct?

16  A    Yes.  I said that.

17  Q    And I believe that you spent a lot of time talking about

18  the possibly using different wavelengths as maybe being a cause

19  for different results; correct?

20  A    Yes, I did.

21  Q    But you didn't do any experiments; right?

22  A    I have done no experiments, no.

23  Q    So you don't know if it really matters what wavelength you

24  conduct the HPLC at.

25  A    Well, I should say I have not done experiments on

1  that was made public; right?

2  A    That is correct.

3  Q    And could you tell us, please, what is shown in this FDA

4  notice?

5  A    That the isosulfan was withdrawn not for reasons related

6  to safety and not related to efficacy.

7  Q    Have you heard of Mylan's generic isosulfan blue product?

8  A    Yes, I have.

9  Q    Now, are you familiar with a document that we kind of in

10  pharmaceutical refer to as the package insert?

11  A    Yes.

12  Q    Did you review the package inserts for Lymphazurin and

13  Mylan's generic isosulfan blue product?

14  A    Yes, I did.

15  Q    Based on your review, what differences, if any, did you

16  find when you compared the package insert between Lymphazurin

17  and Mylan isosulfan blue product?

18  A    I could see no differences.

19  Q    Now, did you review information provided by Mylan

20  regarding its isosulfan blue product on its website?

21  A    Yes, I did.

22  Q    What did Mylan say about its generic isosulfan blue

23  product on its website?

24  A    Well, there's several screenshots, multiple screenshots,

25  and the first one is more to kind of catch the eye of the

1  indication that there's more going on.

2  Q    And you were here when Mr. Dansky testified that he

3  assumed that the -- that the infringement -- excuse me -- that

4  the Patents-in-Suit was pretty much equivalent to the ISB

5  product.

6  A    Yes, I heard that.

7  Q    Okay.  And what -- how does that affect your analysis?

8  A    Well, because of that, it causes Mr. Dansky not to have

9  studied demand, and there's other features and benefits to the

10 product that Mr. Dansky gave on no weight.

11      Just assuming infringement is not enough in this context

12 and really in most, if not all, patent infringement matters

13 because it's -- it's required, as I explained earlier, in order

14 to insure that we're mapping value or the economic attributes

15 specifically on to the patents and not giving other credit to

16 the patents.

17      These types of conclusions are -- potentially confer value

18 on to a patent right that doesn't belong.

19 Q    Have you seen in your work on this case or sitting through

20 this hearing of any evidence that shows that any consumer that

21 purchases ISB product from Mylan due to the 99 percent purity?

22 A    We haven't heard any evidence of that.  Mr. Dansky hasn't

23 presented it and it's not been presented today, and there's

24 actually strong evidence that shows the opposite, that purity

25 is not a requirement of consumers.

1   Q    To your knowledge and all the evidence that you've seen,

2   do you know whether end consumers such as physicians and

3   hospitals even know the purity level of any of the -- any ISB

4   product?

5   A    I understand that they do not from speaking with Dr. Krag.

6   That's -- I spoke with him very early on in this assignment,

7   and that was one of the pieces of information that I considered

8   and relied upon in my first declaration.

9   Q    And did you read the deposition transcript of Dr.

10  Bleicher?

11  A    Yes, I did.

12  Q    And what was his testimony on this point?

13  A    His testimony was very similar on that point.

14  Q    And you were here when Dr. Kovi testified about the start

15  of the relationship with Synerx; correct?

16  A    Yes.

17  Q    And what was his testimony related to the purity?

18  A    Well, he provided testimony very similar to this, that --

19  that they did not specify a certain purity level that they

20  required back in 2004.

21  Q    And what does that tell you?

22  A    So that tells me that demand is a function of other

23  considerations, not purity.

24  Q    And anything else that confirms Dr. Kovi's testimony?

25  A    Yes.  So I have here on this slide that in the 2004 term

1    Q    Okay.  Do you know what this is?

2    A    So this is a certificate of analysis.  This shows sort of

3    the manufacturing requirements or specifications.

4    Q    Okay.  And is this a document that Mr. Dansky ever relied

5    upon in his analysis?

6    A    He did not rely on this document or consider it.

7    Q    And let's -- you can put that away, sir.  Can we go back

8    to our -- let's talk about Mylan's marketing of its ISB

9    product.  Does Mylan ever market or tout the fact that its ISB

10   product is 99 percent pure?

11   A    No.  It discusses that it's a bioequivalent to

12   Lymphazurin, and that's -- that there is a history of use for

13   more than 30 years, that it is an FDA approved blue dye, but it

14   does not discuss the 99 percent purity.

15   Q    And is it your understanding that Mylan as a generic of

16   the brand -- the drug, is it your understanding that they were

17   able to claim a superior or different performance from the

18   branded drug?

19   A    I understand that they can't.  In order to be generic,

20   it's the key phrase here is bioequivalence, and that's what

21   they can claim.

22   Q    Okay.  Did any Mylan witness testify about reasons that

23   its isosulfan blue product would be purchased by consumers?

24   A    Yes.  Ms. Paton testified about that.  She was asked about

25   it during her deposition.  This is among the materials that I

1   report?

2   A    No, he didn't consider price to be a driver of demand.

3   Again, he said that the patent equals the product.

4   Q    And is it your opinion that price is an important

5   consideration?

6   A    Yes, it's a very important consideration in this market.

7   Q    And why do you think that it's particularly important in

8   this market?

9   A    There's a couple of reasons.  One, because there are

10  substitute products; another, because it relates to -- it's

11  driven by the fact that there are purchasing organizations,

12  GPO's, who contract and insure -- try to insure that the --

13  when purchasers get together, they can get the best pricing,

14  and so it's a focus, as we've heard today.

15            THE COURT:  You've got about five minutes left,

16  Ms. Ahn.

17            MS. AHN:  I understand.

18  Q    (By Ms. Ahn)  And are there any pieces of evidence that

19  you rely on that -- that Mylan understands that pricing is a

20  driving factor for its isosulfan blue product?

21  A    Yes, there's emails that I stated in my declaration.

22  These are two examples.

23  Q    And do you recall the pricing when Mylan came on the

24  market as the -- first came on the market as a generic?

25  A    Yes.  It priced its products -- and this is also in my

1  declaration.  It priced its products significantly below

2  Lymphazurin, the Covidien product, and that's what this chart

3  shows.

4  Q    So we heard testimony today from Dr. Krag.  How does that

5  affect your analysis?

6  A    So it provides further evidence of Dr. Krag's testimony as

7  well as Dr. Bleicher's testimony -- I hope I said his name

8  correctly -- that there's considerations other than purity that

9  drive demand.

10       And they also talked about how there are substitutes, and

11  the fact there's substitute products is a reason why price is a

12  prime consideration in this industry.

13  Q    How about the contention that isosulfan blue is the only

14  FDA approved dye for use in lymphography?  Does that change

15  your opinion in any way?

16  A    No.  We've heard a lot about that, and Ms. Paton alluded

17  to that, including in this slide that I showed earlier, but at

18  best that's one of many considerations.

19       And when you look at the FDA approval, the requirements,

20  there's multiple things that are required within the

21  specification sheet, for example.

22  Q    So kind of summarizing your opinions on economic

23  causation, whether it's there or not, can you give a summary to

24  the Court of your opinions?

25  A    Sure.  So I think it's inappropriate just to assume

```
 1  your slides.  I wonder if we can get that back up somehow.

 2  Counsel -- oh, they're going to put it up.  That's great.

 3       And here you say economic nexus is not shown, and the

 4  first thing is the Patents-in-Suit do not claim all of

 5  isosulfan blue; correct?

 6  A    That's correct.

 7  Q    Now, we're assuming for your purposes of your opinion and

 8  for purposes of Mr. Dansky's opinion that the patents are valid

 9  and infringed; correct?

10  A    Yes.

11  Q    And if Aurobindo cannot sell a product that is 99 percent

12  pure, it's not selling a product; correct?

13  A    I'm not sure I understand the question.

14  Q    All right.

15  A    Can you ask that again?

16  Q    One of the patents in this case -- and you've read the

17  patents, the --

18  A    Yes.

19  Q    -- '050 patent, which claims 99 percent purity.

20  A    Yes.

21  Q    Correct?  And that's also, you understand, to be the

22  specification for the Aurobindo product that's been filed with

23  the FDA; correct?

24  A    Yes.

25  Q    If they're not allowed to make a product with 99 percent
```

1    A    Yes.

2    Q    And you agree with her?

3    A    Yes.

4    Q    Okay.  And if the Court were to find that one of the

5    advantages of the method process patents is that customers have

6    availability and customers have ease of acquisition and that

7    cements customer relationships and contracts, that would have a

8    big affect on the sale of the product, wouldn't it?

9    A    It could have some affect.  The question is how much, and

10   that question has not been addressed by Mr. Dansky.

11   Q    So you would agree that if a doctor cannot get a steady

12   supply of isosulfan blue, they're going to buy something else;

13   correct?

14   A    They may, or they can manage it by having more materials

15   in inventory.  It depends.

16   Q    You would agree with me that price erosion is evidence of

17   irreparable harm?

18   A    It's one of legal criteria that's mentioned, yes.

19   Q    And you are aware that the average sales price for

20   isosulfan blue has declined?

21   A    Yes, we've heard that today.

22   Q    And that's since Aurobindo entered the market; correct?

23   A    Yes, there's competition and prices have gone down.

24   Q    And you don't have any information to indicate that the

25   GPO's and the hospitals that have turned away from Mylan are

```
 1   instead using methylene blue or another dye, do you?

 2   A    I think that -- I'm not sure that I can recall anything

 3   particular right now.

 4           MR. STEUER:  Your Honor, I think I'll stop right

 5   here.  Thank you.

 6           MS. AHN:  And nothing from the Defendants.

 7           THE COURT:  Very good.  Thank you, Mr. Bakewell.

 8   A    Thank you, Your Honor.

 9           THE COURT:  All right.

10           MR. PATEL:  Your Honor, Defendants rest their case

11   with the exception there's one issue that I would like to

12   raise, and that's the issue of deposition designations.

13           It's our understanding that this is a live

14   evidentiary hearing and that parties were not supposed to

15   provide deposition designations, but we'd like some guidance

16   from the Court because we have received deposition designations

17   from Plaintiffs from all witnesses, including those that have

18   been here live.

19           Our position is that if the Court is going to

20   entertain deposition designations, that it be limited to the

21   witnesses that are not able to be present at this hearing.

22           THE COURT:  I see no particular reason to have

23   deposition testimony from the witnesses who have appeared here

24   and testified.

25           MS. STAFFORD:  We're okay with that.
```

1                              CERTIFICATION

2              I HEREBY CERTIFY that the foregoing is a true and

3     correct transcript from the stenographic notes of the

4     proceedings in the above-entitled matter to the best of my

5     ability.

6

7     _____          Date: 11/2/16
      Tammy L. Goolsby, CSR
8     Deputy Official Court Reporter
      State of Texas No.:  3101
9     Expiration Date:  12/31/16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDACTED - CONFIDENTIAL**

**APPX7498-APPX7510**

# EXHIBIT A

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF TEXAS

3                     MARSHALL DIVISION

4   MYLAN INSTITUTIONAL, LLC,   )(

5   ET AL                       )(  CIVIL DOCKET NO.

6                               )(  2:16-CV-00491-RWS-RSP

7   vs.                         )(  MARSHALL, TEXAS

8                               )(

9   AUROBINDO PHARMA LTD, ET AL )(  NOVEMBER 2, 2016

10

11

12                     MOTION HEARING

13        BEFORE THE HONORABLE JUDGE ROY S. PAYNE

14              UNITED STATES MAGISTRATE

15

16

17  APPEARANCES:

18  FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                            minutes of this hearing.)
19

20  FOR THE DEFENDANT:  (See sign-in sheets docketed in
                            minutes of this hearing.)
21

22

23  COURT REPORTER:  Ms. Tammy L. Goolsby, CSR

24  Proceedings taken by Machine Stenotype; transcript was produced
    by a Computer
25
```

1   infringes these three valid patents.

2          I want to briefly in the time I'm up here before you

3   hear the witnesses address some of the key arguments that

4   Aurobindo has put forward to try to avoid the Court's judgment

5   against them.  First of the --

6          THE COURT:  Mr. Steuer, I just want to make sure you

7   know that this is your time that you're using, and you're

8   welcome to use it in opening remarks, but I just want you to

9   know it is counting on your time.

10         MR. STEUER:  Thank you, Your Honor.

11         THE COURT:  Okay.

12         MR. STEUER:  My colleagues here are busy with the

13   chess clock to make sure we're on top of that.

14         THE COURT:  All right.  Good.

15         MR. STEUER:  Your Honor, we have two process patents,

16   and they solved the production issue of isosulfan blue by using

17   a specific mild oxidizing metal, which is silver oxide, instead

18   of the prior art, which was a toxic lead-based oxidizing agent,

19   to make the dye.

20         And we prove infringement of these two patents by the

21   doctrine of equivalence.  The change from silver oxide to

22   magnesium dioxide is an insubstantial change that is equivalent

23   with respect to silver oxide and function way and result.

24         Indeed, the description of the invention recited in

25   the patent states -- and this is what Apicore states -- that an

1           Here's a piece of prior art reference that talks

2    about preparative HPLC.  Everybody in this case agrees that

3    preparative HPLC was known prior to the priority date.

4           Here's another prior art reference Snyder that talks

5    about convenient recovery of highly purified 99 percent pure

6    product that could be done using preparative HPLC, and that's

7    what Aurobindo does.

8           The Sigma documents, what are the Sigma documents?

9    Sigma was a supplier to Covidien for Lymphazurin product.  They

10   had been supplying it for 30 years, and so we subpoenaed them

11   to see what documents they had in terms of what level of purity

12   they were able to obtain, and this is a reference standard.

13          Now, they say that the document was signed in August,

14   but that's the day it was produced.  This is from March 2001,

15   and this is a reference standard, so -- which means the

16   benchmark by which they, when they're making their product,

17   they look at and to see, okay, did we get isosulfan blue?

18          And so for the reference standard, they made it pure.

19   They made it pure to a hundred percent, and discovery is still

20   ongoing with Sigma.  They've produced a few documents, and

21   we're going to see -- they have many more documents that

22   they're continuing to produce, but at the very least, this

23   raises a substantial question of invalidity.

24          It supports our argument that these purification

25   techniques were known, and a person skilled in the art, if they

1        That really has nothing to do with the price of eggs.

2   It's not a flat charge dye molecule, so it -- it is just -- I'm

3   sorry to be so blunt.  It's just wrong.

4        THE COURT:  If there were closely related isomers in

5   that 95 percent mixture, would you expect to be able to get to

6   99 percent with HPLC?

7   A    Your Honor, that actually makes it much harder because

8   closely related compounds tend to stick to one another, stick

9   to each other and stick to the column the same way, so that's a

10  particularly tough challenge.

11        THE COURT:  All right.  And I -- I question some of

12  the filings that Aurobindo made with the FDA I think suggested

13  that manganese dioxide gave a lower yield.  Is that your

14  understanding?

15  A    Your Honor, I -- I looked at this, and I think that yields

16  were -- for both the Apicore process and the Aurobindo process

17  are between 60 and 70 percent.

18        THE COURT:  If the manganese dioxide is as mild as

19  the silver dioxide, would you expect there to be a difference

20  in the yield?

21  A    I -- I wouldn't expect that.

22        THE COURT:  Okay.  Well, I'm -- I'm sorry.  It's

23  purity was what I mentioned, not -- purity was what I meant to

24  be asking you about, not yield.

25        Would you expect a difference in the purity between

```
 1   the use of manganese dioxide and the use of the silver dioxide?
 2   A     The key point --
 3           THE COURT:  Silver oxide.
 4   A     I understand, Your Honor.  So the key point is the use of
 5   these mild metal oxides has a real advantage in purification
 6   because both manganese dioxide and silver oxide give rise to
 7   water products that are insoluble so they can be filtered away.
 8       And so the key heavy metal impurity problem is solved by
 9   using a non-hazardous insoluble metal oxide, so it's not just a
10   manganese dioxide is another metal oxide.  It's an insoluble
11   non-hazardous one that allows this key part of the
12   purification.
13       So once you're free of the metal, then you can use --
14   knowing now, in light of the invention showing that it's
15   possible to get to 99 percent purity, we know it's possible,
16   Aurobindo now knows it's possible, and so they can set out to
17   do that.
18       It's a completely different story in my view looking in
19   prospect before that invention than looking in retrospect after
20   that invention.
21           THE COURT:  All right.  We will break until 1:10 and
22   then come back and continue with Dr. Sessler.  Thank you.
23           COURT SECURITY OFFICER:  All rise.
24           (Lunch taken.)
25           COURT SECURITY OFFICER:  All rise.
```

1   A    Yes, sir.

2   Q    And let me ask you, looking at claim one of the '050

3   patent, does claim one have any requirements as to how you

4   synthesize the isosulfan blue having a purity by HPLC?

5   A    No, it does not.

6   Q    Does it have any requirements as to how or if you purify

7   the isosulfan blue that has a purity of at least 99 percent

8   pure by HPLC?

9   A    No, it does not.

10  Q    Does claim one of the '050 patent have any requirement on

11  how much isosulfan blue you have that is of a purity of at

12  least 99 percent by HPLC?

13  A    The claim itself does not, but this is part of a patent

14  submission for making a pharmaceutical product.

15  Q    So does the claim actually require that you have kilogram

16  amounts of isosulfan blue that's 99 percent pure by HPLC?

17  A    Claim itself does not, counselor.

18  Q    Thank you.  Does the claim have any requirement that

19  you're able to make the isosulfan blue having a purity of at

20  least 99.0 percent by HPLC?  I believe you testified in your

21  direct over and over again.

22  A    What's the question?  I didn't understand that.

23  Q    Yes.  Is there a requirement that you're able to

24  repeatedly make isosulfan blue that is at least 99 percent pure

25  by HPLC?

1  Q    And this article, as we have addressed, indicates that the

2  isosulfan blue is 94.5 percent pure by HPLC.

3  A    So what it says is that the 2.5 disulfonated

4  triphenylmethane dye was prepared in high purity 94 percent dye

5  content, so that's -- as determined by high pressure liquid

6  chromatography, so that's talking about part of what's in

7  there, which is the color dye materials.

8  Q    Is this measure of purity that Hirsch presents, is that a

9  different way of measuring purity than is required by the '050

10  patent?

11  A    I don't think so.

12  Q    So for purposes of the '050 patent claims, you would agree

13  that Hirsch's measurement of 94.5 percent purity is a fair

14  measure of purity for his isosulfan blue product.

15  A    Okay.  So I don't -- there's a little bit of a chain of

16  custody issue because I don't know whether he made that

17  measurement or it was appointed by a supplier.

18      But my general position is that HPLC was being used for

19  determining purity in 1981 and can be used for determining

20  purity today and along the way between 1981 and 19 -- 2016.

21  Q    Now, you would agree that this isosulfan blue that's a

22  94.5 percent could be further purified using the preparative

23  HPLC technique by a person of ordinary skill in the art who is

24  trying to purify an organic compound by the filing dates of the

25  Apicore patent in May 11, 2007; right?

1    A    So what I'm aware is that the inventors were able to make

2    under very specific conditions using either silver oxide or

3    from my read of the notebooks prior to that lead oxide, and the

4    inventors and only the inventors of the asserted patents were

5    able to do that.  I'm aware of no one else who succeeded.

6    Q    I understand your testimony is that the inventors made

7    isosulfan blue to 99 percent purity as of a certain date.  I'm

8    asking you whether a person of ordinary skill in the art could

9    take a technique like preparative HPLC, which I believe was

10   known by May of 2007, and use it to purify isosulfan blue

11   having a purity of 94.5 percent.

12   A    That's unknown to me.

13   Q    Okay.  Now, you testified during your deposition that

14   Aurobindo uses preparative HPLC to purify its isosulfan blue

15   product; correct?

16   A    That's after the 2007 date we were just talking about, but

17   I believe that's correct.

18   Q    Okay.  If we could have the Aurobindo manufacturing

19   document at page -- and this is going to be tab 15, and let me

20   ask you to highlight the text by the second arrow.

21        So, Dr. Sessler, you agree that this document is a summary

22   of the process that Aurobindo uses to prepare its isosulfan

23   blue product; correct?

24   A    Yes.

25   Q    And it is indicated here, the text by the second arrow in

1   A    Oh, that's a case where it worked, but I've had lots of

2   cases, going back even to my graduate school days where flash

3   chromatography was just coming on the scene, where it didn't

4   work.

5   Q    And you testified during your depositions that as a person

6   of ordinary skill in the art that you would think to try flash

7   chromatography to purify isosulfan blue prior to May 11th,

8   2007, didn't you?

9   A    What I believe I said is that it would be something I

10  would want to try, but I would not necessarily have expectation

11  of success, and if that's not what I said, that's certainly

12  what I mean, the message I meant to convey.

13  Q    So if you --

14  A    So trying and succeeding -- sir, sorry, let me finish, --

15  Q    I'm sorry.

16  A    -- please, if you would be so kind, sir.  Trying and

17  succeeding are often very different.

18  Q    So if you only had a limited amount of isosulfan blue,

19  would you use it on a technique that was not likely to work?

20  A    That's a very hypothetical question.

21  Q    Let me withdraw it then.

22       Let's go to the next page of the lab notebook, page 4740.

23  So the date on this page is also February 21st, 2005; correct?

24  A    That's correct.

25  Q    Same date as the previous page we looked at.

1  certain.

2  Q    Okay.  But you would agree, wouldn't you, that

3  crystallization organic compounds and even of highly color

4  dyes, that's a pretty common technique to a person of ordinary

5  skill in the art by large extent 2005 and also by May 11th,

6  2007.

7  A    Counselor, I -- we keep coming back to this.  Yes, common

8  technique, something one would think about trying, but not

9  necessarily know that it would succeed.  Again, I come back to

10 my 30 plus years of making color compounds.  Sometimes it works

11 and sometimes it doesn't.

12 Q    Understood.  But in your deposition, you said that the

13 expectation of success for purification was high enough that

14 that you would, quote, give it a whirl.  Would you like to see

15 the transcript?

16 A    Yes.

17 Q    Okay.  It's your second deposition.

18 A    Okay.  Tab 22.  I'm starting to learn.

19 Q    Page 148, lines seven through 19, and I believe in the

20 middle you said, It is the expectation of success is high

21 enough that one would give it a whirl.

22 A    Yeah.  Okay.  So now -- now that we have this up, we can

23 continue and --

24 Q    I actually didn't ask a question yet, sir.  I was just

25 reading from the transcript.

1              THE COURT:  As long as you give him a chance to

2    explain his answer.

3              MR. YU:  Yes, sir.

4    Q    (By Mr. Yu) And so would you like to change your answer

5    from that, the expectation of success of purification of

6    isosulfan blue was high enough that you would give it a whirl?

7    A      Okay.  Two points I want to make.  First, I believe we

8    went to this because you asked me a question, didn't you

9    testify, and so I was responding to that question.

10            Second, if we put that back up there, if you would be so

11   kind, so that we can actually all see this and allow me to read

12   the full sentence, which provides a little bit more scientific

13   integrity to what I was trying to explain.

14            It's a common technique, but as with flash chromatography,

15   it's something one would try, but the expectation of success is

16   high enough that one would give it a whirl, but not so high

17   that one would be confident it would work.

18            I -- that's not the most articulate enunciation of these

19   ideas, but it's what I'm trying to say over and over again,

20   counselor.  These are standard techniques.  One would think

21   about it, but one cannot be certain it's going to work.

22   Q    I think you did testify that the purification of isosulfan

23   blue using this crystallization/precipitation technique, that

24   wasn't something that was invented by Dr. Nampalli.

25            And this is -- mind you, this is isosulfan blue that's

1  Q    Okay.  You did testify earlier in response to my question

2  that it doesn't matter what your method of synthesizing

3  isosulfan blue is according to claim one of the '050 patent.

4  A    That's true.

5  Q    So if you were able to take isosulfan blue that you had

6  made using lead oxide and purify it to greater than 99 percent

7  purity by HPLC, that would satisfy claim one of the '050

8  patent; right?

9  A    Yes.

10  Q    Okay.  Now, --

11  A    But we have to again keep this in mind.  It's within the

12  pharmaceutical arts, and so the lead itself may, if it's a

13  residual impurity, kick you out from the intended scope of the

14  patent as a whole, which is what I like to read as a general

15  person trying to understand patents.

16  Q    So Lymphazurin was an FDA approved product, wasn't it?

17  A    Yes, that's my understanding.

18  Q    So the references to Lymphazurin, that's within the

19  pharmaceutical arts.

20  A    Yeah, that's correct, yes.

21  Q    And you did testify earlier that you inferred that

22  Lymphazurin, at least for a period of time, was made with lead

23  oxide; correct.

24  A    Well, Lymphazurin we know from Hirsch in 1981, and that's

25  a very different regulatory climate from the current time.  I

 1  Hall?  And you see that the claim is to combining a suspension

 2  of isoleuco acid.  That's the pre-cursor to isosulfan blue.

 3  This is in the middle of the paragraph.

 4  A    Yes, sir.

 5  Q    And you combine that with a polar solvent with silver

 6  oxide; right?

 7  A    That's correct.

 8  Q    Okay.  And so the Kulkarni uses another compound, not

 9  silver oxide, to oxidize the leuco form of the isosulfan blue;

10  right?

11  A    Yes.  They use ammonium dichromate and their preferred

12  embodiment in 60 percent sulfuric acid.

13  Q    Okay.  What would happen if you added sulfuric acid to the

14  reaction with the silver oxide?  You would get silver sulfate,

15  wouldn't you?

16  A    I don't know.  I'm not -- I wouldn't do that.  That would

17  be quite dangerous.

18  Q    Right.  That's actually quite a dangerous reaction to do.

19  A    And I don't think you would get that product, no, sir.

20  Q    Right.  So if we could go back to the manufacturing docket

21  document for Aurobindo, this is going to be tab 15.

22  A    Do you want me to go to page 6729?

23  Q    Yes, please.  If we take a look at the text by the first

24  arrow in the middle of the page, I think we've looked at this

25  before, but Aurobindo uses manganese dioxide, purified water,

1    and phosphoric acid; right?

2    A    That's correct.

3    Q    And what would happen if you added phosphoric acid to

4    silver oxide?  You would get silver phosphate, wouldn't you,

5    not silver oxide any more?

6    A    No, I don't agree.

7    Q    Oh, so phosphoric acid wouldn't react with silver oxide?

8    A    Phosphoric acid is a really mild acid, so earlier I was

9    coughing a lot, and so during lunch I decided to have a soda

10   pop, a Diet Dr. Pepper, and just for fun I was looking at the

11   ingredients.

12        Number one ingredient was carbonated water.  Number two

13   was caramel color.  Number three was Aspartame, and number four

14   was phosphoric acid.

15        Phosphoric acid is not anywhere equivalent to 60 percent

16   sulfuric acid.  This is a moderate, mild acid that we can drink

17   in my soda pop, and I wish I had one now because my voice is

18   hurting.

19   Q    I'm sorry.  We're almost done.  Thank you.

20        Now, we did -- you did see that in Mr. Patel's opening, he

21   referred to the Muthyala chapter from the leuco dyes treatise

22   that indicated that manganese dioxide is a strong oxidizing

23   agent.

24   A    So, again, that's a generic treatise.  It is a little bit

25   funny because if you look at that, it says that manganese

1   dioxide is a strong oxidant.

2        And if you go one line below, it will say that oxygen,

3   which has the same formal redox potential, is a weak oxidant,

4   and silver oxide doesn't appear anywhere in that treatise, and

5   nor to my level of scholarship and memory as I sit here does

6   isosulfan blue.

7   Q    And you recall in our second deposition, we looked at the

8   Merck Index.  You know what the Merck Index is; right?

9   A    Yes, sir.

10  Q    It's a journal reference that characterizes many different

11  chemical compounds; right?

12  A    Well, we usually use this as exactly that, an index to

13  then go get further information, so we don't -- as people do in

14  chemistry for a living, it's a good place to start.  It gives

15  us insight into the literature, but none of the people I like

16  to think I've trained would rely on this as the sole source of

17  information.  It's an index.  It's not a recipe.

18  Q    And so you recall your deposition we looked at the Merck

19  Index entry for manganese dioxide, and it indicated that

20  manganese dioxide was a strong oxidant.

21  A    Well, it was talking -- to the best of my recollection,

22  that was talking about the solid rutile form of manganese

23  dioxide, and that's completely different than how it's being

24  used by Aurobindo at dilute phosphoric acid.

25  Q    Besides your testimony, can you point to any reference

1   that refers to manganese dioxide as a mild oxidant?

2   A    Well, that's a good question.

3   Q    You haven't yet, have you?

4   A    Nor have I tried.  I'm not sure that was in the scope of

5   things because --

6   Q    The --

7   A    Let me try and explain my thinking for the benefit of the

8   Court, if you'll indulge me.

9        So I was trying to read these patents within the context

10  of their normal meaning, trying my best to be a person of

11  ordinary skill in the art, and they gave an operative

12  definition of a mild oxidant in terms of avoiding over

13  oxidation, and I saw manganese dioxide being practiced by

14  Aurobindo.

15       And I did check that there are not a lot of over oxidized

16  iced impurities, if any.  Certainly we've discussed already the

17  purities over 99 percent by HPLC for the Aurobindo product.

18  Q    Well, --

19  A    So I -- I didn't think I had a charge to go scouring

20  around looking for that particular reference, sir.

21  Q    And I think it's a good point you raise, and perhaps I'd

22  like to get back to a point that the Judge asked you about a

23  question before lunch.  If we can go back to the Aurobindo

24  manufacturing document, please, and to the page that we were

25  on?

1   A    Yes, sir.

2   Q    Could you call out both of the -- the text from both of

3   the arrows?

4        So I think the Judge asked you doesn't Aurobindo get a

5   lower purity of isosulfan blue using manganese dioxide, and I'm

6   not sure I understood what your answer was.

7        Can you answer that question, please, Dr. Sessler?  Does

8   Aurobindo get a lower purity of isosulfan blue using manganese

9   dioxide?

10  A    Sitting here right now, I don't recall.  I would have to

11  go and take a careful look.  I know Your Honor asked me this,

12  but for yield I do recall.  For purity I'm not so sure.

13  Q    You do understand that Aurobindo has to use preparative

14  HPLC to further purify isosulfan blue before it can be used as

15  a pharmaceutical product.

16  A    Well, I don't know if it has to.  That's what it's elected

17  to do, and Apicore has elected to use a different purification

18  method.

19       What I was trying -- I hope it was helpful for Your Honor.

20  I was trying to make the point that once we knew that you can

21  get to these high levels of purity, then one has confidence in

22  forging ahead using maybe a different approach, but prior to

23  that, one is in uncertain territory.  That was the point I was

24  trying to make.

25  Q    And just looking at the process that Aurobindo uses on

1   A    No.

2   Q    And isn't it true that when Synerx asked Apicore to create

3   an isosulfan blue API, they did not specify any specific purity

4   level; correct?

5   A    No.

6   Q    And as far as you were aware, there wasn't a 99 percent

7   purity requirement by the FDA; correct?

8   A    At the time of starting the project, they hadn't given me

9   the specifications, but over a period of time during the

10  process of developing the API, they did ask for specific

11  specifications, which has to be accepted by the agency.

12  Q    But all they asked you for is an identification of the

13  amount of impurities; correct?

14  A    No.  It has to be the purity as well.

15  Q    But they did not ask for 99 percent impurity; is that

16  correct?

17  A    No, specifically 99 percent they didn't ask for.

18  Q    And in your declaration that you submitted in this case,

19  you identified a number of challenges; correct?

20  A    That's correct.

21  Q    Manufacturing challenges; is that correct?

22  A    Yes.

23  Q    Okay.  And if we can bring up paragraph eight of your

24  declaration, and looking at the sentence, you said, There were

25  market shortages due to manufacturing challenges.  Do you see

1  Q    What -- is it your testimony that consumers such as

2  hospitals or physicians demand 99 percent pure product?

3  A    No.  I believe they demand the product that's currently

4  been approved by the FDA, which has a requirement of 99 percent

5  purity.

6       So inherently when they demand the product, they're

7  demanding the acceptable product, the FDA approved product, and

8  to be approved by the FDA, it needs to be 99 percent pure.

9  Q    So you're not relying on any documents that specifically

10 state that consumers or hospitals, physicians, specifically

11 identify 99 percent purity as the driver for their purchase.

12 A    I don't think that's necessarily true because, again,

13 Mylan is a consumer of the API, and they need a 99 percent pure

14 product from Apicore to be able to sell it, so they're

15 obviously --

16      And Auromedics, if we call Auromedics a company, which

17 it's not, they're demanding a 99 percent pure from Aurobindo

18 product that they need to get to be able to sell it in the

19 marketplace as well.

20 Q    Did you identify any specific documents that any consumer,

21 hospital, or physician or GPO that identifies a specific

22 request or demand for 99 percent purity in the isosulfan blue

23 product?

24 A    Defining the customers like you indicated, no, I have not.

25 Q    Are there any customer surveys, emails from consumers,

1  polls, or any other evidence that you have identified that

2  specifically note that these consumers purchased ISB product

3  because of the 99 percent purity?

4  A    Not that I recall.

5  Q    And, similarly, you do not identify any evidence to show

6  that any consumer purchases the ISB product because it was

7  manufactured using silver oxide; correct?

8  A    I don't recall whether -- whether that was something

9  required between Mylan and Apicore, but outside of that, I

10 would say no.

11 Q    Let's -- let's talk about Mylan as the consumer of the ISB

12 API.  You heard Dr. Kovi testify that he entered into a term

13 sheet agreement with Synerx in 2004; correct?

14 A    That is correct, yes.

15 Q    And if I can turn your attention to your binder, it is tab

16 number 17.  Do you recognize this to be the -- oh, I'm sorry.

17 It's Mylan 1103.  There we go.

18      And you recognize this to be the term agreement entered

19 into between Apicore and Synerx?

20 A    That's correct.  It's entitled term sheet, and I believe

21 this is the agreement they entered into to begin some

22 development work.

23 Q    Right.  And in this agreement, Synerx was asking Apicore

24 to develop an API for potential use in a future ANDA product

25 for isosulfan blue; is that correct?

1  these claims under the doctrine of equivalence?

2  A    I do.

3  Q    And what is that opinion?

4  A    My opinion is that the Aurobindo process does not infringe

5  these claims under the doctrine of equivalence either.

6  Q    Why is that, sir?

7  A    Well, for at least two reasons.  Manganese dioxide is not

8  silver oxide, and the -- furthermore, the reaction is done

9  acidic conditions instead of basic conditions like silver oxide

10 is a base, yes.

11 Q    You've heard some testimony and presentation in Court

12 today as to whether manganese dioxide is a strong oxidizing

13 agent or a mild oxidizing agent.  What is your opinion as to

14 whether manganese dioxide is a strong or mild oxidizing agent?

15 A    Manganese dioxide is a strong oxidizing agent.  It's very

16 close in chemical reactivity to dichromate salts.

17 Q    And we've looked at some references today relating to

18 manganese dioxide being called a strong oxidizing agent.

19 You've seen that; right?

20 A    Yes.

21 Q    So I'd like to sort of put that aside so that we don't

22 retread that ground, but you also heard some testimony from Dr.

23 Sessler regarding the redox potential of an oxidizing agent;

24 right?

25 A    Yes.

1   ability with more potential -- chemical potential than silver

2   oxide does.

3       It's -- manganese dioxide is very close in chemical

4   potential to actually the dichromate salt down below Cr2O72

5   minus.  That's manganese oxide is much closer to dichromate,

6   which is known as a strong dioxidizing agent, than it is to

7   silver oxide, which is a weak oxidizing agent.

8   Q    And manganese being a strong oxidizing agent, what effect,

9   if any, does that have on Aurobindo process to make isosulfan

10  blue?  And perhaps we could go back to slide 15.  Sorry.

11  Fourteen.

12  A    Okay.  I'm sorry.  I -- I'm lost.  What's your question

13  again?

14  Q    Sure.  Given your opinion that manganese dioxide is a

15  strong oxidizing agent, what is your opinion, if any, as to the

16  effect of manganese dioxide on Aurobindo's process for making

17  isosulfan blue?

18  A    Well, Aurobindo's process uses manganese dioxide with

19  purified water and phosphoric acid under acidic conditions to

20  oxidize the isoleuco form of the acid, which is the top

21  structure on the page to the material, which is the blue dye

22  form in the middle, and then they treat with sodium to create

23  the sodium salt at the bottom.

24  Q    Based on your review of documents from Aurobindo, does

25  that oxidation process lead to -- by itself to isosulfan blue

1   that's 99 percent pure or greater?

2   A    No, I don't believe it does.

3   Q    Why not?

4   A    Well, manganese oxide is a more powerful oxidizing agent,

5   and so it has a tendency of reacting with other things such as

6   the product instead of the reactant that -- and so you'll start

7   getting side products forming in the chemical process of making

8   isosulfan blue with manganese oxide.

9   Q    Does that mean that Aurobindo has to undertake a further

10  purification step after to reach 99 percent purity?

11  A    Yes, it does.

12  Q    Now, you also in your declaration addressed prior art that

13  disclosed the use of manganese dioxide with respect to triaryl

14  or triphenylmethane dyes; right?

15  A    Yes, I did.

16  Q    Could we go to slide 20, please?  Are you familiar with

17  U.S. Patent No. 5,158,558?

18  A    5,198,558, yes.

19  Q    Please tell us what is being shown in this slide.

20  A    So here the process for the preparation of the

21  triphenylmethane dyes involves the oxidation of the leuco

22  compound with manganese dioxide and the presence of aqueous

23  phosphoric acid at room temperature to about a hundred degrees.

24       Then you add a base, which they've given a list of basic

25  compounds that can be used.  They filter the precipitate that

1    forms and they isolate the triphenylmethane dye.

2    Q    Based on your review of this '558 patent, is the process

3    to make the triphenylmethane dyes comparable to what Aurobindo

4    uses to make isosulfan blue?

5    A    Yes, I believe this is identical or nearly identical to

6    that process.

7    Q    I'd now like to skip ahead to slide 25, please.  And just

8    to reiterate, how does Aurobindo purify its isosulfan blue

9    product?

10   A    So Aurobindo uses HPLC -- preparative HPLC for

11   purification of its product.

12   Q    Have you prepared some slides to illustrate how one

13   conducts preparative HPLC?

14   A    Yes, I have.

15   Q    Please tell us what you are showing here.

16   A    Okay.  So this first slide shows little blue dots and

17   little orange dots.  The blue dots represent the presence of a

18   blue dye in a sample.  The orange dots represent impurities

19   that are present in the sample.  So ultimately it's a dye

20   solution with impurities in it.

21   Q    And what are you showing in this next slide?

22   A    So in the next slide, we show that this is the way that an

23   HPLC operates really.  There's a column that's filled with a

24   solid material that absorbs materials at different rates or

25   different strengths.

1   blue compound comes off first, and it's much higher than the --

2   or much larger an area than the small orange compound, which

3   comes off second.

4        And -- let's see.  I didn't notice this before, but

5   actually the -- the orange compound would have been on the left

6   side of the blue dye peak rather than the red side since it

7   comes off second.

8        So they've -- it shows that the fractions have been

9   collected and such that the blue dye comes off in one test tube

10  and then some intermediate amount of solvent comes through and

11  is collected in other test tubes, followed by the impurities at

12  the end.

13  Q    All right.  If you put yourself in the shoes of a person

14  of ordinary skill in the art, as of May 11th, 2007, based on

15  the preparative HPLC techniques that were known at that time,

16  would one have -- if you used, say, Lymphazurin as the starting

17  material, 94.5 percent pure, would that person of ordinary

18  skill in the art -- I'm sorry.  Let me start over.

19       Given the information about preparative HPLC that was

20  available as of May 11th, 2007, and if you use Lymphazurin,

21  which is 94.5 percent pure by HPLC, as a starting material,

22  what would have been the expectation of a person of ordinary

23  skill in the art of being able to reach 99 percent purity or

24  greater using preparative HPLC?

25  A    Well, preparative HPLC by this time was a very well-known

 1    technique and had been used in many different circumstances to

 2    purify compounds to better than 99 percent purity.

 3         So as a person of skill in the art, one would expect that

 4    raising the purity from something like 95 percent to something

 5    like 99 percent would be possible using chromatography

 6    technique like HPLC preparative column chromatography.

 7    Q    You've also heard testimony today about some other

 8    purification techniques, haven't you?

 9    A    Yes, I have.

10    Q    And those techniques that you've heard about today, were

11    those known to a person of ordinary skill in the art by May

12    11th, 2007?

13    A    Yes.  Column chromatography was well-known, as well as

14    flash chromatography, which was reported by Clark Still in

15    1998, in '98 or '88, I forget, as well as crystallization and

16    precipitation techniques.

17    Q    Let's take those one at a time.  Putting yourself in the

18    shoes of a person of ordinary skill in the art -- actually, let

19    me back up a minute.

20         You did hear Dr. Sessler testify that as a person of

21    ordinary skill in the art, he would have tried a technique like

22    flash chromatography to purify isosulfan blue as of the filing

23    date of the asserted patents; correct?

24    A    Yes.

25    Q    What is your opinion as to what the expectation of a

1  person of ordinary skill in the art would be of the ability to

2  use flash chromatography to purify isosulfan blue to a purity

3  of greater than 99 percent?

4  A    As a person of skill in the art, at that point I would

5  be -- I would have a reasonable expectation of success for

6  being able to purify the material isosulfan blue away from its

7  impurities to 99 percent or greater.

8  Q    And how about for the crystallization technique?  You

9  heard that -- Dr. Sessler testify that a person of ordinary

10  skill in the art would have given crystallization a whirl as to

11  isosulfan blue; correct?

12  A    Yes.

13  Q    And what was the -- would be the expectation of a person

14  of ordinary skill in the art as of the filing date of the

15  Apicore patents as to whether one should use crystallization to

16  purify isosulfan blue to a purity of at least 99 percent?

17  A    I would think there is a high expectation of success in

18  that process.

19  Q    I would now like to move to slide 40, please.  We've heard

20  some testimony from Dr. Sessler regarding how one determines

21  that the isosulfan blue has a purity of at least 99 percent by

22  HPLC.  What information do the Apicore patents provide as to

23  how you determine purity by HPLC?

24  A    I saw no experimental section on how to determine purity

25  by HPLC.

1    A    Yes.

2    Q    And let's take those one at a time.  What is your opinion

3    as to whether Aurobindo infringes claim one of the '050 patent?

4    A    I don't believe it does infringe.

5    Q    Why not, sir?

6    A    Well, the Aurobindo process does not use silver oxide as

7    an oxidizing agent in the process.

8    Q    Okay.  I think we're maybe confusing patents here.  The

9    '050 patent.

10   A    Oh, so Aurobindo's process actually has one percent of the

11   dye present.  The manufactured goods has one percent of the dye

12   present, and other compounds present in the solution to buffer

13   the solution.

14   Q    So does that have 99 percent purity by HPLC?

15   A    No, because there are phosphate buffers and that sort of

16   thing.  It's not 99 percent pure.  It's more like 50 percent

17   pure.

18   Q    Okay.  And you recall that claim 11 of the '050 patent

19   claims a solution containing isosulfan blue having a purity of

20   99 percent by HPLC; right?

21   A    Yes.

22   Q    What is your opinion as to whether Aurobindo infringes

23   claim 11 of the '050 patent?

24   A    My opinion is it does not infringe the claim 11 of the

25   '050 patent.

1  make it too complex.

2  Q    Well, that's because persons of ordinary skill in the art,

3  they don't consider things that are added intentionally as

4  impurities, do they?

5  A    I believe if they're present, that they are impurities.

6  Q    Well, you would agree with me the FDA doesn't consider

7  excipients that are added intentionally to pharmaceuticals to

8  be impurities, do they?

9  A    I believe that's true.

10 Q    You would agree with me that Aurobindo's specification for

11 its product specifically states that it doesn't allow for more

12 than one percent of impurities by HPLC; correct?

13 A    That's true.

14 Q    And you would agree with me that claim 11 of the '050

15 patent is directed to a solution in which the starting sodium

16 salt has a purity of at least 99 percent; correct?

17 A    I read it that the solution of the material dye is -- has

18 a purity of 99 percent.

19 Q    You would agree with me that there is no solvent in which

20 one could prepare a 99 percent straight solution of isosulfan

21 blue; correct?

22 A    Well, because it's a solution, you don't count the solvent

23 itself.  In this case it would be water.

24 Q    And, in fact, when asked about that in your deposition,

25 you said that that means that you infer that claim 11, it's the

1   that was made public; right?

2   A    That is correct.

3   Q    And could you tell us, please, what is shown in this FDA

4   notice?

5   A    That the isosulfan was withdrawn not for reasons related

6   to safety and not related to efficacy.

7   Q    Have you heard of Mylan's generic isosulfan blue product?

8   A    Yes, I have.

9   Q    Now, are you familiar with a document that we kind of in

10  pharmaceutical refer to as the package insert?

11  A    Yes.

12  Q    Did you review the package inserts for Lymphazurin and

13  Mylan's generic isosulfan blue product?

14  A    Yes, I did.

15  Q    Based on your review, what differences, if any, did you

16  find when you compared the package insert between Lymphazurin

17  and Mylan isosulfan blue product?

18  A    I could see no differences.

19  Q    Now, did you review information provided by Mylan

20  regarding its isosulfan blue product on its website?

21  A    Yes, I did.

22  Q    What did Mylan say about its generic isosulfan blue

23  product on its website?

24  A    Well, there's several screenshots, multiple screenshots,

25  and the first one is more to kind of catch the eye of the

1  Q    Did you actually review any literature that compared

2  Lymphazurin and Mylan's isosulfan blue product?

3  A    I looked quite hard in the literature, and I could find no

4  such published literature.

5  Q    And so was there actually any literature for you to cite

6  in terms of actually comparing Lymphazurin and Mylan's generic

7  isosulfan blue product?

8  A    There was none.

9  Q    Then what is your opinion as to whether there are any

10  meaningful differences between the Lymphazurin product and

11  Mylan's generic isosulfan blue product as a surgeon?

12  A    As a surgeon, I don't think there are any.

13  Q    Now, did you review the reply declaration that Dr. Richard

14  Bleicher submitted through Plaintiffs in this matter?

15  A    I did, yes.

16  Q    Did you see that Dr. Bleicher provided an opinion that the

17  dye methylene blue is not interchangeable with isosulfan blue

18  for sentinel lymph node biopsy procedures?

19  A    I did.

20  Q    Do you agree with Dr. Bleicher's opinion?

21  A    Well, with all respect to Dr. Bleicher, I did not.

22  Q    Why not?

23  A    The -- there's quite a bit of literature about methylene

24  blue as a utility for sentinel node mapping that discusses the

25  important features of the success rate for removing nodes, the

1    your slides.  I wonder if we can get that back up somehow.

2    Counsel -- oh, they're going to put it up.  That's great.

3        And here you say economic nexus is not shown, and the

4    first thing is the Patents-in-Suit do not claim all of

5    isosulfan blue; correct?

6    A    That's correct.

7    Q    Now, we're assuming for your purposes of your opinion and

8    for purposes of Mr. Dansky's opinion that the patents are valid

9    and infringed; correct?

10   A    Yes.

11   Q    And if Aurobindo cannot sell a product that is 99 percent

12   pure, it's not selling a product; correct?

13   A    I'm not sure I understand the question.

14   Q    All right.

15   A    Can you ask that again?

16   Q    One of the patents in this case -- and you've read the

17   patents, the --

18   A    Yes.

19   Q    -- '050 patent, which claims 99 percent purity.

20   A    Yes.

21   Q    Correct?  And that's also, you understand, to be the

22   specification for the Aurobindo product that's been filed with

23   the FDA; correct?

24   A    Yes.

25   Q    If they're not allowed to make a product with 99 percent

1                          CERTIFICATION

2           I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7    _____        Date: 11/2/16
     Tammy L. Goolsby, CSR
8    Deputy Official Court Reporter
     State of Texas No.:  3101
9    Expiration Date:  12/31/16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDACTED - CONFIDENTIAL**

**APPX7545-APPX7561**

EXHIBIT A

```
1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE EASTERN DISTRICT OF TEXAS

3                        MARSHALL DIVISION

4   MYLAN INSTITUTIONAL, LLC,   )(

5   ET AL                       )(  CIVIL DOCKET NO.

6                               )(  2:16-CV-00491-RWS-RSP

7   vs.                         )(  MARSHALL, TEXAS

8                               )(

9   AUROBINDO PHARMA LTD, ET AL )(  NOVEMBER 2, 2016

10

11

12                        MOTION HEARING

13          BEFORE THE HONORABLE JUDGE ROY S. PAYNE

14                  UNITED STATES MAGISTRATE

15

16

17  APPEARANCES:

18  FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                          minutes of this hearing.)
19

20  FOR THE DEFENDANT:  (See sign-in sheets docketed in
                          minutes of this hearing.)
21

22

23  COURT REPORTER:  Ms. Tammy L. Goolsby, CSR

24  Proceedings taken by Machine Stenotype; transcript was produced
    by a Computer
25
```

```
 1   compound having a purity of at least 99 percent by HPLC, a
 2   solution having a purity of at least 99 percent by HPLC, and a
 3   composition.
 4          The plain English construction of this, as Dr. Brown
 5   has said, means that it must not have more than one percent
 6   extraneous material, material that's not isosulfan blue sodium
 7   salt, as determined by using HPLC with a reproducible set of
 8   conditions.
 9          Here when you look at the compound, the compound is
10   not even made in the United States. The compound that -- the
11   API, the solid isosulfan blue API that Aurobindo makes, it's
12   made in India, and that is 99 percent, but that never makes its
13   way into the United States.
14          That compound is then processed into a formulation
15   with buffers and solvents to make the final product.  That
16   final product then is imported into the United States by
17   Auromedics and then sold, so claim number one is not infringed
18   as a compound claim.
19          The solution claim, that -- even if you were to take
20   Plaintiff's construction that, well, you have to look at the
21   API as it sits in the final product.  Even if you look at it
22   from that perspective -- and we believe that the claim language
23   doesn't even require that because Aurobindo's isosulfan blue
24   product, like Mylan's and Lymphazurin is one percent isosulfan
25   blue.
```

1    A    Yes.

2    Q    And are the statements in there true and correct to the

3    best of your knowledge?

4    A    Yes, they are.

5    Q    Now, have you personally been involved in selling

6    isosulfan blue?

7    A    Yes, I have.

8    Q    Okay.  And based on your experience in selling this

9    product, have you learned why a hospital pharmacy might buy one

10   brand of isosulfan blue over another brand?

11   A    Presuming with your question that the customer sees the

12   two products as equivalent and that there is no special

13   features or characteristics that are different in the

14   customer's eyes, price is certainly one of the number one

15   determiners of their decision.  Hospitals are very price

16   sensitive, and they also want to know that there is a trusted

17   and long lasting supply of product.

18   Q    Who sells isosulfan blue today?

19   A    Mylan Institutional sells it and so does Aurobindo.

20   Q    Have any companies formerly sold it?

21   A    Yes.  A company called Covidien, C-O-V-I-D-I-E-N, sold the

22   brand product Lymphazurin, and they came off the market,

23   discontinued their product in September of 2012.

24   Q    In the period from Lymphazurin leaving the market until

25   the beginning of this year, 2016, who supplied isosulfan blue

1  to the U.S. pharmacies and hospitals?

2  A    Exclusively Mylan Institutional.

3  Q    Okay.  Ms. Paton, let me ask you to look at Plaintiff's

4  Exhibit 103.

5  A    I have it.

6  Q    And you see this appears to be an email that you sent to

7  someone named Mark Pittenger.

8  A    Correct.

9  Q    Do you recognize this email?

10  A    Yes, I do.

11  Q    And who is Mark Pittenger?

12  A    Mark Pittenger is a director of national accounts who

13  reports to me.

14  Q    And what did you learn from this email or what were you

15  conveying with this email?

16  A    So this email that was sent September 19th of 2012 from me

17  to Mark, I was forwarding to him a copy of Covidien's kind of

18  dear valued customer memo that they put out to the whole

19  customer base, and it's from Covidien explaining their

20  discontinuation of their brand product Lymphazurin.

21  Q    Is that the second page of your email?

22  A    Yes.

23  Q    And why did you send that email to Mr. Pittenger?

24  A    Mark is responsible for some of our top group purchasing

25  organization, our GPO relationships, and it would have been of

1    calendar year 2013 of significance?

2    A    Yes.  And that's definitely increase in usage because we

3    found ourselves alone in the market with Covidien discontinuing

4    their product in September of 2012.

5    Q    Okay.  And you're aware that Aurobindo has entered the

6    market for isosulfan blue this year.

7    A    Yes, I am.

8    Q    Has that in any way harmed Mylan?

9    A    Significant, yes.

10   Q    How would you describe the harm to Mylan from the entry of

11   Aurobindo into this market?

12   A    Certainly a significant amount of loss in sales and profit

13   for our company that we had anticipated having and also damage

14   to our relationships and the goodwill we've established with

15   many key customers, such as group purchasing organizations and

16   even directly with hospitals, who are the people who are buying

17   the product.

18   Q    Now, has Aurobindo priced the product in a way that's been

19   harmful to Mylan?

20   A    Very aggressively discounted in most cases.  They made

21   unsolicited offers to almost all the top customers almost

22   immediately upon coming to market.  In some of these cases, it

23   was as deep as 40 percent off of Mylan's price that we had in

24   the market.

25   Q    Let me ask you to look at Exhibit Plaintiff's 105, PX 105.

1   This appears to be an email from Howard Martin to you and

2   others dated March 23, 2016.  Do you recognize this exhibit?

3   A    Yes, I do.

4   Q    What is it?

5   A    It's an email from Howard Martin, who is director in

6   Mylan's pricing department, and he's sending it to myself and

7   colleagues in Mylan Institutional.  He is summarizing for us

8   the activity as of that date in March, towards the end of

9   March.

10       Right of first of refusals, also known as a ROFR, R-O-F-R,

11  and that is the situation where we are the incumbent supplier,

12  which is the case essentially everywhere with Iso Blue, where a

13  competitor, in this case, Aurobindo has made an unsolicited

14  offer to that GPO.

15       And so the first example in this was Amerinet, and Premier

16  was also listed and others, and he's summarizing for myself and

17  other people what's the situation with all these right of first

18  refusals that we have as of that date.

19  Q    As an example, what happened with respect to Amerinet?

20  A    With Amerinet, Aurobindo approached them with an

21  unsolicited offer of 40 percent off of our current contract

22  price.  Amerinet came to us giving us the right to meet or beat

23  that price to retain our award, and we were unable and willing

24  to do that at the time, so we have lost that business.

25  Q    Now, if you turn to the second page of Plaintiff's Exhibit

1    to.

2        Third from the bottom has Morris & Dickson, which is very

3    close to where we are right now.  They're close, based in

4    Shreveport, Louisiana, which is about a 45-minute drive from

5    her.

6    Q    And just to explain to us when we talk about GPO's and

7    negotiating prices, why are some sales attributed to the

8    wholesaler instead of the GPO?

9    A    Yes.  And this is important because those sales are really

10   the balance of products that were sold, not at a contract price

11   by the wholesaler to the end customer.

12       So in the case of Morris & Dickson, for example, they sold

13   36 packs in a year to maybe 36 customers or one customer who

14   didn't have access to a contract price.

15       In reality, though, all the customers are purchasing

16   isosulfan blue through a wholesaler, so Morris & Dickson sold a

17   lot more than 36 packs, but that's just the amount we're

18   attributing to them because it's the balance of product that

19   they sold not at a contract price.

20   Q    Now, has Mylan been monitoring the market share that has

21   been taken by Aurobindo in the isosulfan blue market?

22   A    Yes.

23   Q    And what are the latest numbers that Mylan has seen?

24   A    The latest numbers are not great.  Aurobindo has taken

25   59 percent of the market and we have 41 percent.

1    Q    Let me ask you to look at Plaintiff's Exhibit 106.  Excuse

2    me.  That's what we were just looking at.  Okay.  What --

3    A    I have it.

4    Q    Yes.  What is 106?

5    A    It's a print screen from Auromedics' website showing their

6    wholesaler order entry numbers.  Wholesalers assign an order

7    entry number when they stock a product, make it available to

8    end customers, so this indicates to me that they were widely

9    stocked at all five national pharmaceutical wholesalers.

10   Q    Has Aurobindo's entry into the market had an impact on

11   Mylan's inventory forecast?

12   A    Yes.  Significant.

13   Q    What has been that impact?

14   A    Well, we were -- before Aurobindo came to market, Mylan

15   was operating under the assumption in our history of being the

16   only supplier of isosulfan blue.

17        So Aurobindo coming to market, making aggressive

18   unsolicited offers to all the top customers, resulted in us

19   losing a lot of market share, so we've had surplus inventory or

20   excess inventory now that's aging.

21        Pharmaceuticals have an expiration date, and I know of at

22   least planned write-offs of inventory that valued at $3 million

23   at our contract price.

24   Q    Okay.  Let me ask you to turn back, if I may, to

25   Plaintiff's Exhibit 104.

1    A    Okay.

2    Q    I want to call your attention to the second page of Wade

3    Smith's April 28th, 2016, email.  What is -- what do we see on

4    that second page and then the third page?

5         And I'm referring to the CY16 and beyond column.  You

6    might want to switch to that, Mr. Smith.  At the end on the

7    right side.

8    A    Yes.  So column J is the budget that we had set aside for

9    2016, the numbers that we are supposed to try to achieve or

10   exceed in this calendar year that we're in now.

11        So, for example, net sales, which is row number four on

12   that, for the budget for calendar year 2016 is 70.84 million,

13   and then if we go to the third page, column P is calendar year

14   2016 our forecast, and that's the forecast as of Wade's email,

15   which was the end of April.

16        We update forecasts as often as once a month to show how

17   we think we're going to finish the year, but even as of the end

18   of April, you can see the -- in column P, row four, we show

19   that the estimated sales are less than half of what we had

20   budgeted.

21   Q    All right.

22   A    So 34.21 million is what he has as the forecast.

23   Q    And if you went to the pre-competition and current

24   forecast for CY17 through CY20 on this document, would you see

25   a similar drop off or do you see a similar drop off?

1    A    In forecast?

2    Q    Yes.

3    A    Absolutely, yes.

4    Q    Has Mylan now lowered its price for isosulfan blue?

5    A    Yes.

6    Q    Why did Mylan do that?

7    A    To try to extend the tied of market share loss and try to

8    sustain the share we can.

9    Q    Now, if the Court issues an injunction, will Mylan be able

10   to raise its prices all the way back to where they were prior

11   to the entry into the market by Aurobindo?

12   A    In my opinion, it's going to be hard to go all the way

13   back there, and I'll give you a reason for that I think is

14   Mylan sells -- Mylan Institutional, just our business unit,

15   sells hundreds of products into the hospital and through GPO's,

16   so we don't just sell isosulfan blue, so it can't be taken in

17   isolation.

18       Anything we do with that product, which is a top product

19   and has high attention from the customers, has impact on these

20   other products that we currently have and also has impact on

21   future launches.

22       We're in the business that we depend on doing well on

23   launches, so it's important that we have goodwill and good

24   relationships with customers, so making a move back to our old

25   price I think would cement in some of the negative feelings and

1    relationship impacts that we've experienced already due to

2    Aurobindo's entry.

3    Q    Let me change topics a little bit.  We talked about -- you

4    mentioned Morris & Dickson in Shreveport.  Who are they?

5    A    They are a wholesaler, so it's similar to McKesson,

6    Cardinal, or AmerisourceBergen.  Their headquarters and only

7    location is in Shreveport.  They're a well-known,

8    well-respected wholesaler.  I believe they've been in business

9    for 175 years, so they have a lot of loyal customers who look

10   to them to supply them with pharmaceuticals.

11   Q    Does Morris & Dickson distribute Mylan's products in

12   Texas?

13   A    Yes, they do, including isosulfan blue.

14   Q    Have you had personal dealings with this wholesaler?

15   A    Yes, I have.

16   Q    Are there any hospitals in Texas and in East Texas that

17   are customers of Mylan's isosulfan blue?

18   A    Yes.

19   Q    Okay.  Are any of them large?

20   A    Yes.  And, you know, Texas is a big state.  We have a lot

21   of hospitals in the State of Texas, but certainly let me talk

22   about some that are prominent names and also some local places;

23   so East Texas Medical Center, ETMC, is a local health system

24   here in East Texas.

25         We also have Trinity Mother Frances is another health

1    scientist.

2    Q    (By Mr. Patel) So you don't know how Mylan manufactures

3    the isosulfan blue?

4    A    I have never toured the plant where it's manufactured.

5    Q    You don't know the -- how it measures the purity levels of

6    isosulfan blue?

7    A    No.

8    Q    You don't know the chemistry behind isosulfan blue?

9    A    No.

10   Q    You stated that some of the factors that drive the sales

11   of isosulfan blue, one of them is price?

12   A    Correct.

13   Q    The other one is goodwill with the customers; correct?

14   A    Yes.  I think the two things I cited were -- especially

15   were price and product availability, supply, and the customers'

16   faith that the product's going to continue to be available.

17   Q    I believe you testified that Aurobindo's launch has harmed

18   some goodwill with customers?

19   A    Yes.

20   Q    Isn't it correct that customers who no longer purchase

21   isosulfan blue from Mylan still continuing to produce --

22   purchase other products from Mylan?

23   A    Yes.  We have over 500 products that we market, some of

24   which are exclusive in the market, so I think it's a fair

25   statement to say every GPO buys some products from Mylan

1  Q    Would you please turn in your binder to PX 42 Sessler

2  Rebuttal Exhibit 22?  Is that a document that you reviewed and

3  relied upon in forming your opinions?

4  A    Yes.

5  Q    What is it?

6  A    It's coming from AutoSuture, which, as I mentioned, was

7  one of the various names that Covidien -- we have come to know

8  as Covidien.

9       They're saying that after more than five years of work,

10  they are able to get back into the market, and this is saying

11  the FDA approved that in April 22nd of 2008, and I think this

12  document is dated in June of 2008.

13  Q    Did they say anything about what they were going to do to

14  the price of the new product after getting back in the market?

15  A    Yes.  As highlighted in yellow on the bottom of the

16  screen, we can all see the new price has been considerably

17  increased to reflect all modifications.

18       So my understanding is it's a completely different process

19  from a completely different supplier and has its own set of

20  problems that differ from those of the original material that

21  we saw in Hirsch, which then became known as Lymphazurin.

22  Q    So after Sigma started using crude isosulfan blue from

23  Innovassynth, did that remedy all the issues with unreliable

24  supply starting in April of 2008?

25  A    In my view it did not.

1   Q    What were some of the problems associated with the new

2   supply starting in April 2008?

3   A    So, first of all, let's just back up.  So Allied had gone

4   out of business.  Sigma had run out of the isosulfan blue,

5   making it not available or unavailable for Covidien, and

6   whether we call it AutoSuture or U.S. Surgical or any of the

7   other names, Innovassynth was contracted through Sigma.

8        But as I want to show here in this demonstrative, they

9   really failed to live up to the optimism of the June 2008 memo

10  we just saw.

11       So Innovassynth consistently delivered material that

12  failed specification due to heavy metal content and these --

13  they say which have not been resolved despite numerous attempts

14  to do so.

15       And heavy metals is something that you really have to

16  worry about, particularly things like lead, which is toxic, and

17  chromium six.  They state chromium six is one of the worst

18  carcinogens known, and that was showing up in this material.

19       It was passing spec by Innovassynth in-house in India, and

20  Sigma was retesting it in England, and it was consistently

21  failing.

22  Q    And could you please turn to -- I believe it's Plaintiff's

23  Exhibit 43, which was Sessler Rebuttal Exhibit 23 in your

24  binder?

25  A    Yes, ma'am.

1          Production batches of isosulfan blue manufactured and

2     declared passed at Innovassynth had failed in heavy metal

3     content when tested at Sigma-Aldrich Fine Chemical in the UK,

4     so that was one of the problems I was pointing out, trying to

5     point out earlier.

6     Q     And what's the date of this?

7     A     This is from January 2009.

8     Q     So in 2009, Sigma, a large international chemical company,

9     is still having troubles getting crude isosulfan blue?

10    A     That's my inference, yes.

11    Q     So what is -- what do Sigma's issues with obtaining even

12    crude isosulfan blue say to a person of skill in the art about

13    how easy or difficult it would have been before the Apicore

14    invention to obtain pure isosulfan blue?

15    A     I think this makes it very clear in my view as a chemist

16    just how hard it was to make isosulfan blue.  This is not

17    routine.  This is not obvious.  This is not easy, and, in fact,

18    every expectation is not a success.  It's a failure to hear

19    them, one of the best chemical companies in the world not being

20    able to do this.

21    Q     And did the patented invention by Apicore provide a

22    solution to this and other supply issues?

23    A     Yes, it did.  I think there's a demonstrative to help

24    underscore some of that.

25    Q     Maybe not.

1  A    Maybe not.  Well, we'll get to that maybe, but it's my

2  view that they solved the shortage problem, solved the purity

3  problem, solved the supply problem, and increased the quality

4  and --

5  Q    Have there been any drug shortages of isosulfan blue since

6  Apicore and Mylan started supplying the market?

7  A    No, not to my knowledge, ma'am.

8  Q    Would you just briefly at a very high level give the Court

9  your understanding of the asserted patents in the claims

10  without re-treading a lot of the ground that was maybe set

11  forth in the openings?

12  A    Yeah.  Much of this was put forward.  My understanding as

13  a person skilled in the art is there's three asserted patents.

14  They share the same specifications, essentially the same

15  specification.

16      The first two patents are drawn to how you make the

17  material, so it's a process for synthesizing it using a

18  non-hazardous, non-toxic metal oxide, in particular silver

19  oxide, and the third patent talks about the purity and draws

20  claims based on 99 percent purity by HPLC.

21  Q    Okay.  And what does purity 99 percent by HPLC mean?

22  A    That's an art accepted term, and so what one of skill in

23  the art would use is to determine how pure it's used by

24  nowadays, the FDA is the gold standard for purification.  And

25  basically as I read this, it means not more than one percent

1        That really has nothing to do with the price of eggs.

2   It's not a flat charge dye molecule, so it -- it is just -- I'm

3   sorry to be so blunt.  It's just wrong.

4            THE COURT:  If there were closely related isomers in

5   that 95 percent mixture, would you expect to be able to get to

6   99 percent with HPLC?

7   A    Your Honor, that actually makes it much harder because

8   closely related compounds tend to stick to one another, stick

9   to each other and stick to the column the same way, so that's a

10  particularly tough challenge.

11           THE COURT:  All right.  And I -- I question some of

12  the filings that Aurobindo made with the FDA I think suggested

13  that manganese dioxide gave a lower yield.  Is that your

14  understanding?

15  A    Your Honor, I -- I looked at this, and I think that yields

16  were -- for both the Apicore process and the Aurobindo process

17  are between 60 and 70 percent.

18           THE COURT:  If the manganese dioxide is as mild as

19  the silver dioxide, would you expect there to be a difference

20  in the yield?

21  A    I -- I wouldn't expect that.

22           THE COURT:  Okay.  Well, I'm -- I'm sorry.  It's

23  purity was what I mentioned, not -- purity was what I meant to

24  be asking you about, not yield.

25           Would you expect a difference in the purity between

1    the use of manganese dioxide and the use of the silver dioxide?

2    A     The key point --

3            THE COURT:  Silver oxide.

4    A     I understand, Your Honor.  So the key point is the use of

5    these mild metal oxides has a real advantage in purification

6    because both manganese dioxide and silver oxide give rise to

7    water products that are insoluble so they can be filtered away.

8            And so the key heavy metal impurity problem is solved by

9    using a non-hazardous insoluble metal oxide, so it's not just a

10   manganese dioxide is another metal oxide.  It's an insoluble

11   non-hazardous one that allows this key part of the

12   purification.

13           So once you're free of the metal, then you can use --

14   knowing now, in light of the invention showing that it's

15   possible to get to 99 percent purity, we know it's possible,

16   Aurobindo now knows it's possible, and so they can set out to

17   do that.

18           It's a completely different story in my view looking in

19   prospect before that invention than looking in retrospect after

20   that invention.

21           THE COURT:  All right.  We will break until 1:10 and

22   then come back and continue with Dr. Sessler.  Thank you.

23           COURT SECURITY OFFICER:  All rise.

24           (Lunch taken.)

25           COURT SECURITY OFFICER:  All rise.

1    Q    And this article, as we have addressed, indicates that the

2    isosulfan blue is 94.5 percent pure by HPLC.

3    A    So what it says is that the 2.5 disulfonated

4    triphenylmethane dye was prepared in high purity 94 percent dye

5    content, so that's -- as determined by high pressure liquid

6    chromatography, so that's talking about part of what's in

7    there, which is the color dye materials.

8    Q    Is this measure of purity that Hirsch presents, is that a

9    different way of measuring purity than is required by the '050

10   patent?

11   A    I don't think so.

12   Q    So for purposes of the '050 patent claims, you would agree

13   that Hirsch's measurement of 94.5 percent purity is a fair

14   measure of purity for his isosulfan blue product.

15   A    Okay.  So I don't -- there's a little bit of a chain of

16   custody issue because I don't know whether he made that

17   measurement or it was appointed by a supplier.

18        But my general position is that HPLC was being used for

19   determining purity in 1981 and can be used for determining

20   purity today and along the way between 1981 and 19 -- 2016.

21   Q    Now, you would agree that this isosulfan blue that's a

22   94.5 percent could be further purified using the preparative

23   HPLC technique by a person of ordinary skill in the art who is

24   trying to purify an organic compound by the filing dates of the

25   Apicore patent in May 11, 2007; right?

1    A    So what I'm aware is that the inventors were able to make

2    under very specific conditions using either silver oxide or

3    from my read of the notebooks prior to that lead oxide, and the

4    inventors and only the inventors of the asserted patents were

5    able to do that.  I'm aware of no one else who succeeded.

6    Q    I understand your testimony is that the inventors made

7    isosulfan blue to 99 percent purity as of a certain date.  I'm

8    asking you whether a person of ordinary skill in the art could

9    take a technique like preparative HPLC, which I believe was

10   known by May of 2007, and use it to purify isosulfan blue

11   having a purity of 94.5 percent.

12   A    That's unknown to me.

13   Q    Okay.  Now, you testified during your deposition that

14   Aurobindo uses preparative HPLC to purify its isosulfan blue

15   product; correct?

16   A    That's after the 2007 date we were just talking about, but

17   I believe that's correct.

18   Q    Okay.  If we could have the Aurobindo manufacturing

19   document at page -- and this is going to be tab 15, and let me

20   ask you to highlight the text by the second arrow.

21        So, Dr. Sessler, you agree that this document is a summary

22   of the process that Aurobindo uses to prepare its isosulfan

23   blue product; correct?

24   A    Yes.

25   Q    And it is indicated here, the text by the second arrow in

1  and phosphoric acid; right?

2  A    That's correct.

3  Q    And what would happen if you added phosphoric acid to

4  silver oxide?  You would get silver phosphate, wouldn't you,

5  not silver oxide any more?

6  A    No, I don't agree.

7  Q    Oh, so phosphoric acid wouldn't react with silver oxide?

8  A    Phosphoric acid is a really mild acid, so earlier I was

9  coughing a lot, and so during lunch I decided to have a soda

10 pop, a Diet Dr. Pepper, and just for fun I was looking at the

11 ingredients.

12      Number one ingredient was carbonated water.  Number two

13 was caramel color.  Number three was Aspartame, and number four

14 was phosphoric acid.

15      Phosphoric acid is not anywhere equivalent to 60 percent

16 sulfuric acid.  This is a moderate, mild acid that we can drink

17 in my soda pop, and I wish I had one now because my voice is

18 hurting.

19 Q    I'm sorry.  We're almost done.  Thank you.

20      Now, we did -- you did see that in Mr. Patel's opening, he

21 referred to the Muthyala chapter from the leuco dyes treatise

22 that indicated that manganese dioxide is a strong oxidizing

23 agent.

24 A    So, again, that's a generic treatise.  It is a little bit

25 funny because if you look at that, it says that manganese

**REDACTED - CONFIDENTIAL**

**APPX7584-APPX7592**

1    here.  Perhaps it's --

2    A    That's correct.

3    Q    Okay.

4    A    That's correct.

5    Q    How has Apicore been harmed by Defendant's conduct?

6    A    If we go to the next slide just very quickly, one of the

7    things I wanted to show here that just in the very rapid period

8    of time this year since Aurobindo has been in the market,

9    they've now captured in excess of 50 percent of the market, and

10   that's very rapid, and that's had a significant effect as we've

11   heard on Apicore's business.

12   Q    Were you just here for Dr. Kovi's testimony?

13   A    Yes, I was.

14   Q    Do you remember how much isosulfan blue he said he

15   expected Mylan to actually purchase in 2016?

16   A    None.

17   Q    Okay.  Now, does this inform the irreparable harm analysis

18   that you've conducted with respect to Apicore?

19   A    It does, and they also have very little expectation of

20   purchases in 2017 and possibly into 2018.  So given the history

21   of the market and the size of Mylan's expectations of the

22   business, this is going to be a sizable loss for Apicore.

23   Q    Do you have an opinion as to whether the loss of revenue

24   Apicore due to the Defendant's entry into the market causes

25   irreparable harm to Apicore?

1    A    I do, yes.

2    Q    And what is your opinion?

3    A    I think we take maybe one more slide forward, two more.

4    Sorry.  Okay.  So we'll go back up.

5        So this project has been profitable, as we heard.  It's

6    about twice as profitable as any other product that they have,

7    and we've had significant loss of revenue and cash flow, and as

8    Mr. Kovi indicated, a lot of this additional revenue that

9    they've earned is really earmarked for specific projects.

10        So the money from isosulfan blue has really been the free

11   cash that's allowed the company to grow, invest in other

12   products, and over the next few years, the likely losses are

13   going to be substantial and really constrain their business.

14   Q    Have you also looked at whether the assumed infringement

15   by Aurobindo has caused irreparable harm to Mylan?

16   A    Yes, I have.

17   Q    And what is your opinion as to whether Mylan has suffered

18   irreparable harm?

19   A    I believe that Mylan has suffered irreparable harm and I

20   think that that harm is going to be expand unless Aurobindo is

21   enjoined.

22   Q    How has Aurobindo's entry resulted in irreparable harm to

23   Mylan?

24   A    If we go back a few slides which shows -- I think there

25   was a slide put up earlier today where Aurobindo now has

1   captured 59 percent of the market, and that's significant over

2   a relatively short period of time, so that's for one lost

3   sales.

4        We've also heard that they're suffering price erosion, so

5   they're not only losing sales, but they're being forced to

6   lower their price on the existing customers that they've been

7   able to retain, and that's going to affect their overall

8   business, you know, going forward as well.

9        And they're very concerned, and I think rightfully so, the

10  impact on their goodwill with their customers.  They've got a

11  competitor offering something -- you know, a valuable product a

12  lot cheaper.  They're getting pressure from their customers to

13  lower the price.

14       And so their choice is one of two things.  Either they

15  lower the price and suffer price erosion and possibly never get

16  that money back, or they don't lower the price, lose sales, and

17  have customers that are unhappy with them in that way, too, and

18  both of those possibilities are potential losses of goodwill

19  for them.

20  Q    Let me turn to another issue, and the issue is the causal

21  nexus between infringement and the harm to Mylan and Apicore.

22  Have you taken a look at that?

23  A    I have.

24  Q    In your opinion, is there a causal nexus between the

25  alleged infringement and harm to the two Plaintiffs?

1   A    Not for very large batches, no.

2   Q    And you would agree that the oxidation of triarylmethane

3   leuco compounds is a very complex process, and one needs to try

4   different sets of conditions, different revisions and

5   temperatures and solvents to see what works; correct?

6   A    I believe that's true.

7   Q    And there are possibly thousands of different

8   triarylmethane dyes reported in the literature; correct?

9   A    Possibly.

10  Q    And you would agree that structural differences among

11  triarylmethane dye isomers leads to different substances with

12  different properties; correct?

13  A    Yes, it does.

14  Q    And a person of skill in the art might have to use

15  different synthetic schemes and different reactants for

16  different dyes; correct?

17  A    Possibly.

18  Q    And a person of skill in the art might have to use

19  different purification schemes to get something to work for

20  different dyes; correct?

21  A    I believe that that would be possible, but I believe also

22  HPLC works very well in in these situations.

23  Q    You don't have any personal experience using HPLC to

24  separate any triarylmethane dyes; correct?

25  A    That's correct.

1    broad sense, yes.

2    A    Yes.

3    Q    So you would agree that the '458 patent reference

4    discloses hundreds, if not thousands, of potential oxidizing

5    agents; correct?

6    A    Yes, I would.

7    Q    Okay.  And you would agree that sometimes an oxidizing

8    agent will work for a particular dye, but won't work for

9    another dye; correct?

10   A    That's true.

11   Q    And just because an oxidizing agent has been previously

12   shown to work with another dye, it may not work with the dye

13   you were interested in; correct?

14   A    That's true, too.

15   Q    Now, another reference that you relied upon in forming

16   your opinion was a Thoraval reference.  Do you recall that?

17   A    Yes, I do.

18   Q    And that's in your binder if you need to see it.  It's PX

19   49, and this is a document you've also considered in forming

20   your opinions that you thought the patents were invalid; right?

21   A    Right.

22   Q    And you also relied upon this for your opinion that use of

23   silver oxide in the sense of ISB is obvious; right?

24   A    Yes.

25   Q    And you would agree with Thoraval has nothing to do with

1   Q    You didn't consider whether or not there was a commercial

2   success related to the asserted patents; correct?

3   A    Correct.

4   Q    And you didn't consider whether others had tried to

5   manufacture pure isosulfan blue but failed to do so; correct?

6   A    That's true.

7   Q    And you never reviewed any documents produced by Sigma in

8   this case; correct?

9   A    I never did.

10  Q    And I believe you said that it was your opinion in your

11  declaration that there was no on felt need for pure isosulfan

12  blue?

13  A    I believe I said that.

14  Q    But you were aware that there were several shortages of

15  isosulfan blue in the 2000 time period; correct?

16  A    Yes.

17  Q    And you were aware that those supply shortages were so

18  severe that at one point the product was not available anywhere

19  in the United States; correct.

20  A    From those documents, yes.

21  Q    But you never investigated why those shortages occurred

22  prior to forming your opinions; correct?

23  A    That is correct.

24  Q    And you would agree that most chemists would say that if

25  you inject a dye into somebody, the purity should be as high as

1    Q    And the presence of impurities can cause different side

2    effects in a pharmaceutical; correct?

3    A    I believe so.

4    Q    And that's one of the reasons why a chemist would want to

5    have as high a purity product that they could if it was going

6    to go into a pharmaceutical product; correct?

7    A    If it was going to go into a pharmaceutical product, yes.

8    Q    Now, in your declaration, you indicated that a reference

9    to Hironaka that was published in 1975 provided a motivation

10   for a pure blue dye for use in lymphatic mapping; correct?

11   A    Yes.

12   Q    And if a motivation was provided in 1975 for pure blue

13   dyes, you had opined in your declaration you just don't have

14   any idea why it took 30 years to actually obtain it; correct?

15   A    Well, there's no publications involved that I've seen, but

16   that doesn't mean that people didn't do it to purify it.

17   Q    Well, when I asked you during your deposition if a

18   motivation was provided in 1975 for pure blue dye, do you know

19   why it took 30 years to actually obtain it, and you said,

20   answer, No, I don't.  Does that sound like your testimony?

21   A    Yes.

22   Q    And you don't even know or even consider why Mylan decided

23   to purchase API from Apicore, do you?

24   A    I don't believe so.

25   Q    And you would agree that Aurobindo's reaction scheme using

1    manganese dioxide produces a relatively pure form of isosulfan

2    blue; correct?

3    A    I'm not sure of that.

4    Q    Well, let's go to your deposition at page 158.  It's line

5    four through 14, if you can find it, and you were asked the

6    question, Well, isn't manganese dioxide a mild oxidizing agent

7    with respect to at least the way that the asserted patents

8    characterize mild oxidizing agents because it avoids over

9    oxidized products and minimizes them?

10         And your answer, Well, I can't say that it's a mild

11   oxidizing agent.  I can say that it -- apparently, based on

12   what I know now, that the reaction produces a relatively pure

13   form of isosulfan blue.

14   A    Yes, I said that.

15   Q    And that was your truthful, accurate testimony at your

16   deposition.

17   A    Yes.

18              THE COURT:  Ms. Stafford, I know that time is short,

19   but we'll get a better record if you slow down just a little.

20              MS. STAFFORD:  I'm sorry.  I'm sorry, Your Honor.

21   I'll try.

22              THE COURT:  All right.

23              MS. STAFFORD:  Apologies.

24   Q    (By Ms. Stafford)  And, in fact, the use of manganese

25   dioxide Aurobindo allows for the preparation of isosulfan blue

1    of greater than 99 percent purity by HPLC; correct?

2    A    After purification, yes.

3    Q    And you would agree that Aurobindo's API is prepared with

4    a purity of greater than 99 percent as determined by HPLC.

5    A    I believe that's true.

6    Q    And you would agree that silver oxide and manganese

7    dioxide are both metal oxide oxidants; correct?

8    A    That is true.

9    Q    And in the asserted claim, silver oxide functions to

10   oxidize the Leuco form of isosulfan blue to produce isosulfan

11   blue; correct?

12   A    It does.

13   Q    And in Aurobindo's process, manganese dioxide functions to

14   say oxidize the leuco form of isosulfan blue to isosulfan blue;

15   correct?

16   A    It does.

17   Q    And when you talked a little bit about oxidation potential

18   and maybe that being a factor for whether something is a strong

19   or mild oxidant in your opinion; correct?

20   A    Yes.

21   Q    You would agree with me that there are a number of factors

22   that go into the actual oxidation potential of an agent in a

23   process; correct?

24   A    Yes, that's true.

25   Q    And some of those things include the concentration of acid

MYLAN INSTITUTIONAL, LLC vs AUROBINDO PHARMA LTD
, on 11/02/2016                                                    254

1    or base.

2    A    That is true.

3    Q    The temperature.

4    A    Yes.

5    Q    The pressure of the chemical reaction?

6    A    In some cases yes.

7    Q    Concentrations of reagents?

8    A    Yes.

9    Q    So there are a whole number of things that can change the

10   oxidation potential of something; correct?

11   A    That is true.

12   Q    And you would agree with me as you go to a higher pH,

13   manganese oxide becomes a weaker and milder oxidizing agent;

14   correct?

15   A    I believe it becomes -- has a less of a redox potential

16   than it did.

17   Q    But in forming your opinions, you didn't consider the pH

18   in Aurobindo's procedure at all, did you?

19   A    I guess I did not.

20   Q    And, in fact, during your deposition, you thought

21   erroneously that the Aurobindo was operating at a range of a

22   minus one to one pH; correct?

23   A    That is true.  And it actually operates, I believe,

24   between two and three pH, something like that.

25   Q    Or maybe 3.8?

1    A    Okay.

2    Q    And in reaching your opinions on infringement, including

3    infringement of the doctrine of equivalence, you didn't

4    actually consider Aurobindo's procedure directly, did you?

5    A    I'm sorry.  Could you repeat that?

6    Q    In reaching your opinions on infringement and whether

7    there was infringement under the doctrine of equivalence, 00you

8    didn't look at Aurobindo's procedure directly, did you?

9    A    No, I did not.

10    Q    And you talked a little bit on direct about standard half

11    sell reduction potential; correct?

12    A    Yes.

13    Q    And those were done under standard conditions; correct?

14    A    I believe so.

15    Q    And there is a set pH that's closer to like minus one or

16    zero; correct?

17    A    Yes, I believe it's zero.

18    Q    And that's -- that's a much more acidic environment than

19    what Aurobindo's process is; correct?

20    A    It is more acidic.  I would say slightly more acidic

21    compared to a pH 14, for example.

22    Q    You never actually in forming your opinions you never even

23    took into account the fact that the Aurobindo's processes

24    allowed a range from two all the way up to 3.8, did you?

25    A    I did not.

1    Q    You haven't used isosulfan blue in the last year, have

2    you?

3    A    That is correct.

4    Q    And you haven't used isosulfan blue in the last five years

5    since Mylan's product, have you?

6    A    That is correct.

7    Q    So you would agree that you have no personal experience

8    using Mylan's isosulfan blue product.

9    A    I would have to agree with hands-on personal experience,

10   but I have to say that expertise is measured by understanding

11   the totality of information available, and if we relied

12   entirely on personal expertise, it would be quite limited.

13   Q    You didn't find any papers that discussed Mylan's versus

14   Lymphazurin's product; correct?

15   A    That is correct, yes.

16   Q    And you never even touched Mylan's product; right?

17   A    I'm sorry.  What --

18   Q    You never even used Mylan's product.

19   A    I said that already, yes.

20   Q    And you also formed opinions that you thought methylene

21   blue was interchangeable with isosulfan blue; is that correct?

22   A    Yes.  There's an extensive body of literature that

23   supports that.

24   Q    You weren't aware prior to forming your opinions of the

25   approved indications for methylene blue, were you?

1  A    Yes.

2  Q    And you agree with her?

3  A    Yes.

4  Q    Okay.  And if the Court were to find that one of the

5  advantages of the method process patents is that customers have

6  availability and customers have ease of acquisition and that

7  cements customer relationships and contracts, that would have a

8  big affect on the sale of the product, wouldn't it?

9  A    It could have some affect.  The question is how much, and

10 that question has not been addressed by Mr. Dansky.

11 Q    So you would agree that if a doctor cannot get a steady

12 supply of isosulfan blue, they're going to buy something else;

13 correct?

14 A    They may, or they can manage it by having more materials

15 in inventory.  It depends.

16 Q    You would agree with me that price erosion is evidence of

17 irreparable harm?

18 A    It's one of legal criteria that's mentioned, yes.

19 Q    And you are aware that the average sales price for

20 isosulfan blue has declined?

21 A    Yes, we've heard that today.

22 Q    And that's since Aurobindo entered the market; correct?

23 A    Yes, there's competition and prices have gone down.

24 Q    And you don't have any information to indicate that the

25 GPO's and the hospitals that have turned away from Mylan are

1    instead using methylene blue or another dye, do you?

2    A    I think that -- I'm not sure that I can recall anything

3    particular right now.

4            MR. STEUER:  Your Honor, I think I'll stop right

5    here.  Thank you.

6            MS. AHN:  And nothing from the Defendants.

7            THE COURT:  Very good.  Thank you, Mr. Bakewell.

8    A    Thank you, Your Honor.

9            THE COURT:  All right.

10           MR. PATEL:  Your Honor, Defendants rest their case

11   with the exception there's one issue that I would like to

12   raise, and that's the issue of deposition designations.

13           It's our understanding that this is a live

14   evidentiary hearing and that parties were not supposed to

15   provide deposition designations, but we'd like some guidance

16   from the Court because we have received deposition designations

17   from Plaintiffs from all witnesses, including those that have

18   been here live.

19           Our position is that if the Court is going to

20   entertain deposition designations, that it be limited to the

21   witnesses that are not able to be present at this hearing.

22           THE COURT:  I see no particular reason to have

23   deposition testimony from the witnesses who have appeared here

24   and testified.

25           MS. STAFFORD:  We're okay with that.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

MYLAN INSTITUTIONAL LLC and
APICORE US LLC

         Plaintiffs,

    v.

AUROBINDO PHARMA LTD.,
AUROBINDO PHARMA USA INC., and
AUROMEDICS PHARMA LLC

        Defendants.

Civil Action No.: 2:16-cv-491-RWS-RSP

## NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3(a), notice is hereby given that Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC hereby appeal to the United States Court of Appeals for the Federal Circuit pursuant to 28 U.S.C. § 1292(a)(1) from the following:  (1) the February 7, 2017 Order adopting the November 21, 2016 Report and Recommendation of the United States Magistrate Judge (Dkt. No. 122); and (2) the November 21, 2016 Report and Recommendation of the United States Magistrate Judge to grant Plaintiffs' motion for preliminary injunction (Dkt. No. 101).

Dated:  February 10, 2017

Respectfully submitted,

*/s/ Sailesh K. Patel with permission by*
*Michael E. Jones*
Michael E. Jones (State Bar No. 10929400)
Patrick C. Clutter, IV( State Bar No.
24036374)
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500
Tyler, TX 75702
Tel: 903.597.8311
Fax: 903.593.0846
mikejones@potterminton.com
patrickclutter@potterminton.com

Sailesh K. Patel
Cindy S. Ahn
Neil Lloyd
Emily M. Pena
Jaimin H. Shah
SCHIFF HARDIN LLP
233 S. Wacker Drive
Chicago, IL 60606
Tel.: 312-258-5500
Fax: 312-258-5600
spatel@schiffhardin.com
cahn@schiffhardin.com
nlloyd@schiffhardin.com
epena@schiffhardin.com
jshah@schiffhardin.com

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-First Floor
San Francisco, CA 94105
Tel.: 415-901-8700
Fax: 415-901-8701
gyu@schiffhardin.com

2

*Attorneys for Defendants*
*Aurobindo Pharma Ltd.,*
*Aurobindo Pharma USA Inc., and*
*AuroMedics Pharma LLC*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 10, 2017.

*/s/ Michael E. Jones*

3

Case 2:17-1645 Document: 810 Page: 651 Filed: 03/29/2017

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

MYLAN INSTITUTIONAL LLC and
APICORE US LLC

      Plaintiffs,

v.

AUROBINDO PHARMA LTD.,
AUROBINDO PHARMA USA INC., and
AUROMEDICS PHARMA LLC

      Defendants.

Civil Action No.: 2:16-cv-491-RWS-RSP

## <u>AMENDED NOTICE OF APPEAL</u>

Notice is hereby given that Defendants Aurobindo Pharma Ltd., Aurobindo Pharma USA Inc., and AuroMedics Pharma LLC (collectively, "Aurobindo") hereby amend their notice of appeal dated February 9, 2017, and appeal to the United States Court of Appeals for the Federal Circuit from the following: (1) the February 24, 2017 Order enjoining Aurobindo from manufacturing, selling or offering for sale, using, or importing the accused isosulfan blue product within the United States until further order of the Court (Dkt. No. 139); (2) the February 7, 2017 Order adopting the November 21, 2016 Report and Recommendation of the United States Magistrate Judge (Dkt. No. 122); and (3) the November 21, 2016 Report and Recommendation of the United States Magistrate Judge to grant Plaintiffs' motion for preliminary injunction (Dkt. No. 101).

Aurobindo has already filed a Notice of Appeal in this matter related to this Court's February 7, 2017 Order adopting the November 21, 2016 Report and Recommendation of the United States Magistrate Judge and the November 21, 2016 Report and Recommendation of the

United States Magistrate Judge to grant Plaintiffs' motion for preliminary injunction.  (Dkt. No. 123.)  That appeal has been docketed.  *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, No. 17-1645 (Fed. Cir.).  Aurobindo has already paid the appeal docketing fee for this matter, by ECF online payment on February 10, 2017 in the amount of $505.00.  (Dkt. No. 126.)

Dated:  February 27, 2017

Respectfully submitted,

*/s/ Sailesh K. Patel, with permission by Michael E. Jones*
Michael E. Jones (State Bar No. 10929400)
Patrick C. Clutter, IV
(State Bar No. 24036374)
POTTER MINTON
A Professional Corporation
110 N. College, Suite 500
Tyler, TX 75702
Tel: 903.597.8311
Fax: 903.593.0846
mikejones@potterminton.com
patrickclutter@potterminton.com

Sailesh K. Patel
Cindy S. Ahn
Neil Lloyd
Emily M. Pena
Jaimin H. Shah
SCHIFF HARDIN LLP
233 S. Wacker Drive
Chicago, IL 60606
Tel.: 312-258-5500
Fax: 312-258-5600
spatel@schiffhardin.com
cahn@schiffhardin.com
nlloyd@schiffhardin.com
epena@schiffhardin.com
jshah@schiffhardin.com

2

George C. Yu
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-First Floor
San Francisco, CA 94105
Tel.: 415-901-8700
Fax: 415-901-8701
gyu@schiffhardin.com


*Attorneys for Defendants*
*Aurobindo Pharma Ltd.,*
*Aurobindo Pharma USA Inc., and*
*AuroMedics Pharma LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on February 27, 2017.

*/s/ Michael E. Jones*

3

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**M-I LLC,**
*Plaintiff-Appellee*

**v.**

**FPUSA, LLC,**
*Defendant-Appellant*

---

2015-1870

---

Appeal from the United States District Court for the Western District of Texas in No. 5:15-CV-00406, Senior Judge David A. Ezra.

---

Decided: September 24, 2015

---

STEPHEN BURTON CRAIN, Bracewell & Giuliani, LLP, Houston, TX, argued for defendant-appellant. Also represented by CHRISTOPHER DODSON, JEFFREY L. OLDHAM, ANDREW WILLIAM ZEVE; DOUGLAS FRED STEWART, Seattle, WA.

JOHN R. KEVILLE, Winston & Strawn LLP, Houston, TX, argued for plaintiff-appellee. Also represented by MICHELLE REPLOGLE; TED DALTON LEE, Gunn, Lee &

Cave, P.C., San Antonio, TX; RICHARD L. STANLEY, Law
Office of Richard L. Stanley, Houston, TX.

_____

Before PROST, *Chief Judge,* BRYSON and HUGHES, *Circuit
Judges.*

HUGHES, *Circuit Judge.*

FPUSA, LLC, appeals from an order of the district
court granting M-I LLC's motion for a preliminary injunc-
tion. The district court enjoined FPUSA from promoting,
selling, or renting a system for recovering drilling fluid
that infringes claims 1 and/or 16 of M-I's patent. Because
the district court did not abuse its discretion in granting
an injunction with respect to claim 16, we affirm the
preliminary injunction as to claim 16, vacate as to claim
1, and remand with instructions to reform the injunction
consistent with this opinion.

## I

M-I filed suit in the United States District Court for
the Western District of Texas alleging that FPUSA's Vac-
Screen system infringes U.S. Patent No. 9,004,288. The
'288 patent is directed to recovering drilling fluid by using
an improved shaker. Drilling fluid facilitates the oil-
drilling process, and becomes contaminated with solid
particulates during use. The disclosed invention uses
pressure differential devices on screens to improve the
rate and efficiency of separating drilling fluid from con-
taminants, and may include a degassing chamber to
degas the recovered fluid. The district court granted M-I's
motion for a preliminary injunction, denied FPUSA's
subsequent motion for reconsideration, and in a third
order, clarified the enjoined activities.

The district court found that M-I met its burden to
show that it will likely prove that FPUSA infringes at

least claim 16 of the '288 patent, and that this claim is valid and enforceable.[1] Claim 16 recites, in relevant part:

> A system comprising:
>
> a *first screen* having an upper side and a lower side for separating drill cuttings and drilling fluid within a shaker;
>
> a pressure differential generator configured to pull air or vapor through the *first screen* to enhance the flow of drilling fluid through the *first screen* with respect to a *second screen* within the shaker in which the pressure differential generator does not create a pressure differential between an area above and an area below the *second screen*; and . . .
>
> a *degassing chamber* in fluid communication with the pressure differential generator and the sump and located external to the shaker for collecting all of the air or vapor and the drilling fluid in the sump and removing air or vapor from the drilling fluid.

'288 patent, col. 12 ll. 47–65 (emphasis added).

The district court held that the modifiers "first" and "second" merely "distinguish between repeated instances of an element or limitation, and [did] not construe them to denote spatial location relative to the shaker's inlet." J.A. 14. The district court determined that because the Vac-Screen applies a pressure differential to only one of multiple screens in a shaker, it satisfies the "first screen" limitation.

---

[1]    We decline to reach the merits of the district court's findings with respect to claim 1 because the district court did not complete its infringement analysis on that claim. *See* FED. R. CIV. P. 65(d)(1).

In assessing whether the Vac-Screen products contain the "degassing chamber" limitation of claim 16, the district court relied on FPUSA's patent, U.S. Patent No. 9,015,959, which FPUSA concedes covers the Vac-Screen system; and a "Technology Evaluation Report" that was prepared by one of FPUSA's experts. J.A. 21. The '959 patent describes accumulator tanks that provide "fluid/gas separation." '959 patent, col. 8 ll. 61–64. The report states that "[a]ttached to the manifold is a vacuum line with a fluid or air separator." J.A. 695. Based on these disclosures, the district court concluded that the Vac-Screen system includes a system by which drilling fluid is separated from residual air or gas, as required by the "degassing chamber" limitation of claim 16.

In addition to its non-infringement contentions, FPUSA argued that the '288 patent is invalid because it is only entitled to a 2013 priority date, and the Vac-Screen system had been on sale since 2010. The district court determined that the claims are properly entitled to a 2006 priority date, and that FPUSA failed to raise a substantial question as to the validity of the patent. In light of the evidence supporting a finding of infringement and validity, the district court concluded that M-I's likelihood of success on the merits weighs in favor of granting a preliminary injunction.

The district court also determined that M-I would likely suffer irreparable harm in the absence of a preliminary injunction. The district court noted M-I's potential loss of market share, and that the parties did not dispute that they are each other's sole competitors. J.A. 26. The district court also determined that FPUSA is a small subsidiary of a foreign corporation, and that district courts often find that money damages are insufficient in cases involving foreign infringers. J.A. 28. With respect to the remaining factors, the court weighed M-I's patent rights against FPUSA's business concerns, and ultimately

concluded that the balance of equities is neutral, and that the public interest weighs in favor of an injunction.

FPUSA appeals the district court's orders on the preliminary injunction. We have jurisdiction under 28 U.S.C. § 1292(a)(1) and (c)(1).

## II

We apply the standard of the regional circuit in reviewing preliminary injunctions. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1367 (Fed. Cir. 2008). The Fifth Circuit reviews a district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion. *Janvey v. Alguire*, 647 F.3d 585, 591-92 (5th Cir. 2011). As to each element of the district court's preliminary injunction analysis, findings of fact are reviewed for clear error, and conclusions of law are subject to broad review and will be reversed if incorrect. *Id.* at 592.

The district court did not abuse its discretion in granting a preliminary injunction as to claim 16. The district court did not err in finding that M-I is likely to prove infringement of a valid claim. The court's construction of the "first" and "second" modifiers was proper in light of the claim language and the specification. And based on FPUSA's representation that the Vac-Screen system only applies a vacuum to one screen, the one closest to the shaker outlet, the district court's finding that the Vac-Screen system meets the "first screen" limitation was not clearly erroneous. Nor was the district court's determination that the Vac-Screen likely meets the "degassing chamber" limitation, based on the disclosures in the '959 patent and Technology Evaluation Report.

The district court also did not err in finding that FPUSA had not raised a substantial question of invalidity. There is a statutory presumption that issued patents are valid. 35 U.S.C. § 282. The district court did not err in determining that the claims of the '288 patent are

supported by the written description in the parent appli-
cation, which was filed in 2006.

Further, the district court did not err in determining
that irreparable harm would likely result based on the
evidence in the record. FPUSA admitted in its briefing
before the district court that enjoining FPUSA would
"leav[e] M-I as the sole source of a substitute technology,"
J.A. 480, which means that absent an injunction, M-I
would likely suffer an irreparable loss of market share.
*See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142,
1151 (Fed. Cir. 2011) ("[The existence of a two-player
market] creates an inference that an infringing sale
amounts to a lost sale for the patentee."). M-I only start-
ed marketing its product in 2015, while FPUSA has been
on the market since 2010. And while FPUSA faulted
M-I's reliance on a third-party report as evidence of
FPUSA's inability to satisfy a judgment, FPUSA did not
offer any evidence of its profitability. Finally, the district
court did not err in finding that the balance of equities is
neutral, and that the public interest weighs in favor of an
injunction.

## III

FPUSA argues that the preliminary injunction order
is procedurally defective and should be vacated independ-
ent of the merits. Although we affirm the injunction with
regard to claim 16, we agree that the form of the injunc-
tion must be corrected on remand. First, the preliminary
injunction is overbroad and should not include "other
products." As we have previously held, broad injunctions
that merely instruct the enjoined party not to infringe are
improper because such an order frustrates the remedy of
contempt, which is available only with respect to devices
"which are no more than colorably different [from the
enjoined product] and which clearly are infringements of
the patent." *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d

1312, 1316 (Fed. Cir. 2004) (internal quotation marks omitted).

We also note that on remand, the district court should be mindful that the Fifth Circuit "strictly construe[s]" Federal Rule of Civil Procedure 65(d)'s requirement that a preliminary injunction order must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990). The district court did not fully comply with Rule 65(d), because the description of the enjoined acts was set forth in a separate document from the preliminary injunction order.

## IV

We have considered FPUSA's remaining arguments and find them unpersuasive. Because the district court did not abuse its discretion in granting the preliminary injunction as to claim 16, we affirm on the merits. We vacate the preliminary injunction as to claim 1 because the district court did not complete its infringement analysis. Further, we remand to the district court with instructions to reform the preliminary injunction consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART**

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

————————

**ASTRAZENECA LP, ASTRAZENECA AB,**
*Plaintiffs-Appellants*

**v.**

**BREATH LIMITED, APOTEX CORP., APOTEX, INC., SANDOZ INC., WATSON LABORATORIES, INC.,**
*Defendants-Appellees*

————————

2015-1335

————————

Appeal from the United States District Court for the District of New Jersey in No. 1:08-cv-01512-RMB-AMD, Judge Renee Marie Bumb.

————————

Decided: May 7, 2015

————————

CHRISTOPHER NEIL SIPES, Covington & Burling LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by KEITH A. TEEL, RODERICK R. MCKELVIE, STEPHEN PIERCE ANTHONY, JAY I. ALEXANDER, AHMED MOUSA; DANIELLE LUCE GOLDSTEIN, San Francisco, CA; JOHN EDMUND FLAHERTY, RAVIN R. PATEL, McCarter & English, LLP, Newark, NJ.

WILLIAM A. RAKOCZY, Rakoczy Molino Mazzochi Siwik LLP, Chicago, IL, argued for defendants-appellees Breath Limited, Watson Laboratories, Inc. Also represented by AMY D. BRODY, NATASHA L. WHITE, HEINZ JOHANN SALMEN, CONLY S. WYTHERS.

RICHARD JOSEPH BASILE, St. Onge Steward Johnston & Reens, LLC, Stamford, CT, argued for defendants-appellees Apotex Corp., Apotex, Inc. Also represented by DAVID W. ALDRICH, ALYSON J. DILENA.

TARAS A. GRACEY, Steptoe & Johnson, LLP, Chicago, IL, argued for defendant-appellee Sandoz, Inc. Also represented by THOMAS ARTHUR RAMMER, II; GRETCHEN P. MILLER, Washington, DC.

————————

Before PROST, *Chief Judge,* BRYSON and LINN, *Circuit Judges.*

PROST, *Chief Judge.*

This Hatch-Waxman case returns to us following our previous remand to the district court. The suit originates from a consolidated action for patent infringement brought by AstraZeneca LP and AstraZeneca AB (collectively, "AstraZeneca") against Breath Limited, Apotex Corp., Apotex, Inc., Sandoz Inc., and Watson Laboratories, Inc. (collectively, "Defendants"). In our prior decision and of relevance here, we reversed and remanded the district court's noninfringement findings on AstraZeneca's U.S. Patent No. 7,524,834 ("'834 patent") based on the district court's erroneous claim construction. *AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971 (2013).

On remand and following a thirteen-day bench trial, the district court found the asserted claims of the '834 patent infringed but invalid under 35 U.S.C. § 103. *AstraZeneca LP v. Breath Ltd.*, No. 08-1512, 2015 WL

777460 (D.N.J. Feb. 13, 2015). AstraZeneca now appeals the district court's obviousness determination to us. We conclude that, in its very thorough and well-reasoned opinion, the district court correctly determined that the asserted claims of the '834 patent are invalid for obviousness, and therefore we affirm. We also dissolve the injunction pending appeal that was entered on March 12, 2015. *See* ECF No. 46.

I

Because many of the relevant facts are detailed in our previous decision, we repeat them only briefly here.

The '834 patent is directed to sterile, pharmaceutically effective budesonide compositions. Representative claim 1 (the powder) and claim 50 (the suspension) read as follows:

> 1. A pharmaceutically acceptable, micronized powder composition at least 98.5% by weight of which is pure budesonide or an ester, acetal or salt thereof, wherein the composition meets the criteria of sterility according to the US Pharmacopoeia 23/NF18, 1995, pages 1686-1690 and 1963-1975.

> 50. A pharmaceutically acceptable suspension consisting of a micronized powder composition at least 98.5% by weight of which is pure budesonide or an ester, acetal or salt thereof, suspended in an aqueous solution, wherein the suspension meets the criteria of sterility according to the US Pharmacopoeia 23/NF18, 1995, pages 1686-1690 and 1963-1975.

'834 patent col. 11 ll. 47–52, col. 13 ll. 55–60. AstraZeneca markets a product called Pulmicort Respules®, a sterile, nebulized budesonide suspension used for treating asthma in children. The Defendants have all filed ANDAs seeking to market a generic version of Pulmicort Respules®.

In the decision now on appeal, the district court found that the asserted claims of the '834 patent are invalid for obviousness. In its 166-page opinion, the district court concluded that a person of ordinary skill in the art, who the parties agree was motivated to prepare a sterile budesonide composition, would have had a reasonable expectation of successfully doing so with four of five well-known sterilization techniques. In addition to making extensive fact-findings on the prior art, the district court thoroughly analyzed and rejected AstraZeneca's arguments for nonobviousness based on objective indicia.

On appeal, AstraZeneca argues that the district court erred in its evaluation of the prior art and in its analysis of the objective indicia of nonobviousness. We review the district court's ultimate legal conclusion of whether a claimed invention would have been obvious de novo, and the underlying findings of fact for clear error. *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1354 (Fed. Cir. 2013). For the reasons explained below, we agree with the district court's determination that the asserted claims of the '834 patent are invalid for obviousness.

## II

The prior art presented at trial included non-sterile budesonide compositions, sterile compositions of corticosteroids other than budesonide, and five well-known sterilization techniques: sterile filtration followed by aseptic crystallization; moist heat; ethylene oxide; irradiation; and dry heat. Both parties agreed that a skilled artisan would have been motivated to prepare sterile budesonide compositions. Thus, the question before the district court was whether the claimed sterile budesonide compositions were obvious in light of the sterilization methods known in the prior art.

The district court concluded that a skilled artisan would have had a reasonable expectation of success in

preparing the claimed compositions with four of the five prior art sterilization methods (all but dry heat). Reviewing the voluminous documentary and testimonial evidence of record, the district court determined that, although each sterilization method had known disadvantages, a skilled artisan "had within her toolbox several methods to address them." *AstraZeneca*, 2015 WL 777460, at *10. The district court's findings on the prior art and the reasonable expectation of success span over ninety pages and include detailed examinations of multiple prior art references and the testimony of numerous witnesses.

On appeal, AstraZeneca challenges the district court's decision on grounds that the prior art did not disclose "actual success" in creating sterilized budesonide compositions using the known sterilization methods. Appellant's Br. 39. According to AstraZeneca, the district court erred because none of the references on which it relied "disclose processes yielding a sterile, micronized budesonide product of sufficient purity and pharmaceutical acceptability." *Id.* at 38. But AstraZeneca mistakes the test for obviousness. Obviousness requires a showing that "a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art." *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009). To meet this standard, "only a reasonable expectation of success, not a guarantee, is needed." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007); *see also PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014) ("The reasonable expectation of success requirement for obviousness does not necessitate an absolute certainty for success."). In fact, the Defendants used two of the known sterilization methods in creating sterilized budesonide compositions, so this is not a case in which, as AstraZeneca contends, the known sterilization methods were not "operative" to make the claimed product.

Here, AstraZeneca has failed to show any clear error underlying the district court's analysis. While AstraZeneca cites difficulties in the prior art methods relating to degradation, toxic residues, and agglomeration, the district court carefully considered these challenges and found the evidence insufficient to render the claims nonobvious. We see no clear error in the district court's factual findings, nor any error in its ultimate legal conclusion.

III

AstraZeneca also challenges the district court's analysis of the objective indicia of nonobviousness. In particular, AstraZeneca argues that the following factors support a finding of nonobviousness: commercial success, long-felt but unmet need, industry skepticism, and the failure of AstraZeneca and others. The district court rejected these arguments, and we agree.

With respect to commercial success and long-felt but unmet need, AstraZeneca argued that sterility was the key factor underlying the need for, and success of, its Pulmicort Respules® product. In particular, AstraZeneca's position was that: nebulized budesonide products for treating childhood asthma were desperately needed in the United States; although non-sterile versions of such products existed abroad, they could not be marketed in the United States because the FDA required them to be sterile; AstraZeneca was the first to meet the FDA's sterility requirement, thus satisfying the long-felt need and meeting the nexus requirement of commercial success. Now on appeal, AstraZeneca argues that the district court erred by "refus[ing] to consider" its evidence on these factors "on the basis that [the] evidence involved an FDA requirement." Appellant's Br. 24.

AstraZeneca is incorrect. The district court did not ignore AstraZeneca's evidence. To the contrary, the district court thoroughly reviewed the evidence and

concluded, simply, that sterility was not the underlying
need for, or the crux for success of, AstraZeneca's Pul-
micort Respules® product. Citing the testimony of multi-
ple physicians, the district court found that "the need was
really the nebulized budesonide" and that, "had the FDA
determined that Pulmicort Respules® could be sold in the
United States without being sterile, the unmet need
would have been met." *AstraZeneca*, 2015 WL 777460, at
\*50–51. Similarly, the district court found that the evi-
dence did not demonstrate a connection between the sales
of Pulmicort Respules® and its characteristic of being
sterile. While recognizing that Pulmicort Respules® has
been very profitable for AstraZeneca in the United States,
the district court found that the success was due to factors
other than that claimed in the '834 patent—namely,
efficacy, safety of the budesonide molecule, and nebulized
delivery. AstraZeneca has not shown clear error in these
fact-findings, and we reject its invitation for us to reweigh
the evidence. We also reject AstraZeneca's attempt to
equate regulatory compliance with evidence of nonobvi-
ousness. As the district court correctly explained:

> Under AstraZeneca's theory, there would likely al-
> ways be commercial success when a pharmaceuti-
> cal product experiences substantial sales because
> the product must comply with FDA requirements
> in order to be sold in the United States. Sterility
> is an FDA requirement; it is not driving demand
> for Pulmicort Respules®. AstraZeneca conflates
> the two. Whether or not there is a nexus between
> the novel features of the patented product and the
> commercial success must be evaluated in terms of
> what is driving sales, not what is allowing the
> product to reach the shelf in the first place.

*Id.* at \*56.

AstraZeneca's arguments relating to industry skepti-
cism and failures are likewise unavailing. With respect to

industry skepticism, AstraZeneca argues that the district court "imposed an inflated standard . . . requiring proof that the invention was uniformly thought impossible by all in the scientific community." Appellant's Br. 31. With respect to failures, AstraZeneca argues that the district court ignored evidence of AstraZeneca's own failures, and also "imposed an unreasonable, unsupported standard for the amount of evidence necessary to show defendants' and others' failures." *Id.* at 36.

We agree with the district court's analysis of the evidence relating to industry skepticism and failures. The district court reviewed in detail AstraZeneca's proffered evidence and concluded that it was insufficient to show nonobviousness. In particular, the district court discounted AstraZeneca's evidence of others' failures as insufficient as to the nature and extent of those purported failures, and further discounted AstraZeneca's evidence of its own failures as relating only to potential disadvantages and commercial feasibility. The court also rejected AstraZeneca's argument that the FDA believed sterilization to be impossible, finding that the FDA had merely placed the onus on AstraZeneca to either achieve sterility or show that it could not be done. We therefore reject AstraZeneca's arguments that the district court erred in analyzing the evidence relating to the objective indicia of nonobviousness.

## IV

For the foregoing reasons, we affirm the district court's decision that the asserted claims of the '834 patent are invalid for obviousness. We therefore need not reach the Defendants' alternative arguments for invalidity and noninfringement. In view of our opinion, we also dissolve forthwith the injunction pending appeal that was entered on March 12, 2015. *See* ECF No. 46.

**AFFIRMED**

# REDACTED - CONFIDENTIAL

## APPX7628-APPX7634

Exhibit A

**UNITED STATES COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |  |
|---|---|---|
| MYLAN INSTITUTIONAL LLC and APICORE US LLC | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 2:16-cv-491-RWS-RSP |
| v. | ) ) ) | **Jury Trial Demanded** |
| AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA INC., and AUROMEDICS PHARMA LLC | ) ) ) | |
| Defendants. | ) ) ) | |

_____

## DECLARATION OF RONALD QUADREL

I, Ronald Quadrel, on oath state the following.

1.    I have personal knowledge of the facts set forth herein.

2.    I am the CEO of defendant Auromedics Pharma LLC ("Auromedics").

3.    Auromedics is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810.

4.    Defendant Aurobindo Pharma USA Inc. is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810.

5.    Defendant Aurobindo Pharma Ltd. is an Indian corporation having a place of business at Plot No. 2, Maitri Vihar, Ameerpet, Hyderabad – 500 038, Andhra Pradesh, India.

6.    No occurrence witness who would testify on behalf of any of the Aurobindo entities is located in the Eastern District of Texas.

7.    Defendant Auromedics distributes and sells products throughout the United

States.  To the extent that any of these product are distributed and sold in the Eastern District of Texas, they are and were sold and used nationwide, and are not used in any manner differently than they are used elsewhere.

8.      All information in Auromedics's possession, custody, and control concerning the distribution of its products, including without limitation, information about decisions made in respect to distributing those products, is located in New Jersey.

9.      I am not aware of any relevant documents or anticipated witnesses of the Aurobindo entities, of Apicore, or of Mylan located in the Eastern District of Texas.

10.      Occurrence witnesses who are likely to offer testimony regarding the distribution, sale and approval of the Isosulfan blue product on behalf of the Aurobindo entities are located in New Jersey, New York, and in India.  At this time, I anticipate that the witnesses located in the United States would include myself; Vincent Andolina, Vice President of Regulatory Affairs for Auromedics; Mark Fedele, Senior Vice President of Commercial Operations for Auromedics; Julie Faria, Auromedics Director of Sales Operations; and Heather Duval, Director of National Accounts for Auromedics.  I, Messrs. Andolina and Fedele, and Ms. Faria are located in New Jersey; Ms. Duval is located in New York.

11.      Beyond information concerning distribution of the Aurobindo entities' products, documents in the possession, custody, and control of the Aurobindo entities that they will likely use in litigation between the parties are located in New Jersey and India.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on June 13, 2016 in Dayton, New Jersey.

Ronald Quadrel

28 U.S.C. § 1746.

2

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| MYLAN INSTITUTIONAL LLC and | ) | |
| APICORE US LLC | ) | |
| | ) | Civil Action No.: 2:16-cv-491-RWS-RSP |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUROBINDO PHARMA LTD., | ) | |
| AUROBINDO PHARMA USA INC., and | ) | |
| AUROMEDICS PHARMA LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ANSWER TO FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Defendants Aurobindo Pharma Ltd. ("Aurobindo India"), Aurobindo Pharma USA Inc.

("Aurobindo USA"), and AuroMedics Pharma LLC ("AuroMedics") (collectively, "Aurobindo")

answer the First Amended Complaint for Patent Infringement by Plaintiffs Mylan Institutional

LLC and Apicore US LLC (collectively, "Plaintiffs") as follows:

## THE PARTIES

1.      Apicore is a limited liability company organized and existing under the laws of
the State of Delaware, and having a place of business at 49 Napoleon Court, Somerset, NJ
08873.

**ANSWER:**      Admitted.

2.      Apicore is a pharmaceutical company that provides innovative solutions to the
pharmaceutical industry in the field of active pharmaceutical ingredient manufacturing.

**ANSWER:**      Aurobindo lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations of Paragraph 2 and therefore denies them.

3.      Apicore developed a process for the manufacture of a high purity isosulfan blue product that is vastly superior to other methods of isosulfan blue synthesis and has entered into an exclusive arrangement with Mylan to commercialize this innovation.

**ANSWER:**      Aurobindo lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 3 and therefore denies them.

4.      Mylan is a limited liability company organized and existing under the laws of the State of Delaware, and having a place of business at 1718 Northrock Court, Rockford, IL 61103.

**ANSWER:**      Aurobindo lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 4 and therefore denies them.

5.      Mylan is a pharmaceutical company that develops and commercializes injectable pharmaceutical products.

**ANSWER:**      Aurobindo lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 5 and therefore denies them.

6.      On information and belief, Aurobindo India is an Indian corporation having a place of business at Plot No. 2, Maitri Vihar, Ameerpet, Hyderabad – 500 038, Andhra Pradesh, India.

**ANSWER:**      Admitted.

7.      On information and belief, Aurobindo India develops and manufactures certain pharmaceutical drug products for sale in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.  In 2013, Aurobindo India commenced marketing injectable products in the United States through its subsidiary AuroMedics.  In the past, Aurobindo India has designated Aurobindo USA as its U.S. agent before the FDA.  In the past, Aurobindo India has designated AuroMedics as its U.S. agent before the FDA.  On information and belief, AuroMedics and/or Aurobindo USA is the U.S. agent before the FDA for ANDA No. 206831.

**ANSWER:**      Aurobindo admits that Aurobindo India develops and manufactures pharmaceutical drug products for sale. Aurobindo admits that Aurobindo India markets certain injectable products in the United States through its subsidiary AuroMedics. Aurobindo admits that AuroMedics is the U.S. agent before the FDA for ANDA No. 206831. Aurobindo lacks

2

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 7 and therefore denies them.

8. On information and belief, Aurobindo USA is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810. Aurobindo USA is a wholly-owned subsidiary and agent of Aurobindo India.

**ANSWER:** Admitted.

9. On information and belief, Aurobindo USA markets, offers to sell, manufactures, distributes, and sells certain pharmaceutical drug products in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.

**ANSWER:** Admitted.

10. On information and belief, AuroMedics is a Delaware corporation having a place of business at 6 Wheeling Road, Dayton, New Jersey 08810. AuroMedics is a wholly-owned subsidiary of Aurobindo India.

**ANSWER:** Admitted.

11. On information and belief, AuroMedics markets, manufactures, offers to sell, distributes, and sells certain pharmaceutical drug products in the United States, including in Texas and in this district, and/or imports certain pharmaceutical drug products into the United States.

**ANSWER:** Admitted.

12. On information and belief, Aurobindo India, Aurobindo USA, and AuroMedics operate and act in concert as an integrated, unitary business for purposes of manufacturing, marketing, offering to sell, selling, and distributing generic pharmaceutical products throughout the United States, including in Texas and in this district. For example, in several of Aurobindo India's Earnings Conference Calls, including the call on February 10, 2016, Mr. Robert Cunard – CEO, Aurobindo USA and Mr. Ronald Quadrel – CEO, AuroMedics, along with individuals at Aurobindo India, were stated as representing the senior management team.

**ANSWER:** Aurobindo admits that in Aurobindo India's Earnings Conference Call on February 10, 2016, Mr. Robert Cunard – CEO, Aurobindo USA and Mr. Ronald Quadrel – CEO, AuroMedics, along with individuals at Aurobindo India, were stated as representing the senior management team. Aurobindo denies the remaining allegations of Paragraph 12.

**ANSWER:**   Aurobindo admits that it was aware of the '992 patent, the '616 patent, and the '019 App'n prior to the commencement of this lawsuit.  Aurobindo admits that it was aware of the '992 patent and '616 patent prior to the launch of its isosulfan blue injection product. Aurobindo currently lacks knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 31 and therefore denies them.

32.   On information and belief, Aurobindo India submitted to the FDA ANDA No. 206831 seeking approval to engage in the commercial manufacture, use, marketing, offer for sale and sale of isosulfan blue.  On information and belief, AuroMedics and/or Aurobindo USA served as Aurobindo India's U.S. Agent before the FDA with respect to ANDA No. 206831.

**ANSWER:**   Aurobindo India admits that Aurobindo India submitted to the FDA ANDA No. 206831 and that AuroMedics served as Aurobindo Pharma's U.S. Agent before the FDA with respect to ANDA No. 206831.

33.   On information and belief, Aurobindo India received approval of its ANDA No. 206831 on February 2, 2016.  Aurobindo India thereafter announced publicly its intent to begin offering for sale and selling isosulfan blue in the United States in March 2016.  The FDA-approved label for Defendants' isosulfan blue product states that Aurobindo India is the manufacturer of the isosulfan blue product and includes directions to healthcare professionals for the proper use of the product.  A true and correct copy of Defendants' isosulfan blue label is attached as Exhibit E.

**ANSWER:**   Aurobindo admits that a true and correct copy of the label for Aurobindo Pharma's isosulfan blue injection product appears to be attached as Exhibit E.  Aurobindo India also admits that ANDA No. 206831 was approved on February 2, 2016 and that the FDA-approved label for Aurobindo India's isosulfan blue injection product states that Aurobindo India is the manufacturer of the isosulfan blue injection product.  Aurobindo denies the remaining allegations of Paragraph 33.

34.   On information and belief, the only use for Defendants' isosulfan blue is as an API for use in their isosulfan blue injection 1% and there are no known substantial non-infringing uses for isosulfan blue.

**ANSWER:**   Denied.

C. For a declaration that the claims of the '992 patent, the '616 patent, and the '050 patent are invalid;

D. For a declaration that this case is exceptional in favor of Aurobindo and awarding attorneys' fees pursuant to 35 U.S.C. § 285, other statutes or rules, or the general power of the Court; and

E. For such other relief as the Court determines to be just and proper.

Dated: July 12, 2016                                          Respectfully submitted by,


*/s/ Michael E. Jones*
Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Patrick C. Clutter, IV
State Bar No. 24036374
patrickclutter@potterminton.com
POTTER MINTON
110 N. College, Suite 500
Tyler, TX 75702
Tel: 903.597.8311
Fax: 903.593.0846

*Of Counsel:*

SCHIFF HARDIN
Sailesh K. Patel
Neil Lloyd
Cindy S. Ahn
233 S. Wacker Drive
Chicago, IL 60606
312-258-5500
spatel@schiffhardin.com
nlloyd@schiffhardin.com
cahn@schiffhardin.com

George Chih-Lun Yu
One Market, Spear Street Tower, Suite 3200
San Francisco, CA 94105
(415) 901-8700
gyu@schiffhardin.com

*Attorneys for Defendants*
*Aurobindo Pharma Ltd.,*
*Aurobindo Pharma USA Inc., and*
*Auromedics Pharma LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who have consented to electronic service, Local Rule CV-5(a)(3)(A), on this 12th day of July, 2016.

*/s/ Michael E. Jones*

**Appx9025**